**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC, *et al.*,[1] | ) ) ) | Case No. 26-90737 (CML) |
| | ) | |
| Debtors. | ) ) | (Joint Administration Requested) (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u>
MOTION FOR ENTRY OF AN
ORDER (I) AUTHORIZING THE
DEBTORS TO (A) MAINTAIN INSURANCE
COVERAGE, SURETY BOND PROGRAM, AND
LETTERS OF CREDIT ENTERED INTO PREPETITION
AND SATISFY PREPETITION OBLIGATIONS RELATED
THERETO, (B) CONTINUE TO PAY CERTAIN CLAIMS PROCESSING
FEES, AND (C) RENEW, AMEND, SUPPLEMENT, EXTEND, PURCHASE,
CANCEL, AND ENTER INTO NEW INSURANCE POLICIES, LETTERS OF
CREDIT, AND SURETY BONDS, AND (II) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 2:00 p.m. (prevailing Central Time) on July 27, 2026.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on July 27, 2026, at 2:00 p.m. (prevailing Central Time) in Courtroom 402, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's homepage. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/RNDC. The location of Debtor Republic National Distributing Company, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 4300 Wildwood Parkway, Suite 200, Atlanta, GA 30339.

**homepage. Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion"): [2]

## Relief Requested

1.     The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"):   (a) authorizing the Debtors to (i) maintain insurance coverage entered into prepetition, maintain the Surety Bond Program on an uninterrupted basis, and maintain the Letters of Credit on an uninterrupted basis and, in each case satisfy prepetition obligations related thereto in the ordinary course of business, including through the NDC Intercompany Transactions, as and if applicable, (ii) satisfy payment of prepetition obligations on account of, and continue to pay, Claims Processing Fees in the ordinary course of business, and (iii) renew, amend, supplement, modify, extend, purchase, cancel, and enter into new insurance policies, letters of credit, and surety bonds in the ordinary course of business on a postpetition basis; and (b) granting related relief.

## Jurisdiction and Venue

2.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012.   This is a core proceeding pursuant to 28 U.S.C. § 157(b).   The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion

---

[2]     A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of John R. Castellano, Chief Restructuring Officer of Republic National Distributing Company, LLC and its Debtor Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.   Capitalized terms used but not immediately defined in this Motion shall have the meanings ascribed to such terms in the First Day Declaration or later in this Motion, as applicable.

to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 363(b), 363(c), 364(c), 503, 1107(a), 1108, and 1112(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 1075-1, 4002-1, and 9013-1(i) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

**Background**

5.      Republic National Distributing Company, LLC ("RNDC," and together with its Debtor and non-Debtor affiliates, the "Company") was, at its height, the nation's second largest alcoholic beverage distributor, operating across 40 states and specializing in wine and spirits distribution.  Built on the strong foundation of three family-owned businesses, the Company historically enjoyed deep-seated relationships with over 2,000 suppliers and 170,000 customers across its expansive nationwide distribution network.  With headquarters in Atlanta, Georgia, the Debtors currently operate across 21 states and employ a workforce of approximately 1,460 employees.

6.      On July 26, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have also filed a motion contemporaneously herewith requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.  The Debtors are operating their businesses and managing their properties as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

**The Insurance Policies and Related Payment Obligations**

7. In the ordinary course of business, the Debtors maintain approximately 26 insurance policies (collectively, the "RNDC Insurance Policies").  Additionally, National Distributing Company Inc. ("NDC"), the non-Debtor parent company of the Debtors, maintains approximately 20 insurance policies which provide insurance coverage for the Debtors (collectively, the "NDC Insurance Policies," and together with the RNDC Insurance Policies, the "Insurance Policies") as "Insured" thereunder.  To the extent that payments related to the Insurance Policies are made by NDC on the Debtors' behalf, the Debtors have historically reimbursed NDC for such payments through intercompany transactions in the ordinary course of business (collectively, the "NDC Intercompany Transactions"), as more fully described in the Cash Management Motion.[3]  Moreover, to the extent that the Debtors make payments related to the Insurance Policies on behalf of NDC, the Debtors have historically been reimbursed for such amounts pursuant to the NDC Intercompany Transactions.  The NDC Intercompany Transactions have historically been conducted on an ad hoc basis.[4]

---

[3] For the avoidance of doubt, the relief sought with respect to NDC Intercompany Transactions is set forth in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, and (C) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Certain Postpetition Intercompany Transactions, and (III) Granting Related Relief*, filed contemporaneously herewith. Such relief is incorporated herein by reference with respect to the NDC Intercompany Transactions relating to the Insurance Policies.

[4] While amounts owing on account of the NDC Intercompany Transactions have continued to accrue, no payments have been made on account of the NDC Intercompany Transactions since April 2026.

8.     The Insurance Policies, each of which are essential to the ongoing operation of the Debtors' businesses, are administered by various third-party insurance carriers (each, an "Insurance Carrier," and collectively, the "Insurance Carriers").  The Insurance Policies provide coverage for, among other things, commercial property, cyber liability, crime, commercial auto, flood, general liability, stock throughput, kidnap and ransom, terrorism, directors' and officers' liability, and excess liability.[5]  These Insurance Policies vary in length and expire throughout the next six to twelve months.  A schedule of the Insurance Policies is attached to the Order as Exhibit A and incorporated herein by reference.[6]

9.     The Debtors' ability to (a) maintain, renew, supplement, modify, amend, purchase, cancel, and extend the Insurance Policies as needed, including to enter into new insurance policies in the ordinary course of business and (b) ensure uninterrupted coverage under the Insurance Policies, including by continuing the NDC Intercompany Transactions, is critical to preserve the value of the Debtors' estates.  Moreover, in many instances, insurance coverage is required by statutes, rules, regulations, and contracts that govern the Debtors' commercial activities.  In addition, the United States Trustee's *Region 7 Guidelines for Debtors-In-Possession* (the "U.S. Trustee Guidelines") require that a debtor maintain adequate insurance coverage given the

---

[5]   For the avoidance of doubt, the Debtors do not seek authority to maintain workers' compensation coverage nor to pay prepetition amounts related thereto under this Motion, but rather request such authority as part of the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (B) Continue Employee Benefits Programs, and (II) Granting Related Relief*, filed contemporaneously herewith.

[6]   For the avoidance of doubt, the Insurance Policies shall include all insurance policies issued or providing coverage at any time to the Debtors, whether expired, current, or prospective, and any agreements related thereto, regardless of whether they are listed on Exhibit A to the Order.  The descriptions of the Insurance Policies set forth in this Motion, including on Exhibit A to the Order, constitute a summary only.  The actual terms of the Insurance Policies and related agreements will govern in the event of any inconsistency with the description in this Motion. The Debtors request authority to honor obligations and renew all insurance policies, as applicable, regardless of whether the Debtors inadvertently fail to include a particular insurance policy on Exhibit A to the Order, and any such omitted insurance policy is hereby included in the defined term "Insurance Policies" as used herein and in the Order.

circumstances of its chapter 11 case. *See* 11 U.S.C. §1112(b)(4)(C); U.S. Trustee Guidelines, Section III(A) ("All debtors must maintain insurance and pay all premiums as they come due."). Further, as described in the TSA Motion,[7] the Debtors are required to maintain certain Insurance Policies pursuant to the terms of the Reyes TSA.

10.     As of the Petition Date, the Debtors believe that they owe approximately $520,000 on account of the Insurance Policies, as detailed below. Accordingly, the Debtors request authority to pay all outstanding amounts on account of the Insurance Policies and related payment obligations, whether arising directly or indirectly through the NDC Intercompany Transactions, including any prepetition amounts with respect thereto, as they become due and payable in the ordinary course of the Debtors' business. The Debtors also request authority to maintain their existing Insurance Policies and to renew, amend, supplement, extend, purchase, cancel, and enter into new insurance policies, as applicable, in the ordinary course of business to ensure uninterrupted coverage.

---

[7] As described in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue to Provide All TSA Services and Honor All Obligations Related Thereto and (II) Granting Related Relief* (the "TSA Motion"), filed contemporaneously herewith, further details the Debtors' obligations under the Reyes TSA, including the requirement to maintain certain Insurance Policies, including, among other things, general liability insurance, workers' compensation insurance, and business automobile liability insurance (collectively, the "Reyes TSA Insurance Policies") through the Reyes Transition Period (as defined and described in the TSA Motion).

| Insurance Category | Approximate Amount Due Prepetition |
|---|---|
| Insurance Premiums | $0 |
| SIRs and Deductibles | $300,000 |
| Claims Processing Fees | $175,000 |
| Surety Premiums | $10,000 |
| Letters of Credit Fees | $35,000 |
| **Total** | **$520,000** |

## I.    Insurance Premium Payments.

11.    In the ordinary course of business, either the Debtors or NDC pay the premium obligations associated with the Debtors' insurance coverage under the Insurance Policies (collectively, the "Insurance Premiums").  In the event that the Insurance Premiums are paid for by NDC on the Debtors' behalf, the Debtors reimburse NDC for these payments through the NDC Intercompany Transactions (and vice versa).

12.    The Debtors and NDC, as applicable, pay the Insurance Premiums indirectly through their broker, Marsh & McLennan Agency, LLC (the "Broker").  The Debtors or NDC, as applicable, typically prepay the Insurance Premiums for most of the Insurance Policies on or around the start of each policy period.  For the most recent renewal period, the Debtors' aggregate obligations on account of the Insurance Premiums, excluding certain third-party administration fees related to the Insurance Policies but including amounts owed to NDC on account of the NDC Intercompany Transactions, was approximately $10 million.  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of Insurance Premiums.

13.    To ensure uninterrupted coverage under the Insurance Policies, comply with their obligations under the Reyes TSA, and avoid jeopardizing the Debtors' ongoing marketing and sale processes, the Debtors seek authority to pay any prepetition amounts owed on account of the Insurance Premiums, including any third-party administration fees related thereto, to continue to honor the Insurance Premiums, and to continue to reimburse NDC on account of the Insurance

Premiums through the NDC Intercompany Transactions, as and if applicable, as such obligations under the Insurance Policies come due in the ordinary course of business on a postpetition basis consistent with past practice.

## II.      Deductibles and Self-Insured Retentions.

14.      Certain of the Insurance Policies require that the Debtors pay deductibles (each, a "Deductible," and collectively, the "Deductibles") or self-insured retentions (each, a "SIR," and collectively, the "SIRs").  Generally, if a claim is made against an Insurance Policy that is subject to a Deductible, the applicable Insurance Carrier administers the claims, makes payments in connection therewith, and then invoices the Debtors for the Deductible.[8]  In addition, the Debtors may be subject to certain administrative fees for claims handling by the Insurance Carriers.  As a result, the Insurance Carriers may have prepetition claims against the Debtors.  The Debtors risk losing their Insurance Policies if they fail to make their Deductible payments, which would not only greatly increase the risk related to the Debtors' operations but may cause the Debtors to violate state laws requiring them to maintain such policies.

15.      Under Insurance Policies with a SIR, the Debtors must make payments in the first instance up to the limit of the SIR, and the Insurance Carrier is obligated to cover the remaining costs, pay any claim in excess of the SIR limits, and administer and defend claims until the SIR limits are reached.  Typically, satisfaction of the SIR is a condition precedent to coverage for payment of the portion of a loss in excess of the SIR.  In addition, the Debtors use a third-party claims administrator processor, Sedgwick Claims Management Services, Inc. (the "Claims Processor"), to process certain claims and pay certain Deductibles and SIRs on the Debtors' behalf.

---

[8]      When a policy is subject to a deductible, a compensable claim is typically assessed from dollar one, and then the deductible is subtracted from the claim.

For such claims, the Claims Processor pays the applicable Insurance Carriers the appropriate Deductible or SIR and then invoices the Debtors for such amounts on a weekly basis.  Both the Deductibles and the SIRs typically range from approximately $1,000 to $2.5 million, depending on the Insurance Policy.  The Debtors' obligations for the Deductibles and SIRs arise either directly under the Insurance Policies or, under the Debtors' Insurance Policies for prior years, indirectly through the NDC Intercompany Transactions.

16.     As of the Petition Date, the Debtors believe that they owe the Claims Processor approximately $300,000 on account of any Deductibles and SIRs.  Further, the Debtors have recorded estimated liabilities on their balance sheet relating to prepetition Deductibles and anticipate that certain amounts may become due and owing during these chapter 11 cases.  The Debtors therefore seek authority to make prepetition payments on account of the Deductibles and SIRs, if any, including through the NDC Intercompany Transactions and the Claims Processor, that are due and owing as of the Petition Date and to continue to pay the Deductibles and SIRs under the Insurance Policies, including honoring any payment obligations under the Deductibles and SIRs, in the ordinary course of business on a postpetition basis consistent with past practice to ensure uninterrupted coverage thereunder.

**Surety Bonds and Related Payment Obligations**

17.     In the ordinary course of business, the Debtors are required to maintain various surety bonds for credit support to certain third parties, often governmental and regulatory authorities, to satisfy licensing, permitting, tax, and other statutory requirements applicable to the Debtors' businesses (collectively, the "Debtor Surety Bonds," the payees of such bonds, the "Surety Payees," and the maintenance of such bonds, the "Surety Bond Program").  In addition, NDC provides certain surety bonds on behalf of the Debtors, which are also issued for the benefit of the Surety Payees and are maintained as part of the Surety Bond Program

(collectively, the "NDC Surety Bonds," and together with the Debtor Surety Bonds, the "Surety Bonds"). The issuance of a Surety Bond lessens the Surety Payee's risk that the Debtors and/or NDC will fail to perform and/or tender payment by providing that the surety will perform obligations or tender payment on behalf of the Debtors and/or NDC. Several of the Surety Payees are federal, state, and local regulators that require the Debtors and NDC to provide the Surety Bonds in connection with the Debtors' and NDC's alcohol distribution licenses. The Debtors and NDC also maintain Surety Bonds that provide financial assurances to certain taxing authorities in connection with the Debtors' and NDC's obligation to pay certain taxes.

18.     As of the Petition Date, the Debtors maintain approximately 20 Surety Bonds in an aggregate principal amount of approximately $26 million, and NDC maintains approximately two Surety Bonds in an aggregate principal amount of approximately $75,000 on behalf of the Debtors. All of the Surety Bonds are issued by the Hartford Financial Services Group, Inc. and certain of its direct and indirect insurance company subsidiaries and affiliates ("Hartford" or the "Surety").

19.     The Debtors and NDC must pay premiums on account of the Surety Bonds (collectively, the "Surety Premiums," and together with the Insurance Premiums, the "Premiums"). The Surety Premiums are generally determined by the Surety and paid by the Debtors and NDC on an annual basis. The Debtors and NDC, as applicable, either pay the Surety Premiums directly to the Surety or indirectly through the Broker. Similar to the Insurance Premiums for the Insurance Policies, to the extent that the Surety Premiums are paid by NDC on behalf of the Debtors, the Debtors then typically reimburse NDC for the Surety Premiums through

10

the NDC Intercompany Transactions (and vice versa). A schedule of the Surety Bonds is attached to the Order as Exhibit B and incorporated herein by reference.[9]

20. To maintain the Surety Bonds, in the 12-month period preceding the Petition Date, the Debtors paid approximately $200,000 in Surety Premiums, including amounts paid directly by the Debtors with respect to the Debtor Surety Bonds, and amounts paid pursuant to the NDC Intercompany Transactions with respect to the NDC Surety Bonds. As of the Petition Date, the Debtors estimate they owe $10,000 on account of the Surety Premiums. The Debtors seek authority to pay outstanding prepetition Surety Premiums, if any, that are due and owing as of the Petition Date and to continue to honor their obligations under the Surety Bonds as they come due in the ordinary course of business on a postpetition basis consistent with past practice. Further, the Debtors seek authority to provide the Surety with additional collateral for the Surety Bonds and/or renew or acquire additional Surety Bonds, and execute other agreements in connection therewith, as necessary to operate their businesses in the ordinary course. Failure to provide, maintain, cancel, or timely replace the Surety Bonds, as necessary, could prevent the Debtors from undertaking essential functions related to their operations, and fulfilling among other things, their obligations under federal or state law.

21. In addition, the Surety requires the Debtors to sign agreements promising to pay the Surety directly in the event that certain Surety Bonds are called. Unlike an Insurance Policy, if a Surety incurs a loss on a Surety Bond, it is entitled to recover the full amount of that loss from the principal, *i.e.,* the Debtors. To that end, the Debtors are party to that certain General Indemnity

---

[9]   The descriptions of the Surety Bonds set forth in this Motion and on Exhibit B to the Order constitute a summary only. The actual terms of the Surety Bonds and related agreements will govern in the event of any inconsistency with the description in this Motion. The Debtors request authority to honor obligations and renew all Surety Bonds, as applicable, regardless of whether the Debtors inadvertently fail to include a particular surety bond on Exhibit B to the Order, and any such omitted surety bond is hereby included in the defined term "Surety Bonds" as used herein and in the Order.

Agreement, dated February 6, 2024, by and among Debtor RNDC, Debtor Young's Market Company, LLC, NDC, and Hartford (the "Indemnity Agreement"), which sets forth the Surety's right to recover from the Debtors in the event that a Surety Bond is called. Pursuant to the Indemnity Agreement, the Debtors agree to indemnify the Surety from any loss, charge, claim, demand, cost, liability, or expense that the Surety may incur on account of the issuance of any bonds on behalf of the Debtors. Additionally, the Indemnity Agreement allows the Surety to request collateral from the Debtors from time to time. In the event that NDC indemnifies the Surety under the Indemnity Agreement, RNDC must reimburse NDC pursuant to the NDC Intercompany Transactions.

22. To continue their ordinary course business operations during these chapter 11 cases, the Debtors must be able to provide financial assurance to the Surety and Surety Payees. Therefore, to ensure the Surety Bonds remain in force, the Debtors seek authorization to make payments, including through the NDC Intercompany Transactions, to maintain the existing Surety Bond Program, including: (a) paying any outstanding prepetition Surety Premiums and related obligations and to continue paying any Surety Premiums and related obligations in the ordinary course of business on a postpetition basis; (b) renewing, or potentially acquiring additional bonding capacity postpetition, as necessary, in the ordinary course of business; (c) cancelling, revising, or supplementing Surety Bonds in the ordinary course of business; (d) providing, renewing, supplementing, and/or cancelling letters of credit or other forms of collateral to the Surety as may be necessary in the ordinary course of business; and (e) executing other agreements, such as letters of credit, as needed, in connection with the Surety Bond Program. Failure to continue the Surety Bond Program will prevent the Debtors from undertaking essential

functions related to their operations, fulfilling their legal obligations during these chapter 11 cases, and facilitating their ongoing sale process.

**Letters of Credit**

23.     In the ordinary course of business, the Debtors and NDC post certain letters of credit for the benefit of certain Insurance Carriers, including Hartford, Liberty Mutual Insurance Company ("Liberty Mutual"), and Safety National Casualty Corporation and certain of its affiliates (together, "Safety National") to secure obligations relating to the Deductibles under certain Insurance Policies.  As of the Petition Date, the Debtors have two letters of credit outstanding issued in favor of Liberty Mutual and Hartford (together, the "Debtor Letters of Credit"), in an aggregate principal amount of approximately $922,276, comprising (a) one letter of credit in the amount of $322,276, issued in favor of Liberty Mutual, and (b) one letter of credit in the amount of $600,000, issued in favor of Hartford.  In addition, NDC is the applicant on certain letters of credit on behalf of the Debtors, which are issued for the benefit of Safety National and Hartford (collectively, the "NDC Letters of Credit," and collectively with the Debtor Letters of Credit, the "Letters of Credit"), in an aggregate principal amount of approximately $28.25 million.  In the event that NDC provides a Letter of Credit on behalf of the Debtors, the Debtors have typically reimbursed NDC for such amounts in the ordinary course of business pursuant to the NDC Intercompany Transactions.

24.     The Debtors pay certain fees in connection with the Letters of Credit on a quarterly basis (collectively, the "Letters of Credit Fees").  To the extent that the Letters of Credit Fees are paid by NDC on behalf of the Debtors, the Debtors then reimburse NDC for the Letters of Credit Fees through the NDC Intercompany Transactions.  The Debtors pay approximately $600,000 annually on account of the Letters of Credit Fees, including amounts paid directly by the Debtors with respect to the Debtor Letters of Credit, and amounts paid pursuant to the NDC Intercompany

13

Transactions with respect to the NDC Letters of Credit.  As of the Petition Date, the Debtors believe that they owe approximately $35,000 on account of prepetition Letters of Credit Fees.  To ensure that the Letters of Credit remain in place, the Debtors request authority to satisfy prepetition Letters of Credit Fees and to continue honoring the Letters of Credit Fees on a postpetition basis in the ordinary course of business consistent with past practice.  A schedule of the Letters of Credit is attached to the Order as Exhibit C.

25.     Failing to provide, maintain, back, or timely replace the Letters of Credit will prevent the Debtors from maintaining essential insurance coverage that allows the Debtors to operate their businesses safely and from satisfying material contractual and financial obligations necessary to facilitate the continued operation of the Debtors' business, which in turn would materially jeopardize the Debtors' estates and ongoing sale process.  The Debtors request authority to meet any prepetition or postpetition obligations under the Letters of Credit, including through the NDC Intercompany Transactions, when they come due in the ordinary course of business and to continue, modify, and provide additional forms of credit support on a postpetition basis in the ordinary course of business as needed consistent with past practice.

**Claims Processing Fees**

26.     The Debtors are party to that certain Claim Service and Funding Agreement, by and between Debtor RNDC and the Claims Processor, effective as of June 30, 2007 (the "Claims Processing Agreement").  Pursuant to the Claims Processing Agreement, and in addition to the services discussed above, the Claims Processor provides claims administration and related support services with respect to certain of the Debtors' Insurance Policies, including claims intake, coordination with Insurance Carriers, monitoring and reporting, and other administrative functions

related to the Debtors' Insurance Policies in exchange for variable fees paid by the Debtors (collectively, the "Claims Processing Fees").

27.     As of the Petition Date, the Debtors believe that they owe approximately $175,000 to the Claims Processor on account of the Claims Processing Fees.  To ensure that the Debtors continue to receive critical services from the Claims Processor, the Debtors request authority to satisfy prepetition Claims Processing Fees that are due and owing as of the Petition Date and to continue to pay the Claims Processing Fees as they come due in the ordinary course of business on a postpetition basis consistent with past practice.

## Basis for Relief

**I.     The Maintenance of the Insurance Policies is Required Under the Bankruptcy Code and the U.S. Trustee Guidelines.**

28.     The Debtors' existing Insurance Policies (which include the Reyes TSA Insurance Policies) and Surety Bonds provide a comprehensive range of protection for the Debtors' business, property, and other assets.  Section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.  In many instances, the coverage provided under the Insurance Policies is required by various state and federal laws, regulations, certain credit agreements, and contracts that govern the Debtors' commercial activities.  To ensure compliance with section 1112(b)(4)(C) of the Bankruptcy Code and applicable state and federal regulations, it is therefore essential that the Debtors' Insurance Policies continue in full force and effect during these chapter 11 cases.

29.     Further, the U.S. Trustee Guidelines require that "[a]ll debtors **must** maintain insurance and pay all [insurance] premiums as they come due."  *See* U.S. Trustee Guidelines § III(A) (emphasis in original).  The U.S. Trustee Guidelines further require, absent an order of

the court otherwise, a debtor in possession under chapter 11 of the Bankruptcy Code to maintain (if applicable) casualty insurance, workers' compensation insurance, and general liability insurance along with any other insurance customary in such debtors' business. *Id.* at III(B). The relief requested is necessary to ensure that the Debtors comply with their obligations under the Bankruptcy Code, applicable law, and the U.S. Trustee Guidelines. Accordingly, it is essential that the Court authorize the Debtors to (a) maintain and satisfy all prepetition and postpetition obligations required under their Insurance Policies, and (b) have the authority to supplement, amend, extend, renew, cancel, and/or replace their Insurance Policies as needed, in their business judgment and in the ordinary course of business, without further order of the Court.

## II. Maintaining, Continuing, Renewing, Amending, Supplementing, Extending, Purchasing, Canceling, or Entering into New Insurance Policies, Letters of Credit, and Surety Bonds, and Paying Obligations Related to the Insurance Policies, Letters of Credit, and Surety Bond Program in the Ordinary Course of Business, are Each Warranted.

30. Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor in possession may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing. 11 U.S.C. § 363(c). At least one bankruptcy court has explicitly recognized debtor purchases of new insurance policies as falling within the ordinary course of business. *See, e.g.*, *In re DGI Resols., Inc.*, 445 B.R. 376, 380 (Bankr. D. Del. 2011) (recognizing that the purchase of a director and officer tail insurance policy qualified as an action taken in the debtor's ordinary course of business). The Debtors submit that their obligations on account of the Insurance Policies (including the Reyes TSA Insurance Policies), Letters of Credit, and the Surety Bond Program are within the ordinary course of business and thus may be continued in the Debtors' discretion under section 363(c)(1) of the Bankruptcy Code. Out of an abundance of caution, however, this Motion seeks the relief set forth herein to the extent that

16

payment of these obligations and the administration of the Insurance Policies, the Letters of Credit, and the Surety Bond Program are not considered ordinary course transactions.

31.     As set forth above, the Insurance Policies (including the Reyes TSA Insurance Policies), Surety Bonds, and Letters of Credit provide a comprehensive range of protection for the Debtors' businesses and assets.  It is therefore essential that the Insurance Policies, Surety Bonds, and Letters of Credit continue in full force and effect during the course of these chapter 11 cases. Section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.  *See also In re Davis*, 730 F.2d 176, 185 (5th Cir. 1984) (holding that insurance policies constitute property of the estate and describing maintenance of adequate insurance "as a bulwark against erosion of the estate").  In addition, in many instances, the coverage provided under the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities.

32.     To ensure compliance with the Bankruptcy Code and applicable state and federal laws and regulations, it is essential that the Debtors (a) maintain, and continue to make payments required under, the Insurance Policies (including the Reyes TSA Insurance Policies), Letters of Credit, and the Surety Bond Program and (b) have authority to renew, amend, supplement, modify, extend, and/or purchase Insurance Policies, Letters of Credit, and Surety Bonds, and to execute other agreements in connection therewith, as needed, in the ordinary course of business without further order from the Court.

33.     In authorizing payments of prepetition insurance obligations, courts have relied on several legal theories rooted in sections 1107(a), 1108, 363(b), and 105(a) of the Bankruptcy Code. *See, e.g., In re AMR Corp.*, 2011 WL 6841205, at *1 (Bankr. S.D.N.Y. Nov. 30, 2011) (granting

17

relief requested by an insurance motion, citing sections 105(a) and 363(b) of the Bankruptcy Code); *In re Oncure Holdings, Inc.*, 2009 WL 10817379, at *2 (Bankr. D. Del. Dec. 18, 2009) (same, citing sections 105, 363, 1107, and 1108); *In re Exide Techs.*, 2013 WL 4777665, at *1 (Bankr. D. Del. July 10, 2013) (granting surety bond motion, citing section 363).  Under these sections of the Bankruptcy Code, and consistent with the chapter 11 goal of value preservation, the Court may authorize the Debtors to pay prepetition amounts due on account of the Insurance Policies, and to maintain the Insurance Policies, including renewing and entering into new Insurance Policies on a postpetition basis.

34.     Several courts, including those in the Fifth Circuit, have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (stating that a debtor's duty to protect and preserve the estate may sometimes require preplan satisfaction of a prepetition claim); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (holding that business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("[t]he ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *In re James A. Phillips, Inc.*, 29 B.R. 391, 392, 398 (S.D.N.Y. 1983) (affirming bankruptcy court order authorizing payments by debtor to prepetition creditors when the payments were essential to the debtor's survival).

35.     Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so.

18

*See In re Ionosphere*, 98 B.R. at 175 (noting that section 363(b) of the Bankruptcy Code provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). In addition, pursuant to section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor in possession to 'protect and preserve the estate, including an operating business' going-concern value." *In re CEI Roofing, Inc*., 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *CoServ*, 273 B.R. at 497).

36. Further, section 503(b)(1)(A) of the Bankruptcy Code provides that: "[a]fter notice and a hearing, there shall be allowed administrative expenses[,] including . . . the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). The Court, therefore, can authorize the Debtors to use estate funds to pay any obligations under the Insurance Policies (including the Reyes TSA Insurance Policies), the Surety Bonds, and the Letters of Credit arising during or relating to the period after the Petition Date.

37. The Court may also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code which codifies the inherent equitable powers of the bankruptcy court and empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may authorize payments of prepetition obligations when essential to the continued operation of a debtor's business. The Court's power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations is known as the "necessity of payment" rule or the "doctrine of necessity" and has long been recognized as precedent within the Fifth Circuit. *See CoServ,* 273 B.R. at 492–93, 497 (discussing the instances in which the "doctrine of necessity" or "necessity of payment" apply to debtors in possession); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003)

(allowing a debtor in possession to pay prepetition claims when failing to do so could "seriously damage" the debtor's business).

38.     The doctrine of necessity is satisfied here.  The nature of the Debtors' businesses and these chapter 11 cases make it essential for the Debtors to maintain the Insurance Policies, Surety Bond Program, and Letters of Credit and pay the Claims Processing Fees on an ongoing and uninterrupted basis.  The non-payment of any Premiums, Deductibles, SIRs, Claims Processing Fees, or related fees under the Insurance Policies, Surety Bond Program, or Letters of Credit (as applicable) could result in one or more of the Insurance Carriers terminating or declining to renew the Insurance Policies or Surety Bonds or refusing to enter into new insurance policies with the Debtors.  If any of the Insurance Policies or the Surety Bonds lapse without renewal, the Debtors could be exposed to substantial liability to the detriment of all parties in interest.

39.     Failure to maintain the Insurance Policies (including the Reyes TSA Insurance Policies), the Surety Bonds, and the Letters of Credit, and pay amounts owed in connection therewith, could have a detrimental impact on the Debtors' businesses, operations, and the value of their estates.  Any interruption in insurance coverage would expose the Debtors to a number of risks, including the potential for the:  (a) incurrence of direct liability for the payment of claims that otherwise would have been covered by the Insurance Policies (including the Reyes TSA Insurance Policies), the Surety Bonds, or the Letters of Credit; (b) incurrence of material costs and other losses that otherwise would have been reimbursed; (c) incurrence of higher costs for reestablishing lapsed Insurance Policies or obtaining new insurance coverage or surety bonds; and (d) regulatory exposure in the event the Debtors are required to maintain insurance and surety coverage to continue their operations in compliance with federal and state law.  If any of these situations arise, the Debtors and their advisors would be forced to immediately address these

matters, thus expending limited time and resources that should be focused on the stabilizing operations in these chapter 11 cases. In short, failure to maintain the Insurance Policies, the Surety Bonds, and the Letters of Credit could have a detrimental impact on the Debtors' businesses and the value of their estates.

40.     Furthermore, the continued retention of the Broker allows the Debtors and their employees to focus on their core operational matters. The Debtors are not well-suited to bring the Broker's services in-house. If the Debtors fail to make timely payments to the Broker, the Debtors may lose access to the Broker's valuable services. Accordingly, the requirements of section 363(b) of the Bankruptcy Code are satisfied.

41.     The Debtors seek authority to continue, maintain, renew, amend, supplement, modify, cancel, and/or extend the existing Insurance Policies, the Letters of Credit, and the Surety Bond Program, and purchase new Insurance Policies and Surety Bonds, and execute Letters of Credit and other agreements in connection therewith, as required by law, in the ordinary course of business. Failure to timely honor any outstanding prepetition obligations on account of the Insurance Policies, Letters of Credit, and the Surety Bond Program could negatively affect the Debtors' ability to enter into such agreements, amendments, supplements, extensions, or new policies and bonds. Continuation of the Insurance Policies (including the Reyes TSA Insurance Policies), Letters of Credit, and Surety Bond Program is essential to preserving the value of the Debtors' assets and minimizing exposure to risk during the pendency of these chapter 11 cases. Therefore, the Debtors should be authorized to pay any prepetition obligations related to the Insurance Policies (including the Reyes TSA Insurance Policies), Letters of Credit, and the Surety Bond Program and to renew, amend, supplement, modify, purchase, cancel, and/or enter into new

insurance coverage, surety bonds, or letters of credit, in the ordinary course of business on a postpetition basis.

42.     Courts in this district have granted relief similar to the relief requested herein under sections 105(a) and 363(b) of the Bankruptcy Code. *See, e.g.*, *In re QVC Grp., Inc.,* No. 26-90447 (ARP) (Bankr. S.D. Tex. Apr. 17, 2026) (authorizing the debtors to continue their insurance policies and maintain their surety bond program); *In re Nine Energy Serv., Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. Feb. 3, 2026) (same); *In re Kleopatra Finco S.à r.l.*, No. 25-90642 (CML) (Bankr. S.D. Tex. Nov. 5, 2025) (same); *In re Anthology Inc.,* No. 25-90498 (ARP) (Bankr. S.D. Tex. Sep. 30, 2025) (same*); In re Sunnova Energy Int'l Inc.,* No. 25-90160 (ARP) (Bankr. S.D. Tex. June 9, 2025) (same).[10]

### III.     To the Extent that the Court Determines that the Surety Bonds or the Letters of Credit are Secured Extensions of Credit, Relief is Appropriate Under Section 364 of the Bankruptcy Code.

43.     Under section 364(c) of the Bankruptcy Code, a debtor may obtain unsecured credit in the ordinary course of business or obtain secured credit:  (a) with priority over administrative expenses; (b) secured by a lien on unencumbered estate assets; or (c) secured by a junior lien on previously encumbered assets.  To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *See In re Snowshoe Co., Inc.,* 789 F.2d 1085, 1088 (4th Cir. 1986).  Given the Debtors' current liquidity position, they may not be able to obtain financial accommodations comparable to those the Surety offers on an unsecured basis or administrative expense basis.

---

[10]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

44.     To the extent that a Surety Bond or Letter of Credit is deemed an extension of credit, section 364 of the Bankruptcy Code provides the Debtors with ample authority to exercise their business judgment to renew the existing Surety Bonds and procure new Surety Bonds, and/or renew the existing Letters of Credit and procure new ones, whether on an unsecured basis or, if necessary, on a secured basis if the Debtors are unable to obtain unsecured credit and the borrowing is in the best interests of the Debtors' estates.

45.     Continuing to perform obligations in connection with the Surety Bond Program and the Letters of Credit is necessary to maintain the Debtors' current business operations.  As described above, the Debtors are required to provide Surety Bonds or other forms of credit support to certain third parties, often governmental units or other public agencies, to secure the payment or performance of certain obligations.  The Debtors therefore seek authority, but not direction, to maintain the Letters of Credit and to furnish the Surety (or any new provider of Surety Bonds) with collateral or new forms of credit support with respect to the Debtors' existing Surety Bonds, Surety Bond renewals, or any new Surety Bonds.

46.     Courts in this district have granted similar relief to the relief requested herein.  *See, e.g.*, *In re QVC Grp., Inc.,* No. 26-90447 (ARP) (Bankr. S.D. Tex. Apr. 17, 2026) (authorizing the debtors to continue their surety bond program); *In re Nine Energy Serv., Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. Feb. 3, 2026) (same); *In re Kleopatra Finco S.à r.l.*, No. 25-90642 (CML) (Bankr. S.D. Tex. Nov. 5, 2025) (same); *e.g.*, *In re Sunnova Energy*, No. 25-90160 (ARP) *In re Ascend Performance Materials Holdings Inc.,* No. 25-90127 (CML) (Bankr. S.D. Tex. Apr. 22, 2025) (same).

### Emergency Consideration

47.     The Debtors request emergency consideration of this Motion in accordance with Bankruptcy Local Rule 9013-1 and section G of the Complex Case Procedures, and pursuant to

23

Bankruptcy Rule 6003, which empowers a court to grant certain relief within the first 21 days after the commencement of a chapter 11 case to the extent that such "relief is needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(a). As set forth herein, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations. Failure to receive the relief requested in this Motion during the first 21 days of these chapter 11 cases would imperil the Debtors' operations at this critical juncture and cause immediate and irreparable harm. The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

48.     The Debtors will have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to debtor-in-possession financing and the consensual use of cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored. Therefore, the Debtors request authority to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, direct debit, wire transfer, ACH, or other payment requests in respect of the relief requested in this Motion.

24

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

49.     The Debtors request that the Order include a finding that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exempt such relief from the 14-day stay under Bankruptcy Rule 6004(h).

**Modification of Bankruptcy Rule 2002(a)(2)**

50.     The Debtors request that the Court, for cause, modify the service requirements set forth in Bankruptcy Rule 2002(a)(2) to limit service of this Motion only to the core service list and affected creditors.  In light of the breadth and complexity of the Debtors' business, serving the Motion on all creditors, even those that are unaffected by the relief sought herein, would cause unnecessary confusion and expense to the detriment of all stakeholders.  Accordingly, sufficient cause exists under Bankruptcy Rule 2002(a)(2) to modify the service requirements for this Motion.

**Reservation of Rights**

51.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested in this Motion is intended as or should be construed or deemed to be: (a) an implication or admission as to the amount of, basis for, priority, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien (that arises under contractual rights, common law, statutory law, or otherwise) on,

25

security interest in, or other encumbrance on property of the Debtors' estates, including any lien that may be satisfied pursuant to the relief requested in this Motion, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; or (h) a waiver of the obligation of any party in interest to file a proof of claim.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

### Notice

52.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Bank Lenders; (d) the Bank Agent; (e) the Second Lien Lender; (f) the Equipment Loan Lenders; (g) holders of the Owner Notes; (h) the office of the attorney general for each of the states in which the Debtors operate; (i) the Internal Revenue Service; (j) any other governmental agencies having a regulatory or statutory interest in these chapter 11 cases; (k) the Insurance Carriers; (l) the Surety; (m) the Broker; (n) the Claims Processor; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

26

WHEREFORE, the Debtors request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
Dated: July 27, 2026

*/s/ John F. Higgins*

| | |
|---|---|
| **PORTER HEDGES LLP** | **KIRKLAND & ELLIS LLP** |
| John F. Higgins (TX Bar No. 09597500) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| M. Shane Johnson (TX Bar No. 24083263) | Joshua A. Sussberg, P.C. (*pro hac vice* pending) |
| Megan Young-John (TX Bar No. 24088700) | Christopher Marcus, P.C. (*pro hac vice* pending) |
| Joanna D. Caytas (TX Bar No. 24127230) | Maddison Levine (*pro hac vice* pending) |
| 1000 Main St., 36th Floor | 601 Lexington Avenue |
| Houston, Texas 77002 | New York, New York 10022 |

PORTER HEDGES LLP
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Joanna D. Caytas (TX Bar No. 24127230)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone:     (713) 226-6000
Facsimile:     (713) 228-1331
Email:          jhiggins@porterhedges.com
                sjohnson@porterhedges.com
                myoung-john@porterhedges.com
                jcaytas@porterhedges.com

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christopher Marcus, P.C. (*pro hac vice* pending)
Maddison Levine (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                cmarcus@kirkland.com
                maddison.levine@kirkland.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

**Certificate of Accuracy**

In accordance with Bankruptcy Local Rule 9013-1(i), I certify that the foregoing statements are true and accurate to the best of my knowledge.

*/s/ John R. Castellano*

John R. Castellano

**Certificate of Service**

I certify that on July 27, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.  Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' proposed claims and noticing agent.

*/s/ John F. Higgins*

John F. Higgins