**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC, *et al.*,[1] | ) ) | Case No. 26-90737 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u>**
**MOTION FOR ENTRY OF AN**
**ORDER (I) AUTHORIZING THE**
**DEBTORS TO (A) PAY CERTAIN TAXES**
**AND FEES AND (B) UNDERTAKE CERTAIN TAX**
**PLANNING ACTIVITIES, AND (II) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 2:00 p.m. (prevailing Central Time) on July 27, 2026.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on July 27, 2026, at 2:00 p.m. (prevailing Central Time) in Courtroom 402, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's homepage. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's homepage. Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/RNDC. The location of Debtor Republic National Distributing Company, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 4300 Wildwood Parkway, Suite 200, Atlanta, GA 30339.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion"):[2]

**Relief Requested**

1.      The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"):  (a) authorizing the Debtors to (i) negotiate, remit, and pay (or use tax credits to offset) or otherwise satisfy any Taxes and Fees in the ordinary course of business that are payable as of the Petition Date or become payable during these chapter 11 cases, including any obligations arising on account of any Audit or Assessment, without regard to whether such obligations accrued or arose before, on, or after the Petition Date and (ii) undertake Tax Planning Activities, as necessary; and (b) granting related relief.

**Jurisdiction and Venue**

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]   A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of John R. Castellano, Chief Restructuring Officer of Republic National Distributing Company, LLC and its Debtor Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.  Capitalized terms used but not immediately defined in this Motion shall have the meanings ascribed to such terms in the First Day Declaration or later in this Motion, as applicable.

4.      The bases for the relief requested herein are sections 105(a), 363(b), 507(a)(8), 541, and 1107 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 1001-1(d), 1075-1, and 9013-1(i) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

## Background

5.      Republic National Distributing Company, LLC (together with its Debtor and non-Debtor affiliates, the "Company") was, at its height, the nation's second largest alcoholic beverage distributor, operating across 40 states and specializing in wine and spirits distribution. Built on the strong foundation of three family-owned businesses, the Company historically enjoyed deep-seated relationships with over 2,000 suppliers and 170,000 customers across its expansive nationwide distribution network.  With headquarters in Atlanta, Georgia, the Debtors currently operate across 21 states and employ a workforce of approximately 1,460 employees.

6.      On July 26, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have also filed a motion contemporaneously herewith requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

**Taxes and Fees Overview**

7.      In the ordinary course of business, the Debtors collect, withhold, and incur taxes and fees related to, among other things:  (a) income taxes; (b) property taxes; (c) franchise taxes; (d) excise taxes; (e) customs duties and fees; (f) sales and use taxes; (g) regulatory, licensing, and other taxes and fees; (h) audits; (i) fees owed to various tax service providers on account of tax consulting services provided to the Debtors; and, (j) in each case, including any interest and penalties on late payments (clauses (a) through (j), collectively, the "Taxes and Fees").[3]  The Debtors pay or remit, as applicable, the Taxes and Fees to various governmental units (as that term is defined in section 101(27) of the Bankruptcy Code), including the Internal Revenue Service (the "IRS"), federal and state alcoholic beverage and consumable hemp regulators, state environmental regulators, and other taxing authorities (each, an "Authority," and collectively, the "Authorities"), each of which are identified on **Exhibit A** attached hereto.[4]  The Debtors generally pay and remit Taxes and Fees either by electronic fund transfer or by check, with such payments processed through the Debtors' banks, financial institutions, or other service providers. From time to time, the Debtors may also receive tax credits for overpayments or refunds with respect to Taxes and Fees.  The Debtors generally use these credits in the ordinary course of

---

[3]   By this Motion, the Debtors do not seek the authority to collect and remit state and federal employee-related taxes and withholdings (other than with respect to potential audits or assessments for such taxes or withholdings).  Such relief is instead requested in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* (the "Wages Motion") filed contemporaneously herewith.

[4]   Although **Exhibit A** is intended to be comprehensive, the Debtors may have inadvertently omitted Authorities from **Exhibit A**.  The Debtors request relief with respect to Taxes and Fees payable to all Authorities, regardless of whether such Authority is specifically identified on **Exhibit A**, and any such omitted Authority is hereby included in the defined term "Authorities" used herein and in the Order.  For the avoidance of doubt, the Debtors' inclusion of an Authority in **Exhibit A** is not an admission that any Taxes and Fees are due or will become due during these chapter 11 cases to such Authority.

4

business to offset against future Taxes and Fees or cause the amount of such credits to be refunded to the Debtors.[5]

8.      Additionally, the Debtors are currently subject to, and may become subject to further, audit investigations on account of tax returns and/or tax obligations in respect of prior years (collectively, the "Audits") during these chapter 11 cases, including as a result of voluntary disclosures or similar mechanisms.  Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors (such additional Taxes and Fees, the "Assessments").[6] Critically,  in certain of the jurisdictions where the Debtors operate, the Debtors must be able to accept a proposed resolution of an Audit and make a payment with respect to such resolution in a timely manner.  Accordingly, the Debtors seek authority to pay or remit all obligations, including the Assessments, on account of the Audits as they arise, including as a result of any resolutions of issues raised in an Audit, and including Taxes and Fees otherwise addressed in the Wages Motion.

9.      The Debtors seek authority to pay and remit all prepetition and postpetition obligations on account of Taxes and Fees and Assessments (including any such obligations identified upon completion of an Audit or voluntary disclosure or otherwise determined to be owed), including:  (a) Taxes and Fees that have accrued or were incurred prepetition but were not paid prepetition, or were paid in an amount less than actually owed; (b) Taxes and Fees that accrue or are incurred postpetition; (c) Taxes and Fees paid by the Debtors prepetition that were lost or

---

[5]     As described in the *Debtors' Emergency Motion For Entry of an Order (I) Authorizing the Debtors to Continue to Provide All TSA Services and Honor All Obligations Related Thereto and (II) Granting Related Relief* (the "TSA Motion"), filed contemporaneously herewith, the Debtors provide certain services related to the Taxes and Fees to Reyes under the Reyes TSA (each as defined and described in the TSA Motion).  For the avoidance of doubt, the Debtors do not seek authority to continue to provide such Reyes TSA Services (as defined in the TSA Motion) or honor obligations in connection therewith in this Motion but rather request such authority in the TSA Motion.

[6]     Nothing in this Motion or any related Order constitutes or should be construed as an admission of liability by the Debtors with respect to any Audit or Assessment.  The Debtors expressly reserve all rights with respect to any Audit and the right to contest any Assessments claimed to be due as a result of any Audit.

otherwise not received in full by any of the Authorities; and (d) Taxes and Fees incurred for prepetition periods that become due and payable after the commencement of these chapter 11 cases, including as a result of Audits, Assessments, or voluntary disclosures.  In addition, for the avoidance of doubt, the Debtors seek authority to pay Taxes and Fees for so-called "straddle" periods (*i.e.*, periods that include the Petition Date).[7]

10.     Finally, the Debtors seek authority, to undertake certain typical activities related to tax planning and to pay Taxes and Fees related thereto (if any), including:  (a) converting Debtor entities from one form to another (*e.g.*, converting an entity from a corporation to a limited liability company) via conversion, merger, or otherwise (collectively, the "Entity Conversions"); (b) making certain tax elections (including with respect to the tax classification of Debtor entities) (collectively, the "Entity Classification Elections"); (c) changing the position of Debtor entities within the Debtors' corporate structure (collectively, the "Entity Movements"); and (d) modifying or resolving intercompany claims and moving assets or liabilities among Debtor entities, in each of the foregoing clauses (a) through (d), if doing so will not alter the substantive rights of the Debtors' stakeholders in these chapter 11 cases (clauses (a) through (d), collectively, the "Tax Planning Activities").

11.     The Debtors estimate that approximately $27.5 million in Taxes and Fees, not including those Taxes and Fees paid to Tax Service Providers, is outstanding as of the Petition Date:[8]

---

[7]   The Debtors reserve their rights with respect to the proper characterization of any "straddle" Taxes and Fees and to seek any appropriate remedy including reimbursement of or reallocation of claims related to any portion of any payment made that ultimately is not entitled to administrative or priority treatment.

[8]   The Debtors cannot predict the amounts of any potential Assessments that may result from Audits, if any. Accordingly, the Debtors' estimate of outstanding Taxes and Fees as of the Petition Date does not include any amounts relating to potential Assessments.

6

| Category[9] | Description | Approximate Amount Accrued and Unpaid as of Petition Date[10] |
|---|---|---|
| Income Taxes | The Debtors incur Income Taxes in some of the jurisdictions in which they do business and generally remit income taxes to certain state authorities as they come due in the ordinary course on a quarterly or annual basis. | $6.3 million |
| Property Taxes | The Debtors incur taxes related to real and personal property holdings and remit Property Taxes as they come due in the ordinary course on an annual basis.[11] | $5.5 million |
| Franchise Taxes | The Debtors pay certain Franchise Taxes that are required for the Debtors to conduct business in the ordinary course and comply with state laws.  Such Franchise Taxes are accrued and paid on a quarterly or annual basis. | $1.8 million |
| Excise Taxes | The Debtors pay Excise Taxes, arising from or payable on account of certain dispositions of assets (including real estate transfer taxes and similar disposition-related taxes), and other incidental import-related fees and expenses that are required for the Debtors to conduct business in the ordinary course and comply with federal, state, and local laws.  Excise Taxes are generally remitted as they come due, which is typically, but not always, on a monthly basis.[12] | $5.8 million |
| Customs Duties | The Debtors pay customs duties, import and export-related taxes, and other incidental import and export expenses.  Generally, the Debtors remit Customs Duties as they come due in the ordinary course. | $1.1 million |
| Sales and Use Taxes | The Debtors collect and remit sales and use taxes to the Authorities in various jurisdictions in connection with the sale or use of goods or services in such jurisdictions.  Generally, the Debtors remit Sales and Use Taxes on a monthly or quarterly basis, as applicable. | $6.5 million |

---

[9]   In certain cases, the approximate amount of Taxes and Fees is based on current exchange rates and may be subject to change based on fluctuations in exchange rates.

[10]   In light of the recent going-concern sale transactions consummated prior to the Petition Date, all estimated taxes contained herein are subject to change.

[11]   Property Taxes are assessed annually mostly in arrears, though some jurisdictions permit payment in two installments.

[12]   The timing of Excise Tax payments varies by state.  Federal Excise Taxes on imports are paid at the time of importation.

| Category[9] | Description | Approximate Amount Accrued and Unpaid as of Petition Date[10] |
|---|---|---|
| Regulatory, Licensing, and Other Taxes and Fees | The Debtors remit Taxes and Fees associated with regulatory requirements, including corporate filing fees, licenses, and other applicable regulations related to the brokering and distribution of alcoholic beverages, as well as additional Taxes and Fees, typically on an annual basis. | $500,000 |
| Tax Service Providers | The Debtors pay Taxes and Fees related to their use of third-party tax service providers in the ordinary course of business. | $300,000 |
| | **Total** | **$27.8 million** |

12. Any failure by the Debtors to pay the Taxes and Fees (including any Assessments) as and when they become due could materially disrupt the Debtors' business operations in several ways, including (but not limited to): (a) the Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from these chapter 11 cases; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the Debtors' estates; and (c) in some instances, certain of the Debtors' directors and officers could be subject to personal liability, which would likely distract those key individuals from their duties related to the Debtors' chapter 11 cases. Taxes and Fees that are not paid on the due date, as required by law, may also result in fines and penalties, the accrual of interest, or both. In addition, nonpayment of the Taxes and Fees may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code. The Debtors also collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates. Risking any of these negative outcomes is unnecessary. Accordingly, the Debtors seek authority to pay the Taxes and Fees and Assessments as they become due, and to engage in Tax Planning Activities, as necessary.

8

I.      **Income Taxes.**

13.     In the ordinary course of business, the Debtors incur and may be required to pay the relevant Authorities various state and, potentially, federal income taxes (including nonresident withholding and similar taxes determined by reference to income) (collectively, the "Income Taxes").[13]  As a general matter, the Debtors that are not taxed as C-corporations for U.S. federal income tax purposes are required to pay Income Taxes only in certain state jurisdictions as required by applicable law or upon election by the Debtors.  The Debtors remit Income Taxes to the relevant Authorities on a quarterly or annual basis in accordance with the statutory requirements of each applicable jurisdiction.  In some jurisdictions, the Debtors remit estimated Income Taxes in advance, which may result in tax credits or overpayments that may be refunded to the Debtors in certain circumstances.[14]  In 2025, the Debtors did not pay any federal Income Taxes to the applicable Authorities and remitted approximately $525,000 in state Income Taxes.

14.     As of the Petition Date, the Debtors estimate that they owe approximately $6.3 million on account of Income Taxes.  The Debtors request authority to pay any Income Taxes that are due and owing as of the Petition Date and to continue to pay Income Taxes as they become due in the ordinary course of business during these chapter 11 cases.

II.     **Property Taxes.**

15.     State and local laws in various jurisdictions where the Debtors operate generally grant Authorities the power to levy property taxes against the Debtors' real and personal property

---

[13]   Most of the Debtors are not taxed as C-corporations for U.S. federal Income Tax purposes (*i.e.*, most of the Debtors are "pass-through" entities for U.S. federal Income Tax purposes), and, as a result, most of the Debtors do not pay federal Income Taxes.  Because certain jurisdictions do not recognize pass-through status, such pass-through Debtors pay certain state Income Taxes.  Furthermore, it is possible that even a pass-through entity could ultimately have a liability to make a payment on account of federal Income Taxes in the event of an Audit.

[14]   Of the Debtors, only Republic National Distributing Company of North Dakota, Inc. ("RNDC ND") is a C-corporation.  In 2025, RNDC ND did not make any federal Income Tax payments.

9

(collectively, the "Property Taxes").  To avoid the imposition of statutory liens on their real and personal property, the Debtors generally remit Property Taxes on an annual basis in arrears,[15] either directly to the relevant Authorities or through a "pass-through" mechanism under certain lease agreements.  For the payment of Property Taxes, the Debtors deposit the amounts owed into an escrow account administered by one of the Debtors' Tax Service Providers, Ryan, LLC ("Ryan"), and then Ryan transfers the funds from the escrow account to the appropriate Authorities.  In limited circumstances the Debtors pay property taxes directly to the applicable Authorities.  In 2025, the Debtors remitted approximately $23.5 million in Property Taxes to the applicable Authorities.

16.    As of the Petition Date, the Debtors estimate that they owe approximately $5.5 million in Property Taxes to the relevant Authorities.  The Debtors request authority to pay any Property Taxes that are due and owing as of the Petition Date and to continue to pay Property Taxes as they become due in the ordinary course of business during these chapter 11 cases.

III.    **Franchise Taxes.**

17.    In the ordinary course of business, the Debtors are required to pay state franchise taxes and gross receipts taxes (collectively, the "Franchise Taxes") in various jurisdictions.  The Franchise Taxes are independent of income taxes and are necessary for the Debtors to conduct their business in the ordinary course pursuant to state law.  The Debtors generally remit Franchise Taxes to the relevant Authorities in accordance with the statutory requirements of each applicable jurisdiction (*e.g.*, on a quarterly or annual basis).  Failure to pay Franchise Taxes as they become due in the ordinary course could cause the Debtors to lose their ability to conduct business in the

---

[15]    In certain jurisdictions, Property Taxes are remitted bi-annually, with payments typically made in arrears. Amounts may be paid more than 90 days after year-end but are generally remitted during the first or second quarter of the following year.

applicable jurisdictions, which would immediately and irreparably harm the Debtors' estates. The Debtors generally pay their Franchise Taxes on a quarterly or annual basis. In 2025, the Debtors remitted approximately $2.3 million in Franchise Taxes to the applicable Authorities.

18.     As of the Petition Date, the Debtors estimate that they owe approximately $1.8 million in Franchise Taxes to the applicable Authorities. The Debtors request authority to pay any Franchise Taxes that are due and owing as of the Petition Date and to continue to pay Franchise Taxes as they come due in the ordinary course of business during these chapter 11 cases.

## IV.     Excise Taxes.

19.     The Debtors incur excise taxes (collectively, the "Excise Taxes") in connection with, among other things, the brokering and distribution of alcoholic beverages in the ordinary course of business and the disposition of certain assets.[16] Excise Taxes are remitted directly to either the Alcohol and Tobacco Tax and Trade Bureau or applicable local, county, or state Authorities. For domestic products, federal Excise Taxes are included in the sales price at the time of purchase; accordingly, the Debtors do not remit any amounts on account of federal Excise Taxes for domestic products. In contrast, state Excise Taxes are typically paid on a monthly basis by the applicable Debtor.[17] Furthermore, the Debtors incur federal Excise Taxes related to healthcare, heavy vehicles, and insurance. In 2025, the Debtors incurred approximately $65 million in Excise Taxes per fiscal quarter.

20.     As of the Petition Date, the Debtors estimate that they owe approximately $5.8 million in Excise Taxes, which the Debtors must pay to comply with federal, state, and local

---

[16]    In connection with certain of the going-concern sale transactions consummated prior to the Petition Date, the Debtors paid certain non-recurring Excise Taxes related to real estate transfers.

[17]    For example, in some states, Excise Taxes become due and payable when the Debtors sell the taxed product. In other states, Excise Taxes become due and payable when the Debtors purchase the taxed product or bring it into the state.

laws.[18]  The Debtors request authority to pay any Excise Taxes that are due and owing as of the Petition Date and to continue to pay Excise Taxes as they come due in the ordinary course of business during these chapter 11 cases.

**V.      Customs Duties.**

21.      In the ordinary course of business, the Debtors pay customs duties, import and export-related taxes,[19] and other incidental import and export expenses, including, without limitation, import and export fees related to freight handling fees and fines (collectively, the "Customs Duties"), each of which are assessed by the U.S. Customs and Border Protection Agency (the "U.S. Customs Service").  In addition, certain of the Debtors utilize customs brokers[20] for the import and export of goods (collectively, the "Customs Brokers").

22.      If the Debtors do not timely pay the Customs Duties, the U.S. Customs Service may demand liquidated damages, assess interest, or impose other sanctions.  Contesting these measures would require the Debtors to expend substantial time, effort, and expense that could otherwise be directed toward navigating a value-maximizing path through these chapter 11 cases.  In addition, absent payment, the U.S. Customs Service may assert a lien against such goods under 19 C.F.R.

---

[18]   As described in TSA Motion and pursuant to the Reyes TSA, the Debtors are also required to calculate, apply, and remit, as applicable, Excise Taxes for products processed through the Debtors' systems on behalf of Reyes, including filing required alcohol and excise tax returns for such transactions on behalf of Reyes.  As described in the TSA Motion and the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Operating the Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, and (C) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Certain Postpetition Intercompany Transactions, and (III) Granting Related Relief* (the "Cash Management Motion"), such amounts have been and/or will be either prefunded or reimbursed by Reyes.  For the avoidance of doubt, the Debtors do not seek authority to perform such Reyes TSA Services under this Motion but rather request such authority as part of the TSA Motion and/or the Cash Management Motion, as applicable.

[19]   Following the recent United States Supreme Court ruling, the Debtors expect to receive a refund for amounts previously remitted in connection with tariffs paid under the International Emergency Economic Powers Act.  *See Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026).

[20]   The Customs Brokers do not pay the taxes themselves; instead, they transfer the funds provided to them for payment to the applicable Authority.

12

§ 141.1 (2008).  Any such actions would impair the Debtors' ability to conduct business across borders, resulting in immediate and irreparable harm to the Debtors' estates.

23.     In 2025, the Debtors paid approximately $35 million in Customs Duties to the applicable Authorities.  As of the Petition Date, the Debtors estimate that they have incurred or accrued approximately $1.1 million in prepetition Customs Duties.  Additionally, the Debtors incur fees payable to Customs Brokers in the ordinary course of business.[21]  The Debtors request authority to pay any Customs Duties and Customs Brokers' fees that are due and owing as of the Petition Date and to continue to pay Customs Duties and Customs Brokers' fees as they become due in the ordinary course of business during these chapter 11 cases.

## VI.     Sales and Use Taxes.

24.     In the ordinary course of business, the Debtors incur, collect, and remit sales and use taxes (including interest and penalties on any late payments and, in applicable jurisdictions, commercial activity taxes) to the relevant Authorities in connection with the sale, purchase, and use of goods and services (collectively, the "Sales and Use Taxes").  Sales and Use Taxes are general consumption taxes charged at either the point of purchase or the point of sale for goods and services and are usually set by the relevant Authority as a percentage of the retail price of the applicable good or service purchased.  The process by which the Debtors remit Sales and Use Taxes varies depending on the Authority.  The Debtors generally accrue Sales and Use Taxes on a monthly basis, as applicable, and remit such taxes in the month or quarter following the period in which they are accrued.  In 2025, the Debtors remitted approximately $2.6 million in Sales and Use Taxes to the applicable Authorities.

---

[21]   The Customs Brokers' fees are included on freight invoices and are not delineated as separate line items.  Accordingly, it is difficult to quantify the precise amount of such fees.

25.     As of the Petition Date, the Debtors estimate that they owe approximately $6.5 million in Sales and Use Taxes.[22]  The Debtors request authority to pay any Sales and Use Taxes that are due and owing as of the Petition Date and to continue to pay Sales and Use Taxes as they become due in the ordinary course of business during these chapter 11 cases.

## VII.    Regulatory, Licensing, and Other Taxes and Fees.

26.     In the ordinary course of business, the Debtors incur certain other Taxes and Fees, including:  (a) regulatory assessments, annual reporting, permitting, operational, and other recurring licensing fees related to the brokering and distribution of alcoholic beverages; (b) environmental fees and corporate filing fees; and (c) other miscellaneous taxes and fees (collectively, the "Regulatory, Licensing, and Other Taxes and Fees").  The Debtors typically remit the Regulatory, Licensing, and Other Taxes and Fees to the relevant Authorities as they become due, either on a quarterly, monthly, or annual basis, depending on the specific tax or fee. In 2025, the Debtors paid approximately $2.6 million in Regulatory, Licensing, and Other Taxes and Fees.

27.     As of the Petition Date, the Debtors estimate that they owe approximately $500,000 on account of Regulatory, Licensing, and Other Taxes and Fees.  The Debtors request authority to pay any Regulatory, Licensing, and Other Taxes and Fees owed as of the Petition Date and to continue paying Regulatory, Licensing, and Other Taxes and Fees as they become due in the ordinary course of business during these chapter 11 cases.

---

[22]   As described in the TSA Motion and pursuant to the Reyes TSA, the Debtors are also required to calculate, apply, and remit, as applicable, Sales and Use Taxes for customer transactions processed through the Debtors' systems on behalf of Reyes.  As described in the TSA Motion and the Cash Management Motion, such amounts have been and/or will be either prefunded or reimbursed by Reyes.  For the avoidance of doubt, the Debtors do not seek authority to perform such Reyes TSA Services under this Motion but rather request such authority as part of the TSA Motion and/or the Cash Management Motion, as applicable.

14

## VIII.   Tax Service Providers.

28.      In the ordinary course of business, the Debtors use third-party tax service providers, including PricewaterhouseCoopers LLP,[23] Aprio LLP, Walton Management Services, Inc., Automatic Data Processing, Inc., and Ryan (collectively, the "Tax Service Providers") to facilitate the calculation and payment of Taxes and Fees.  Such services may include, among other things, compliance and provision preparation, assistance in claiming tax refunds, calculation of Sales and Use Taxes, and remittance of taxes to the Authorities on behalf of the Debtors.  In addition to other services and as discussed herein, Ryan also assists the Debtors in remitting certain Property Tax obligations to the appropriate Authorities.  On an annual basis, the Debtors generally remit approximately $3.5 million in aggregate fees to the Tax Service Providers.

29.      As of the Petition Date, the Debtors estimate that they owe approximately $300,000 on account of the Tax Service Providers' prepetition services.  The Debtors believe that continuation of the Tax Service Providers' services is necessary to assure the Debtors' compliance with the various taxing regimes to which they are subject, particularly in light of the highly regulated nature of the Debtors' businesses.  The Debtors need the expertise of the Tax Service Providers to track and provide necessary tax services, which encompass tasks that would otherwise overburden the Debtors and distract the Debtors' personnel from the administration of these chapter 11 cases.  Additionally, the Tax Service Providers' services reduce the risk of having to pay reinstatement fees, penalties, or interest on missed payments.  Accordingly, the Debtors request authority to pay any amounts to the Tax Service Providers that are due and owing as of the Petition Date and to continue to pay amounts to the Tax Service Providers on account of services

---

[23]   For the avoidance of doubt, as of the Petition Date, the Debtors have no outstanding amounts owed to PricewaterhouseCoopers LLP.

15

provided by the Tax Service Providers as they come due in the ordinary course of business during these chapter 11 cases.

**IX.     Audits.**

30.     The Debtors may be subject to Audits (or voluntary disclosures of unpaid tax amounts that give rise to an agreed Assessment), which may result in additional prepetition Taxes and Fees being assessed against the Debtors during the pendency of these chapter 11 cases. Critically, in certain jurisdictions where the Debtors operate, the Debtors must be able to accept a proposed resolution of an Audit (or voluntary disclosure) and make a payment with respect to such resolution in a timely manner.

31.     The Debtors seek authority to negotiate with any applicable Authority regarding any Assessments or Audits and to pay or remit any obligations on account of Audits as they arise in the ordinary course of business.  This includes obligations resulting from the resolution of issues addressed in an Audit, the satisfaction of any Assessments, or amounts arising in connection with a voluntary disclosure.  Nothing in this Motion, the Order, or any related order constitutes or should be construed as an admission of liability by the Debtors with respect to any Audit (or voluntary disclosure) or Assessment.  The Debtors expressly reserve all rights with respect to any Audit (and voluntary disclosure).  Furthermore, the Debtors reserve the right to contest any Assessments claimed to be due as a result of any Audits.

32.     As of the Petition Date, at least five[24] Audits are pending against the Debtors, and the Debtors may become subject to additional Audits in the future.  As of the Petition Date, the Debtors cannot predict with certainty how much they may owe on account of Assessments arising

---

[24]     The Debtors are currently subject to pending Audits in the following jurisdictions:  Florida; Jefferson Parish, Louisiana; Michigan; South Dakota; and Texas.  These Audits may result in the assessment of additional prepetition Taxes and Fees against the Debtors during the course of these chapter 11 cases.

out of the pending or future Audits.    Accordingly, the Debtors request authority to pay any amounts owed on account of the Audits, including any Assessments, as of the Petition Date and to continue paying such amounts owed on account of the Audits as they become due in the ordinary course of business during these chapter 11 cases.

**X.      Tax Planning Activities.**

33.      Finally, the Debtors seek authority to undertake certain typical Tax Planning Activities, which, if required, may involve Entity Conversions, Entity Classification Elections, and/or Entity Movements, among other related activities.  The Debtors, and companies like the Debtors, routinely engage in Tax Planning Activities; however, it is often not possible to know precisely which Tax Planning Activities will be required at the outset of any particular tax year or as a result of any particular set of circumstances, including one or more potential sales of the Debtors' assets or businesses.  Accordingly, the Debtors cannot predict whether any Tax Planning Activities will be necessary in order to conserve estate resources by realizing any available tax efficiencies.  Having the authority to engage in Tax Planning Activities at the outset of these chapter 11 cases will therefore provide the Debtors with the flexibility that they need to quickly adapt to changing tax situations, including those that may arise in connection with a sale or other disposition of their assets.

34.      If the Debtors are not granted the authority to engage in Tax Planning Activities *ex ante*, they could miss the opportunity to realize tax savings, as certain circumstances—including those arising in the context of a potential sale—require quick action.  Granting the Debtors the authority to engage in Tax Planning Activities, should they become necessary, will allow the Debtors to take the necessary steps without delay.  Although the Debtors consider Tax Planning Activities to constitute ordinary course operations, explicit authority to engage in such activities will allow the Debtors to act with certainty if and when they act to protect beneficial tax attributes

17

and maximize value, whether in the ordinary course or in connection with a sale transaction. Accordingly, out of an abundance of caution, the Debtors seek authority to engage in any Tax Planning Activities in the ordinary course of the Debtors' business on a postpetition basis.

**Basis for Relief**

**I.      Certain Taxes and Fees May Not Be Property of the Debtors' Estates.**

35.      Section 541(d) of the Bankruptcy Code provides, in relevant part, that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtors' legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d). Certain Taxes and Fees, including sales taxes, are collected or withheld by the Debtors and held in trust on behalf of the applicable Authorities. *See, e.g.*, 26 U.S.C. § 7501(a) (stating that certain taxes and fees are held in trust); *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 57–60 (1990) (holding that certain taxes are property held by the debtor in trust for another and, as such, do not constitute property of the estate); TEX. TAX CODE ANN. § 111.016(a) (Vernon 2007) ("Any person who receives or collects a tax or any money represented to be a tax from another person holds the amount so collected in trust for the benefit of the state and is liable to the state for the full amount collected plus any accrued penalties and interest on the amount collected."). These Taxes and Fees are therefore not property of the Debtors' estates under section 541 of the Bankruptcy Code. *See, e.g.*, *Begier*, 496 U.S. at 56–57 (holding that any prepetition payment of trust fund taxes is not an avoidable preference because the funds are not the debtor's property); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("[C]ertain prepetition tax claims, such as sales taxes, could be trust fund claims."); *In re Shank*, 792 F.2d 829, 833 (9th Cir. 1986) (holding that a sales tax required by state law to be collected by seller from their customers is a "trust fund" tax and not

18

released by bankruptcy discharge). For example, all U.S. federal internal revenue tax that is withheld is considered to be held in trust in a special fund for the benefit of the United States. *See Begier*, 496 U.S. at 60. Failure to pay such Taxes and Fees can give rise to personal liability for the Debtors' directors and officers. Because the Debtors generally do not have an equitable interest in funds held on account of such "trust fund" Taxes and Fees, the Debtors should be permitted to pay those "trust fund" taxes to the applicable Authorities as they become due.

**II.      Certain Taxes and Fees May Be Secured or Priority Claims Entitled to Priority Treatment Under the Bankruptcy Code.**

36.      Claims on account of certain Taxes and Fees may be entitled to priority treatment under the Bankruptcy Code. *See* 11 U.S.C. § 507(a)(8) (describing taxes entitled to priority treatment). To the extent that such amounts are entitled to priority treatment under the Bankruptcy Code, the respective Authorities may attempt to assess fees, interest, and penalties if such amounts are not paid. *See* 11 U.S.C. § 507(a)(8)(G) (providing that penalties related to priority taxes under sections 507(a)(8)(A) through (F) that compensate the government for actual pecuniary loss are accorded priority). Claims entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code must be paid in full to satisfy section 1129(a)(9)(C) of the Bankruptcy Code. Therefore, payment of certain of the Taxes and Fees at this time only affects the timing of the payment for the amounts at issue and will not unduly prejudice the rights and recoveries of junior creditors. *See In re Equalnet*, 258 B.R. 368 at 370 ("[C]ertain types of claims enjoy a priority status in addition to being sometimes critical to the ongoing nature of the business. For instance . . . certain tax claims are both priority claims in whole or in part. The need to pay these claims in an ordinary course of business time frame is simple common sense."). Payment of such Taxes and Fees will likely provide the Authorities with no more than what they would otherwise be entitled

to receive under a chapter 11 plan while saving the Debtor from potential interest expenses, legal expenses, and penalties that might otherwise accrue during these chapter 11 cases.

37.     In addition, some of the Taxes and Fees may be secured by certain of the Debtors' property.  As secured claims, these Taxes and Fees would be entitled to priority treatment either upon the sale of the property to which they are attached or when the Debtors confirm a chapter 11 plan.  *See* 11 U.S.C. §§ 506(a), 1129(a)(9)(C), 1129(b)(2)(A) (requiring that any plan of reorganization "crammed down" over a class of secured creditors pay those creditors in full or allow those creditors to retain their liens).  Moreover, if not timely paid, such secured claims could accrue interest.  Granting authority to pay secured Taxes and Fees would therefore only affect the timing of the payments and will not unduly prejudice the rights and recoveries of other creditors, and should therefore be approved.

**III.     Payment of Taxes and Fees and Undertaking the Tax Planning Activities as Provided Herein Are Sound Exercises of the Debtors' Business Judgment.**

38.     Courts in the Fifth Circuit and elsewhere have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business' going-concern value.  *See e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Equalnet*, 258 B.R. at 369–370; *see also In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims outside of a confirmed chapter 11 plan.

39.  Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also In re James A. Phillips, Inc.*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 of the Bankruptcy Code to allow a contractor to pay prepetition claims of suppliers who were potential lien claimants because such payments were necessary for the general contractors to release funds owed to debtors).  In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor in possession to 'protect and preserve the estate, including an operating business' going concern value." *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ*, 273 B.R. at 497).

40.  Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under section 105(a) of the Bankruptcy Code, courts may "authorize the payment of pre-petition claims when such payment is deemed necessary to the survival of a debtor in a chapter 11 reorganization." *See In re Just for Feet*, 242 B.R. at 824.  Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  *See, e.g., In re Ionosphere Clubs*, 98 B.R. at 174, 175–176; *In re Lehigh & New England Ry. Co.*, 657

F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment").   A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs*, 98 B.R. at 175 (citing *Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286 (1882)).   The Bankruptcy Code authorizes the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here.   *See, e.g.*, *In re CoServ*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate.").   Indeed, at least one court has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *Id.*

41. The Debtors' ability to timely pay the Taxes and Fees is critical to their continued and uninterrupted operations.  If certain Taxes and Fees remain unpaid, the Authorities may seek to recover such amounts directly from the Debtors' directors, officers, or employees, thereby distracting such key personnel from the administration of these chapter 11 cases.  *See, e.g.*, TEX. TAX CODE ANN. § 111.016 (Vernon 2007) (persons who hold money paid as a tax for the benefit of the state are liable to the state for the full amount); *In re Tex. Pig Stands, Inc.*, 610 F.3d 937, 941 (5th Cir. 2010); *see also Schmehl v. Helton*, 662 S.E.2d 697, 707 (W. Va. 2008) (noting that corporate officers may be held responsible for payment of certain corporate taxes); *In re Am. Motor Club, Inc.*, 139 B.R. 578, 581–83 (Bankr. E.D.N.Y. 1992) (citing *United States v. Energy Res. Co.*, 495 U.S. 545 (1990)) (stating "[i]f the employer fails to pay over the trust fund taxes, the IRS may collect an equivalent amount directly from officers or employees of the

22

employer who are responsible for collecting the tax" and finding director personally liable for unpaid taxes). Any collection action on account of such amounts, and any potential ensuing liability, would distract the Debtors and their personnel to the detriment of the Debtors' estates and all parties in interest. The dedicated and active participation of the Debtors' officers and employees is integral to the Debtors' continued operations and the orderly administration—and ultimately the success of—these chapter 11 cases.[25]

42. Additionally, the Debtors' failure to timely pay Taxes and Fees may result in increased tax liability for the Debtors if interest and penalties accrue on the unpaid Taxes and Fees, which amounts may also be entitled to priority treatment. Such a result would be contrary to the best interests of the Debtors' estates and all stakeholders. As discussed herein, many of the Taxes and Fees may be secured by certain of the Debtors' property and therefore entitled to priority status pursuant to section 507(a)(8)(C) of the Bankruptcy Code. As priority claims, these obligations must be paid in full before any general unsecured obligations of the Debtors may be satisfied. To the extent that the Debtors are not able to timely pay the prepetition Taxes and Fees, they may ultimately be required to pay those amounts with additional interest and penalties. The Debtors' failure to pay the prepetition Taxes and Fees as they come due may therefore ultimately increase the amount of priority claims held by the Authorities against the Debtors' estates, to the detriment of the Debtors' general unsecured creditors and other non-priority creditors. *See* 11 U.S.C. §§ 507(a)(8)(C) and 507(a)(8)(G). Accordingly, the Debtors request that the Court authorize the

---

[25] For the avoidance of doubt, nothing herein is a concession that the Debtors' officers, directors, or employees would have personal liability for any unpaid Taxes and Fees. However, the threat of such collection efforts, even if ultimately unwarranted, would be a severe distraction. In addition, such individuals may be entitled to indemnification from the Debtors' estates, which would result in unnecessary costs to the detriment of the Debtors' stakeholders.

Debtors to pay all prepetition and postpetition obligations on account of Taxes and Fees, including any Assessments.

43.     Finally, the Debtors' ability to engage in Tax Planning Activities, if necessary and without delay, is an essential ordinary course function that allows the Debtors to maximize tax efficiencies.   This authority is particularly important as the Debtors evaluate potential sale transactions, where timely tax planning may be critical to preserving the value of their estates for the benefit of all stakeholders.  The Tax Planning Activities are routine actions that sophisticated enterprises like the Debtors take on a regular basis to minimize unnecessary expenditure and ensure efficient tax profiles.  Just as there are numerous other situations where courts may "apply the Doctrine of Necessity to authorize payment of prepetition claims," circumstances may arise in these chapter 11 cases where Tax Planning Activities are necessary to preserve critical tax attributes and estate resources.  *In re CoServ*, 273 B.R. at 497.  As previously discussed, tax circumstances can change quickly and having the authority to engage in Tax Planning Activities at the outset of these chapter 11 cases will provide the Debtors with the tools and certainty needed to exercise sound business judgment, optimize their tax profiles, and maximize value.  By contrast, failure to engage in Tax Planning Activities, if and when they become necessary, would risk additional cost to the Debtors' estates and economic harm to all of the Debtors' stakeholders.  Such an outcome directly conflicts with the Debtors' duties as fiduciaries to maximize the value of their estates.  *See id.* ("Implicit in the duties of a . . . debtor in possession . . . is the duty of such a fiduciary to protect and preserve the estate, including an operating business's going concern value.")  Accordingly, the Debtors request that the Court authorize the Debtors to undertake any Tax Planning Activities in the ordinary course of business on a postpetition basis.

24

44.     Courts in this district routinely approve relief similar to that requested herein.  *See,
e.g.*, *In re QVC Group, Inc.*, No. 26-90447 (ARP) (Bankr. S.D. Tex. Apr. 17, 2026) (authorizing
debtors to pay prepetition taxes and fees in the ordinary course of business and undertake tax
planning activities); *In re Nine Energy Service, Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. Feb.
4, 2026) (same); *In re Kleopatra Finco S.à r.L.*, No. 25-90642 (CML) (Bankr. S.D. Tex. Nov. 5,
2025); *In re Anthology Inc.*, No. 25-90498 (ARP) (Bankr. S.D. Tex. Sept. 30, 2025) (same); *In re
Sunnova Energy Int'l Inc.*, No. 25-90160 (ARP) (Bankr. S.D. Tex. June 9, 2025) (same).[26]

## Emergency Consideration

45.     The Debtors request emergency consideration of this Motion in accordance with
Bankruptcy Local Rule 9013-1 and section G of the Complex Case Procedures, and pursuant to
Bankruptcy Rule 6003, which empowers a court to grant certain relief within the first 21 days after
the commencement of a chapter 11 case to the extent that such "relief is needed to avoid immediate
and irreparable harm."  Fed. R. Bankr. P. 6003(a).  As set forth herein, an immediate and orderly
transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to receive
the relief requested in this Motion during the first 21 days of these chapter 11 cases would imperil
the Debtors' operations at this critical juncture and cause immediate and irreparable harm.  The
requested relief is necessary for the Debtors to operate their businesses in the ordinary course,
preserve the ongoing value of their operations, and maximize the value of their estates for the
benefit of all stakeholders.  Accordingly, the Debtors have demonstrated that the requested relief
is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003,
and the Court should grant the requested relief.

---

[26]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.
Copies of these orders are available upon request of the Debtors' proposed counsel.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

46.    The Debtors will have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to debtor-in-possession financing and the consensual use of cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored.  Therefore, the Debtors request authority to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, direct debit, wire transfer, ACH, or other payment requests in respect of the relief requested in this Motion.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

47.    The Debtors request that the Order include a finding that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exempt such relief from the 14-day stay under Bankruptcy Rule 6004(h).

**Modification of Bankruptcy Rule 2002(a)(2)**

48.    The Debtors request that the Court, for cause, modify the service requirements set forth in Bankruptcy Rule 2002(a)(2) to limit service of this Motion only to the core service list and affected creditors.  In light of the breadth and complexity of the Debtors' business, serving the Motion on all creditors, even those that are unaffected by the relief sought herein, would cause unnecessary confusion and expense to the detriment of all stakeholders.  Accordingly, sufficient cause exists under Bankruptcy Rule 2002(a)(2) to modify the service requirements for this Motion.

**Reservation of Rights**

49.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested in this Motion is intended as or should be construed or deemed to be: (a) an implication or admission as to the amount of, basis for, priority, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien (that arises under contractual rights, common law, statutory law, or otherwise) on, security interest in, or other encumbrance on property of the Debtors' estates, including any lien that may be satisfied pursuant to the relief requested in this Motion, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; or (h) a waiver of the obligation of any party in interest to file a proof of claim.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

50.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Bank Lenders; (d) the Bank Agent; (e) the Second Lien Lender; (f) the Equipment Loan Lenders; (g) holders of the Owner Notes; (h) the office of the attorney general for each of the states in which the Debtors operate; (i) the IRS; (j) any other governmental agencies having a regulatory or statutory interest in these chapter 11 cases; (k) the Authorities; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors request that the Court enter the Order granting the relief

requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
Dated: July 27, 2026

*/s/ John F. Higgins*

| | |
|---|---|
| **PORTER HEDGES LLP** | **KIRKLAND & ELLIS LLP** |
| John F. Higgins (TX Bar No. 09597500) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| M. Shane Johnson (TX Bar No. 24083263) | Joshua A. Sussberg, P.C. (*pro hac vice* pending) |
| Megan Young-John (TX Bar No. 24088700) | Christopher Marcus, P.C. (*pro hac vice* pending) |
| Joanna D. Caytas (TX Bar No. 24127230) | Maddison Levine (*pro hac vice* pending) |
| 1000 Main St., 36th Floor | 601 Lexington Avenue |
| Houston, Texas 77002 | New York, New York 10022 |

PORTER HEDGES LLP
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Joanna D. Caytas (TX Bar No. 24127230)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone:     (713) 226-6000
Facsimile:     (713) 228-1331
Email:          jhiggins@porterhedges.com
                    sjohnson@porterhedges.com
                    myoung-john@porterhedges.com
                    jcaytas@porterhedges.com

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christopher Marcus, P.C. (*pro hac vice* pending)
Maddison Levine (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                    cmarcus@kirkland.com
                    maddison.levine@kirkland.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

## Certificate of Accuracy

In accordance with Bankruptcy Local Rule 9013-1(i), I certify that the foregoing statements are true and accurate to the best of my knowledge.

*/s/ John R. Castellano*
John R. Castellano

## Certificate of Service

I certify that on July 27, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.  Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' proposed claims and noticing agent.

*/s/ John F. Higgins*
John F. Higgins