**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC, *et al.*,[1] | ) ) | Case No. 26-90737 (CML) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u>
MOTION FOR ENTRY OF AN
ORDER (I) AUTHORIZING THE DEBTORS TO
(A) PAY PREPETITION WAGES, SALARIES, OTHER
COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE
EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested.  Relief is requested not later than 2:00 p.m. (prevailing Central Time) on July 27, 2026.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on July 27, 2026, at 2:00 p.m. (prevailing Central Time) in Courtroom 402, 4th floor, 515 Rusk Street, Houston, Texas 77002.  Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Lopez's homepage.  The meeting code is "JudgeLopez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Lopez's homepage.  Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/RNDC.  The location of Debtor Republic National Distributing Company, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 4300 Wildwood Parkway, Suite 200, Atlanta, GA 30339.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion"):[2]

**Relief Requested**

1.     The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"):   (a) authorizing the Debtors to (i) pay all prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto; and (b) granting related relief.

**Jurisdiction and Venue**

2.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012.   This is a core proceeding pursuant to 28 U.S.C. § 157(b).   The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), 541(b)(1), and 1107 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532

---

[2]     A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of John R. Castellano, Chief Restructuring Officer of Republic National Distributing Company, LLC and its Debtor Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.   Capitalized terms used but not immediately defined in this Motion shall have the meanings ascribed to such terms in the First Day Declaration or later in this Motion, as applicable.

(the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 1075-1, 2002-1, and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

## Background

5.      Republic National Distributing Company, LLC ("RNDC," and together with its Debtor and non-Debtor affiliates, the "Company") was, at its height, the nation's second largest alcoholic beverage distributor, operating across 40 states and specializing in wine and spirits distribution.  Built on the strong foundation of three family-owned businesses, the Company historically enjoyed deep-seated relationships with over 2,000 suppliers and 170,000 customers across its expansive nationwide distribution network.  With headquarters in Atlanta, Georgia, the Debtors currently operate across 21 states and employ a workforce of approximately 1,460 employees.

6.      On July 26, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion contemporaneously herewith requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

## The Debtors' Workforce

7.      As of the Petition Date, the Debtors employ approximately 1,460 employees (collectively, the "Employees"), of which approximately 1,450 are full-time Employees and 10 are

3

part-time Employees.[3]  Approximately 450 Employees are paid on an hourly basis, 950 Employees are paid a salary, and the other 60 Employees are paid exclusively via sales-based commissions. Approximately 120 Employees are union employees (collectively, the "Union Employees") represented by three[4] local chapters of The International Brotherhood of Teamsters (collectively, the "Unions").  The Union Employees are located at one of the Debtors' various warehouses or distribution centers and are covered by certain collective bargaining agreements (collectively, the "CBAs") between the Unions and Debtors RNDC Shared Services, LLC, Young's Market Company, LLC, and Young's Market Company of Washington, LLC, as applicable.[5]  The Employees perform a variety of critical functions throughout the Debtors' businesses, including, among other things, operating and managing the Debtors' distribution centers and warehouse operations, building relationships with suppliers and customers, and providing necessary administrative, managerial, and financial support services.

8.  In addition to the Employees, the Debtors' workforce includes approximately 250 temporary employees (collectively, the "Temporary Employees") and 20 independent contractors (collectively, the "Independent Contractors," and collectively with the Temporary Employees and the Employees, the "Workforce"), in each case sourced periodically from 30 staffing agencies (collectively, the "Staffing Agencies").  Given the number of Temporary Employees and

---

[3]  The Debtors' non-Debtor affiliates also employ approximately 2,050 employees, of which approximately 740 are employed by National Distributing Company Inc. ("NDC"), the non-Debtor parent company.  For the avoidance of doubt, the relief requested herein relates only to the Debtors' Workforce.

[4]  For the avoidance of doubt, the Unions described herein include only those Unions that are associated with existing Employees and do not include any Unions associated with former Employees or non-Debtor employees. Certain recently terminated Union Employees may be entitled to Severance Payments and/or other benefits under other collective bargaining agreements not described herein, and such Unions affiliated with former Employees have made certain customary demands for effective bargaining under applicable law.

[5]  Certain non-Debtor affiliates are also party to collective bargaining agreements with various local chapters of certain labor force unions.  For the avoidance of doubt, the relief requested herein relates solely to the Debtors' Union Employees.

Independent Contractors that the Debtors engage, the Debtors utilize managed services programs administered by L2 Source, LLC (the "Managed Services Provider") to manage the administrative, legal, and logistical obligations associated with all the Temporary Employees, nearly all of the Independent Contractors, and most of the Staffing Agencies. Payments to all of the Temporary Employees, all but one Independent Contractor, and most of the Staffing Agencies are made indirectly by the Managed Services Provider.

9.      In the ordinary course of business, the Debtors engage the Temporary Employees and the Independent Contractors to provide interim or specialty services for certain targeted transactions or projects on an as-needed basis. The Temporary Employees and the Independent Contractors provide flexibility to the Debtors' Workforce and enable the Debtors to meet their operational needs in a cost-effective and efficient manner.

10.     The Workforce performs a wide variety of functions that are critical to the Debtors' ongoing operations and preserving the value of the Debtors' estates. Members of the Workforce possess unique skills and experience with respect to the Debtors' core business, including close relationships with the Debtors' expansive network of suppliers and customers who are the lifeblood of the Debtors' business. The Workforce's essential job functions include sales, marketing, customer relations, supply chain management, and corporate responsibilities such as treasury and accounting. The Workforce's skills, knowledge, and understanding of the Debtors' operations, including familiarity with the Debtors' supply chain and internal infrastructure, are essential to preserving operational stability and efficiency. In many instances, these individuals are highly trained and have an essential working knowledge of the Debtors' businesses such that they cannot be easily replaced. Moreover, several members of the Workforce perform critical

services related to the TSAs.[6]  Simply put, without the continued, uninterrupted services of the Workforce, the Debtors' business operations would suffer immediate and irreparable harm and the sale efforts would be materially impaired.  Additionally, a temporary disruption would almost certainly foreclose the possibility of consummating any value-maximizing going-concern sales by severely impairing the Company's goodwill and reputation among suppliers and customers.

11.     Moreover, the vast majority of the Workforce relies exclusively on their Compensation and Benefits to pay their daily living expenses and to support their families.  The Workforce would be exposed to significant financial hardship if the Debtors are not permitted to continue paying their compensation and providing them with health insurance and other benefits during these chapter 11 cases in the ordinary course of business.  Consequently, the Debtors submit that the relief requested herein is necessary and appropriate.

**Compensation and Benefits**

12.     To minimize the personal hardship that the Workforce would suffer and potential attrition that likely would follow if prepetition Workforce-related obligations are not paid or remitted to such parties when due or expected, the Debtors seek authority to:  (a) pay and honor certain prepetition claims, if any, relating to, among other things, Compensation and Withholding Obligations, Health and Welfare Coverage and Benefits, Managed Services Provider Fees, Independent Contractor Obligations, Staffing Agency Fees, Non-Employee Director Compensation, Reimbursable Expenses, Non-Insider Employee Bonus Programs, the Workers'

---

[6]   As described in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue to Provide All TSA Services and Honor All Obligations Related Thereto and (II) Granting Related Relief* (the "TSA Motion"), filed contemporaneously herewith, the Debtors provide certain services related to the Compensation and Benefits to Reyes and Quality Brands under the TSAs (each as defined and described in the TSA Motion).  For the avoidance of doubt, the Debtors do not seek authority to continue to provide such TSA Services (as defined in the TSA Motion) or honor obligations in connection therewith in this Motion but rather request such authority in the TSA Motion.

Compensation Program, Payroll Processing Fees, Paid Leave Benefits, Retirement Programs, Severance Payments, WARN Act Obligations, Additional Benefit Programs, and certain other compensation or benefits that the Debtors provide in the ordinary course (collectively, the "Compensation and Benefits");[7] and (b) continue to honor and pay all costs related to, or on account of, the Compensation and Benefits on a postpetition basis in the ordinary course consistent with past practice.

13.     Subject to Court approval, the Debtors intend to continue their prepetition Compensation and Benefits in the ordinary course of business consistent with past practice on a postpetition basis and pay all necessary costs related thereto.  Recognizing that certain of the Compensation and Benefits are mandated by applicable law, out of an abundance of caution, the Debtors request confirmation of their right to (a) modify, change, and/or discontinue any of their Compensation and Benefits and (b) implement new programs, policies, and benefits on a postpetition basis in the ordinary course of business, in each case, in the Debtors' sole discretion and without the need for further Court approval, subject to applicable law.

14.     As set forth below, the Debtors seek authority to make the following payments or reimbursements related to prepetition amounts owed on account of the Compensation and Benefits:

---

[7]     The descriptions of the Compensation and Benefits set forth in this Motion constitute a summary only.  The actual terms of the agreements, contracts, plans, programs, and manuals governing the Compensation and Benefits will govern in the event of any inconsistency between such documents and this Motion.  The Debtors request authority to honor obligations related to the Compensation and Benefits in the ordinary course of business consistent with past practices regardless of whether the Debtors inadvertently failed to include a particular benefit or aspect of compensation in the defined term "Compensation and Benefits," and any such omitted benefits or aspect of compensation are hereby included in the defined term "Compensation and Benefits" as used herein and in the Order.

| Relief Sought | Prepetition Amount |
|---|---|
| **Compensation and Withholding Obligations** | **$7,690,000** |
| Employee Wages | $2,580,000 |
| Commissions | $300,000 |
| Managed Services Provider Fees | $874,000 |
| Independent Contractor Obligations | $6,000 |
| Staffing Agency Fees | $450,000 |
| Payroll Deductions, Payroll Taxes, and Union Dues | $1,810,000 |
| Payroll Processing Fees | $30,000 |
| Non-Insider Employee Bonus Programs | $1,280,000 |
| Non-Employee Director Compensation | $0 |
| Reimbursable Expenses | $360,000 |
| **Health and Welfare Coverage and Benefits** | **$7,697,000** |
| Medical and Prescription Coverage | $7,350,000 |
| FSA and HSA Coverage | $64,000 |
| Dental Insurance Coverage | $200,000 |
| Vision Insurance Coverage | $0 |
| Life Insurance and AD&D Coverage | $53,000 |
| COBRA | $26,000 |
| Other Coverage | $4,000 |
| **Workers' Compensation Program** | **$1,100,000** |
| **Retirement Programs** | **$1,421,000** |
| 401(k) Plan | $120,000 |
| Pension Plans | $1,131,000 |
| Union Retirement Plans | $170,000 |
| **Paid Leave Benefits** | **$4,800,000** |
| **Non-Insider Severance Programs** | **$2,430,000** |
| Employee Severance Program | $2,400,000 |
| Union Severance Programs | $30,000 |
| **WARN Act Obligations** | **$0** |
| **Additional Benefit Programs** | **$80,000** |
| **Total** | **$25,218,000** |

15.     As of the Petition Date, with the exception of certain former non-Insider Employees pursuant to the Non-Insider Severance Programs and the Debtors' PTO program, the Debtors do not believe that they owe any members of the Workforce any prepetition amounts in excess of the priority amount of $17,150 imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code

(the "Priority Claim Amount").[8]   However, the Debtors believe that they may owe certain Employees unpaid Employee Obligations in excess of the Priority Claim Amount, as obligations related to the Debtors' Non-Insider Severance Programs and PTO program arise in the ordinary course.[9]   Accordingly, the Debtors seek authority to make payments in excess of the Priority Claim Amount relating to the Non-Insider Severance Programs and the PTO program, as necessary in the ordinary course of business.   For the avoidance of doubt, to the extent that the Debtors seek to pay other outstanding prepetition amounts on account of the Compensation and Benefits outside of the Non-Insider Severance Programs and the PTO program in excess of the Priority Claim Amount, the Debtors shall seek such relief pursuant to a separate motion or notice.

**I.      Compensation and Withholding Obligations.**

16.      In the ordinary course of business, the Debtors incur obligations to their Workforce on account of Employee Obligations, Managed Services Provider Fees, Independent Contractor Obligations, Staffing Agency Fees, Withholding Obligations, the Payroll Processing Fees, Non-Insider Employee Bonus Programs, Non-Employee Director Compensation, and Reimbursable Expenses (collectively, the "Compensation and Withholding Obligations").   As of the Petition Date, the Debtors estimate that they owe approximately $7.7 million in the aggregate on account of accrued but unpaid Compensation and Withholding Obligations.   Accordingly, the

---

[8]   For the avoidance of doubt, the Debtors are not requesting authorization to pay any insiders (as such term is defined in section 101(31) of the Bankruptcy Code, collectively, the "Insiders") (a) on account of the Non-Insider Severance Programs, (b) on account of the Non-Insider Key Employee Retention Program, or (c) any amounts in excess of the Priority Claim Amount.   The Debtors reserve all rights with respect to the classification of any Employee as an "Insider," and no description of any Compensation and Benefits hereunder indicating that such Compensation and Benefits covers or is made available to "Insiders" or "non-Insiders" shall be construed as an admission or concession by the Debtors that any Employee is or is not an "Insider."

[9]   While the Debtors do not anticipate making any PTO payments at this time, the Debtors request authority to make such payments in excess of the Priority Claim Amount if it becomes necessary to comply with the Debtors' PTO program and applicable state law.   As described in this Motion, the Debtors request authority to only pay such PTO amounts as they come due when an Employee's tenure with the Company ends in accordance with applicable state law.

9

Debtors seek authority to continue to honor the Compensation and Withholding Obligations, pay any related prepetition claims, and continue to make all payments related thereto on a postpetition basis in the ordinary course of business consistent with past practices.

### A.     Employee Wages.

17.     In the ordinary course of business, the Debtors incur obligations to their Employees for wages, overtime, and similar obligations (collectively, the "Employee Wages").  Employees are either paid on a weekly, bi-weekly, or semi-monthly basis depending on the specific Employee's location and role.  Most of the Employee Wages are paid on a bi-weekly basis via check or direct deposit through the electronic transfer of funds to the Employees' bank accounts.[10] Certain salaried employees receive overtime wages in the event that they work more than 40 hours in any week.  As hourly Employees are generally paid in arrears, most hourly Employees are owed accrued but unpaid Employee Wages as of the Petition Date.  Employee Wages may also be due and owing as of the Petition Date because of, among other factors, potential discrepancies between the amounts paid and the amounts that Employees believe they should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees.

18.     As of the Petition Date, the Debtors estimate that they owe approximately $2.6 million on account of accrued but unpaid Employee Wages.  Accordingly, the Debtors seek authority to continue to pay all Employee Wages, including prepetition amounts with respect

---

[10]   In lieu of receiving a paper check or direct deposit, terminated Employees may elect to have their compensation loaded onto debit cards (collectively, the "Payroll Debit Cards") which are managed by ADP (the "Payroll Debit Card Program").  Employees may utilize the Payroll Debit Cards for personal spending or transfer the funds to a personal bank account.  For the avoidance of doubt, the Debtors do not seek authority to maintain the Payroll Debit Card Program or pay any prepetition amounts with respect thereto under this Motion, but rather request such authority as part of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, and (C) Continue Intercompany Transactions, and (II) Granting Administrative Expense Status to Certain Postpetition Intercompany Transactions, and (III) Granting Related Relief* (the "Cash Management Motion"), filed contemporaneously herewith.

thereto and all payments related thereto on a postpetition basis, as they become due and payable in the ordinary course of business consistent with past practices.

### B. Commissions.

19. In the ordinary course of business, the Debtors pay sales-based commissions (collectively, the "Commissions," and together with the Employee Wages, the "Employee Obligations") to approximately 120 non-Insider Employees (collectively, the "Sales Employees"). The Sales Employees market and sell the Debtors' products and services and generally receive Commissions calculated as a percentage of individual sales. Commissions are paid on a monthly basis, in arrears, one week after the end of the following month.

20. The Commissions are an integral part of the Sales Employees' overall compensation package, and in certain cases, are the exclusive source of compensation for certain Sales Employees. Moreover, the Commissions motivate the Sales Employees to maximize their sales performance and therefore generate value for the Debtors' estates. The Sales Employees rely on the Commissions for their daily living expenses such that failure to pay such Commissions would impose undue hardship.

21. On average, the Debtors pay approximately $300,000 per month on account of Commissions. As of the Petition Date, the Debtors estimate that they owe approximately $300,000 on account of accrued but unpaid Commissions.[11] Due to the particular importance of Commissions to the Debtors' business, including their ability to maintain Sales Employees' morale and sales momentum during these chapter 11 cases, the Debtors seek the authority to pay all

---

[11] For the avoidance of doubt, accrued but unpaid prepetition Commissions do not exceed the Priority Claim Amount.

outstanding prepetition Commissions in full, and to continue to make payments on a postpetition basis in the ordinary course of business consistent with past practices.

       **C.**      **Managed Services Provider Fees, Independent Contractor Obligations, and Staffing Agency Fees.**

22.      In the ordinary course of business, the Debtors retain certain Temporary Employees and Independent Contractors indirectly through the Staffing Agencies.  The Debtors leverage the Staffing Agencies to identify and hire Temporary Employees and Independent Contractors on the Debtors' behalf and manage those Temporary Employees and Independent Contractors at the Debtors' warehouses, distribution centers, and corporate offices.  The Debtors use the Managed Services Provider to pay and manage the majority of the Temporary Employees, Independent Contractors, and Staffing Agencies.  The Debtors make payments to the Managed Services Provider on account of amounts owed to the Temporary Employees and Independent Contractors on either (a) a bi-weekly basis for those Temporary Employees or Independent Contractors that are in information technology or professional roles, or (b) a monthly basis for those Temporary Employees or Independent Contractors that are warehousemen or in operations roles (such amounts, collectively with all amounts paid from the Debtors to the Managed Services Provider, including related fees, the "Managed Services Provider Fees").  In turn, the Managed Services Provider distributes those amounts to the applicable Staffing Agencies on the Debtors' behalf to pay the wages and benefits of the applicable Temporary Employees and Independent Contractors. On average, the Debtors pay approximately $1.1 million per month on account of the Managed Services Provider Fees.

23.      In addition, the Debtors retain and pay seven Staffing Agencies directly for amounts owing to certain Independent Contractors along with such Staffing Agencies' related fees (collectively, the "Staffing Agency Fees"), and the Staffing Agencies distribute such amounts to

the applicable Independent Contractors to pay such Independent Contractors' wages and benefits. Finally, as of the Petition Date, the Debtors pay one Independent Contractor directly (the "Independent Contractor Obligations").  The Independent Contractor and Staffing Agencies who are paid directly submit invoices either on a weekly or monthly basis and are paid in arrears.

24.     As of the Petition Date, the Debtors estimate that they owe approximately $1.3 million in accrued but unpaid Managed Services Provider Fees, Independent Contractor Obligations, and Staffing Agency Fees.  The Debtors believe that the ability to pay the Managed Services Provider Fees, Independent Contractor Obligations, and Staffing Agency Fees is critical to maintaining and administering their estates.  The Debtors therefore request authority to pay all outstanding prepetition amounts incurred on account of the Managed Services Provider Fees, Independent Contractor Obligations, and Staffing Agency Fees and to continue to make such payments on a postpetition basis in the ordinary course of business consistent with past practices.

**D.     Withholding Obligations.**

25.     In the ordinary course of business, the Debtors incur obligations on account of Payroll Deductions, Payroll Taxes, and Union Dues (collectively, the "Withholding Obligations"). In the three-month period preceding the Petition Date, the Debtors incurred a monthly average of approximately $5.7 million per month in Withholding Obligations.  As of the Petition Date, the Debtors estimate that they owe approximately $1.8 million on account of Withholding Obligations. The Debtors submit that, with the exception of the Employer Payroll Taxes, the Withholding Obligations are not property of the estate and are held in trust.  Accordingly, the Debtors seek authority to continue to honor their Withholding Obligations, to pay any prepetition claims with respect thereto, and to continue to make all payments on a postpetition basis related thereto in the ordinary course of business consistent with past practices.

### i.     Payroll Deductions.

26.     During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, child support, and similar deductions required by law.  The Debtors also deduct other pre-tax and post-tax deductions payable pursuant to certain of the Health and Welfare Coverage and Benefits, such as, among others, an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, legally ordered deductions, and miscellaneous deductions (collectively, the "Payroll Deductions"), and forward the Payroll Deductions to various third-party recipients.  During each pay cycle, the Debtors retain only those Payroll Deductions related to the Employees' share of healthcare benefits, insurance premiums, and 401(k) contributions.  Such amounts are generally automatically remitted as they come due to such applicable third parties.  As of the Petition Date, the Debtors estimate that they owe approximately $620,000 on account of the Payroll Deductions. Accordingly, the Debtors request the authority to pay all outstanding prepetition amounts incurred on account of the Payroll Deductions and to continue to make all payments on a postpetition basis in the ordinary course of business consistent with past practices.

### ii.     Payroll Taxes

27.     In addition to the Payroll Deductions, the Debtors are also required by law to withhold from Employee Obligations amounts related to, among other things, federal, state, and local income taxes, as well as Social Security and Medicare taxes, for remittance to the appropriate federal, state, and local taxing authorities (collectively, the "Employee Payroll Taxes").  The Debtors must then match the Employee Payroll Taxes with their own funds and pay, based on a percentage of gross payroll, additional amounts for state and federal unemployment insurance and Social Security and Medicare Taxes (collectively, the "Employer Payroll Taxes," and together

with the Employee Payroll Taxes, the "Payroll Taxes").  The Payroll Taxes are generally processed by the Debtors' payroll tax services provider, Automatic Data Processing, Inc. ("ADP").

28.     The Payroll Taxes are immediately debited from the Company's accounts each payroll period.  In turn, ADP forwards these deposits to the appropriate federal, state, or local taxing authority/agency on behalf of the Debtors, in accordance with each taxing authority or agency's filing and deposit schedule requirements.  As of the Petition Date, the Debtors estimate that they owe approximately $1.2 million on account of accrued but unpaid Payroll Taxes. Accordingly, the Debtors seek authority to pay all outstanding prepetition Payroll Taxes to the appropriate third parties, and to continue to pay such Payroll Taxes on a postpetition basis in the ordinary course of business consistent with past practices.

### iii.     Union Dues.

29.     As part of the CBAs, union dues are withheld from participating Union Employees' paychecks (collectively, the "Union Dues").  This calculation is based both on the number of hours that such Union Employee works and his or her earnings for the applicable pay period.  In the three months immediately preceding the Petition Date, the amount withheld from the Union Employees averaged approximately $10,000 per month.  As of the Petition Date, the Debtors estimate that they owe approximately $10,000 in accrued but unpaid obligations on account of the Union Dues. Accordingly, the Debtors seek authority to pay all outstanding prepetition amounts on account of the Union Dues and to continue paying Union Dues on a postpetition basis in the ordinary course of business consistent with past practices.

### E.     Payroll Processing Fees.

30.     The Debtors utilize ADP for a broad range of human capital management functions, including processing, administering, and managing certain Compensation and Withholding Obligations including payroll.  In connection with maintaining and operating their payroll system,

the Debtors incur fees on account of the services provided by ADP (the "Payroll Processing Fees"). The majority of the Compensation and Benefits obligations are satisfied by direct deposit through electronic funds transfer from the Debtors' disbursement accounts to each member of the Workforce's bank account, with the balance of the Workforce receiving checks. For each payroll period, ADP processes direct deposit transfers or administers payroll checks to the Workforce. ADP is integral to the Debtors' ability to pay their Workforce and preserve the value of their estates.

31.     As of the Petition Date, the Debtors estimate that they owe approximately $30,000 on account of accrued but unpaid Payroll Processing Fees. Accordingly, the Debtors seek authority to pay any prepetition amounts owed to ADP with respect to the Payroll Processing Fees and to continue to make all payments on a postpetition basis in the ordinary course of business consistent with past practices.

**F.     Non-Insider Employee Bonus Programs.**

32.     In the ordinary course of business, the Debtors offer various bonus programs instituted prepetition to certain eligible non-Insider Employees: (a) the Non-Insider Key Employee Retention Program; (b) the Quarterly Incentives Program; (c) the Supplier Incentives Program; and (d) the De Minimis Incentives Programs (collectively, the "Non-Insider Employee Bonus Programs").

33.     As of the Petition Date, the Debtors estimate that they owe approximately $1.3 million on account of the Non-Insider Employee Bonus Programs. Accordingly, the Debtors seek authority to pay all outstanding prepetition amounts incurred on account of the Non-Insider Employee Bonus Programs and to continue the Non-Insider Employee Bonus Programs on a postpetition basis in the ordinary course of business consistent with past practices. For the

16

avoidance of doubt, the Debtors are not seeking relief to pay any Employee that is an Insider under the Non-Insider Employee Bonus Programs.

34.     ***Non-Insider Employee Retention Program***.  In the ordinary course of business, the Debtors maintain a retention bonus program (the "Non-Insider Key Employee Retention Program," and such bonuses paid under the Non-Insider Key Employee Retention Program, collectively, the "Retention Bonuses") for 58 non-Insider Employees deemed critical to the Debtors' business, operations, and sale processes.  The Debtors believe that the Non-Insider Key Employee Retention Program is crucial to both maintaining Employee morale, motivation, and loyalty and to avoiding the disruption that would result if certain key Employees were to leave their positions, especially during the pendency of these chapter 11 cases and as the Debtors pursue the sale processes.  Employees eligible under the Non-Insider Key Employee Retention Program can earn monetary payments for meeting certain requirements depending on the Employee's role, skill set, expertise, and performance.  For each eligible Employee, the Retention Bonus is structured as a percentage of the Employee's individual base compensation.

35.     Pursuant to the Non-Insider Key Employee Retention Program, the Retention Bonuses are distributed to eligible non-Insider Employees in three installments over the retention period.  The retention period began to run when the applicable award notice was provided to an individual Employee, and the award is paid out in installments which vest depending on if the Employee was/is still employed at the Company at the end of April 2026, July 2026, and December 2026, respectively.  Awards vary based on title, ranging from 30 to 75 percent of a participating non-Insider Employee's base salary.  For participating non-Insider Employees, the Retention Bonuses have been or will be paid out pursuant to the following schedule:  (a) the first payment was paid out on April 30, 2026 and equaled either (i) 25 percent of the total retention award payable

17

to such Employee or (ii) 10 percent of the total retention award payable to such Employee; (b) the second payment will be paid out on July 31, 2026 and equals either (i) 30 percent of the total retention award payable to such Employee or (ii) 35 percent of the total retention award payable to such Employee; and (c) the final payment will be paid out on December 31, 2026 and equals either (i) 45 percent of the total retention award payable to such Employee or (ii) 55 percent of the total retention award payable to such Employee.  Pursuant to the Non-Insider Key Employee Retention Program, the unvested portion of the award will accelerate if a participant is terminated without cause during the retention period; *provided* that, if the participant subsequently provides goods or services to a competitor, the accelerated portion of the award will be subject to clawback at the Company's discretion.  In the event that a participant is terminated for cause or the participant voluntarily resigns during the retention period, the unvested portion of the award will be forfeited.  The total aggregate amount expected to be paid on account of the Non-Insider Key Employee Retention Program for 2026 is approximately $4.4 million.

36.     As of the Petition Date, the Debtors do not believe that any amounts are owed on account of the Non-Insider Key Employee Retention Program.  The Debtors estimate that the total amount that will come due under the Non-Insider Key Employee Retention Program after the Petition Date and during the pendency of these chapter 11 cases is approximately $3.5 million. Nevertheless, the Debtors seek authority to pay any prepetition amounts owed on account of the Non-Insider Key Employee Retention Program and to continue to make all payments on a postpetition basis in the ordinary course of business and consistent with past practices.  For the avoidance of doubt, the relief sought with respect to the Non-Insider Key Employee Retention Program does not include payments to any Insiders.

18

37.    ***Quarterly Incentives Program***.   In the ordinary course of business, the Debtors offer a Quarterly Incentives Program (the "Quarterly Incentives Program").  Under the Quarterly Incentives Program, certain non-Union Employees may be eligible to receive incentive payments based on individual performance, title, and other metrics.   The eligibility requirements are established at the corporate level and, while these benchmarks do not vary on a quarterly basis, the quarterly incentives are paid out on a quarterly basis 45 days after the end of each quarter.  As of the Petition Date, the Debtors estimate that they owe approximately $380,000 on account of the Quarterly Incentives Program to non-Insider Employees.

38.    ***Supplier Incentives Program.***   In the ordinary course of business, the Debtors maintain a Supplier Incentives Program (the "Supplier Incentives Program").  Under the Supplier Incentives Program, the Debtors work in concert with various suppliers to institute incentives programs of varying duration (typically 30, 60, or 90 days) for different products, which programs are standard in the alcohol distribution industry.  Commission-based, full-time Employees are eligible for incentives under the Supplier Incentives Program on a regional basis according to their job title and career level.  Incentive payments are made 45 days after the end of any given incentive period.  As of the Petition Date, the Debtors estimate that they owe approximately $900,000 on account of the Supplier Incentives Program to non-Insider Employees.[12]

39.    ***De Minimis Incentives Programs***.  In addition to the specific programs detailed above, the Debtors offer Employees a variety of *de minimis* incentives programs, including relocation bonuses, signing bonuses, and spot bonuses (collectively, the "De Minimis Incentives

---

[12]   $340,000 of the prepetition amounts owed under the Supplier Incentives Program are owed to former Company employees who were transitioned to Reyes in connection with the Reyes Sales on account of supplier incentives earned for the month of May.

Programs"). The De Minimis Incentives Programs support the Debtors' efforts to retain Employees and are provided at the Debtors' discretion on an as-needed basis.

40. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the De Minimis Incentives Programs. Nevertheless, out of an abundance of caution, the Debtors seek authority to pay any prepetition amounts owing on account of the De Minimis Incentives Programs and to continue to make all payments due in connection therewith on a postpetition basis in the ordinary course of business and consistent with past practices.

**G.     Non-Employee Director Compensation.**

41. As of the Petition Date, the Debtors' boards of directors and/or boards of managers (collectively, the "Boards," and such members, the "Directors" or "Managers," as applicable) include four Non-Employee individuals (collectively, the "Non-Employee Directors") who serve as independent and disinterested Directors or Managers, as applicable, for various Debtor entities. The Non-Employee Directors receive monthly cash payments of $40,000 and compensation of between $5,000 and $6,500 on a per diem basis if certain criteria are met (collectively, the "D&M Payments"). The Non-Employee Directors are also entitled to reimbursement for certain reasonable and documented out-of-pocket business expenses incurred in connection with their Board service (the "D&M Reimbursable Expenses," and together with the D&M Payments, the "Non-Employee Director Compensation"). The Non-Employee Directors are a critical component of the Debtors' governance structure and vital to ensuring that the Debtors continue to adhere to the best governance practices.

42. As of the Petition Date, the Debtors do not believe that they owe any prepetition amounts on account of the Non-Employee Director Compensation. However, out of an abundance of caution, the Debtors seek authority to pay any prepetition amounts owing on account of the Non-Employee Director Compensation and to continue paying the Non-Employee Director

Compensation on a postpetition basis in the ordinary course of business consistent with past practices.

**H.    Reimbursable Expenses.**

43.    Prior to the Petition Date and in the ordinary course of business, the Debtors reimburse certain Employees for ordinary, necessary, and reasonable expenses that are approved and incurred on behalf of the Debtors within the scope of such Employees' employment (collectively, the "Reimbursable Expenses").[13]    Reimbursable Expenses include, among other expenses, expenses for business travel, business-related transportation and mileage costs, and business-related entertainment.

44.    Employees pay for the Reimbursable Expenses that they incur by using either a personal credit card or cash.    Employees then periodically submit receipts to request reimbursement of such expenses, as incurred in the normal course, via Emburse Professional, Inc. or ExpenseWire, a Paychex, Inc. company, and if approved in accordance with internal policies and procedures, the Reimbursable Expenses are processed through the Debtors' payroll system. Employees incur the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that such expenses will be reimbursed.  Without continued reimbursement of the Reimbursable Expenses, Employees relying on these benefits would be saddled with additional costs, causing personal financial hardship.

45.    As of the Petition Date, the Debtors owe approximately $360,000 on account of Reimbursable Expenses.  Accordingly, in order to preserve Employee morale and loyalty, the

---

[13]    The Reimbursable Expenses also include certain credit card expenses under the Credit Card Program (as described and defined in the Cash Management Motion).  For the avoidance of doubt, the Debtors do not seek authority to maintain the Credit Card Program or pay any prepetition amounts with respect thereto under this Motion but rather request such authority as part of the Cash Management Motion.  However, to the extent there is any deviation from the description provided herein, the Debtors request relief with regard to all the Reimbursable Expenses, regardless of whether such individual Reimbursable Expenses are specifically identified herein.

Debtors seek authority to pay all outstanding prepetition amounts on account of Reimbursable Expenses and to continue to honor their Reimbursable Expenses on a postpetition basis in the ordinary course of business consistent with past practices.

## II.     Health and Welfare Coverage and Benefits.

46.     In the ordinary course of business, the Debtors offer certain Employees the ability to participate in a number of health, insurance, and benefits programs, including, among other programs, medical and prescription coverage, dental insurance, vision insurance, savings and spending account programs, life, disability, accidental death, and dismemberment insurance, and other employee benefit plans (collectively, the "Health and Welfare Coverage and Benefits").  The Health and Welfare Coverage and Benefits are, in each case, generally available to Employees who work 30 hours or more per week (collectively, the "Eligible Employees") and their eligible dependents, as applicable.[14]  Additionally, Union Employees are eligible to participate in certain Health and Welfare Coverage and Benefits pursuant to the relevant CBAs.

47.     The Debtors' Health and Welfare Coverage and Benefits include:

(a)     ***Medical and Prescription Coverage***.   The Debtors offer Eligible Employees the opportunity to participate in a medical and prescription plan (the "Medical and Prescription Coverage") through (a) three self-insured medical plans administered by United Healthcare Insurance Group ("UHC," and such plans, collectively, the "UHC Plans"), (b) three fully insured medical plans administered by either Kaiser Permanente ("Kaiser") or Hawaii Medical Services Association ("HMSA") for certain Eligible Employees in Hawaii (collectively, the "Hawaii Health Plans"), or (c) one self-insured medical plan administered by Premera Blue Cross Blue Shield ("Blue Cross") for certain Eligible Employees in (i) Alaska and (ii) Oregon, Utah, Washington, Wyoming, California, Montana, Idaho, Colorado, and South Dakota (collectively, each of the states in the foregoing clause, (ii) the "Pacific Northwest States," and such benefit plan, the "Pacific Northwest Health Plan") each as described in more detail below.  Under the Medical and Prescription Coverage, participants and their eligible

---

[14]   Employees in the state of Hawaii who work 20 hours or more are generally eligible for Health and Welfare Coverage and Benefits.

dependents (typically legal spouses, domestic partners, and dependent children) receive coverage for, among other things, preventative care, doctor visits, hospital care, prescription drugs, and wellness treatments. The majority of the Employees are enrolled in the Medical and Prescription Coverage. The annual cost of the Medical and Prescription Coverage to the Debtors is approximately $46 million. As of the Petition Date, the Debtors estimate that approximately $7.4 million is outstanding on account of the Medical and Prescription Coverage.

- *UHC Plans*. Eligible Employees in all states (excluding Hawaii, Alaska, and the Pacific Northwest States) have the option to participate in (a) a high-deductible health plan (the "UHC HDHP"), (b) a low-cost preferred provider plan (a "PPO"), or (c) a high-cost PPO plan. On average, the Debtors cover between approximately 60-75 percent of the premiums, while the Eligible Employees cover the remaining 25-40 percent. The Debtors have an agreement with Sun Life Financial Inc. ("Sun Life"), their stop-loss insurer, whereby the Debtors are self-insured up to $600,000 per month, per insured individual (the "Stop Loss Limit"). The Debtors cover Eligible Employees' Medical and Prescription Coverage up to the Stop Loss Limit. Sun Life then reimburses the Debtors for any amount in excess of the Stop Loss Limit. The Debtors also pay a monthly premium of $285,000 to Sun Life on account of the stop-loss coverage. Upon request by UHC, the Debtors, in the ordinary course, prefund segregated UHC bank accounts which then in turn are utilized to pay claims up to the Stop Loss Limit. As of the Petition Date, the Debtors estimate that approximately $2 million is held in prefunded UHC accounts. The Debtors typically fund these accounts weekly to maintain the account balance at a precalculated amount per entity, as determined by UHC. On average, the amount funded each week to such accounts is $700,000.

- *Hawaii Health Plans*. Eligible Employees in the state of Hawaii have the option to participate in (a) a HMO plan administered by Kaiser, (b) a HMSA plus HMO plan, or (c) a HMSA CompMed PPO plan. On average, the Debtors cover 95-100 percent of the premiums for the Eligible Employees and approximately 70 percent of the premiums for their eligible dependents, while the Eligible Employees cover the remaining amount, if any.

- *Pacific Northwest Health Plan*. Eligible Employees in Alaska and the Pacific Northwest States have the option to participate in a PPO plan administered by Blue Cross. On average, the

Debtors cover 50-80 percent of the premiums, while Eligible Employees cover the remaining amount.

(b)  ***Flexible Spending Accounts and Health Savings Accounts Coverage.*** The Debtors provide Eligible Employees with the opportunity to contribute to two types of flexible savings accounts administered by Navia Benefits Solutions ("Navia"):  (i) a dependent care flexible spending account (the "Dependent FSA"); and (ii) a health care flexible spending account (the "Health FSA," and together with the Dependent FSA, the "FSAs").  In addition, Eligible Employees enrolled in the UHC HDHP have the option to contribute to a health savings account (the "HSA," and together with the FSAs, the "FSA and HSA Coverage") administered by Optum Financial, Inc.  The FSA and HSA Coverage allows Eligible Employees to voluntarily set aside pre-tax funds to pay for eligible health and welfare expenses.  For the 2026 calendar year, each Eligible Employee can contribute up to approximately $5,000 for a Dependent FSA, up to $3,300 for a Health FSA (or, for certain Eligible Employees in Alaska and the Pacific Northwest States, up to a maximum of $3,400 for a Health FSA), and up to approximately $10,000 for an HSA depending on the Employee's marital status, age, and familial status.  Eligible Employees are then able to immediately draw on contributions to pay for child and dependent care or health care expenses, as applicable.  The Debtors do not contribute directly to the FSAs or HSA and believe that the FSA and HSA amounts are generally held in trust by the Debtors and are not property of their estates. The Debtors deduct an average of $190,000 per month from each participating Employee's Employee Wages on account of the participating Employee's contributions to the FSAs or the HSA, as applicable.  As of the Petition Date, there are approximately $60,000 in accrued amounts to be remitted on account of the FSAs and the HSA (collectively, the "Unremitted FSA and HSA Amounts").  The Debtors pay approximately $2,000 per month to Navia in administrative fees on account of the FSA and HSA Coverage (collectively, the "FSA and HSA Fees").  As of the Petition Date, the Debtors estimate that they owe $4,000 on account of the FSA and HSA Fees.  As a result, the Debtors seek authority to pay and/or remit the Unremitted FSA and HSA Amounts and the FSA and HSA Fees and to continue the FSA and HSA Coverage in the ordinary course of business on a postpetition basis.

(c)  ***Dental Insurance Coverage***. The Debtors offer certain Eligible Employees the opportunity to participate in a self-insured dental plan administered by Delta Dental or, for certain Eligible Employees in Alaska and the Pacific Northwest States, by Blue Cross (collectively, the "Dental Insurance Coverage").  Under the Dental Insurance Coverage, Eligible Employees and their eligible dependents receive coverage for, among other things, teeth cleaning, diagnostic and preventative services, and orthodontia. Approximately 10-20 percent of the premiums are employer-paid.  The average annual cost of the Dental Insurance Coverage to the Debtors is

24

approximately $4.6 million.  As of the Petition Date, the Debtors estimate that they owe approximately $200,000 on account of unpaid Dental Insurance Coverage.

(d)     ***Vision Insurance Coverage.***  The Debtors offer certain Eligible Employees the opportunity to participate in a fully insured vision plan administered by United Healthcare or, for certain Eligible Employees in Alaska and the Pacific Northwest States, by VSP Vision (collectively, the "Vision Insurance Coverage").  Under the Vision Insurance Coverage, Eligible Employees and their eligible dependents receive coverage for, among other things, lenses, frames, annual eye exams, and various other vision treatments.  The premiums are fully covered by the Eligible Employees.  As of the Petition Date, the Debtors estimate that they do not owe any prepetition amounts on account of unpaid Vision Insurance Coverage.

(e)     ***Life Insurance and AD&D Coverage***.  The Debtors provide (i) basic life and accidental death and dismemberment ("AD&D") insurance (at an amount equal to one times the Eligible Employee's base annual earnings, up to a maximum of $500,000) automatically to the Eligible Employees, (ii) long- and short-term disability insurance, and (iii) voluntary AD&D insurance which may be purchased in increments of $10,000 or $25,000, up to a maximum of $200,000 (or, for certain Eligible Employees in Alaska and the Pacific Northwest States, up to a maximum of $300,000) (collectively, the "Life Insurance and AD&D Coverage"), administered by The Hartford Insurance Group, Inc. ("Hartford"), to all Eligible Employees. Certain Union Employees are eligible for the Life Insurance and AD&D Coverage pursuant to the terms of the applicable CBAs.  The Debtors cover basic life and AD&D insurance and short-term disability insurance at no cost to the Eligible Employees and eligible Union Employees.  The Debtors pay 50 percent of the premium associated with the long-term disability insurance.  The Debtors pay approximately $53,000 per month in premiums and administrative fees on account of the Life Insurance and AD&D Coverage.  As of the Petition Date, the Debtors estimate that they owe approximately $53,000 on account of unpaid Life Insurance and AD&D Coverage.[15]

(f)     ***COBRA***.  The Debtors are required to offer certain of their former Employees certain health benefits following termination of employment. Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), former Employees of the Debtors (collectively, the "COBRA Eligible Employees") may continue using the Medical and Prescription Coverage, Dental Insurance Coverage, Vision Insurance Coverage, and Other Coverage (collectively, the "COBRA Benefits").  COBRA Eligible

---

[15]    One Employee has a split dollar agreement, pursuant to the Employee's employment agreement, that provides for life insurance coverage that is not administered by Hartford.

25

Employees are entitled by law to receive COBRA Benefits for up to 18, and occasionally 36, months following termination of employment. The Debtors' COBRA Eligible Employees are typically responsible for paying all costs associated with the COBRA Benefits. The Debtors pay a monthly administrative fee of approximately $13,000 to Navia on account of COBRA coverage. As of the Petition Date, the Debtors estimate that they owe $26,000 on account of COBRA Benefits.

(g)    ***Other Coverage***. The Debtors offer additional Health and Welfare Coverage and Benefits, such as accident coverage, critical illness coverage, hospital indemnity coverage, and employee assistance programs, among others (collectively, the "Other Coverage"). These additional Health and Welfare Coverage and Benefits are at the election of each Eligible Employee and only require *de minimis* administrative costs or obligations to the Debtors. As discussed above, failure to continue these additional Health and Welfare Coverage and Benefits could cause Eligible Employees to experience hardship and make it difficult to retain the Debtors' Workforce. As of the Petition Date, the Debtors estimate that they owe approximately $4,000 on account of unpaid Other Coverage programs and benefits.

48.    As of the Petition Date, the Debtors estimate that they owe approximately $7.7 million on account of the Health and Welfare Coverage and Benefits. Accordingly, the Debtors seek authority to pay all outstanding prepetition amounts on account of the Health and Welfare Coverage and Benefits and to continue paying the Health and Welfare Coverage and Benefits on a postpetition basis in the ordinary course of business consistent with past practices.

**III.    Workers' Compensation Program.**

49.    In the ordinary course of business, the Debtors maintain workers' compensation insurance ("Workers' Compensation Insurance") that provides coverage for the Debtors' Employees at least at the statutorily required level for each state in which the Debtors have Employees (the "Workers' Compensation Program"). The Workers' Compensation Program is supported with a guaranteed cost insurance policy with Hartford. The current policy period took effect on June 30, 2026, and ends on October 1, 2026. The Debtors intend to renew on the same terms thereafter in the ordinary course of business to ensure uninterrupted coverage. Historical

26

policies under the Workers' Compensation Program were provided by Safety National Casualty Corporation ("Safety National," and together with Hartford, the "Workers' Compensation Insurance Carriers").  Premiums are paid up front (collectively, the "Workers' Compensation Premiums").[16]  For the current policy period, the Debtors paid approximately $2.4 million on account of the Workers' Compensation Premiums.  As of the Petition Date, the Debtors do not believe that any amounts are owed on account of the Workers' Compensation Premiums.[17]

50.     Certain policies under the Workers' Compensation Program that cover historical time periods require that the Debtors pay deductibles (each, a "Deductible," and collectively, the "Deductibles").   Generally, if a claim is made against a policy under the Workers' Compensation Program that is subject to a Deductible, the applicable Workers' Compensation Insurance Carrier administers the claims, makes payments in connection therewith, and then invoices the Debtors for the Deductible.  In addition, the Debtors used a third-party administrator processor, Sedgwick Claims Management Services, Inc. (the "Claims Processor"), to process certain claims and pay certain Deductibles related to the Workers' Compensation Program on the

---

[16]   Historically, NDC maintained the Debtors' Workers' Compensation Insurance.  Although NDC was the named insured, the insurance policies provided essential insurance coverage to the Debtors.  To the extent that the insurance-related payments were paid by NDC on the Debtors' behalf, the Debtors then reimbursed NDC through intercompany transactions in the ordinary course of business (collectively, the "NDC Intercompany Transactions"), as more fully described in the Cash Management Motion.  Such relief is incorporated herein by reference with respect to the NDC Intercompany Transactions relating to the Workers' Compensation Program.  As of June 30, 2026, NDC no longer maintains any Workers' Compensation Programs on behalf of the Debtors, and the Debtors pay for all Workers' Compensation Premiums directly instead of through the NDC Intercompany Transactions.

[17]   As described in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance Coverage, Surety Bond Program, and Letters of Credit Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Continue to Pay Certain Claims Processing Fees, and (C) Renew, Amend, Supplement, Extend, Purchase, Cancel, and Enter into New Insurance Policies, Letters of Credit, and Surety Bonds, and (II) Granting Related Relief* (the "Insurance Motion"), filed contemporaneously herewith, the Claims Processor also processes certain claims on behalf of the Debtors' Insurance Policies (as defined in the Insurance Motion) in the ordinary course.  For the avoidance of doubt, the Debtors do not seek authority to pay any Claims Processing Fees (as defined in the Insurance Motion), maintain such Insurance Policies, nor pay any prepetition amounts related thereto in this Motion, but rather request such authority in the Insurance Motion.

Debtors' behalf.   For such claims, the Claims Processor pays the applicable Workers' Compensation Insurance Carriers the appropriate Deductible and then invoices the Debtors for such amounts on a weekly basis.  The Deductible under the Workers' Compensation Program is $500,000 per Employee for the applicable workers' compensation policies.   The Debtors' obligations for the Deductibles related to the Workers' Compensation Program arise either directly under the Workers' Compensation Program or indirectly through the NDC Intercompany Transactions.

51.     As of the Petition Date, approximately $1.1 million is owed to the Claims Processor on account of the Deductibles related to the Workers' Compensation Program.  The Debtors therefore seek authority to make prepetition payments on account of the Deductibles related to the Workers' Compensation Program, if any, including through the NDC Intercompany Transactions and the Claims Processor, that are due and owing as of the Petition Date and to continue to pay the Deductibles under the Workers' Compensation Program, including honoring any payment obligations under the Deductibles related to the Workers' Compensation Program, in the ordinary course of business on a postpetition basis consistent with past practice to ensure uninterrupted coverage thereunder.

52.     Additionally, the Debtors must continue the claim assessment, determination, adjudication, and payment pursuant to the Workers' Compensation Program, without regard to whether such liabilities are outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[18]  As of the Petition Date, there

---

[18]   The Debtors' Workers' Compensation Program may change postpetition in the ordinary course due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.  By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any necessary modifications thereto.

28

are approximately 430 open claims under the Workers' Compensation Program.  To the extent that any Employees assert claims arising under the Workers' Compensation Program (collectively, the "Workers' Compensation Claims") during these chapter 11 cases based on prepetition conduct, the Debtors request that the Court modify the automatic stay imposed by section 362 of the Bankruptcy Code to permit such Employees to proceed with such claims.  This requested modification of the automatic stay pertains solely to claims under the Workers' Compensation Program, and solely to the extent such claims are with respect to recovery from an insurance policy, or with the prior written consent of the Debtors.

53.     Since the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, any inability to do so may result in adverse legal consequences that potentially could disrupt the Debtors' reorganization process.  As of the Petition Date, the Debtors do not believe that there are any prepetition amounts outstanding on account of claims under the Workers' Compensation Program.  Nevertheless, out of an abundance of caution, the Debtors request authority to continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis, including to continue to pay any prepetition and postpetition amounts with respect thereto as they become due and payable and by modifying the automatic stay solely to allow affected Employees to assert claims under the Workers' Compensation Program. The Debtors also request authority to maintain their existing Workers' Compensation Program and to renew, amend, supplement, extend, purchase, cancel, and enter into new workers' compensation insurance policies, as applicable, in the ordinary course of business to ensure uninterrupted coverage.

**IV.     Retirement Programs.**

54.     In the ordinary course of business, the Debtors incur obligations to their Employees on account of the 401(k) Plan, the Pension Plans, and the Union Retirement Plans (collectively,

the "Retirement Programs").   As of the Petition Date, the Debtors estimate that they owe approximately $1.4 million in the aggregate on account of accrued but unpaid Retirement Programs.  Accordingly, the Debtors request the authority to continue to honor the Retirement Programs and to pay any related prepetition claims in the ordinary course of business.

### A.      The 401(k) Plan.

55.      The Debtors provide all non-Union Employees with the ability to participate in a safe harbor 401(k) plan (the "401(k) Plan") administered by Empower Annuity Insurance Company of America ("Empower").[19]  The 401(k) Plan provides for the automatic pre-tax salary deductions of eligible compensation up to the limits set forth in the Internal Revenue Code.  The Debtors also match contributions at a rate of 50 percent on contributions of 8 percent of the Employees' annual compensation (collectively, the "401(k) Matching Contributions").   On average, the Debtors pay approximately $390,000 per month in 401(k) Matching Contributions, including administrative fees.  Approximately $1.1 million is deducted from the Employees' pay in the aggregate each month on account of Employees' contributions to the 401(k) Plan (collectively, the "401(k) Deductions").

56.      As of the Petition Date, the Debtors estimate that they owe approximately $120,000 on account of the 401(k) Matching Contributions, including administrative fees.  Accordingly, the Debtors request authority to pay all outstanding prepetition amounts incurred on account of the 401(k) Plan, including 401(k) Matching Contributions, to remit any unpaid prepetition 401(k) Deductions, and to continue honoring their obligations on account of the 401(k) Plan and 401(k) Matching Contributions on a postpetition basis in the ordinary course of business consistent with past practices.

---

[19]    Certain Union Employees may be eligible to participate in the 401(k) Plan pursuant to their applicable CBA.

### B.     The Pension Plans.

57.     The Debtors sponsor two defined benefit pension plans under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") for certain current and former Employees (together, the "Pension Plans").   The Pension Plans are administered by benefits committees (together, the "Committees") appointed by the Boards of Debtor Young's Market Company, LLC, and Debtor RNDC.  In general, all participants in the Pension Plans earned their retirement benefits over a period of their employment with the Company (or its predecessor), and the amount of the retirement benefits is determined by certain negotiated formulas which account for years of service and earnings' history.  The Pension Plans are frozen as to new participants and benefits accrual.  All participants are 100 percent vested in their accrued benefits.

58.     During the past 12 months, the Debtors paid funding contributions of $2.7 million to the Pension Plans.  In addition, over the same time period, the Debtors reimbursed the Committees for approximately $262,000 in expenses incurred to the Committees while administering the Pension Plans and managing the Pension Plans' assets.  As of the Petition Date, the Debtors estimate that they are required to pay approximately $1 million in required minimum funding contributions through January 15, 2027 and an additional $131,000 in unpaid administrative expenses on behalf of the Pension Plans.  Continuing to reimburse the Committees is essential to ensuring the Debtors' applicable Employees receive their hard-earned pensions.  Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay any prepetition amounts on account of the Pension Plans and to continue to make all payments on a postpetition basis in the ordinary course of business and consistent with past practices.

### C.     The Union Retirement Plans.

59.     Pursuant to the terms of certain CBAs, the Debtors provide employer contributions to the Unions' defined benefit pension plans and 401(k) plans for the Union Employees

(collectively, the "Union Retirement Plans").  The Debtors make monthly contributions on account of the Union Retirement Plans (collectively, the "Union Retirement Plan Obligations") as required by applicable law and the CBAs.  In the three-month period preceding the Petition Date, the Debtors have contributed approximately $170,000 per month on average to the Union Retirement Plans.  As of the Petition Date, the Debtors estimate that they owe approximately $170,000 on account of the Union Retirement Plans.  The Debtors seek authority to pay any prepetition amounts owed on account of the Union Retirement Plan Obligations and to continue honoring the Union Retirement Plans on a postpetition basis in the ordinary course of business consistent with past practices.

## V.     Deferred Compensation Plans.

60.     The Debtors maintain five non-qualified deferred compensation plans (each, a "Deferred Compensation Plan," and collectively, the "Deferred Compensation Plans") for certain current and former Employees (a) that were designated by the Company as eligible to participate in a Deferred Compensation Plan and (b) who qualify as members of a "select group of management or highly compensated employees" under ERISA.  The Deferred Compensation Plans are intended to incentivize certain key Employees to maintain and increase their standards of performance by providing such Employees with an opportunity to defer the receipt of a portion of their salary, bonus, and/or other specified compensation.  The Debtors maintain four Deferred Compensation Plans that are funded through "rabbi trusts:"  (a) the Kronheim Company, Inc. Deferred Compensation Plan, as amended (the "Kronheim Plan"); (b) the RNDC Executive Deferred Compensation Plan II, as amended (the "DCPII"); (c) the Second Amended and Restated RNDC Deferred Compensation Plan III, as amended (the "DCPIII"); and (d) the Young's Market Company Deferred Compensation Plan (the "Young's Market DCP").  The Debtors also maintain one additional Deferred Compensation Plan where payments are made directly to participants from

the Company's balance sheet:  the Young's Market Company Supplemental Executive Retirement Plan, as amended (the "SERP").

61.     Across all Deferred Compensation Plans, there are approximately 294 participating Employees comprising:  (a) one participant in the Kronheim Plan; (b) 15 participants in the DCPII; (c) 267 participants in the DCPIII; (d) two participants in the SERP; and (e) nine participants in the Young's Market DCP.  The Deferred Compensation Plans are administered by various third-party administrators and committees, including (a) with respect to the Kronheim Plan, certain NDC-affiliated equity owners, as plan administrators, and AON, LLC, as actuary, (b) with respect to the DCPII, Principal Financial Group, as trustee, and Empower Annuity Insurance Company ("Empower"), as recordkeeper, (c) with respect to the DCPIII, Principal Financial Group, as trustee, and Empower, as recordkeeper, (d) with respect to SERP, Principal Financial Group, as trustee, and (e) with respect to the Young's Market DCP, Empower, as plan administrator and Great-West Trust Company, LLC, as trustee.  As of the Petition Date, the Debtors have approximately $62 million in outstanding obligations on account of the Deferred Compensation Plans.  As of the Petition Date, the DCPII Plan, the DCPIII Plan, and the Young's Market DCP were frozen, such that no new Employees may opt into the plans, no currently participating Employees can make new contributions to the plans, and payments under all of the Deferred Compensation Plans have been paused.  For the avoidance of doubt, the Debtors are not seeking authority to make any disbursements under the Deferred Compensation Plans by this Motion.  The Debtors do intend, however, to seek such authority to make disbursements under the Deferred Compensation Plans pursuant to a separate motion to be filed in these chapter 11 cases.

## VI.     Paid Leave Benefits.

62.     In the ordinary course of business, the Debtors provide paid leave benefits to all full-time and part-time Employees (collectively, the "Paid Leave Benefits").  Specifically, the

Debtors provide (a) paid time off ("PTO") to Employees for vacation, personal illness care (for themselves or their dependents), or other personal matters, (b) parental leave ("Parental Leave"), (c) short-term disability leave, (d) military leave, and (e) other paid leave for certain missed work time in the ordinary course of business (*i.e.*, bereavement leave and jury duty).

63.     The Paid Leave Benefits accrue differently depending on the type of benefit conferred.  Generally, PTO accrues on a bi-weekly or monthly basis at a specified rate based on the Employee's tenure with the Company.  Additionally, Employees in most states can carry forward up to 40 hours of unused PTO to the following calendar year.  In certain states, employees who are terminated or resign are entitled to a cash payment in lieu of their accrued, but unused, PTO.[20]  With respect to Parental Leave, parents can take a maximum of six weeks at any time in the 12 months following the birth or adoption of a child.  Further, parents can take up to 26 weeks to care for a covered service member with a qualifying serious injury or illness related to certain types of military service.  The Debtors also provide paid Parental Leave to full-time Employees who have worked for the Debtors for at least one month.  If eligible, Employees can receive up to six weeks of fully paid Parental Leave.  Eligible Employees may also receive short-term disability leave of up to 12 weeks, comprised of a one-week waiting period followed by two weeks of paid leave at 100 percent of their salary and 10 weeks of paid leave at 75 percent of their salary, subject to offsets by any applicable state statutory disability plan.  With respect to military leave, Eligible Employees are paid in full for up to two-week absences.  Military leave in excess of two weeks is unpaid.

---

[20]   PTO is typically a non-cash benefit.  To the extent required by applicable state law, employees receive cash for accrued PTO only when they end their employment with the Company.  For the avoidance of doubt, the Debtors are seeking to pay outstanding PTO amounts only as they come due when an Employee's tenure with the Company ends in accordance with applicable state law.

64.     In addition, certain Union Employees who have completed their probationary period are eligible for vacation pay depending on length of service and the terms of the CBA. Depending on the terms of the CBA, Union Employees are generally paid out their PTO upon termination, depending on the reason for termination and their years of service. Under certain CBAs, terminated Union Employees are eligible to receive payment for earned PTO that rolled over from the prior year and, accordingly, receive a lump sum payment for this PTO on January 1 of the following year.

65.     As of the Petition Date, the Debtors estimate that they owe approximately $4.8 million on account of accrued but unpaid Paid Leave Benefits. Accordingly, the Debtors seek authority to pay all outstanding prepetition amounts incurred on account of the Paid Leave Benefits and to continue paying the Paid Leave Benefits on a postpetition basis in the ordinary course of business consistent with past practices, including to cash out accrued benefits at termination, as and when they come due, and to continue to make all payments on a postpetition basis, each in the ordinary course of business and consistent with their prepetition practices. For the avoidance of doubt, to the extent the Debtors seek to pay outstanding prepetition amounts on account of accrued PTO in excess of the Priority Claim Amount, the Debtors request such relief solely pursuant to the Order.

## VII.    Non-Insider Severance Programs.

### A.    Employee Severance Program.

66.     In the ordinary course of business, the Debtors maintain a severance program for the benefit of all full-time, non-Union, non-Insider Employees on a case-by-case basis

35

(the "Employee Severance Program").[21]   Under the Employee Severance Program, certain Employees may be eligible for the payment of severance if their employment is terminated due to any not for-cause employer-initiated termination.  Any such severance payments (collectively, the "Severance Payments") are calculated by reference to the terminated Employee's salary, job level, and their time of service with the Debtors prior to the termination.  Generally, Severance Payments are paid consistent with the Employee's schedule of salary payments, over a period of several pay periods.

67.     As described in greater detail in the First Day Declaration, over the course of the prior year, the Company conducted several reductions in force (each, a "RIF") given the Company's financial and operating situation.   The Company's largest RIF occurred on September 2, 2025 and implicated approximately 1,770 Employees in California in connection with the Company's exit from the California market (the "California RIF").   Further, after exhausting all available options, the Company was forced to terminate approximately 1,000 additional Employees in several smaller RIFs since the initial California RIF.  Continuing to compensate these terminated Employees is necessary to prevent further attrition from Employees who are vital to RNDC's sale and wind-down processes.

68.     As of the Petition Date, the Debtors estimate that they owe approximately $2.4 million on account of all accrued but unpaid Severance Payments under the Employee Severance Program.  Of the $2.4 million due, the Debtors estimate that approximately $1.4 million is due to approximately 43 former Employees that exceed the Priority Claim Amount.  Accordingly, the Debtors request authority to pay all outstanding prepetition amounts incurred on account of the

---

[21]   The Employee Severance Program described herein applies to Employees terminated after January 22, 2026.  To the extent that Employees were terminated prior to January 22, 2026, and are receiving payments under a previous severance program, the Debtors seek to continue to make these payments in the ordinary course.

36

Employee Severance Program and to continue honoring the Employee Severance Program on a postpetition basis in the ordinary course of business consistent with past practices.  The Debtors do not request authorization to make any Severance Payments to any Insider.  Consequently, the Debtors submit that section 503(c) of the Bankruptcy Code with respect to bonus or Severance Payments to Insiders does not apply to the relief requested herein.

### B. Union Employee Severance Programs.

69.     In addition, under certain CBAs, the applicable Union Employees with one year or more of service are entitled to receive Severance Payments equal to wages and benefits for up to 20 weeks of work at 40 hours per week, depending on the Union Employee's years of continuous service (collectively, the "Union Employee Severance Programs," and together with the Employee Severance Programs, the "Non-Insider Severance Programs").

70.     In the three months immediately preceding the Petition Date, the Debtors have paid approximately $135,000 on account of the Union Employee Severance Programs.  As of the Petition Date, the Debtors estimate that they owe approximately $30,000 on account of the Union Employee Severance Programs.  The Debtors seek authority to pay any prepetition unpaid obligations pursuant to the Union Employee Severance Programs and to continue to honor the Union Employee Severance Programs on a postpetition basis in the ordinary course of business consistent with past practices.

### VIII.  WARN Act Obligations.

71.     Unless an exception applies, the Worker Adjustment and Retraining Notification Act of 1988, as amended, and similar state laws (collectively, the "WARN Act") generally require the Debtors to provide 60 days advance notice to affected non-Union Employees, Union Employees, and/or their Union representative (if applicable), and certain governmental entities prior to the implementation of a "mass layoff" or a "plant closing" (collectively, the "WARN Act

Notices"). The Debtors issued several different WARN Act Notices to certain impacted Employees and Unions to comply with their obligations under the WARN Act in the event that certain sales transactions were not finalized in the applicable markets or Employees do not accept or receive offers of employment from potential buyers in any contemplated sale transactions.[22] Such WARN Act Notices also notified the affected Employees that, in connection with the applicable potential sale transactions, certain of the affected Employees may continue to be employed by the Company, including to provide transition services in connection with such sale transactions.

72. The WARN Act Notices that were provided to affected Employees prior to the Petition Date each contemplate a termination date (the "WARN Act Termination Date") that comports with the statutory notice period under the WARN Act. The WARN Act Termination Date is subject to extension, including for any required wind-down or transition services, and, if the WARN Act Termination Date is extended, the Debtors will notify the relevant Employees as promptly as possible. The Debtors do not currently believe that there are any prepetition amounts outstanding on account of claims under the WARN Act.

---

[22] The Debtors issued the following WARN Act Notices to certain potentially impacted Employees and Unions: (a) on April 21, 2026, conditional notices were issued in Arizona, Colorado, the District of Columbia, Florida, Hawaii, Louisiana, Maryland, Oklahoma, South Carolina, Texas and Virginia (collectively, the "Reyes Notices"), (b) on May 18, 2026, non-conditional notices were issued in (i) Nebraska and South Dakota and (ii) Oregon and Washington, which notices in this clause (b)(i) were subsequently corrected by certain WARN Act Notices sent on July 6, 2026 to remedy a clerical error in the original WARN Act Notices, (c) on June 1, 2026, non-conditional notices were issued in (i) North Carolina, New Hampshire, Oregon (to only certain control state Employees), Virginia (to only certain control state Employees), and Philadelphia and (ii) Ohio, which notices in this clause (c)(ii) were subsequently corrected by certain WARN Act Notices sent on July 6, 2026 to remedy a clerical error in the original WARN Act Notices, (d) on July 6, 2026, conditional notices were issued in Alaska. In addition, on June 12, 2026, the Debtors issued non-conditional WARN Act Notices in Illinois, and on June 18, 2026, the Debtors issued conditional notices in Indiana and Michigan, each of which were subsequently corrected by certain WARN Act Notices sent by certain of the Debtors' non-Debtor affiliates on July 6, 2026 to remedy a clerical error in the original WARN Act Notices. For the avoidance of doubt, notwithstanding the issuance of such corrected notices in the foregoing sentence, the original WARN Act Notices remain in full force and effect.

73.     During these chapter 11 cases, the Debtors anticipate the potential need to close certain of the Debtors' warehouses, distribution centers, and corporate offices, and such closures may implicate the WARN Act.  The Debtors intend to continue to employ the Employees who received the WARN Act Notices through the WARN Act Termination Date before terminating their employment.  However, the Debtors anticipate that they may incur certain obligations pursuant to the WARN Act in connection with such closures (collectively, the "WARN Act Obligations").  To the extent that the WARN Act is implicated by such closures, or there are circumstances that may result in the accelerated closure of any impacted facilities, by this Motion, out of an abundance of caution, the Debtors seek authority to make payments on behalf of obligations incurred on account of the WARN Act on a postpetition basis.

## IX.     Additional Benefit Programs.

74.     In addition to the foregoing, the Debtors offer Employees a range of ancillary benefits including (a) the Tuition Assistance Program, (b) vehicle stipends, (c) pet insurance, (d) prepaid legal services coverage, (e) commuter benefits, and (f) identity theft protection, among others (collectively, the "Additional Benefit Programs").  The aggregate monthly cost of the Additional Benefit Programs is approximately $200,000.

- *Tuition Assistance Program.*  In the ordinary course of business, the Debtors offer a scholarship program to eligible Employees' children to help offset the cost of a college education (the "Tuition Assistance Program").  Employees can apply to participate in the Tuition Assistance Program, and, if selected, can receive $2,000 per dependent, per college semester, up to a maximum of $16,000, for any individual eligible dependent's college education.  Awards under the Tuition Assistance Program are paid through checks delivered directly to the applicable Employee and are taxed to the applicable Employee over four pay periods.

- *Vehicle Stipends.*  The Debtors do not provide any vehicles for use by their Employees.  Certain Employees may be provided with a stipend to purchase a vehicle to use in support of the Debtors' business.  On average, eligible Employees are offered an $800 monthly vehicle stipend.

39

- *Pet Insurance.* The Debtors offer enrollment in a pet insurance plan to provide coverage for veterinary expenses related to accidents and illnesses for household pets.

- *Prepaid Legal Services.* The Debtors enable Employees to enroll in a prepaid legal services plan to access a network of attorneys to provide affordable legal guidance for various matters, including, among others, credit card debt, traffic tickets, home purchases, landlord negotiations and lease review, adoption, and estate planning.

- *Charitable Donations.* The Debtors offer Employees the opportunity to participate in a charity donation program. Employees may elect to have a portion of their wages withheld and donated to certain designated charitable causes. On average, the Debtors pay approximately $500 per month in charitable donations.

- *Commuter Benefits.* The Debtors offer enrollment in a program administered by Navia that subsidizes parking and transit expenses on a pre-tax basis.

- *Identity Theft Protection.* The Debtors enable Employees to enroll in an identity theft protection program to receive access to services that protect against identity theft, including credit monitoring services.

75. As of the Petition Date, the Debtors estimate that they owe approximately $80,000 on account of the Additional Benefit Programs. The Debtors request authority to pay any prepetition amounts on account of the Additional Benefit Programs and to continue to make all payments on a postpetition basis in the ordinary course of business consistent with past practices.

## Basis for Relief

I.   **Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits Obligations.**

A.   **Certain Compensation and Benefits Are Entitled to Priority Treatment.**

76. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Compensation and Benefits owed to the Employees to priority treatment to the extent that such payments do not exceed $17,150 for each Employee as provided for under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B). To the extent that any member of the Workforce receives no more than the Priority Claim Amount on account of claims entitled

40

to priority, the relief sought with respect to compensation only affects the timing of certain payments to the Workforce and does not have any material negative impact on recoveries for general unsecured creditors, aside from the request to exceed the cap in narrow circumstances for the Non-Insider Severance Programs and the Debtors' PTO program.  The Debtors submit that payment of the Compensation and Benefits at this time enhances value for the benefit of all interested parties.  *See In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("The need to pay [employee wage] claims in an ordinary course of business time frame is simple common sense.  Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted.").  To the extent that an Employee or former non-Insider Employee is owed more than the Priority Claim Amount on account of certain Compensation and Benefits, the Debtors submit that the full payment of such obligations in the ordinary course is warranted under section 363(b)(1) of the Bankruptcy Code and the doctrine of necessity.

77.     The Debtors' Workforce is essential to the success of these chapter 11 cases, and timely payment of the Compensation and Benefits at this time reduces the risk of Workforce attrition and preserves and enhances the value of the Debtors' estates for the benefit of all parties in interest.  Finding, attracting, and training new qualified and specialized talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than those currently provided to the Workforce.  The Debtors would face personnel vacancies at a critical business juncture which would give rise to additional uncertainty in what is already an unfamiliar and unstable operating environment.  Moreover, even if replacement personnel were hired, the Debtors would be required to invest additional resources in training such new team members.  Losing the Debtors' significant talent

41

base would also materially impede the Debtors' ongoing sale efforts during these chapter 11 cases. To avoid potentially costly disputes that could disrupt the Debtors' business and reduce the value of the Debtors' estates, and to ease potential concerns from the Workforce regarding ongoing compensation, it is necessary and appropriate to continue to pay any accrued and unpaid prepetition and postpetition amounts on account of the Compensation and Benefits in the ordinary course of business consistent with past practices.

      **B.**      **Payment of Certain Compensation and Benefits Is Required by Law.**

78.      The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' wages. Certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' wages on another party's behalf. *See* 11 U.S.C. § 541(b)(1), (d); *see also In re Equalnet Commc'ns*, 258 B.R. at 370 (noting that, for tax obligations where funds are held by the debtor in trust, "the legal right to payment of such claims at any time appears irrefutable.") (citing *In re Al Copeland Enter., Inc.*, 991 F.2d 233 (5th Cir. 1993)).

79.      Further, federal law requires the Debtors to withhold certain tax payments from the Employees' wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request

42

authority to transmit the Withholding Obligations to the proper parties in the ordinary course of business. *See In re Dameron*, 155 F.3d 718, 721 (4th Cir. 1998) (stating "when a debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate' for purposes of the Bankruptcy Code.").

80.     Similarly, state laws in certain of the jurisdictions in which the Debtors operate require the Debtors to maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program, the laws of those jurisdictions may prohibit the Debtors from continuing to operate in those jurisdictions.  Payment of all obligations related to the Workers' Compensation Program is crucial to the Debtors' continued operations and the success of these chapter 11 cases.

**II.     Payment of the Compensation and Benefits Is Proper Pursuant to Section 363 of the Bankruptcy Code.**

81.     Section 363(c)(1) of the Bankruptcy Code expressly grants the Debtors the authority to "enter into transactions . . . in the ordinary course of business" and "use property of the estate in the ordinary course of business without notice or a hearing."  Therefore, the Debtors believe they are permitted to pay all postpetition amounts due pursuant to the Compensation and Benefits as such actions are in the ordinary course of the Debtors' business consistent with past practices.  Out of an abundance of caution, however, the Debtors seek entry of an order granting the relief requested herein to avoid any destruction to the value of their estates.

82.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ*, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to the "doctrine of necessity").  Several

legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

83.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (citation omitted); *see also Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ,* 273 B.R. at 497).

84.     Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business pursuant to the "doctrine of necessity," which functions in a

44

chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re CoServ*, 273 B.R. at 497. Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs*, 98 B.R. at 176.

85. These standards are satisfied here. Payment of the Compensation and Benefits represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a), 363(b), and 1107 of the Bankruptcy Code. Paying prepetition wages, employee benefits, and similar obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. The Employees are essential to the success of these chapter 11 cases. As the Debtors seek to effectuate value-maximizing restructuring and consummate several sale transactions, it is imperative that the Employees remain fully engaged, motivated, and productive. Absent timely payment of amounts owed to Employees, the Debtors risk workforce attrition and resulting business disruption, which stands to materially impair estate value. In addition, the Debtors believe that without the relief requested herein, the Employees may elect to seek alternative employment opportunities, potentially with the Debtors' competitors. Paying the amounts that arise under the Compensation and Benefits in the ordinary course of business will help minimize the adverse effect of commencement of these chapter 11 cases on the Debtors' Employees and business operations.

86. Importantly, the majority of the Workforce relies exclusively on the Compensation and Benefits to satisfy their (and, as applicable, their dependent's) daily living expenses and expect and require their wages be paid on a timely basis. Consequently, the Workforce will be exposed

to significant financial difficulties if the Debtors are not permitted to honor their obligations for unpaid Compensation and Benefits in the ordinary course of business.  Failure to timely satisfy such obligations will also jeopardize Workforce morale and loyalty at this crucial time.  Additionally, if this Court does not grant the relief requested herein, Employees will not receive their expected health coverage and thus may be obligated to pay certain health care claims that the Debtors have not satisfied.  The loss of health care coverage will result in considerable anxiety (and likely attrition) for Employees at a time when the Debtors need such Employees to perform their jobs at peak efficiency.  Accordingly, the relief requested herein is a necessary and critical element of the Debtors' efforts to maximize estate value and will give the Debtors the greatest likelihood of retention of the Workforce as the Debtors seek to operate their businesses in chapter 11.

87.     Courts in this district have repeatedly recognized the importance of a debtor's workforce to its operations and those courts have granted relief similar to the relief requested herein. *See, e.g., In re QVC Grp., Inc.*, No. 26-90447 (ARP) (Bankr. S.D. Tex. Apr. 17, 2026) (authorizing the debtors to pay prepetition employee wages, salaries, other compensation, and reimbursable expenses, and continue employee benefits program); *In re Nine Energy Serv., Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. Feb. 3, 2026) (same); *In re Kleopatra Finco S.à r.l.*, No. 25-90642 (CML) (Bankr. S.D. Tex. Nov. 5, 2025) (same); *In re Anthology Inc.*, No. 25-90498 (ARP) (Bankr. S.D. Tex. Sep. 30, 2025) (same); *In re Sunnova Energy Int'l Inc.*, No. 25-90160 (ARP) (Bankr. S.D. Tex. June 9, 2025) (same).[23]

---

[23]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

**III.    A Limited Waiver of the Automatic Stay as it Applies to Workers' Compensation Claims Is Appropriate in this Case.**

88.      Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

Section 362(d) of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  11 U.S.C. § 362(d)(1).

89.      Pursuant to section 362(d) of the Bankruptcy Code, the Debtors seek authorization to modify the automatic stay to permit Employees to proceed with their Workers' Compensation Claims in the appropriate judicial or administrative forum.  The Debtors believe that cause exists to modify the automatic stay because staying the Workers' Compensation Claims could have a detrimental effect on the financial wellbeing of Employees and Employee morale and lead to the departure of certain Employees who are critical at this juncture.  Such departures could cause a severe disruption in the Debtors' businesses to the detriment of all parties in interest.  Additionally, if the Debtors fail to maintain the Workers' Compensation Program, certain state laws may prohibit the Debtors from operating in those states.  The Debtors therefore request a limited waiver of the automatic stay solely for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

## Emergency Consideration

90.      The Debtors request emergency consideration of this Motion in accordance with Bankruptcy Local Rule 9013-1 and section G of the Complex Case Procedures, and pursuant to Bankruptcy Rule 6003, which empowers a court to grant certain relief within the first 21 days after the commencement of a chapter 11 case to the extent that such "relief is needed to avoid immediate

47

and irreparable harm." Fed. R. Bankr. P. 6003(a).  As set forth herein, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to receive the relief requested in this Motion during the first 21 days of these chapter 11 cases would imperil the Debtors' operations at this critical juncture and cause immediate and irreparable harm.  The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

91.     The Debtors will have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to debtor-in-possession financing and the consensual use of cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored.  Therefore, the Debtors request authority to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, direct debit, wire transfer, ACH, or other payment requests in respect of the relief requested in this Motion.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

92.     The Debtors request that the Order include a finding that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exempt such relief from the 14-day stay under Bankruptcy Rule 6004(h).

48

**Modification of Bankruptcy Rule 2002(a)(2)**

93.     The Debtors request that the Court, for cause, modify the service requirements set forth in Bankruptcy Rule 2002(a)(2) to limit service of this Motion only to the core service list and affected creditors.  In light of the breadth and complexity of the Debtors' business, serving the Motion on all creditors, even those that are unaffected by the relief sought herein, would cause unnecessary confusion and expense to the detriment of all stakeholders.  Accordingly, sufficient cause exists under Bankruptcy Rule 2002(a)(2) to modify the service requirements for this Motion.

**Reservation of Rights**

94.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested in this Motion is intended as or should be construed or deemed to be: (a) an implication or admission as to the amount of, basis for, priority, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien (that arises under contractual rights, common law, statutory law, or otherwise) on, security interest in, or other encumbrance on property of the Debtors' estates, including any lien that may be satisfied pursuant to the relief requested in this Motion, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes

49

of action, or other rights under the Bankruptcy Code or any other applicable law; or (h) a waiver of the obligation of any party in interest to file a proof of claim.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

### Notice

95.    The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Bank Lenders; (d) the Bank Agent; (e) the Second Lien Lender; (f) the Equipment Loan Lenders; (g) holders of the Owner Notes; (h) the office of the attorney general for each of the states in which the Debtors operate; (i) the Internal Revenue Service; (j) any other governmental agencies having a regulatory or statutory interest in these chapter 11 cases; (k) the Staffing Agencies; (l) the Managed Services Provider; (m) ADP; (n) UHC; (o) Kaiser; (p) HMSA; (q) Sun Life; (r) Blue Cross; (s) Delta Dental; (t) Empower; (u) Navia; (v) Hartford; (w) Safety National; (x) the Claims Processor; (y) VSP Vision; and (z) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
Dated: July 27, 2026

*/s/ John F. Higgins*

| **PORTER HEDGES LLP** | **KIRKLAND & ELLIS LLP** |
|---|---|
| John F. Higgins (TX Bar No. 09597500) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| M. Shane Johnson (TX Bar No. 24083263) | Joshua A. Sussberg, P.C. (*pro hac vice* pending) |
| Megan Young-John (TX Bar No. 24088700) | Christopher Marcus, P.C. (*pro hac vice* pending) |
| Joanna D. Caytas (TX Bar No. 24127230) | Maddison Levine (*pro hac vice* pending) |
| 1000 Main St., 36th Floor | 601 Lexington Avenue |
| Houston, Texas 77002 | New York, New York 10022 |

PORTER HEDGES LLP
Telephone: (713) 226-6000
Facsimile: (713) 228-1331
Email: jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jcaytas@porterhedges.com

KIRKLAND & ELLIS
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
cmarcus@kirkland.com
maddison.levine@kirkland.com

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

## Certificate of Accuracy

In accordance with Bankruptcy Local Rule 9013-1(i), I certify that the foregoing statements are true and accurate to the best of my knowledge.

*/s/ John R. Castellano*
John R. Castellano

## Certificate of Service

I certify that on July 27, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.  Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' proposed claims and noticing agent.

*/s/ John F. Higgins*
John F. Higgins