**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC, *et al.*,[1] | ) Case No. 26-90737 (CML) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DEBTORS' MOTION**
**FOR ENTRY OF INTERIM AND FINAL**
**ORDERS (I) AUTHORIZING AND APPROVING THE**
**REYES SETTLEMENT PROCESS, (II) APPROVING THE**
**FORM OF REYES SETTLEMENT NOTICE, (III) AUTHORIZING**
**AND APPROVING THE REYES SETTLEMENT UPON SATISFACTION OF**
**THE SETTLEMENT CONDITIONS, AND (IV) GRANTING RELATED RELIEF**

> **If you object to the relief requested, you must respond in writing.  Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within 21 days from the date this Motion was filed.  If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within 21 days from the date this Motion was filed.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor subsidiaries and affiliates, the "Company") state the following in support of this motion (this "Motion"):[2]

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/RNDC.  The location of Debtor Republic National Distributing Company, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 4300 Wildwood Parkway, Suite 200, Atlanta, GA 30339.

[2] A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of John R. Castellano, Chief Restructuring Officer of Republic National Distributing Company, LLC and its Debtor Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.  Capitalized terms used but not immediately defined in this Motion shall have the meanings ascribed to such terms in the First Day Declaration or later in this Motion, as applicable.

**Preliminary Statement**

1. As described in the First Day Declaration, in the months preceding the Petition Date, the Company and its advisors undertook a robust marketing process for potential going-concern sales of all, or any portion of, the Company's markets. That process resulted in the negotiation and consummation of a value-maximizing sale transaction with Reyes Holdings, L.L.C. ("Reyes"), another established alcohol distributor, for 11 of the Company's markets—Florida, Hawaii,[3] Illinois, Maryland, South Carolina, Virginia,[4] Washington, D.C., Colorado, Louisiana, Oklahoma, and Texas (collectively, the "Reyes Transaction"). The Reyes Transaction closed on May 29, 2026, generating more than $1 billion in sale proceeds and preserving over 5,000 jobs and nearly 700 supplier relationships.

2. In connection with the Reyes Transaction, on May 29, 2026, the Company entered into a transition services agreement with Reyes (the "Reyes TSA") to facilitate the orderly transition of the Company's operations in the 11 transferred markets. Among other obligations, the Reyes TSA requires that the Company provide various services through the transition period (*i.e.*, September 30, 2026 with optional monthly extensions in Reyes's sole discretion through December 31, 2026 (the "Transition Period")). In exchange for providing the transition services contemplated by the Reyes TSA, Reyes agreed to pay the Company $11 million per month through and including September 30, 2026, and, subject to an extension of the Transition Period, $11 million for October and $12 million for each of November and December. In connection with

---

[3] The transaction with respect to the Hawaii market (the "Hawaii Transaction") has not yet closed as of the Petition Date. The conditions to close the Hawaii Transaction were satisfied prior to the Petition Date, but the Parties have not yet executed the documents required to close, due, at least in part, to the ongoing discussions as described herein. The Debtors intend to seek authority to approve the closing of the Hawaii Transaction pursuant to a separate motion to be filed in these chapter 11 cases.

[4] Reyes did not acquire the Company's "control state" business in Virginia.

the closing of the Reyes Transaction, Reyes deposited $50 million of the purchase price into a third-party escrow account (the "Escrow") to support potential indemnification obligations under the 11 asset purchase agreements (collectively, the "Reyes APAs") and Reyes TSA pursuant to the terms thereof.  Under the terms of the Reyes APAs and the Escrow Agreement, the funds in Escrow are not property of the Debtors or their estates unless and until the Escrow Agent (as defined in the Escrow Agreement) releases the funds to the Debtors.  As of the Petition Date, none of the funds held in Escrow have been released from the Escrow.

3.       Consistent with market practice for transactions of this size and nature, the Reyes APAs provide for a customary post-closing purchase price adjustment mechanism pursuant to which certain estimated purchase price components would be reconciled following closing. Specifically, pursuant to the terms of the Reyes APAs, certain Debtors and non-Debtor affiliates (collectively, the "Sellers") and Reyes (together with the Sellers, the "Parties") agreed that certain components of the purchase price would be subject to adjustment during the 20-business-day period following the closing (or such longer period as the Parties may mutually agree to extend). Depending on the results of the reconciliation, the post-closing adjustment would either require Reyes to make an additional payment to the Sellers or require the Sellers to reimburse Reyes, in each case, for the full amount of the post-closing purchase price adjustment.

4.       Following the closing of the Reyes Transaction, the Parties reviewed additional information with respect to the purchase price components and engaged in discussions regarding the resulting purchase price adjustment.  Based on the Parties' initial discussions and calculations, the post-closing true-up (the "Post-Closing True-Up") is expected to result in the Sellers reimbursing Reyes for the purchase price adjustment.  As of the Petition Date, however, the Parties have not reached agreement on the final post-closing purchase price adjustment (the "Post-Closing

True-Up"). The Parties are continuing to work together at arm's length and in good faith to determine the Post-Closing True-Up as soon as reasonably practicable. The Parties are nearing final agreement and expect to align on the final amount of the Post-Closing True-Up in the coming days.

5.       On July 9, 2026, counsel to Reyes sent a letter (the "Reyes Letter") to the Sellers on behalf of Reyes that, among other things, demanded adequate assurance of the Sellers' ability to satisfy the Post-Closing True-Up in light of the Parties' initial calculations indicating that the Post-Closing True-Up is expected to result in a purchase price adjustment payable to Reyes by the Sellers. The Reyes Letter also requested that the Sellers implement a litigation hold to preserve all potentially relevant evidence in anticipation of potential litigation if the Parties could not reach a consensual resolution. In light of the Debtors' financial condition, the Sellers are unable to provide adequate assurance of their ability to satisfy the Post-Closing True-Up.

6.       Reyes desires to recover from the Escrow on account of the Sellers' inability to satisfy the Post-Closing True-Up. For the Escrow to be available in respect of the Post-Closing True-Up, the Reyes APAs require several contractual prerequisites. *First*, the Parties must finally determine the amount of the Post-Closing True-Up through the post-closing reconciliation process (either mutually or through an Accounting Firm to resolve purchase price disputes). *Second*, if the Sellers fail to pay the Post-Closing True-Up within 3 business days of such final determination, Reyes must submit an indemnification claim in accordance with the Reyes APAs for the Sellers alleged breach of their obligations to satisfy the Post-Closing True-Up under the Reyes APAs. *Third*, following receipt of such indemnification claim, the Sellers have a 10-business day period to respond to such claim. *Fourth*, if the Sellers fail to respond or dispute any portion of such claim during such 10-business-day period, Reyes may pursue any and all remedies available under the

Reyes APAs; *provided* that Reyes and the Sellers are required to negotiate any disputes in good faith and, if they are unable to reach a resolution, such disputes are to be resolved in the courts specified in the Reyes APAs. ***Finally***, if amounts are determined or agreed to be owing from the Sellers with respect to such indemnification claims, Reyes must seek collection of such amounts first from the Escrow consistent with the terms of the Escrow Agreement (collectively, the "Conditions to Release").

7.       In light of the foregoing, the Parties, with the consent of the Lenders (collectively, the "Reyes Settlement Parties"), and each of their respective advisors, engaged in extensive, arm's-length negotiations to determine an appropriate path forward, that, among other things, conserves estate resources and is in the best interests of all stakeholders. The Reyes Settlement Parties ultimately determined that an expeditious and organized process (the "Reyes Settlement Process") for a settlement that provides for the consensual resolution of all potential claims and causes of action between the Reyes Settlement Parties on account of the Post-Closing True-Up (the "Reyes Settlement") represents the most value-maximizing path forward for the Debtors, their estates, and other stakeholders by avoiding the costs, delay, and uncertainty associated with protracted litigation that would ensue absent the Reyes Settlement.

8.       Pursuant to this Motion, the Debtors seek approval, upon entry of the Interim Order, of the Reyes Settlement Process agreed to by the Reyes Settlement Parties to facilitate the consensual resolution of the Post-Closing True-Up. The proposed Reyes Settlement Process contemplates the following:

- ***Reconciliation of the Post-Closing True-Up.*** The Parties will work expeditiously and in good faith to reach a final determination of the Post-Closing True-Up, and in any event no later than July 31, 2026, unless otherwise agreed to by the Parties or ordered by the Court.

- ***Notice of Satisfaction of Settlement Conditions and Revised Proposed Final Order.*** Within 3 business days of the date on which the Conditions to Release have been satisfied, waived, and/or agreed to be deemed to have been satisfied or waived (collectively, the "Settlement Conditions"), the Debtors will file a notice, substantially in the form attached to the Interim Order as Exhibit A (the "Reyes Settlement Notice"), certifying that such conditions have been satisfied, notifying the Court that the Reyes Settlement Parties have reached a final settlement, and advising the Court that the Debtors have filed a revised proposed Final Order reflecting the terms of the Reyes Settlement and seeking approval thereof.

  The Parties may file the proposed Reyes Settlement Notice and proposed revised Final Order prior to the entry of the Interim Order, which proposed Reyes Settlement Notice shall state that it is subject in all respects to the entry of the Interim Order and shall attach a revised proposed Final Order reflecting the terms of the Reyes Settlement and seeking approval thereof upon entry of the revised proposed Final Order.

  The objection period for the Reyes Settlement Notice shall either be: (a) for any proposed Reyes Settlement Notice filed before the entry of the Interim Order, 14 days after the formation of any official committee of unsecured creditors appointed in these chapter 11 cases; and (b) for any Reyes Settlement Notice filed after the entry of the Interim Order, 14 days from the filing thereof ((a) and (b) together, the "Objection Period").

- ***Objections.*** If no objection is timely filed within the Objection Period, the Debtors will file a certificate of no objection and request entry of the revised proposed Final Order approving the Reyes Settlement on the terms set forth therein. If an objection is timely filed within the Objection Period, the Debtors request that the Court schedule a hearing on an expedited basis to consider the objection and determine whether entry of the Final Order is appropriate and grant such other relief as the Court deems appropriate.

- ***Failure to Reach a Consensual Resolution.*** If the Parties are unable to reach a consensual resolution of the dispute regarding the Post-Closing True-Up by or before July 31, 2026, the Parties will request that the Court determine the Post-Closing True-Up at a subsequent hearing to be held on or before August 14, 2026 or as soon thereafter as the Court is available.

9. Upon satisfaction of the Settlement Conditions and entry of the Final Order, the Reyes Settlement Parties will consummate the Reyes Settlement contemplated herein, pursuant to which (a) the Sellers will (i) sign and deliver to the Escrow Agent (as defined in the Escrow Agreement) joint instructions for the release of the applicable portion of the Escrow to Reyes necessary to satisfy such Post-Closing True Up less the value of the Unsaleable Inventory

(the "Escrow Settlement Amount") and (ii) relinquish their interests in inventory which is related to certain additional suppliers that consented to the transfer of their distribution rights to Reyes following the closing of the Reyes Transaction (the "Unsaleable Inventory"), which will be transferred to Reyes for no additional consideration, (b) the Lenders will release their liens on the Unsaleable Inventory,[5] and (c) the Reyes Settlement Parties will grant mutual releases in a scope to be mutually agreed upon.  For the avoidance of doubt, as of the date hereof, the Debtors do not seek relief to release the Escrow Settlement Amount from the Escrow or the Unsaleable Inventory by this Motion and, as described in greater detail herein, will only do so once the Settlement Conditions are met.  Additionally, any funds held in Escrow in excess of the Escrow Settlement Amount shall continue to be held in Escrow, subject to the terms and conditions of the Escrow Agreement.  The consideration proposed to be provided by the Debtors pursuant to the Reyes Settlement is, subject to satisfaction of the Settlement Conditions, not property of the Debtors' estates and consists of inventory that has little or no value to any party other than Reyes.

10.     Approval of the Reyes Settlement Process provides a clear path to resolving the Parties' dispute with respect to the Post-Closing True-Up.  The Reyes Settlement Parties believe that the Reyes Settlement, once the Settlement Conditions are satisfied, will facilitate the efficient administration of these chapter 11 cases by eliminating potential distractions and disputes that could otherwise consume estate resources and impede the Debtors' ability to implement an orderly wind down of their estates and consummate any value-maximizing pending sale transactions. Further, Reyes advised the Debtors that the value of the Unsaleable Inventory depreciates on a

---

[5]     Pursuant to that certain *Third Amended and Restated Credit Agreement*, dated as of November 1, 2022, by and among certain of the Debtors party thereto, the guarantors from time to time party thereto, Wells Fargo Bank, National Association, as administrative agent, and each lender from time to time party thereto, as may be further amended, restated, supplemented, other otherwise modified from time to time, the Lenders have a lien on, among other things, all of the Debtors' inventory.

daily basis.  Additionally, the Reyes Settlement is expected to enable the Debtors to facilitate the closing of the Hawaii Transaction, subject to Court approval, which remains subject to resolution of the outstanding matters addressed by the Reyes Settlement and which is anticipated to generate millions of dollars in proceeds for the Debtors' estates.  Accordingly, the Debtors request that the Court enter the Interim Order approving the Reyes Settlement Process, and upon satisfaction of the applicable conditions set forth therein, grant such further relief as may be appropriate, including subject to satisfaction of the Settlement Conditions, entry of the Final Order approving the Reyes Settlement contemplated herein.

**Relief Requested**

11.     The Debtors seek entry of interim and final orders, substantially in the form attached hereto (respectively, the "Interim Order" and the "Final Order"):  (a) authorizing and approving the Reyes Settlement Process; (b) approving the form of Reyes Settlement Notice; (c) upon satisfaction of the Settlement Conditions, authorizing the Debtors to enter into the Reyes Settlement on the terms set forth in the Final Order; (d) authorizing and directing the Reyes Settlement Parties to perform any and all obligations contemplated by the Reyes Settlement Process and, subject to entry of the Final Order, the Reyes Settlement; and (e) granting related relief.

12.     Following the applicable notice period for the Interim Order, if no objections are timely filed, the Debtors will submit a certificate of no objection and request entry of the Interim Order, which, for the avoidance of doubt, will seek approval of the Reyes Settlement Process and either (a) the form of the Reyes Settlement Notice or (b) the Reyes Settlement Notice filed prior to entry of the Interim Order for which the Objection Period has expired.  To the extent any objections are timely filed, the Debtors will seek an expedited hearing before the Court to resolve such objections and, if appropriate, obtain entry of the Interim Order.  Consistent with the proposed

7

Reyes Settlement Process, upon satisfaction of the Settlement Conditions, the Debtors will file (i) a revised proposed Final Order and (ii) the Reyes Settlement Notice, which will, among other things, provide notice of the filing of the revised proposed Final Order and commence the Objection Period.  If no objections are timely filed within the Objection Period, the Debtors will submit a certificate of no objection and request entry of the revised proposed Final Order without further hearing.  If any objections are timely filed within the Objection Period, the Debtors will seek an expedited hearing before the Court to resolve such objections and, if appropriate, obtain entry of the revised proposed Final Order.

**Jurisdiction and Venue**

13. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

14. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

15. The bases for the relief requested herein are sections 105(a), 363, and 554 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 4001, 6004, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 1075-1, 7041-1, and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

**Background**

16.     The Company was, at its height, the nation's second largest alcoholic beverage distributor, operating across 40 states and specializing in wine and spirits distribution.  Built on the strong foundation of three family-owned businesses, the Company historically enjoyed deep-seated relationships with over 2,000 suppliers and 170,000 customers across its expansive nationwide distribution network.  With headquarters in Atlanta, Georgia, the Debtors currently operate across 21 states and employ a workforce of approximately 1,460 employees.

17.     On July 26, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have also filed a motion contemporaneously herewith requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

**The Reyes Settlement**

### A.     The Post-Closing True-Up.

18.     Pursuant to the terms of the Reyes APAs, certain purchase price components were estimated as of closing and remained subject to a post-closing true-up.  As described above, the Parties were to agree to any resulting purchase price adjustments within 20 business days after closing, or within such other period as the Parties mutually agreed.  If the Parties were unable to reach an agreement with respect to the applicable purchase price adjustments, the dispute would be submitted to an independent third-party accounting firm (the "Accounting Firm") for final determination in accordance with the terms of the Reyes APAs.  Following either the Parties'

agreement or the Accounting Firm's final determination, the resulting purchase price adjustment would be paid by the Sellers or Reyes, as applicable, to the other Party.  Specifically, if the final amount of the applicable purchase price components exceeded the estimated amount used at closing, Reyes would be required to pay the resulting adjustment to the Sellers.  Conversely, if the final amount of the applicable purchase price components was less than the estimated amount used at closing, the Sellers would be required to reimburse Reyes for the resulting adjustment.

19.     In compliance with the Reyes APAs, on June 26, 2026, the Sellers provided Reyes with an initial working draft (the "Initial Draft") of the calculation of the purchase price adjustment components.  The Initial Draft was based on information that became available to the Parties following the closing, including information regarding the amount of inventory and customer accounts receivables at closing, additional suppliers that consented to the transfer of their distribution rights to Reyes, and outstanding amounts payable to suppliers.  The Initial Draft indicated a purchase price adjustment of approximately $85 million that, if correct, would be payable by the Sellers to Reyes, driven primarily by an increase in supplier liabilities to be assumed by Reyes offset partially by increased inventory to be purchased by Reyes and additional inventory determined to be unsaleable.  After continuing discussions between the Parties and further refinement of the calculation of the purchase price components, on July 24, 2026, the Sellers provided Reyes with an updated working draft of the purchase price components reflecting a Post-Closing True-Up of approximately $63 million payable by the Sellers to Reyes.  The Parties have agreed to reach a final determination with respect to the Post-Closing True-Up on or before July 31, 2026.

B.     The Escrow.

20.     In connection with the Reyes Transaction, the Parties entered into that certain Escrow Agreement, dated May 29, 2026 (the "Escrow Agreement"), pursuant to which Reyes

deposited $50 million of the purchase price into the Escrow to secure, in part, certain obligations of the Sellers under the Reyes APAs, including potential indemnification obligations arising from claims, losses, or breaches of the Reyes APAs or the Reyes TSA, as applicable.  Pursuant to the terms of the Reyes APAs, if the Sellers fail to satisfy the Post-Closing True-Up, Reyes may assert indemnification claims against the Sellers under the Reyes APAs.  Pursuant to the Reyes APAs and the Escrow Agreement, Reyes is required to seek satisfaction of such indemnification claims first from the Escrow.

21.    The Parties have been and remain engaged in ongoing, good faith discussions regarding the final amount of the Post-Closing True-Up.  Based on the Parties' discussions and calculations to date, the Parties believe that the quantum of the Post-Closing True-Up, and thus the resulting indemnification claims with respect thereto, will likely exceed the amount held in Escrow (but for the Unsaleable Inventory discussed below, which may reduce the quantum of the Post-Closing True-Up only partially below the amount held in Escrow).  However, because the Settlement Conditions have not yet been satisfied—*i.e.*, the Parties have not yet reached a final determination as to the amount of the Post-Closing True-Up, among other things—the Debtors are not seeking approval of the Escrow Settlement Amount at this time.  Instead, the Debtors request that the Court approve the Reyes Settlement Process, which includes, among other things, notifying the Court upon reaching a final determination of the Post-Closing True-Up, and will seek approval of the Escrow Settlement Amount at that time.

C.    **The Unsaleable Inventory.**

22.    The Sellers hold an interest in the Unsaleable Inventory, which is related to certain additional suppliers that consented to the transfer of their distribution rights to Reyes following the closing of the Reyes Transaction.  However, the Sellers are unable to realize value from such Unsaleable Inventory.  Following the transfer of the applicable distribution rights, the Sellers

neither possess the contractual rights necessary to sell the Unsaleable Inventory nor operate in the applicable markets or maintain the operational infrastructure necessary to effectively monetize the Unsaleable Inventory to the extent the Sellers were otherwise legally permitted to do so. Additionally, due to certain regulatory constraints, the Sellers are unable to transfer the Unsaleable Inventory to other states or otherwise monetize the Unsaleable Inventory through alternative channels. Accordingly, the Unsaleable Inventory has limited, if any, realizable value to the Debtors' estates.

23. The Unsaleable Inventory does, however, provide value to Reyes as a distributor who the Sellers assigned their distribution rights to, and as the Party with the infrastructure and regulatory capacity necessary to lawfully distribute and monetize the Unsaleable Inventory. While the Unsaleable Inventory has an approximate value of $21.5 million as of the date hereof, its value to Reyes may continue to diminish. Before the Reyes Settlement can be consummated, the Parties must agree on the value of the Unsaleable Inventory. As part of the Reyes Settlement, upon satisfaction of the Settlement Conditions and Court approval of the Reyes Settlement pursuant to the Final Order, the Sellers will relinquish their interests in, and otherwise abandon, the Unsaleable Inventory in favor of Reyes. The Lenders have agreed that, upon approval of the Reyes Settlement, they will release their liens on the Unsaleable Inventory, thereby allowing Reyes to realize value from such Unsaleable Inventory that would otherwise continue to diminish in value. The abandonment of the Unsaleable Inventory will enable the Sellers to avoid the costs, delay, and uncertainty associated with attempting to dispose of the Unsaleable Inventory that the Debtors cannot practically monetize, while preserving the opportunity for Reyes, as the successor distributor with the applicable distribution rights and market presence, to sell and distribute the Unsaleable Inventory in the ordinary course.

24.     Additionally, Reyes asserts that the Unsaleable Inventory's value continues to depreciate every day that such inventory is not sold because it includes products with expiration dates, as well as short-run promotional products containing marketing tied to current or recent events.  Any delay in distributing the Unsaleable Inventory increases the risk that Reyes will lose the rights to distribute such inventory or the shelf-space and market share with key retailers.  For these reasons, Reyes believes it is critical that the Debtors receive authorization to release the Unsaleable Inventory to Reyes as soon as possible to realize the maximum settlement value of the Unsaleable Inventory.

**Basis for Relief**

I.      **The Settlement Conditions Have Not Yet Been Satisfied as of the Petition Date, Thus the Debtors' Contingent Interest in the Escrow is Property of the Debtors' Estates.**

25.     Generally, funds held in escrow are not property of the bankruptcy estate, but the debtors retain a contingent interest in the escrowed funds to the extent the "contingency of the escrow'" that entitles the non-debtor to the escrowed funds is "not fulfilled prior to bankruptcy.'" *See In re Jazzland, Inc.*, 322 B.R. 610, 616-17 (Bankr. E.D. La. 2005) (explaining that "[g]enerally, under bankruptcy law funds held in escrow are not property of the estate," and that "[m]ost courts have held only that the debtor's contingent right to the return of funds in escrow is property of the estate"); *In re Missionary Baptist Foundation of Am., Inc.*, 792 F.2d 502, 506 (5th Cir. 1986)).

26.     Here, the Parties have not yet reached a final determination with respect to the Post-Closing True-Up, and accordingly, the Settlement Conditions have not yet been satisfied. Therefore, as of the Petition Date, the Debtors retain an interest in the Escrow.  Instead, pursuant to the Interim Order, the Debtors seek approval of the Reyes Settlement Process, pursuant to which the Parties intend to file the Reyes Settlement Notice upon satisfaction of the Settlement

13

Conditions to seek, in part, approval of the Escrow Settlement Amount upon entry of the Final Order.

27.     Importantly, subject to satisfaction of the Settlement Conditions and upon entry of the Final Order, the Reyes Settlement will not alter the economic treatment of the Escrow under the Reyes APAs or applicable non-bankruptcy law.  Rather, entry into the Reyes Settlement upon entry of the Final Order will preserve the Parties' respective rights with respect to the Escrow while providing an agreed-upon mechanism for resolving the dispute with respect to the Post-Closing True-Up.  To the extent the Escrow Settlement Amount equals or exceeds the funds held in the Escrow, the Escrow would be distributed to Reyes, consistent with the result that would have occurred absent the Reyes Settlement.  To the extent the Escrow Settlement Amount is less than the funds held in the Escrow, any remaining balance shall continue to be held and ultimately distributed in accordance with the terms and conditions of the Escrow Agreement.  Accordingly, the Debtors' interest in the Escrow is limited to their contingent interest in any amounts remaining after satisfaction of the Escrow Settlement Amount, if any, and the Reyes Settlement merely recognizes and preserves that economic reality rather than conferring any additional rights on Reyes or the Debtors.  Nonetheless, to the extent necessary, the relief requested herein contemplates that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified and vacated to the extent necessary to implement the terms and conditions of the Interim Order and Final Order (as applicable) and the transactions contemplated thereby.  The Debtors have determined, in an exercise of their business judgment, that such stay modification is appropriate under the circumstances.  Further, stay modifications of this kind are ordinary and are reasonable and fair under the circumstances of these chapter 11 cases.

28.     Additionally, any contingent interest the Debtors may have in the Escrow, and any proceeds realized therefrom, are subject to the Lenders' valid, perfected liens.  The Lenders have consented to the Reyes Settlement as the proposed resolution protects the value of their collateral while avoiding unnecessary protracted and expensive litigation.

## II.     The Unsaleable Inventory Is of Inconsequential Value and Benefit to the Debtors' Estates.

29.     Section 554(a) of the Bankruptcy Code provides that after notice and a hearing, a debtor in possession may abandon, subject to court approval, "property of the estate that . . . is of inconsequential value and benefit to the estate."  A bankruptcy court may authorize property to be abandoned when either (a) the property is burdensome to the estate or (b) the property is of inconsequential value and benefit to the estate.  *See, e.g.*, *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 499–500 (1986).

30.     The Debtors submit that the Unsaleable Inventory is of inconsequential value and benefit to the Debtors' estates.  Given the Debtors' inability to realize value from the Unsaleable Inventory, retaining the Unsaleable Inventory would provide no corresponding benefit to the Debtors' estates and would instead require the expenditure of estate resources to manage and dispose of the Unsaleable Inventory that the Debtors cannot practically monetize.  In contrast, upon entry of the Final Order, abandonment of the Unsaleable Inventory pursuant to the Reyes Settlement will eliminate any administrative burden associated with the Unsaleable Inventory and will allow the Debtors to preserve estate resources for the benefit of all stakeholders.

## III.    The Court Should Approve the Reyes Settlement Process, the Reyes Settlement Notice, and, Upon Entry of the Final Order, the Reyes Settlement, as a Sound Exercise of the Debtors' Business Judgment.

31.     Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

15

Section 105(a) of the Bankruptcy Code gives the Court vast equitable powers. *See In re Davis*, 170 F.3d 475, 492 (5th Cir. 1999) ("The basic purpose of § 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction.") (Dennis, J. dissenting) (*quoting* 2 L. King, *Collier on Bankruptcy* § 105.01, at 105-3 (1996)) (internal quotations omitted). Determining the appropriate method for carrying out the provisions of the Bankruptcy Code is left to the discretion of the court. *See In re Rojas*, No. 07-70058, 2009 WL 2496807, at *7 (Bankr. S.D. Tex. Aug. 12, 2009) ("Section 105 does not require a court to use the least restrictive means to carry out the requirements of the Code. Section 105(a) [of the Bankruptcy Code] does not say that the Court's authority is limited to orders or judgments *necessary* to carry out the Code. Rather, Congress explicitly added to the statute deferential, discretionary language with 'or appropriate.'") (quoting 11 U.S.C. § 105(a)) (emphasis in original). The Court is given these vast equitable powers to ensure that the Debtors are "not unduly denied benefits" provided to them under the Bankruptcy Code. *In re Exquisito Servs., Inc.*, 823 F.2d 151, 155 (5th Cir. 1987).

32.     Further, section 105(a) of the Bankruptcy Code provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity." The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable powers to allow a debtor to take actions essential to its rehabilitation, which courts have recognized as "the paramount policy and goal of Chapter 11." *See Ionosphere Clubs*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).

33.     Additionally, section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the

16

estate," after notice and a hearing.  It is well-established in this jurisdiction that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so.  *See, e.g.*, *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (quoting *In re Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); *In re State Park Bldg. Grp., Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005); *In re Filene's Basement, LLC*, No. 11-13511 (KJC) (Bankr. D. Del. Apr. 29, 2014) (stating that, under the business judgment standard, once the debtor presents "a reasonable basis for its business decisions . . . courts will generally not entertain objections to the debtor's conduct").

34.      The Debtors' decision to (a) implement the Reyes Settlement Process and, (b) upon satisfaction of the Settlement Conditions and further approval by the Court, consummate the Reyes Settlement is a sound exercise of the Debtors' business judgment and enjoys the support of Reyes and the consent of the Lenders.  Agreeing to the Reyes Settlement Process is a sound exercise of the Debtors' business judgment because it provides a consensual path toward resolution of the Parties' ongoing dispute with respect to the Post-Closing True-Up while avoiding the uncertainty, expense, and delay associated with protracted litigation.  By establishing an agreed-upon process for, among other things, finalizing the Post-Closing True-Up, which includes, for the avoidance of doubt, seeking approval of the Escrow Settlement Amount at the appropriate time, the Reyes Settlement Process preserves estate resources, reduces administrative burdens, and advances the Debtors' efforts to maximize value for their estates and stakeholders.

35. Specifically with respect to the Escrow Settlement Amount, the Debtors' agreement to such amount in connection with the Reyes Settlement will represent a sound exercise of the Debtors' business judgment because it will effectuate the pre-existing treatment of the Escrow. Pending entry of the Final Order, by resolving the Escrow Settlement Amount through the Reyes Settlement, the Debtors bring the resolution of the Parties' rights with respect to the Escrow before the Court in a transparent, Court-supervised process that affords parties in interest notice and an opportunity to object to such resolution, while promoting an orderly administration of these chapter 11 cases.

36. Additionally, the Debtors submit that entering into the Reyes Settlement upon satisfaction of the Settlement Conditions and further approval by the Court is a sound exercise of the Debtors' business judgment because the Reyes Settlement will preserve the Debtors' ongoing relationship with Reyes, which is integral to the Debtors' pursuit of additional value-maximizing sales in chapter 11 and the orderly wind down of the Debtors' estates. Pursuant to the Reyes TSA, the Sellers are required to provide ongoing transition services to support the 11 transitioned markets. The revenue generated from the Reyes TSA represents a significant source of value and liquidity for the Debtors' estates during these chapter 11 cases and is critical to facilitating other potential sale transactions and an orderly wind down of the Debtors' estates. Accordingly, continued cooperation and coordination between the Parties with respect to the Reyes TSA is essential to preserving such value, and resolving the Parties' dispute with respect to the Post-Closing True-Up will promote the continued effectiveness of the Reyes TSA and avoid potential value-destructive disruptions with respect thereto.

37. Moreover, entering into the Reyes Settlement upon satisfaction of the Settlement Conditions and further approval by the Court is a sound exercise of the Debtors' business judgment

18

because the Reyes Settlement will facilitate an orderly resolution with respect to the Unsaleable Inventory. Abandoning the Unsaleable Inventory in favor of Reyes allows Reyes to sell and distribute the Unsaleable Inventory in a manner that benefits the suppliers of such inventory. Many of these suppliers maintain relationships with the Debtors across multiple markets, including markets that remain subject to the Debtors' ongoing sale process and wind-down efforts. Preserving these supplier relationships and supporting an efficient transition of inventory that would otherwise be of no use to the Debtors is therefore important to the Debtors' ability to maximize value from any remaining potential sale transactions during these chapter 11 cases. Additionally, as discussed herein, releasing the Unsaleable Inventory as soon as possible is critical to mitigate the ongoing depreciation of the value of that inventory. Accordingly, the Debtors believe that the Reyes Settlement will provide a consensual and value-maximizing resolution that benefits the Debtors, Reyes, and all other stakeholders.

**IV.     Upon Satisfaction of the Settlement Conditions and Approval Thereof, The Reyes Settlement Is Fair, Reasonable, and in the Best Interests of the Debtors' Estates.**

38.     Under Bankruptcy Rule 9019(a), "[o]n the [debtor in possession]'s motion and after notice and a hearing, the court may approve a compromise or settlement." "Settlements are favored in the bankruptcy context to 'minimize litigation and expedite the administration of a bankruptcy estate.'" *In re Highland Capital Mgmt., L.P.*, No. 19-34054-SGJ11, 2025 WL 2047279, at *6 (Bankr. N.D. Tex. July 21, 2025) (quoting *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996)). Settlements are considered a "normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated[,] and costly." *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted).

39.     Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable,

and in the best interest of the estate. *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).

Generally, the court's role is not to decide the issues in dispute when evaluating the merits of a

settlement. *In re Watts*, 154 B.R. 56, 59 (S.D. Tex. 1993). Instead, the court should determine

whether the settlement as a whole is fair and equitable. *In re TMT Trailer Ferry, Inc.*, 390 U.S.

414, 424 (1968). Ultimately, "[t]he decision of whether to approve a compromise lies within the

discretion of the trial judge[.]" *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984); *see also*

*Jackson Brewing Co.*, 624 F.2d at 602–03 (same).

40. Courts in the Fifth Circuit use a three-factor balancing test to analyze whether a

proposed settlement is fair, reasonable, and in the best interests of the estate: "(1) the probability

of success in litigating the claim subject to settlement, with due consideration for the uncertainty

in fact and law; (2) the complexity and likely duration of litigation and any attendant expense,

inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise."

*Age Ref. Inc.*, 801 F.3d at 540. In connection with the third factor, courts should also consider "the

paramount interest of creditors with proper deference to their reasonable views" and "the extent to

which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion."

*In re Foster Mortg. Corp.*, 68 F.3d 914, 917–918 (5th Cir. 1995); *see also Age Ref. Inc.*, 801 F.3d

at 540. These factors will weigh in favor of approving the Reyes Settlement.

41. Upon satisfaction of the Settlement Conditions and the subsequent entry of the

Final Order, the Reyes Settlement will provide substantial benefits to the Debtors' estates through

the comprehensive and consensual resolution of Reyes's claims with respect to the Post-Closing

True-Up. The Reyes Settlement will maximize value of the Debtors' estates by resolving the

Parties' outstanding Post-Closing True-Up dispute on a consensual basis, thereby avoiding costly

and protracted litigation and preserving the Parties' ongoing relationship necessary to facilitate an

orderly transition of the 11 transferred markets and, importantly, to allow the Debtors to continue serving the Reyes TSA.  Additionally, resolving the Parties' outstanding Post-Closing True-Up dispute removes the impediment to closing the Hawaii Transaction, thereby allowing the Debtors to realize the value associated with such pending sale (subject to Court approval).  Absent resolution of this dispute, any threatened litigation on account of the Post-Closing True-Up would divert the time and attention of the Debtors, their management, and their advisors and further drain precious limited estate resources at this critical juncture.  Approving the Reyes Settlement upon entry of the Final Order will also enable the Debtors to release the Unsaleable Inventory to Reyes before its value materially depreciates.

42.    The Reyes Settlement is the product of good-faith, arm's-length negotiations between the Reyes Settlement Parties, each of which is a sophisticated party represented by experienced counsel.  The Reyes Settlement represents a compromise for each of the Reyes Settlement Parties and the best, most value-maximizing resolution available to the Debtors under the circumstances.  Accordingly, the Debtors submit that approval of the Reyes Settlement, upon entry of the Final Order, is in the best interests of the Debtors, their estates, and all parties in interest because it preserves estate resources, facilitates the efficient administration of the Debtors' chapter 11 cases, and avoids the substantial costs associated with litigating the Parties' dispute with respect to the Post-Closing True-Up.

**Reservation of Rights**

43.    Notwithstanding anything to the contrary herein, and with the exception of the Post-Closing True-Up and the other obligations of the Debtors pursuant to the Reyes Settlement Process and Reyes Settlement, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested in this Motion is intended as or should be construed or

deemed to be:  (a) an implication or admission as to the amount of, basis for, priority, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien (that arises under contractual rights, common law, statutory law, or otherwise) on, security interest in, or other encumbrance on property of the Debtors' estates, including any lien that may be satisfied pursuant to the relief requested in this Motion, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; or (h) a waiver of the obligation of any party in interest to file a proof of claim.

## Notice

44.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Lenders; (d) the Bank Agent; (e) the Second Lien Lender; (f) the Equipment Loan Lenders; (g) holders of the Owner Notes; (h) the office of the attorney general for each of the states in which the Debtors operate; (i) the Internal Revenue Service; (j) any other governmental agencies having

a regulatory or statutory interest in these chapter 11 cases; (k) Reyes; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors request that the Court enter the Interim Order and the Final

Order granting the relief requested herein and such other relief as the Bankruptcy Court deems

appropriate under the circumstances.

Houston, Texas
Dated: July 27, 2026

*/s/ John F. Higgins*

| | |
|---|---|
| **PORTER HEDGES LLP** | **KIRKLAND & ELLIS LLP** |
| John F. Higgins (TX Bar No. 09597500) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| M. Shane Johnson (TX Bar No. 24083263) | Joshua A. Sussberg, P.C. (*pro hac vice* pending) |
| Megan Young-John (TX Bar No. 24088700) | Christopher Marcus, P.C. (*pro hac vice* pending) |
| Joanna D. Caytas (TX Bar No. 24127230) | Maddison Levine (*pro hac vice* pending) |
| 1000 Main St., 36th Floor | 601 Lexington Avenue |
| Houston, Texas 77002 | New York, New York 10022 |

| | | |
|---|---|---|
| Telephone: | (713) 226-6000 | |
| Facsimile: | (713) 228-1331 | |
| Email: | jhiggins@porterhedges.com | |
| | sjohnson@porterhedges.com | |
| | myoung-john@porterhedges.com | |
| | jcaytas@porterhedges.com | |

| | | |
|---|---|---|
| Telephone: | (212) 446-4800 | |
| Facsimile: | (212) 446-4900 | |
| Email: | joshua.sussberg@kirkland.com | |
| | cmarcus@kirkland.com | |
| | maddison.levine@kirkland.com | |

*Proposed Co-Counsel for the Debtors*          *Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*                          *and Debtors in Possession*

**Certificate of Service**

I certify that on July 27, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas. Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' proposed claims and noticing agent.

/s/ *John F. Higgins*
John F. Higgins