**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC, *et al.*,[1] | ) ) | Case No. 26-90737 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF JOHN R. CASTELLANO,
CHIEF RESTRUCTURING OFFICER OF REPUBLIC NATIONAL
DISTRIBUTING COMPANY, LLC AND ITS DEBTOR AFFILIATES, IN SUPPORT
OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, John R. Castellano, hereby declare under penalty of perjury:[2]

1. Republic National Distributing Company[3] is a family-founded company started more than 125 years ago—namely, four family businesses that came together to ultimately become the nation's second largest alcohol beverage distributor.



2. It all began in 1898 when Newman Goldring, an immigrant from Eastern Europe, founded N. Goldring Corporation ("NGC"). Based in Pensacola, Florida, NGC became the first licensed beer distributor in Florida, growing over the next several decades well beyond what

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/RNDC. The location of Debtor Republic National Distributing Company, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 4300 Wildwood Parkway, Suite 200, Atlanta, GA 30339.

[2] Capitalized terms not immediately defined herein have the meanings ascribed to them later in this declaration (this "Declaration").

[3] "RNDC" or the "Company" refers to Republic National Distributing Company, LLC, together with its direct and indirect subsidiaries and certain of its affiliates. "Debtors" refers to Republic National Distributing Company, LLC and its Debtor affiliates listed on **Exhibit A** attached hereto.

Goldring ever anticipated. In 1919, however, it seemed his burgeoning business would come to an early end as Prohibition ceased operations. But the impact of Prohibition proved only temporary; following its repeal in 1933, Goldring reopened with the help of his son in 1939.

3. Like Newman Goldring, others saw the repeal of Prohibition as an opportunity to provide relief from the depths of the Great Depression.  Chris Carlos, an immigrant from Greece who spoke little English, knew nothing of the alcohol industry and had no money. Nonetheless, two years post-Prohibition, Chris Carlos founded the Dixie Wine Company in Atlanta, Georgia.

4. At the same time, Al Davis, a young alcohol salesman from New York, was making a name for himself across the southeast. After finding success working for distributors in the southeast and Chicago, Al Davis approached Chris Carlos, and together they grew the Dixie Wine Company. In 1942, the pair formed a new jointly-owned alcohol distribution company known as National Distributing Company, Inc. ("NDC"), with Carlos running the finances and Davis focusing on sales.

 5. In San Antonio, Texas, Edward Block had similar aspirations of succeeding in the liquor distribution business based on his familiarity with the industry as a route-salesman for a liquor distributor. Block went on to form his own alcohol distribution company—Block Distributing Company ("BDC")— with just one delivery truck and a small warehouse in 1939.

6. Over the next few decades, the Goldring, Block, Carlos, and Davis families actively developed and cultivated their respective businesses, building personal relationships with suppliers and customers. These relationships—first established by the founders and later carried forward by their children—are critical to the success of a distributor, which serves as a middleman between suppliers of alcohol (distilleries, wineries,  breweries, etc.) and the ultimate customers (bars, restaurants, retail stores, etc.). Al Davis, for example, continued to travel and meet personally with suppliers and customers well into the 1980s—nearly 50 years after he first entered the industry—because face-to-face interaction and personal attention from ownership were not merely courtesies, but central to how the business operated and trust was maintained. This hands-on, relationship-driven approach became a defining characteristic of each company's culture and allowed all three to expand in both size and geography. By the early 1990s, NGC had operations in approximately ten states, NDC had operations in approximately eight states, and BDC had expanded throughout much of Texas.

7. Each of NGC, BDC, and NDC applied this same relationship-driven philosophy to their employees, or "associates" as they are called—a term that reflected the founders' view that employees are partners in building the business, not merely hired labor. The impact of this culture was (and is) undeniable: associates remained with the companies for decades. The ability to retain and grow this talent over time was a testament to the supportive corporate culture the founding families cultivated within each of their companies.

8. In 1997, the Block and Goldring families—who had developed a strong friendship over the years—formally combined their businesses to create

Republic Beverage Company ("RBC").  A decade later, amid broader industry consolidation, RBC and NDC merged nearly all of their businesses to create RNDC.

9.     Following the merger, RNDC grew steadily for a number of years through a series of strategic acquisitions and partnerships with established suppliers.  At its height, RNDC achieved annual revenue of approximately $12 billion and maintained operations in nearly 40 states, serving as a vital link between approximately 2,000 suppliers and 170,000 customers in the purchase, transport, and sale of approximately 390,000 cases of alcohol per day.  RNDC remained under the stewardship of the Block, Goldring, Davis, and Carlos families, with several descendants of the original founders working for the Company and serving on its board.  This growth was made possible by the personal relationships developed with suppliers and customers alike and a workforce built over generations.  RNDC formerly employed more than 10,000 people, many of whom began their careers at NGC, BDC, or NDC years or decades before the 2007 merger.

10.     All of this success, however, could not shield RNDC from the immense challenges facing the entire alcohol industry in the aftermath of the COVID-19 pandemic.  During the first two years of the pandemic, alcohol consumption spiked, and distributors like RNDC raced to meet the unprecedented demand.  When bars and restaurants closed, consumers increasingly purchased alcohol at stores and through delivery services for in-home consumption.  But when the pandemic began to subside in late 2022, alcohol sales precipitously declined, and distributors were left with significant excess inventory that has yet to normalize.  Efforts to close the destocking gap were frustrated by a sustained period of elevated interest rates, inflation, increasing labor costs, and supply chain delays.  On top of these obstacles, consumer preferences dramatically shifted— Americans began drinking less, and younger generations began opting for more health-conscious

alcohol alternatives.  Notably, 2023 marked the first year in nearly three decades that overall alcohol sales volumes declined.[4]

11.     Making matters worse, as the industry landscape shifted, so too did RNDC's relationships with its suppliers.  The same headwinds impacting distributors—declining consumption, inventory overhangs, and margin compression—were likewise impacting suppliers who were increasingly focused on their own bottom lines.  From late 2022 through 2025, RNDC lost several key suppliers that together accounted for more than $3 billion in annual revenue.  These losses placed substantial pressure on the business and reduced the Company's ability to generate positive free cash flow.  At the same time, suppliers that did *not* terminate began extracting more onerous contractual terms.  In many instances, maintaining key relationships required the Company to accept materially less favorable arrangements.  For example, the renewal of one of the Company's key contracts resulted in an approximate *$50 million* reduction in gross profit simply for re-signing the contract.  Sensing that RNDC had become vulnerable, other distributors seized on the opportunity to increase market share by offering aggressive, more favorable terms to the Company's suppliers, which intensified margin compression across the entire industry.

12.     RNDC also faced headwinds unique to the California market, which is the largest market for alcohol sales in the United States.  Before exiting the market in June 2025, RNDC maintained a significant presence in California, representing nearly 200 wineries and countless other wine and liquor suppliers.  RNDC ultimately determined to withdraw from the California market altogether and instead focus on strategically reinvesting in the geographies where it was

---

[4]     *See US Beverage Alcohol Market Set for Slow Recovery After 'Reset Year'*, IWSR (June 26, 2024), https://www.theiwsr.com/insight/us-beverage-alcohol-market-set-for-slow-recovery-after-reset-year/.  *See also* Damita Menezes, *US Beer Consumption Hits Lowest Level in a Generation in 2023*, NewsNation (Jan. 2, 2024, at 8:46 CST), https://www.newsnationnow.com/health/beer-consumption-lowest-level-generation-2023/.

best positioned to grow.  While the California exit saved RNDC from even greater operating losses had it remained in the market, the California exit led to large volume and revenue losses, as well as operational challenges with respect to inventory and national suppliers, directly contributing to the straining financial health of RNDC.

13.     These challenges were exacerbated by the substantial debt burden RNDC had accumulated throughout the years to fund its nationwide expansion.  To remain competitive in the growing alcohol industry over the years, the Company relied on debt-financed mergers and acquisitions to expand its footprint and market share.  These expansions, including the Company's entry into the California market, added incremental debt to the balance sheet, with the expectation that this expanded distribution network and increased volume would generate sufficient cash flow to service debt over time.  This leverage profile was manageable under favorable operating and macroeconomic conditions, but became increasingly difficult to sustain in the aftermath of the COVID-19 pandemic, especially in light of interest rates rising substantially together with consumer preferences dramatically shifting.  It created a perfect storm.

14.     In September 2025, as their financial challenges persisted, the Debtors engaged AlixPartners, LLP ("AlixPartners"), and in October 2025, the Debtors engaged Kirkland & Ellis LLP ("Kirkland") and Lazard Frères & Co. LLC ("Lazard," and collectively with Kirkland and AlixPartners, the "Advisors") to consider value-maximizing paths forward for the Company. Following the unexpected passing of the Company's then-Chief Executive Officer ("CEO") in the middle of October 2025, Marc Sachs, a longtime board member and the son-in-law of Alan Dreeben, quickly stepped into the CEO role in the face of significant uncertainty.  Mr. Sachs assumed responsibilities that neither he nor the Company could have fully anticipated at the time, providing critical leadership through the storm.

15.     On November 11, 2025, the board of Republic National Distributing Company, LLC (the "Board") appointed Scott D. Vogel and Charles T. Piper as disinterested managers and delegated to them binding decision-making authority with respect to matters that constitute, or are reasonably likely to constitute, a conflict of interest between the Company and any of its related parties (including, among others, current and former directors, managers, officers, equityholders, employees, advisors, affiliates, or other stakeholders (each, a "Related Party")). They were also delegated authority to investigate all historical transactions between the Company and Related Parties.  On December 21, 2025, a third disinterested manager—John T. Young, Jr. (together with Mr. Vogel and Mr. Piper, the "Disinterested Managers," and collectively, the "Special Committee")—was appointed to the Board and the Special Committee.  As part of their mandate, the Special Committee has investigated potential claims and causes of action the Debtors may possess.

16.     On June 25, 2026, each of the Debtors appointed Jill Frizzley to their boards as a fourth Disinterested Manager.  Ms. Frizzley was appointed to a newly-created special committee and granted sole authority to review and investigate any decisions made and/or transactions entered into by the Company/Special Committee since its creation (the "Additional Special Committee," and together with the Special Committee, the "Special Committees").  The Company retained Porter Hedges LLP ("Porter Hedges") as co-counsel and conflicts counsel.  Porter Hedges also represents Ms. Frizzley in her capacity as independent manager and sole member of the Additional Special Committee.  Consistent with Ms. Frizzley's delegation of authority, Ms. Frizzley is currently reviewing various transactions from the time the Special Committee was first appointed to the Petition Date, including the Reyes Sale Transactions.

17.     As the Company's financial challenges continued in the fourth quarter of 2025, the Company began considering every available strategic alternative.  These included, among other options:  (a) a potential sale-leaseback transaction of substantially all of the Company's owned real estate; (b) a refinancing of certain of the Company's funded indebtedness; (c) one or more potential going-concern sales of some or all of the Company's assets and/or equity interests; and (d) any combination thereof.  In parallel, the Company began implementing various cost-cutting initiatives, including deferring maintenance at its warehouse facilities and reductions in workforce, as well as liquidity enhancing measures, including stretching supplier payment terms.

18.     The Company commenced robust outreach to solicit proposals for third-party capital.  Notably, the Company's first-lien Credit Agreement includes numerous lender consent rights—including, in many instances, the 100% vote of each of the then-existing 16 first-lien lenders (collectively, the "Lenders").  In addition to certain typical "sacred rights," the Lenders maintain several atypical consent rights—a direct result of the Credit Agreement having been amended 11 times by the end of November 2025.[5]  These atypical 100% consent rights included the incurrence of additional indebtedness and other forms of financing.  Notwithstanding comprehensive and exhaustive outreach, it was not surprising that none of the third-party proposals offered an actionable solution because no party was willing to provide financing on a junior basis or in a manner that the Lenders would otherwise support.

19.     It therefore became clear that a sale of some or all of the Company's markets was the most value-maximizing path forward.  In early December 2025, the Company began receiving inbounds for certain markets, including Maryland, Virginia, and Washington D.C.  The Company

---

[5]     As discussed in greater detail herein, the Credit Agreement has been amended a total of 23 times before the Petition Date.

and the Advisors began engaging with parties regarding potential merger or acquisition transactions for those markets while also conducting outreach to buyers for other markets. Between early December 2025 and early January 2026, the Company engaged with 26 such parties, 14 of which signed non-disclosure agreements. The Lenders firmly believed the sale process should occur in chapter 11. But with only indications of interest in hand, the Company did not believe a going-concern sale transaction or series of sale transactions would come together in chapter 11 and instead would likely result in the Company's liquidation. A full Company liquidation would have led to an extremely depressed recovery on the value of the Company's approximately $1.3 billion of inventory on hand, as well as its other assets, not to mention the significant loss of jobs and supplier disarray.

20. The Company's view was largely informed by certain state-specific laws narrowly restricting how collateral, such as inventory and licenses, may be sold or transferred, and there was uncertainty regarding a buyer's appetite to consummate a going-concern sale transaction in a chapter 11 process. *First*, in any given state, as a result of certain regulatory considerations, there is a limited universe of potential purchasers (or, in some states, a *single* viable purchaser), most of whom are unfamiliar with and wary of the chapter 11 process. *Second*, many of the Debtors' suppliers operate primarily on a purchase order basis without a formal agreement—given that no alcohol distributor of this size has ever filed for chapter 11, there was a real risk that such suppliers could not be compelled to perform after filing for chapter 11. Because the suppliers are a key component of any going-concern sale transaction, the Debtors anticipated that a chapter 11 proceeding would create meaningful uncertainty and strain relationships. *Most critically*, absent the time and liquidity necessary to prepare for a chapter 11 filing to effectuate negotiated going-concern sale transactions, a disorderly chapter 11 would have further frustrated the

Company's supplier base at large and generally eroded supplier confidence and years of goodwill. This was of particular concern given that viable interest had materialized for one or more going-concern sale transactions outside of chapter 11.

21.     In the face of dire liquidity constraints, and after weeks of unsuccessful negotiations with the Lenders, the Company sent a letter to the Bank Agent (the "Letter")[6] and each of the then-existing 16 Lenders on January 5, 2026.  The Letter focused on the need for immediate liquidity to facilitate an out-of-court sale process and avoid a disorderly liquidation to the detriment of all stakeholders.  The Lenders ultimately agreed to support the Company with $250 million of incremental financing to facilitate a sale process, solidify the balance sheet, and fund ordinary course operations, among other things.  This funding proved critical for all stakeholders; it preserved thousands of jobs, many of which are held by associates who built their careers at RNDC (or its predecessor companies) over decades, and approximately 700 suppliers have transitioned to new distributors.

22.     More specifically, in January 2026, an established beer distributor—Reyes Holdings, L.L.C. ("Reyes")—indicated interest in seven of the Company's markets.  Reyes ultimately provided an expanded offer encompassing 11 states that would generate more than $1 billion in net proceeds.  Reyes was committed to closing on an expedited timeline to mitigate growing supplier attrition.  In connection with the $250 million financing, the Lenders required RNDC to comply with certain sale milestones and other requirements, including, among others, (a) closing the Reyes transactions by May 31, 2026, (b) repaying outstanding funded debt obligations with the sale proceeds, and (c) continuing to explore potential sales of other markets.

---

[6]     The Letter is attached hereto as **Exhibit B**.

23.     The Reyes transactions for 11 markets (collectively, the "Reyes Sale Transactions") closed on May 29, 2026.  The Reyes Sale Transactions contemplated entry into a transition services agreement (the "Reyes TSA") to facilitate the transition of operations through September 30, 2026 with optional extensions through December 31, 2026.  Reyes agreed to pay the Company $11 million per month through October 2026 and $12 million per month in November and December 2026 for transition services.  $50 million of the sale proceeds were placed in a third-party escrow to address indemnification obligations under the sale agreements.  Certain variable components of the purchase price with respect to the Reyes Sale Transactions were subject to a post-closing true-up, pursuant to which the purchase price paid at closing may be adjusted up or down dependent on post-closing review of, among other things, inventory levels, supplier payables, prepaid expenses, equipment value, and trade receivables.  Contemporaneously herewith, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing and Approving the Reyes Settlement Process, (II) Approving the Form of Reyes Settlement Notice, (III) Authorizing and Approving the Reyes Settlement Upon Satisfaction of the Settlement Conditions, and (IV) Granting Related Relief*, pursuant to which the Debtors seek approval of (a) certain procedures related to a potential settlement with Reyes resolving the ongoing dispute with respect to the post-closing true-up and (b) a comprehensive settlement with Reyes.

24.     Following the closing of the Reyes Sale Transactions, the Company was once again out of liquidity.  With additional sales pending, the Company engaged with the Lenders to secure the liquidity necessary to facilitate additional sales.  The Lenders provided incremental funding draws of a $74 million, allowing the Debtors to consummate sales for assets in Washington, Oregon, Nebraska, North Dakota, South Dakota, and Arkansas.  The Debtors also executed

non-binding letters of intent for assets in Alaska, as well as for their "control state" operations in 17 states nationwide. The purchaser for the asset sales in Nebraska, North Dakota, and South Dakota was Quality Brands Distribution, LLC; that sale also included a transition services agreement (the "Quality Brands TSA," together with the Reyes TSA, the "TSAs"). The Quality Brands TSA requires RNDC and certain other Debtors to provide various services through the transition period (*i.e.*, July 31, 2026, for the majority of services and September 30, 2026, for certain information technology related services).

26. With liabilities mounting and additional sales substantially negotiated, it became clear that the only path forward to maximize value was the commencement of these chapter 11 cases. The Debtors and the Lenders agreed on the terms of a $75 million new money senior secured superpriority revolving debtor-in-possession credit facility (the "DIP Facility") to fund these chapter 11 cases. In addition, the Special Committee reached a settlement with certain Related Parties consistent with the term sheets included in **Exhibit C** attached hereto (collectively, the "Equity Holder Settlement"). The Equity Holder Settlement, combined with the milestones set forth in the DIP Facility, will allow the Debtors to move through these chapter 11 cases efficiently and expeditiously to both maximize value for distribution to creditors and minimize the administrative expenses of these chapter 11 cases. The Debtors are obligated to (a) file and prosecute a chapter 11 plan within five business days of the Petition Date and (b) seek confirmation of a chapter 11 plan and/or one or more sales of all or substantially all Debtor assets within 70 days of the Petition Date.

26. To that end, the Debtors have commenced these chapter 11 cases to (a) facilitate the consummation of potential private sales of the Debtors' remaining assets (each, a "Going-Concern Sale Transaction"); (b) effectuate an orderly, value-maximizing wind down of

remaining operations; (c) satisfy their obligations under the TSAs; and (d) seek approval, through confirmation of a chapter 11 plan, of the Equity Holder Settlement. This expedited timeline will maximize the value of the Debtors' estates for the benefit of all stakeholders, including the holders of over $400 million of general unsecured claims.[7] The Debtors and the Lenders look forward to engaging with the to-be-formed official committee of unsecured creditors immediately upon its appointment.

27.     For more than a year, the Company has worked tirelessly to preserve the business that the Goldring, Block, Davis, and Carlos families devoted generations to building. This was by no means an outcome any of these families desired. Nonetheless, all parties worked collaboratively under the most challenging of circumstances to maximize value for all stakeholders. These efforts, under the leadership of Mr. Sachs, protected the livelihoods of thousands of associates—who built this business alongside the founding families, hundreds of suppliers, and potentially hundreds of wineries that otherwise could have disappeared.

28.     Accordingly, after carefully evaluating all available alternatives, the Debtors, at the direction of the Special Committee, believe these chapter 11 cases represent the best available path forward. A streamlined, efficient chapter 11 proceeding will allow the Debtors to quickly complete one or more Going-Concern Sale Transactions, and in turn, bring these cases to an orderly conclusion.

*     *     *     *     *

---

[7] The Debtors maintain five non-qualified deferred compensation plans (each, a "<u>Deferred Compensation Plan</u>," and collectively, the "<u>Deferred Compensation Plans</u>") for certain current and former associates (a) that were designated by the Company as eligible to participate in a Deferred Compensation Plan and (b) who qualify as members of a "select group of management or highly compensated employees" under ERISA. As of the Petition Date, the Debtors have more than $60 million in outstanding obligations on account of the Deferred Compensation Plans. The Debtors intend to seek authority to make disbursements under the Deferred Compensation Plans pursuant to a separate motion to be filed in these chapter 11 cases.

29.    I am the Chief Restructuring Officer of each of the Debtors and a Managing Director at AlixPartners, the proposed financial advisor to the Debtors.  I have 30 years of experience in restructuring and bankruptcy-related matters and have served as a financial advisor to both public and private companies, specializing in advising companies, lenders, creditors, corporate boards, and equity sponsors across a wide range of industries, both domestically and internationally.  I have undertaken both advisory and executive roles, including chief restructuring officer, chief financial officer, and interim chief executive officer.

30.    I have acted as the Chief Restructuring Officer (or in an equivalent role) in the following chapter 11 proceedings:  *In re Office Properties Income Trust*, No. 25-90530 (CML) (Bankr. S.D. Tex. 2025); *In re Steward Health Care System LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. 2024); *In re Aearo Technologies, LLC*, No. 22-02890 (JJG) (Bankr. S.D. Ind. 2022); *In re Footprint Power Salem Harbor Development LP*, No. 22-10239 (MFW) (Bankr. D. Del. 2022); *In re Alpha Latam Management, LLC*, No. 21-11109 (JKS) (Bankr. D. Del. 2021); *In re Lonestar Resources US Inc.*, No. 20-34805 (DRJ) (Bankr. S.D. Tex. 2020); *In re McDermott International, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. 2020); and *In re Aegerion Pharmaceuticals, Inc.*, No 19-11632 (MG) (Bankr. S.D.N.Y. 2019).

31.    I have served as a Managing Director in AlixPartners' Turnaround & Restructuring Group since 2007.  Previously, I worked at Ernst & Young LLP in its Assurance practice as an auditor, and in its Consulting practice focusing on restructuring advisory services.  I hold a bachelor's degree in Accounting from DePaul University and a master's degree in Management, Finance, and Strategy from the Kellogg School of Management at Northwestern University.

32.     In my role as Chief Restructuring Officer of the Debtors, I am involved with RNDC's day-to-day operations and familiar with RNDC's history, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases. Except where specifically noted, the statements in this declaration are based on:  (a) my personal knowledge; (b) information provided to me by the Company's management team, associates, and the Advisors; or (c) my review of relevant documents and information concerning the Company's operations, financial affairs, and restructuring initiatives.  I am over the age of 18, and if called upon to testify, I could and would testify competently to the facts set forth herein.

33.     On July 26, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 with the Court.  I submit this Declaration to assist the Court and interested parties in understanding the reasons for these chapter 11 cases and in support of the Debtors' chapter 11 petitions and related motions (collectively, the "First Day Motions").

34.     This Declaration has been organized into four sections:

- **Part I** provides a general overview of the Debtors' business operations;

- **Part II** provides an overview of the Debtors' organizational and capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases; and

- **Part IV** sets forth the evidentiary basis for the relief requested in the First Day Motions.

I.     **The Company's Business Operations.**

A.     **Nationwide Expansion.**

35.     Beginning in 2007, RNDC steadily expanded its operations throughout much of the United States, growing together with the industry.  A series of more than a dozen strategic acquisitions and joint-venture partnerships with other established alcohol distributorships fueled this growth.  Between 2007 and 2023, RNDC effectuated many transactions, including:

15

- **2007:** RNDC entered the **South Carolina** market through a joint-venture partnership with the Capital Group of South Carolina.

- **2008:** RNDC entered the **Nebraska** market by acquiring Nebraska Wine & Spirits.

- **2010:** RNDC entered the **Indiana** market through a joint-venture partnership with National Wine and Spirits, Inc. ("NWS").

- **2011:** RNDC acquired Sparrow and Associates, the leading spirits broker in **Virginia** and **North Carolina**.  RNDC also entered the **Arizona** market through a joint-venture partnership with Young's Market Company, LLC ("YMC").

- **2014:** RNDC entered the **Michigan** market through a joint-venture partnership with NWS.

- **2017:** RNDC solidified its presence in the **Oklahoma** market through a joint-venture partnership with Central Liquor Company.  Central Liquor Company is a third-generation family-owned business, which was founded in 1959.

- **2019:** RNDC expanded its partnership with YMC and acquired a 50% interest in YMC and YMC-Arizona from its then-owners, Young's Holdings, Inc. and its affiliates (collectively "YHI").  This allowed RNDC to enter the **California** market and other states on the west coast.  RNDC also partnered with Liberation Distribution, Inc. to launch eRNDC, which is a business-to-business eCommerce platform that connects suppliers and customers.

- **2021:** RNDC expanded its operations in the **Florida** market by acquiring Opici Family Distributing, a fourth-generation family-owned wine and spirits wholesaler started in 1913.  The Company also entered the **Illinois** market through a joint-venture partnership with Heritage Wine Cellars, Ltd.

- **2022:** RNDC entered the **Alaska** market by acquiring White Mountain Beverage, an independent Anheuser-Busch wholesaler.  The Company also expanded its operations in several key control states through the acquisition of Ultra, a division of Horizon Beverage.  RNDC also entered the **New York** market through a joint-venture partnership with Opici Family Distributing.

- **2023:** RNDC expanded its operations in **Virginia**, **Maryland**, **Washington D.C.**, **Pennsylvania**, and **North Carolina**, and expanded its product offering to include sake, soju, Korean wine, baiju, and Asian beer for the first time, through the acquisition of Young Won Trading Distribution.  The Company also expanded its operations in **Arkansas** by acquiring Natural State Distributing.

36. Through these various strategic acquisitions and joint-venture partnerships, RNDC became a nationwide alcohol distribution powerhouse operating in 40 states, maintaining 45

warehouses and distribution centers, employing more than 10,000 associates, and generating revenue of more than $12 billion at its peak.

### B. RNDC's Business Operations.

37. RNDC has historically served as a distribution partner to over 2,000 suppliers and more than 170,000 customers. RNDC's success has been built on more than its ability to simply fill and deliver orders. The Company instead has focused on differentiating itself by offering comprehensive support from regulatory compliance to route-to-market strategy for suppliers and customers at all stages.

### a. The Three-Tier System of Alcohol Distribution.

38. Beverage alcohol distributors like RNDC fill an essential role in what is known as the "three-tier system." This is a regulatory framework that followed Prohibition.[8] The system divides the alcohol industry into three distinct tiers:

- *suppliers*—distilleries, wineries, and breweries that manufacture or import alcohol;

- *distributors*—the "middleman" of the supply chain who purchases product from suppliers and transports and sells product to those who sell or serve alcohol; and

- *customers*—bars, restaurants, and retail stores that purchase products from distributors and sell for consumption.

Each tier must be licensed by a state and/or local regulatory body to operate within a specific state, and each state has its own regulatory scheme to which distributors must adhere.

---

[8] When the United States passed the 21st Amendment repealing Prohibition, states were given the power to regulate alcohol distribution within their respective borders. As a result, most states implemented a version of the three-tier system, although specific regulations vary from state to state.

39. Within this framework, states are generally organized into three different categories:

- *open states*, where private distributors like RNDC can freely purchase alcohol at wholesale prices and distribute it at a markup;

- *control states*, where state government agencies oversee and handle the distribution and sale of alcohol; and

- *franchise states*, where distributors are protected by franchise laws that prevent unfair termination of distribution agreements.[9]

40. Due to the state-by-state regulatory environment, RNDC was historically either the dominant distributor—or the only distributor—capable of serving suppliers at scale in many states.

### b.   Supplier Partnerships.

41. RNDC has historically supported thousands of suppliers by offering a full suite of capabilities, including transportation, warehousing and storage, supply chain logistics, marketing and brand management, sales forecasting and analytics, and regulatory compliance. The Company primarily operates under distribution rights agreements with suppliers that grant RNDC the right to distribute certain of that supplier's products in a specific region. RNDC typically agrees to purchase a certain volume of products from the suppliers for a set period of time—generally anywhere from three to ten years. It was often the case that these connections turned into decades-long relationships. Some suppliers do not have formal agreements with the Company and instead will designate RNDC as their "distributor of record." RNDC then becomes the sole authorized "middleman" between the supplier and the customer of the applicable brand.

42. In many instances, RNDC's supplier relationships could be traced back to its founders' relationships with individual winemakers and distillers. And as the supplier market

---

[9] In addition, in some states, different types of beverages are regulated differently. For instance, in Oregon, the state is a "control" state with respect to spirits and an "open" state with respect to wine and beer.

began to consolidate, RNDC's connections with individual winemakers and distillers evolved into decades-long partnerships with new larger platforms and their expanded portfolio of products.

### c.      *Warehouse Facilities and Distribution Network.*

43.      RNDC has historically maintained an expansive supply chain fulfillment network with facilities in most major states.  RNDC's warehouses operate around the clock and utilize automated systems to maximize efficiency and locate products, package them together, and load them onto delivery trucks.  This enables the Company to offer 24-hour turnaround on deliveries. The Company also strategically plans its delivery routes to maximize efficiency, utilizing artificial intelligence to optimize route planning and timely deliveries.  At its height, the Company utilized a fleet of approximately 1,800 vehicles, delivering more than 390,000 cases of alcohol products daily.

### d.      *Customer Sales.*

44.      The Company's customers have consisted of both "on-premise" customers— establishments that are licensed to sell alcohol for consumption at the same location where the product was received (*e.g.*, restaurants, bars, and hotels)—and "off-premise" customers—various retail locations that are licensed to sell alcohol (*e.g.*, grocery stores, convenience stores, and liquor stores).  Within each of these categories, RNDC has historically served a diverse customer base, from mom-and-pop liquor stores to top national retail chains, including Walmart, Costco, and Kroger.  Off-premise customers historically accounted for a vast majority of RNDC's total sales, most of which was the result of partnerships with well-known national retail chains.

### e.      *eRNDC.*

45.      In 2019, RNDC launched a collaborative business-to-business eCommerce platform ("eRNDC") to connect customers, sales teams, and suppliers online.  The eRNDC platform allowed customers to browse over 11,500 brands, place orders, communicate with sales

representatives, track delivery updates, and pay their bills online.  eRNDC complements the Company's wholesale business by acting as a marketing vehicle and additional channel to place orders.  RNDC agreed to support the eRNDC platform until it is migrated to the eCommerce platform operated by Reyes per the terms of the Reyes Sale Transactions.

## II.    RNDC's Organizational Structure and Prepetition Capital Structure.

### A.    RNDC's Organizational Structure.

46.    RNDC's organizational structure includes 39 entities, 18 of which are Debtors in these chapter 11 cases.  The Company's non-U.S. entities, as well as certain joint-venture partnerships and their subsidiaries, are not part of these chapter 11 cases.  A simplified overview of the Company's current organizational structure, including the 18 Debtor entities and certain non-Debtor entities, is reflected below:



47.    Debtor RNDC Texas, LLC, which is a direct subsidiary of Debtor Republic National Distributing Company, LLC, was formed under the laws of the State of Texas in 2006.

### B.    RNDC's Prepetition Capital Structure.

48.    As of the Petition Date, the Debtors have approximately $225 million in aggregate principal and accrued interest outstanding under the Credit Facilities.  This reflects a substantial paydown of over $1.1 billion through the prepetition Going-Concern Sale Transactions, including over $1 billion from the Reyes Sale Transactions.

| Prepetition Capital Structure (as of July 2026) | | |
|---|---|---|
| **Secured Funded Debt** | | |
| *Debt Instrument* | *Maturity* | *Principal and Interest Outstanding ($ millions)* |
| **Delayed Draw Term Loan Facility** | November 1, 2026 | $66.3 |
| **ABL Facility (incl. FILO Revolver)** | November 1, 2026 | $158.6 |
| **2L Facility** | January 31, 2028 | $260.4 |
| **Equipment Loans** | Various | $7.0 |
| | *Total Secured Funded Debt Outstanding* | $492.4 |
| **Unsecured Funded Debt** | | |
| *Facility* | *Maturity* | *Principal and Interest Outstanding ($ millions)* |
| **Owner Notes** | On Demand | $47.7 |
| | *Total Unsecured Funded Debt Outstanding* | $47.7 |
| | *Total Funded Debt Outstanding* | **$540.0 million** |

#### a.    *Credit Facilities.*

49.    The Debtors are party to that certain Third Amended and Restated Credit Agreement, dated as of November 1, 2022 (as amended, restated, supplemented, waived, or otherwise modified from time to time, the "Credit Agreement").  Wells Fargo Bank, National Association (the "Agent") serves as administrative agent.  The Credit Agreement includes:  (a) a delayed draw term loan facility at SOFR *plus* 6% per annum (the "Delayed Draw Term Loan Facility"); (b) a revolving facility at SOFR *plus* 6% per annum (the "ABL Facility"); and (c) a first in last out revolving loan at a rate equal to SOFR *plus* 6% per annum (the "FILO Revolver Facility," and together with the Delayed Draw Term Loan Facility and the ABL Facility, the "Credit Facilities").

50.     The Credit Facilities mature on November 1, 2026, and are secured by a first priority lien on substantially all of the Debtors' assets, including commercial litigation claims, subject to certain limitations and exclusions.  In the fall of 2025, approximately $1.5 billion in unpaid principal was outstanding under the Credit Facilities.  Approximately $225 million in unpaid principal and accrued interest is outstanding under the Credit Facilities, of which approximately $150 million is outstanding on account of the ABL Facility, approximately $9 million is outstanding on account of the FILO Revolver Facility, and approximately $66 million is outstanding on account of the Delayed Draw Term Loan Facility.  The Debtors and the Lenders have entered into 13 amendments to the Credit Agreement since late November 2025.[10]

### b.     Second Lien Facility.

51.     The Debtors are party to the Subordinated Credit Agreement, dated as of December 19, 2024 (as amended, restated, supplemented, waived, or otherwise modified from time to time, the "Subordinated Credit Agreement," and such facility thereunder, the "Second Lien Facility"), by and among Republic National Distributing Company, LLC ("RNDC LLC") and certain of its subsidiaries as borrowers, and NDC, as subordinated creditor.  The Second Lien Facility is $235 million in aggregate principal, and interest is accruing at 14% per annum, paid in kind.  The Second Lien Facility is subordinate and junior in right of payment to the Credit Facilities.

52.     The obligations under the Subordinated Credit Agreement mature on January 31, 2028, and are secured by a second lien security interest on certain inventory, distribution rights, and real estate property in New Mexico.  Approximately $260 million in unpaid principal and accrued interest is outstanding under the Second Lien Facility.

---

[10]   A description of these amendments is attached to this Declaration as **Exhibit D**.

### c.      Equipment Loans.

53.     Certain Debtors are party to various equipment loans (collectively, the "Equipment Loans"), as borrower or lessee of certain equipment, with various banks and financing counterparties.  The equipment includes certain forklifts, trucks, racking, and other miscellaneous warehousing equipment used to transport and organize inventory.  Approximately $7 million in unpaid principal and accrued interest is outstanding under the Equipment Loans.

### d.      Owner Notes.

54.     On August 1, 2019,[11] RNDC LLC formally issued 12 subordinated promissory notes to certain members of the Block family (collectively, the "Owner Notes").  The Owner Notes are an aggregate principal amount of $61 million, with interest accruing at the prime rate *minus* 1% per annum.  The Owner Notes are subordinate and junior in right of payment to the Credit Facilities and all other indebtedness of the Company.

55.     The obligations under the Owner Notes are payable on demand, subject to the terms of the Credit Agreement.  Since at least January 1, 2020, interest on the Owner Notes has not been paid in cash and has instead been added to the principal.  Approximately $48 million in unpaid principal and accrued interest is outstanding under the Owner Notes.

### e.      Equity Ownership of Republic National Distributing Company, LLC.

56.     The outstanding equity interests of Debtor RNDC LLC are indirectly owned by the Carlos, Davis, and Block families via two intermediate entities:  (a) non-Debtor affiliate NDC Partners, LLC, which owns 66.67%, and (b) non-Debtor affiliate New BG Distribution Partners, LLC ("New BG Partners"), which owns 33.33%. Members of the Carlos and Davis families own the equity interests of non-Debtor affiliate NDC Partners, LLC ("NDC Partners"), which is an

---

[11]    In addition, the Debtors have recorded various liabilities related to owner notes since 2007.

affiliate of NDC; members of the Block family own the equity interests of non-Debtor affiliate New BG Partners.

57.     Since 2007, NDC has operated as a distinct legal entity from RNDC and services the Georgia and New Mexico markets, although NDC and RNDC have historically cooperated with respect to various inventory and supplier issues.  Historically, the Debtors have also provided accounting, treasury, information technology, and general back-office and support services to NDC.  RNDC and NDC have agreed to go-forward terms for the continued provision of these services and additional transition services and technology transfer services during the course of this case as set forth in the term sheet attached to this declaration as **Exhibit E**.  NDC has agreed to pay $1.6 million per month in cash for these post-petition support and additional transition services, which AlixPartners calculated as the fair value for RNDC's provision of these services to NDC.

### III.    Events Leading to These Chapter 11 Cases.

58.     Since 2022, RNDC has faced significant challenges attributable to a combination of post-COVID-19 operational difficulties and adverse macroeconomic conditions that eroded margins and significantly tightened liquidity.  These challenges were exacerbated by a substantial debt burden, resulting from several years of strategic growth and acquisition, as well as rising interest costs.

### A.      Post-COVID-19 Macroeconomic and Industry Headwinds.

59.     Before the COVID-19 pandemic, the alcohol industry experienced a prolonged period of steady growth.  As government shutdowns forced the closure of restaurants and bars in April 2020, Americans were confined to their homes and increasingly turned to retail stores to purchase alcohol for in-home consumption.  Retail and online sales channels saw a corresponding

24

boom, resulting in an approximate 35% increase in retail alcohol sales during the spring of 2020.[12] Distributors like RNDC raced to meet this incredible surge in demand by stockpiling unprecedented levels of inventory. Given that retail customers have historically generated the vast majority of RNDC's revenue, and because RNDC was one of the only distributors with an eCommerce sales channel, RNDC was able to fully capitalize on this historic demand.

60.     As the effects of the pandemic began to wane in late 2022, so too did the demand for off-premise alcohol consumption. RNDC and other distributors, which had aggressively accumulated significant product during the pandemic, were left holding excess inventory as demand returned to pre-pandemic levels. The Company's efforts to close the destocking gap were frustrated by other macroeconomic factors, including a sustained period of high interest rates and persistent inflation on the heels of the pandemic. Making matters worse, the long-lasting disruption to supply chains instigated increased labor and other elevated costs, thereby increasing expenses and further reducing margins.

61.     But the biggest surprise was the drastic, almost overnight shift in consumer preferences—not only were Americans drinking less in their homes, many stopped drinking altogether. Since 2022, fewer and fewer Americans have reported drinking alcohol; the percentage of adults in the United States that report themselves as regular consumers of alcohol is the lowest it has been in nearly 90 years.[13] Younger generations have become more health-conscious, often opting for alcohol alternatives, such as CBD-infused products or "better-for-you" beverages.

---

[12]   *See* Leon S Moskatel & David JG Slusky, *The Impact of COVID-19 on Alcohol Sales and Consumption in the United States: A Retrospective, Observational Analysis*, National Library of Medicine, (May 23, 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10202895/.

[13]   Lydia Saad, *U.S. Drinking Rate at New Low as Alcohol Concerns Surge*, Gallup (Aug. 13, 2025) https://news.gallup.com/poll/693362/drinking-rate-new-low-alcohol-concerns-surge.aspx.

The rise of GLP-1 drugs like Ozempic and Wegovy, which curb alcohol cravings and consumption, has further contributed to this decline. And when consumers *do* opt to drink alcohol, many have increasingly started to prefer high-quality, high-end wine and spirits brands. Although the trend toward more premium, high-value beverages has allowed distributors like RNDC to realize higher per-unit sales in some instances, it has also contributed to the decline in total sales across the industry because fewer total units are being purchased.

62.    The combination of these macroeconomic and industry headwinds continued to compound. Inventory levels have yet to stabilize to pre-pandemic levels.[14] Persistent inflation and high interest rates posed industry-wide challenges and materially increased RNDC's cash interest expense (all floating rates tied to USD SOFR). This has hugely destabilized and put severe pressure on RNDC's margins, cashflows, and liquidity.

### B.    Operational Challenges.

63.    The sudden drop-off in demand following the pandemic quickly resulted in a mismatch between RNDC's obligations under its supplier distribution agreements and the economic realities of softening demand. During the COVID-19-driven demand, RNDC realized significantly improved unit economics and increased margins, negotiating favorable contractual volume and pricing commitments. Without the same level of demand, however, these commitments proved unfavorable, directly impairing RNDC's margins. Simply put, the Company had become obligated to purchase more inventory from suppliers at unfavorable economic terms than it could sell to its customers in the face of a drastic shift in consumer preferences. As the

---

[14]    *See Merchant Wholesalers, Except Manufacturers' Sales Branches and Offices: Nondurable Goods: Beer, Wine, and Distilled Alcoholic Beverages Inventories/Sales Ratio,* FRED (Dec. 11, 2025, at 9:03 A.M.), https://fred.stlouisfed.org/series/R4248IM163SCEN

middleman of the three-tier distribution network, RNDC's inventory stockpile was entirely inconsistent with demand.

64.     On top of these pressures, between late 2022 and 2025, RNDC lost several key suppliers that collectively generated more than $3 billion of RNDC's annual revenue.  While RNDC worked diligently to establish new supplier partnerships and expand business with existing suppliers, securing approximately ten new or expanded supplier relationships since 2023, the broader macroeconomic factors and industry dynamics became insurmountable.

**C.     RNDC's Entry Into, and Exit From, the California Market.**

*a.     RNDC's Entry into the California Market and Disputes with YHI.*

65.     As the largest alcohol market in the United States, California had long been a target for RNDC.  Following entry into a joint venture with YMC in Arizona, RNDC approached YMC and its indirect owner, YHI—which maintained a significant presence in California and other west coast states—in late 2016 to explore a transaction in the California market.  YMC was founded in 1888 as a family-owned retail store in downtown Los Angeles.  YMC grew into a leading broker and distributor of fine wines and spirits.  Ultimately, the parties were unable to agree on terms.

66.     The original discussions with YHI proved unsuccessful, so RNDC explored other avenues to expand their nationwide footprint.  In 2017, RNDC engaged in merger discussions with Breakthru Beverage Group ("Breakthru")—another major beverage alcohol distributor.  Following a costly two-year review by the Federal Trade Commission, RNDC and Breakthru terminated discussions in 2019.

67.     RNDC re-engaged with YMC in 2019 after the Breakthru deal was terminated. RNDC expressed a preference to purchase the entirety of YMC.  But YHI wanted to retain an ownership stake with the hope that RNDC's ownership and involvement would help revive YMC, which itself had been struggling.

68. Recognizing the critical role the California market could play in its continued expansion, RNDC ultimately agreed to acquire 50% of YMC from YHI for $297 million. After approximately six months of negotiations, the transaction closed in August 2019.

69. Consistent with RNDC's desire to acquire the other 50% of YMC, RNDC, and YHI entered into a new operating agreement granting (a) YHI an option to sell the remaining 50% to RNDC (the "Put Option") or (b) RNDC an option to acquire the remaining options.

70. RNDC and YHI operated as a joint venture for several years. In early 2022, after two years of strong performance during the pandemic, YHI exercised the Put Option on August 5, 2022. A significant dispute over the calculation of the put price arose between RNDC and YHI. RNDC and YHI ultimately agreed—as part of a negotiated resolution— to a final put price of approximately $422 million, which RNDC paid on November 1, 2022.

71. At the same time as these negotiations, Sazerac, a supplier with a desirable portfolio of brands, including Buffalo Trace, Pappy Van Winkle, Southern Comfort, and Blanton's, terminated YMC's distribution rights in Washington. Sazerac was required to pay a termination fee. This led to another dispute between RNDC and YHI, with YHI claiming that it was owed a portion of the termination fee as a true-up payment. After the parties were unable to resolve that dispute, YHI commenced arbitration. Ultimately, this dispute was resolved in June 2024, with RNDC agreeing to pay YHI $7.5 million.

### b. RNDC's Exit from the California Market.

72. Despite RNDC's long-standing desire to enter California, operating in the nation's largest alcohol market presented its own unique challenges. With the extreme competition in the state, labor and occupancy costs almost triple the national average, and heavily discounted customer orders due to certain state regulations, RNDC faced significant margin pressure and diminished cash generation year after year.

73.     On top of these pressures, in early 2025, several of RNDC's key suppliers began moving to RNDC's competitors. In particular—Tito's, Brown-Forman, and Gallo's High Noon— switched to Reyes, putting further pressure on RNDC's California operations. In June 2025, RNDC announced that it would withdraw from the California market by September 2, 2025. This led to the loss of additional suppliers, including Gallo and Proximo.

74.     While the California exit was expected to significantly increase profitability through reduced losses and simplify go-forward operational management over the long-term, the exit reduced its collateral base and has contributed to a large volume and revenue loss in the short-term.

### D.     Retention of Advisors.

75.     In the face of significant liquidity concerns, the Company retained AlixPartners. The Company subsequently retained Kirkland, Lazard, and Joele Frank, Wilkinson Brimmer Katcher. The Company also retained Porter Hedges, as co-counsel and conflicts counsel. And after soliciting proposals from three qualified claims and noticing firms, the Debtors retained Omni Agent Solutions, Inc.

### E.     Enhanced Corporate Governance.

76.     As part of the Company's evaluation of strategic transactions to maximize value for stakeholders, the Advisors conducted a review of the existing corporate governance in late 2025. This led to the appointment of two experienced and disinterested directors—Scott D. Vogel and Charles T. Piper—to the Board of RNDC LLC on November 11, 2025. In addition, the Board of RNDC LLC delegated to the Special Committee certain rights, authority, and powers in connection with any matters in which a conflict of interest exists or is reasonably likely to exist between the Company, on the one hand, and Related Parties, on the other. In connection with the twelfth amendment to the Credit Agreement, John T. Young, Jr. was appointed as an additional

Disinterested Manager to the Board and a member of the Special Committee on December 21, 2025.

77. And, on June 25, 2026, each of the Debtors appointed Ms. Jill Frizzley to their boards as a fourth Disinterested Manager and the sole member of the Additional Special Committee. Ms. Frizzley has authority to review and investigate any decisions made and/or transactions entered into by the Company, including the Reyes Sale Transactions, and approved by the Special Committee and the Board, since its creation.

### a. *Special Committee Investigation.*

78. With the assistance of Kirkland and AlixPartners, the Special Committee has conducted an investigation into potential claims and causes of action the Company may hold against Related Parties, including the Company's current and former officers, directors, and equityholders, as well as potential estate causes of action against other parties. The Special Committee focused on a number of categories of transactions and issues, including the below.

79. ***Insider Debt Payments.*** The Debtors currently owe approximately $260 million on the Second Lien Facility with NDC, one of the Debtors' indirect equityholders, and approximately $48 million on the Owner Notes. The Special Committee investigated the circumstances surrounding the incurrence of the Second Lien Facility and the Owner Notes, the consideration received by the Debtors in exchange for issuing the Second Lien Facility and the Owner Notes, the interest rates on the Second Lien Facility and the Owner Notes, any changes to the terms of the Second Lien Facility and the Owner Notes, and the timing and amount of any payments made on the Second Lien Facility and the Owner Notes.

80. ***Tax Distributions.*** The parent-level Debtor, RNDC LLC, is a partnership for U.S. federal income tax purposes. As a result, many (but not all) of the income tax liabilities attributable to income recognized by RNDC LLC are borne by RNDC LLC's direct and indirect equityholders,

*i.e.*, as a general matter, those equityholders report (and pay taxes on) income recognized by RNDC LLC on their own tax returns—in other words, RNDC LLC is a "flow-through" entity.

81.     Since 2018, RNDC LLC has made more than $700 million in tax distributions to its direct equityholders, New BG Partners and NDC Partners, in proportion to their ownership of RNDC LLC.  New BG Partners and NDC Partners then, in turn, made proportionate distributions to their own equityholders.[15]

82.     To calculate the amount of a tax distribution, RNDC LLC used a two-step process. First, RNDC LLC estimated its annual taxable income by taking the prior year's taxable income and adding 10%.  Second, RNDC LLC applied a 50% assumed tax rate to the estimated taxable income to determine the total annual tax distribution amount.  Because certain of RNDC LLC's direct and indirect equityholders were required to make quarterly estimated tax payments to the Internal Revenue Service, RNDC LLC paid quarterly estimated tax distributions to its equityholders based on this calculation.  At the end of each year, RNDC LLC compared its estimated taxable income to its actual taxable income.  If actual taxable income exceeded the initial estimate, RNDC LLC made additional "true-up" distributions to cover the shortfall.

83.     Since 2018, RNDC LLC has made tax distributions in the following annual amounts:

| Year | RNDC LLC Taxable Income | NDC Partners Tax Distributions | New BG Tax Distributions | Total Tax Distributions |
|---|---|---|---|---|
| 2018 | $150,968,389 | $47,252,356 | $30,462,997 | $77,715,353 |
| 2019 | $194,745,418 | $59,481,236 | $40,518,764 | $100,000,000 |
| 2020 | $312,113,452 | $62,943,741 | $43,376,906 | $106,320,647 |
| 2021 | $343,925,886 | $103,708,951 | $68,651,049 | $172,360,000 |
| 2022 | $197,813,638 | $119,334,690 | $73,175,310 | $192,510,000 |

---

[15]   Because New BG Partners did not maintain its own bank accounts, RNDC would distribute tax distributions directly to the equityholders of New BG Partners.

| 2023 | Negative | $43,721,937 | $25,619,363 | $69,341,300 |
| **Total** | | **$436,442,911** | **$281,804,389** | **$718,247,300** |

84.     In 2023, RNDC LLC made tax distributions to NDC Partners and New BG in January and April.  RNDC LLC did not, however, make any additional tax distributions in 2023 after projections showed that RNDC LLC's taxable income would be negative for the year.  In April and September 2024, certain of RNDC LLC's direct and indirect equityholders paid to the Company amounts approximately equivalent to the tax distributions that had been made in 2023.

85.     The Special Committee investigated the process surrounding these tax distributions, including how they were calculated and paid, and to what extent any tax distributions were later reconciled against actual tax obligations and/or returned to RNDC LLC.

86.     ***Provision of Services to NDC.***  As part of the 2007 merger between NDC and RBC, RNDC and NDC entered into a services agreement dated May 1, 2007 (the "Services Agreement"). Under the Services Agreement, RNDC provided NDC with back-office support functions, including finance and accounting, information technology, employee benefits and training, general management, sales, operations, and human resources.  The initial annual fee for the services covered by the Services Agreement was $5.5 million.  Although the agreement was not formally extended, NDC has continued to pay RNDC $5.5 million annually for these services—a price that has not been adjusted since execution of the Services Agreement.  The Special Committee investigated the circumstances surrounding the Services Agreement, RNDC's continued provision of such services to NDC, and any compensation received by RNDC in exchange for providing services to NDC, including whether $5.5 million represents fair market value for the services RNDC provides.

87.     ***New Mexico Property.***  Also in connection with the 2007 merger, RNDC and NDC entered into a lease agreement dated May 1, 2007 for property located at 5920 Office Boulevard,

Albuquerque, New Mexico 87109 (the "New Mexico Property"). Under the lease for the New Mexico Property, NDC paid $125,000 per month in rent ($1.5 million annually) to RNDC. The lease was extended in 2017, 2022, and 2024 with no rent increase. In September 2025, RNDC sold the New Mexico Property to NDC for $23 million. The Special Committee investigated the circumstances surrounding the transactions involving the New Mexico Property, including whether the $125,000 monthly lease rate and $23 million sale price were fair market values.

88. ***Payments to Insiders.*** Because the Debtors are a family-owned and -operated business, many members of the Debtors' equityholder families are former or current Debtor officers, directors, and employees who received various payments, including salaries, bonuses, and expense reimbursements. The Special Committee investigated the amounts and timing of these payments made to members of the Debtors' equityholder families, including the nature of the payments made by the Debtors and the services the Debtors received in exchange.

89. ***Financial Condition.*** Because the Debtors' financial condition and solvency materially affects the assessment of potential estate causes of action, the Special Committee's advisors assessed the Debtors' financial condition over the course of recent years to identify any potential periods of time in which the Debtors were insolvent.

90. ***Young's Holdings Transactions.*** The Debtors entered California and other west coast markets through a series of transactions involving YHI. These transactions involved the Debtors paying hundreds of millions of dollars to YHI. The Special Committee investigated the nature and circumstances of all payments related to YHI, which totaled more than $700 million between 2019 and 2024.

91. In connection with the investigation, the Special Committee requested broad categories of documents from the Debtors' management, as well as from the Debtors' direct and

indirect equityholders, who are separately represented by Katten Muchin Rosenman LLP (for New BG Partners-associated entities and individuals) and Seward & Kissel LLP (for NDC Partners-associated entities and individuals). The Special Committee collected over 600,000 documents from the Debtors alone.

### b. *Additional Special Committee Investigation.*

92. Since the Special Committee was appointed in November 2025, the Debtors have engaged in certain asset sales and other transactions in an effort to maximize the value of their estates. These efforts resulted in several sales, including the Reyes Sale Transactions. The proceeds of these sales were used to pay down existing indebtedness. To ensure a robust investigation of any and all potential causes of action while avoiding any potential conflicts, the Debtors appointed Jill Frizzley as the sole member of the Additional Special Committee, which is empowered to review and investigate potential claims or causes of action arising out of actions taken by the Debtors since the original Special Committee was appointed. Ms. Frizzley has retained Porter Hedges to serve as counsel in connection with her investigation.

### F. The Company Pursued All Reasonable Alternatives.

93. The Debtors truly exhausted all alternatives. In addition to identifying and implementing cost rationalization measures, including reducing its headcount and consolidating its core operations, the Company worked closely with the Advisors to develop a long-term business plan and explore various strategic and financial alternatives with both existing members of the Company's capital structure and potential third-party investors. More specifically, the Company and its Advisors (a) progressed the ongoing sale-leaseback negotiations, (b) launched a third-party financing process to solicit proposals around a potential refinancing of certain of the Company's funded debt facilities, and (c) launched a sale process to explore a potential sale of all or any part of the business.

### a. Sale-Leaseback.

94. On May 14, 2025, the Board approved the engagement of Eastdil Secured LLC to explore a potential sale-leaseback transaction of substantially all of the Company's owned real estate. The sale-leaseback transaction, however, did not present a comprehensive solution to the Company's capital structure.

### b. Third-Party Financing.

95. Beginning on November 3, 2025, Lazard engaged over 15 prospective third-party capital providers to evaluate a potential refinancing of certain of the Company's funded debt facilities. Many of the prospective financing parties executed non-disclosure agreements and received access to a confidential information memorandum and other related diligence materials. The Company received seven non-binding financing proposals, which contemplated new term loans and/or refinancing the Debtors' securitization facility.

96. In December 2025, the Debtors engaged the Lenders to provide debtor-in-possession financing for a potential chapter 11 process. In parallel, Lazard approached 12 prospective third-party capital providers. The Debtors received a proposal from the Lenders and four proposals from third parties between late December 2025 and early January 2026.

### c. Going-Concern Sale Process.

97. Beginning in December 2025, Lazard commenced a marketing process for certain markets, which was expanded over time to include substantially all of the Company's markets. Lazard discussed the potential purchase of some or all of the Company's assets with over 50 potential acquirers via inbound and outbound engagement, including a mix of financial and strategic counterparties. Over 25 parties executed non-disclosure agreements and received diligence materials. Over 20 parties submitted non-binding indications of interest to acquire RNDC's operations in a particular state or across multiple states.

35

98.     After extensive engagement with various interested parties, on January 13, 2026, the Company announced publicly that Reyes submitted a proposal for the purchase of the Company's Arizona, Florida, Hawaii, Illinois, Maryland, South Carolina, Virginia, and Washington, D.C. geographies.[16]  Reyes' offer eventually expanded to 11 states in total, including Colorado, Louisiana, Oklahoma, and Texas.  Critically, Reyes was committed to closing quickly to mitigate supplier attrition.

99.     The Company convinced the Lenders to provide $250 million to facilitate the Reyes Sale Transactions.  The Debtors also consummated going-concern sale transactions with respect to (a) the Company's wine-searcher.com entity and business on April 30, 2026; (b) the Company's equity interests in a joint-venture partnership for the Idaho market on May 8, 2026; and (c) sales of assets in Washington, Oregon, Nebraska, North Dakota, South Dakota, and Arkansas.  The Debtors have also executed non-binding letters of intent for assets in the Alabama, Alaska, Iowa, Maine, Mississippi, Montana, New Hampshire, North Carolina, Ohio, Pennsylvania, Utah, Vermont, West Virginia, and Wyoming markets, as well as for their "control state" businesses in Michigan, Idaho, Oregon, and Virginia.

100.    In connection with the asset sales in Nebraska, North Dakota, and South Dakota, the Quality Brands TSA requires that the Debtors provide services and receive payment ahead of the filing of these cases—$1.2 million for the month of July and a fixed monthly fee of $113,000 per month through September 30, 2026.

---

[16]  Reyes did not acquire the Company's "control state" business in Virginia.  Illinois was later removed from the proposal.

### d.      The DIP Facility[17]

101.    Lazard contacted six third parties (who were part of Lazard's original outreach) to determine willingness to fund these chapter 11 cases.  Despite the Debtors' and Lazard's best efforts, no third party provided an actionable debtor-in-possession financing proposal due to, among other things, the Debtors' limited unencumbered assets, the lack of interest in funding a potential wind-down, and uncertainty around the Debtors' remaining asset sales.

102.    The Debtors likewise engaged with the Lenders over the last several months to secured funds necessary to administer these chapter 11 cases.  As a result of the Debtors' negotiations with the Lenders, the Debtors secured a $250 million DIP Facility, comprised of (a) $75 million of new money revolving loans, of which $50 million will be made available on an interim basis, (b) upon entry of the interim order, a "roll-up" of the delayed draw term loans extended under the fourteenth amendment to the Credit Agreement, totaling approximately $66.3 million; and, (c) upon entry of the final order, a "roll-up" of approximately $108.7 million of the revolving loans under the Credit Agreement.

103.    The DIP Credit Agreement establishes the following milestones:

- Filing a Plan and Disclosure Statement within five business days;

- Execution of binding purchase agreements with respect to a majority of the remaining Going-Concern Sale Transactions within 30 days;

- Entry of a final order approving the DIP Facility within 35 days;

---

[17]    A description of the terms of the DIP Facility can be found in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion"), filed contemporaneously herewith.  Capitalized terms used in this section but not otherwise defined in this Declaration have the meanings ascribed to them in the DIP Motion.

- Confirmation of the Plan and approval of asset sales within 70 days; and

- The Effective Date within 75 days.

## IV.   <u>Evidentiary Basis for Relief Requested in the First Day Motions.</u>

104.    Contemporaneously with the filing of this Declaration, the Debtors have filed a number of First Day Motions seeking relief to minimize the adverse effects of the commencement of these chapter 11 cases on their businesses and to ensure limited disruptions to operations. Approval of the relief requested in the First Day Motions is critical to the Debtors' ability to continue operating their businesses with minimal disruption and thereby preserve value for the Debtors' estates and various stakeholders.

105.    The First Day Motions request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and to their estates.

106.    I am familiar with the contents and substance of each First Day Motion, and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge.  I believe that the relief sought therein (a) is necessary to permit an effective transition into chapter 11, (b) constitutes a critical element for the Debtors to successfully implement a chapter 11 strategy and is a sound exercise of business judgment, and (c) best serves the Debtors' estates and creditors' interests.  I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to make certain essential payments and otherwise continue their business operations as sought in the First Day Motions.  The evidentiary

support for the First Day Motions is set forth on **Exhibit F** attached hereto.  Accordingly, for the

reasons set forth herein and in the First Day Motions, the Court should grant the relief requested

in each of the First Day Motions.


\* \* \* \* \* \*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 27, 2026

/s/ John R. Castellano
Name: John R. Castellano
Title: Chief Restructuring Officer

**Exhibit A**

**The Debtors**

1.  Republic National Distributing Company, LLC

2.  8201 Associates, LLC

3.  K&L Beverage Company, LLC

4.  Republic National Distributing Company Michigan Holdings, LLC

5.  Republic National Distributing Company of North Dakota, Inc.

6.  Republic National Distributing Company, LLC (Nebraska)

7.  RNDC Alaska, LLC

8.  RNDC Arkansas, LLC

9.  RNDC Indiana Holdings, LLC

10. RNDC New Hampshire, LLC

11. RNDC Receivables, LLC

12. RNDC Shared Services, LLC

13. RNDC Texas, LLC

14. WSJV Holdings, Inc.

15. Young's Market Company of Arizona, LLC

16. Young's Market Company of Oregon, LLC

17. Young's Market Company of Washington, LLC

18. Young's Market Company, LLC

**Exhibit B**

**The Letter**

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Josh Sussberg, P.C.
To Call Writer Directly:
+1 212 446 4829
joshua.sussberg@kirkland.com

601 Lexington Avenue
New York, NY 10022
United States

+1 212 446 4800

www.kirkland.com

Facsimile:
+1 212 446 4900

January 5, 2026

**Via Electronic Mail**

Justin Rawlins
Paul Hastings LLP
1999 Avenue of the Stars, Floor 27
Century City, CA 90067

Re: *RNDC's Financial and Operational Challenges*

Dear Counsel:

We send this letter on behalf of, and as counsel to, Republic National Distributing Company, LLC (together with its subsidiaries, the "Company"). We ask that you share this letter immediately with each of the 16 institutions that are part of the lending syndicate represented by Paul Hastings (collectively, the "Bank Group"). Although we have had many conversations with the Bank Group and its advisors over the last several weeks, there seems to be a lack of urgency and true comprehension of just how tenuous the situation has become. Exactly what we indicated would happen to the business to your predecessor counsel (Greenberg Traurig), Paul Hastings, and the Bank Group is happening. Value is eroding daily. Therefore, as counsel to the Company—not counsel to any of the equity holders, all of whom have separate counsel copied on this letter—tasked with the duty to maximize enterprise value for all stakeholders, including the Bank Group, we are compelled to distill the current circumstances to writing. The Bank Group is making this duty more difficult to achieve by the day. And while we appreciate and fully recognize that the Bank Group has no obligation to extend further liquidity to the Company, it is our view that the Bank Group is severely misguided as to its recoveries in what would be an unprecedented liquidation. It is critically important for everyone that the record be uncontroverted if we find ourselves standing in front of a bankruptcy court in the near future.

It seems the Bank Group's preferred path is the Company conducting a sale process through a chapter 11 filing. We have yet to receive any proposal from the Bank Group on financing necessary for a chapter 11 case and related sale process, including the potentially significant administrative costs associated with disposing of unsellable inventory (as further described below) and the professional fees associated with a potentially long and litigious chapter 11 process, in which all historical transactions (including both the entry into, and exit from, the California market) will be heavily scrutinized by both the estate and a creditors' committee, with those

Beijing  Boston  Chicago  Dallas  Hong Kong  Houston  London  Los Angeles  Munich  Palo Alto  San Francisco  Shanghai  Washington, D.C.

investigations to be bankrolled by the Bank Group.  As explained below, in the face of upcoming supplier terminations, any financing should include funds to pay suppliers or funds for all the professionals around the table (including a yet to be formed creditors' committee) to litigate the propriety of each potential contract termination.  The suggestion that the automatic stay is a magic wand fails to take into account the litigation costs attendant to keeping all contract counterparties at bay.  Those dollars all come directly out of the Bank Group's recovery.  But this is all hypothetical as there is no financing proposal, and we have no confidence one will be negotiated with the Bank Group before the illusory January 19th deadline.  In fact, the earliest a supplier can argue its contract has terminated is January 22, 2026, reinforcing that time continues to be of the essence.  Any narrative that the Company's advisors forced the Company into chapter 11 will not be tolerated.  Indeed, I will be the first one to stand up in court and indicate that we repeatedly told each of the institutions in the Bank Group to not go down this path.

The path that the Bank Group should pursue is the path with Centerbridge, which not only provides an avenue to stabilize the Company's critical supplier relationships (without which a value-destructive chapter 11, attendant professional fees, and likely liquidation follows) but also provides a path to an out-of-court asset sale process.  From the Company's perspective, and subject to the execution of definitive documentation, the Centerbridge proposal and the liquidity, time, and increased certainty it brings to the asset sale process is unquestionably the superior outcome for the Bank Group.  Of course, if the Bank Group is willing to provide the same amount of funding, or even a portion of what Centerbridge has indicated a willingness to fund, that too represents a far superior outcome for the Bank Group and a path that the Company and its advisors are prepared to swiftly and rigorously advance.

Importantly, however, the Company is at an inflection point and the window for action is narrowing.  Absent decisive action—either via swift engagement from the Bank Group on the Centerbridge proposal that would allow the proposal to be consummated in the next few weeks *or* a prompt DIP term sheet that provides for sufficient liquidity and time to pursue an in-court sale process—the Company will have no choice but to reckon with an unprecedented and value destructive liquidation.

As the Bank Group considers its path forward, we are compelled to highlight three critical considerations.  *First*, the regulatory challenges facing any large-scale liquidation of the Company's operations—these challenges are likely to restrict the ability to freely sell regulated collateral while imposing significant destruction costs for any unsellable collateral.  *Second*, the increasingly fragile state of the Company's supplier relationships—as set forth below, the Company has started receiving supplier termination notices at an increased pace (which is not surprising, given the small community of suppliers), which jeopardizes the continuity of operations and materially impairs the Company's' ability to pursue any value-maximizing transactions.  *Third*, the status of the Company's ongoing sale process—there is already real and viable interest in certain of the Company's business segments.  A chapter 11 filing and subsequent court process will only result in value degradation as a result of the chaos (and resulting cost) that will inevitably occur with all parties, including the many contract counterparties that are critical to the value of the enterprise and any going concern sales.

*Liquidation Challenges*

It is undisputed that a full-scale liquidation of the business would not be value-maximizing for the Bank Group or any other stakeholders. The Company operates in a highly regulated industry across 39 states, each of which impose state-specific laws that cannot be overridden by a bankruptcy court. These state regulatory regimes continue to apply in any liquidation scenario and will narrowly restrict how collateral may be sold or transferred. Depending on the jurisdiction and subject to significant regulatory restrictions and/or requirements, collateral may generally only be sold back to the supplier, transferred to a licensed wholesale distributor, or sold on behalf of the Company to licensed retailers and cannot be transferred between different states. Thus, while a liquidator could use the bankruptcy process to foreclose on the collateral under most state laws, the ability to sell or otherwise dispose of that collateral would remain significantly constrained by applicable state law in each jurisdiction the Company operates.

It is further undisputed that a full-scale liquidation of this Company is uniquely value destructive for three reasons.

- *First*, the Company's economic value resides in its durable operational assets accumulated over many decades—franchise rights, licenses, supplier portfolios, and an integrated distribution platform—that cannot be realized in a wind-down.

- *Second*, in a liquidation, the "three-tier" alcohol system effectively blocks any high-volume exit channel for an alcohol distributor, forcing it to sell inventory on a compressed timeframe in a highly regulated state-by-state environment—an outcome that yields poor recoveries regardless of theoretical "orderly" assumptions. Notably, in each state, there is a very limited set of potential purchasers (or even just one, in control states), each of whom is disincentivized from purchasing inventory from a liquidating distributor. If the Bank Group has ever asked itself why there are not more examples of distributor liquidations, this is why. Nor can suppliers be relied upon as a liquidation backstop for the inventory. The wine, beer, and spirits industry remains materially oversupplied, with slowing depletions across most categories and widespread discounting already occurring at the supplier level. In these circumstances, buybacks are discretionary accommodations, not scalable mechanisms for absorbing large volumes on compressed timelines. This is particularly unlikely where suppliers are owed outstanding amounts by the Company as further described below.

- *Third*, in retail chapter 11 cases involving inventory-centered businesses, unsellable collateral can often be abandoned via court order. No such option would exist here given the collateral is alcohol and highly regulated. *See Midlantic Nat'l Bank v. N.J. Dep't of Env't Prot.*, 474 U.S. 494, 507 (1986) (holding that a debtor "may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards"). Pursuant to applicable state law, unsellable inventory will have to be transported to a designated, licensed destruction facility, and any costs associated therewith will be borne by the Company and, ultimately, the Bank Group. As a result, the Company, and by extension, the Bank Group, will be required, pursuant to a court order, to absorb significant costs (without any recovery) to responsibly dispose of the Company's inventory that is rendered unsellable in a forced, expedited liquidation. These challenges can be significantly mitigated in an out-of-court going-concern sale.

***Supplier Considerations***

***Immediate Stabilization of Supplier Relations is Key.***  The Company is receiving notices of default, requests for adequate assurance, and/or notices of termination from suppliers, including many of its key suppliers, on a daily basis.  As a distributor, the Company's ability to operate depends entirely on maintaining strong, reliable relationships with its suppliers.  Any interruption in supply has immediate and compounding consequences, including reputational harm and loss of revenue, which directly impact the value of the business and the Bank Group's collateral.  The Company, with the assistance of its advisors, is actively managing the Company's cash to provide partial payments where possible—which takes significant time and resources to prioritize and assess at a time when such resources should be focused on a value-maximizing path forward.  An unplanned, disorderly chapter 11 will only further frustrate the Company's supplier base and erode supplier confidence and years of goodwill.

To help the Bank Group appreciate the gravity of this situation, I want to inform you that one of the Company's largest suppliers sent a notice of termination to the Company on January 2, 2026, stating its intent to terminate its contracts with the Company across all markets. This supplier accounts for 10-15% of the Company's total revenue in certain states and the termination of such agreements would undoubtedly adversely impact the Company's going-concern value and materially impair the Company's ability to sell certain states as a going concern.

The supplier community is concentrated and extremely close-knit.  Once one supplier makes noise in the marketplace, the other suppliers will follow suit (to the extent they haven't already).  Once news of this termination is public, the narrative in the marketplace will be one of operational and financial instability—a narrative that will likely catalyze suppliers that have already sent notices of default to expedite sending notices of termination.  Additionally, as obligations continue to become due and owing without payment, it becomes increasingly apparent to suppliers that the Company lacks the liquidity to meet its obligations in the ordinary course. This results in heightened tension amongst the suppliers, accelerated payment demands, and a growing reluctance to continue supporting the business.  The Company has been nurturing its relationships with its suppliers for decades—losing credibility with these suppliers will have longstanding, irreversible impacts on the business.

While the Company's outstanding payment obligations continue to grow, and, in turn, trigger defaults for non-payment under various contractual provisions, suppliers are not required to continue providing new inventory.  To be clear, this means that the longer the Bank Group waits to decide on a path forward and to negotiate any in-court or out-of-court financing, there is nothing compelling these suppliers to continue flowing inventory into the business.  Any effort to enforce these agreements against the suppliers will be illusory, as the Company does not have sufficient liquidity to survive the adjudication of such claims.  If the Bank Group continues to restrict the Company's ability to pay critical suppliers, the consequences of that decision rest squarely with the Bank Group.

***Chapter 11 Affords Limited Tools to Prevent Supplier Disruption***.  Each amendment that has been executed with the Bank Group over the past few months has further tightened the Company's liquidity position and restricted access to critical funds—funds that could have been

directed to key suppliers to prevent operational disruption.  These constraints on liquidity have strained the Company's relationships with its suppliers and impaired value across all markets. Simply filing for chapter 11 and running an in-court sale process will not reverse the loss of goodwill or restore value that has already been impaired.  Consummating the Centerbridge proposal is the only path to stabilization and a real opportunity to maximize value.  Timing is of the essence.  Each day that passes without meaningfully engaging on the Centerbridge proposal increases the risk that key suppliers will act on the termination notices already sent (which continue to accumulate).  Moreover, many suppliers operate without formal contracts and could stop supplying to the Company at any time, further heightening the urgency.

The notion that the automatic stay will thwart efforts to terminate these contracts fundamentally mischaracterizes the operational reality.  As the Company's cash has been narrowly restricted with each amendment, the Company's outstanding supplier balances have continued to grow.  The balances are substantial, and these suppliers are critical to any going-concern sale that would support a recovery to the Bank Group.  The costs associated with negotiating the assumption of these significant liabilities will further erode value rather than preserve it.  Relatedly, the costs associated with the litany of professionals who will be involved in these litigable issues and negotiations on a contract-by-contract basis will only further diminish value available to the estate, creating an additional drag on the Bank Group's and other stakeholders' recoveries.

As the Company continues to stress to the Bank Group, forcing the Company into a disorderly and unplanned chapter 11 will not resolve supplier attrition.  Many of the suppliers operate primarily on a purchase order basis; as a result, the automatic stay, which is one of the most powerful tools in bankruptcy, cannot compel these suppliers to continue performing or providing inventory given that there is no underlying agreement.  Since no wholesaler of a similar scale has ever filed for chapter 11, particularly for suppliers without long-term contracts, it is uncertain whether the automatic stay will prevent these suppliers from assigning distribution rights to their brands to other wholesale distributors.  Once distribution rights are lost, the Company cannot purchase, sell, or ship inventory.  To be clear, for suppliers with no contracts, if the Company loses a supplier's distribution rights, the inventory (*i.e.*, the Bank Group's collateral) is effectively worthless because the Company can no longer purchase, sell, or deliver the products. Further, suppliers may refuse to ship to the Company on a postpetition basis if the Company does not have a clear path forward.

Consummating the Centerbridge proposal is the only way to mitigate supplier attrition— the publicity around the capital infusion would unquestionably send a positive message to the market, highlighting that the Company is now well-capitalized and has the liquidity to pay suppliers.

### *Potential Strategic Alternatives*

The Company and its advisors have presented the Bank Group with various potential value-maximizing strategic alternatives, each of which require time and liquidity to realize.  In addition to the Centerbridge proposal, these alternatives include (a) the potential sale leaseback of the Company's real property, (b) a payoff of the A/R securitization facility, (c) the solicitation of third-party financing to refinance some or all of the Company's funded debt, and (d) the pursuit of potential going-concern sales.

With respect to the going-concern sale process, the Company has received two indications of interest to date for Virgina (together, the "IOIs"). The approximate headline values of the IOIs range from $200 million to $240 million. This is approximately 4.5 to 5.5x the hypothetical liquidation value, which underscores the notion that an out-of-court going concern sale is the better path for the Bank Group to maximize its recoveries. Additionally, the sale process is in its early stages, and the receipt of two IOIs in such a short period of time demonstrates genuine market interest and the ability to create competitive tension if provided the opportunity to do so.

Importantly, progressing a sale of Virginia, or any other states for that matter, will require incremental funding and time in the near-term. During any sale process, the Company will need to continue to pay and true-up suppliers to retain distribution rights and value associated with the underlying supplier agreements. And with respect to franchise states, like Virgina, preserving franchise statute protections requires continued compliance with the supplier agreement. Non-payment of supplier invoices is grounds for termination in franchise states, so limitations on the Company's ability to pay suppliers not only creates operational risk but also erodes the value of these highly protected markets that are critical to any going-concern sale. This reinforces the need to address the Company's near-term operational issues—if the Bank Group ultimately decides to give the Company the runway to pursue these value-maximizing sales, there needs to be a business left to sell. Additionally, any outstanding obligations owed to suppliers that need to be cured will be assumed liabilities as part of any going-concern sale. Thus, as these outstanding obligations continue to grow each day, the net value available to the estate in connection with potential going-concern sales is correspondingly reduced.

The current state of the business threatens the feasibility of any of the potential value-maximizing strategic alternatives. Without stabilizing the business, particularly with respect to its suppliers, there is a meaningful risk that the Company will be unable to execute on otherwise viable value-maximizing strategies, further dissipating enterprise value and any recovery to the Bank Group. We remain committed to ensuring that the Bank Group has full visibility into the current state of the business.

As counsel to the Company, it is our strong belief that the Bank Group's best path forward is negotiating an agreement with Centerbridge on an out-of-court basis. This is the path to stabilize the supplier relationships that underpin the asset sale process and ensure the regulatory hurdles and attendant costs of a chapter 11/liquidation are avoided. If the Bank Group prefers the uncertainty and administrative costs of a chapter 11 process, the Company needed a financing proposal yesterday.

The Company reserves all rights.

Sincerely,

/s/ *Joshua A. Sussberg*

Joshua A. Sussberg, P.C.

cc: John R. Ashmead – Counsel to National Distributing Company, Inc.
    Steven J. Reisman – Counsel to New BG Distribution Partners, LLC

**Exhibit C**

**Equity Holder Settlement Term Sheets**

***Settlement Term Sheet Between***
***(1) RNDC Debtors and (2) New BG Distribution Partners, LLC and Related Entities***

1.    In connection with seeking approval of a chapter 11 plan pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), the Debtors will incorporate into their proposed chapter 11 plan, and seek approval of, a settlement pursuant to rule 9019 of the Federal Rules of Bankruptcy Procedure on the terms specified in this term sheet, subject to definitive documentation (the "NBG Settlement").  A confirmed chapter 11 plan incorporating the terms of the NBG Settlement shall be defined as a "Conforming Plan."

2.    Under a Conforming Plan, in exchange for the NBG Released Parties providing the NBG Settlement Consideration to the Debtors, the Debtors shall (a) agree to the Fiduciary Trust Construct subject to the Fiduciary Trust Limitations with respect to the NBG Covered Claims; and (b) provide the NBG Released Parties with full and final releases from the Debtor Releasing Parties with respect to the NBG Non-Covered Claims.

3.    Though the NBG Settlement will be subject to the approval of the Bankruptcy Court of a Conforming Plan, the NBG Settlement will be binding upon the NBG Released Parties upon the signing of this term sheet; provided that the NBG Settlement shall not be binding upon the NBG Released Parties if a Conforming Plan is not confirmed within 120 days hereof and effective within 30 days after such 120 days elapse unless the NBG Released Parties and RNDC mutually agree to extend such period.  In the event that the NBG Settlement is not approved and no Conforming Plan is confirmed, (a) each of the Debtors and the NBG Released Parties reserve any and all of their rights and defenses to any claims that would otherwise be the subject of the NBG Settlement, (b) the NBG Released Parties shall have no obligation to provide any portion of the NBG Settlement Consideration, and (c) the Debtors shall have no obligation to agree to the Fiduciary Trust Construct or provide any releases of NBG Non-Covered Claims to the NBG Released Parties.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this term sheet and all negotiations relating hereto shall not be admissible into evidence in any proceeding of the validity or amount of any potential claims that would otherwise be the subject of the NBG Settlement.  The Debtors and the NBG Released Parties agree that the terms of the NBG Settlement were reached without any admission or concession as to any matters of fact or law.

4.    The "NBG Settlement Consideration" shall consist of:

(a)    a cash payment of $10.25 million from the NBG Released Parties to the Debtors on the effective date of a Conforming Plan, with the agreement that none of the NBG Released Parties will seek to have any portion of the $10.25 million or the professional fees associated with the negotiation of the NBG Settlement reimbursed from a Debtor D&O Policy;

(b)    the waiver by the NBG Released Parties of any right to recover (whether under a chapter 11 plan or otherwise) from any Debtor, directly or indirectly, on account of any amounts in any way related to the 2L Facility, whether styled as a claim, debt, interest, participation, or otherwise, subject to confirmation from the RNDC credit facility agent and confirmation of tax or other issues to govern form;

(c)      the waiver by Marc Sachs, Grant Sechler, and Josh Zeller of any right to recover (whether under a chapter 11 plan or otherwise) from any Debtor, directly or indirectly, on account of any amounts in any way related to the Deferred Compensation Plan, subject to confirmation of tax, penalty or similar issues to govern form;

(d)      the NBG Released Parties' agreement to the Fiduciary Trust Construct subject to the Fiduciary Trust Limitations with respect to the NBG Covered Claims; and

(e)      the waiver by the NBG Released Parties of any right to recover (whether under a chapter 11 plan or otherwise) from any Debtor, directly or indirectly, on account of any amounts in any way related to any Owner Subordinated Promissory Notes, whether styled as a claim, debt, interest, participation, or otherwise.

5.      The NBG Released Parties agree to use commercially reasonable efforts to cooperate with and assist in obtaining support for the NBG Settlement and a Conforming Plan from the Debtors' other stakeholders.

6.      The NBG Released Parties agree that they shall not directly or indirectly, as applicable, propose, file, or support any chapter 11 plan that is not a Conforming Plan, which, for the avoidance, means a chapter 11 plan that does not provide for the approval and implementation of the NBG Settlement in accordance with the terms set forth herein, or take any other action that would, or would reasonably be expected to, prevent, interfere with, delay, or impede the approval or implementation of the NBG Settlement or the Conforming Plan.

7.      The "NBG Covered Claims" shall consist of any and all claims and causes of action assertable by the Debtors, whether directly, derivatively, and whether styled as estate causes of action, property of the estate, or otherwise, concerning or arising out of any matter prior to the effective date of a Conforming Plan, that (a) are assertable against any NBG Released Party that is an insured (whether denominated as a "named insured," "additional insured," or otherwise) under a Debtor D&O Policy; and (b) assert a theory of recovery or loss that is ultimately covered by a Debtor D&O Policy.  Each such claim or cause of action shall be an "NBG Covered Claim."

8.      The "NBG Non-Covered Claims" shall consist of any claims and causes of action assertable by the Debtors, whether directly, derivatively, and whether styled as estate causes of action, property of the estate, or otherwise, concerning or arising out of any matter prior to the effective date of a Conforming Plan, that are (a) assertable against any NBG Released Party and (b) not an NBG Covered Claim.

9.      The "Fiduciary Trust Construct" shall consist of the Debtors' conveyance under a chapter 11 plan of both (a) the NBG Covered Claims and (b) the Debtor D&O Policies to a post-confirmation liquidating trust for the benefit of the Debtors' general unsecured creditors, to be managed by a trustee or other entity with fiduciary obligations (the "Fiduciary Entity"), in all cases subject to the Fiduciary Trust Limitations.

10.      The "Fiduciary Trust Limitations" shall consist of provisions in a chapter 11 plan and any documents implementing the Fiduciary Trust Construct that (i) any recovery by the Fiduciary Entity (and the beneficiaries thereof) on account of any NBG Covered Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the

2

proceeds of the Debtor D&O Policies, after payment from such Debtor D&O Policies of any and all covered costs and expenses incurred by any of the NBG Released Parties in connection with the defense of the NBG Covered Claims; (ii) any party, including any trustee or any beneficiary of the Fiduciary Entity (including, for the avoidance of doubt, any litigation trustee or oversight committee), seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the NBG Covered Claims shall do so solely upon available insurance coverage; and (iii) no party shall (a) record any judgment against any NBG Released Party, or (b) otherwise attempt to collect, directly or indirectly, from the individual, personal, marital or joint interests or assets of any NBG Released Party (be it held through corporation, limited liability company, trust or otherwise).  For avoidance of doubt, this provision (i) does not release any NBG Released Party from any liability with respect to any NBG Covered Claim; (ii) does not absolve any NBG Released Party of any legal obligation to pay on account of liability incurred in relation to an NBG Covered Claim; and (iii) is intended only to identify the specific assets that would be used to satisfy any liability on account of an NBG Covered Claim and limit the recovery on such NBG Covered Claim to such assets.

11.     The following defined terms not otherwise defined above shall have the following meanings:

(a)     "Debtors" shall mean (1) Republic National Distributing Company, LLC, and (2) its subsidiaries and affiliates who file voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code;

(b)     "Debtor Releasing Parties" shall mean (1) the Debtors and (2) customary definitions of related parties of the Debtors, which shall be subject to the agreement of the Debtors and the NBG Released Parties.

(c)     "NBG Released Parties" shall mean (1) New BG Distribution Partners, LLC, (i) Edward L. Block; (ii) Alan Dreeben; (iii) Barbara Block Dreeben; (iv) Margery Block Estate; (v) Margery Block Preferred; (vi) Allison Dreeben Zeller Family 2016 Trust I; (vii) Lisa Dreeben Sechler Family 2016 Trust I; (viii) Paige Dreeben Sachs Family 2016 Trust I; (ix) Phil H. Boeck; (x) Phil Boeck Family LP; (xi) Stephanie Block; (xii) Stephanie Block Property Trust A; (xiii) Stephanie Block Property Trust B; (xiv) Stephanie Block Property Trust A Preferred; (xv) Stephanie Block Property Trust B Preferred; (xvi) Corey Block; (xvii) Corey Block Property Trust A; (xviii) Corey Block Property Trust B; (xix) Corey Block Property Trust A Preferred; (xx) Corey Block Property Trust B Preferred; (xxi) Allison Dreeben Zeller; (xxii) Josh Zeller; (xxiii) Allison Zeller and Josh Zeller Preferred; (xxiv) Lisa Dreeben Sechler; (xxv) Grant Kelly Sechler; (xxvi) Lisa Sechler and Grant Kelly Sechler Preferred; (xxvii) Paige Dreeben Sachs; (xxviii) Marc Sachs; (xxix) Paige Sachs and Marc Sachs Preferred; (xxx) BG Spirits, LLC and all members of the same; (xxxi) Block Distributing Company, Ltd. and all members of the same; (xxxii) Block Distributing Company, Ltd. Preferred Return; (xxxiii) MB–Stephanie L. Block DGT Trust; (xxxiv) MB–Corey A. Block DGT Trust; (xxxv) Allison Dreeben Zeller Trust I; (xxxvi) Lisa Dreeben Sechler Trust I; and (xxxvii) Paige Dreeben Sachs Trust I, together with the estates of any deceased individual identified above, and any trust established by, for the benefit of, or holding an interest on behalf of any individual or entity identified above, including any successor trustee or acting trustee thereof and (2) customary definitions of

3

related parties of each of the foregoing, which shall be subject to the agreement of the Debtors and the NBG Released Parties.

(d)　"2L Facility" shall mean any and all claims, obligations, debt, or amounts related to that certain Subordinated Credit Agreement dated as of December 19, 2024 among National Distributing Company, Inc. as subordinated creditor and Republic National Distributing Company, LLC as borrower, as may be further amended, restated, supplemented, or otherwise modified from time to time.

(e)　"Deferred Compensation Plan" shall mean that certain Second Amended and Restated Republic National Distributing Company, LLC Deferred Compensation Plan III, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

(f)　"Debtor D&O Policies" shall mean any and all Directors & Officers liability insurance policies or management liability insurance policies that provide coverage to any current or former directors or officers of any Debtors, including any tail policies;

(g)　"Owner Subordinated Promissory Notes" shall mean any and all claims, obligations, debt, or amounts related to all Subordinated Promissory Notes dated August 1, 2019, with Republic National Distributing Company, LLC as debtor/payor and any NBG Released Party as payee, as may be further amended, restated, supplemented, or otherwise modified from time to time, and any and all claims, obligations, debt, or amounts related to any other promissory notes with Republic National Distributing Company, LLC as debtor/payor and any NBG Released Party as payee, however denominated and whenever dated.

***Settlement Term Sheet Between***
***(1) RNDC Debtors and (2) NDC Partners, LLC, National Distributing Company, Inc., NDC Leasing Company, LLC and Related Entities***

1.      In connection with seeking approval of a chapter 11 plan pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), the Debtors will incorporate into their proposed chapter 11 plan, and seek approval of, a settlement pursuant to rule 9019 of the Federal Rules of Bankruptcy Procedure on the terms specified in this term sheet, subject to definitive documentation (the "NDC Settlement").  A confirmed chapter 11 plan incorporating the terms of the NDC Settlement shall be defined as a "Conforming Plan."  RNDC and National Distributing Company, Inc. are simultaneously entering into a Term Sheet regarding Specified Services and Transferred Technology Services (as defined therein).

2.      Under a Conforming Plan, in exchange for the NDC Released Parties providing the NDC Settlement Consideration to the Debtors, the Debtors shall (a) agree to the Fiduciary Trust Construct subject to the Fiduciary Trust Limitations with respect to the NDC Covered Claims; and (b) provide the NDC Released Parties with full and final releases from the Debtor Releasing Parties with respect to the NDC Non-Covered Claims.

3.      Though the NDC Settlement will be subject to the approval of the Bankruptcy Court of a Conforming Plan, the NDC Settlement will be binding upon the NDC Released Parties upon the signing of this term sheet; provided that the NDC Settlement shall not be binding upon the NDC Released Parties if a Conforming Plan is not confirmed within 120 days hereof and effective within 30 days after such 120 days elapse unless NDC and RNDC mutually agree to extend such period.  In the event that the NDC Settlement is not approved and no Conforming Plan is confirmed, (a) each of the Debtors and the NDC Released Parties reserve any and all of their rights and defenses to any claims that would otherwise be the subject of the NDC Settlement, (b) the NDC Released Parties shall have no obligation to provide any portion of the NDC Settlement Consideration, and (c) the Debtors shall have no obligation to agree to the Fiduciary Trust Construct or provide any releases of NDC Non-Covered Claims to the NDC Released Parties. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this term sheet and all negotiations relating hereto shall not be admissible into evidence in any proceeding of the validity or amount of any potential claims that would otherwise be the subject of the NDC Settlement.  The Debtors and the NDC Released Parties agree that the terms of the NDC Settlement were reached without any admission or concession as to any matters of fact or law.

4.      The "NDC Settlement Consideration" shall consist of:

      (a)      a cash payment of $40 million from the NDC Released Parties to the Debtors on the effective date of a Conforming Plan, with the agreement that none of the NDC Released Parties will seek to have any portion of the $40 million or the professional fees associated with the negotiation of the NDC Settlement reimbursed from a Debtor D&O Policy;

      (b)      the waiver by the NDC Released Parties of any right to recover (whether under a chapter 11 plan or otherwise) from any Debtor, directly or indirectly, on account of any amounts in any way related to the 2L Facility, whether styled as a claim, debt,

interest, participation, or otherwise subject to confirmation from the RNDC credit facility agent and the New BG participants with respect to their participation in the 2L Facility, and confirmation of tax or other issues to govern form;

(c)    the waiver by Richard J. Davis, Elizabeth A. Davis, Kenneth Rosenberg, and H. Alan Rosenberg of any right to recover (whether under a chapter 11 plan or otherwise) from any Debtor, directly or indirectly, on account of any amounts in any way related to the Deferred Compensation Plan, subject to confirmation of tax, penalty or similar issues to govern form; and

(d)    the NDC Released Parties' agreement to the Fiduciary Trust Construct subject to the Fiduciary Trust Limitations with respect to the NDC Covered Claims.

5.    The NDC Released Parties agree to use commercially reasonable efforts to cooperate with and assist in obtaining support for the NDC Settlement and a Conforming Plan from the Debtors' other stakeholders.

6.    The NDC Released Parties agree that they shall not directly or indirectly, as applicable, propose, file, or support any chapter 11 plan that is not a Conforming Plan, which, for the avoidance of doubt, means a chapter 11 plan that does not provide for the approval and implementation of the NDC Settlement in accordance with the terms set forth herein, or take any other action that would, or would reasonably be expected to, prevent, interfere with, delay, or impede the approval or implementation of the NDC Settlement or the Conforming Plan.

7.    The "NDC Covered Claims" shall consist of any and all claims and causes of action assertable by the Debtors, whether directly, derivatively, and whether styled as estate causes of action, property of the estate, or otherwise, concerning or arising out of any matter prior to the effective date of a Conforming Plan, that (a) are assertable against any NDC Released Party that is an insured (whether denominated as a "named insured," "additional insured," or otherwise) under a Debtor D&O Policy; and (b) assert a theory of recovery or loss that is ultimately covered by a Debtor D&O Policy.  Each such claim or cause of action shall be an "NDC Covered Claim."

8.    The "NDC Non-Covered Claims" shall consist of any claims and causes of action assertable by the Debtors, whether directly, derivatively, and whether styled as estate causes of action, property of the estate, or otherwise, concerning or arising out of any matter prior to the effective date of a Conforming Plan, that are (a) assertable against any NDC Released Party and (b) not an NDC Covered Claim.

9.    The "Fiduciary Trust Construct" shall consist of the Debtors' conveyance under a chapter 11 plan of both (a) the NDC Covered Claims and (b) the Debtor D&O Policies to a post-confirmation liquidating trust for the benefit of the Debtors' general unsecured creditors, to be managed by a trustee or other entity with fiduciary obligations (the "Fiduciary Entity"), in all cases subject to the Fiduciary Trust Limitations.

10.    The "Fiduciary Trust Limitations" shall consist of provisions in a chapter 11 plan and any documents implementing the Fiduciary Trust Construct that (i) any recovery by the Fiduciary Entity (and the beneficiaries thereof) on account of any NDC Covered Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the

2

proceeds of the Debtor D&O Policies, after payment from such Debtor D&O Policies of any and all covered costs and expenses incurred by any of the NDC Released Parties in connection with the defense of the NDC Covered Claims; (ii) any party, including any trustee or any beneficiary of the Fiduciary Entity (including, for the avoidance of doubt, any litigation trustee or oversight committee), seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the NDC Covered Claims shall do so solely upon available insurance coverage; and (iii) no party shall (a) record any judgment against any NDC Released Party, or (b) otherwise attempt to collect, directly or indirectly, from the individual, personal, marital or joint interests or assets of any NDC Released Party (be it held through corporation, limited liability company, trust or otherwise).  For avoidance of doubt, this provision (i) does not release any NDC Released Party from any liability with respect to any NDC Covered Claim; (ii) does not absolve any NDC Released Party of any legal obligation to pay on account of liability incurred in relation to an NDC Covered Claim; and (iii) is intended only to identify the specific assets that would be used to satisfy any liability on account of an NDC Covered Claim and limit the recovery on such NDC Covered Claim to such assets.

11.     The following defined terms not otherwise defined above shall have the following meanings:

(a)     "Debtors" shall mean (1) Republic National Distributing Company, LLC, and (2) its subsidiaries and affiliates who file voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code;

(b)     "Debtor Releasing Parties" shall mean (1) the Debtors and (2) customary definitions of related parties of the Debtors, which shall be subject to the agreement of the Debtors and the NDC Released Parties.

(c)     "NDC Released Parties" shall mean (1) NDC Partners, LLC, (2) National Distributing Company, Inc., (3) NDC Leasing Company, LLC, (4) Atlanta Wines International, Inc., (5) the NDC Owners, and (6) customary definitions of related parties of each of the foregoing, which shall be subject to the agreement of the Debtors and the NDC Released Parties.

(d)     "NDC Owners" shall mean Jay M. Davis; Richard J. Davis; Elizabeth A. Davis; Dulcy D. Rosenberg; H. Jerry Rosenberg; H. Alan Rosenberg; Kenneth Rosenberg; Karen R. Musa; Chris M. Carlos; Helen A Carlos, James A. Carlos; John A. Carlos; Carlos Company; John A. Carlos, Trustee of the Helen A. Carlos Family Trust u/a December 19, 2012; James A. Carlos, Trustee of the 2012 Helen S. Carlos Irrevocable Trust u/a December 31, 2012; Helen S. Carlos, Trustee of the 2012 James A. Carlos Irrevocable Trust u/a December 31, 2012; Elaine F. Carlos Family Trust; Chris M. Carlos Revocable Trust; Andrew C. Carlos Family Investments LLC; John A. Carlos & James A. Carlos, Co-Trustees of the John A. Carlos Family Trust U/A March 1, 2013; and each of their respective spouses, children, trustees, beneficiaries, and owners.

(e)     "2L Facility" shall mean any and all claims, obligations, debt, or amounts related to that certain Subordinated Credit Agreement dated as of December 19, 2024 among National Distributing Company, Inc. as subordinated creditor and Republic

3

National Distributing Company, LLC as borrower, as may be further amended, restated, supplemented, or otherwise modified from time to time.

      (f)     "Deferred Compensation Plan" shall mean that certain Second Amended and Restated Republic National Distributing Company, LLC Deferred Compensation Plan III, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

      (g)     "Debtor D&O Policies" shall mean any and all Directors & Officers liability insurance policies or management liability insurance policies that provide coverage to any current or former directors or officers of any Debtors, including any tail policies.

4

**Exhibit D**

**Credit Agreement Amendments**

- **On November 21, 2025**, the Company and the Lenders entered into the eleventh amendment to the Credit Agreement (the "Eleventh Amendment"):  (a) instituted tight milestones by which the Company was required to present potential strategic alternatives to the Agent; (b) inserted a "block" against the borrowing base; (c) increased the interest rate of the Credit Facilities by 100 basis points; (d) waived prior events of default; and (e) included several additional reporting and lender engagement obligations, such as weekly borrowing base reporting.

- **On December 22, 2025**, the Company and the Lenders entered into the twelfth amendment to the Credit Agreement (the "Twelfth Amendment"), which (a) provided for the reduction of the availability "block" set forth in the Eleventh Amendment from $120 million to $100 million upon the occurrence of certain trigger events; (b) increased the interest rate of the Credit Facilities by an additional 200 basis points; and (c) required the appointment of a chief restructuring officer and an additional independent director.

- **On January 8, 2026**, the Company and the Lenders entered into the thirteenth amendment to the Credit Agreement, which, among other things, facilitated the payoff of the Company's then-outstanding accounts receivable securitization facility.

- **On January 16, 2026**, the Company and the Lenders entered into the fourteenth amendment to the Credit Agreement, which (a) provided for new priority delayed draw term loan commitments in an aggregate principal amount of $250 million, (b) introduced certain milestones related to the Reyes Sale Transactions and other sale transactions, and (c) required the Company to market substantially all of its assets.

- **On January 30, 2026**, the Company and the Lenders entered into a limited waiver and fifteenth amendment to the Credit Agreement, which waived any existing defaults or events of default related to failure to comply with the variance test related to disbursements and introduced additional restrictions on borrowing the delayed draw term loans.

- **On March 6, 2026**, the Company and the Lenders entered into the limited waiver and sixteenth amendment to the Credit Agreement, which (a) waived any defaults or events of default related to failure to meet specified milestones and variance tests, (b) increased the interest rate applicable to all tranches of loans under the Credit Agreement to SOFR *plus* 5.90%, (c) revised certain milestones related to the Reyes Sale Transactions and other sale transactions, and (d) required the establishment of the Special Committee with full authority and sole decision-making power with respect to the approval and consummation of certain asset sales.

- **On April 16, 2026**, the Company and the Lenders entered into the seventeenth amendment to the Credit Agreement, which (a) required the Debtors to pay a $6 million amendment fee and certain arranger fees and (b) reduced the availability "block" set forth in the Twelfth Amendment to (i) $60 million on April 16, 2026 and (ii) $40 million on April 23, 2026.

- **On May 7, 2026**, the Company and the Lenders entered into the eighteenth amendment to the Credit Agreement, which (a) released certain reserves against the borrowing base and (b) permitted the sale of the Idaho joint venture.

- **On May 20, 2026**, the Company and the Lenders entered into the nineteenth amendment to the Credit Agreement, which (a) amended certain milestones related to the contemplated sale transactions and (b) gave the Agent discretion to remove cash dominion over some or all of the loan parties' deposit accounts.

- **On June 18, 2026**, the Company and the Lenders entered into the forbearance and twentieth amendment to the Credit Agreement, which (a) allowed the Debtors to access an incremental $40 million and (b) provided that the Lenders would forbear from exercising remedies with respect to the failure to make certain interest payments and mandatory prepayments on the ABL Facility until July 3, 2026.

- **On July 3, 2026**, the Company and the Lenders entered into the forbearance and twenty-first amendment to the Credit Agreement, which (a) allowed the Debtors to access an incremental $34 million and (b) provided that the Lenders would forbear from exercising remedies with respect to the failure to make certain interest payments and mandatory prepayments on the ABL Facility until July 17, 2026.

- **On July 17, 2026**, the Company and the Lenders entered into the forbearance and twenty-second amendment to the Credit Agreement, which (a) allowed the Debtors to access an incremental $5.5 million and (b) provided that the Lenders would forbear from exercising remedies with respect to the failure to make certain interest payments and mandatory prepayments on the ABL Facility until July 26, 2026.

- **On July 26, 2026**, the Company and the Lenders entered into the forbearance and twenty-third amendment to the Credit Agreement, which (a) reduced the aggregate revolving credit commitments under the Credit Facilities to $325 million and (b) extended the forbearance period to July 26, 2026.  This amendment was technical in nature, done at the request of the Lenders prior to the Company's chapter 11 filing, and did not affect the Company's ability to borrow or otherwise materially alter the Company's rights under the Credit Agreement.

**Exhibit E**

**NDC Term Sheet**

***Term Sheet Services Agreement Between***
***(1) RNDC and (2) National Distributing Company, Inc.***

1.        In exchange for the payment from National Distributing Company, Inc. ("NDC") to Republic National Distributing Company, LLC ("RNDC") of the Monthly Services Fee, RNDC shall provide NDC with (a) the Specified Services from the Petition Date through the Termination Date and (b) the Transferred Technology Services.

2.        To the extent necessary, RNDC shall seek approval from the Bankruptcy Court of the provision of the Specified Services to NDC on the terms set forth in this term sheet.

3.        The "Monthly Services Fee" shall mean $1.6 million per month paid in cash, due in advance on the 1st of every calendar month following the Petition Date (beginning August 1, 2026) through the Termination Date.  RNDC shall not be entitled to and shall not receive any pro-rated Monthly Services Fee for the portion of the month between the Petition Date and August 1, 2026, and NDC shall not be entitled to and shall not receive any credit or pro-rating of the Monthly Services fee for the portion of any month between the Termination Date and the end of the calendar month in which the Termination Date occurs.

4.        The "Specified Services" shall mean the accounting, treasury, HR services (Payroll/Benefits), IT support, and general back-office and support services provided by RNDC to NDC in the ordinary course of business prior to the Petition Date and such other transition services as required to enable NDC to operate on a standalone basis after the Termination Date.

5.        For the avoidance of doubt, the Monthly Services Fee and the Specified Services are separate from, and shall not include or cover, the payment or resolution of any amounts due to or from NDC or RNDC with respect to any post-Petition Date matters related to shared suppliers, inventory, insurance, or the rental of real estate, which shall be paid and resolved in the ordinary course subject to approval of a motion addressing such matters by the Bankruptcy Court.

6.        The "Transferred Technology Services" shall consist of the following rights and obligations:

(a)        *Definitions*. "Transferred Technology" means all software, source code, object code, compiled applications, middleware, databases (including all schemas, stored procedures, triggers, and database jobs), integration layer components, APIs, configuration files, deployment scripts, virtual machine images, and associated technical documentation comprising or required to operate the Alpha warehouse management system and all other operationally-required software and applications used in the conduct of the NDC business, financial reporting software, and any associated applications (collectively, the "Alpha Platform").

(b)        *Interim Operating Rights*. Between the Petition Date and the Termination Date, NDC shall have the right to continue operating within and accessing the shared technology environment currently used to run the Alpha Platform. NDC shall not be required to operate on a fully standalone basis prior to the Termination Date. RNDC shall maintain the Alpha Platform in its current operational state and shall not materially alter,

degrade, or restrict NDC's access to the Alpha Platform or the shared environment prior to the Termination Date without NDC's prior written consent.

(c)     *Escrow Deposit.* Within thirty (30) days of the Petition Date, RNDC shall deposit a complete copy of the Transferred Technology into a mutually agreed third-party source code escrow repository (the "Escrow"), including all items necessary to compile, deploy, and operate the Alpha Platform in a standalone environment. NDC shall be named as a beneficiary of the Escrow with release rights triggered upon the Termination Date.

(d)     *Transfer of Ownership.* Upon the Termination Date, RNDC shall assign and transfer to NDC all right, title, and interest in and to the Transferred Technology, free and clear of all liens, claims, and encumbrances, together with all associated vendor contracts, maintenance agreements, and third-party licenses necessary to operate the Alpha Platform, to the extent assignable. RNDC shall execute all documents and take all actions reasonably necessary to effectuate such transfer.

(e)     *License-Back.* Following the transfer of the Transferred Technology to NDC, NDC shall grant RNDC a limited, non-exclusive, royalty-free license to use the Alpha Platform solely to the extent necessary for RNDC to fulfill its obligations under any remaining wind-down activities, which license shall terminate automatically upon RNDC's cessation of operations or wind-down completion, whichever is earlier.

(f)     *Diligence Process.* The parties acknowledge that AlixPartners has requested the opportunity to conduct diligence in connection with the transfer of the Transferred Technology. The parties agree to cooperate in good faith to complete such diligence within thirty (30) days of the Petition Date (the "Diligence Period"). The Debtors' obligation to transfer the Transferred Technology shall not be conditioned upon or delayed beyond the expiration of the Diligence Period. If the diligence process identifies any third-party IP, encumbrances, or license restrictions that preclude RNDC from affecting the transfer, the parties shall negotiate in good faith to resolve such issues within the Diligence Period.

(g)     *Key Personnel.* Between the Petition Date and the Termination Date, RNDC shall make available to NDC, upon reasonable request, those employees with material knowledge of the architecture, operation, and maintenance of the Alpha Platform, for purposes of knowledge transfer. RNDC shall use commercially reasonable efforts to retain such personnel through the Termination Date.

(h)     In the event that RNDC is not permitted to transfer ownership of Transferred Technology (as defined above) under third-party agreements or otherwise unable to comply with the above terms with respect to Transferred Technology Services for reasons that are not within the control of RNDC despite its best efforts, NDC agrees to work with RNDC in good faith to agree on alternative terms, in NDC's sole satisfaction, that will enable NDC to operate on a standalone basis.

2

7.      The "Petition Date" shall mean the date on which RNDC files a petition under chapter 11 of the Bankruptcy Code.

8.      The "Termination Date" shall mean (a) with respect to the provision of the Specified Services, the earlier of (1) 90 days after the Petition Date, (2) a date mutually agreed upon by NDC and RNDC, or (3) the effective date of any confirmed plan of reorganization for RNDC; and (b) with respect to the Transferred Technology Services, (1) the date determined in the foregoing clause or (2) in the event clause (h) of Transferred Technology Services applies, a date mutually agreed upon by NDC and RNDC.

9.      For the avoidance of doubt, the terms, agreements, and rights and obligations provided pursuant to this term sheet are independent from, and shall not be conditioned upon the effectiveness of, any separate settlement term sheet between NDC and RNDC, and nothing contained in this term sheet affects or modifies the provisions of any such settlement term sheet. This term sheet does not address, release, resolve, or otherwise affect any potential claims or causes of action relating to the provision of any services by RNDC to NDC prior to the Petition Date, and the terms of this term sheet were reached without any admission or concession as to any matters of fact or law.

**Exhibit F**
**Evidentiary Support for First Day Motions**[1]

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the applicable First Day Motion.

**Evidentiary Support for First Day Motions**[2]

1.    ***Joint Administration Motion.***  The *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* seeks joint administration of the Debtors' cases for procedural purposes only, given the integrated nature of the Debtors' operations.  Joint administration of these chapter 11 cases for procedural purposes only will provide significant administrative convenience without harming the substantive rights of any party in interest.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

2.    ***156(c) Retention.***  The *Debtors' Emergency* Ex Parte *Application for Entry of an Order Authorizing the Employment and Retention of Omni Agent Solutions, Inc. as Claims, Noticing, and Solicitation Agent* seeks authority to employ Omni Agent Solutions, Inc. ("Omni") as claims, noticing, and solicitation agent for the Debtors.  Omni's employment is in the best interest of the estates in light of the number of parties in interest and the complexity of the Debtors' businesses because it will provide the most efficient and effective means for noticing and administering claims and soliciting and tabulating votes.  Further, Omni has the expertise required for complex chapter 11 cases.

3.    ***Creditor Matrix Motion.***  The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix, (B) Redact or Withhold Certain Confidential Information of Customers, and (C) Redact Certain Personally Identifiable*

---

2    To the extent there is any conflict or inconsistency between the relief described herein and the relief requested in the applicable First Day Motion, the relief requested in the applicable First Day Motion shall govern.

*Information of Natural Persons, (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (III) Granting Related Relief* seeks a court order (a) authorizing the Debtors to (i) file a consolidated creditor matrix, (ii) redact or withhold certain confidential information of customers, and (iii) redact certain personally identifiable information of natural persons from the Consolidated Creditor Matrix, the Consolidated Top 30 Creditors List, the Debtors' Schedules and Statement, the Equityholders List, and other documents filed in these chapter 11 cases, and (b) approving the form and manner of notifying creditors of the commencement of these chapter 11 cases and other information. Bankruptcy Rule 1007(a)(1) requires a debtor to file "a list containing the name and address of each entity included or to be included on Schedules D, E/F, G, and H[.]" Fed. R. Bankr. P. 1007(a)(1). Because the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors should be authorized to file one Consolidated Creditor Matrix for all Debtors. Additionally, the redaction of certain personally identifiable information of customers and individuals is necessary due to the privacy and safety concerns that would arise if such information were disclosed in the Debtors' court filings and to help the Debtors comply with applicable privacy laws. Publicly distributing the Customer List in exchange for no renumeration would provide the Debtors' competitors with valuable and competitively sensitive information about the Debtors' commercial operations, destroy value, and undermine the Debtors' ongoing sale efforts. If the Customer List is disclosed, the Debtors' competitors would inevitably launch broad solicitation campaigns, significantly increasing the risk of Customer attrition and distracting the Debtors from their sale efforts. Approving the form and manner of the notice of commencement is necessary to avoid confusion among creditors as well as to prevent the Debtors' estates from incurring unnecessary costs

associated with serving multiple notices to the parties listed on the Debtors' voluminous Consolidated Creditor Matrix.

4.          ***Schedules/SOFA Motion.***  The *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) Rule 2015.3 Financial Reports, (II) Modifying the Requirements of Bankruptcy Local Rule 2015-3, and (III) Granting Related Relief* seeks authority to (a) extend the deadline by which the Debtors must file their Schedules and Statements and 2015.3 Reports to fifty-nine days from the Petition Date and (b) modify the requirements of rule 2015-3 of the Bankruptcy Local Rules to allow the Debtors to file the 2015.3 reports every six months, rather than monthly.  The ordinary operation of the Debtors' businesses requires the Debtors to maintain voluminous books, records, and complex accounting systems.  To prepare their Schedules and Statements and 2015.3 Reports, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, and contracts from each Debtor entity.  This information is extensive and located in numerous places throughout the Debtors' organization.  The Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously on preparing the Schedules and Statements, but resources are strained.  Given the amount of work entailed in completing the Schedules and Statements and the competing demands on the Debtors' employees and professionals to assist with stabilizing business operations during the initial postpetition period, and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these Chapter 11 Cases, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period.  Moreover, collecting the necessary information for the 2015.3 Reports requires an enormous expenditure of time and efforts on the part of the Debtors, their employees, and their professional

advisors on a consistent, monthly basis when these resources would be best used to restructure the Debtors' businesses. As such, ample cause exists to extend the time by which the Debtors must prepare their Schedules and Statements and 2015.3 Reports and modify rule 2015-3 of the Bankruptcy Code to allow the Debtors to file the 2015.3 Reports every six months. Finally, the relief requested will not prejudice any party in interest.

5.     ***Taxes Motion.***     The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Certain Taxes and Fees and (B) Undertake Certain Tax Planning Activities, and (II) Granting Related Relief* seeks authority to: (a) negotiate, remit, and pay (or use tax credits to offset) or otherwise satisfy any Taxes and Fees in the ordinary course of business that are payable as of the Petition Date or become payable during these chapter 11 cases, including any obligations arising on account of any Audit or Assessment, without regard to whether such obligations accrued or arose before, on, or after the Petition Date and (b) undertake Tax Planning Activities, as necessary. Failure to pay Taxes and Fees could materially disrupt the Debtors' business operations, as taxing Authorities may initiate Audits of the Debtors, attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the Debtors' estates. Further, claims on account of certain of the Taxes and Fees may be priority claims entitled to payment before general unsecured claims, and certain of those claims may be entitled to secured status. Finally, the Debtors' failure to pay the prepetition Taxes and Fees as they come due may ultimately increase the Debtors' tax liability via interest and penalties and, in some instances, could result in personal liability for certain of the Debtors' directors and officers, which would likely distract those key individuals from their duties related to the Debtors' restructuring efforts.

6. **_Insurance Motion._**   The Debtors' _Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance Coverage, Surety Bond Program, and Letters of Credit Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Continue to Pay Certain Claims Processing Fees, and (C) Renew, Amend, Supplement, Extend, Purchase, Cancel, and Enter Into New Insurance Policies, Letters of Credit, and Surety Bonds and (II) Granting Related Relief_ seeks authority to (a) maintain insurance coverage entered into prepetition, maintain the Surety Bond Program on an uninterrupted basis, and maintain the Letters of Credit on an uninterrupted basis and, in each case satisfy prepetition obligations related thereto in the ordinary course of business, including through the NDC Intercompany Transactions, as and if applicable, (b) satisfy payment of prepetition obligations on account of, and continue to pay, Claims Processing Fees in the ordinary course of business, and (c) renew, amend, supplement, modify, extend, purchase, cancel, and enter into new insurance policies, Letters of Credit, and Surety Bonds in the ordinary course of business on a postpetition basis.  The continuation and renewal of the Debtors' Insurance Policies (including the Reyes TSA Insurance Policies), Letters of Credit, and Surety Bond Program are essential to preserving the value of the Debtors' businesses, properties, and assets.

7. **_Utilities Motion._**   The _Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief_ seeks a court order (a) determining that the Adequate Assurance Procedures provide the Utility Providers with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) prohibiting the Utility Providers from altering, refusing,

or discontinuing services, and (c) approving procedures for resolving any dispute concerning adequate assurance in the event that a Utility Provider is not satisfied with the Proposed Adequate Assurance. If any Utility Provider refused or discontinued the Utility Services, even for a brief period, the Debtors' business operations would be severely disrupted. Further, the Debtors would incur significant costs to restart disrupted operations. Any disruption to the Utility Services would also materially impair the Debtors' revenue-generating and distribution capabilities, thereby jeopardizing the Debtors' ability to maximize the value of their estates pursuant to the contemplated sales to the detriment of all stakeholders. It is therefore essential that the Utility Services continue uninterrupted during these chapter 11 cases.

8. ***Cash Management Motion***. The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, and (C) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Certain Postpetition Intercompany Transactions, and (III) Granting Related Relief* seeks a court order (a) authorizing the Debtors to (i) continue to operate their Cash Management System, (ii) maintain their existing Bank Accounts, Business Forms, and Books and Records, and (iii) continue to perform the Intercompany Transactions and funding consistent with the Debtors' historical practices, subject to the terms described therein; (b) granting administrative expense status to the Intercompany Transactions on a postpetition basis to transactions (i) among the Debtors and (ii) between the Debtors and certain of the JVs; and (c) granting related relief. The Debtors are seeking to continue their Cash Management System because, among other reasons, any disruption to the system could jeopardize the Debtors' value-maximizing sale processes. Because of the nature and operational scale of the Debtors' businesses, any disruption to the Cash Management

System would have an immediate and material adverse effect on the Debtors' businesses and operations to the detriment of their estates and stakeholders.

9. ***Wages Motion.*** The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* seeks authority to pay prepetition wages, salaries, other compensation, and reimbursable expenses and continue employee benefits programs in the ordinary course.  The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Compensation and Benefits, including, among other things, Employee Wages, Commissions, Managed Service Provider Fees, Independent Contractor Obligations, Staffing Agency Fees, Payroll Deductions, Payroll Taxes, and Union Dues, Payroll Processing Fees, Non-Insider Employee Bonus Programs, Non-Employee Director Compensation, Reimbursable Expenses, Health and Welfare Coverage and Benefits, Workers' Compensation Program, Retirement Programs, Paid Leave Benefits, Non-Insider Severance Programs, Warn Act Obligations, Additional Benefit Programs, and certain other benefits that the Debtors provide in the ordinary course.  The Debtors' employ approximately 1,450 full-time employees, as well as 20 independent contractors, who perform a wide variety of job functions that are critical to the Debtors' continued operations and efficient administration of these chapter 11 cases.  The workforce possesses unique skills and experience, including familiarity and close relationships with the Debtors' expansive network of suppliers and customers who are the lifeblood of the Debtors' businesses.  The Debtors believe that absent payment of the Compensation and Benefits owed to their employees, the Debtors may experience employee turnover and instability at this critical time in these chapter 11 cases.  Further, the vast majority of the Debtors' Workforce relies exclusively or primarily on the Compensation and Benefits to pay

their daily living expenses and support themselves and/or their families.  Thus, the Workforce will face significant financial consequences if the Debtors are not permitted to continue the Compensation and Benefits in the ordinary course of business.  Consequently, the relief requested is necessary and appropriate.

10.     **NOL Motion.**   The *Debtors' Emergency Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock, (II) Directing That Any Such Transfer or Declaration of Worthlessness in Violation of Such Procedures Be Null and Void Ab Initio, and (III) Granting Related Relief* seeks (a) approval of certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to Debtor RNDC's existing classes (or series) of Common Stock or any Beneficial Ownership thereof and (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to, Beneficial Ownership of Common Stock in violation of the Procedures shall be null and void *ab initio*.

11.     The Debtors estimate that, as of December 31, 2025, they had approximately $660.6 million of U.S. federal NOLs and approximately $62.2 million of 163(j) Carryforwards. The Debtors may generate substantial additional Tax Attributes in the current tax year, including during the pendency of these chapter 11 cases.  The Tax Attributes are potentially of significant value to the Debtors and their estates because the Tax Attributes may offset U.S. federal taxable income or U.S. federal tax liability in future years.  In addition, the Debtors may utilize such Tax Attributes to offset any taxable income generated by transactions consummated during these chapter 11 cases.  The implementation of the Procedures is necessary and appropriate to preserve the value of the Tax Attributes for the benefit of the Debtors' estates.  The Tax Attributes may

provide the potential for material future tax savings (including in post-emergence years) or other potential tax structuring opportunities in these chapter11 cases.  Conversely, the termination or limitation of the Tax Attributes could, therefore, be materially detrimental to all parties in interest, including by potentially limiting the Debtors' ability to utilize certain structures to consummate the Plan.

12.     ***Critical Vendors Motion.***  The *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Prepetition Claims of Critical Vendors, 503(B)(9) Claimants, Lien Claimants, and Foreign Vendors and (B) Honor Their Obligations Under the Supplier Agreements and Enforce the Provisions of the Supplier Agreements in the Ordinary Course of Business, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* seeks entry of an order:  (a) authorizing the Debtors to (i) pay, in the ordinary course of business, certain prepetition amounts owing on account of (1) Critical Vendor Claims, (2) 503(b)(9) Claims, (3) Lien Claims, and (4) Foreign Vendor Claims and (ii) honor their obligations under the Supplier Agreements and enforce the provisions of the Supplier Agreements in the ordinary course of business; and (b) confirming the administrative expense priority status of Outstanding Orders and authorizing the payment of such obligations in the ordinary course of business.  The Debtors' businesses rely on continued access to, and relationships with, the Trade Claimants, which include highly specialized vendors, suppliers, and other strategic partners that provide the Debtors with a wide range of alcoholic beverages for distribution to the Debtors' customers, as well as vital industry-specific transportation and warehousing services and health, safety, and environmental-related goods and services.  The Trade Claimants are difficult to replace due to the specialized nature of the goods, branded products, and unique services that they provide, and the institutional knowledge they

possess regarding the Debtors' operations and facilities.  The Debtors have already experienced a significant exodus of critical supplier relationships in the months leading up to the Petition Date, and any incremental losses will continue erode estate value.  If the Debtors are unable to pay the Trade Claims, the Trade Claimants may refuse to provide goods and services essential to the Debtors' operations.  Finding replacements for Trade Claimants that refuse to deal with the Debtors would require significant expenditure in time and resources that the Debtors cannot afford. Moreover, the Debtors are required to maintain certain third-party systems pursuant to the TSAs and any interruption in payments to this critical subset of vendors could give rise to a breach of the Debtors' obligations, disrupting the scheduled contractual payments and materially straining liquidity.  This Motion also seeks to enforce inventory repurchase provisions under the Supplier Agreements, which represents a meaningful source of liquidity for the estates.  Accordingly, authorizing the Debtors to use their business judgment to pay the Trade Claims, subject to the limitations in the Interim Order and Final Order, is essential to allow the Debtors to maintain the going concern value of the Debtors' enterprise and minimize degradation of operations as the Debtors work to implement a comprehensive reorganization.

13.     ***Customer Programs Motion.***  The *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain and Administer Their Existing Supplier and Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief* seeks authority to maintain, continue, administer, modify, supplement, and/or terminate their Supplier and Customer Programs and honor prepetition obligations related thereto on a postpetition basis in the ordinary course.  The Supplier and Customer Programs include (a) Return Policies to maintain positive relationships with customers, (b) Deposit Policies, including the Returnable Container Program, to facilitate smooth operations

and manage risk, (c) Point-of-Sale Support Services to ensure products are properly displayed, competitively positioned, and effectively promoted at the retail level, (d) Other Promotions, including sponsorships, supplier and product events, media and advertising support, mentoring events, consumer tastings, coupons and discounts, sweepstakes, and charitable donations, and (e) the eRNDC Platform, a business-to-business, AI-powered eCommerce platform.  These programs are standard in the Debtors' industry.  The Debtors believe that their ability to continue the Supplier and Customer Programs, while honoring any supplier- and customer-related prepetition business practices thereunder in the ordinary course of business, is necessary to meet competitive market pressures, ensure supplier and customer satisfaction, comply with contractual obligations, and maintain strategic relationships.  Any disruption would almost certainly foreclose the possibility of consummating any value-maximizing going concern sales by severely impairing the Company's goodwill and brand amongst suppliers and customers.  Maintaining the goodwill of their customers and suppliers is critical to the Debtors' ongoing operations in these chapter 11 cases and is necessary to maximize value for the benefit of all the Debtors' stakeholders.

14.     ***TSA Motion.***    The *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Continue to Provide All TSA Services and Honor All Obligations Related Thereto and (II) Granting Related Relief* seeks entry of an order (a) authorizing the Debtors to continue to provide all TSA Services and honor all obligations related thereto and (b) granting related relief.  On May 29, 2026, Reyes Holdings, L.L.C. closed sale transactions for 11 of the Company's key markets, generating more than $1.0 billion in proceeds.  On July 10, 2026, Quality Brands Distribution, LLC purchased the Company's three markets in the plains states region, generating approximately $49.8 million in proceeds.  To support the Reyes Sale Transactions and the Quality Brands Sales Transactions and transition certain business activities

in connection therewith, the Company entered into a Transition Services Agreement with each of the Buyers pursuant to which the Company agreed to provider certain services to the Buyers to facilitate the transition of the business from the Company to the Buyer.  In exchange for the Company providing the applicable TSA Services, the Buyers agreed to pay the Company the TSA Fees for the services provided by the Company under the TSAs.  Since closing the transactions, the Debtors have been performing their obligations under the TSAs in the ordinary course pursuant to the applicable TSA.  Failure by the Company to provide the TSA Services and facilitate an orderly transition of the applicable business would constitute a breach of the Company's obligations under the applicable purchase agreements and TSAs and, therefore, would, among other things, jeopardize a key source of liquidity for the Debtors during these chapter 11 cases and cause significant disruption to the Debtors' businesses and sale processes.  Further, prospective buyers in the proposed value-maximizing sale transactions are likely to request (or have already requested) that the Debtors enter into contracts similar to the TSAs in connection with such sale transaction.  Failure to provide the TSA Services would harm the Debtors' goodwill with these prospective buyers. In turn, interested parties may, in the case of parties who have already submitted bids, reduce their bids or determine to withdraw their bids entirely, and in the case of future potential bidders, may forego submitting a proposal all together.  The Debtors' inability to provide the TSA Services would significantly undermine the Debtors' sale efforts, destroy value, and reduce any potential recovery available to the Debtors' stakeholders. Accordingly, allowing the Debtors to use their business judgment to continue to provide the TSA Services in the ordinary course is necessary to maximize value all stakeholders.

15.     ***Lease Rejection Motion.*** The *Debtors' First Omnibus Motion for Entry of an Order (I) Authorizing Effective* Nunc Pro Tunc *to the Petition Date, the (A) Rejection of Certain*

*Unexpired Leases and (B) Abandonment of Certain Personal Property, If Any, Each Effective As of the Rejection Date and (II) Granting Related Relief* seeks entry of an order (a) authorizing, effective *nunc pro tunc* to the Petition Date, the Debtors to (i) reject (A) certain unexpired leases for non-residential real property located at the Premises and (B) certain unexpired equipment leases, in each case, including any guaranties thereof and any amendments, modifications, or subleases thereto and (ii) abandon certain equipment, fixtures, furniture, or other personal property that may be located at the Premises.  In support of the requested relief, the Debtors, with the assistance of their advisors, undertook an extensive analysis of their lease portfolio—consisting of approximately 50 real estate properties and equipment leases with nine lessors, governing approximately 500 assets—to identify burdensome leases that are no longer value-maximizing for the Debtors' estates, including leases in states where the Debtors intend to wind down operations. The Debtors have determined in their business judgment that the carrying costs of the Leases exceed any benefits that could potentially be achieved and would continue to unnecessarily drain resources from the Debtors' estates.  The Debtors also have evaluated such Personal Property and have determined either that (a) the Personal Property is of inconsequential value or (b) the cost of removing and storing the Personal Property for future use, marketing, or sale exceeds its value to the Debtors' estates.  Accordingly, the Debtors believe that the relief requested is necessary and appropriate to preserve and maximize the value of their estates and to avoid incurring costs and expenses that are no longer integral to their business operations or chapter 11 efforts.