**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC, *et al.*,[1] | ) ) ) | Case No. 26-90737 (CML) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**JOINT CHAPTER 11 PLAN OF REPUBLIC NATIONAL
DISTRIBUTING COMPANY, LLC AND ITS DEBTOR SUBSIDIARIES**

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Joanna D. Caytas (TX Bar No. 24127230)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone:      (713) 226-6000
Facsimile:      (713) 226-6248
Email:          jhiggins@porterhedges.com
                sjohnson@porterhedges.com
                myoung-john@porterhedges.com
                jcaytas@porterhedges.com

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Maddison Levine (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                christopher.marcus@kirkland.com
                maddison.levine@kirkland.com

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

Dated:  August 3, 2026

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/RNDC.  The location of Debtor Republic National Distributing Company, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 4300 Wildwood Parkway, Suite 200, Atlanta, GA 30339.

**TABLE OF CONTENTS**

**Page**

**Article I . DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ...........1
   A.   Defined Terms .........1
   B.   Rules of Interpretation .........16
   C.   Computation of Time .........17
   D.   Governing Law .........17
   E.   Reference to Monetary Figures .........17
   F.   Reference to the Debtors or the Wind-Down Debtors .........17
   G.   Controlling Document .........17
   H.   Nonconsolidated Plan .........17

**Article II . ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, DIP CLAIMS, AND PROFESSIONAL FEE CLAIMS** .........18
   A.   Administrative Claims and Priority Tax Claims .........18
   B.   DIP Claims .........18
   C.   Professional Compensation .........19

**Article III . CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** .........20
   A.   Summary of Classification .........20
   B.   Treatment of Claims and Interests .........21
   C.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .........24
   D.   Special Provision Governing Unimpaired Claims .........24
   E.   Elimination of Vacant Classes .........25
   F.   Voting Classes; Presumed Acceptance by Non-Voting Classes .........25
   G.   Subordinated Claims and Interests .........25

**Article IV . MEANS FOR IMPLEMENTATION OF THE PLAN** .........25
   A.   Settlement of Claims and Interests .........25
   B.   The Equityholder Settlement .........25
   C.   Litigation Trust .........26
   D.   Wind-Down Transactions .........30
   E.   Distributable Proceeds and Waterfall Recovery. .........30
   F.   The Wind-Down Reserve .........31
   G.   Cancellation of Notes, Instruments, Certificates, and Other Documents .........31
   H.   Means for Implementation .........32
   I.   Exemption from Certain Transfer Taxes and Fees .........34
   J.   Corporate Action .........34
   K.   D&O Liability Insurance Policies .........35
   L.   Indemnification Obligations .........35

**Article V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .........36
   A.   Assumption and Rejection of Executory Contracts and Unexpired Leases .........36
   B.   Claims Based on Rejection of Executory Contracts or Unexpired Leases .........36
   C.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .........37
   D.   Insurance Policies .........37
   E.   Modifications, Amendments, Supplements, Restatements, or Other Agreements .........38
   F.   Reservation of Rights .........38
   G.   Nonoccurrence of Plan Effective Date .........38
   H.   Contracts and Leases Entered Into After the Petition Date .........38

**Article VI . PROVISIONS GOVERNING DISTRIBUTIONS** .........38
   A.   Timing and Calculation of Amounts to Be Distributed .........38

|   |   |   |   |
|---|---|---|---|
| B. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | | 39 |
| C. | Tax Issues and Compliance with Tax Requirements | | 40 |
| D. | Allocations | | 41 |
| E. | No Postpetition or Default Interest on Claims | | 41 |
| F. | Manner of Payment | | 41 |
| G. | Setoffs and Recoupment | | 41 |
| H. | No Double Payment of Claims | | 41 |
| I. | Claims Paid or Payable by Third Parties | | 41 |

**Article VII . THE PLAN ADMINISTRATOR**........................................................................**42**

|   |   |   |
|---|---|---|
| A. | The Plan Administrator | 42 |
| B. | Wind Down | 43 |
| C. | Exculpation, Indemnification, Insurance, and Liability Limitation | 44 |
| D. | Tax Returns | 44 |
| E. | Dissolution of the Wind-Down Debtors | 44 |

**Article VIII . RESERVES ADMINISTERED BY THE PLAN ADMINISTRATOR** .........................**45**

|   |   |   |
|---|---|---|
| A. | Undeliverable Distribution Reserve | 45 |
| B. | Wind-Down Reserve | 45 |
| C. | The General Account and Distribution Reserve Account Adjustments | 46 |

**Article IX . PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**...............................................................................................**46**

|   |   |   |
|---|---|---|
| A. | Disputed Claims Process | 46 |
| B. | Allowance of Claims | 47 |
| C. | Claims Administration Responsibilities | 47 |
| D. | Estimation of Claims | 47 |
| E. | Adjustment to Claims Without Objection | 47 |
| F. | Time to File Objections to Claims | 48 |
| G. | Disallowance of Claims | 48 |
| H. | Amendments to Claims | 48 |
| I. | No Distributions Pending Allowance | 48 |
| J. | Distributions After Allowance | 49 |

**Article X . SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**.............**49**

|   |   |   |
|---|---|---|
| A. | Compromise and Settlement of Claims, Interests, and Controversies | 49 |
| B. | Release of Liens | 49 |
| C. | Releases by the Debtors | 50 |
| D. | Releases by the Releasing Parties | 51 |
| E. | Exculpation | 52 |
| F. | Injunction | 53 |
| G. | Protection Against Discriminatory Treatment | 53 |

**Article XI . CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**.......................**54**

|   |   |   |
|---|---|---|
| A. | Conditions Precedent to the Plan Effective Date | 54 |
| B. | Waiver of Conditions | 55 |
| C. | Substantial Consummation | 55 |
| D. | Effect of Nonoccurrence of Conditions to the Plan Effective Date | 55 |

**Article XII . MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**................**55**

|   |   |   |
|---|---|---|
| A. | Modification and Amendments | 55 |
| B. | Effect of Confirmation on Modifications | 56 |
| C. | Revocation or Withdrawal of the Plan | 56 |

**Article XIII . RETENTION OF JURISDICTION**.....................................................................**56**

**Article XIV . MISCELLANEOUS PROVISIONS**.................................................................................**58**
    A.     Immediate Binding Effect...............................................................................58
    B.     Additional Documents ....................................................................................58
    C.     Dissolution of Statutory Committees .............................................................58
    D.     Payment of Statutory Fees .............................................................................58
    E.     Reservation of Rights.....................................................................................58
    F.     Successors and Assigns...................................................................................58
    G.     Service of Documents .....................................................................................59
    H.     Entire Agreement ...........................................................................................60
    I.     Exhibits ..........................................................................................................60
    J.     Nonseverability of Plan Provisions................................................................60
    K.     Votes Solicited in Good Faith ........................................................................60
    L.     Closing of Chapter 11 Cases ..........................................................................60
    M.     Waiver and Estoppel ......................................................................................61

**INTRODUCTION**

Republic National Distributing Company, LLC and the other above-captioned debtors and debtors in possession (each, a "Debtor," and collectively, the "Debtors"), propose this joint chapter 11 plan (as may be amended, supplemented, or otherwise modified from time to time, the "Plan" or this "Plan") for the resolution of outstanding Claims against, and Interests in, the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A of this Plan. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan, the Wind-Down Transactions, and certain related matters. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

**A.     Defined Terms**

As used in this Plan, capitalized terms have the meanings set forth below.

1.  "*Additional Disinterested Director*" means Jill Frizzley, in her capacity as independent and disinterested manager and director of each of the boards of managers and boards of directors, as applicable, of each of the Debtors except for Debtor RNDC, Alaska, LLC.

2.  "*Additional Special Committee*" means, collectively, the special committee of the independent and disinterested manager and director of each of the boards of managers and boards of directors, as applicable, of each of the Debtors except for Debtor RNDC, Alaska, LLC, comprised of the Additional Disinterested Director.

3.  "*Additional Special Committee Investigation*" means the independent investigation conducted by the Additional Special Committee.

4.  "*Adequate Assurance Information*" means written evidence to demonstrate the ability of the Wind-Down Debtors or any assignee, as applicable, to provide adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code under the Executory Contract or Unexpired Lease to be assumed.

5.  "*Administrative Claim*" means a Claim against any of the Debtors arising before the Plan Effective Date for the costs or expenses of the administration of the Chapter 11 Cases pursuant to sections 330, 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Plan Effective Date; (b) the Allowed Professional Claims; (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code; and (d) any DIP Claims that have not been satisfied pursuant to (i) payment in full in Cash on the Plan Effective Date or (ii) such other terms agreed to by the Holders of Allowed DIP Claims.

6.  "*Administrative Claims Bar Date*" means the applicable deadline by which all requests for payment of Administrative Claims must be Filed and served on the Debtors or the Wind-Down Debtors, as applicable, which shall be:  (a) with respect to Administrative Claims other than Professional Claims, 30 days after the Plan Effective Date; and (b) with respect to Professional Claims, 45 days after the Plan Effective Date.

7. "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

8. "*Allowed*" means, with respect to any Claim or Interest (or portion thereof), except as otherwise provided herein: (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Claims Bar Date or a request for payment of an Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which a Proof of Claim is not required under this Plan, the Bankruptcy Code, or pursuant to a Final Order); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed; or (c) a Claim or Interest Allowed pursuant to this Plan, a Final Order, or by the Wind-Down Debtors, as applicable; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that, with respect to such Claim or Interest, no objection to the allowance thereof has been interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order. Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes to the applicable Debtor or Wind-Down Debtor, as applicable. Notwithstanding anything to the contrary in this Plan, a Proof of Claim Filed after and subject to the Claims Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim or Interest. "Allow" and "Allowing" shall have correlative meanings.

9. "*Assumed Liabilities*" means, collectively, the liabilities assumed by the Purchasers in any Sale(s) pursuant to the terms of the applicable Purchase Agreement.

10. "*Assumption/Rejection Procedures Motion*" means the [*Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No.[●]].

11. "*Assumption/Rejection Procedures Order*" means the order entered by the Bankruptcy Court approving the Assumption/Rejection Procedures Motion [Docket No. [●]].

12. "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of one or more of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common Law, including, for the avoidance of doubt, fraudulent transfer Laws and Preference Actions.

13. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

14. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

15. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

16. "*Bar Date Order*" means the [*Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date, Rejection Damages Bar Date, and Administrative Claims Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, and (IV) Approving Notice Thereof, and (V) Granting Related Relief* entered at [Docket No. [●]]].

2

17. "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.  When a period of days under this Agreement ends on a day that is not a Business Day, then such period shall be extended to the specified hour of the following Business Day.

18. "*Cash*" or "*$*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

19. "*Causes of Action*" means, collectively, any and all Claims, damages, remedies, causes of action, reimbursement Claims, contribution Claims, recoupment rights, debts, judgments, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, Avoidance Actions, counterclaims and cross claims, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable, asserted or unasserted, direct or indirect, choate or inchoate, reduced to judgment or otherwise, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, Law, equity, or otherwise pursuant to any theory of Law or otherwise.  "Causes of Action" also includes:  (a) all rights of setoff, counterclaim, or recoupment and Claims under contracts or for breaches of duties imposed by Law or in equity; (b) any Claim based on, or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal Law or breach of any duty imposed by Law or in equity, including Securities Laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) Claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any other Avoidance Actions.

20. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

21. "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code.

22. "*Claims and Noticing Agent*" means Omni Agent Solutions, Inc., the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

23. "*Claims Bar Date*" means the date established by the Bankruptcy Court pursuant to the Bar Date Order by which Proofs of Claim must be Filed with respect to all Claims (including claims arising under section 503(b)(9) of the Bankruptcy Code), other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the Holders of such Claims or Interests from the requirement of Filing Proofs of Claim.

24. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Plan Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to Claims.

25. "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

26. "*Class*" means a class of Claims or Interest as set forth in <u>Article III</u> of this Plan pursuant to section 1122(a) of the Bankruptcy Code.

27. "*CM/ECF*" means the Bankruptcy Court's case management and electronic case filing system.

28. "*Creditors' Committee*" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases in accordance with section 1102 of the Bankruptcy Code.

29. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

30. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

31. "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court to consider Confirmation of this Plan pursuant to Bankruptcy Rule 3020(b)(3) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

32. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

33. "*Consummation*" means the occurrence of the Plan Effective Date as to the applicable Debtor.

34. "*Cure Claim*" means a monetary Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under any Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code, other than with respect to a default that is not required to be cured under section 365(b)(2) of the Bankruptcy Code.

35. "*Cure Obligations*" means, collectively, all (a) Cure Claims and (b) other obligations required to cure any non-monetary defaults (the performance required to cure such non-monetary defaults and the timing of such performance will be described in reasonable detail in a notice of proposed assumption and assignment) under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

36. "*Cure/Assumption Objection Deadline*" means the date that is 14 days after filing of the Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement and service of the Cure Notice; *provided* that if any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, or an Executory Contract or Unexpired Lease proposed to be assumed by the Wind-Down Debtors is proposed to be assigned to a third party after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be 14 days after service of the amended Schedule of Assumed Executory Contracts and Unexpired Leases with such modification (or such other time period as the Debtors set (subject to Bankruptcy Court approval) if the Debtors seek a limited notice period prior to the date of the Confirmation Hearing).

37. "*Cure Notice*" means a notice of a proposed amount to be paid and/or obligation to be performed on account of a Cure Obligation in connection with an Executory Contract or Unexpired Lease to be assumed under this Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include:  (a) procedures for objecting to the proposed assumptions of Executory Contracts and Unexpired Leases; (b) Cure Claims to be paid in connection therewith; (c) Adequate Assurance Information; and (d) procedures for resolution by the Bankruptcy Court of any related dispute.

38. "*D&O Liability Insurance Policies*" means, collectively, all insurance policies (including any "tail policies" and all agreements, documents, or instruments related thereto) issued at any time providing directors' and officers' liability and/or management liability coverage to any of the Debtors' current or former directors, officers, managers, and/or employees and all agreements, documents, or instruments relating thereto.

39. "*Deferred Compensation Plan*" means that certain Second Amended and Restated Republic National Distributing Company, LLC Deferred Compensation Plan III, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

40. "*Deferred Compensation Plan Claims*" means, collectively, any and all Claims held by Marc Sachs, Grant Sechler, Josh Zeller, Richard J. Davis, Elizabeth A. Davis, Kenneth Rosenberg, and H. Alan Rosenberg arising

4

under, derived from, or based upon the Deferred Compensation Plan, which Claims shall be irrevocably waived pursuant to the NBG Settlement and the NDC Settlement, as applicable.

41. "*Definitive Documents*" means, collectively, and, in each case, including all exhibit(s) thereto (a) the Litigation Trust Documents, (b) this Plan and any Plan Supplement, (c) the Disclosure Statement and the Solicitation Materials, (d) the Confirmation Order, (e) the Disclosure Statement Order, (f) the First Day Pleadings and all orders sought pursuant thereto, (g) the DIP Documents, (h) the Sale Documents (if any), (i) any and all filings with or requests for regulatory or other approvals from any governmental Entity or unit, other than ordinary course filings and requests, necessary or desirable to implement the Wind-Down Transactions, (j) such other agreements and documentation contemplated in, or necessary or advisable to, consummate and implement the Wind-Down Transactions, and (k) any amendments or modifications to each of the Definitive Documents in clauses (a) through this clause (k), all of which shall be acceptable to the DIP Agent.

42. "*DIP Agent*" means Wells Fargo Bank, National Association, in its capacity as administrative agent under the DIP Credit Agreement.

43. "*DIP Claims*" means any and all Claims arising under the DIP Documents or the DIP Orders with respect to the DIP Facility.

44. "*DIP Credit Agreement*" means that certain Senior Secured Super-Priority Priming Debtor-In-Possession Credit Agreement, dated as of July 28, 2026, by and among certain of the Debtors party thereto, the guarantors party thereto, the DIP Agent, and each lender and issuing bank from time to time party thereto, as may be amended, restated, supplemented, or otherwise modified from time to time.

45. "*DIP Documents*" means, collectively, the DIP Credit Agreement and any amendments, modifications, or supplements thereto, and including any related notes, certificates, agreements, intercreditor agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

46. "*DIP Facility*" means that certain senior secured asset-based revolving debtor-in-possession credit facility provided to the Debtors on the terms and conditions set forth in the DIP Documents and the DIP Orders.

47. "*DIP Lenders*" means, collectively, the lenders from time to time party to the DIP Credit Agreement.

48. "*DIP Obligations*" shall have the meaning set forth in the DIP Orders.

49. "*DIP Orders*" means, as applicable, the Interim DIP Order and the Final DIP Order, in each case, which shall be consistent with the DIP Credit Agreement.

50. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is Scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable Law or this Plan; (c) is not Scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable Law or this Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

51. "*Disbursing Agent*" means, as applicable, the Debtors, the Wind-Down Debtors, the Plan Administrator, or any Entity or Entities selected jointly by the Debtors and the DIP Agent, as applicable, to make or facilitate distributions contemplated under this Plan; *provided* that, for purposes of making distributions to Holders of Litigation Trust Interests, the Disbursing Agent shall be the Litigation Trustee.

52. "*Disinterested Director*" or "*Disinterested Directors*" means Scott D. Vogel, Charles T. Piper, and John T. Young, Jr., in each case, in their capacity as the independent and disinterested managers and directors of each of the boards of managers and boards of directors, as applicable, of each of the Debtors except for Debtor RNDC, Alaska, LLC.

53. "*Disclosure Statement*" means the *Disclosure Statement to the Joint Chapter 11 Plan of Republic National Distributing Company, LLC and Its Debtor Subsidiaries*, filed contemporaneously herewith, including all exhibits and schedules thereto and references therein that relate to this Plan, as may be amended, supplemented, or modified from time to time, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable Law and approved by the Bankruptcy Court pursuant to the Disclosure Statement Order.

54. "*Disclosure Statement Order*" means the order (and all exhibits thereto), entered by the Bankruptcy Court approving, among other things, the Disclosure Statement and the Solicitation Materials, and allowing solicitation of this Plan to commence.

55. "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not yet Allowed; (b) that is not Disallowed under this Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment.

56. "*Distributable Proceeds*" means, subject only to funding the Professional Fee Escrow Account and the Wind-Down Reserve on the Plan Effective Date, all (a) Cash of the Debtors or the Wind-Down Debtors, as applicable, (b) Cash proceeds generated from the use, sale, lease, liquidation, or other disposition of Estate property including, for the avoidance of doubt, the Sales or the Real Property Sale, in each case, if any, (c) Cash proceeds generated by the use, sale, lease, liquidation, or other disposition of any property belonging to the Wind-Down Debtors, in each case, excluding the Wind-Down Reserve, and (d) the Cash component of the Equityholder Settlement less the GUC Cash Consideration.

57. "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions under this Plan, which date shall be the Plan Effective Date or such other date as is designated in a Final Order of the Bankruptcy Court.

58. "*Distribution Reserve Accounts*" means, collectively, the Wind-Down Reserve and the Undeliverable Distribution Reserve.

59. "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

60. "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Plan Effective Date.

61. "*Equityholder Covered Claims*" means, collectively, the NBG Covered Claims and the NDC Covered Claims.

62. "*Equityholder Released Claims*" means, collectively, the NBG Non-Covered Claims and the NDC Non-Covered Claims.

63. "*Equityholder Released Parties*" means, collectively, the NBG Released Parties and the NDC Released Parties.

64. "*Equityholder Settlement*" means, collectively, the NBG Settlement and the NDC Settlement.

65. "*Equityholder Settlement Parties*" means, collectively, the NBG Settlement Parties and the NDC Settlement Parties.

66. "*Equityholder Settlement Term Sheets*" means, collectively, the NBG Settlement Term Sheet and the NDC Settlement Term Sheet.

6

67. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; and (b) each of the Disinterested Directors and the Additional Disinterested Director of the Debtors solely in their capacities as such.

68. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

69. "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

70. "*File*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases or, with respect to the filing of a Proof of Claims, the Claims and Noticing Agent.  "Filed" and "Filing" shall have correlative meanings.

71. "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. [●]].

72. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or another court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, vacated, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing thereof has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or section 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment will not preclude such order from being a Final Order.

73. "*First Day Declaration*" means *Declaration of John R. Castellano, Chief Restructuring Officer of Republic National Distributing Company, LLC and its Debtor Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 18].

74. "*First Day Pleadings*" means, collectively, any "first day" or "second day" pleadings that the Debtors determine are necessary or desirable to file with the Bankruptcy Court, including any pleadings seeking entry of the DIP Orders.

75. "*General Account*" means a general account:  (a) into which shall be deposited revenues and proceeds of all assets of the Debtors, including proceeds of any Sales, if any, and Cash of the Debtors in an amount in excess of the amount required to adequately maintain the Distribution Reserve Accounts as described in Article VIII.C hereof (*provided* that the General Account shall not include funds required to be deposited into the Distribution Reserve Accounts); and (b) from which payments shall be made according to the priority set forth in Article IV.E hereof.

76. "*General Unsecured Claim*" means any Claim, that is not (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), (b) a Priority Tax Claim; (c) an Other Secured Claim, (d) an Other Priority Claim, (e) a Prepetition DDTL Claim, (f) a Prepetition ABL/FILO Claim, (g) a Second Lien Claim, (h) an Owner Notes Claim, (i) a Prepetition ABL/FILO Deficiency Claim, or (j) an Intercompany Claim; *provided* that any General Unsecured Claim that is an Assumed Liability under the Purchase Agreement (if any) shall be satisfied solely under the applicable Purchase Agreement and shall not be an obligation of the Debtors or the Wind-Down Debtors.

77. "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

7

78. "*GUC Cash Consideration*" means no less than $2.5 million of the Cash component of the Equityholder Settlement.

79. "*Holder*" means an Entity holding a Claim or Interest in any Debtor, as applicable.

80. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

81. "*Indemnification Obligations*" means, collectively, all indemnification provisions of the Debtors, consistent with applicable Law (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise), that are in place immediately prior to the Plan Effective Date, for the benefit of current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable.

82. "*Insurance Policies*" means, collectively, all insurance policies issued or providing coverage at any time to any of the Debtors or any of their predecessors and all agreements, documents, or instruments relating thereto, including, without limitation, the D&O Liability Insurance Policies.

83. "*Intercompany Claim*" means, collectively, any and all Claims against a Debtor held by another Debtor. For the avoidance of doubt, all Intercompany Claims that are transferred to any Purchaser pursuant to the Sale Documents shall be satisfied by the applicable Purchaser following the Plan Effective Date on the terms set forth in the Sale Documents and shall not receive the treatment provided for Intercompany Claims under this Plan.

84. "*Intercompany Interest*" means, other than an Interest in RNDC, any Interest held by a Debtor in another Debtor or non-Debtor Affiliate.

85. "*Interest*" means, collectively, any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock, profit interest, unit, or share of any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, limited liability company interests, partnership interests, membership interests, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

86. "*Interim Compensation Order*" means the order granting the [*Motion of Debtors for Entry of an Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and (II) Granting Related Relief* [Docket No. [●]], as the same may be amended, supplemented, or modified from time to time after entry thereof.

87. "*Interim DIP Order*" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 60].

88. "*Inventory*" means all inventory of the Debtors, wherever located, including beer, wine, spirits, and other alcoholic beverages held for sale or distribution in the ordinary course of business.

89. "*IRC*" means the Internal Revenue Code of 1986, as amended.

90. "*IRS*" means the Internal Revenue Service.

8

91. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time, and as applicable to the Chapter 11 Cases.

92. "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

93. "*Lenders' Advisors*" means, collectively, (a) Paul Hastings, LLP, as counsel to the Prepetition Agent and DIP Agent, and (b) Carl Marks Advisory Group LLC, as financial advisor to the Prepetition Agent and DIP Agent.

94. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

95. "*Litigation Trust*" means one or more trusts and/or sub-trusts formed pursuant to the Litigation Trust Agreement, which trust(s) shall hold the Litigation Trust Assets.

96. "*Litigation Trust Advisory Board*" shall have the meaning ascribed to such term in Article IV.C hereof.

97. "*Litigation Trust Agreement*" means the trust or similar agreement providing for the Litigation Trust, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof and substantially in the form set forth in the Plan Supplement, in form and substance acceptable to the Debtors and the DIP Agent.

98. "*Litigation Trust Assets*" means, collectively, the Permitted Litigation Claims transferred from the Wind-Down Debtors to the Litigation Trust on the Plan Effective Date in accordance with Article IV.C hereof.

99. "*Litigation Trust Beneficiaries*" means, collectively, the Holders of Allowed DIP Claims, Holders of Allowed Prepetition ABL/FILO Deficiency Claims, and Holders of Allowed General Unsecured Claims pursuant to this Plan and the Litigation Trust Documents.

100. "*Litigation Trust Documents*" means, collectively, the Litigation Trust Agreement and all other agreements, documents, procedures, and instruments delivered or entered into in connection with the establishment, formation, and implementation of the Litigation Trust, in form and substance acceptable to the Debtors and the DIP Agent.

101. "*Litigation Trust Interests*" means, collectively, the beneficial interests in the Litigation Trust as provided for in the Litigation Trust Agreement, which interests shall only be issued to the Litigation Trust Beneficiaries.

102. "*Litigation Trustee*" means the trustee for the Litigation Trust to be selected jointly by the Debtors and the DIP Agent.

103. "*NBG*" means New BG Distribution Partners, LLC.

104. "*NBG Covered Claims*" means, collectively, any Causes of Action assertable by the Debtors, whether directly, derivatively, and whether styled as "estate causes of action," property of the Estates, or otherwise, concerning or arising out of any matter prior to the Plan Effective Date, that (a) are assertable against any NBG Released Party that is an insured (whether denominated as a "named insured," "additional insured," or otherwise) under a D&O Liability Insurance Policy, and (b) assert a theory of recovery or alleged damages or loss that is ultimately covered by a D&O Liability Insurance Policy.

105. "*NBG Non-Covered Claims*" means, collectively, any Causes of Action assertable by the Debtors, whether directly, derivatively, and whether styled as "estate causes of action," property of the Estates, or otherwise, concerning or arising out of any matter prior to the Plan Effective Date, that are (a) assertable against any NBG Released Party and (b) not an NBG Covered Claim.

106. "*NBG Released Parties*" means, collectively, (a) NBG, including:  (i) Edward L. Block; (ii) Alan Dreeben; (iii) Barbara Block Dreeben; (iv) Margery Block Estate; (v) Margery Block Preferred; (vi) Allison Dreeben

9

Zeller Family 2016 Trust I; (vii) Lisa Dreeben Sechler Family 2016 Trust I; (viii) Paige Dreeben Sachs Family 2016 Trust I; (ix) Phil H. Boeck; (x) Phil Boeck Family LP; (xi) Stephanie Block; (xii) Stephanie Block Property Trust A; (xiii) Stephanie Block Property Trust B; (xiv) Stephanie Block Property Trust A Preferred; (xv) Stephanie Block Property Trust B Preferred; (xvi) Corey Block; (xvii) Corey Block Property Trust A; (xviii) Corey Block Property Trust B; (xix) Corey Block Property Trust A Preferred; (xx) Corey Block Property Trust B Preferred; (xxi) Allison Dreeben Zeller; (xxii) Josh Zeller; (xxiii) Allison Zeller and Josh Zeller Preferred; (xxiv) Lisa Dreeben Sechler; (xxv) Grant Kelly Sechler; (xxvi) Lisa Sechler and Grant Kelly Sechler Preferred; (xxvii) Paige Dreeben Sachs; (xxviii) Marc Sachs; (xxix) Paige Sachs and Marc Sachs Preferred; (xxx) BG Spirits, LLC and all members of the same; (xxxi) Block Distributing Company, Ltd. and all members of the same; (xxxii) Block Distributing Company, Ltd. Preferred Return; (xxxiii) MB–Stephanie L. Block DGT Trust; (xxxiv) MB–Corey A. Block DGT Trust; (xxxv) Allison Dreeben Zeller Trust I; (xxxvi) Lisa Dreeben Sechler Trust I; and (xxxvii) Paige Dreeben Sachs Trust I, and each of their respective spouses, children, trustees, beneficiaries, and owners, together with the estates of any deceased individual identified above, and any trust established by, for the benefit of, or holding an interest on behalf of any individual or entity identified above, including any successor trustee or acting trustee thereof and (b) to the maximum extent permitted by Law, each Related Party of each of the foregoing Entities.

107. "*NBG Settlement*" means the settlement agreed to by the Debtors and NBG and embodied in the NBG Settlement Term Sheet, as incorporated into this Plan, which shall become effective upon occurrence of the Plan Effective Date.

108. "*NBG Settlement Consideration*" shall have the meaning ascribed to such term in <u>Article IV.B</u> hereof.

109. "*NBG Settlement Term Sheet*" means that certain term sheet setting forth the material terms of the NBG Settlement, dated July 26, 2026, which is attached as <u>Exhibit C</u> to the First Day Declaration. A copy of the NBG Settlement Term Sheet is annexed hereto as **Exhibit A**.

110. "*NDC*" means, collectively, National Distributing Company, Inc., NDC Leasing Company, LLC, Atlanta Wines International, Inc., and NDC Partners, LLC.

111. "*NDC Covered Claims*" means, collectively, any Causes of Action assertable by the Debtors, whether directly, derivatively, and whether styled as "estate causes of action," property of the Estates, or otherwise, concerning or arising out of any matter prior to the Plan Effective Date, that (a) are assertable against any NDC Released Party that is an insured (whether denominated as a "named insured," "additional insured," or otherwise) under a D&O Liability Insurance Policy and (b) assert a theory of recovery or alleged damages or loss that is ultimately covered by a D&O Liability Insurance Policy.

112. "*NDC Non-Covered Claims*" means, collectively, any Causes of Action assertable by the Debtors, whether directly, derivatively, and whether styled as "estate causes of action," property of the Estates, or otherwise, concerning or arising out of any matter prior to the Plan Effective Date, that are (a) assertable against any NDC Released Party and (b) not an NDC Covered Claim.

113. "*NDC Released Parties*" means, collectively, (a) NDC, (b) Jay M. Davis; Richard J. Davis; Elizabeth A. Davis; Dulcy D. Rosenberg; H. Jerry Rosenberg; H. Alan Rosenberg; Kenneth Rosenberg; Karen R. Musa; Chris M. Carlos; Helen A Carlos, James A. Carlos; John A. Carlos; Carlos Company; John A. Carlos, Trustee of the Helen A. Carlos Family Trust u/a December 19, 2012; James A. Carlos, Trustee of the 2012 Helen S. Carlos Irrevocable Trust u/a December 31, 2012; Helen S. Carlos, Trustee of the 2012 James A. Carlos Irrevocable Trust u/a December 31, 2012; Elaine F. Carlos Family Trust; Chris M. Carlos Revocable Trust; Andrew C. Carlos Family Investments LLC; John A. Carlos & James A. Carlos, Co- Trustees of the John A. Carlos Family Trust U/A March 1, 2013; and each of their respective spouses, children, trustees, beneficiaries, and owners, together with the estates of any deceased individual identified above, and any trust established by, for the benefit of, or holding an interest on behalf of any individual or entity identified above, including any successor trustee or acting trustee thereof, and (c) to the maximum extent permitted by Law, each Related Party of each of the foregoing Entities.

10

114. "*NDC Settlement*" means the settlement agreed to by the Debtors and NDC and embodied in the NDC Settlement Term Sheet, as incorporated into this Plan, which shall become effective upon occurrence of the Plan Effective Date.

115. "*NDC Settlement Consideration*" shall have the meaning ascribed to such term in Article IV.B hereof.

116. "*NDC Settlement Parties*" means, collectively, the Debtors and the NDC Released Parties.

117. "*NBG Settlement Parties*" means, collectively, the Debtors and the NBG Released Parties.

118. "*NDC Settlement Term Sheet*" means that certain term sheet setting forth the material terms of the NDC Settlement, dated July 26, 2026, which is attached as Exhibit C to the First Day Declaration. A copy of the NDC Settlement Term Sheet is annexed hereto as **Exhibit B**.

119. "*Non-Debtor Subsidiaries*" means, collectively, the direct and indirect subsidiaries of RNDC that are not Debtors.

120. "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such Claim has not already been paid during the Chapter 11 Cases.

121. "*Other Secured Claim*" means any Secured Claim, other than a Priority Tax Claim, a Prepetition DDTL Claim, a Prepetition ABL/FILO Claim, or a Second Lien Claim.

122. "*Owner Notes*" means those certain unsecured promissory notes, each dated as of August 1, 2019, issued by certain of the Debtors to the Owner Noteholders, including any amendments, modifications, restatements, or replacements thereof.

123. "*Owner Notes Claims*" means any and all Claims, arising under, derived from, or based upon the Owner Notes.

124. "*Owner Noteholders*" means, collectively, the payees under the Owner Notes.

125. "*Permitted Litigation Claims*" means, collectively, (a) the NBG Covered Claims, subject to the provisions concerning recoveries embodied in the NBG Settlement Term Sheet that are incorporated into this Plan and the Litigation Trust Documents, (b) the NDC Covered Claims, subject to the provisions concerning recoveries embodied in the NDC Settlement Term Sheet that are incorporated into this Plan and the Litigation Trust Documents, (c) all of the Estates' rights, titles, and interest in any Causes of Action (i) against (A) Young's Holdings, Inc., (B) YHI Spirits, LLC, and (C) each Related Party of the foregoing Entities in subclauses (A) through (B), and (ii) that are Avoidance Actions. For the avoidance of doubt, subject to approval of the Equityholder Settlement by the Bankruptcy Court, which approval shall come in the form of the Confirmation Order, the NBG Non-Covered Claims and the NDC Non-Covered Claims shall not be Permitted Litigation Claims, and shall be settled and released in full pursuant to the terms of this Plan.

126. "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

127. "*Petition Date*" means July 26, 2026, the date on which the Debtors commenced the Chapter 11 Cases.

128. "*Plan Administrator*" means the person selected jointly by the Debtors and the DIP Agent to administer the Wind-Down Debtors. For the avoidance of doubt, all costs, liabilities, and expenses reasonably incurred by the Plan Administrator, and any personnel employed by the Plan Administrator in the performance of the Plan Administrator's duties, shall be paid from the Wind-Down Debtors' assets and in accordance with the Wind-Down Budget. The identity of the Plan Administrator shall be disclosed in the Plan Supplement.

129. "*Plan Effective Date*" means, as to the applicable Debtor, the date that is the first Business Day on which (a) the conditions to the occurrence of the Plan Effective Date have been satisfied or waived pursuant to Article XI of

this Plan and (b) no stay of the Confirmation Order is in effect.  Any action to be taken on the Plan Effective Date may be taken on or as soon as reasonably practicable thereafter.

130. "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules), to be Filed by the Debtors prior to the Confirmation Hearing to the extent available, and any additional documents Filed prior to the Plan Effective Date as amendments to the Plan Supplement, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable:  (a) Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the identity of the Plan Administrator and the terms of any documentation establishing the rights and compensation of the Plan Administrator, each of which shall be acceptable to the DIP Agent; (d) any transition services agreements between a Purchaser and the Debtors (as applicable); (e) the Litigation Trust Agreement; (f) the Wind-Down Transactions Memorandum; (g) any other necessary documentation related to any Sales (if any) or other Wind-Down Transactions in accordance with Article IV hereof.

131. "*Prepetition ABL/FILO Claims*" means any and all Claims arising under, derived from, or based upon the Prepetition Revolving Loans.

132. "*Prepetition ABL/FILO Deficiency Claims*" means any portion of a Prepetition ABL/FILO Claim that is not a Secured Claim (if any).

133. "*Prepetition ABL/FILO Facility*" means that certain senior secured asset-based revolving credit facility issued pursuant to the Prepetition Credit Agreement.

134. "*Prepetition Agent*" means Wells Fargo Bank, National Association in its capacity as administrative agent under the Prepetition Credit Agreement.

135. "*Prepetition Credit Agreement*" means that certain Third Amended and Restated Credit Agreement, dated as of November 1, 2022, by and among certain of the Debtors party thereto, the guarantors from time to time party thereto, Wells Fargo Bank, National Association, as administrative agent, and each lender from time to time party thereto, as may be further amended, restated, supplemented, or otherwise modified from time to time.

136. "*Prepetition Credit Facilities*" means, collectively, the Prepetition DDTL Facility and the Prepetition ABL/FILO Facility.

137. "*Prepetition Credit Facility Documents*" means, collectively, the Prepetition Credit Agreement and any other documents executed in connection therewith or related thereto.

138. "*Prepetition Lenders*" means, collectively, the lenders party to the Prepetition Credit Agreement.

139. "*Prepetition Revolving Loans*" means, collectively, the loans outstanding under the Prepetition Credit Agreement, other than the Prepetition Delayed Draw Term Loans.

140. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

141. "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under this Plan.

142. "*Professional*" means an Entity (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the

12

Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code, or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

143. "*Professional Fee Claims*" means, collectively, all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Plan Effective Date to the extent such fees and expenses have not been previously paid.

144. "*Professional Fee Escrow Account*" means an interest-bearing account (to the extent commercially reasonable) in an amount equal to the total Professional Fee Reserve Amount funded by the Wind-Down Debtors on the Plan Effective Date.

145. "*Professional Fee Reserve Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses set forth in the Wind-Down Budget that the Professionals estimate they have incurred or will incur in rendering services to the Debtors through the Plan Effective Date as set forth in Article II.C hereof, including (a) amounts budgeted for prior months not yet invoiced to the Debtors and (b) any amounts for services provided in prior periods that are invoiced but not yet paid (including hold back amounts).

146. "*Proof of Claim*" means a proof of Claim Filed in the Chapter 11 Cases.

147. "*Purchase Agreements*" means, collectively, any asset or stock purchase agreement to be entered into as part of any Sale by and among the Debtors, as sellers, and the applicable Purchaser (if any).

148. "*Purchaser*" means, collectively, any purchaser under any Sale, together with its or their successors and permitted assigns (including any and all of its or their wholly-owned Affiliates to which it assigns, or they assign, any of its rights or obligations).

149. "*Real Property Sale*" means the sale of the Debtors' Unencumbered Real Property pursuant to section 363 of the Bankruptcy Code, if any.

150. "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

151. "*Rejection Notice*" means any applicable notice filed by the Debtors in accordance with the Assumption/Rejection Procedures Order, providing notice to counterparties of the Debtors' intent to reject an Executory Contract or Unexpired Lease.

152. "*Related Party*" means, collectively, with respect to any Person or Entity, each of, and in each case in its capacity as such, such Person's or Entity's current and former directors, managers, officers, committee members, members of any governing body, equityholders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns (whether by operation of Law or otherwise), subsidiaries, current, former, and future associated Entities, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, fiduciaries, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

153. "*Released Party*"  means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Wind-Down Debtors; (c) each of the DIP Lenders; (d) each of the Prepetition Lenders; (e) the Prepetition Agent; (f) the Equityholder Released Parties solely with respect to Equityholder Released Claims; (g) each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (h) each Related Party of each Entity in clause (a) through (g) *provided* that, notwithstanding the foregoing, in each case, an Entity shall not be a Released Party if it: (i) elects to opt out of the releases contained in Article X hereof; or (ii) timely objects to the releases contained in Article X hereof and such objection is not resolved before Confirmation; *provided,*

13

*further* that, for the avoidance of doubt, and notwithstanding anything to the contrary herein, no Equityholder Released Party shall be a Released Party with respect to any Equityholder Covered Claims.[2]

154. "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Wind-Down Debtors; (c) each of the DIP Lenders; (d) each of the Prepetition Lenders; (e) the Prepetition Agent; (f) the Equityholder Released Parties; (g) all Holders of Claims or Interests that vote to accept this Plan; (h) all Holders of Claims who are deemed to accept this Plan; (i) all Holders of Claims or Interests who abstain from voting on this Plan; (j) all Holders of Claims or Interests who vote to reject this Plan or are deemed to reject this Plan; (k) to the maximum extent permitted by Law, each current and former Affiliate of each Entity in clause (a) through the following clause (k); and (l) to the maximum extent permitted by Law, each Related Party of each Entity in clauses (a) through (k); *provided*, that, in each case, an Entity in clauses (g) through (l) shall not be a Releasing Party if it:  (i) affirmatively elects to opt out of the releases contained in Article X by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided for in this Plan; or (ii) timely objects to the releases contained in Article X hereof and such objection is not resolved before Confirmation; *provided*, *further*, that, notwithstanding anything to the contrary herein, the Equityholder Released Parties shall not be Releasing Parties if the Equityholder Settlement is not approved by the Bankruptcy Court.

155. "*Retained Causes of Action*" means, collectively, any Claim or Cause of Action that the Debtors or their Estates may hold as of the Plan Effective Date listed on the Schedule of Retained Causes of Action as Filed on or prior to the Plan Effective Date; *provided* that, for the avoidance of doubt, the retained Claims or Causes of Action shall not include any Claim or Cause of Action (a) transferred to any Purchaser pursuant to any Sale, (b) transferred to or vested in the Litigation Trust as a Permitted Litigation Claim, or (c) that is a Equityholder Released Claim.

156. "*RNDC*" means Republic National Distributing Company, LLC.

157. "*Sales*" means, collectively, one or more sales of some, all, or substantially all of the Debtors' assets conducted pursuant to section 363 of the Bankruptcy Code, whether by private sale or public auction.

158. "*Sale Documents*" means, collectively, all agreements, instruments, pleadings, orders, or other related documents utilized to consummate the Sales (if any), including, but not limited to, any Sale Motion, any Sale Order, and any Purchase Agreement.

159. "*Sale Motion*" means any motion filed by the Debtors seeking approval of one or more of the Sales.

160. "*Sale Order*" means an order of the Bankruptcy Court approving a Sale.

161. "*Second Lien Claims*" means any and all Claims, arising under, derived from, or based upon the Second Lien Loans.

162. "*Second Lien Credit Agreement*" means that certain subordinated credit agreement, dated as of December 19, 2024, by and among certain of the Debtors party thereto, the guarantors from time to time party thereto, and NDC, as a subordinated creditor, as may be further amended, restated, supplemented, or otherwise modified from time to time.

163. "*Second Lien Facility*" means that certain subordinated credit facility issued pursuant to the Second Lien Credit Agreement.

---

[2]   To the extent the Debtor Release covers the topics of the Additional Special Committee Investigation, such releases are subject to, and determined following, the completion of the Additional Special Committee Investigation.

164. "*Second Lien Lenders*" means, collectively, National Distributing Company, Inc. and any holder of participation interests in the Second Lien Credit Agreement.

165. "*Second Lien Loans*" means, collectively, the loans outstanding under the Second Lien Credit Agreement.

166. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule, if any, of the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned by the Wind-Down Debtors pursuant to this Plan, as set forth in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time, in accordance with Article V hereof.

167. "*Schedule of Retained Causes of Action*" means the schedule of Retained Causes of Action as set forth in the Plan Supplement.

168. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

169. "*Section 510(b) Claim*" means any and all Claims subject to subordination under section 510(b) of the Bankruptcy Code.

170. "*Secured Claim*" means a Claim that is: (a) secured by a valid, perfected, and enforceable Lien on collateral in which any of the Debtors has an interest to the extent of the value of the Debtors' interest in such collateral and to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable Holder's interest in the applicable Debtor's interest in such collateral or to the extent of the amount that is subject to setoff as determined pursuant to section 506(a) of the Bankruptcy Code; or (c) Allowed pursuant to this Plan, or separate order of the Bankruptcy Court, as a secured claim.

171. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

172. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

173. "*Solicitation Materials*" means all solicitation materials in respect of this Plan.

174. "*Special Committee*" means, collectively, the special committee of the independent and disinterested managers and directors of each of the boards of managers and boards of directors, as applicable, of each of the Debtors except for Debtor RNDC, Alaska, LLC, comprised of the Disinterested Directors.

175. "*Successor Entity*" means the Wind-Down Debtors.

176. "*U.S. Trustee*" means the United States Trustee for the Southern District of Texas.

177. "*Unencumbered Real Property*" means that certain real property owned by the Debtors located at 229 Distribution Drive, Lafayette, LA 70507, that is not subject to a valid, perfected, and enforceable Lien.

178. "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

179. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that are unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash.

180. "*Undeliverable Distribution Reserve*" shall have the meaning ascribed to such term in Article VIII.A hereof.

15

181. "*Voting Deadline*" means [●], 2026, at [4:00 p.m. (prevailing Central Time)].

182. "*Waterfall Recovery*" shall have the meaning ascribed to such term in Article IV.E hereof.

183. "*Wind-Down*" means the wind down, dissolution, and liquidation of the Debtors' Estates following the Plan Effective Date as set forth in Article VII.B hereof.

184. "*Wind-Down Budget*" means the budget to be delivered by the Debtors to the DIP Agent no later than [●] days prior to the Plan Effective Date, which shall project the Wind-Down Debtors' and Plan Administrator's receipts and disbursements, and expenditures from the Wind-Down Reserve, and shall be in form and substance acceptable to the Debtors and the DIP Agent.

185. "*Wind-Down Debtors*" means, collectively, the Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date.

186. "*Wind-Down Reserve*" means a segregated account established by the Plan Administrator in accordance with Article VIII.B in an amount sufficient to cover all (a)(i) Allowed Administrative Claims (excluding Professional Fee Claims), (ii) Allowed Priority Tax Claims, (iii) Allowed Other Secured Claims, and (iv) Allowed Other Priority Claims, in each case that are not otherwise paid in the ordinary course of business or not Assumed Liabilities pursuant to any Sale Documents (if any) and (b) the reasonable costs and expenses anticipated to be incurred by the Plan Administrator to administer the Plan on and after the Plan Effective Date pursuant to, and in accordance with, the Wind-Down Budget.

187. "*Wind-Down Transactions*" means, collectively, the transactions described in Article IV hereof, including the Sales (if any), and any and all mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Plan Administrator reasonably determines to be necessary to implement the Wind Down, as described in more detail in Article IV.D hereof.

188. "*Wind-Down Transactions Memorandum*" means the summary of transaction steps to complete the Wind-Down Transactions contemplated by this Plan.

### B. Rules of Interpretation

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to any particular portion of this Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time,

16

and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Wind-Down Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Plan Effective Date shall mean the Plan Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; and (18) unless otherwise specified, any action to be taken on the Plan Effective Date may be taken on or as soon as reasonably practicable thereafter.

## C.      Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.      Governing Law

Unless a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the Laws of the State of New York, without giving effect to the principles of conflict of Laws, shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing Law of such agreement shall control); *provided* that corporate governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the Laws of the state of incorporation or formation of the relevant Debtor.

## E.      Reference to Monetary Figures

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

## F.      Reference to the Debtors or the Wind-Down Debtors

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtor or the Wind-Down Debtors shall mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

## G.      Controlling Document

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of an inconsistency between this Plan and any document included in the Plan Supplement, the terms of the relevant provision in this Plan shall control (unless stated otherwise in such document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and this Plan, the Confirmation Order shall control.

## H.      Nonconsolidated Plan

Although for purposes of administrative convenience and efficiency this Plan has been Filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, this Plan does not provide for the substantive consolidation of any of the Debtors.

17

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, DIP CLAIMS, AND PROFESSIONAL FEE CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

### A.        Administrative Claims and Priority Tax Claims

Except as otherwise provided in this Article II.A. and except with respect to Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Allowed Administrative Claims must be made by the Administrative Claims Bar Date or in compliance with the Bar Date Order.  **Holders of Administrative Claims that are required to, but do not timely request payment on account of Administrative Claims as set forth in the Bar Date Order or by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or the Wind-Down Debtors, as applicable, or their property, and such Administrative Claims shall be deemed satisfied, settled, and released as of the Plan Effective Date**.  Objections to such requests, if any, must be Filed in compliance with the Bar Date Order.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) or Wind-Down Debtor(s), as applicable, agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid the unpaid portion of its Allowed Administrative Claim from the Wind-Down Reserve on the latest of:  (a) the Plan Effective Date if such Administrative Claim is Allowed as of the Plan Effective Date; (b) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Wind-Down Debtors' businesses that are required for the Wind-Down shall be paid in the ordinary course of business after the Plan Effective Date in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions (and no requests for payment of such Administrative Claims must be Filed or served).

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that any Allowed Priority Tax Claim that is not an Assumed Liability under any Sale Documents shall be satisfied in full by the Debtors or the Wind-Down Debtors, as applicable, from the Wind-Down Reserve.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Wind-Down Debtors and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

### B.        DIP Claims

On the Plan Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, and in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed DIP Claim, each Holder of an Allowed DIP Claim (which shall include interest, fees, and all other amounts due and owing under the DIP Facility) shall receive on account of such Allowed DIP Claim (a) payment in full in Cash or (b) such other terms agreed to by the Holders of DIP Claims.  To the extent any DIP Claims are not fully satisfied as of the Plan Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Administrative Claims in the full amount outstanding under the DIP Credit Agreement, including principal, interest, fees, costs, other charges, and expenses, and shall be satisfied from, or receive, as applicable (i) Cash in the

18

Wind-Down Reserve and, (ii) solely to the extent necessary, (A) the Distributable Proceeds in accordance with the Waterfall Recovery and (B) its Pro Rata share of the Litigation Trust Interests.

Upon the satisfaction of the Allowed DIP Claims in accordance with the terms of the Plan, the Waterfall Recovery, the Final DIP Order, and the Purchase Agreement(s), if any, all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Pursuant to the DIP Credit Agreement, all distributions pursuant to this Article II.B shall be made to the DIP Agent for distributions to the DIP Lenders in accordance with the DIP Credit Agreement and DIP Documents unless otherwise agreed upon in writing by the DIP Agent and the Debtors.  The DIP Agent shall hold or direct distributions for the benefit of the applicable Holders of DIP Claims.  The DIP Agent shall retain all rights as DIP Agent under the DIP Documents in connection with the delivery of the distributions to the DIP Lenders.  The DIP Agent shall not have any liability to any person with respect to distributions made or directed to be made by the DIP Agent.

### C.       Professional Compensation

#### 1.       Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than 45 days after the Plan Effective Date.  The Bankruptcy Court shall determine the Allowed Amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court, including the Interim Compensation Order.  The Wind-Down Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows from the Professional Fee Escrow Account promptly after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, to the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A hereof.

#### 2.       Professional Fee Escrow Account

On the Plan Effective Date, the Wind-Down Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates or property of the Plan Administrator.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Wind-Down Debtors or the Plan Administrator, as applicable, as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all Allowed amounts owing to the Professionals have been paid in full, any amount remaining in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors or the Plan Administrator, as applicable, for distribution in accordance with the Waterfall Recovery without any further action or order of the Bankruptcy Court.

#### 3.       Professional Fee Reserve Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Plan Effective Date, and shall deliver such estimate to the Debtors no later than five Business Days before the anticipated Plan Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Wind-Down Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.

4.    Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtors or the Plan Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### ARTICLE III.
### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**A.    Summary of Classification**

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and Plan distributions and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  Except as otherwise provided in this Plan, a Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Plan Effective Date.

The classification of Claims in and Interests against each Debtor pursuant to this Plan is set forth below.  This Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.

1.    Class Identification

The classification of Claims in and Interests against each Debtor (as applicable) pursuant to this Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Prepetition ABL/FILO Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 5 | Owner Notes Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Prepetition ABL/FILO Deficiency Claims | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |

20

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 10 | Interests in RNDC | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.        Treatment of Claims and Interests**

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Wind-Down Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Plan Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.        Class 1 – Other Secured Claims

a.        *Classification*: Class 1 consists of all Other Secured Claims.

b.        *Treatment*: On or as soon as reasonably practicable after the Plan Effective Date, to the extent that each Holder of an Allowed Other Secured Claim was either not paid during the Chapter 11 Cases or not an Assumed Liability under the Purchase Agreement, except to the extent that such Holder agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Wind-Down Debtor, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

i.        payment in full in Cash of such Holder's Allowed Other Secured Claim;

ii.        the collateral securing such Holder's Allowed Other Secured Claim;

iii.        Reinstatement of such Holder's Allowed Other Secured Claim; or

iv.        such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

c.        *Voting*: Class 1 is Unimpaired under this Plan. Holders of Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

2.        Class 2 – Other Priority Claims

a.        *Classification*: Class 2 consists of all Other Priority Claims.

b.        *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later to occur of (i) the Plan Effective Date, and (ii) the date such Claim becomes Allowed (or as otherwise set forth in this Plan), each Holder of an Allowed Other Priority Claim will either be satisfied in full, in Cash, by the Debtors or the Wind-Down Debtors, or otherwise receive treatment consistent with the provisions of

21

section 1129(a)(9) of the Bankruptcy Code, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim.

    c.    *Voting*: Class 2 is Unimpaired under this Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted this Plan under section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

3.    Class 3 – Prepetition ABL/FILO Claims

    a.    *Classification*: Class 3 consists of all Prepetition ABL/FILO Claims.

    b.    *Allowance*: The Prepetition ABL/FILO Claims shall be Allowed in the aggregate amount of $[●] plus accrued but unpaid interest, fees, and all other amounts due under the Prepetition Credit Agreement.

    c.    *Treatment*: On or as soon as reasonably practicable after the Plan Effective Date, except to the extent that each Holder of an Allowed Prepetition ABL/FILO Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition ABL/FILO Claim shall receive its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery.

    d.    *Voting*: Class 3 is Impaired under the Plan. Holders of Allowed Prepetition ABL/FILO Claims are entitled to vote to accept or reject the Plan.

4.    Class 4 – Second Lien Claims

    a.    *Classification*: Class 4 consists of all Second Lien Claims.

    b.    *Treatment*: On the Plan Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Second Lien Claim, all Allowed Second Lien Claims, including, for the avoidance of doubt, any participation interests therein held by the NBG Released Parties, shall be waived, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Allowed Second Lien Claims.

    c.    *Voting*: Class 4 is Impaired. Holders of Allowed Second Lien Claims are deemed to have rejected this Plan and are not entitled to vote to accept or reject this Plan.

5.    Class 5 – Owner Notes Claims

    a.    *Classification*: Class 5 consists of all Owner Notes Claims.

    b.    *Treatment*: On the Plan Effective Date, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Owner Notes Claim, all Allowed Owner Notes Claims shall be waived, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Allowed Owner Notes Claims.

    c.    *Voting*: Class 5 is Impaired. Holders of Allowed Owner Notes Claims are deemed to have rejected this Plan and are not entitled to vote to accept or reject this Plan.

6.     Class 6 – Prepetition ABL/FILO Deficiency Claims

   a.     *Classification*:  Class 6 consists of all Prepetition ABL/FILO Deficiency Claims.

   b.     *Treatment*:  On or as soon as reasonably practicable after the Plan Effective Date, except to the extent that each Holder of an Allowed Prepetition ABL/FILO Deficiency Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition ABL/FILO Deficiency Claim shall receive (i) its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery and (ii) its Pro Rata share of the Litigation Trust Interests.

   c.     *Voting*:  Class 6 is Impaired under the Plan.  Holders of Allowed Prepetition ABL/FILO Deficiency Claims are entitled to vote to accept or reject the Plan.

7.     Class 7 – General Unsecured Claims

   a.     *Classification*:  Class 7 consists of all General Unsecured Claims.

   b.     *Treatment*:  On or as soon as reasonably practicable after the Plan Effective Date, except to the extent that each Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive (i) its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery, (ii) its Pro Rata share of the Litigation Trust Interests, (iii) its Pro Rata share of the GUC Cash Consideration.

   c.     *Voting*:  Class 7 is Impaired under this Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject this Plan.

8.     Class 8 – Intercompany Claims

   a.     *Classification*:  Class 8 consists of all Intercompany Claims.

   b.     *Treatment*:  On or as soon as reasonably practicable after the Plan Effective Date, to the extent not assumed pursuant to the terms of the applicable Sale Order, Allowed Intercompany Claims shall be, at the option of the applicable Debtor or Wind-Down Debtor, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Allowed Intercompany Claim:  (i) Reinstated; (ii) set off, settled, addressed, distributed, contributed, merged, cancelled, or released without any distribution on account of such Intercompany Interests; or (iii) otherwise addressed at the option of the Debtors or the Wind-Down Debtors.

   c.     *Voting*:  Holders of Intercompany Claims are either Unimpaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted this Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Claims are not entitled to vote to accept or reject this Plan.

9.     Class 9 – Intercompany Interests

   a.     *Classification*:  Class 9 consists of all Intercompany Interests.

   b.     *Treatment*:  On or as soon as reasonably practicable after the Plan Effective Date, Allowed Intercompany Interests shall be, at the option of the applicable Debtor or Wind-Down Debtor, in full and final satisfaction, compromise, settlement, and

23

release of and in exchange for its Allowed Intercompany Interest:  (i) Reinstated; (ii) set off, settled, addressed, distributed, contributed, merged, cancelled, or released without any distribution on account of such Intercompany Interests; or (iii) otherwise addressed at the option of the Debtors or the Wind-Down Debtors.

    c.    *Voting*:  Holders of Intercompany Interests are either Unimpaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted this Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject this Plan.

10.    <u>Class 10 – Interests in RNDC</u>

    a.    *Classification*:  Class 10 consists of all Interests in RNDC.

    b.    *Treatment*:  On the Plan Effective Date, in full and final satisfaction, settlement, release, and discharge of the Allowed Interests in RNDC, each Allowed Interest in RNDC shall be cancelled, released, and extinguished and will be of no further force or effect, and Holders of Interests in RNDC shall not receive any distribution, property, or other value under the Plan on account of such Interest in RNDC.

    c.    *Voting*:  Class 10 is Impaired under the Plan.  Holders of Interests in RNDC are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders of Interests in RNDC are not entitled to vote to accept or reject the Plan.

11.    <u>Class 11 – Section 510(b) Claims</u>

    a.    *Classification*:  Class 11 consists of all Section 510(b) Claims.

    b.    *Treatment*:  On the Plan Effective Date, all Section 510(b) Claims shall be canceled, released, discharged, and extinguished without any distribution and will be of no further force or effect, and each Holder of a Section 510(b) Claim shall not receive or retain any distribution, property, or other value on account of its Section 510(b) Claim.

    c.    *Voting*:  Class 11 is Impaired.  Holders of Section 510(b) Claims are deemed to have rejected this Plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

**C.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims and Interests.  The Debtors reserve the right to modify this Plan in accordance with <u>Article XII</u> hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**D.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in this Plan, nothing under this Plan shall affect the Debtors' or the Wind-Down Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable

defenses to or setoffs or recoupments against any such Claims that are Unimpaired.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under this Plan.

### E.        Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### F.        Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class of Claims or Interests is eligible to vote and no Holder of such Claims or Interests, as applicable, in such Class votes to accept or reject this Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted this Plan.

### G.        Subordinated Claims and Interests

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### ARTICLE IV.
### MEANS FOR IMPLEMENTATION OF THE PLAN

### A.        Settlement of Claims and Interests

Pursuant to the Bankruptcy Code and Bankruptcy Rules, and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Interests, Causes of Action, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their respective Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of this Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Plan Effective Date, the Wind-Down Debtors may compromise and settle Claims against the Debtors and their respective Estates and Causes of Action against other Entities.

### B.        The Equityholder Settlement

This Plan provides for and implements the Equityholder Settlement.  Pursuant to the Equityholder Settlement, the Equityholder Settlement Parties have agreed to the terms of this Plan, including the treatment of Claims and Interests and releases of Claims and Causes of Action set forth herein.  The compromises and settlements included in the Equityholder Settlement are necessary and integral to this Plan and the success of these Chapter 11 Cases.

This Plan serves as a motion to approve the Equityholder Settlement pursuant to Bankruptcy Rule 9019.  The Bankruptcy Court's entry of the Confirmation Order shall constitute approval of the compromises and settlements provided for in the Equityholder Settlement, and the Bankruptcy Court's findings shall constitute its determination that the compromises and settlements are in the best interests of the Debtors, their Estates, Holders of Claims and

25

Interests, and other parties in interest, and are fair, equitable, and reasonable.  The Debtors, the Wind-Down Debtors, the Plan Administrator, or the Litigation Trustee, as applicable, are authorized to take all necessary and appropriate actions to implement the Equityholder Settlement following the Bankruptcy Court's approval thereof.

1.      NBG Settlement Consideration

Following good-faith, arm's-length negotiations, and in exchange for the releases and other valuable consideration provided for in this Plan, NBG, on behalf of itself and the other NBG Released Parties, agreed to the NBG Settlement, pursuant to which the NBG Released Parties shall:  (a) provide a Cash payment of $10.25 million to the Debtors on the Plan Effective Date, with the agreement that none of the NBG Released Parties shall seek to have any portion of the $10.25 million or the professional fees associated with the negotiation of the NBG Settlement reimbursed from the D&O Liability Insurance Policies or indemnified by any Debtor or Wind-Down Debtor, as applicable; (b) waive any right to recover from any Debtor, directly or indirectly, on account of any amounts related to their Second Lien Facility Claims; (c) waive any right to recover from any Debtor, directly or indirectly, on account of any amounts related to their Deferred Compensation Plan Claims, as applicable, (d) subject to the limitations set forth in this Plan and the Litigation Trust Documents, agree to the formation of the Litigation Trust with respect to the NBG Covered Claims; and (e) waive any right to recover from any Debtor, directly or indirectly, on account of any amounts related to their Owner Notes Claims ((a)–(e), collectively, the "NBG Settlement Consideration").

For U.S. federal and applicable state and local income tax purposes, the Debtors and the NBG Released Parties agree to treat the Cash payment of $10.25 million by the NBG Released Parties to the Debtors as first, a contribution of Cash to NBG by the equityholders of NBG that are NBG Released Parties, and second, a capital contribution to RNDC by NBG governed by section 721(a) of the IRC.  The Debtors, the NBG Released Parties, and their respective Affiliates shall file all tax returns in accordance with, and not take any tax-related action inconsistent with, the foregoing intended tax treatment, in each case, unless otherwise required by a "determination" within the meaning of section 1313(a) of the IRC.

2.      NDC Settlement Consideration

Following good-faith, arm's-length negotiations, and in exchange for the releases and other valuable consideration provided for in this Plan, NDC, on behalf of itself and the other NDC Released Parties, agreed to the NDC Settlement, pursuant to which the NDC Released Parties shall:  (a) provide a Cash payment of $40 million to the Debtors on the Plan Effective Date, with the agreement that none of the NDC Released Parties shall seek to have any portion of the $40 million or the professional fees associated with the negotiation of the NDC Settlement reimbursed from the D&O Liability Insurance Policies or indemnified by any Debtor or Wind-Down Debtor, as applicable; (b) waive any right to recover from any Debtor, directly or indirectly, on account of any amounts related to their Second Lien Facility Claims; (c) waive any right to recover from any Debtor, directly or indirectly, on account of any amounts related to their Deferred Compensation Plan Claims, as applicable, and (d) subject to the limitations set forth in this Plan and the Litigation Trust Documents, agree to the formation of the Litigation Trust with respect to the NDC Covered Claims ((a)–(d), collectively, the "NDC Settlement Consideration").

For U.S. federal and applicable state and local income tax purposes, the Debtors and the NDC Released Parties agree to treat the Cash payment of $40 million by the NDC Released Parties to the Debtors as first, a contribution of Cash to NDC Partners, LLC, made directly or indirectly by the direct and indirect equityholders of NDC Partners, LLC that are NDC Released Parties, and second, a capital contribution to RNDC by NDC Partners, LLC governed by section 721(a) of the IRC.  The Debtors, the NDC Released Parties, and their respective Affiliates shall file all tax returns in accordance with, and not take any tax-related action inconsistent with, the foregoing intended tax treatment, in each case, unless otherwise required by a "determination" within the meaning of section 1313(a) of the IRC.

**C.      Litigation Trust**

Notwithstanding anything to the contrary herein, in connection with the Equityholder Settlement, on the Plan Effective Date, the Debtors shall execute the Litigation Trust Agreement and take all necessary steps to establish the Litigation Trust for the benefit of the Litigation Trust Beneficiaries as one or more standalone trusts and/or sub-trusts in accordance with this Plan and the Litigation Trust Documents.  Notwithstanding anything to the contrary herein,

26

the Debtors and the Wind-Down Debtors, as applicable, shall irrevocably transfer all of their rights, title, and interest in the Litigation Trust Assets to the Litigation Trust, which, except to the extent the Debtors or the Wind-Down Debtors determine otherwise to treat all or any portion of the Litigation Trust as a "qualified settlement fund," "disputed ownership fund," "widely held fixed investment trust," and/or otherwise, shall be intended to be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations, and such treatment as a "liquidating trust" is assumed with respect to the following discussion.  For the avoidance of doubt, in the event of any transfer of the Litigation Trust Assets to the Litigation Trust, the provisions set forth herein shall continue to govern all matters associated with the prosecution, settlement, or collection upon any Permitted Litigation Claims transferred to the Litigation Trust.  The Litigation Trust shall be established for the primary purpose of liquidating the Litigation Trust Assets, reconciling such Claims as are expressly assigned to the Litigation Trust under this Plan or the Litigation Trust Documents, and distributing the proceeds thereof in accordance with this Plan and the Litigation Trust Documents, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Litigation Trust and the purposes described in this Plan.  Upon the transfer of the Litigation Trust Assets to the Litigation Trust, the Debtors and the Wind-Down Debtors, as applicable, will have no reversionary or further interest in, or with respect to, the Litigation Trust Assets.

The (a) establishment, purpose, and administration of the Litigation Trust, (b) appointment, rights, and powers, of the Litigation Trustee, and (c) treatment of the Litigation Trust for federal income tax purposes, among other things, shall be governed by the Litigation Trust Agreement.  On and after the Plan Effective Date, the Litigation Trustee shall be authorized, in accordance with the terms of this Plan and the Litigation Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of any Litigation Trust Assets.

### 1.    Transfer of Permitted Litigation Claims

In furtherance of the transfer of the Litigation Trust Assets to the Litigation Trust and in accordance with the Litigation Trust Agreement, on the Plan Effective Date, the Debtors and/or the Wind-Down Debtors, as applicable, shall be deemed to have irrevocably vested in, transferred, granted, and assigned to the Litigation Trust, and the Litigation Trust shall receive and accept, any and all of the Permitted Litigation Claims.  The foregoing transfer shall be:  (a) free and clear of any and all actual or alleged Liens or encumbrances of any nature whatsoever pursuant to section 1141 of the Bankruptcy Code; (b) made to the maximum extent possible under applicable Law; (c) absolute and without requirement of any further action by the Debtors, the Wind-Down Debtors, the Litigation Trustee, the Bankruptcy Court, or any other Person; and (d) governed by, and construed in accordance with the Bankruptcy Code and the other applicable Laws governing such Permitted Litigation Claims.

Notwithstanding the foregoing, the Litigation Trustee shall have the power to assign and/or transfer the Permitted Litigation Claims in accordance with the Litigation Trust Documents, subject to reasonable restrictions so as not to interfere with, increase costs to, or impede the efforts of the Litigation Trust, as further described in the Litigation Trust Documents, to the extent permitted by applicable Law.  The Litigation Trustee, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Permitted Litigation Claims in accordance with this Plan and the Litigation Trust Agreement.

### 2.    Vesting of the Litigation Trust Assets in the Litigation Trust

The corpus of the Litigation Trust shall consist of the Litigation Trust Assets.  On the Plan Effective Date, the Litigation Trust shall hold and administer the Litigation Trust Assets in accordance with this Plan and the Litigation Trust Documents.  From and after the Plan Effective Date, all proceeds of the Litigation Trust Assets shall be paid to the Litigation Trust to be applied in accordance with this Plan, including the treatment of claims set forth in Article III hereof, and the Litigation Trust Documents.  For the avoidance of doubt, any insurance proceeds paid pursuant to an insurance Claim asserted by or on behalf of the Litigation Trust must be paid into the Litigation Trust.

### 3.    Institution and Maintenance of Legal and Other Proceedings

On the Plan Effective Date (and subject to the establishment of the Litigation Trust):  (a) the Litigation Trust shall be empowered, and have the sole authority, to initiate, prosecute, defend, and resolve (as applicable) all legal actions and other proceedings related to any asset, liability, or responsibility of the Litigation Trust, including the Permitted Litigation Claims, that are transferred to the Litigation Trust by operation of this Plan, subject to the terms

and conditions of this Plan and the Litigation Trust Documents; and, (b) subject to applicable Law and contractual rights, the Litigation Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the date upon which the Litigation Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

4.      Claims Reconciliation

Solely with respect to the Permitted Litigation Claims, the Litigation Trustee shall have the rights and responsibilities set forth in this Plan and/or the Litigation Trust Documents with respect to reconciliation of Allowed General Unsecured Claims, including the authority to review, object to, settle, compromise, withdraw, or otherwise resolve such Claims, subject to any consultation, consent, or oversight rights set forth in this Plan or the Litigation Trust Documents.

5.      Litigation Trust Distributions

The Litigation Trust shall make distributions in accordance with this Plan, the Confirmation Order, and the Litigation Trust Documents.  Unless otherwise expressly provided for in this Plan or the Litigation Trust Documents, the Litigation Trust Beneficiaries shall share in distributions from the Litigation Trust on account of their Litigation Trust Interests.  For the avoidance of doubt, no Holder shall be entitled to receive a distribution on account of any recoveries from Permitted Litigation Claims where such Holder is the defendant in connection with such Permitted Litigation Claims.

6.      Litigation Trust Tax Treatment

To the extent reasonably practicable, the Debtors intend to treat the Litigation Trust as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d).  If such treatment applies, then for U.S. federal income tax purposes the Litigation Trust Beneficiaries would be treated as the grantors of the Litigation Trust and as the deemed owners of the Litigation Trust Assets.  For U.S. federal income tax purposes, the transfer of assets to the Litigation Trust would be deemed to occur as (a) a first-step transfer of the Litigation Trust Assets to the Litigation Trust Beneficiaries, and (b) a second-step transfer by such Litigation Trust Beneficiaries to the Litigation Trust.

No request for a ruling from the IRS will be sought on the classification of the Litigation Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust. If the IRS were to successfully challenge the classification of the Litigation Trust as a grantor trust, the federal income tax consequences to the Litigation Trust and its beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Litigation Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.  The Litigation Trust shall, in no event, be dissolved later than five years from the creation of such Litigation Trust unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five years with a private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension

Allocations of taxable income and loss of the Litigation Trust among the Litigation Trust Beneficiaries shall be determined by reference to the Litigation Trust Beneficiaries' economic entitlements in respect of the Litigation Trust, as will be further described in the organizational documents of the Litigation Trust.

Assuming that the tax treatment above applies, the Litigation Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information

28

concerning certain items relating to the holding or disposition (or deemed disposition) of the Litigation Trust Assets (e.g., income, gain, loss, deduction and credit). Each Litigation Trust Beneficiary holding a Litigation Trust beneficial interest will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Litigation Trust will pertain to Litigation Trust Beneficiaries who receive their Litigation Trust beneficial interests in connection with the Plan.

7.    Disputed Ownership Fund, Qualified Settlement Fund, or Widely Held Fixed Investment Trust Treatment

Notwithstanding the foregoing, to the extent the Debtors or the Wind-Down Debtors, as applicable, determine in their reasonable discretion to treat all or any portion of the Litigation Trust as a "disputed ownership fund" under section 1.468B-9 of the Treasury Regulations or a "qualified settlement fund" under section 1.468B-1 of the Treasury Regulations, any appropriate elections with respect thereto shall be made, and such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return may be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

8.    Litigation Trustee

The Litigation Trust shall be administered by the Litigation Trustee.  The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Trust Agreement and shall include, without limitation, the power to:  (a) hire and compensate professionals and advisors selected by the Litigation Trustee in consultation with the Litigation Trust Advisory Board; (b) investigate, prosecute, and settle Permitted Litigation Claims, subject to any applicable consent rights described herein; and (c) make distributions on account of the Litigation Trust Assets to the Litigation Trust Beneficiaries, in each case in accordance with the Plan, the Confirmation Order, and the Litigation Trust Agreement.  The compensation of the Litigation Trustee shall be governed by the Litigation Trust Agreement.

The Litigation Trustee shall report to and be overseen by a four-member oversight committee (the "Litigation Trust Advisory Board").  Each member of the Litigation Trust Advisory Board shall have a fiduciary obligation to the beneficiaries of the Litigation Trust.  The Litigation Trust Advisory Board shall initially consist of (a) two members selected by the DIP Agent, (b) one member selected by the Special Committee, and (c) one member selected by the Creditors' Committee.

Subject to the terms of this Plan and the Litigation Trust Agreement, subject to the unanimous vote of the Litigation Trust Advisory Board, the Litigation Trustee shall have the right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment, any such Permitted Litigation Claims, or to decline to do any of the foregoing, without the consent, or approval, of any third party or any further notice to, or action, order, or approval, of the Bankruptcy Court; *provided, however*, that with respect to any Permitted Litigation Claims that constitute Equityholder Covered Claims against any Equityholder Released Party, (a) any recovery by any party, including the Litigation Trustee, the Litigation Trust, or the beneficiaries thereof, on account of such Permitted Litigation Claims, including, in each case, by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the D&O Liability Insurance Policies, after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred by any of the Equityholder Released Parties in connection with the defense of the Permitted Litigation Claims, (b) the Litigation Trustee, the Litigation Trust, the beneficiaries thereof, or any other party seeking to execute, garnish, or otherwise attempt to collect on any settlement of, or judgement in, such Permitted Claims shall do so solely upon available D&O Liability Insurance Policy coverage, and (c) neither the Litigation Trustee, the Litigation Trust, the beneficiaries thereof, nor any other party shall (i) record any judgment against any Equityholder Released Party or (ii) otherwise attempt to collect, directly or indirectly, from the individual, personal, marital, or joint interests or assets of any Equityholder Released Party (be it held through corporation, limited liability company, trust, or otherwise), other than the proceeds of any D&O Liability Insurance Policies.

Solely to the extent necessary and in furtherance of the duties of the Litigation Trustee in accordance with the Litigation Trust Agreement, following the Plan Effective Date, the Litigation Trustee shall be deemed to be a judicial substitute for the Wind-Down Debtors or Plan Administrator, as applicable, as the party in interest in the

29

Chapter 11 Cases, consistent with section 1123(b)(3)(B) of the Bankruptcy Code.  The Litigation Trustee shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers, including upon advice of counsel, unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence, or willful misconduct; *provided* that, notwithstanding the foregoing, the Litigation Trustee shall owe a fiduciary duty of care and loyalty to all beneficiaries of the Litigation Trust (but, for the avoidance of doubt, the Litigation Trustee shall not owe a fiduciary duty to the Debtors or the Wind-Down Debtors).

The Litigation Trustee may be removed by the Bankruptcy Court upon application by any party in interest for cause shown.  In the event of the resignation or removal, liquidation, dissolution, death, or incapacity of the Litigation Trustee, the Litigation Trust Advisory Board shall designate another Person to become the Litigation Trustee and thereupon the successor Litigation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.

## D.        Wind-Down Transactions

On the Plan Effective Date, or as soon as reasonably practicable thereafter, the Wind-Down Debtors shall take all actions as may be necessary or appropriate to effectuate the Wind-Down Transactions, including as set forth in the Wind-Down Transactions Memorandum, including, without limitation:  (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of this Plan, and that satisfy the requirements of applicable Law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state Law; (d) such other transactions that are required to effectuate the Wind-Down Transactions; (e) all transactions necessary to provide for the purchase of some or all of the assets of, or Interests in, any of the Debtors, which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (f) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate this Plan.

The Confirmation Order shall and shall be deemed to, pursuant to both sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

The Confirmation Order shall authorize the Debtors, the Wind-Down Debtors, and the Plan Administrator, as applicable, to undertake the Wind-Down Transactions contemplated by the Definitive Documents, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

## E.        Distributable Proceeds and Waterfall Recovery.

On or after the Plan Effective Date, the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall make distributions on account of Allowed Claims in accordance with Article III.B hereof using the Distributable Proceeds, which shall be paid to Holders of Allowed Claims until paid in full from time to time in the following priority (in each case on a Pro Rata basis): (a) *first*, on account of any unpaid DIP Claims (in Cash, unless Holders of Allowed DIP Claims agree to alternative treatment), if any; (b) *second*, on account of Allowed Administrative Claims and Priority Tax Claims (other than DIP Claims and Professional Fee Claims), if any; (c) *third*, on account of Allowed Other Secured Claims (solely to the extent that such proceeds are on account of collateral for such Allowed Other Secured Claim), if any; (d) *fourth*, on account of Allowed Other Priority Claims, if any; (e) *fifth*, on account of Allowed Prepetition ABL/FILO Claims, if any; and (f) *sixth*, on account of Allowed Prepetition ABL/FILO Deficiency Claims and Allowed General Unsecured Claims, if any (collectively, the "Waterfall Recovery").

F.        **The Wind-Down Reserve.**

On and after the Plan Effective Date, the Plan Administrator shall administer the Wind-Down Reserve.

All funds in the Wind-Down Reserve constitute property of the Estate, and are free and clear of all liens, claims, or encumbrances; *provided* that, until the DIP Claims have been paid in full in Cash, unless otherwise agreed to by the DIP Lenders in accordance with the DIP Orders and the DIP Credit Agreement, the DIP Agent shall continue to maintain perfected, first-priority liens and security interests in the property in the Wind-Down Reserve, in accordance with the DIP Orders. The Wind-Down Reserve shall be used to pay Holders of all Allowed Administrative Claims (other than Professional Fee Claims), Allowed Other Priority Tax Claims, Allowed Other Secured Claims, Allowed Other Priority Claims their respective Pro Rata share of the Wind-Down Reserve, to the extent that such Administrative Claims (other than Professional Fee Claims), Priority Tax Claims, Other Secured Claims, and Other Priority Claims have not been paid in full on or before the Plan Effective Date. If all or any portion of an Administrative Claim (other than Professional Fee Claim), Priority Tax Claim, Other Secured Claim, or Other Priority Claim shall become a Disallowed Claim, then the amounts on deposit in the Wind-Down Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Wind-Down Reserve, shall remain in the Wind-Down Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Wind-Down Reserve is sufficient to ensure that all Allowed Administrative Claims (other than Professional Fee Claims), Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims will be paid in accordance with this Plan, and shall otherwise promptly be transferred to the General Account to be distributed in accordance with this Plan without any further action or order of the Bankruptcy Court.

The Wind-Down Reserve shall also be used by the Plan Administrator to satisfy the expenses of the Wind-Down Debtors, and the Plan Administrator as set forth in this Plan and the Wind-Down Budget; *provided* that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents shall constitute expenses of the Wind-Down Debtors and shall be paid from the Wind-Down Reserve to the extent set forth in the Wind-Down Budget. In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes. Any amounts remaining in the Wind-Down Reserve after payment of all expenses of the Wind-Down Debtors and the Plan Administrator, and all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims (or any amount in excess of that reasonably needed to be reserved for any Disputed Claims) shall promptly be transferred to the General Account and shall be distributed according to the Waterfall Recovery without any further action or order of the Bankruptcy Court.

Any contrary provision hereof notwithstanding, Allowed Administrative Claims (other than Professional Fee Claims), Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims shall be paid exclusively from (a) the Wind-Down Reserve, and, (b) solely to the extent necessary, the Distributable Proceeds pursuant to the Waterfall Recovery.

G.        **Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the later of the Plan Effective Date and the date on which distributions are made pursuant to this Plan (if not made on the Plan Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under this Plan or to the extent otherwise specifically provided for in this Plan, the Confirmation Order, the Definitive Documents, or any agreement, instrument, or other document entered into in connection with or pursuant to this Plan or the Wind-Down Transactions, all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto, and the duties and obligations of the Debtors or the Wind-Down Debtors, as applicable, any non-Debtor Affiliates shall be deemed satisfied in full, cancelled, released, discharged, and of no force or effect.

31

**H.      Means for Implementation**

The Wind-Down Transactions will be consummated either through (a) Sales (if any) and (b) a Wind-Down pursuant to this Plan.

1.      Sources of Consideration for Plan Distributions

The Plan Administrator or the Litigation Trustee, as applicable, will fund distributions under this Plan from (a) the Wind-Down Reserve and (b) the Distributable Proceeds in accordance with the Waterfall Recovery; *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance.

2.      Vesting of Assets in the Wind-Down Debtors

Except as otherwise provided in this Plan, or any agreement, instrument, or other document incorporated herein or therein, on the Plan Effective Date, all property of the Estates other than the Litigation Trust Assets shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances, *provided* that, until the DIP Claims have been paid in full in Cash, unless otherwise agreed to by the DIP Lenders in accordance with the DIP Orders and the DIP Credit Agreement, the DIP Agent shall continue to maintain perfected, first-priority liens and security interests in the property of the Wind-Down Debtors, in accordance with the DIP Orders.  On and after the Plan Effective Date, the Debtors and the Wind-Down Debtors may (at the direction of the Plan Administrator) use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action, other than the Permitted Litigation Claims, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules; *provided, however*, that to the extent that any property disposed of pursuant to this Plan constitutes Inventory, such disposition shall be conducted in compliance with all applicable state and local Laws, rules, and regulations governing the disposal or transfer of such Inventory.

3.      Wind-Down Debtors

On and after the Plan Effective Date, if applicable, the Wind-Down Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) establishing and, to the extent not already funded, funding the Distribution Reserve Accounts, (e) enforcing and prosecuting claims, interests, rights, and privileges under all Causes of Action other than the Permitted Litigation Claims in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) filing appropriate tax returns, (g) complying with its continuing obligations under any Purchase Agreements, if any, (h) liquidating all assets of the Wind-Down Debtors, and (i) otherwise administering this Plan in an efficacious manner consistent with this Plan.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (A) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (B) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

4.      Plan Administrator

As set forth below, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a president and chief executive officer (and all certificates of formation, membership agreements, and related documents are deemed amended by this Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down and as otherwise provided in the Confirmation Order.  On the Plan Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Wind-Down Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole officer of the Wind-Down Debtors, and shall succeed to the rights, powers, duties and privileges of the Wind-Down Debtors' officers.  The Plan Administrator will replace all officers of each Debtor.  Subject to the terms of this Plan, among other duties normal

32

and customary of a director and officer responsible for winding down the affairs of a business, the Plan Administrator shall have the right and duty to investigate, prosecute, and compromise any and all of the Debtors' and Wind-Down Debtors' Claims and Causes of Action other than the Permitted Litigation Claims.

From and after the Plan Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors as further described in Article VII hereof.  The Plan Administrator shall have the authority to sell, liquidate, or otherwise dispose of any and all of the Wind-Down Debtors' assets without any additional notice to or approval from the Bankruptcy Court; *provided, however*, to the extent the assets constitute Inventory, such disposition shall be conducted in compliance with all applicable state and local Laws, rules, and regulations governing the disposal or transfer of such Inventory.

5.      Board of the Debtors

As of the Plan Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be deemed to have resigned without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.  Subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Plan Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Plan Effective Date, the Plan Administrator shall act as the sole officer of the Debtors with respect to its affairs.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of any of the Debtors under the applicable Laws of each applicable Debtor's state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax Laws; and (c) represent the interests of the Debtors or the Estates before any taxing authority in all tax matters, including any action, suit, proceeding, or audit.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable Law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of RNDC or any of its affiliates.

6.      Release of Liens

Except as otherwise provided herein, including in connection with the DIP Obligations, or in any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Plan Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Plan Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates shall be fully released, settled, and compromised, and the holder of such mortgages, deeds of trust, Liens, pledges, or other security interest against any property of the Debtors' Estates shall be authorized to take such actions as may be reasonably requested by the Debtors to evidence such releases.

7.      Preservation of Causes of Action

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Bankruptcy Court order, in accordance with section 1123(b) of the Bankruptcy Code, on the Plan Effective Date, all Causes of Action, other than the Permitted Litigation Claims, shall automatically vest in the Wind-Down Debtors, and the Plan Administrator shall have the right and authority to investigate, commence, prosecute, or settle, as appropriate, any and all the Retained Causes of Action, whether arising

33

before or after the Petition Date.  For the avoidance of doubt, the Equityholder Released Claims shall not be Retained Causes of Action and shall be released pursuant to this Plan.

No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Plan Administrator or the Litigation Trustee, as applicable, will not pursue any and all available Causes of Action against them.  No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors preserve the Retained Causes of Action and Permitted Litigation Claims notwithstanding the assumption or rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, on the Plan Effective Date, any Causes of Action that a Debtor (or its Estate) may hold against any Entity shall automatically vest in and become property of the Wind-Down Debtors or the Litigation Trust, as applicable, except as otherwise provided in this Plan.  The Wind-Down Debtors, the Plan Administrator, and the Litigation Trustee, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all Retained Causes of Action and Permitted Litigation Claims, as applicable, vested, transferred, or assigned to such entity.  The Debtors, the Plan Administrator, or the Litigation Trustee, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and Permitted Litigation Claims, as applicable, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; *provided that* the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall consult with the DIP Agent in connection with such Retained Causes of Action until the DIP Obligations have been paid in full in Cash.

## I.    Exemption from Certain Transfer Taxes and Fees

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including any Sale (if any), or the issuance, transfer, or exchange of any security under this Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

## J.    Corporate Action

Upon the Plan Effective Date, all actions contemplated under this Plan and the Definitive Documents, regardless of whether taken before, on, or after the Plan Effective Date, shall be deemed authorized and approved, and, to the extent taken prior to the Plan Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Plan Administrator, or any other Entity or Person in all respects.  All matters provided for in this Plan, the Definitive Documents, or deemed necessary or desirable by the Debtors before, on, or after the Plan Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with this Plan or corporate structure of the Debtors or Wind-Down Debtors shall be deemed to have occurred and shall be in effect on the Plan Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors.  Before, on, or after the Plan Effective Date, the appropriate directors, managers, officers, governing bodies, or other similarly authorized Persons of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, file (including File), record and/ deliver any agreements and documents, securities, and instruments contemplated under this Plan (or necessary, appropriate, or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Wind-Down Debtors.  The authorizations and approvals contemplated by this Section IV.J shall be effective notwithstanding any requirements under non-bankruptcy Law.

34

### K.        D&O Liability Insurance Policies

Notwithstanding anything in this Plan to the contrary, after the Plan Effective Date, the Wind-Down Debtors, the Plan Administrator, or the Litigation Trustee, as applicable, shall not terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Plan Effective Date, and all directors, officers, managers, and members of the Debtors who served in such capacity at any time prior to the Plan Effective Date shall be entitled to the full benefits of any such D&O Liability Insurance Policy for the full term of such D&O Liability Insurance Policy, to the extent set forth therein and in accordance with and subject in all respects to the terms and conditions of such D&O Liability Insurance Policy, which shall not be altered, regardless of whether such directors, officers, managers, and members remain in such positions after the Plan Effective Date.

Notwithstanding anything in this Plan to the contrary, on the Plan Effective Date, to the extent the D&O Liability Insurance Policies are executory, any and all D&O Liability Insurance Policies shall be deemed assumed by the Wind-Down Debtors pursuant to sections 105 and 365 of the Bankruptcy Code, and vest in the Litigation Trust, and nothing shall alter, modify, amend, expand, or otherwise affect any coverage for defense and indemnity under any applicable D&O Liability Insurance Policy available to any individuals and/or entities under such D&O Liability Insurance Policy in accordance with and subject in all respects to the terms and conditions of such D&O Liability Insurance Policy, which shall not be altered.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Wind-Down Debtors' foregoing assumption of the D&O Liability Insurance Policies.

To the extent the Debtors are not the first named insured under any D&O Liability Insurance Policy, and notwithstanding entry of the Confirmation Order or the occurrence of the Plan Effective Date, (a) nothing herein shall constitute a rejection of such D&O Liability Insurance Policy, (b) such D&O Liability Insurance Policy shall remain in full force and effect, and (c) any and all rights of the Debtors or the Wind-Down Debtors, as applicable, under the D&O Liability Insurance Policies shall remain in full force and effect.  For the avoidance of doubt, the dissolution of the Debtors, if any, shall not impact the rights of the Litigation Trust to assert Claims against the Equityholder Released Parties solely with respect to the Equityholder Covered Claims or to recover the proceeds of the D&O Liability Insurance Policies with respect thereto.

### L.        Indemnification Obligations

On and as of the Plan Effective Date, each Indemnification Obligation (other than those that may exist in the D&O Liability Insurance Policies and, if applicable, those assumed by any Purchaser in any Sale(s) pursuant to the terms of the applicable Sale Order) shall be rejected by the Debtors as of the Plan Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise; *provided* that, notwithstanding anything herein to the contrary, the Litigation Trustee's obligation to fund such Indemnification Obligations shall be limited to the extent of coverage available under the D&O Liability Insurance Policies in accordance with the terms and conditions thereof.  Accordingly, the Litigation Trust Assets and any proceeds therefrom (other than, for the avoidance of doubt, any D&O Liability Insurance Policies) will not be used to fund such Indemnification Obligations of the Debtors or the Litigation Trust, as applicable.

Notwithstanding anything herein to the contrary, no Persons or Entities that are not Released Parties shall be entitled to benefit from such Indemnification Obligations; *provided, however,* that, notwithstanding anything herein to the contrary, the Equityholder Released Parties shall have no right to seek or recover indemnification from any current or former director, officer, manager, member, or employee of the Debtors with respect to (a) any obligations arising under, or in connection with, the Equityholder Settlement, including any NBG Settlement Consideration or NDC Settlement Consideration payable thereunder, or (b) any obligations arising under, or in connection with, the Permitted Litigation Claims transferred to the Litigation Trust.  For the avoidance of doubt, any obligation to satisfy any Indemnification Obligation asserted by any Equityholder Settlement Released Party shall be limited to the extent of coverage under the D&O Liability Insurance Policies, in accordance with the terms and conditions thereof.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.       Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Plan Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, assumed and assigned, or included in a Rejection Notice shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (a) is specifically described in this Plan as to be assumed in connection with Confirmation of this Plan, is identified on a Cure Notice, is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases, or was assumed as part of a Sale; (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Confirmation Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with any Sale that is the subject of a pending motion as of the Confirmation Date; (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan; or (e) is a D&O Liability Insurance Policy.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Debtors shall make all assumption and rejection determinations for their Executory Contracts and Unexpired Leases either through the Filing of a motion or identification in the Plan Supplement, in each case prior to the applicable deadlines set forth in sections 365(d)(2) and 365(d)(4) of the Bankruptcy Code, and as further set forth in the 365(d)(4) extension order entered at Docket No. [●] (the "365(d)(4) Extension Order").  To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease by a deadline, including section 365(d) of the Bankruptcy Code, such requirement shall be satisfied if the Debtors make an election, either through the Filing of a motion or identification in the Plan Supplement or similar schedule in connection with the Sale Order, to assume or reject such Executory Contract or Unexpired Lease prior to the applicable deadline, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code; *provided* that neither this Plan nor the Confirmation Order is intended to or shall be construed as limiting the Debtors' authority under any Sale Order to assume and assign Executory Contracts and Unexpired Lease to any Purchaser pursuant to any Sale Documents.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Plan Effective Date shall be subject to approval by the Bankruptcy Court on or after the Plan Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Wind-Down Debtors or Plan Administrator, as applicable. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A. or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Wind-Down Debtors in accordance with its terms, except as such terms are modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal Law.

Notwithstanding anything to the contrary in this Plan or any Sale Documents, the Debtors, the Wind-Down Debtors, and the Plan Administrator, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases Schedule identified in this Article V of this Plan and in the Plan Supplement.  The Debtors or the Wind-Down Debtors, as applicable, shall provide notice of any amendments to the Schedule of Assumed Executory Contracts and Unexpired Leases to the parties to the Executory Contracts or Unexpired Leases affected thereby.  For the avoidance of doubt, this Article V relates to Executory Contracts or Unexpired Leases other than such agreements assumed, assumed and assigned, or rejected in accordance with the terms of any Sale Order.

### B.       Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by this Plan or a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (a) the date of

36

service of notice of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (b) the effective date of such rejection, or (c) the Plan Effective Date.  The notice of the Plan Supplement shall also be deemed appropriate notice of rejection when served on applicable parties.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Wind-Down Debtors, their Estates, or their property without the need for any objection by the Wind-Down Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary**.  Unless otherwise provided for herein, all Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III hereof or such other treatment as agreed to by the Wind-Down Debtors and the Holder of such Claim.

### C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any Cure Obligations under each Executory Contract and Unexpired Lease to be assumed pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by performance or payment of the Cure Obligation in Cash on or after the Plan Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (a) the Cure Obligation, (b) the ability of the Wind-Down Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the Cure Obligations shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

At least seven days before Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third-parties and their counsel (if known).  Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure amount much be Filed by the Cure/Assumption Objection Deadline.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption or assumption and assignment and Cure amount.  To the extent that the Debtors seek to assume and assign an Unexpired Lease pursuant to this Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule of Assumed Executory Contracts and Unexpired Leases and provide Adequate Assurance Information, which Adequate Assurance Information will be provided with the Cure Notice.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise, and the satisfaction of the Cure Obligations, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be barred from asserting such claims against the Debtors and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions from the Debtors on account of such claims in these Chapter 11 Cases.  The Debtors or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any claims Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned; *provided* that the Debtors will provide notice to such Claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such Claimant that its Claim will be removed from the Claims Register.  For the avoidance of doubt, with respect to any asserted non-monetary Cure Obligations, such Cure obligations may be cured (or resolved) by the assignee and the applicable counterparty in the ordinary course of business following the assumption and all parties reserve all rights with respect to any such asserted Cure obligations.

### D.    Insurance Policies

Each of the Debtors' Insurance Policies, including, for the avoidance of doubt, the D&O Liability Insurance Policies, and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under

this Plan.  Unless otherwise provided in this Plan, on the Plan Effective Date, (a) the Debtors shall be deemed to have assumed all Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (b) such Insurance Policies and any agreements, documents, or instruments relating thereto shall vest in the Wind-Down Debtors; *provided*, *however*, that the D&O Liability Insurance Policies and any agreements, documents, or instruments relating thereto shall vest in the Litigation Trust.  For the avoidance of doubt, this Article V.D does not apply to Insurance Policies or any agreements, documents, or instruments relating thereto that were transferred to any Purchaser in the Sales, if any.

### E.        Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed (or assumed and assigned) shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### F.        Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in this Plan or Plan Supplement, or any other exhibit, schedule, or annex, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under this Plan or the Sale Order (if any), as applicable.

### G.        Nonoccurrence of Plan Effective Date

In the event that the Plan Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Executory Contract or Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code.

### H.        Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into in the ordinary course of business after the Petition Date by any Debtor, including any Executory Contracts and/or Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Wind-Down Debtor in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected under this Plan will survive and remain unaffected by entry of the Confirmation Order, except as provided therein.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.        Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided herein or in the Confirmation Order, on the Plan Effective Date (or, if a Claim is not an Allowed Claim on the Plan Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Interest (or such Holder's affiliate) shall receive the full amount of the distributions that this Plan provides for Allowed Claims and Interests in each applicable

Class.  After such initial distribution, the Disbursing Agent shall distribute additional Distributable Value as soon as practicable upon such Distributable Value becoming available to the Debtors or the Wind-Down Debtors.  Such additional Distributable Value shall be distributed in accordance with Article III of this Plan provided for in this Plan.

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Article VI.  Except as otherwise provided in this Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Plan Effective Date.

### B.      Delivery of Distributions and Undeliverable or Unclaimed Distributions

1.      Disbursing Agent

All Plan Distributions shall be made by the applicable Disbursing Agent.  No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties.

a.      Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ Professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

b.      Expenses Incurred on or After the Plan Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Plan Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement Claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Wind-Down Debtors or from the Wind-Down Reserve, as applicable, and in accordance with the Wind-Down Budget.

2.      Delivery of Distributions

a.      Delivery of Distributions in General

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims, except as otherwise provided in this Article VI, or Interests shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent:  (a) to the signatory set forth on any of the Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Wind-Down Debtors after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Wind-Down Debtors have not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf. Subject to this Article VI, distributions under this Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in this Plan.  The Debtors and the Wind-Down Debtors shall not incur any liability whatsoever on account of any distributions under this Plan except for gross negligence or willful misconduct.

3.       Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred 20 or fewer days before the Distribution Record Date, Plan Distributions shall be made to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

4.       Minimum Distributions

Holders of Allowed Claims entitled to distributions of $100 or less shall not receive distributions, and each such Claim shall be discharged pursuant to Article X hereof and its Holder is forever barred pursuant to Article X hereof from asserting that Claim against the Wind-Down Debtors or their property.

5.       Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Plan Effective Date. After such date, all unclaimed property or interests in property shall revert to the applicable Wind-Down Debtors or the Plan Administrator, as applicable, without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

Cash payments in the form of checks shall be null and void if not cashed within 90 days after the date of issuance, notwithstanding any notation or legend on a distribution check that may specify a different period. Distributions in respect of such voided checks shall be treated as unclaimed or undeliverable Distributions as provided in this Plan as to which the requisite time period for asserting a claim for an undeliverable Distribution as set forth herein has passed. Requests for reissuance of any check must be made in writing to the Plan Administrator by Holders of such Allowed Claims that originally was issued such check, which request shall be made within 90 days after the date of issuance thereof.

C.       **Tax Issues and Compliance with Tax Requirements**

In connection with this Plan, to the extent applicable, the Debtors, Wind-Down Debtors, or the Plan Administrator, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to this Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Disbursing Agent reserves the right to allocate all distributions made under this Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

For any property deposited into a Claim distribution account described elsewhere in this Plan that is subject to disputed ownership fund treatment under section 1.468B-9 of the United States Treasury Regulations, all corresponding elections with respect to such account shall be made, and such treatment shall be applied to the extent possible for state, local, and non-U.S. tax purposes. Under such treatment, a separate federal income tax return would be filed with the IRS with respect to such accounts, and any taxes (including with respect to interest, if any, or appreciation in property between the Plan Effective Date and date of distribution) imposed on such accounts would be paid out of the assets of such accounts (and reductions would be made to amounts disbursed from such accounts to account for the need to pay such taxes).

40

D.      **Allocations**

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

E.      **No Postpetition or Default Interest on Claims**

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the DIP Orders, this Plan, or the Confirmation Order, or required by applicable bankruptcy Law, (a) postpetition and/or default interest shall not accrue or be paid on any Claims, and (b) no Holder of a Claim shall be entitled to (i) interest accruing on or after the Petition Date on any such Claim or (ii) interest at the contract default rate, as applicable.

F.      **Manner of Payment**

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer.

G.      **Setoffs and Recoupment**

Except as expressly provided in this Plan, the Debtors or the Wind-Down Debtors, as applicable, may, pursuant to section 553 of the Bankruptcy Code, setoff and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that the Debtors or the Wind-Down Debtors, as applicable, may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount among the Debtors or the Wind-Down Debtors, as applicable, and the Holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Wind-Down Debtors, as applicable, or, in each case, their successor of any and all claims, rights, and Causes of Action that the Debtors or the Wind-Down Debtors, as applicable, or, in each case, their successor may possess against the applicable Holder.  Notwithstanding anything to the contrary herein, in no event shall any Holder of a Claim be entitled to (a) setoff any such Claim against any Purchaser following consummation of the Sales (if any) or (b) recoup such Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Wind-Down Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XIV.G hereof on or before the Plan Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

H.      **No Double Payment of Claims**

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall be only a single recovery on account of that Allowed Claim.  No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by this Plan only until payment in full on that Allowed Claim.

I.      **Claims Paid or Payable by Third Parties**

1.      Claims Paid by Third Parties

To the extent that the Holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor or Wind-Down Debtor, such Holder shall be barred from asserting such Claim against the Debtors and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions from the Debtors on account of such claims in these Chapter 11 Cases.  The Debtors or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any claims Filed with respect to an Executory Contract or Unexpired Lease that received payment in full on account of such Claim from a party that is not a Debtor or Wind-Down Debtor; *provided* that the Debtors will provide notice to such Claimant at the address

41

or email address on the Proof of Claim, to the extent such information is provided, informing such Claimant that its Claim will be removed from the Claims Register.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or Wind-Down Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor or Wind-Down Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove the applicable portion of such Claim; *provided* that the Debtors will provide notice to such Claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such Claimant that its Claim will be removed from the Claims Register.

3.      Applicability of Insurance Policies

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.  Notwithstanding anything herein to the contrary (including, without limitation, Article VII), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## THE PLAN ADMINISTRATOR

### A.      The Plan Administrator

The powers of the Plan Administrator shall include any and all powers and authority to implement this Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and Wind-Down Debtors, including (all without further order of the Bankruptcy Court):  (a) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors; (b) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under this Plan from the Distribution Reserve Accounts; (c) making distributions from the Distribution Reserve Accounts as contemplated under this Plan; (d) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (e) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating this Plan to the extent necessary; (f) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (g) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (h) representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (i) investigating commencing, prosecuting, or settling the Retained Causes of Action other than the Permitted Litigation Claims; (j) to the extent applicable, consummating, or causing to be consummated, any Sales that are pending as of the Plan Effective Date, if any, in accordance with the terms and conditions of the applicable Sale Documents; and (k) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to this Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of this Plan.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Wind-Down Debtors and the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator.  Upon its appointment, the successor Plan Administrator,

without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

1.  Plan Administrator Rights and Powers

The Plan Administrator shall retain and have all the rights, powers, and duties of a trustee in bankruptcy including without limitation the powers necessary to carry out his or her responsibilities under this Plan and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the assets of the Wind-Down Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

2.  Retention of Professionals

The Plan Administrator shall have the right, subject to the Wind-Down Reserve and the Wind-Down Budget, to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties, without notice or approval of the Bankruptcy Court. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator without notice or approval of the Bankruptcy Court.

3.  Compensation of the Plan Administrator

The Plan Administrator's compensation, on a post-Plan Effective Date basis, shall be as described in the Plan Supplement, set forth in the Wind-Down Budget, and paid out of the Wind-Down Reserve. Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Plan Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve if such amounts relate to any actions taken hereunder. Notwithstanding anything to the contrary herein, all fees, expenses, and disbursements of the Plan Administrator, including the compensation of the Plan Administrator and the payment of fees and expenses of any professionals engaged by the Plan Administrator, shall be subject to the Wind-Down Budget.

4.  Plan Administrator Expenses

All costs, expenses and obligations incurred by the Plan Administrator in administering this Plan, the Wind-Down Debtors, or in any manner connected, incidental or related thereto, in effecting distributions from the Wind-Down Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid from the Wind-Down Reserve as set forth in the Plan Supplement and in accordance with the Wind-Down Budget.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Plan Administrator is so ordered after the Plan Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

**B.  Wind Down**

On and after the Plan Effective Date, the Plan Administrator will be authorized to implement this Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

As soon as practicable after the Plan Effective Date, the Plan Administrator shall: (1) cause the Debtors and the Wind-Down Debtors, as applicable, to comply with, and abide by, the terms of this Plan, the Confirmation Order, the Litigation Trust Documents, any Purchase Agreements, and any other documents contemplated by any of the

43

foregoing; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable Laws of their state of incorporation or formation (as applicable); and (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of this Plan.  Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or board of directors or managers of any Debtor.  From and after the Plan Effective Date, except with respect to Wind-Down Debtors as set forth herein, the Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have canceled pursuant to this Plan all Interests, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Plan Effective Date.  For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Plan Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

### C. Exculpation, Indemnification, Insurance, and Liability Limitation

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors.  The Plan Administrator may obtain, at the expense of the Wind-Down Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the Indemnification Obligations of the Wind-Down Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

### D. Tax Returns

After the Plan Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax Laws.

### E. Dissolution of the Wind-Down Debtors

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under this Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the filing of any documents with the secretary of state for the state in which each

Debtor is formed or any other jurisdiction.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable state(s).

## ARTICLE VIII.
## RESERVES ADMINISTERED BY THE PLAN ADMINISTRATOR

A.      **Undeliverable Distribution Reserve**

1.      Deposits

If a distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VIII.A.2 hereof.

2.      Forfeiture

Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an undeliverable or unclaimed distribution within three months after the first distribution is made to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for the undeliverable or unclaimed distribution against any Debtor, any Estate, the Plan Administrator, the Wind-Down Debtors, or their respective properties or assets.  In such cases, any Cash or other property held by the Wind-Down Debtors in the Undeliverable Distribution Reserve for distribution on account of such claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become the property of the Wind-Down Debtors, notwithstanding any federal or state escheat Laws to the contrary, and shall promptly be transferred to the General Account to be distributed according to the priority set forth in Article IV.E without any further action or order of the Court.

3.      Disclaimer

The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to attempt to locate any Claim Holder; *provided* that in his or her sole discretion, the Plan Administrator may periodically publish notice of unclaimed distributions.

4.      Distribution from Reserve

Within 15 Business Days after the Holder of an Allowed Claim satisfies the requirements of this Plan, such that the distribution(s) attributable to its Claim is no longer an undeliverable or unclaimed distribution, the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the undeliverable or unclaimed distribution attributable to such Claim, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, to the General Account.

B.      **Wind-Down Reserve**

On and after the Plan Effective Date, the Plan Administrator shall establish the Wind-Down Reserve by depositing Cash funded solely from Cash on hand in the Debtors' Estate as of the Plan Effective Date in the amount set forth in the Wind-Down Budget into the Wind-Down Reserve.  The Plan Administrator shall administer the Wind-Down Reserve.

All funds in the Wind-Down Reserve constitute property of the Estate, and are free and clear of all liens, claims, or encumbrances upon payment in full of the DIP Obligations.  Until payment in full of the DIP Obligations, the Wind-Down Reserve shall be subject to first priority, perfected liens and security interests belonging to the DIP Agent.  The Wind-Down Reserve shall be used to pay Holders of all DIP Claims (if not paid in full in Cash prior to the Plan Effective Date), Allowed Other Priority Claims, Allowed Priority Tax Claims, Allowed Administrative

45

Claims (other than Professional Fee Claims), and Allowed Other Secured Claims their respective Pro Rata share of the Wind-Down Reserve, to the extent that such DIP Claims, Other Priority Claims, Priority Tax Claims, Administrative Claims (other than Professional Fee Claims), and Allowed Other Secured Claims have not been paid in full on or before the Plan Effective Date.  If all or any portion of an Other Priority Claim, Priority Tax Claim, Administrative Claim (other than Professional Fee Claims), or Allowed Other Secured Claim shall become a Disallowed Claim, then the amounts on deposit in the Wind-Down Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Wind-Down Reserve, shall remain in the Wind-Down Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Wind-Down Reserve is sufficient to ensure that all Allowed Other Priority Claims, Allowed Priority Tax Claims, Allowed Administrative Claims, and Allowed Other Secured Claims will be paid in accordance with this Plan, and shall otherwise promptly be transferred to the General Account to be distributed in accordance with this Plan without any further action or order of the Court.

The Wind-Down Reserve shall also be used by the Plan Administrator to satisfy the expenses of the Wind-Down Debtors, and the Plan Administrator as set forth in this Plan and Wind-Down Budget; *provided* that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents shall constitute expenses of the Wind-Down Debtors and shall be paid from the Wind-Down Reserve to the extent set forth in the Wind-Down Budget.  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.  Any amounts remaining in the Wind-Down Reserve after payment of all expenses of the Wind-Down Debtors and the Plan Administrator, and all Allowed Other Priority Claims, Allowed Priority Tax Claims, Allowed Administrative Claims, and Allowed Other Secured Claims (or any amount in excess of that reasonably needed to be reserved for any Disputed Claims) shall promptly be transferred to the DIP Agent and, if the DIP Obligations have been paid in full, in Cash, unless otherwise agreed to by the DIP Lenders in accordance with the DIP Orders and the DIP Credit Agreement, to the General Account and shall be distributed according to the priority set forth in the Waterfall Recovery without any further action or order of the Court.

### C.      The General Account and Distribution Reserve Account Adjustments

Beginning on the two-month anniversary of the Plan Effective Date or at such other times as the Plan Administrator shall determine as appropriate, and thereafter, on each two-month interval thereafter, the Plan Administrator shall determine the amount of Cash required to adequately maintain each of the Distribution Reserve Accounts.  If after making and giving effect to any determination referred to in the immediately preceding sentence, the Plan Administrator determines that any Distribution Reserve Account contains Cash in an amount in excess of the amount then required to adequately maintain such Distribution Reserve Account, then at any such time the Plan Administrator shall transfer such surplus Cash to the General Account to be used or distributed according to the priority set forth in the Waterfall Recovery without any further action or order of the Court.  Neither the Plan Administrator nor any other party shall transfer Cash to any Distribution Reserve Account.

**ARTICLE IX.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

### A.      Disputed Claims Process

The Debtors, the Wind-Down Debtors, the Plan Administrator, or the Litigation Trustee (solely with respect to the Permitted Litigation Claims), as applicable, shall have the exclusive authority to (a) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed and (b) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  Except as otherwise provided herein, all Proofs of Claim Filed after the earlier of (i) the Plan Effective Date or (ii) the applicable Claims Bar Date, shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Wind-Down Debtor, as applicable, without the need for any objection by the Debtors, the Wind-Down Debtors, the Plan Administrator, or the Litigation Trustee, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court.

46

### B.   Allowance of Claims

After the Plan Effective Date, the Plan Administrator, the Wind-Down Debtors, or the Litigation Trustee (solely with respect to the Permitted Litigation Claims), as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Plan Effective Date.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases before the Plan Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

### C.   Claims Administration Responsibilities

Except as otherwise specifically provided in this Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Plan Effective Date, the Plan Administrator, the Wind-Down Debtors, or the Litigation Trustee (solely with respect to the Permitted Litigation Claims and subject to the limitations set forth in this Plan), as applicable, shall have the sole authority:  (a) to File, withdraw, or litigate to judgment objections to Claims or Interests; (b) to settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  Except as otherwise provided herein, from and after the Plan Effective Date, the Plan Administrator, the Wind-Down Debtors, or the Litigation Trustee (solely with respect to the Permitted Litigation Claims), as applicable, shall have and retain any and all rights and defenses such Entity had immediately prior to the Plan Effective Date with respect to any Claim or Interest (including any Disputed Claim or Interest).

### D.   Estimation of Claims

Before, on, or after the Plan Effective Date, the Debtors, the Wind-Down Debtors, the Plan Administrator, or the Litigation Trustee (solely with respect to the Permitted Litigation Claims), as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable Law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in this Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under this Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors, the Wind-Down Debtors, the Plan Administrator, or the Litigation Trustee (solely with respect to the Permitted Litigation Claims), as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### E.   Adjustment to Claims Without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled, or otherwise expunged (including pursuant to this Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Wind-Down Debtors, the Plan Administrator, or the Litigation Trustee, (solely with respect to the Permitted Litigation Claims), as applicable, without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.  Additionally, any Claim or Interest that is duplicative or redundant with another Claim against or

47

Interest in the same Debtor or another Debtor may be adjusted or expunged on the Claims Register by the Wind-Down Debtors, the Plan Administrator, or the Litigation Trustee (solely with respect to Permitted Litigation Claims), as applicable, without the applicable Wind-Down Debtors, Plan Administrator, or the Litigation Trustee having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

### F. Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

### G. Disallowance of Claims

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Plan Administrator, or the Wind-Down Debtors, as applicable.  All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Plan Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to this Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

Pursuant to the terms of the Bar Date Order, if Proofs of Claim are not received by the Claims and Noticing Agent on or before the Prepetition Claims Bar Date, the Administrative Claims Bar Date (as required), or the Governmental Bar Date, as applicable, and except in the case of certain exceptions explicitly set forth in the Bar Date Order, the Holders of the underlying Claims shall be barred from asserting such claims against the Debtors and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions from the Debtors on account of such claims in these Chapter 11 Cases.  The Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall be authorized to update the Claims Register to remove any claims not received by the Claims and Noticing Agent before the Prepetition Claims Bar Date, Administrative Claims Bar Date or the Governmental Bar Date, as applicable, and not subject to an exception as set forth above; *provided* that the Debtors, the Wind-Down Debtors, or the Plan Administrator will provide notice to such Claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such Claimant that its Claim will be removed from the Claims Register as a result of being untimely Filed.

### H. Amendments to Claims

On or after the Plan Effective Date, a Claim (other than a Claim arising from the rejection of an Executory Contract or Unexpired Lease or a Claim filed by the Administrative Claims Bar Date) may not be Filed or amended without the prior authorization of the Bankruptcy Court, the Plan Administrator, or the Wind-Down Debtors, as applicable, and the Plan Administrator and the Wind-Down Debtors shall be authorized to update the Claims Register to remove any such new or amended Claim Filed; *provided* that the Debtors will provide notice to such Claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such Claimant that its Claim will be adjusted or removed from the Claims Register.

### I. No Distributions Pending Allowance

Notwithstanding any other provision of this Plan, if any portion of a Claim or Interest is a Disputed Claim or Disputed Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Interest; *provided* that if the Allowed amount of a Claim or Interest is Disputed, but not the existence or nature of such Claim, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

J.      **Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution to which such Holder is entitled under this Plan as of the Plan Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy Law or as otherwise provided herein.

**ARTICLE X.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.      **Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, and except as otherwise specifically provided in this Plan or in any contract, instrument, or other agreement or document created pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete settlement, compromise, and release, effective as of the Plan Effective Date, of Claims (including, for the avoidance of doubt, any Equityholder Released Claims), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Plan Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted this Plan.  The Confirmation Order shall be a judicial determination of the settlement, compromise, and release of all Claims (other than the Retained Causes of Action and the Permitted Litigation Claims) and Interests subject to the Plan Effective Date occurring.  In accordance with the provisions of this Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Plan Effective Date, the Plan Administrator, or Wind-Down Debtors, as applicable, may compromise and settle any Claims and Causes of Action against other Entities.

B.      **Release of Liens**

**Except as otherwise expressly provided in this Plan, the Confirmation Order, the DIP Orders, or in any contract, instrument, release, or other agreement or document amended or created pursuant to this Plan, on the Plan Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim or any related Claim that may be asserted against a Non-Debtor Subsidiary, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Plan Effective Date, except for the Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any Non-Debtor Subsidiary shall be fully released and discharged, and all of the right, title, benefit, and interest of any Holder (and the applicable Agents of such Holder) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Wind-Down Debtors and their successors and assigns.  Any Holder of such Secured Claim or Claim against a Non-Debtor Subsidiary (and the applicable Agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Wind-Down Debtors, to release any collateral or other property of any Debtor or Non-Debtor Subsidiary (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable Agents for such Holder) and to take such actions as may be reasonably requested by the Wind-Down Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and**

49

filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, mortgages, deeds of trust, pledges, and other security interests.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Plan Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

C.      Releases by the Debtors[3]

Except as expressly set forth in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, effective on the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Causes of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, including any Avoidance Actions and derivative Claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein-after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise that such Holders or their Estates, Affiliates, heirs, executors, administrators, successors, assigns, and managers would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Wind-Down Debtors, or their Estates, or any other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Wind-Down Debtors, or their Estates (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, the Wind-Down Debtors, or their Estates, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business, financing, or contractual arrangements between any Debtor and any Released Party, any Securities issued by the Debtors' and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Equityholder Settlement, the Equityholder Settlement Term Sheets, the Definitive Documents, the Prepetition DDTL Facility, the Prepetition ABL/FILO Facility, the Prepetition ABL/FILO Deficiency Claims, the Second Lien Facility, the Owner Notes, any Sale, or any transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Equityholder Settlement, the Equityholder Settlement Term Sheets, the Prepetition DDTL Facility, the Prepetition ABL/FILO Facility, the Prepetition ABL/FILO Deficiency Claims, the Second Lien Facility, the Owner Notes, any Sale, or the Plan, the filing of the Chapter 11 Cases, the Definitive Documents, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, if any, or the distribution of property under this Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under this Plan, the Equityholder Settlement, the Equityholder Settlement Term Sheets, the

---

[3]    To the extent the Debtor Release covers the topics of the Additional Special Committee Investigation, such releases are subject to, and determined following, the completion of the Additional Special Committee Investigation.

50

Confirmation Order, any Sale, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or any Claim or obligation arising under this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Wind-Down Transactions and implementing this Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, Wind-Down Debtors, or their respective Estates asserting any claim or Cause of Action released pursuant to the Debtor release.

Any contrary provision hereof notwithstanding, nothing contained in this Plan, including the foregoing Debtor release, will release, compromise, impair, or in any way affect (i) any Retained Causes of Action or (ii) the Permitted Litigation Claims.

D.        Releases by the Releasing Parties

Except as expressly set forth in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, effective on the Plan Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under this Plan, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties (other than the Debtors and the Wind-Down Debtors), in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Entities who may purport to assert any Causes of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, including any Avoidance Actions and derivative Claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise that such Holders or their Estates, Affiliates, heirs, executors, administrators, successors, assigns, and managers would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Wind-Down Debtors, or their Estates, or any other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Wind-Down Debtors, or their Estates (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, the Wind-Down Debtors, or their Estates, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business, financing, or contractual arrangements between any Debtor and any Released Party, any Securities issued by the Debtors' and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Equityholder Settlement, the Equityholder Settlement Term Sheets, the Definitive Documents, the Prepetition DDTL Facility, the Prepetition ABL/FILO Facility, the Prepetition ABL/FILO Deficiency Claims, the Second Lien Facility, the Owner Notes, or any Sale, contract, instrument, release, or other agreement or document created or entered into in connection with the Equityholder Settlement, the Equityholder Settlement Term Sheets, the Prepetition DDTL Facility, the Prepetition ABL/FILO Facility, the Prepetition ABL/FILO Deficiency Claims, the Second Lien Facility, the Owner Notes, any Sale, or this Plan, the filing of the Chapter 11 Cases, the Definitive Documents, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date; *provided*, *however*, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under this Plan, the Equityholder Settlement, the Equityholder Settlement Term Sheets, or any document, instrument, or agreement (including any other

51

documents, instruments, and agreements set forth in the Plan Supplement) executed to implement this Plan and nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under this Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement and those Claims left Unimpaired by <u>Article III</u> hereof) executed to implement this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the third-party release is:  (a) consensual; (b) essential to the confirmation of this Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating any Sale or Wind-Down Transaction, as applicable, and implementing this Plan; (d) a good faith settlement and compromise of the Claims released by the third-party release; (e) in the best interests of the Debtors and their respective Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the third-party release.

Any contrary provision hereof notwithstanding, nothing contained in this Plan, including the foregoing Debtor release, will release, compromise, impair, or in any way affect (i) any Retained Causes of Action or (ii) the Permitted Litigation Claims.

E.      Exculpation

Notwithstanding anything contained in this Plan to the contrary, to the fullest extent permissible under applicable Law and without limiting the releases contained in this <u>Article X</u>, effective as of the Plan Effective Date, no Exculpated Party shall have or incur liability for, and each Exculpated Party is released and exculpated from any claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases prior to the Plan Effective Date, including, the formulation, preparation, dissemination, negotiation, or Filing of the Equityholder Settlement, the Equityholder Settlement Term Sheets, the Disclosure Statement, this Plan, or any Wind-Down Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Equityholder Settlement, the Equityholder Settlement Term Sheets, the Disclosure Statement or this Plan, the Plan Supplement, the Filing of the Chapter 11 Cases, the Wind-Down Transactions, the DIP Facility, the Prepetition DDTL Facility, the Prepetition ABL/FILO Facility, the Prepetition ABL/FILO Deficiency Claims, the Definitive Documents (including the Plan Supplement), or any other agreement, contract, instrument, release, or document (including any legal opinion requested by any Entity regarding any other agreement, transaction, contract, instrument, release, or document contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Wind-Down Transactions, the Disclosure Statement, this Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable Law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan, or such distributions made pursuant to this Plan, including the issuance of Securities hereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and other applicable Law or rules protecting such Exculpated Parties from liability. The Exculpated Parties and other parties set forth above have, and upon Confirmation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on

account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

Any contrary provision hereof notwithstanding, nothing contained in this Plan, including the foregoing exculpation, will release, compromise, impair, or in any way affect (a) any Retained Causes of Action or (b) the Permitted Litigation Claims.

F.      Injunction

Except as otherwise provided in this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that have been (a) released, settled, discharged, satisfied, stayed, or terminated pursuant to the terms of this Plan or (b) are subject to exculpation pursuant to this Plan, are permanently enjoined and precluded, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, Wind-Down Debtors, the Released Parties, or the Exculpated Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities discharged, released, exculpated, or settled pursuant to this Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any action to interfere with the implementation or consummation of this Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this Article X.F.

For the avoidance of doubt, and notwithstanding the foregoing, nothing in this section shall release, compromise, impair, exculpate or in any way affect any Retained Causes of Action or Permitted Litigation Claim.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Exculpated Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, in whole or in part, a claim or Cause of Action, as applicable, subject to the release and exculpation provisions of Article X hereof, without the Bankruptcy Court (A) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim not released or subject to exculpation under this Plan and (B) specifically authorizing such Entity to bring such claim or Cause of Action, as applicable, against any such Exculpated Party.

G.      Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Wind-Down Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to,

53

discriminate with respect to such a grant against, the Wind-Down Debtors, or another Entity with whom the Wind-Down Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

## ARTICLE XI.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

### A.        Conditions Precedent to the Plan Effective Date

It shall be a condition to Consummation of this Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article XI.B hereof):

1.        the Bankruptcy Court shall have entered the Confirmation Order, which shall be in full force and effect and shall not have been reversed, stayed, modified, dismissed, vacated, or reconsidered;

2.        there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim or proceeding currently instituted, threatened or pending) before or by any court, governmental, regulatory or administrative agency or instrumentality, domestic or foreign, or by any other person, domestic or foreign, in connection with the Wind-Down Transactions that, in the reasonable judgment of the Debtors, would prohibit, prevent, or restrict consummation of the Wind-Down Transactions;

3.        an order, statute, rule, regulation, executive order, stay, decree, judgment or injunction shall not have been enacted, entered, issued, promulgated, enforced or deemed applicable by any court or governmental, regulatory or administrative agency or instrumentality, domestic or foreign, that, in the reasonable judgment of the Debtors, would prohibit, prevent, or restrict consummation of the Wind-Down Transactions;

4.        to the extent the Debtors consummate the Sales, (a) the Bankruptcy Court shall have entered a Sale Order approving each such Sale, which Sale Order shall be in full force and effect and shall not have been stayed, reversed, modified, or amended, and (b) each Sale contemplated therein shall have been consummated, or shall be capable of being consummated by the Plan Administrator following the Plan Effective Date, in accordance with the terms of the applicable Sale Order and the Sale Documents related thereto;

5.        the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate this Plan and each of the other transactions contemplated by the Wind-Down Transactions, including, for the avoidance of doubt, the Sales (if any);

6.        the final version of the schedules, documents, and exhibits contained in the Plan Supplement, and all other schedules, documents, supplements and exhibits to this Plan, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with this Plan, and shall not have been modified in a manner inconsistent therewith;

7.        all conditions precedent to the effectiveness of the Litigation Trust Agreement have been satisfied or duly waived by the party whose consent is required thereunder, and the Litigation Trust Agreement shall be in full force and effect;

8.        the conditions to effectiveness of the NBG Settlement, as set forth in this Plan, shall have been satisfied or waived in accordance with the terms of the NBG Settlement, including, for the avoidance of doubt, that the NBG Settlement (including the releases contained herein with respect thereto) has been approved upon entry of the Confirmation Order;

9.        the conditions to effectiveness of the NDC Settlement, as set forth in this Plan, shall have been satisfied or waived in accordance with the terms of the NDC Settlement, including, for the avoidance of doubt, that

the NDC Settlement (including the releases contained herein with respect thereto) has been approved upon entry of the Confirmation Order;

10.      the Final DIP Order shall be in full force and effect;

11.      the Definitive Documents shall have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties;

12.      the Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.C.2 hereof;

13.      the Debtors shall have implemented the Wind-Down Transactions in a manner consistent in all material respects with this Plan;

14.      to the extent invoiced, all reasonable and documented fees and expenses of the Debtors' professionals (solely if payment of such fees and expenses have been authorized by the Bankruptcy Court, including under the Final DIP Order) related to the implementation of the Wind-Down Transactions and not previously paid by the Debtors shall have been paid; and

15.      the Wind-Down Reserve shall have been fully funded in Cash.

## B.      Waiver of Conditions

The Debtors may waive any of the conditions to the Plan Effective Date set forth in Article XI.A hereof at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate this Plan; *provided*, *however*, that the conditions set forth in Article XI.A.8 and Article XI.A.9 hereof may not be waived without the prior written consent of NBG or NDC, as applicable.

## C.      Substantial Consummation

"Substantial Consummation" of this Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Plan Effective Date.

## D.      Effect of Nonoccurrence of Conditions to the Plan Effective Date

If the Plan Effective Date does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

**ARTICLE XII.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

## A.      Modification and Amendments

Except as otherwise specifically provided in this Plan, the Debtors reserve the right to modify this Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in this Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially this Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan.  Notwithstanding anything in this Plan to the

55

contrary, the Debtors shall not modify or amend the provisions of this Plan implementing, or relating to, the Equityholder Settlement without the prior written consent of NBG or NDC, as applicable.

### B.      Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### C.      Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw this Plan before the Confirmation Date.  If the Debtors revoke or withdraw this Plan, or if Confirmation and Consummation does not occur, then:  (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XIII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes arising from or relating to distributions under this Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Plan Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) this Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with this Plan; *provided* that the Bankruptcy Court shall not

56

retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan;

10. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI hereof; (b) with respect to the releases, injunctions, and other provisions contained in Article X hereof, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of this Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12. adjudicate any and all disputes arising from or relating to distributions under this Plan or any transactions contemplated therein, including, for the avoidance of doubt, the Sales, if any;

13. consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any Retained Causes of Action.

15. enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with this Plan;

16. hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18. enforce all orders previously entered by the Bankruptcy Court; and

19. hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce this Plan and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth

in this <u>Article XIII</u>, the provisions of this <u>Article XIII</u> shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Plan Effective Date.

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

### A.      Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Plan Effective Date, the terms of this Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or Interest has voted on this Plan.

### B.      Additional Documents

On or before the Plan Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of this Plan.  The Debtors or the Wind-Down Debtors, as applicable, all Holders of Claims receiving distributions pursuant to this Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

### C.      Dissolution of Statutory Committees

On the Plan Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases.

### D.      Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Wind-Down Debtors (or the Disbursing Agent on behalf of each of the Wind-Down Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

### E.      Reservation of Rights

Before the Plan Effective Date, neither this Plan, any statement or provision contained in this Plan, nor any action taken or not taken by any Debtor with respect to this Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to any Claims or Interests.

### F.      Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in this Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

58

G.        Service of Documents

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| **Republic National Distribution Company, LLC**<br>4300 Wildwood Parkway SE<br>Atlanta, Georgia 30339<br>Attention:  John Castellano, Marc Sachs, Alan Rosenberg<br><br>E-mail addresses:  jcastellano@alixpartners.com,<br>                marc.sachs@rndc-usa.com,<br>                alan.rosenberg@rndc-usa.com | **Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Maddison Levine, Rachel Golden<br><br>E-mail addresses:  joshua.sussberg@kirkland.com,<br>                christopher.marcus@kirkland.com,<br>                maddison.levine@kirkland.com,<br>                rachel.golden@kirkland.com<br><br>~ and ~<br><br>**Porter Hedges LLP**<br>1000 Main Street, 36th Floor<br>Houston, Texas 77002<br>Attention: John F. Higgins<br><br>E-mail address:  jhiggins@porterhedges.com |
| **United States Trustee** | **Counsel to the Prepetition Agent** |
| Office of the United States Trustee<br>505 Rusk Avenue, Suite 3516<br>Houston, TX 77002<br>Attn:  Jana Whitworth; Travis C. Ross<br><br>E-mail Address:  jana.whitworth@usdoj.gov<br>                C.Ross.Travis@usdoj.gov | **Paul Hastings LLP**<br>1999 Avenue of the Stars, Twenty-Seventh Floor<br>Century City, CA 90067<br>Attention:  Justin Rawlins, Geoff King, Dov Goodman<br><br>E-mail addresses:  justinrawlins@paulhastings.com<br>                geoffking@paulhastings.com<br>                dovgoodman@paulhastings.com |
| **Counsel to NBG** | **Counsel to NDC** |
| **Katten Muchin Rosenman LLP**<br>50 Rockefeller Plaza<br>New York, New York 10020-1605<br>Attention:  Steven J. Reisman, Cindi Giglio, Shaya Rochester, Rachel Riley<br><br>E-mail addresses:  sreisman@katten.com,<br>                cgiglio@katten.com,<br>                srochester@katten.com,<br>                rachel.riley@katten.com | **Seward & Kissel**<br>One Battery Park Plaza<br>New York, New York 10004<br>Attention:  John Ashmead, Kwame Akuffo, Robert Gayda, Ross Hooper<br><br>E-mail addresses:  ashmead@sewkis.com,<br>                akuffo@sewkis.com,<br>                gayda@sewkis.com,<br>                hooper@sewkis.com |

After the Plan Effective Date, the Wind-Down Debtors shall have the authority to send a notice to Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such party must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Plan Effective Date, the Wind-Down Debtors are

59

authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

### H.     Entire Agreement

Except as otherwise indicated, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### I.     Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan.  The following exhibits are annexed hereto:

Exhibit A – NBG Settlement Term Sheet

Exhibit B – NDC Settlement Term Sheet

After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://omniagentsolutions.com/RNDC or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.

### J.     Nonseverability of Plan Provisions

If, before Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to this Plan and may not be deleted or modified without the Debtors' or Wind-Down Debtors' consent, as applicable; and (c) nonseverable and mutually dependent.

### K.     Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Wind-Down Debtors will have any liability for the violation of any applicable Law (including the Securities Act), rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and any previous plan.

### L.     Closing of Chapter 11 Cases

Upon the occurrence of the Plan Effective Date, the Wind-Down Debtors shall be permitted to close some or all of the Chapter 11 Cases, and all contested matters and adversary proceedings relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of any Wind-Down Debtor that remains open; *provided* that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until the Chapter 11 Cases of all other Wind-Down Debtors have been closed.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Wind-Down Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**M.      Waiver and Estoppel**

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

62

REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC (on behalf of itself and all other Debtors)

Dated:  August 3, 2026

/s/ *John Castellano*

John Castellano
Chief Restructuring Officer of Republic National Distributing Company, LLC and its Debtor Affiliates

**Exhibit A**

**NBG Settlement Term Sheet**

1

***Settlement Term Sheet Between***
***(1) RNDC Debtors and (2) New BG Distribution Partners, LLC and Related Entities***

1.　　In connection with seeking approval of a chapter 11 plan pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), the Debtors will incorporate into their proposed chapter 11 plan, and seek approval of, a settlement pursuant to rule 9019 of the Federal Rules of Bankruptcy Procedure on the terms specified in this term sheet, subject to definitive documentation (the "NBG Settlement").  A confirmed chapter 11 plan incorporating the terms of the NBG Settlement shall be defined as a "Conforming Plan."

2.　　Under a Conforming Plan, in exchange for the NBG Released Parties providing the NBG Settlement Consideration to the Debtors, the Debtors shall (a) agree to the Fiduciary Trust Construct subject to the Fiduciary Trust Limitations with respect to the NBG Covered Claims; and (b) provide the NBG Released Parties with full and final releases from the Debtor Releasing Parties with respect to the NBG Non-Covered Claims.

3.　　Though the NBG Settlement will be subject to the approval of the Bankruptcy Court of a Conforming Plan, the NBG Settlement will be binding upon the NBG Released Parties upon the signing of this term sheet; provided that the NBG Settlement shall not be binding upon the NBG Released Parties if a Conforming Plan is not confirmed within 120 days hereof and effective within 30 days after such 120 days elapse unless the NBG Released Parties and RNDC mutually agree to extend such period.  In the event that the NBG Settlement is not approved and no Conforming Plan is confirmed, (a) each of the Debtors and the NBG Released Parties reserve any and all of their rights and defenses to any claims that would otherwise be the subject of the NBG Settlement, (b) the NBG Released Parties shall have no obligation to provide any portion of the NBG Settlement Consideration, and (c) the Debtors shall have no obligation to agree to the Fiduciary Trust Construct or provide any releases of NBG Non-Covered Claims to the NBG Released Parties.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this term sheet and all negotiations relating hereto shall not be admissible into evidence in any proceeding of the validity or amount of any potential claims that would otherwise be the subject of the NBG Settlement.  The Debtors and the NBG Released Parties agree that the terms of the NBG Settlement were reached without any admission or concession as to any matters of fact or law.

4.　　The "NBG Settlement Consideration" shall consist of:

(a)　　a cash payment of $10.25 million from the NBG Released Parties to the Debtors on the effective date of a Conforming Plan, with the agreement that none of the NBG Released Parties will seek to have any portion of the $10.25 million or the professional fees associated with the negotiation of the NBG Settlement reimbursed from a Debtor D&O Policy;

(b)　　the waiver by the NBG Released Parties of any right to recover (whether under a chapter 11 plan or otherwise) from any Debtor, directly or indirectly, on account of any amounts in any way related to the 2L Facility, whether styled as a claim, debt, interest, participation, or otherwise, subject to confirmation from the RNDC credit facility agent and confirmation of tax or other issues to govern form;

(c)      the waiver by Marc Sachs, Grant Sechler, and Josh Zeller of any right to recover (whether under a chapter 11 plan or otherwise) from any Debtor, directly or indirectly, on account of any amounts in any way related to the Deferred Compensation Plan, subject to confirmation of tax, penalty or similar issues to govern form;

(d)      the NBG Released Parties' agreement to the Fiduciary Trust Construct subject to the Fiduciary Trust Limitations with respect to the NBG Covered Claims; and

(e)      the waiver by the NBG Released Parties of any right to recover (whether under a chapter 11 plan or otherwise) from any Debtor, directly or indirectly, on account of any amounts in any way related to any Owner Subordinated Promissory Notes, whether styled as a claim, debt, interest, participation, or otherwise.

5.      The NBG Released Parties agree to use commercially reasonable efforts to cooperate with and assist in obtaining support for the NBG Settlement and a Conforming Plan from the Debtors' other stakeholders.

6.      The NBG Released Parties agree that they shall not directly or indirectly, as applicable, propose, file, or support any chapter 11 plan that is not a Conforming Plan, which, for the avoidance, means a chapter 11 plan that does not provide for the approval and implementation of the NBG Settlement in accordance with the terms set forth herein, or take any other action that would, or would reasonably be expected to, prevent, interfere with, delay, or impede the approval or implementation of the NBG Settlement or the Conforming Plan.

7.      The "NBG Covered Claims" shall consist of any and all claims and causes of action assertable by the Debtors, whether directly, derivatively, and whether styled as estate causes of action, property of the estate, or otherwise, concerning or arising out of any matter prior to the effective date of a Conforming Plan, that (a) are assertable against any NBG Released Party that is an insured (whether denominated as a "named insured," "additional insured," or otherwise) under a Debtor D&O Policy; and (b) assert a theory of recovery or loss that is ultimately covered by a Debtor D&O Policy.  Each such claim or cause of action shall be an "NBG Covered Claim."

8.      The "NBG Non-Covered Claims" shall consist of any claims and causes of action assertable by the Debtors, whether directly, derivatively, and whether styled as estate causes of action, property of the estate, or otherwise, concerning or arising out of any matter prior to the effective date of a Conforming Plan, that are (a) assertable against any NBG Released Party and (b) not an NBG Covered Claim.

9.      The "Fiduciary Trust Construct" shall consist of the Debtors' conveyance under a chapter 11 plan of both (a) the NBG Covered Claims and (b) the Debtor D&O Policies to a post-confirmation liquidating trust for the benefit of the Debtors' general unsecured creditors, to be managed by a trustee or other entity with fiduciary obligations (the "Fiduciary Entity"), in all cases subject to the Fiduciary Trust Limitations.

10.      The "Fiduciary Trust Limitations" shall consist of provisions in a chapter 11 plan and any documents implementing the Fiduciary Trust Construct that (i) any recovery by the Fiduciary Entity (and the beneficiaries thereof) on account of any NBG Covered Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the

2

proceeds of the Debtor D&O Policies, after payment from such Debtor D&O Policies of any and all covered costs and expenses incurred by any of the NBG Released Parties in connection with the defense of the NBG Covered Claims; (ii) any party, including any trustee or any beneficiary of the Fiduciary Entity (including, for the avoidance of doubt, any litigation trustee or oversight committee), seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the NBG Covered Claims shall do so solely upon available insurance coverage; and (iii) no party shall (a) record any judgment against any NBG Released Party, or (b) otherwise attempt to collect, directly or indirectly, from the individual, personal, marital or joint interests or assets of any NBG Released Party (be it held through corporation, limited liability company, trust or otherwise).  For avoidance of doubt, this provision (i) does not release any NBG Released Party from any liability with respect to any NBG Covered Claim; (ii) does not absolve any NBG Released Party of any legal obligation to pay on account of liability incurred in relation to an NBG Covered Claim; and (iii) is intended only to identify the specific assets that would be used to satisfy any liability on account of an NBG Covered Claim and limit the recovery on such NBG Covered Claim to such assets.

11.     The following defined terms not otherwise defined above shall have the following meanings:

(a)     "Debtors" shall mean (1) Republic National Distributing Company, LLC, and (2) its subsidiaries and affiliates who file voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code;

(b)     "Debtor Releasing Parties" shall mean (1) the Debtors and (2) customary definitions of related parties of the Debtors, which shall be subject to the agreement of the Debtors and the NBG Released Parties.

(c)     "NBG Released Parties" shall mean (1) New BG Distribution Partners, LLC, (i) Edward L. Block; (ii) Alan Dreeben; (iii) Barbara Block Dreeben; (iv) Margery Block Estate; (v) Margery Block Preferred; (vi) Allison Dreeben Zeller Family 2016 Trust I; (vii) Lisa Dreeben Sechler Family 2016 Trust I; (viii) Paige Dreeben Sachs Family 2016 Trust I; (ix) Phil H. Boeck; (x) Phil Boeck Family LP; (xi) Stephanie Block; (xii) Stephanie Block Property Trust A; (xiii) Stephanie Block Property Trust B; (xiv) Stephanie Block Property Trust A Preferred; (xv) Stephanie Block Property Trust B Preferred; (xvi) Corey Block; (xvii) Corey Block Property Trust A; (xviii) Corey Block Property Trust B; (xix) Corey Block Property Trust A Preferred; (xx) Corey Block Property Trust B Preferred; (xxi) Allison Dreeben Zeller; (xxii) Josh Zeller; (xxiii) Allison Zeller and Josh Zeller Preferred; (xxiv) Lisa Dreeben Sechler; (xxv) Grant Kelly Sechler; (xxvi) Lisa Sechler and Grant Kelly Sechler Preferred; (xxvii) Paige Dreeben Sachs; (xxviii) Marc Sachs; (xxix) Paige Sachs and Marc Sachs Preferred; (xxx) BG Spirits, LLC and all members of the same; (xxxi) Block Distributing Company, Ltd. and all members of the same; (xxxii) Block Distributing Company, Ltd. Preferred Return; (xxxiii) MB–Stephanie L. Block DGT Trust; (xxxiv) MB–Corey A. Block DGT Trust; (xxxv) Allison Dreeben Zeller Trust I; (xxxvi) Lisa Dreeben Sechler Trust I; and (xxxvii) Paige Dreeben Sachs Trust I, together with the estates of any deceased individual identified above, and any trust established by, for the benefit of, or holding an interest on behalf of any individual or entity identified above, including any successor trustee or acting trustee thereof and (2) customary definitions of

3

related parties of each of the foregoing, which shall be subject to the agreement of the Debtors and the NBG Released Parties.

(d)    "2L Facility" shall mean any and all claims, obligations, debt, or amounts related to that certain Subordinated Credit Agreement dated as of December 19, 2024 among National Distributing Company, Inc. as subordinated creditor and Republic National Distributing Company, LLC as borrower, as may be further amended, restated, supplemented, or otherwise modified from time to time.

(e)    "Deferred Compensation Plan" shall mean that certain Second Amended and Restated Republic National Distributing Company, LLC Deferred Compensation Plan III, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

(f)    "Debtor D&O Policies" shall mean any and all Directors & Officers liability insurance policies or management liability insurance policies that provide coverage to any current or former directors or officers of any Debtors, including any tail policies;

(g)    "Owner Subordinated Promissory Notes" shall mean any and all claims, obligations, debt, or amounts related to all Subordinated Promissory Notes dated August 1, 2019, with Republic National Distributing Company, LLC as debtor/payor and any NBG Released Party as payee, as may be further amended, restated, supplemented, or otherwise modified from time to time, and any and all claims, obligations, debt, or amounts related to any other promissory notes with Republic National Distributing Company, LLC as debtor/payor and any NBG Released Party as payee, however denominated and whenever dated.

4

**<u>Exhibit B</u>**

**NDC Settlement Term Sheet**

*Settlement Term Sheet Between*
*(1) RNDC Debtors and (2) NDC Partners, LLC, National Distributing Company, Inc., NDC Leasing Company, LLC and Related Entities*

1.      In connection with seeking approval of a chapter 11 plan pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), the Debtors will incorporate into their proposed chapter 11 plan, and seek approval of, a settlement pursuant to rule 9019 of the Federal Rules of Bankruptcy Procedure on the terms specified in this term sheet, subject to definitive documentation (the "NDC Settlement"). A confirmed chapter 11 plan incorporating the terms of the NDC Settlement shall be defined as a "Conforming Plan." RNDC and National Distributing Company, Inc. are simultaneously entering into a Term Sheet regarding Specified Services and Transferred Technology Services (as defined therein).

2.      Under a Conforming Plan, in exchange for the NDC Released Parties providing the NDC Settlement Consideration to the Debtors, the Debtors shall (a) agree to the Fiduciary Trust Construct subject to the Fiduciary Trust Limitations with respect to the NDC Covered Claims; and (b) provide the NDC Released Parties with full and final releases from the Debtor Releasing Parties with respect to the NDC Non-Covered Claims.

3.      Though the NDC Settlement will be subject to the approval of the Bankruptcy Court of a Conforming Plan, the NDC Settlement will be binding upon the NDC Released Parties upon the signing of this term sheet; provided that the NDC Settlement shall not be binding upon the NDC Released Parties if a Conforming Plan is not confirmed within 120 days hereof and effective within 30 days after such 120 days elapse unless NDC and RNDC mutually agree to extend such period. In the event that the NDC Settlement is not approved and no Conforming Plan is confirmed, (a) each of the Debtors and the NDC Released Parties reserve any and all of their rights and defenses to any claims that would otherwise be the subject of the NDC Settlement, (b) the NDC Released Parties shall have no obligation to provide any portion of the NDC Settlement Consideration, and (c) the Debtors shall have no obligation to agree to the Fiduciary Trust Construct or provide any releases of NDC Non-Covered Claims to the NDC Released Parties. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this term sheet and all negotiations relating hereto shall not be admissible into evidence in any proceeding of the validity or amount of any potential claims that would otherwise be the subject of the NDC Settlement. The Debtors and the NDC Released Parties agree that the terms of the NDC Settlement were reached without any admission or concession as to any matters of fact or law.

4.      The "NDC Settlement Consideration" shall consist of:

(a)      a cash payment of $40 million from the NDC Released Parties to the Debtors on the effective date of a Conforming Plan, with the agreement that none of the NDC Released Parties will seek to have any portion of the $40 million or the professional fees associated with the negotiation of the NDC Settlement reimbursed from a Debtor D&O Policy;

(b)      the waiver by the NDC Released Parties of any right to recover (whether under a chapter 11 plan or otherwise) from any Debtor, directly or indirectly, on account of any amounts in any way related to the 2L Facility, whether styled as a claim, debt,

interest, participation, or otherwise subject to confirmation from the RNDC credit facility agent and the New BG participants with respect to their participation in the 2L Facility, and confirmation of tax or other issues to govern form;

(c)     the waiver by Richard J. Davis, Elizabeth A. Davis, Kenneth Rosenberg, and H. Alan Rosenberg of any right to recover (whether under a chapter 11 plan or otherwise) from any Debtor, directly or indirectly, on account of any amounts in any way related to the Deferred Compensation Plan, subject to confirmation of tax, penalty or similar issues to govern form; and

(d)     the NDC Released Parties' agreement to the Fiduciary Trust Construct subject to the Fiduciary Trust Limitations with respect to the NDC Covered Claims.

5.     The NDC Released Parties agree to use commercially reasonable efforts to cooperate with and assist in obtaining support for the NDC Settlement and a Conforming Plan from the Debtors' other stakeholders.

6.     The NDC Released Parties agree that they shall not directly or indirectly, as applicable, propose, file, or support any chapter 11 plan that is not a Conforming Plan, which, for the avoidance of doubt, means a chapter 11 plan that does not provide for the approval and implementation of the NDC Settlement in accordance with the terms set forth herein, or take any other action that would, or would reasonably be expected to, prevent, interfere with, delay, or impede the approval or implementation of the NDC Settlement or the Conforming Plan.

7.     The "NDC Covered Claims" shall consist of any and all claims and causes of action assertable by the Debtors, whether directly, derivatively, and whether styled as estate causes of action, property of the estate, or otherwise, concerning or arising out of any matter prior to the effective date of a Conforming Plan, that (a) are assertable against any NDC Released Party that is an insured (whether denominated as a "named insured," "additional insured," or otherwise) under a Debtor D&O Policy; and (b) assert a theory of recovery or loss that is ultimately covered by a Debtor D&O Policy.  Each such claim or cause of action shall be an "NDC Covered Claim."

8.     The "NDC Non-Covered Claims" shall consist of any claims and causes of action assertable by the Debtors, whether directly, derivatively, and whether styled as estate causes of action, property of the estate, or otherwise, concerning or arising out of any matter prior to the effective date of a Conforming Plan, that are (a) assertable against any NDC Released Party and (b) not an NDC Covered Claim.

9.     The "Fiduciary Trust Construct" shall consist of the Debtors' conveyance under a chapter 11 plan of both (a) the NDC Covered Claims and (b) the Debtor D&O Policies to a post-confirmation liquidating trust for the benefit of the Debtors' general unsecured creditors, to be managed by a trustee or other entity with fiduciary obligations (the "Fiduciary Entity"), in all cases subject to the Fiduciary Trust Limitations.

10.     The "Fiduciary Trust Limitations" shall consist of provisions in a chapter 11 plan and any documents implementing the Fiduciary Trust Construct that (i) any recovery by the Fiduciary Entity (and the beneficiaries thereof) on account of any NDC Covered Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the

2

proceeds of the Debtor D&O Policies, after payment from such Debtor D&O Policies of any and all covered costs and expenses incurred by any of the NDC Released Parties in connection with the defense of the NDC Covered Claims; (ii) any party, including any trustee or any beneficiary of the Fiduciary Entity (including, for the avoidance of doubt, any litigation trustee or oversight committee), seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the NDC Covered Claims shall do so solely upon available insurance coverage; and (iii) no party shall (a) record any judgment against any NDC Released Party, or (b) otherwise attempt to collect, directly or indirectly, from the individual, personal, marital or joint interests or assets of any NDC Released Party (be it held through corporation, limited liability company, trust or otherwise).  For avoidance of doubt, this provision (i) does not release any NDC Released Party from any liability with respect to any NDC Covered Claim; (ii) does not absolve any NDC Released Party of any legal obligation to pay on account of liability incurred in relation to an NDC Covered Claim; and (iii) is intended only to identify the specific assets that would be used to satisfy any liability on account of an NDC Covered Claim and limit the recovery on such NDC Covered Claim to such assets.

11.     The following defined terms not otherwise defined above shall have the following meanings:

(a)     "Debtors" shall mean (1) Republic National Distributing Company, LLC, and (2) its subsidiaries and affiliates who file voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code;

(b)     "Debtor Releasing Parties" shall mean (1) the Debtors and (2) customary definitions of related parties of the Debtors, which shall be subject to the agreement of the Debtors and the NDC Released Parties.

(c)     "NDC Released Parties" shall mean (1) NDC Partners, LLC, (2) National Distributing Company, Inc., (3) NDC Leasing Company, LLC, (4) Atlanta Wines International, Inc., (5) the NDC Owners, and (6) customary definitions of related parties of each of the foregoing, which shall be subject to the agreement of the Debtors and the NDC Released Parties.

(d)     "NDC Owners" shall mean Jay M. Davis; Richard J. Davis; Elizabeth A. Davis; Dulcy D. Rosenberg; H. Jerry Rosenberg; H. Alan Rosenberg; Kenneth Rosenberg; Karen R. Musa; Chris M. Carlos; Helen A Carlos, James A. Carlos; John A. Carlos; Carlos Company; John A. Carlos, Trustee of the Helen A. Carlos Family Trust u/a December 19, 2012; James A. Carlos, Trustee of the 2012 Helen S. Carlos Irrevocable Trust u/a December 31, 2012; Helen S. Carlos, Trustee of the 2012 James A. Carlos Irrevocable Trust u/a December 31, 2012; Elaine F. Carlos Family Trust; Chris M. Carlos Revocable Trust; Andrew C. Carlos Family Investments LLC; John A. Carlos & James A. Carlos, Co-Trustees of the John A. Carlos Family Trust U/A March 1, 2013; and each of their respective spouses, children, trustees, beneficiaries, and owners.

(e)     "2L Facility" shall mean any and all claims, obligations, debt, or amounts related to that certain Subordinated Credit Agreement dated as of December 19, 2024 among National Distributing Company, Inc. as subordinated creditor and Republic

3

National Distributing Company, LLC as borrower, as may be further amended, restated, supplemented, or otherwise modified from time to time.

      (f)     "Deferred Compensation Plan" shall mean that certain Second Amended and Restated Republic National Distributing Company, LLC Deferred Compensation Plan III, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

      (g)     "Debtor D&O Policies" shall mean any and all Directors & Officers liability insurance policies or management liability insurance policies that provide coverage to any current or former directors or officers of any Debtors, including any tail policies.

4