**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC, *et al.*,[1] | ) | Case No. 26-90737 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING ENTRY INTO AND PERFORMANCE UNDER THE ASSET PURCHASE AGREEMENT (II) APPROVING THE PRIVATE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (IV) GRANTING RELATED RELIEF**

**Emergency relief has been requested. Relief is requested not later than September 18, 2026, at 5:00 p.m. (prevailing Central Time).**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion"):[2]

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/RNDC. The location of Debtor Republic National Distributing Company, LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 4300 Wildwood Parkway, Suite 200, Atlanta, GA 30339.

[2] A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of John R. Castellano, Chief Restructuring Officer of Republic National Distributing Company, LLC and its Debtor Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 18] (the "First Day Declaration"). Capitalized terms used but not immediately defined in this Motion shall have the meanings ascribed to such terms in the Sale Order, the APA, the other Sale Documents, the First Day Declaration, or later in this Motion, as applicable.

## Preliminary Statement

1. The Debtors submit this Motion seeking to approve the private going-concern sale of substantially all of the Company's assets in the Control States[3] to Martignetti Companies Control State, LLC, Martignetti Companies of New Hampshire, LLC, and Martignetti Companies of Utah, LLC (collectively, the "Purchaser" or "Martignetti," and together with the Sellers[4], the "Parties") free and clear of all liens, claims, encumbrances, and interests, all as more fully described herein, pursuant to that certain *Asset Purchase Agreement*, dated as of September 5, 2026, attached as Exhibit 1 to the Sale Order (as amended, modified, or supplemented from time to time in accordance with the terms thereof, the "APA," and together with all schedules, exhibits, and ancillary documents related thereto, the "Sale Documents," and the transactions contemplated or required to be taken in connection with the implementation and consummation thereof, collectively, the "Sale Transaction"). The Sale Transaction will provide the Debtors' estates with over $11 million of net cash proceeds, provide for the payment of Cure Costs in connection with the Assigned Contracts and Assigned Leases, and preserve hundreds of jobs, with the Purchaser taking nearly 100% of the Sellers' employees in the Control States.

2. As set forth herein, the Sale Transaction is the product of a comprehensive sale and marketing process and months of hard-fought, arm's-length negotiations among the Parties. For more than six months, the Debtors, with the assistance of their advisors, have diligently marketed

---

[3] The "Control States" refers to the Company's "control state" brokerage businesses in Alabama, Idaho, Iowa, Maine, Michigan, Mississippi, Montana, New Hampshire, North Carolina, Ohio, Oregon, Pennsylvania, Utah, Vermont, Virginia, West Virginia, and Wyoming. The Company's Michigan and Ohio operations are operated through non-Debtor joint- venture affiliates RNDC-NWS, LLC (and its subsidiaries) (collectively, the "Michigan JV") and RNDC General, LLC (the "Ohio JV"). The Michigan JV owns certain non-"control" assets that are not contemplated as part of the Sale Transaction.

[4] "Sellers" means, collectively, RNDC, RNDC New Hampshire, LLC, K&L Beverage Company, LLC, Young's Market Company of Oregon, LLC, RNDC General, LLC, RNDC-NWS, LLC, NWS Michigan, LLC, National Wine & Spirits, LLC, and L&L Wine and Liquor, LLC.

and pursued sales of substantially all of their assets, including of their Control States operations. In connection with key liquidity provided by the Lenders in January 2026, the Lenders required the Company to comply with certain sale milestones and other requirements, including, among other things, (a) closing the Reyes Sale Transactions by May 31, 2026 and (b) continuing to explore potential sales of their remaining markets. Additionally, pursuant to the DIP Credit Agreement (as defined in the DIP Motion), the Debtors are required to meet certain milestones with respect to the execution of binding purchase agreements for the sale of substantially all of the Debtors' assets, including executing the APA for the Control States. In parallel with pursuing and consummating the Reyes Sale Transactions, the Debtors' investment banker, Lazard Frères & Co. LLC ("Lazard"), ran a comprehensive marketing process for all of the Debtors' remaining markets, including the Control States. As part of this process, Lazard contacted over 50 potentially interested parties and executed confidentiality agreements with over 25 prospective purchasers. Martignetti was the only party that submitted an actionable proposal to purchase all of the Control States' assets through a going-concern sale. While three other parties expressed interest in purchasing assets of certain of the Control States, the Debtors determined, in their business judgment, that a sale of the Control States as a single package would be the most value-maximizing path forward as the Debtors would otherwise be forced to incur the costs associated with winding down any unsold Control States to the detriment of all stakeholders. As such, the Debtors and Martignetti executed a non-binding letter of intent (the "LOI") for the Control States on April 13, 2026.

3. As described herein, the limited universe of potential purchasers for the Control States was not surprising. The Control States are a key part of the "three-tier" system for alcohol distribution nationwide, whereby state governmental agencies control distribution and

distributors—like RNDC—act as a broker to facilitate sales between alcohol suppliers and retailers. To succeed, brokers must operate at scale across multiple "control state" markets to meet competitive demands and realize sufficient economies of scale to satisfy the requirements of alcohol suppliers, governmental agencies, and retailers.

4. Since executing the LOI in April 2026, the Debtors and Martignetti have spent the last four months engaging in good faith, arm's-length negotiations to finalize the terms of the Sale Transaction. The proposed Sale Transaction represents the most value-maximizing—and only actionable—proposal for the Control States. The Sale Transaction provides for, among other things, (a) a cash payment equal to (i) $14.5 million plus (ii) the aggregate laid-in-cost of all saleable vendor of record ("VOR") inventory (*i.e.*, the saleable inventory of suppliers transitioning to Martignetti) (approximately $2 million as of July 31, 2026) and (b) the Purchaser's assumption of the Assumed Liabilities ((a) and (b), collectively, the "Purchase Price"). The Debtors estimate that their estates will realize approximately $11 million of net proceeds at or around closing of the Sale Transaction after taking into account amounts to be paid to the non-Debtor Sellers and transaction expenses. Importantly, the APA provides the Debtors with a "fiduciary out," permitting any Debtor to terminate the APA if such Debtor or its applicable governing body determines that proceeding with the Sale Transaction or failing to terminate the APA would be inconsistent with its fiduciary duties, including, for instance, if a superior alternative arises, in which case the Sellers may pivot to such an alternative to maximize the value of their estates for the benefit of all stakeholders.

5. The Sale Transaction is the only viable going-concern transaction for the Control States and is supported by the Lenders, who hold liens on substantially all of the Debtors' assets, and the Debtors' joint-venture partners in Michigan and Ohio, who have consent rights pursuant

to the applicable governing documents over any sale of the applicable joint venture's assets. Accordingly, the Debtors believe that entering into the APA, consummating the Sale Transaction, and approving the Sale Transaction in their capacity as members and/or managers of certain of the non-Debtor Sellers is fair and reasonable, represents a sound exercise of the Debtors' business judgment, and is the best available option to maximize value for the benefit of the Debtors, their estates, and all stakeholders.

## Relief Requested

6. The Debtors seek entry of an order, substantially in the form attached hereto (the "Sale Order"): (a) authorizing and approving the applicable Debtors' entry into and performance under the APA, whereby the applicable Debtors and the non-Debtor Sellers have agreed to transfer, convey, and assign to the Purchaser, and the Purchaser has agreed to purchase, acquire, accept, and assume the Purchased Assets and Assumed Liabilities from the applicable Sellers (including all actions taken or required to be taken by the Debtors in connection with the Sale Transaction); (b) authorizing and approving the consummation of the Sale Transaction, including the sale of the Purchased Assets and the Assumed Liabilities of the Debtors to the Purchaser free and clear of any and all liens, claims, and encumbrances, other than Permitted Encumbrances and Assumed Liabilities; (c) authorizing the assumption and assignment of the Assigned Contracts and the Assigned Leases of the Debtors in connection with the Sale Transaction; and (d) granting related relief.

## Jurisdiction and Venue

7. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The

Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9. The bases for the relief requested herein are sections 105, 363, 365, 1107, and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1, 4002-1(e), and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

**Background**

10. Republic National Distributing Company, LLC (together with its Debtor and non-Debtor affiliates, the "Company") was the nation's second largest alcoholic beverage distributor, operating across 40 states. The Company maintained deep-seated relationships with over 2,000 suppliers and 170,000 customers across its expansive nationwide distribution network. With headquarters in Atlanta, Georgia, the Debtors operated across 21 states and employed a workforce of approximately 1,460 employees as of the Petition Date.

11. On July 26, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12. On July 27, 2026, the Court entered an order [Docket No. 22] authorizing the procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1. On August 6, 2026, the Office of

the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 137] (the "Committee"). No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

**The Marketing Process**

13. Leading up to the Petition Date, the Debtors ran a comprehensive marketing and sale process for the Debtors' operations nationwide, including the Control States. This process included reaching out to over 50 potential purchasers, including a mix of financial and strategic acquirers. Over the course of this comprehensive marketing process, over 25 parties executed confidentiality agreements and received access to diligence. Over that period of time, only three other parties, other than the Purchaser, expressed an interest in certain of the Control States. One additional party—one of the Debtors' main competitors—verbally expressed interest in all of the Control States in April 2026, prior to the execution of the LOI with Martignetti, in addition to their interest in certain of the Debtors' joint venture markets. However, the Debtors did not have confidence that the party's stated interest in the Control States reflected a serious and actionable acquisition proposal, as opposed to an effort to gain access to competitively sensitive information without a genuine intention to pursue a transaction for the Control States. Given the Debtors' experience with this competitor soliciting key suppliers, and the meaningful competitive risk associated with providing such access, the Debtors, in consultation with their advisors, determined, in an exercise of their business judgment, to limit their discussions with this party to certain of the Debtors' joint venture markets only. The Debtors continued to engage with this additional party over the following months as part of the Debtors' broader sale process, yet no actionable bid or transaction ever materialized. Martignetti was the only party that submitted an actionable proposal to purchase all of the Control States as a going concern. Accordingly, following weeks of negotiation and with no alternative proposals for all Control States, the Debtors and Martignetti

executed the LOI in April 2026 for all 17 of the Control States, with the intention of closing the potential sale transaction out of court in the following months.

14. While the LOI formalized Martignetti's intent, the LOI was only the beginning of hard-fought, good-faith, and arm's-length negotiations among the Parties. Over the following months, the Debtors and Martignetti worked tirelessly on finalizing key economic terms and definitive documentation with the goal of closing the sale in July 2026, which, at the time, the Parties expected to occur through an out-of-court process. However, in light of the Debtors' deteriorating liquidity position, the Parties were ultimately unable to finalize and consummate the potential sale transaction prior to commencing the Chapter 11 Cases and therefore now seek to close the Sale Transaction in chapter 11.

15. The Debtors believe that a private sale process is appropriate under the circumstances. For more than six months, Lazard ran a comprehensive marketing process and entertained all offers for the Debtors' operations, including the Control States. Moreover, the Debtors, with the assistance of Lazard and their other advisors, have continued this exhaustive process postpetition. To date, no other party has submitted an actionable proposal for all of the Control States nor any subset thereof. Importantly, both the Debtors and Martignetti have an interest in closing the Sale Transaction on an expedited basis. The Debtors continue to incur millions of dollars of expenses to maintain operations in the Control States. Based on the Debtors' projected liquidity, the Debtors will not have the liquidity necessary to sustain operations in the Control States let alone to fund the administration of the Chapter 11 Cases if the Sale Transaction (or any other sale transaction) does not close by the week ending September 25, 2026. Additionally, any delay to closing the Sale Transaction risks the loss of additional suppliers that are essential to the value of the Control States, many of which do not have long-term agreements

with the Debtors. Consequently, the Purchaser has a right to terminate the APA if the closing of the Sale Transaction does not occur by September 22, 2026. This termination right and the September 22 deadline were required by the Purchaser because of concerns that the Purchased Assets, including the Debtors' relationships with suppliers, will deteriorate prior to closing of the Sale Transaction, while the Purchase Price is fixed (other than with respect to Inventory). Accordingly, given the comprehensive prepetition and postpetition marketing process of the Control States, and to avoid incurring the unnecessary expense of a longer marketing and sale process that is not likely to generate a higher or otherwise better offer for the Purchased Assets, the Debtors, in an exercise of their business judgment and subject to their fiduciary duties as debtors in possession, believe that a private sale process is appropriate under the circumstances.

**The Sale Transaction**

16. The terms of the Sale Transaction as reflected in the APA and the other Sale Documents are the product of extensive, arm's-length negotiations between the Debtors and the other Sellers, on the one hand, and the Purchaser, on the other hand. Pursuant to the APA, Martignetti will pay a cash purchase price of approximately $14.5 million plus the aggregate value of VOR inventory for transitioning suppliers and assume the Assumed Liabilities in exchange for substantially all of the Sellers' operating assets in the Control States, excluding the Excluded Assets. The Debtors estimate that their estates will realize over $11 million of net proceeds at or around closing of the Sale Transaction after taking into account amounts to be paid to the non-Debtor Sellers and transaction-related expenses. The Debtors intend to use the net proceeds of the transaction to pay down the outstanding new money revolving loans under the DIP Facility and fund the administration of the Chapter 11 Cases as they work to close sales for their remaining markets and pursue an orderly wind down of their estates.

17. Consummating the Sale Transaction on the terms set forth in the APA is a sound exercise of the Debtors' business judgment. ***First***, the Sale Transaction represents the value-maximizing and only proposal for a going-concern sale of the Control States and is expected to preserve hundreds of jobs and supplier relationships in these markets. Martignetti has indicated that it intends to hire hundreds of the Sellers' employees in connection with the Sale Transaction and expects to continue serving the vast majority of the Sellers' suppliers and customers in the Control States. Specifically, Martignetti made offers of employment to approximately 345 of the Sellers' employees, which represents nearly 100% of the employees in the Control States. The APA also provides for a limited transition services agreement to ensure the continuation of key corporate and support services, which in turn will help facilitate a seamless transition and minimize disruption for the Debtors' customers and suppliers after closing the Sale Transaction. Further, based on the Debtors' forecasted liquidity, the Debtors must close the Sale Transaction (or a sale for one of their other markets) by the week ending September 25, 2026, to maintain minimum liquidity to sustain operations. The Sale Transaction is the furthest advanced sale of the Debtors' remaining markets and is the only transaction the Debtors currently expect to close by that time. Absent the Sale Transaction, the Debtors would likely be forced to pursue a value-destructive wind down of its Control States operations, which would result in the immediate loss of hundreds of jobs and likely materially disrupt services to the Debtors' suppliers and customers.

18. ***Second***, the Debtors believe that the Purchase Price is the highest and best offer available for the Purchased Assets. To date, the Debtors have received no higher or otherwise better proposals for the Control States, and a higher or otherwise better offer for the Control States is unlikely given the limited universe of potential buyers and the comprehensive marketing process run by Lazard. ***Third***, the Debtors can close the proposed Sale Transaction on an expedited

timeline because the negotiations and drafting of deal documentation were substantially advanced prior to the Petition Date. Even if another potential purchaser emerged now, a sale to any purchaser other than Martignetti on terms other than those contemplated by the APA would lead to a substantial delay at significant cost to, and to the detriment of, the Debtors and their estates because most of the Debtors' suppliers are not bound by long-term contracts, and these supplier relationships are essential to the value of the business. As a result, supplier support for any sale transaction and of the purchaser is critical. Since executing the LOI, many of the Debtors' suppliers have communicated their support for the Sale Transaction and have agreed to transition to Martignetti. Many of these consenting suppliers have also indicated that they would be unwilling to work with an alternative purchaser. Accordingly, any delay or a public auction process risks further supplier attrition, which would diminish the value of the Purchased Assets and jeopardize the likelihood of a successful closing. ***Fourth***, the Sale Transaction will result in the payment of millions of dollars of supplier liabilities that would otherwise go unpaid if the Debtors were forced to wind down the Control States absent a value-maximizing sale transaction.

## Summary of Key Transaction Terms

19. The following chart summarizes the key terms and conditions of the APA:

| **Summary Description of the APA**[5] | |
|---|---|
| **Sellers** | **Debtors**: Republic National Distributing Company, LLC, RNDC New Hampshire, LLC, K&L Beverage Company, LLC, and Young's Market Company of Oregon, LLC<br><br>**Non-Debtors**: RNDC General, LLC, RNDC-NWS, LLC, NWS Michigan, LLC, National Wine & Spirits, LLC, and L&L Wine and Liquor, LLC |

[5] Any description of the terms of the APA contained herein is a summary provided for convenience purposes only. In the event of any inconsistency between the summary set forth herein and the APA, the APA shall control. Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the APA or this Motion, as applicable.

| Summary Description of the APA [5] | |
|---|---|
| **Purchaser** | Martignetti Companies Control State, LLC, Martignetti Companies of New Hampshire, LLC, and Martignetti Companies of Utah, LLC |
| **Good Faith Deposit** | In connection with executing the APA, the Purchaser is making a cash deposit equal to $1,450,000 with a third-party escrow agent. If the Closing occurs, the deposit will be applied towards the Purchase Price. If the APA is terminated as a result of a breach caused by the Purchaser, Sellers will be entitled to retain the deposit. If the APA is terminated for any other reason, the deposit will be returned to the Purchaser.<br><br>APA §1.6. |
| **Purchased Assets** | All of each Seller's right, title, and interest in and to all of the assets, properties, goodwill, and rights of each Seller related primarily to, or used primarily in, the operation of the Business, of whatever kind and nature, real, personal or mixed, tangible or intangible, other than the Excluded Assets, of the Control States (collectively, the "Purchased Assets").<br><br>APA § 1.1. |
| **Excluded Assets** | Certain assets of the Sellers' assets shall not be included as part of the Purchaser's acquisition of the Purchased Assets, including cash and cash equivalents of the Sellers, certain distribution rights, contracts, inventory, and assets relating to the sale of non-alcoholic products in New Hampshire and Pennsylvania, certain contracts that are not exclusively related to the businesses being purchased by the Purchaser, certain intellectual property and information technology equipment of the Seller not exclusively related to the businesses being purchased by the Purchaser, and corporate organizational and other records that Sellers are required by Law to retain.<br><br>APA § 1.2. |
| **Purchase Price** | The purchase price for the Purchased Assets shall be equal to the sum of the following: (a) an amount equal to $14,500,000 *plus* (b) the estimated Laid-in-Cost of all Saleable VOR Inventory as of the Closing Date (the "Inventory Price"), which estimate shall be agreed to by the Parties at least three Business Days prior to the Closing (the sum of (a) and (b), the "Cash Payment"), *plus* (c) the assumption of the Assumed Liabilities.<br><br>At the Closing, the Purchaser shall pay the Cash Payment (minus the deposit held by the Escrow Agent and funded by the Purchaser in the amount equal to 10% of the Cash Payment) to the Sellers by wire transfer of immediately available funds, and the Escrow Agent shall retain in the Escrow Account an amount equal to twenty-five percent (25%) of the estimated Inventory Price (the "VOR Adjustment Escrow Amount"), which is subject to the post-closing true-up of the actual against the estimated Inventory Price pursuant to section 1.5(c) of the APA.<br><br>APA § 1.5. |

| Summary Description of the APA [5] | |
|---|---|
| **Assumed and Excluded Liabilities** | Except for the Assumed Liabilities, which Assumed Liabilities shall become the obligation of the Purchaser upon the Closing, the Purchaser shall not assume, nor be responsible for, any liabilities or obligations of any Seller or any of its Affiliates, whether absolute, contingent or otherwise, known or unknown, accrued or unaccrued, asserted or unasserted, or otherwise. Effective as of the Closing, the Purchaser shall irrevocably assume from Sellers and pay, perform, discharge, or otherwise satisfy in accordance with their respective terms, and Sellers shall irrevocably transfer, assign, convey, and deliver to the Purchaser, only the Assumed Liabilities: (a) the liabilities as expressly set forth in the APA; (b) all liabilities under the Assigned Contracts that arise or become due from and after the Closing; (c) all liabilities arising out of the conduct of the Business or the ownership or operation of the Purchased Assets or the Business, in each case, by the Purchaser from and after the Closing, including all liabilities arising out of or relating to any environmental, health or safety matter (including those relating to or arising under Environmental Law or relating to Hazardous Substances), in all cases, only to the extent arising out of or, in connection with the ownership or operation of the Purchased Assets or the Business by the Purchaser on or after the Closing Date; (d) all liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by the Purchaser under the express terms of the APA and all Transfer Taxes; and (e) all liabilities for Taxes with respect to the Purchased Assets, the Assumed Liabilities, or the Business, in each case, for any taxable period (or portion thereof) beginning on or after the Closing Date.<br><br>APA § 1.3. |
| **Conditions Precedent to Obligations of the Sellers** | The obligation of Sellers to consummate the Closing is subject to the satisfaction, on or prior to the Closing, of each of the following conditions, the failure of any one of which shall excuse Sellers from consummating the Closing unless, to the extent permitted by Law, any such conditions are waived in writing by each Seller in its sole discretion:<br><br>(a) the representations and warranties made by the Purchaser shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date. The Purchaser shall have duly performed and complied in all material respects with all covenants required by the APA to be performed or complied with by it prior to or on the Closing Date;<br>(b) no court of competent jurisdiction shall have issued, enacted, entered, promulgated, or enforced any Sale Order (including any temporary restraining Sale Order or preliminary or permanent injunction) restraining, enjoining, or otherwise prohibiting the Closing that is still in effect and no Action seeking any such Sale Order shall be pending;<br>(c) the Sellers shall have received a certificate from the Purchaser representing and warranting that the conditions precedent set forth have been satisfied;<br>(d) the Purchaser shall have executed and delivered to Sellers an Assumption Agreement;<br>(e) the Purchaser shall have delivered to Sellers (i) assignments of the Assigned Leases executed by the Purchaser and, where applicable, by landlords to such |

| Summary Description of the APA[5] | |
| --- | --- |
| | leases, substantially in the form attached to the APA as Exhibit 7.2(j)(i); and (ii) executed by the Purchaser, as licensee, the license for 90 days for the premises located at 13000 Eckles Road, Livonia, MI 48150 in the form attached to the APA as Exhibit 7.2(j)(ii); and<br>(f) the Court shall have entered the Sale Order and the Sale Order shall not have been stayed, vacated, or modified without Sellers' consent.<br><br>APA § 7.1. |
| **Conditions Precedent to Obligations of the Purchaser** | The obligations of the Purchaser to consummate the Closing is subject to the satisfaction, on or prior to the Closing, of each of the following conditions, the failure of any one of which shall excuse the Purchaser from consummating the Closing unless, to the extent permitted by Law, any such conditions are waived in writing by the Purchaser in its sole discretion:<br><br>(a) the representations and warranties made by Sellers shall be true and correct in all respects as though made on and as of the Closing Date, except (i) that representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date and (ii) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect, and (iii) the representations and warranties set forth shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all respects (in the case of any representation or warranty containing any materiality qualification) or in all material respects (in the case of any representation or warranty without any materiality qualification) only as of such date. Sellers shall have duly performed and complied in all material respects with all covenants required by the APA to be performed or complied with by them prior to or on the Closing Date;<br>(b) between the Effective Date and the Closing Date, there shall have been no Material Adverse Effect;<br>(c) between the Effective Date and the Closing Date, no Governmental Authority shall have enacted or promulgated any Law that would have the effect of making the Transactions illegal;<br>(d) no court of competent jurisdiction shall have issued, enacted, entered, promulgated, or enforced any Sale Order (including any temporary restraining Sale Order or preliminary or permanent injunction) restraining, enjoining, or otherwise prohibiting the Closing that is still in effect and no Action seeking any such Sale Order shall be pending<br>(e) the Purchaser shall have obtained all the federal and state licenses and permits pertaining to the sale and distribution of alcoholic beverages in the Territory listed in the APA;<br>(f) the Purchaser shall have received duly authorized and executed consents from the Persons or with respect to the matters set forth in the APA;<br>(g) the Purchaser shall have received from Sellers a certificate representing and warranting that the conditions precedent set forth in (a) and (b) above have been satisfied; |

| **Summary Description of the APA**[5] | |
|---|---|
| | (h) the applicable Seller(s) shall have executed and delivered to the Purchaser or its designee a Transition Services Agreement in the form attached to the APA;<br>(i) the Sellers shall have executed and delivered to the Purchaser or its designee Bills of Sale for the Purchased Assets in the form attached to the APA;<br>(j) the Sellers shall have delivered to the Purchaser, or its designee, (i) assignments of the Assigned Leases executed by the applicable Seller and, where applicable, by landlords to such Assigned Leases, substantially in the form attached to the APA as Exhibit 7.2(j)(i); and (ii) executed by the applicable Seller, as licensor, the license for 90 days for the premises located at 13000 Eckles Road, Livonia, MI 48150 in the form attached to the APA as Exhibit 7.2(j)(ii);<br>(k) the Court shall have entered the Sale Order as a final order and the Sale Order shall not have been stayed, vacated, reversed, or modified without the Purchaser's consent;<br>(l) neither the Purchaser nor the Sellers shall have received written notice from any Supplier listed in the Schedule attached to the APA that such Supplier does not intend to do business with the Purchaser in the Territory from and after the Closing or that such Supplier will be transitioning to do business with a competitor of the Purchaser in lieu of the Purchaser from and after the Closing, in either case where the affected Suppliers represent, in the aggregate, more than ten percent of the commission revenue plus VOR gross profit of the Business;<br>(m) NWS Michigan, LLC, RNDC-NWS, LLC, and L&L Wine and Liquor, LLC shall have delivered to the Purchaser evidence, in form and substance reasonably satisfactory to the Purchaser, of the release of the Encumbrances set forth in the APA (including UCC-3 termination statements and any other releases or terminations required to release such Encumbrances of record) on any of the Acquired Assets held by such Sellers; and<br>(n) each Seller shall have delivered to the Purchaser, or its designee, a duly executed IRS Form W-9 (or such Seller's regarded owner for U.S. federal income Tax purposes shall have delivered to Purchaser a duly executed IRS Form W-9).<br><br>APA § 7.2. |
| **Deadline for the Closing of the Sale** | September 22, 2026 (the "Outside Date"); *provided* that the Purchaser shall have the right, in its sole discretion, to extend the Outside Date up to an additional 60 calendar days by notice to Sellers.<br><br>APA § 8.1.(a). |
| **Executory Contracts and Leases to be Assumed and Assigned** | Schedule 1.1(g) sets forth a true and complete list, as of the date of entry into the APA, of the Assigned Contracts and Assigned Leases, including Sellers' proposed Cure Costs associated with each such Assigned Contract and Assigned Lease set forth therein.<br><br>No later than one Business Day prior to the Closing Date (the "Designation Deadline"), Purchaser may, by written notice to Sellers, (a) designate any Available Contract that is an Excluded Asset as an Assigned Contract or Assigned Lease, as applicable, and (b) remove any Assigned Contract or Assigned Lease |

| Summary Description of the APA[5] | |
|---|---|
| | from Schedule 1.1(g) so that it becomes an Excluded Asset. Schedule 1.1(g) and the list of Assigned Contracts and Assigned Leases shall be deemed automatically updated to reflect the same.<br>*See* APA § 2.2.<br>If a party objects to the proposed assumption and assignment of an Assigned Contract or Assigned Lease (a "Disputed Contract") and such objection has not been resolved prior to the Designation Deadline, then the Designation Deadline with respect to such Disputed Contract shall automatically be extended (including past the Closing) until the earlier of (a) the date on which such Disputed Contract is deemed rejected under section 365 of the Bankruptcy Code or is otherwise rejected with the express prior written consent of the Purchaser (which consent may be withheld in the Purchaser's sole discretion), (b) the date that is ten Business Days following the date, if any, on which such dispute is finally determined by the Court, or (c) the date that is ten Business Days following the date, if any, on which such dispute is mutually resolved.<br>*See* APA § 2.2. |
| **Executory Contracts to be Rejected** | At the Closing, each Seller shall discontinue and terminate its relationships (and if applicable, reject any Contracts that relate solely to the Debtors and cover only the Territory) with the Suppliers with respect to all applicable Brands. From and after the Effective Date, each Seller shall not assign, convey, transfer, or otherwise dispose of any distribution rights or brokerage rights with any Supplier in the Territory to any Person (other than the Purchaser).<br>*See* APA § 6.14. |
| **Sale of Property Free and Clear of Leasehold Interest, License, or Other Right** | Except as set forth on Schedule 3.7(a), the Sellers have good and valid title to all of the Purchased Assets free and clear of all Encumbrances, other than Permitted Encumbrances. Upon the entry and effectiveness of the Sale Order, the Sellers will have the power and right to sell, assign, transfer, convey, and deliver, as the case may be, to the Purchaser the Purchased Assets, free and clear of all Encumbrances other than Permitted Encumbrances and Assumed Liabilities. Other than Encumbrances that will be released upon the entry and effectiveness of the Sale Order, the Sellers own or have rights to, and upon delivery to Purchaser at the Closing will transfer to the Purchaser, good title to or a valid leasehold interest in all of the Purchased Assets, free and clear of all Encumbrances, except for Permitted Encumbrances and Assumed Liabilities.<br>APA § 3.7(a). |
| **Other Material Terms** | At the Closing, the Purchaser and the Sellers shall enter into a Transition Services Agreement by which the Sellers shall provide certain services and support to Purchaser for a specified period following the Closing.<br>APA § 7.2.<br>The Sellers that are not Debtors are agreeing to provide indemnification with respect to the representations and warranties made by such Sellers, certain |

| Summary Description of the APA[5] | |
|---|---|
| | covenants of such Sellers, and the Excluded Liabilities of such Sellers. The Debtors are not subject to any indemnification obligations under the APA.<br>APA §9.1<br>Following the Closing, the Sellers are agreeing not to compete with the Business in the Territory following the Closing, to generally terminate relationships with Suppliers in the Territory, and to not solicit employees of the Purchaser.<br>APA §6.4 |
| **6004(h) and 6006(d) Waivers** | To close the Sale Transaction prior to the Outside Date, the Sellers seek a waiver of the stay imposed by Bankruptcy Rules 6004(h) or 6006(d). |

## Basis for Relief

### I. The Sale Transaction is a Sound Exercise of the Debtors' Business Judgment, is Appropriate Pursuant to Bankruptcy Rule 6004(f), and Should Be Approved Pursuant to Section 363(b) of the Bankruptcy Code.

20. Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." A debtor may sell estate property outside the ordinary course of business under this provision if there is a good business reason for doing so. *See, e.g.*, *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011). "Great judicial deference is given to the [debtor in possession's] exercise of business judgment" regarding the sale of estate property. *GBL Holding Co. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005). Once a debtor articulates a valid business justification, then the burden of rebutting the "strong presumption . . . that the agreement at issue was negotiated in good faith and in the best interests of the estate" falls to parties opposing the transaction. *In re Filene's Basement*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). Thus, if a debtor satisfies the business judgment rule, the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

21. Moreover, Bankruptcy Rule 6004(f)(1) authorizes a debtor to sell estate property outside of the ordinary course of its business by private sale or public auction. Private sales are appropriate where the debtor demonstrates that the proposed sale is permissible pursuant to section 363 of the Bankruptcy Code. *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 436 (Bankr. S.D. Tex. 2009) ("[T]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction." (quoting *In re Woodscape Ltd. P'Ship*, 134 B.R. 165, 174 (Bankr. D. Md. 1991))); *In re Dura Auto. Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *88 (Bankr. D. Del. Aug. 15, 2007) ("[S]ales of property rights outside the ordinary course of business may be by private sale or public auction."). Additionally, a debtor has broad discretion to determine the manner in which its assets are sold. *See Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) (finding that section 363 of the Bankruptcy Code "clearly indicates that the manner of sale is within the discretion of the trustee"); *see also In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has ample authority to conduct a sale of estate property through a private or public sale).

22. Selling the Purchased Assets of the Debtors on the terms set forth in the APA is a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' estates, and should be approved. After engaging in good-faith, arm's-length negotiations, the Debtors and Martignetti agreed on the Purchase Price. The Debtors, in a sound exercise of their business judgment, believe that the Purchase Price is the highest and best offer available for the Purchased Assets and the share of the Purchase Price allocable to the Purchased Assets of the Debtors constitutes the highest, best, and most value-maximizing offer that will yield the most value for the Debtors and their estates, including after taking into account amounts to be paid to the non-Debtor Sellers. The Debtors have received no alternative actionable proposals for all of the

Control States nor for any subset thereof. Moreover, consummating the Sale Transaction on the terms set forth in the APA will not only allow the Debtors to maximize the value of the Control States, but will also support the Debtors' hundreds of suppliers and employees in the Control States by allowing for their continued employment with the Purchaser. Absent the consummation of the Sale Transaction, the Debtors face the prospect of a value-destructive wind-down of their Control States operations, which will result in the loss of hundreds of jobs and leave hundreds of suppliers without a distributor.

23. In addition to the sale of the Purchased Assets of the Debtors, the Debtors also seek authority, in their capacity as members and/or managers of certain of the non-Debtor Sellers, as applicable, to authorize and approve such non-Debtor Sellers' entry into the Sale Transaction. Under the organizational documents of the Ohio JV and RNDC-NWS, LLC, Debtor Republic National Distributing Company, LLC and Debtor Republic National Distributing Company Michigan Holdings, LLC, respectively, are required to approve the Sale Transaction in their capacities as members and/or managers. The applicable Debtors have determined, in a sound exercise of their business judgment, that the Sale Transaction is in the best interest of the Debtors and the other Sellers and within the Debtors' authority to continue operating their businesses and managing their properties as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code. *See* 11 U.S.C. § 1108 ("Unless the court, on request of a party in interest and after notice and a hearing, orders otherwise, the trustee may operate the debtor's business."). "It is well-settled that unless a trustee has been appointed, the Bankruptcy Code does not affect the applicability of the corporation law of [the] debtor's state of incorporation as it relates to management of the corporation." *In re FSC Corp.*, 38 B.R. 346 (Bankr. W.D. Pa. 1983); *see also* 11 U.S.C. § 363(c)(1) ("If the business of the debtor is authorized to be operated under

section [1108] of this title and unless the court orders otherwise, the trustee may enter into transactions . . . in the ordinary course of business, without notice or a hearing.”).

24. The Debtors submit that the Court’s approval is not required in order for the non-Debtor Sellers to sell or transfer the Purchased Assets of the non-Debtor Sellers because the Purchased Assets of the non-Debtor Sellers are not property of the Debtors’ estates within the meaning of section 541(a) of the Bankruptcy Code. However, out of an abundance of caution, the Debtors seek authority for the Debtors to take all corporate action necessary to approve and consummate the Sale Transaction with respect to the non-Debtor Sellers. In doing so, the Debtors submit that the Court may grant such relief pursuant to section 105(a) of the Bankruptcy Code consistent with the Court’s approval of the Sale Transaction with respect to the Debtors.

25. The Debtors, in a sound exercise of their business judgment, have determined that the Sale Transaction is value-maximizing and in the best interest of all Sellers, including the non-Debtor Sellers, their creditors, and other stakeholders. The Purchase Price allocable to the non-Debtor Sellers represents the highest and only actionable proposal for the Purchased Assets of the non-Debtor Sellers. Martignetti has indicated that it would be unwilling to close the Sale Transaction on terms that exclude the non-Debtor Sellers. Moreover, due to the nature of the Control States, the Debtors do not believe they would be able to pursue a going-concern sale of the Purchased Assets of the non-Debtor Sellers outside of the Sale Transaction because the non-Debtor Sellers would be unable to sustain their operations fully independent of the Debtors. Accordingly, the Debtors’ authorization and approval of the Sale Transaction with respect to the non-Debtor Sellers is appropriate and, to the extent so required under the Bankruptcy Code, should be approved.

26. Additionally, for the reasons described herein, the Debtors believe that selling the Purchased Assets of the Debtors through a private sale is in the best interests of the Debtors' estates and should be approved. The Debtors solicited interest from over 50 potential purchasers. Martignetti was the only party that expressed an interest in purchasing all of the Control States as a going-concern and that submitted a non-binding LOI. A public auction process would require the Debtors' estates to incur substantial costs, extend the Debtors' case timeline, and create undue delay for the remote possibility that an alternative purchaser materializes, notwithstanding the Debtors' comprehensive pre and postpetition marketing process. The Debtors and their advisors do not believe that an alternative purchaser is likely to materialize nor do they believe that any offer, if received, would fully offset the additional cost incurred of delaying the Sale Transaction. Moreover, based on the Debtors' forecasted liquidity, the Debtors must close the Sale Transaction (or a sale for one of their other markets) by the week ending September 25, 2026, to maintain minimum liquidity to sustain operations. The Sale Transaction is the furthest advanced sale of the Debtors' remaining markets and is the only transaction the Debtors currently expect to close by September 25, 2026. Absent an alternative source of funding to bridge this gap, which is currently unavailable to the Debtors, an auction process is not feasible from a liquidity perspective.

27. Additionally, an auction process may put the existing sale to the Purchaser at risk due to the increased risk of supplier attrition. Because many of the Debtors' suppliers do not have long-term broker agreements that are readily assignable, and because suppliers have to plan for the following year months in advance, many suppliers have communicated that they cannot wait for the conclusion of an extended sale process before selecting a successor supplier. As a result, Martignetti has indicated that it may not be willing to move forward with the Sale Transaction on the terms contemplated by the APA if the sale extends past September 22, 2026. As a condition

to the Sale Transaction, Martignetti insisted that they have a unilateral termination right if the Sale Transaction does not close by such date. Additionally, many of the Debtors' suppliers have communicated their support for the Sale Transaction, with some suppliers indicating that they would not be supportive of an alternative purchaser or of an extended process. Accordingly, the Debtors believe that a private sale is appropriate under the circumstances and that a public auction would be value destructive to the detriment of the Debtors, their estates, and other stakeholders.

28. Courts in this jurisdiction have authorized private sales pursuant to section 363 of the Bankruptcy Code. *See, e.g.*, *In re Desktop Metal, Inc.*, No. 25-09268 (CML) (Bankr. S.D. Tex. July 31, 2025) (authorizing a private sale of certain of the debtors' assets without bidding procedures or an auction); *In re Sunnova Energy Int'l Inc.*, No. 25-90160 (ARP) (Bankr. S.D. Tex. June 11, 2025) (same); *In re Kal Freight Inc.*, No. 24-90614 (CML) (Bankr. S.D. Tex. Mar. 31, 2025); (same); *In re Envision Healthcare Corp.*, No. 23-90342 (CML) (Bankr. S.D. Tex. Aug. 1, 2023) (same); *In re Katerra Inc.*, No. 21-31861 (DRJ) (Bankr. S.D. Tex. July 8, 2021) (same).

29. Accordingly, the Debtors' entry into the Sale Transaction, and approval of the Sale Transaction in their capacity as members and/or managers of certain of the non-Debtor Sellers, is a sound exercise of the Debtors' business judgment and should be approved under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004(h).

## II. The Sale of the Purchased Assets of the Debtors Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.

30. Section 363(f) of the Bankruptcy Code permits a debtor in possession to sell estate property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest

is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.

31. Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of *any* of the requirements enumerated therein will suffice to warrant the sale of the applicable property free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed under the applicable agreement. *See In re C-Power Prods., Inc.*, 230 B.R. 800, 803 (Bankr. N.D. Tex. 1998); *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 Bankr. LEXIS 4333, at *7 (Bankr. E.D. Tex. Dec. 19, 2007) ("satisfaction of any one of the requirements [of section 363(f) of the Bankruptcy Code] will suffice to warrant the Debtors' sale . . . free and clear of all interests").

32. Here, pursuant to Article 9 of the Uniform Commercial Code, any liens will attach to the proceeds of the sale. Moreover, any such statutory liens fall squarely within section 363(f)(5) of the Bankruptcy Code, under which it is well-established that assets may be sold free and clear of statutory liens. *See, e.g., In re AG Van Metre, Jr. Inc.*, 155 B.R. 118 (Bankr. E.D. Va. 1993), *aff'd without opinion*, 16 F.3d 414 (4th Cir. 1994) ("It would be illogical to require full satisfaction statutory tax liens as a condition to the approval of sale pursuant to § 363(f)(3) (sic) when § 724(b) explicitly provides otherwise").

33. The APA contemplates that the Sellers shall convey the Purchased Assets to the Purchaser free of all liens, mortgages, security interests, claims, or other encumbrances (collectively, the "<u>Encumbrances</u>"), subject to certain exceptions. To the extent the Purchased Assets to be transferred pursuant to the Sale Transaction are subject to any Encumbrances, the holders of such Encumbrances have either consented to or are anticipated to consent to the Sale Transaction because it will provide the most efficient, value-maximizing approach to realizing proceeds for, among other

things, the repayment of amounts due to such parties. Specifically, Wells Fargo Bank, National Association, as agent under the Credit Agreement and DIP Credit Agreement, consents to the sale of the Purchased Assets of the Debtors free and clear of all Encumbrances pursuant to the Sale Transaction and consents to the release and termination of any Encumbrances on the Purchased Assets of the Debtors. The lenders to the non-Debtor Sellers have also consented or are expected to consent to the Sale Transaction of the Purchased Assets free and clear of all Encumbrances.[6] Further, any and all Encumbrances on the Purchased Assets that are not assumed or otherwise transferred to the Purchaser will attach to the proceeds of the Sale Transaction with the same force, effect, and priority as such Encumbrances currently have on these assets, subject to the rights and defenses, if any, of the Sellers and of any party in interest to object thereto.

34. The Debtors therefore submit that the treatment of all Encumbrances in the Purchased Assets of the Debtors, except with respect to any Assumed Liabilities or Permitted Encumbrances, satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code. The Debtors further submit that the treatment of any interest that will not be a Permitted Encumbrance satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing or by attaching to the net proceeds of the Sale Transaction, subject to any claims and defenses the Debtors may possess with respect thereto.

35. Accordingly, the Sale Transaction satisfies (or will satisfy) section 363(f)(3) of the Bankruptcy Code and the Court should approve the Sale Transaction of the Purchased Assets of

---

[6] For the avoidance of doubt, the Debtors are only seeking the Court's approval with respect to the sale of the Purchased Assets of the Debtors and are not seeking approval with respect to the sale of the Purchased Assets of the other Sellers (which is not property of the Debtors' estates and not subject to section 363 of the Bankruptcy Code).

the Debtors free and clear of all liens, claims, rights, mortgages, interests, charges, and other encumbrances, other than as set forth in the Sale Documents.

## III. The Purchaser is a Good Faith Purchaser and is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code.

36. Because the Purchaser is acting in good faith, it is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale Transaction. Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith[.]" Although "[t]he Bankruptcy Code does not explicitly define 'good faith,'" the Fifth Circuit has stated that a good faith purchaser is one who (a) "purchases the assets for value, in good faith, and without notice of adverse claims" and (b) "one who does not engage in 'misconduct' including," among other things, "fraud, collusion between the purchaser and other bidders, or an attempt to take grossly unfair advantage of other bidders." *In re Palm Springs II, L.L.C.*, 65 F.4th 752, 759 (5th Cir. 2023) (quoting *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014)). "Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pa.,* 788 F.2d 143, 147 (3d Cir. 1986).

37. ***First***, as set forth in more detail above, the Purchase Price to be received by the Debtors is fair and reasonable under the circumstances. ***Second***, the Parties entered into the APA and the other Sale Documents in good faith after extensive, arm's-length negotiations—that spanned four months—during which all parties were represented by competent counsel. ***Third***, there is no indication of any "fraud, collusion between the purchaser and other bidders or

the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code. ***Fourth***, the Purchaser is not an "insider" or "affiliate" of any of the Debtors or the other Sellers, as those terms are defined in sections 101(2) and 101(31) of the Bankruptcy Code, and no common identity of incorporators, directors, members, or controlling stockholders exists between the Purchaser and the Debtors or other Sellers. ***Fifth***, the Purchaser in no way induced or caused the commencement of these Chapter 11 Cases. ***Sixth***, the Purchaser recognized that the Debtors and the other Sellers were free to deal with any other party interested in acquiring the Purchased Assets during the sale process. ***Seventh***, the Purchase Price was not controlled by any agreement among third parties. Accordingly, the Purchaser is a "good faith purchaser" of the Purchased Assets of the Debtors and is entitled to the full protection of section 363(m) of the Bankruptcy Code in connection with the Sale Transaction.

## IV. Consummation of the Sale Transaction is Appropriate Under Bankruptcy Rule 6004(f).

38. Bankruptcy Rule 6004(f) authorizes a debtor in possession to sell estate property outside of the ordinary course of business by private sale or public auction. Courts generally afford debtors in possession broad discretion to determine the manner in which estate property is sold. *See, e.g.*, *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998); *In re Alisa P'ship*, 15 B.R. 802, 802 (Bankr. D. Del. 1981). Sales outside of an auction are appropriate where the debtor demonstrates that the proposed sale is permissible under section 363(b) of the Bankruptcy Code; *i.e.*, where the debtor articulates a good business reason for the sale. *See In re Cypresswood Land Partners, I,* 409 B.R. 396, 436 (Bankr. S.D. Tex. 2009). Additionally, courts have held that a debtor has broad discretion to determine the manner in which its assets are sold. *See In re Alisa P'ship*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) (finding that section 363 "clearly indicates that the

manner of sale is within the discretion of the trustee"); *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has ample authority to conduct a sale of estate property through a private or public sale).

39. Here, there are sound business reasons for the Sale Transaction, and the Sale Transaction is the best available option to maximize the value of the Purchased Assets of the Debtors. As set forth herein, the Debtors and their advisors conducted a comprehensive marketing process prepetition and have continued engaging with prospective buyers postpetition. Not a single actionable bid for the Control States arose other than the offer submitted by the Purchaser. Given that this market check did not produce a single alternative actionable going-concern bid, and considering the limited universe of potential purchasers (due to the heavily regulated nature of the alcoholic beverage brokerage business), holding an auction for the Purchased Assets at this juncture would almost certainly fail to yield additional value for the Debtors' estates and would needlessly delay consummation of the Sale Transaction, the Chapter 11 Cases, and the Debtors' ability to pursue a value-maximizing wind down. For these reasons, selling the Purchased Assets via private sale without an auction is appropriate under Bankruptcy Rule 6004(f).

**V. Relief Under Bankruptcy Rule 6004(h) is Appropriate.**

40. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately upon its entry by providing that the 14-day stay under Bankruptcy Rule 6004(h) is waived.

41. Although Bankruptcy Rule 6004(h) and the *Advisory Committee Notes* to the Bankruptcy Rules are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, the leading treatise on bankruptcy suggests that the 14-day stay should be

eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 Collier on Bankruptcy ¶ 6004.11, ¶ 6004.04 (16th rev. ed. 2014).

42. Under the facts and circumstances of the Chapter 11 Cases, the Debtors must close the Sale Transaction immediately. Without the liquidity the Sale Transaction provides, the Debtors anticipate that they will not have the liquidity required to pay the ordinary course expenses necessary to continue operations or fund the administration of the Chapter 11 Cases. Accordingly, the Debtors, the other Sellers, and the Purchaser are committed to promptly close the Sale Transaction upon entry of the Sale Order. Accordingly, the Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## VI. The Assumption and Assignment of Assigned Contracts and Assigned Leases and the Rejection of Rejected Contracts Is Appropriate and Should Be Approved.

### a. The Assumption and Assignment of the Assigned Contracts and Assigned Leases Reflects the Debtors' Reasonable Business Judgment.[7]

43. To facilitate and effectuate the Sale Transaction, the Sellers seek authority to assign or transfer the Assigned Contracts and the Assigned Leases to the Purchaser and reject or terminate the Rejected Contracts. Section 365 of the Bankruptcy Code authorizes a debtor to assume or assume and assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See generally* 11 U.S.C. § 365. "A bankruptcy court reviews a debtor's decision to assume or reject an executory contract under the deferential 'business judgment' standard." *In re J. C. Penney Direct Mktg. Servs., L.L.C.*, 50 F.4th 532, 534 (5th Cir. 2022) (citation omitted). Indeed, "a bankruptcy court should only withhold approval [of a debtor's assumption request] when 'the debtor's judgment is clearly erroneous, too speculative, or contrary

[7] For the avoidance of doubt, the Debtors only seek the Court's approval to assign the Assigned Contracts and Assigned Leases of the Debtors and not the other Sellers.

to the provisions of the Bankruptcy Code.'" *Id*. (quoting *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985)); *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) (noting that the business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage").

44. The Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assigned Contract or Assigned Lease be deemed to consent to the assumption and assignment of the applicable Assigned Contract or Assigned Lease pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order. *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to the sale motion, the creditor was deemed to consent).

45. The Assigned Contracts and Assigned Leases of the Debtors are important to operate the Control States. As such, the Purchaser would not consent to the Sale Transaction absent such relief, and the assignment of such agreements is essential to consummating the Sale Transaction. Counterparties to the Assigned Contracts and Assigned Leases of the Debtors will have sufficient notice and opportunity to raise any issues, including with respect to cure and adequate assurance of performance with the proposed assignee, so their respective rights, remedies, and defenses are preserved. The Assigned Contracts and Assigned Leases are essential to the value of the Purchased Assets and, as such, they are essential to inducing the highest or otherwise best offer for the Purchased Assets. Accordingly, the Court should approve the decision to assume and assign the Assigned Contracts and Assigned Leases of the Debtors in connection with the Sale Transaction as a sound exercise of the Debtors' business judgment.

**b. Defaults Under the Assigned Contracts Will Be Cured.**

46. Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract or unexpired lease is in the best interest of its estate, courts must

then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code. Specifically, before assumption will be permitted, a debtor must (a) cure existing defaults or provide adequate assurance that cure will promptly occur, (b) compensate any party to the agreement that has suffered actual pecuniary loss as a result of default or provide adequate assurance of prompt compensation to the injured party, and (c) provide adequate assurance of future performance under the agreement. *In re Carlisle Homes, Inc.,* 103 B.R. 524, 538 (Bankr. D.N.J. 1988); *see also Cinicola v. Scharffenberger,* 248 F.3d 110, 120 (3d Cir. 2001) ("Before an executory contract may be assigned, the trustee first must assume the contract and 'adequate assurance of future performance' of the contract must be provided."). This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *Id.* (*quoting In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)).

47. Here, the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will promptly be satisfied because the applicable Debtor or Debtors will cure all defaults associated with, or required to properly assume and assign, the Assigned Contracts and the Assigned Leases of the Debtors on, prior to, or after the Closing Date, as applicable, in accordance with the terms of the APA. The Debtors believe that if any defaults exist that must be cured, such cure will be achieved fairly, efficiently, properly, and consistently with the Bankruptcy Code. In conjunction with or following consummation of the Sale Transaction, the applicable Debtor or Debtors will pay all identified and outstanding obligations under the Assigned Contracts and the Assigned Leases and will perform all of their undisputed prepetition obligations in connection with the assumption and assignment of any Assigned Contract and the Assigned Lease.

48. Further, the Assigned Contracts and the Assigned Leases of the Debtors and the related Cure Costs are listed on Exhibit 2 of the Sale Order (as may be amended or modified from time to time, the "Cure Schedule," and the related costs, collectively, the "Cure Costs"). On the date hereof (or as soon as reasonably practicable thereafter), the applicable Debtor or Debtors will serve each non-Debtor counterparty to an Assigned Contract or Assigned Lease of the Debtors with the Motion, the Sale Order, and the Cure Schedule, notifying such counterparty (a) that the Assigned Contract or Assigned Lease of the Debtors may be assumed and assigned to the Purchaser in connection with the Sale Transaction and (b) of the proposed Cure Cost associated with the relevant Assigned Contract or Assigned Lease. Objections to the proposed assumption and assignment of an Assigned Contract or Assigned Lease of the Debtors (including with respect to the proposed Cure Cost) must (a) be in writing, (b) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, (c) state, with specificity, the legal and factual bases thereof, including the Cure Cost that the counterparty believes is required to cure defaults under the relevant Assigned Contract or Assigned Lease if different from the Cure Cost set forth in the Cure Schedule, and (d) be filed with the Court (contemporaneously with a proof of service) by no later than (i) the date of the hearing on the Motion, (ii) for any Assigned Contract or Assigned Lease added to Exhibit 2 after the filing of this Motion, 14 days after service of the notice to such Assigned Contract or Assigned Lease counterparty, or (iii) such later date as may be agreed to by the Debtors (an "Assignment Objection"). A properly filed Assignment Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment or Cure Costs of the Assigned Contract and/or Assigned Lease at issue, but will not constitute an objection to the remaining relief requested in the Motion.

49. If a counterparty to an Assigned Contract or Assigned Lease of the Debtors fails to properly and timely file and serve an Assignment Objection in accordance with paragraph 48 of this Motion, the counterparty shall be forever barred from asserting any objection with regard to the assumption or assignment of its Assigned Contract or Assigned Lease, as applicable, and notwithstanding anything to the contrary in the Assigned Contract or Assigned Lease or any other document, the Cure Costs set forth in the Cure Schedule shall be the only amount necessary to cure outstanding defaults under the applicable Assigned Contract or Assigned Lease under section 365 of the Bankruptcy Code.

50. In the event of a dispute between the applicable Debtor or Debtors and a counterparty to any Assigned Contract or Assigned Lease with respect to a Cure Cost for which there is an unresolved objection, the Debtors propose that it will promptly pay the appropriate amount after: (a) the applicable Debtor or Debtors reach a consensual resolution and agreement on the amount of the cure with the applicable counterparty; or (b) the Court has entered an order fixing such amount.

**c. Non-Debtor Parties Will Be Adequately Assured of Future Performance.**

51. The third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied. "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).

52. Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.

*See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (noting that adequate assurance of future performance is present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding). The Purchaser is an established alcoholic beverage distributor with experience operating in "control" markets and has the preexisting infrastructure necessary to facilitate a smooth transition of the Assigned Contracts and the Assigned Leases. The Debtors will also enter into a transition services agreement with the Purchaser as required by the APA to further support a smooth transition.

53. Accordingly, the Debtors submit the assumption and assignment of the Assigned Contracts and Assigned Leases in connection with the Sale Transaction should be authorized pursuant to section 365(b) of the Bankruptcy Code.

**d. The Rejection of the Rejected Contracts Reflects the Debtors' Reasonable Business Judgment and Should Be Approved.**

54. In addition, section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may . . . reject any executory contract or unexpired lease of the debtor." Section 365 of the Bankruptcy "allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (citing *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62 (5th Cir. 1994)). Rejection of an executory contract or an unexpired lease is appropriate where such rejection would benefit the estate. *See In re Pisces Energy, LLC*, No. 09-36591-H5-11, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) ("Courts apply the 'business judgment test,' which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment.").

55. As part of the Sale Transaction, the Debtors are required to reject any Supplier Contracts of the Debtors that relate solely to the Debtors' brokerage business in the Control States (collectively, the "Rejected Contracts") and to terminate their relationship with Suppliers in the Control States in accordance with section 6.14 of the APA. This requirement to reject the Rejected Contracts and terminate Supplier relationships is an integral component of the Sale Transaction and was required by Martignetti to ensure that the Debtors do not continue to operate in the Control States and to facilitate Martignetti's establishment of direct relationships with Suppliers. Rejection of the Rejected Contracts and termination of the applicable Supplier relationships in accordance with section 6.14 of the APA is within the Debtors' business judgment and is in the best interest of the Debtors and their estates. The Debtors are selling all of their Control States assets and will have no business purpose for the Rejected Contracts or the applicable Supplier relationships after the closing of the Sale Transaction. Moreover, the rejection of the Rejected Contracts and termination of the Supplier relationships by the Debtors is necessary to facilitate smooth supplier transitions to Martignetti as the Debtors cannot readily assume and assign supplier agreements in connection with the Sale Transaction. Accordingly, the Debtors submit the rejection of the Rejected Contracts and the termination of Supplier relationships consistent with section 6.14 of the APA should be authorized and approved.

## Emergency Consideration

56. The Debtors request emergency consideration of this Motion in accordance with Bankruptcy Local Rule 9013-1 and section G of the Complex Case Procedures. For the reasons discussed above, consummating the Sale Transaction on an expedited basis is critical to the success of the Chapter 11 Cases and necessary to sustain the Debtors' remaining operations as they pursue value-maximizing sales for their other markets and an orderly wind down of their estates. As a condition to the Sale Transaction, Martignetti insisted that they have a unilateral termination right

if the Sale Transaction does not close by September 22, 2026. Absent emergency relief, the Debtors will not be able to close the Sale Transaction as necessary to continue funding the administration of the Chapter 11 Cases and may be forced to commence a value-destructive liquidation of their assets to the detriment of all stakeholders. Accordingly, the Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

57. The Debtors request that the Sale Order include a finding that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exempt such relief from the 14-day stay under Bankruptcy Rule 6004(h).

**Reservation of Rights**

58. Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested in this Motion is intended as or should be construed or deemed to be: (a) an implication or admission as to the amount of, basis for, priority, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) except as provided for in this Motion and authorized pursuant to the Sale Order, a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien (that arises under contractual rights, common law, statutory law, or otherwise) on, security interest in,

or other encumbrance on property of the Debtors' estates, including any lien that may be satisfied pursuant to the relief requested in this Motion, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; or (h) a waiver of the obligation of any party in interest to file a proof of claim. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

59. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee; (b) the Committee; (c) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (d) the Bank Lenders; (e) the Bank Agent; (f) the Second Lien Lender; (g) the Equipment Loan Lenders; (h) holders of the Owner Notes; (i) the office of the attorney general for each of the states in which the Debtors operate; (j) the Internal Revenue Service; (k) any other governmental agencies having a regulatory or statutory interest in these Chapter 11 Cases; (l) counsel to the Purchaser; (m) counsel to the non-Debtor owners of the Michigan JV and Ohio JV; (n) all counterparties to the Assigned Contracts and Assing Leases of the Debtors to be assumed and assigned in connection with the Sale Transaction; (o) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors request that the Court enter the Sale Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
Dated: September 5, 2026

*/s/ John F. Higgins*

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Joanna D. Caytas (TX Bar No. 24127230)
John ("Jack") Eiband (TX Bar No. 24135185)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 228-1331
Email: jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jcaytas@porterhedges.com
jeiband@porterhedges.com

*Proposed Co-Counsel for the Debtors*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Maddison Levine (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
christopher.marcus@kirkland.com
maddison.levine@kirkland.com

*Proposed Co-Counsel for the Debtors*

**Certificate of Accuracy**

In accordance with Bankruptcy Local Rule 9013-1(i), I certify that the foregoing statements are true and accurate to the best of my knowledge.

*/s/ John R. Castellano*
John R. Castellano

**Certificate of Service**

I certify that on September 5, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas. Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' claims and noticing agent.

*/s/ John F. Higgins*
John F. Higgins