United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 18, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC, *et al.*,[1] | ) | Case No. 26-90737 (CML) |
| Debtors. | ) | (Jointly Administered) |

# ORDER (I) AUTHORIZING ENTRY INTO AND PERFORMANCE UNDER THE ASSET PURCHASE AGREEMENT, (II) APPROVING THE PRIVATE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, RIGHTS, AND INTERESTS, (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (IV) GRANTING RELATED RELIEF

[Relates to Docket No. 338]

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Sale Order"): (a) authorizing and approving the Debtors' entry into and performance under that certain Asset Purchase Agreement, by and among (i) the Sellers and (ii) Martignetti Companies Control State, LLC, Martignetti Companies of New Hampshire, LLC, and Martignetti Companies of Utah, LLC, as Purchaser, dated as of September 5, 2026 (the "APA"), substantially in the form attached hereto as **Exhibit 1**; (b) authorizing and approving the sale of the Purchased Assets free and clear of all liens, claims,

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/RNDC. The location of Debtor Republic National Distributing Company, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 4300 Wildwood Parkway, Suite 200, Atlanta, GA 30339.

[2] Capitalized terms used but not immediately defined herein shall have the meanings ascribed to such terms in the Motion, the APA, or the Final DIP Order (as defined herein), as applicable.

encumbrances, rights, and interests pursuant to section 363(f) of the Bankruptcy Code on the terms set forth in the APA; (c) authorizing the assumption and assignment of the Assigned Contracts and the Assigned Leases of the Debtors; and (d) granting related relief, all as more fully set forth in the Motion; and upon consideration of the *Declaration of Ryan Murphy in Support of Debtors' Motion for Entry of an Order (I) Authorizing Entry Into and Performance Under the Asset Purchase Agreement, (II) Approving the Private Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, Rights, and Interests, (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* [Docket No. 413] (the "Murphy Declaration") and the *Declaration of John R. Castellano in Support of Debtors' Motion for Entry of an Order (I) Authorizing Entry Into and Performance Under the Asset Purchase Agreement, (II) Approving the Private Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, Rights, and Interests, (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* [Docket No. 424] (the "Castellano Declaration"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that it may enter this Sale Order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that sufficient cause exists for the relief set forth herein; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found

that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having conducted a hearing on the Motion and having heard the statements in support of the relief requested therein, at a hearing before this Court (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion, all relief related thereto, any objections thereto, and statements of counsel and the evidence presented at the Sale Hearing in support of the relief requested by the Debtors in the Motion; and after due deliberation thereon; and upon the full evidentiary record; and this Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing, if any, establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

A. **Jurisdiction and Venue.** This Court has jurisdiction to consider this Motion and approve the Sale Transaction pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges from the United States District Court for the Southern District of Texas*, entered May 24, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for these Chapter 11 Cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This Court may enter a final order consistent with Article III of the United States Constitution.

B. **Statutory Predicates.** The statutory predicates for the relief sought in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006 and Bankruptcy Local Rules 1075-1, 4002-1(e), and 9013-1.

C. **Final Order.** This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), any other applicable

Bankruptcy Rules, or Bankruptcy Local Rules, and to any extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.

D. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E. **Notice.** As evidenced by the affidavits of service filed with the Court [Docket Nos. 401 and 405], due, proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise be heard regarding the Motion, the APA, the Sale Transaction, the Sale Hearing, this Sale Order, the assumption and assignment of the Assigned Contracts and the Assigned Leases, and the Cure Schedule was provided to all parties entitled thereto in accordance with sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007, and 9008. No other or further notice of, other opportunity to object to, or other opportunity to be heard regarding the Motion or the entry of this Sale Order need to be given to any entity. The disclosures made by the Debtors concerning the Motion, the APA, the other Sale Documents, and the Sale Hearing were good, complete, and adequate and sufficient under the circumstances. The applicable requirements of the Bankruptcy Rules and the Bankruptcy Local Rules are satisfied by such notice and disclosures.

F. **<u>Corporate Authority</u>.** The Debtors, together with the other Sellers, have full corporate power and authority to execute the Sale Documents and consummate the Sale Transaction and do not require any consents or approvals that have not been obtained, other than this Court's entry of this Sale Order and those expressly provided for in the APA to consummate the Sale Transaction. No other consents or approvals, other than those expressly provided for in the Sale Documents, are required for the Debtors to consummate the Sale Transaction.

G. The Sale Documents were not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither the Debtors, the other Sellers, nor the Purchaser are entering into the transactions contemplated by the Sale Documents fraudulently (as that term is understood in the context of statutory and common law fraudulent conveyance and fraudulent transfer claims or otherwise).

H. The Debtors and the other Sellers are the sole and lawful owner of the Purchased Assets. Subject to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets of the Debtors to the Purchaser in accordance with the Sale Documents will be, as of the Closing Date, a legal, valid, and effective transfer of the Purchased Assets, which transfer vests or will vest in the Purchaser all right, title, and interest of the Debtors to the Purchased Assets free and clear of (a) all liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) and encumbrances relating to, accruing, or arising at any time prior to the Closing Date (collectively, the "<u>Liens</u>"), and (b) all debts arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan

agreements, instruments, collective bargaining agreements, leases, licenses, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter-ego, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to claims and Liens that (i) purport to give any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the Purchaser's respective interests in the Purchased Assets, or (ii) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, as defined in this clause (ii), the "Claims"), relating to, accruing, or arising any time prior to entry of this Sale Order, in each case, with the exception of any such Liens or Claims that are expressly assumed by the Purchaser or retained by the Sellers pursuant to the Sale Documents.

I. **Sale Transaction in Best Interests of the Debtors' Estates.** Good and sufficient reasons for approval of the Sale Documents and the transactions to be consummated in connection therewith have been articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Debtors have demonstrated both (a) good, sufficient, and sound business purposes and justifications for approving the APA and other Sale Documents and (b) compelling circumstances for the Sale Transaction other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, and outside of a chapter 11 plan, in that, among other things, the immediate consummation of the Sale

Transaction is necessary and appropriate to maximize the value of the Debtors' estates and the Sale Transaction will provide the means for the Debtors to maximize distributions to creditors.

J. The Sale Transaction must be approved and consummated promptly to maximize the value of the Debtors' estates. Time is of the essence in consummating the Sale Transaction. Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price, the proposed Sale Transaction constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

K. The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

L. **Good Faith of the Debtors, the Other Sellers, and the Purchaser.** The Sale Documents and the Sale Transaction, including but not limited to the prepetition marketing and sale process engaged in by the Debtors, the other Sellers, and the Purchaser and entry into the APA, were negotiated, proposed, and entered into by the Debtors, the other Sellers, and the Purchaser without collusion, in good faith, from arm's-length bargaining positions, and are substantively and procedurally fair to all parties in interest. The Purchaser is consummating the Sale Transaction in good faith and is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and is not an "insider" or "affiliate" of any of the Debtors or the other Sellers, as those terms are defined in sections 101(2) and 101(31) of the Bankruptcy Code, and no common identity of incorporators, directors, members, or controlling stockholders exists between the Purchaser and the Debtors or the other Sellers. Neither any of the Debtors, the

other Sellers, nor the Purchaser have engaged in any conduct that would cause or permit the APA or the other Sale Documents to be avoided, or for any costs or damages to be imposed, under section 363(n) of the Bankruptcy Code. Specifically, the Purchaser has not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreement among third parties. As further described in the Motion, the Murphy Declaration, and as demonstrated by (a) any testimony and other evidence proffered or adduced at the Sale Hearing, if any, and (b) the arguments and representations of counsel made on the record at the Sale Hearing, if any, substantial marketing efforts for the Debtors' assets, including the Purchased Assets, and a competitive sale process were conducted and, among other things, (i) the Purchaser in no way induced or caused any chapter 11 filing by the Debtors, and (ii) the Purchaser recognized that the Debtors and the other Sellers were free to deal with any other party interested in acquiring the Purchased Assets during the sale process, including postpetition. The Purchaser is purchasing the Purchased Assets, in accordance with the Sale Documents, in good faith, and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is therefore entitled to all of the protections afforded by such provision and otherwise has proceeded in good faith in all respects in connection with the Chapter 11 Cases.

M. **Marketing and Sale Process; Highest or Otherwise Best Offer**. The Debtors and their advisors engaged in a robust and extensive prepetition marketing and sale process and have marketed the Purchased Assets and conducted all aspects of the sale process in good faith. The marketing process undertaken by the Debtors and their advisors with respect to the Purchased Assets has been adequate and appropriate and reasonably calculated to maximize value for the benefit of all stakeholders and was conducted in a diligent, non-collusive, fair and good-faith manner. The Debtors have adequately marketed the Purchased Assets and the marketing process

with respect to the Purchased Assets afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Purchased Assets. The APA, including the form and total consideration to be realized by the Debtors under the APA, (a) constitutes the highest and best offer for the Purchased Assets of the Debtors, (b) is fair and reasonable, and (c) is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest. No other person, entity, or group of entities has presented, and it is unlikely that any entity or group of entities would present in a reasonable time frame, a higher or otherwise better offer to purchase the Purchased Assets, including the Permitted Encumbrances and Assumed Liabilities, for greater economic value and/or on better terms to the Debtors' estates than the Purchaser. In addition, a postpetition public sale process or auction would further decrease the value to be received by the Debtors by, among other things, creating uncertainty and deteriorating relationships with Suppliers, which are essential to the value of the Purchased Assets of the Debtors.

N. **Business Justification; Fiduciary Duties**. Good and sufficient reasons for approval of the Motion and the Sale Transaction to be consummated in connection therewith have been articulated by the Debtors, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Debtors have demonstrated both (a) good, sufficient, and sound business purposes and justifications and (b) compelling circumstances for the Sale Transaction outside of the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, outside of a chapter 11 plan, in that, among other things, the immediate consummation of the Sale Transaction to the Purchaser is necessary and appropriate to maximize the value of the Debtors' assets and estates. The Debtors' decision to enter into the APA and pursue and consummate the Sale Transaction constitutes a proper exercise of the

fiduciary duties of the Debtors and their respective directors, managers, and officers. Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price, including the allocation of the Purchase Price for the Purchased Assets of the Debtors, the proposed Sale Transaction constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved. The consummation of the Sale Transaction, the assumption and assignment of the Assigned Contracts and the Assigned Leases of the Debtors, and the rejection of the Rejected Contracts are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction. The Debtors have demonstrated that it is an exercise of their sound business judgment to (a) assume and assign the Assigned Contracts and the Assigned Leases of the Debtors to the Purchaser and (b) reject the Rejected Contracts, in connection with the consummation of the Sale Transaction, and such actions are in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Assigned Contracts and the Assigned Leases of the Debtors being assigned to the Purchaser and the rejection of the Rejected Contracts, are an integral part of the Sale Transaction and, accordingly, such actions are reasonable and an enhancement to the value of the Debtors' estates.

O. **Consideration.** The consideration provided by the Purchaser pursuant to the Sale Documents (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Purchased Assets of the Debtors, and (c) constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Voidable Transactions Act (formerly the Uniform Fraudulent Transfer Act), Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) for the Purchased Assets of the Debtors under the laws of the United States, any state,

territory, possession, or the District of Columbia. No other person or entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtors' estates than that contemplated by the Sale Transaction. Approval of the Motion, the Sale Documents, and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

P. **No Merger**. Neither the Purchaser nor any of its affiliates are a mere continuation of the Debtors or any of the other Sellers or their estates and there is no continuity of enterprise or common identity between the Purchaser or any of its affiliates, on the one hand, and the Debtors or any other of the Sellers, on the other hand. Neither the Purchaser nor any of its affiliates are holding themselves out to the public as a continuation of the Sellers. Neither the Purchaser nor any of its affiliates are successors to the Debtors or their estates or any of the other Sellers by reason of any theory of law or equity, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of the Purchaser or any of its affiliates with or into the Debtors or any other Seller.

Q. **Binding Agreement; Subsequent Orders and Plans**. The APA is a valid and binding contract between the Sellers and the Purchaser and shall be enforceable pursuant to its terms. The APA and the Sale Transaction itself, and the consummation thereof, shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, their estates, and any chapter 7 or chapter 11 trustee appointed with respect to any of the Debtors, and shall not be subject to rejection or avoidance by the foregoing parties or any other person. The terms and provisions of the APA and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their affiliates, their estates, the other Sellers, all creditors of and holders of equity interests in any Debtor, any holders of Encumbrances (whether known or

unknown) in, against, or on all or any portion of the Purchased Assets of the Debtors, all counterparties to the Assigned Contracts and the Assigned Leases of the Debtors, the Purchaser, designees, successors, and assigns of the Purchaser, the Purchased Assets of the Debtors, and any trustees, examiners, or receivers, if any, subsequently appointed in any of the Debtors' Chapter 11 Cases or upon the conversion of any of the Debtors' cases to a case under chapter 7 of the Bankruptcy Code (collectively, the "Bound Parties"). The provisions of this Sale Order and the terms and provisions of the APA shall survive the entry of any order that may be entered confirming or consummating any chapter 11 plan of the Debtors, dismissing these Chapter 11 Cases, or converting these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in any chapter 11 plan confirmed in these Chapter 11 Cases or any subsequent order of this Court, including, without limitation, any order confirming any such chapter 11 plan, any order authorizing the sale of the Debtors' assets pursuant to any section of the Bankruptcy Code, and any order approving the wind-down or dismissal of any Debtor's chapter 11 case or any subsequent chapter 7 case, nothing in such plan or order shall change, supersede, abrogate, nullify, restrict, or conflict with the provisions of the APA or this Sale Order, or in any way prevent or interfere with the consummation or performance by the Debtors of the Sale Transaction. The rights and interests granted pursuant to this Sale Order and the APA shall continue in these or any superseding cases and shall be binding upon the applicable Bound Parties and their respective successors and permitted assigns including, without limitation, any trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized to perform under the APA and

this Sale Order without the need for further order of the Court. Notwithstanding the foregoing, nothing in this Sale Order shall modify, supersede, or impair the Final DIP Order,[3] the Preserved Challenge Claims (as defined herein), or any rights under paragraph 16 of the Final DIP Order.

R. **No *Sub Rosa* Plan**. The Sale Transaction does not constitute a *sub rosa* chapter 11 plan. The consummation of the Sale Transaction outside of a chapter 11 plan pursuant to the APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a chapter 11 plan for any of the Debtors.

S. **Free and Clear.** The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full, and therefore, the Debtors may sell the Purchased Assets of the Debtors free and clear of all Liens and Claims other than as expressly provided in the Sale Documents. The Purchaser would not have entered into the Sale Documents and would not consummate the transactions contemplated thereby if the transfer of the Purchased Assets of the Debtors to the Purchaser pursuant to the Sale Transaction were not free and clear of all Liens and Claims other than as provided in the Sale Documents. The Debtors may sell the Purchased Assets of the Debtors free and clear of all Liens and Claims (other than as expressly provided in the Sale Documents) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Each entity with a Lien in respect of the Purchased Assets of the Debtors to be transferred on the Closing Date: (a) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction; (b) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien; (c) is a holder of a Lien that is subject to a bona fide dispute; or (d) otherwise falls

[3] "Final DIP Order" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 275].

within the provisions of section 363(f) of the Bankruptcy Code. In particular, Wells Fargo Bank, as Prepetition Agent and DIP Agent, consents to the sale of the Purchased Assets free and clear of all Claims and Liens arising under the prepetition Credit Facilities as well as the DIP Facility Loans pursuant to this Sale Order and consents to the release/termination of any Liens on the Purchased Assets arising under the Credit Facilities or DIP Facility Loans. Those holders of Liens or Claims who did not object to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All holders of Liens or Claims in respect of the Purchased Assets of the Debtors are adequately protected by either (a) having their Encumbrances, if any, in each instance against the Debtors, their estates, or the Purchased Assets, attach to the net cash proceeds of the Purchase Price ultimately attributable to the Purchased Assets of the Debtors in which such creditor alleges Encumbrances in the same order of priority, with the same validity, force, and effect that such Encumbrances had prior to the Sale Transaction, subject to any claims and defenses the Debtors and their estates may possess with respect thereto, or (b) fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

T. Those holders of Encumbrances who did not object or who withdrew their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

U. For the avoidance of doubt, none of the Purchased Assets of any Seller that is not a Debtor are being sold pursuant to section 363 of the Bankruptcy Code and, therefore, none of the findings of fact or conclusions of law herein shall apply to such Purchased Assets.

V. **Consent and Waiver**. Section 6.3 of the DIP Credit Agreement provides that the Debtors are not permitted to sell, transfer, lease, or otherwise dispose of any assets owned by the Debtors, unless such Disposition (as defined in the DIP Credit Agreement) is made with the prior

written consent of the Required Lenders (as defined in the DIP Credit Agreement). Additionally, section 6.3 of the Prepetition First Lien Credit Agreement, section 6.3 of the DIP Credit Agreement, and paragraph 26 of the Final DIP Order each provide that, subject to paragraph 16 of the Final DIP Order, section 363(k) of the Bankruptcy Code, and the Carve Out, and any bidding or auction procedures approved by this Court, (a) the DIP Agent or its designee (in each case, acting at the direction of the Required DIP Lenders) has the unqualified right to credit bid up to the full amount of the DIP Facility Loans in any sale of all or any portion of the DIP Collateral and (b) the Prepetition Agent or its designee (in each case, acting at the direction of Required Prepetition Lenders (as defined in the Final DIP Order) has the unqualified right to credit bid up to the full amount of the Prepetition Loans in any sale of all or any portion of the Prepetition Collateral, subject to the satisfaction of all DIP Obligations and all obligations secured by the Permitted Prior Senior Liens.

W. The Required DIP Lenders consented to the Sale Transaction pursuant to section 6.3 of the DIP Credit Agreement and paragraph 26 of the Final DIP Order and the Required DIP Lenders under the DIP Credit Agreement and the Required Lenders under the Prepetition First Lien Credit Agreement each agreed to waive the applicability of section 6.3 of the DIP Credit Agreement, section 6.3 of the Prepetition First Lien Credit Agreement, and paragraph 26 of the Final DIP Order, as applicable, in connection with the Sale Transaction, including waiving the right of the Prepetition Agent, the DIP Agent, or their respective designees to credit bid for the Purchased Assets of the Debtors (collectively, the Consent and Waiver").

X. The Consent and Waiver is a material component to the overall consideration provided by the Sellers to the Purchaser and is appropriate under the circumstances of the Sale Transaction. The Purchaser would not have entered into the APA without the Consent and Waiver,

thereby adversely affecting the Debtors, their estates, and their creditors. The Consent and Waiver Agreement was thus a material inducement to the Purchaser agreeing to (a) enter into the APA, (b) purchase the Purchased Assets for the Purchase Price, and (c) consummate the Sale Transaction.

Y. **Assumption and Assignment of Executory Contracts and Unexpired Leases of the Debtors**.

(i) Schedule 1.1(g) of the APA lists certain contracts (collectively, the "Assigned Contracts") and unexpired leases (collectively, the "Assigned Leases") or other agreements to which one or more of the Debtors or the other Sellers is a party (collectively, the "APA Contracts"). On the Closing Date, the applicable Debtors and other Sellers shall undertake to assume and assign the APA Contracts to the Purchaser in accordance with the terms and conditions of the Sale Documents; *provided* that this Sale Order shall only serve to approve the Assigned Contracts and Assigned Leases of the Debtors, as set forth on **Exhibit 2** hereto, and not the other Sellers.

(ii) The assumption and assignment of the Assigned Contracts and the Assigned Leases listed in the APA pursuant to the terms of this Sale Order is integral to the APA, does not constitute unfair discrimination, and is in the best interests of the Debtors and their estates, their creditors, and all other parties in interest, and represents a reasonable exercise of sound and prudent business judgment by the Debtors. Subject to the terms and conditions of the APA, the applicable Debtor or Debtors shall, (a) to the extent necessary, cure or provide adequate assurance of cure, of any default existing prior to the Closing Date with respect to the Assigned Contracts and the Assigned Leases of the Debtors within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code and, (b) to the extent necessary, provide compensation or adequate assurance

of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof with respect to the Assigned Contracts and the Assigned Leases of the Debtors within the meaning of sections 365(b)(1)(B) and 365(f)(2)(A) of the Bankruptcy Code. The applicable Debtor's or Debtors' payment or otherwise cure of all defaults or other obligations of the applicable Debtor or Debtors under the Assigned Contracts and the Assigned Leases of the Debtors arising or accruing prior to the Closing Date, or otherwise required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts and the Assigned Leases of the Debtors that are listed on **Exhibit 2** hereto (as may be amended or modified from time to time, the "Cure Schedule," and the related costs, collectively, the "Cure Costs") in accordance with the terms of the APA, the Purchaser's promise to perform the obligations under the Assigned Contracts and the Assigned Leases of the Debtors, and the evidence provided to counterparties of the Assigned Contracts and the Assigned Leases of the Debtors, as applicable, that the Purchaser has the ability to perform, and intends to perform, its future obligations under the Assigned Contracts and/or Assigned Leases of the Debtors upon the assumption, shall constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the counterparties to such Assigned Contracts and Assigned Leases.

(iii) On or as soon as reasonably practicable after the Closing Date, the applicable Debtor or Debtors shall pay the Cure Costs for the Assigned Contracts and the Assigned Leases of the Debtors and cure any and all other defaults and breaches under the Assigned Contacts and the Assigned Leases of the Debtors to the extent required under section 365 of the Bankruptcy Code; *provided*, *however*, that the applicable Debtor or Debtors shall not pay any Cure Costs on

account of any Assigned Contract or Assigned Lease for which there is an unresolved objection by a non-Debtor counterparty. With respect to each Assigned Contract or Assigned Lease that is a Disputed Contract, the Debtors shall only be required to pay any Cure Costs as consensually agreed or after the Court has entered an order fixing such Cure Costs, at which time such Assigned Contracts and/or Assigned Leases, as applicable, shall be deemed assumed and assigned to the Purchaser. Notwithstanding anything to the contrary in this Sale Order, the Debtors reserve the right to amend **Exhibit 2** until the Designation Deadline under the APA, including as extended with respect to any Disputed Contracts; *provided* that the Debtors shall give prompt notice of any such amendment to any affected counterparty and such counterparty shall have a reasonable opportunity to object thereto on any grounds. For the avoidance of doubt, any Disputed Contract shall not be assumed and/or assigned on the Closing Date and will not be assumed and/or assigned until the cure dispute is resolved and the Cure Costs have been paid by the applicable Debtor.

(iv) The assumption and assignment of the APA Contracts in accordance with the Sale Documents and this Sale Order, as applicable, is in the best interests of the Debtors, their estates, creditors, and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors. The Purchaser has provided adequate assurance of future performance under the Assigned Contracts and Assigned Leases of the Debtors.

(v) For the avoidance of doubt, none of the Assigned Contracts or Assigned Leases of any Seller that is not a Debtor are being sold pursuant to section 365 of the Bankruptcy Code and none of the findings of fact or conclusions of law herein shall apply to such Assigned Contracts or Assigned Leases.

(vi) **Rejection or Termination of Executory Contracts and Unexpired Leases of the Debtors**. On the Closing Date and pursuant to section 6.14 of the APA, the Debtors

are authorized and directed, in their business judgment, to terminate their relationships in the Control States with Suppliers to all applicable Brands in accordance with the Sale Documents and applicable law, and, if applicable, reject the Rejected Contracts pursuant to section 365 of the Bankruptcy Code. The Debtors have exercised reasonable business judgment in determining that the rejection of the Rejected Contracts and termination of Supplier relationships, as applicable, in accordance with the Sale Documents and this Sale Order is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

**NOW, THEREFORE, IT IS ORDERED THAT:**

## I. General Provisions.

1. The Motion is granted and approved to the extent indicated herein, and entry into and performance under, and in respect of, the APA, and the consummation of the Sale Transaction contemplated thereby, is authorized and approved as set forth in this Sale Order.

2. All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing (the full record of which is incorporated herein by reference) or otherwise, and all reservations of rights included in such objections, except as otherwise expressly preserved in this Sale Order, including pursuant to paragraph 42 hereof, are hereby denied and overruled on the merits with prejudice; *provided* that objections to an assignment or rejection that are unresolved as of the date of this Sale Order shall be considered at a later date in connection with any proposed assumption or assignment of such applicable Assigned Contract or Assigned Lease of the Debtors or rejection of such Rejected Contract, as applicable, in accordance with the APA. Those parties who did not object or who withdrew their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code to the relief granted herein.

3. Notice of the Motion and Sale Hearing was adequate, appropriate, fair, and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

**II. Approval of the APA.**

4. The APA, all other instruments and documents related thereto or contemplated thereby, and all of the terms and conditions thereof, are hereby approved pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

5. The Debtors are authorized and empowered pursuant to sections 363(b) and 363(f) of the Bankruptcy Code to, and to cause the other Sellers to, take any and all actions necessary or appropriate to (a) perform, consummate, implement, and close the Sale Transaction pursuant to and in accordance with the terms and conditions of, and as contemplated in, the APA and this Sale Order and (b) execute and deliver, perform under, consummate, implement, and fully close the APA, including the assumption and assignment to the Purchaser of the Assigned Contracts and the Assigned Leases, together with all other additional instruments and documents that may be necessary or desirable to implement the APA and the Sale Transaction, without any further corporate action or order of the Court.

6. The Debtors are authorized to take all such corporate actions as are desirable or necessary to cause the non-Debtor Sellers to monetize substantially all of their assets pursuant to the APA, including approving, effectuating, and consummating the Sale Transaction.

7. Subject only to the restrictions set forth in this Sale Order and the APA, the Debtors, the other Sellers, and the Purchaser are hereby authorized to take any and all actions as may be necessary or desirable to implement the Sale Transaction, and any actions taken by the Sellers

and/or the Purchaser necessary or desirable to implement the Sale Transaction prior to the date of this Sale Order, are hereby approved and ratified. For the avoidance of doubt, the Debtors are authorized to take any acts, in their sole discretion, contemplated by this Sale Order or the Sale Documents, to facilitate, consummate, or in support of the Sale Transaction with respect to the non-Debtor Sellers to the Purchaser.

8. This Sale Order and the terms and provisions of the APA shall be binding in all respects upon the Bound Parties. The APA shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their equity holders, or any trustees, examiners, or receivers. Any trustee appointed in these cases (including a chapter 7 trustee, if applicable) shall be and hereby is authorized to operate the businesses of the Debtors to the fullest extent necessary to permit compliance with the terms of this Sale Order. This Sale Order and the APA shall inure to the benefit of the Debtors, their estates and creditors, the other Sellers, the Purchaser, and the respective successors and assigns of each of the foregoing.

**III. Transfer of the Purchased Assets of the Debtors.**

9. Subject only to the terms of this Sale Order, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Purchased Assets of the Debtors to the Purchaser in accordance with the terms of the APA. Such transfer shall constitute a legal, valid, binding, and effective transfer of all such Purchased Assets of the Debtors and shall vest the Purchaser, as applicable, with title to the Purchased Assets. Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets of the Debtors shall be sold free and clear of all Encumbrances of any kind or nature whatsoever, other than Permitted Encumbrances and Assumed Liabilities. Any and all valid and perfected Encumbrances shall attach to the net proceeds of the Sale Transaction ultimately attributable to the property against or in which such

Encumbrances are asserted, subject to the terms thereof, after application of the net proceeds in accordance with this Sale Order, with the same validity, force, and effect, and in the same order of priority, which such Encumbrances had prior to the Sale Transaction, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto. The Purchaser is authorized to execute and file any necessary termination statements with respect to the DIP Liens or the Prepetition Liens (as defined in the DIP Orders).

10. The Debtors are hereby authorized to take any and all actions necessary to consummate the APA, including any actions that otherwise would require further approval by shareholders, members, or their board of directors or any special committee thereof, as the case may be, without the need of obtaining such approvals.

11. The sale of the Purchased Assets to the Purchaser pursuant to the APA and the consummation of the Sale Transaction do not require any consents other than as specifically provided for in the APA, the Final DIP Order, and the DIP Credit Agreement. Each and every federal, state, and local government agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction. A certified copy of this Sale Order may be filed with the appropriate clerk or recorded with the recorder of any state, county, province, or local authority to act to cancel any of the Encumbrances, and any other encumbrances of record, except for the Permitted Encumbrances and Assumed Liabilities.

12. If any person or entity that has filed statements or other documents or agreements evidencing Encumbrances on or in all or any portion of the Purchased Assets of the Debtors (other than statements or documents with respect to Permitted Encumbrances or Assumed Liabilities) has not delivered, or refused to deliver, to the Debtors, in proper form for filing and executed by the

appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Encumbrances which the person or entity has or may assert with respect to all or any portion of the Purchased Assets of the Debtors, the Sellers and the Purchaser are hereby authorized, on behalf of the Debtors and the other Sellers, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets of the Debtors. The Sellers and the Purchaser are each authorized to file a copy of this Sale Order in any court where the person or entity filed the statements, documents, or agreements evidencing such Encumbrances, which, upon filing, shall be conclusive evidence of the release and termination of all such Encumbrances.

13. This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, foreign or domestic federal, state, provincial, territorial, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Transactions, including the Sale Transaction. The Purchased Assets of the Debtors are sold free and clear of any reclamation rights.

14. Except for as provided in the APA and this Sale Order, after the Closing Date, the Debtors shall have no further liability with respect to the Purchased Assets, and any claims,

whether administrative or otherwise, relating to or arising from such Purchased Assets after the Closing Date asserted against the Debtors shall be deemed disallowed.

15. Except as expressly permitted by the APA or this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, employees, litigation claimants, parties to executory contracts and unexpired leases, customers, licensors, current and former employees, and other creditors holding Encumbrances against or in any Debtor or the Purchased Assets of the Debtors (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors or the Purchased Assets of the Debtors, are forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such persons' or entities' Encumbrances against the Purchaser, its successors or assigns, or the Purchased Assets of the Debtors, whether by payment, setoff, or otherwise, directly or indirectly, including, without limitation: (a) commencing or continuing in any manner any action or other proceeding against the Purchaser, its successors or assigns, or the Purchased Assets of the Debtors; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, its successors or assigns, or the Purchased Assets of the Debtors; (c) creating, perfecting, or enforcing any Encumbrance against the Purchaser, its successors or assigns, or the Purchased Assets of the Debtors; (d) asserting an Encumbrance as a setoff, right of subrogation, or recoupment of any kind against any obligation due to the Purchaser or against the Purchased Assets of the Debtors; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or the APA.

## IV. Assumption and Assignment of Assigned Contracts and Assigned Leases.

16. The applicable Debtor or Debtors are hereby authorized and directed in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, in accordance with the terms of the APA and this Sale Order, the Assigned Contracts and the Assigned Leases identified on **Exhibit 2** to this Sale Order (as may be amended or modified from time to time in accordance with the terms of this Sale Order and the APA) free and clear of all Encumbrances (other than the Assumed Liabilities and Permitted Encumbrances) effective as of the Closing Date or such other date after the Closing Date, subject to the terms of the APA and this Sale Order, or as otherwise provided by a separate order of this Court, and (b) execute and deliver to the Purchaser such documents or other instruments as the Purchaser deems may be necessary to assign and transfer the Assigned Contracts and the Assigned Leases of the Debtors to the applicable Purchaser.

17. With respect to the Assigned Contracts and the Assigned Leases of the Debtors: (a) the applicable Debtor or Debtors may assume each of the Assigned Contracts and the Assigned Leases in accordance with section 365 of the Bankruptcy Code; (b) the applicable Debtor or Debtors may assign each of the Assigned Contracts and the Assigned Leases to the Purchaser in accordance with sections 363 and 365 of the Bankruptcy Code, this Sale Order, and the APA, and any provisions in any of the Assigned Contracts and the Assigned Leases that prohibit or condition the assignment of such Assigned Contracts and the Assigned Leases or allow the party to such Assigned Contract and the Assigned Lease to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract and the Assigned Lease, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (c) subject to the applicable Debtor's or Debtors' payment of Cure

Costs, all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the applicable Debtor or Debtors and assignment to the Purchaser of each Assigned Contract and Assigned Lease have been satisfied; and (d) the Assigned Contracts and the Assigned Leases shall be transferred and assigned to, and following the Closing Date, or such other date after the Closing Date, as applicable, remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provision in any such Assigned Contract or Assigned Lease (including those of the type described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits, restricts, or conditions, or that purports to prohibit, restrict, or condition, such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assigned Contracts and the Assigned Leases after such assumption and assignment to the Purchaser.

18. Assignment Objections were to be filed with the Court, or will be filed with the Court, by no later than (a) the date of the Sale Hearing, (b) for any Assigned Contract or Assigned Lease of the Debtors added to **Exhibit 2** after the filing of the Motion, 14 days after service of the notice to such Assigned Contract or Assigned Lease counterparty, or (c) such later date as may be agreed to by the Debtors. If a counterparty to an Assigned Contract or Assigned Lease of the Debtors failed to properly and timely file and serve an Assignment Objection in accordance with the Motion, the counterparty is hereby forever barred from asserting any objection with regard to the assumption or assignment of its Assigned Contract or Assigned Lease, as applicable, and notwithstanding anything to the contrary in the Assigned Contract or Assigned Lease or any other document, the Cure Costs set forth in the Cure Schedule shall be the only amount necessary to cure outstanding defaults under the applicable Assigned Contract or Assigned Lease under section 365 of the Bankruptcy Code. If no Assignment Objection has been filed, or an Assignment

Objection has been properly filed but has been resolved by the parties or determined by this Court, this Sale Order shall serve as approval of the assumption and assignment of the applicable Assigned Contract or Assigned Lease of the applicable Debtor to the applicable Purchaser without need for a further notice or order. If an Assignment Objection has been properly filed with respect to an Assigned Contract or Assigned Lease of the Debtors and is not resolved by the parties or determined by this Court prior to the Closing Date, the applicable Debtors' assumption and assignment of such Assigned Contract or Assigned Lease shall be subject to the requirements applicable to Disputed Contracts set forth in the APA.

19. All timely filed objections to this Sale Order related *solely* to the assumption or assumption and assignment of an Assigned Contract, Cure Costs, or adequate assurance in connection with an Assigned Contract which have not been resolved between the Debtors, the Purchaser, and the applicable contract counterparty prior to the entry of this Sale Order shall be continued to a future hearing which shall be noticed by the Debtors. The Debtors shall have no obligation to pay Cure Costs for such Assigned Contract until the objection is resolved. Such disputes related *solely* to the assumption or assumption and assignment of an Assigned Contract, Cure Costs, or adequate assurance shall be adjudicated by this Court if the Debtors, the Purchaser, and the applicable contract counterparty are unable to come to a resolution in accordance with the procedures set forth in the APA. The Debtors' rights are reserved to reject any Disputed Contract on a post-closing basis, subject to the terms of the APA.

20. The pendency of a dispute relating to a particular Assigned Contract or Assigned Lease of the Debtors shall not delay the assumption and assignment of any other Assigned Contract or Assigned Lease or the Closing. Upon the effective date of the assignment of any Assigned Contract or Assigned Lease of the Debtors, in accordance with sections 363 and 365 of the

Bankruptcy Code, the applicable Purchaser shall be fully and irrevocably vested in all right, title, and interest of each such Assigned Contract or Assigned Lease. To the extent provided in the APA, the Debtors shall cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing.

21. Each counterparty of an Assigned Contract or Assigned Lease of the Debtors is deemed to have consented to the assumption and assignment of such Assigned Contract and Assigned Lease, as applicable, and the Purchaser shall be deemed to have demonstrated adequate assurance of future performance with respect to each such Assigned Contract and Assigned Lease pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

22. Upon the applicable Debtor's or Debtors' assignment of the Assigned Contracts and the Assigned Leases of the Debtors to the Purchaser under the provisions of this Sale Order, any additional orders of this Court, and the applicable Debtor's or Debtors' payment of any Cure Costs pursuant to the terms hereof or the APA, no default shall exist under any Assigned Contract and Assigned Lease of the Debtors, and no counterparty to any Assigned Contract and Assigned Lease shall be permitted (a) to declare a default under such Assigned Contract and Assigned Lease or (b) to otherwise take action against the Debtors, its successors or assigns, or the Purchaser as a result of any Debtors' financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assigned Contract and/or Assigned Lease, as applicable. Each non-Debtor party to an Assigned Contract and Assigned Lease of a Debtor hereby is forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors or the Purchaser, or the property of any of them, any default or Claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing Date, or, against the Purchaser, any counterclaim, defense, setoff, or any other Claim asserted or assertable against the Debtors and

(b) imposing or charging against the Purchaser or its affiliates any rent accelerations, assignment fees, increases, or any other fees as a result of the applicable Debtor's or Debtors' assumption and assignment of the Assigned Contracts and the Assigned Leases to the Purchaser. Any provision in any Assigned Contract or Assigned Lease of the Debtors that purports to declare a breach, default, or termination as a result of a change of control of the Purchased Assets is hereby deemed unenforceable under section 365(f) of the Bankruptcy Code. To the extent that any counterparty to an Assigned Contract and/or Assigned Lease was notified of the Cure Costs (or the absence thereof) and failed to object to such Cure Costs (or the absence thereof) with respect to an Assigned Contract of the Debtors and/or Assigned Lease of the Debtors, as applicable, such counterparty shall be deemed to have consented to such Cure Costs (or the absence thereof) and is deemed to have waived any right to assert or collect or enforce any Cure Costs that may arise or have arisen prior to or as of the Closing. For the avoidance of doubt, nothing in this Sale Order shall obligate the Purchaser to pay, perform, or discharge any liabilities with respect to the Excluded Liabilities, including any Cure Costs.

23. On the Closing Date, or such other date after the Closing Date as provided in this Sale Order and the APA, the applicable Purchaser shall be deemed to be substituted for the applicable Debtor as a party to the applicable Assigned Contract and Assigned Lease and the applicable Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contract and the Assigned Lease. There shall be no rent or other payment accelerations, assignment fees, increases, or any similar fees, costs, or expenses charged to the Debtors or to the Purchaser as a result of the assumption and assignment of the Assigned Contracts and the Assigned Leases.

24. All counterparties to the Assigned Contracts and Assigned Leases of the Debtors shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Purchaser, and shall not charge the Debtors or the Purchaser for any instruments, applications, consents, or other documents that may be required or requested by any public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transaction.

25. The assumption and assignment of each of the Assigned Contracts and the Assigned Leases is made in good faith under sections 363(b) and 363(m) of the Bankruptcy Code and is entitled to the protections thereof. For the avoidance of doubt, and without limiting any of the rights or obligations of the Sellers or Purchaser pursuant to the APA and other Sale Documents, this Sale Order is not intended to approve the assignment of any of the Assigned Contracts or Assigned Leases of the non-Debtor Sellers, if any, and none of the Assigned Contracts or Assigned Leases of the non-Debtor Sellers, if any, are to be assigned pursuant to section 365 of the Bankruptcy Code or subject to the procedures set forth in this Sale Order and the Debtors shall have no obligation to pay Cure Costs or pre-Closing Liabilities in connection with any such assignment of the non-Debtor Sellers' Assigned Contracts or Assigned Leases to the Purchaser; *provided* that nothing herein shall limit or modify the non-Debtor Sellers' obligations under the APA to pay any pre-Closing Liabilities in connection with any assignment of the non-Debtor Sellers' Assigned Contracts or Assigned Leases to the Purchaser.

26. The Debtors are hereby authorized to terminate the Supplier relationships of the Debtors in the Territory or reject the Rejected Contracts pursuant to section 6.14 of the APA and consistent with applicable law. The Debtors have exercised reasonable business judgment in determining that such rejection or termination, as applicable, is in the best interests of the Debtors' estates, their creditors, and other parties in interest. The rejection of the Rejected Contracts and

termination of Supplier relationships pursuant to section 6.14 of the APA are an integral component of the Sale Transaction and are necessary to enable the Purchaser to establish direct relationships with Suppliers in the applicable Territory and to maximize the value of the Purchased Assets of the Debtors. All Rejected Contracts under the APA are hereby rejected effective as of the Closing Date.

**V. Use of Proceeds.**

27. Notwithstanding anything to the contrary set forth herein, in accordance with the DIP Orders and the DIP Loan Documents, and subject in all respects to the Carve Out and paragraph 16 of the Final DIP Order, on the Closing Date, the Debtors shall transfer, or cause to be transferred, the net proceeds generated from the sale of the Purchased Assets for application to the DIP New Money Loans and the DIP Obligations related thereto, in each case to the extent required by and in accordance with paragraph 5 of the Final DIP Order and the DIP Loan Documents; *provided* that nothing herein shall restrict the Debtors from reborrowing any amounts so repaid in accordance with the DIP Loan Documents and the DIP Budget. For the avoidance of doubt, nothing in this paragraph shall require the Debtors to deliver or apply any proceeds that the Final DIP Order permits the Debtors to retain, including the proceeds from the sale of any Unencumbered Property. For the avoidance of doubt, the net proceeds from the sale of the assets of the non-Debtor Sellers, as provided in the Sale Documents, shall only include any distributions made to the Debtors on account of their interests in the same. The Debtors shall provide the Committee with the final funds flow, including the gross Cash Payment and Inventory Price, the amounts payable to each Debtor and each non-Debtor Seller, and the proposed application of proceeds received by the Debtors.

## VI. Amendments to the APA.

28. The APA and any related agreements, documents, or other instruments may be modified, amended, supplemented, or restated by the parties thereto in a writing signed by such parties and in accordance with the terms thereof, without further order of this Court; *provided* that all such modifications, amendments, supplements, or restatements shall be promptly provided to the Committee; *provided further* that any such modification, amendment, supplement, or restatement that has a material or adverse effect on the Debtors' estates shall require notice to this Court and the Committee, and such material or adverse modifications, amendment, supplement, or restatement shall be subject to a further Court order while the Chapter 11 Cases remain pending.

## VII. Prohibitions of Actions Against the Purchaser.

29. All persons and entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets of the Debtors to be sold, transferred, or conveyed to or by the Purchaser pursuant to the APA are hereby directed to surrender possession of those portions of the Purchased Assets to the applicable Purchaser on the Closing Date. Subject to the terms, conditions, and provisions of this Sale Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the applicable Debtor or Debtors to sell and/or transfer the Purchased Assets of the Debtors to the Purchaser in accordance with the terms of the APA and this Sale Order.

30. To the maximum extent permitted by law, in accordance with the APA, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval (collectively, the "Licenses") of the applicable Sellers with respect to the Purchased Assets of the Debtors. To the extent any Purchaser cannot operate under any Licenses in accordance with the foregoing, such Licenses shall be in

effect while such Purchaser, with assistance from the applicable Sellers, works promptly and diligently to apply for and secure all necessary government approvals for new issuance of Licenses to such Purchaser.

31. Notwithstanding anything in this Sale Order, subject to section 525(a) of the Bankruptcy Code, no governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any representative thereof may revoke, suspend any right, license, trademark, or other permission relating to the use of the Purchased Assets sold, transferred, or conveyed by the Debtors to the Purchaser on account of the filing or pendency of these Chapter 11 Cases, the conduct of the Sale Transaction, or the consummation of the Sale Transaction.

**VIII. Other Provisions.**

32. The Purchaser is deemed to be a good faith purchaser of the Purchased Assets of the Debtors and is hereby granted and is entitled to all of the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code. Pursuant to section 363(m) of the Bankruptcy Code, if this Sale Order is reversed or modified on appeal, such reversal or modification shall not affect the validity of the Sale Transaction. The consideration provided for the Purchased Assets of the Debtors under the Sale Documents is fair and reasonable, and the Sale Transaction with respect to the Debtors is not subject to avoidance under section 363(n) of the Bankruptcy Code.

33. The consideration provided by the Purchaser for the Purchased Assets of the Debtors under the Sale Documents is the highest or otherwise best offer, fair and reasonable, and shall be deemed for all purposes to constitute reasonably equivalent value, fair value, and fair consideration under the Bankruptcy Code. All persons and entities are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors, or assigns, or the

Purchased Assets of the Debtors, any claim or cause of action arising under or based upon any fraudulent transfer or fraudulent conveyance theory, whether under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Conveyance Act, or otherwise with respect to the Purchased Assets of the Debtors. For the avoidance of doubt, nothing herein shall release, enjoin, adjudicate, or otherwise affect any direct claim or cause of action of the Debtors, their estates, the Committee, or any successor estate representative against any Purchaser, other than any claim arising under or out of, in connection with, or in any way relating to (i) the Debtors or the Purchased Assets of the Debtors or (ii) the Purchaser's acquisition of the Purchased Assets.

34. None of the Purchaser or its affiliates (including "affiliates" as defined in section 101(2) of the Bankruptcy Code), past, present, and future members, partners, principals, or equityholders (whether direct or indirect), lenders, subsidiaries, parents, divisions, funds, agents, representatives, insurers, attorneys, successors, and assigns, or any of their respective directors, managers, officers, employees, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, or insurance companies (collectively, the "<u>Purchaser Parties</u>") is a "successor" to the Debtors or their estates by reason of any theory of law or equity, and none of the Purchaser Parties shall assume, or be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates with respect to the Purchased Assets or otherwise, including, but not limited to, under any bulk sales law, doctrine or theory of successor liability, or similar theory or basis of liability or responsibility for any claim against any Debtor or against an insider of any Debtor, or similar liability, in each case, except as otherwise expressly provided in the APA.

35. Except to the extent the Purchaser specifically agrees in the APA or as otherwise set forth in this Sale Order, the Purchaser shall not have any liability, responsibility, or obligation

for any claims, liabilities, or other obligations of the Debtors or their estates, including any claims, liabilities, or other obligations related to the Purchased Assets of the Debtors arising prior to the Closing Date. Under no circumstances shall the Purchaser be deemed a successor of or to the Debtors for any Encumbrances against, in, or to the Debtors or the Purchased Assets of the Debtors. For the purposes of this paragraph and the two preceding paragraphs, all references to the Purchaser shall also include the Purchaser Parties.

36. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, without further order of this Court, to (a) allow the Purchaser to (i) deliver any notice provided for in the APA and any ancillary documents and (b) to allow the Purchaser, the non-Debtor Sellers, the non-Debtor owners of the Michigan JV and the Ohio JV to take any and all actions permitted under this Sale Order, the APA, the other agreements contemplated by the APAs, and any other ancillary documents in accordance with the terms and conditions thereof.

37. From time to time, as and when requested by any party, each party to the Sale Transaction and other agreements contemplated by the APA shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale Transaction and other transactions contemplated by the APA including such actions as may be necessary to vest, perfect or confirm, of record or otherwise, in the Purchaser its right, title and interest in and to the Purchased Assets.

38. The Debtors and the DIP Agent are authorized to prepare and file, execute, and deliver any applicable UCC termination statement or other release documentation pursuant to this Sale Order.

39. This Sale Order is and shall be binding upon all persons and entities that may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or that may be required to report or insure any title or state of title in or to any property; and each of the foregoing persons and entities shall accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction.

40. This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding the applicability of any of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or any other provisions of the Bankruptcy Rules or the Bankruptcy Local Rules stating the contrary, the terms and provisions of this Sale Order shall be immediately effective and enforceable upon its entry, any applicable stay of the effectiveness and enforceability of this Sale Order is hereby waived, and the Debtors, the other Sellers, and the Purchaser are authorized to close the Sale Transaction immediately upon entry of this Sale Order. Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing Date, or risk its appeal being foreclosed as moot.

41. The failure to specifically include any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the APA be authorized and approved in its entirety; *provided* that this Sale Order shall govern if there is any inconsistency between such agreements, as applicable, and this Sale Order.

42. Notwithstanding the relief granted in this Sale Order and any actions taken pursuant to such relief, nothing in this Sale Order is intended to or should be construed or deemed to be: (a) an implication or admission as to the amount of, basis for, priority, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a

waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or any order granting the relief requested by the Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) except as expressly set forth herein, a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other Encumbrance on property of the Debtors' estates, including any Encumbrance that is asserted to have attached to the proceeds from the Sale Transaction; (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; (h) a concession that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (i) a waiver of the obligation of any party in interest to file a proof of claim; (j) a waiver or impairment of the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease; (k) an admission as to the applicability of the automatic stay with respect to the other Sellers; or (l) a waiver or impairment of the Debtors' rights or interests in the non-Debtor Sellers.

43. Notwithstanding anything to the contrary in this Sale Order, the APA, or any other Sale Document, nothing herein, including entry of this Sale Order, approval or consummation of the Sale Transaction, the Closing, or any other application or distribution of proceeds of the Sale Transaction, shall waive, release, discharge, impair, prejudice, enjoin, or otherwise affect (a) any claims, causes of action, objections, or defenses that are the subject of a Challenge or Standing

Motion (each as defined in the Final DIP Order) timely asserted or filed on or before the Investigation Termination Date (as defined in the Final DIP Order) in accordance with paragraph 16 of the Final DIP Order, together with all rights and remedies available under the Final DIP Order with respect thereto (collectively, the "Preserved Challenge Claims"), or (b) any rights of the Committee or any successor thereto under paragraph 16 of the Final DIP Order, all of which are expressly preserved.

44. The Debtors are either the contributing sponsor or a member of the contributing sponsor's controlled group with respect to the Retirement Plan for Employees of Block Distributing Company, Ltd. and the Retirement Income Plan for Nonbargaining Unit Employees of Young's Market Company, LLC (collectively, the "Pension Plans"). All documents and records of the Pension Plans (the "Pension Plan Documents") shall be stored and preserved by the Debtors until the Pension Benefit Guaranty Corporation ("PBGC") has completed its investigation regarding the Pension Plans. If any Pension Plan Documents are transferred pursuant to the relief granted herein, the Debtors shall retain copies to comply with this provision of this Sale Order. Pension Plan Documents may be in hard copy or electronic form and may include, but are not limited to, any Pension Plan governing documents, actuarial documents, records and statements of the Pension Plans' assets, board resolutions relating to the Pension Plans, and employee and personnel records of the employees who participate in the Pension Plans. The Debtors shall not abandon or destroy any Pension Plan Documents and shall make the Pension Plan Documents available to the PBGC for inspection and copying.

45. The Debtors, together with the other Sellers, are authorized to take all actions necessary to effectuate the relief granted pursuant to this Sale Order in accordance with the Motion.

46. To the extent there are any inconsistencies between this Sale Order, any prior order or pleading filed in these Chapter 11 Cases related to the Motion, and the Sale Documents, the terms of this Sale Order shall control; *provided*, *however*, that in the event of any inconsistencies between this Sale Order and the Final DIP Order, the Final DIP Order shall control, including with respect to the rights, obligations, priorities, and remedies provided in paragraph 16 thereof.

47. The headings in this Sale Order are for purposes of reference and shall not limit or otherwise affect the meaning of the Sale Order.

48. The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, all amendments thereto and any waivers and consents thereunder, and each of the agreements executed in connection therewith and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction, including, but not limited to, retaining jurisdiction to interpret, implement, and enforce the provision of this Sale Order.

Signed: September 18, 2026

Christopher Lopez
United States Bankruptcy Judge

# **Exhibit 1**

## Asset Purchase Agreement

**Execution Version**
**Confidential**

# ASSET PURCHASE AGREEMENT

**DATED AS OF SEPTEMBER 4, 2026**

**BY AND AMONG**

**MARTIGNETTI COMPANIES CONTROL STATE, LLC, MARTIGNETTI COMPANIES OF NEW HAMPSHIRE, LLC AND MARTIGNETTI COMPANIES OF UTAH, LLC**

**AS PURCHASER,**

**AND**

**THE SELLERS NAMED HEREIN**

# TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE OF ACQUIRED ASSETS ........ 5**
Section 1.1 Purchase of Acquired Assets ........ 5
Section 1.2 Excluded Assets ........ 7
Section 1.3 Assumed Liabilities ........ 9
Section 1.4 Excluded Liabilities ........ 10
Section 1.5 Purchase Price; Payment ........ 10
Section 1.6 Deposit ........ 11
Section 1.7 Withholding ........ 12
Section 1.8 Other Tax Matters ........ 12
Section 1.9 Allocation of Purchase Price ........ 12

**ARTICLE II CLOSING ........ 13**
Section 2.1 Closing ........ 13
Section 2.2 Assumption/Rejection of Certain Contracts; Non-Assignable Items ........ 13

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS ........ 15**
Section 3.1 Organization; Good Standing ........ 15
Section 3.2 Qualifications ........ 15
Section 3.3 Authority, Enforceability ........ 15
Section 3.4 No Conflict or Violation ........ 16
Section 3.5 Certain Financial Information ........ 16
Section 3.6 Absence of Certain Changes ........ 17
Section 3.7 Acquired Assets ........ 17
Section 3.8 Real Property ........ 18
Section 3.9 Tax Matters ........ 19
Section 3.10 Material Contracts ........ 20
Section 3.11 Litigation or Proceedings ........ 21
Section 3.12 Compliance with Laws ........ 21
Section 3.13 Health, Safety and Environmental Matters ........ 22
Section 3.14 Governmental Authorizations and Regulations ........ 23
Section 3.15 No Illegal Payments; Etc. ........ 23
Section 3.16 Brokers ........ 23
Section 3.17 Certain Matters of Non-Debtor Sellers ........ 23

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ........ 24**
Section 4.1 Organization ........ 24
Section 4.2 Authorization of Agreement ........ 24
Section 4.3 No Conflict or Violation ........ 24
Section 4.4 Litigation ........ 24
Section 4.5 Financing ........ 25
Section 4.6 Solvency ........ 25
Section 4.7 WARN Act and Mass Layoffs ........ 25
Section 4.8 Brokers ........ 25

**ARTICLE V BANKRUPTCY COURT MATTERS ........ 25**
Section 5.1 Bankruptcy Actions ........ 25

**TABLE OF CONTENTS**

**Page**


Section 5.2 Cure Costs ....26
Section 5.3 Approval ....26
Section 5.4 Fiduciary Obligations....26

**ARTICLE VI COVENANTS....27**
Section 6.1 Access, Information and Documents ....27
Section 6.2 Conduct of Business Pending Closing....28
Section 6.3 Other Consents and Approvals ....29
Section 6.4 Restrictive Covenants Provisions ....29
Section 6.5 Further Assurances....31
Section 6.6 Taxes ....32
Section 6.7 Employee Matters; WARN Act....32
Section 6.8 Seller Support Obligations....34
Section 6.9 Insurance Matters....34
Section 6.10 Accounts ....35
Section 6.11 Access to Records....35
Section 6.12 Publicity ....35
Section 6.13 Acknowledgement by Purchaser....36
Section 6.14 Supplier Relationships ....37

**ARTICLE VII CONDITIONS TO CLOSING ....37**
Section 7.1 Conditions to Obligations of Sellers....37
Section 7.2 Conditions to Obligations of Purchaser....38
Section 7.3 Waiver of Conditions....39

**ARTICLE VIII TERMINATION ....40**
Section 8.1 Termination....40
Section 8.2 Effect of Termination....41

**ARTICLE IX INDEMNIFICATION....41**
Section 9.1 By JV Sellers....41
Section 9.2 By Purchaser....42
Section 9.3 Indemnification Procedures ....42
Section 9.4 Limitations on Recovery....44

**ARTICLE X MISCELLANEOUS ....45**
Section 10.1 Expenses ....45
Section 10.2 Severability ....45
Section 10.3 Notices ....46
Section 10.4 Construction....48
Section 10.5 Schedules ....48
Section 10.6 Entire Agreement....48
Section 10.7 Counterparts....48
Section 10.8 Specific Performance....49
Section 10.9 Governing Law ....49
Section 10.10 Waiver of Jury Trial....49
Section 10.11 Jurisdiction and Exclusive Venue....50

**TABLE OF CONTENTS**

**Page**


Section 10.12 Binding Effect ........ 50
Section 10.13 Assignment ........ 50
Section 10.14 No Third Party Beneficiaries ........ 50
Section 10.15 No Right of Set-Off ........ 50
Section 10.16 Non-Recourse ........ 51
Section 10.17 Amendment; Waivers ........ 51
Section 10.18 Bulk Sales Laws ........ 51
Section 10.19 Seller Representative ........ 51
Section 10.20 Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers ........ 52

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS ........ 52**
Section 11.1 Certain Definitions ........ 52
Section 11.2 Index of Other Defined Terms ........ 56
Section 11.3 Rules of Interpretation ........ 58


EXHIBITS


| | |
|---|---|
| Exhibit 7.1(d) | Form of Assumption Agreement |
| Exhibit 7.2(h) | Form of Transition Services Agreement |
| Exhibit 7.2(i) | Form of Bills of Sale |
| Exhibit 7.2(j)(i) | Forms of Lease Documents |
| Exhibit 7.2(j)(ii) | Form of License Agreement |
| Exhibit 11.1(t) | Form of Sale Order |

**ASSET PURCHASE AGREEMENT**

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 4, 2026 (the "Effective Date"), is made and entered into by and among:

1. Republic National Distributing Company, LLC, a Delaware limited liability company ("RNDC");

2. RNDC New Hampshire, LLC, a New Hampshire limited liability company ("RNDC New Hampshire");

3. RNDC General, LLC, an Ohio limited liability company;

4. K&L Beverage Company, LLC, a Delaware limited liability company ("K&L");

5. Young's Market Company of Oregon, LLC, an Oregon limited liability company ("Young's Market" and together with RNDC, RNDC New Hampshire and K&L, the "Debtors" and each individually a "Debtor");

6. RNDC-NWS, LLC, a Michigan limited liability company, NWS Michigan, LLC, a Michigan limited liability company, National Wine & Spirits, LLC, a Michigan limited liability company, and L&L Wine and Liquor, LLC, a Michigan limited liability company (collectively, 1 through 6, "Sellers" and each a "Seller"); and

7. MARTIGNETTI COMPANIES CONTROL STATE, LLC, a Massachusetts limited liability company, MARTIGNETTI COMPANIES OF NEW HAMPSHIRE, LLC, a New Hampshire limited liability company and MARTIGNETTI COMPANIES OF UTAH, LLC, a Utah limited liability company (collectively, "Purchaser" and together with Sellers, the "Parties" and each individually a "Party").

Capitalized terms are defined or indexed, as applicable, in Article XI.

**WHEREAS**, each Seller is engaged in the "control state" business of brokering the distribution of beverage products, including the brands set forth on Schedule 1.1(a) (the "Brands"), from suppliers, including the suppliers set forth on Schedule 1.1(a) (the "Suppliers"), in the applicable Territory (with respect to each Seller in its respective Territory, the "Business");

**WHEREAS**, on July 26, 2026, the Debtors and certain of their Affiliates commenced voluntary cases (the "Bankruptcy Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"); and

**WHEREAS**, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (with respect to the Debtors),

on the terms and subject to the conditions set forth in this Agreement and (with respect to the Debtors) in the Sale Order.

**NOW, THEREFORE**, in consideration of the mutual representations, warranties, covenants and agreements contained in this Agreement, the receipt and sufficiency of which are acknowledged by the Parties' signatures below, each Seller, individually and not jointly and severally, and Purchaser agree as follows:

## ARTICLE I
## PURCHASE OF ACQUIRED ASSETS

**Section 1.1** **Purchase of Acquired Assets**. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (with respect to the Debtors), subject to the terms and conditions set forth in this Agreement and (with respect to the Debtors) in the Sale Order, at the Closing, each Seller shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase from such Seller, all of such Seller's right, title and interest, as of the Closing, in and to all of the assets, properties, goodwill and rights of such Seller related primarily to, or used primarily in, the operation of the Business, of whatever kind and nature, real, personal or mixed, tangible or intangible, other than the Excluded Assets ("Acquired Assets"), free and clear of all liens, mortgages, security interests, claims or other encumbrances of any nature whatsoever (collectively, "Encumbrances"), except Permitted Encumbrances, pursuant to Section 363(f) of the Bankruptcy Code (with respect to the Debtors), including the following:

(a) Supplier Relationships. Seller's commercial relationship with Suppliers with respect to the Business in the Territories with respect to the Brands.

(b) Real Property. The leasehold or subleasehold estates and other rights to use or occupy the Leased Real Property pursuant to the Leases, but only those listed on Schedule 1.1(g) (which shall be Assigned Contracts) (the "Assigned Leases").

(c) Information Technology. The following software, hardware or other items related to information technology of the Business:

(i) (A) all furniture, furnishings and equipment in the offices subject to the Leases; (B) all cell phones, laptops and tablets used by employees in the Business that become employees of Purchaser and on the Sellers' company phone plan; (C) all computer and telecommunications equipment including phones, computers, laptops, tablets, servers and related items, in each case, located on the premises of the Assigned Leases; and (D) all items including those listed on Schedule 1.1(c) ((A) through (D) the "Acquired IT").

(d) VOR Inventory. All Saleable VOR Inventory. "Saleable VOR Inventory" means all "vendor of record" inventory that is within code per the applicable standards of the Supplier from which such product was purchased, can be processed and received by a retail account in its existing packaging as of the Closing Date and is not damaged, spoiled, discontinued, obsolete, or otherwise not salable and merchantable that is from Purchaser identified Suppliers that are continuing with Purchaser as part of the to be sold Business. At Closing the Purchaser shall purchase Saleable VOR Inventory at Laid-in-Cost as an addition to the Purchase Price in accordance with Section 1.5(a)(ii). "Laid-in-Cost" means, with respect to any item of Saleable

VOR Inventory, the original purchase price of such item, based on the actual cost to Sellers, plus freight charges, fuel charges, Taxes due and payable upon the purchase of such item, customs charges and duties, and brokerage charges, if any; and less all discounts, rebates, and special purchase allowances, if any, all as established by the actual invoices and other records of Suppliers and Sellers.

(e) Other Tangible Property. All tangible personal property owned by Sellers and used primarily in the operation of the Business and located in the Territory (the "Tangible Property"), including the following to the extent used primarily in the operation of the Business and located in the Territory:

(i) all point-of-sale (POS) materials, including advertising, sales literature, promotional literature, promotional displays, catalogs, tap handles/markers and similar materials of Sellers relating to the Brands;

(ii) copies of all non-privileged files, records and information (whether or not proprietary), including if and to the extent that any of the following exist: all customer lists, customer account records, sales records, route records, prospective customer and contact information, demographic data (including market statistics, studies and resulting marketing strategies), vendor lists, financial records relating to the Business, warehouse expansion plans, cost analyses, process sheets, and environmental health and safety compliance and regulatory information, and product development records and reports, in each case relating primarily to the Business;

(iii) originals of all files, records and information (whether or not proprietary), including if and to the extent that any of the following exist: all customer lists, customer account records, sales records, route records, prospective customer and contact information, demographic data (including market statistics, studies and resulting marketing strategies), vendor lists, financial records relating to the Business, warehouse expansion plans, cost analyses, process sheets, and environmental health and safety compliance and regulatory information, and product development records and reports, in all cases, that are related primarily to the Business; provided that such files, records, and information shall be transferred to Purchaser at Closing and Sellers may retain copies thereof; and

(iv) the items set forth on Schedule 1.1(e).

If any Tangible Property is leased to a Seller, Purchaser shall not acquire any right, title or interest in or to such Tangible Property unless the Contract governing such Tangible Property is an Assigned Contract.

(f) Other Intangible Property. All other intangible property owned by Sellers and used primarily in the operation of the Business, in each case to the extent transferable (the "Other Intangible Property"), including:

(i) if transferable to Purchaser and related primarily to the Business, all licenses, permits, authorizations, and Orders (such licenses, permits, authorizations and Orders that are transferable and related primarily to the Business, the "Transferred Permits");

(ii) all guaranties, warranties, indemnities and similar rights in favor of Sellers with respect to any other Acquired Asset; and

(iii) the telephone numbers and facsimile numbers, in each case, used by Sellers primarily for the operation of the Business.

If any Seller's right, title, and interest in or to any Other Intangible Property is pursuant to a Contract, Purchaser shall not acquire any right, title or interest in or to such Other Intangible Property unless the Contract governing such Other Intangible Property is an Assigned Contract.

(g) Contracts. The Leases and the other Contracts set forth on Schedule 1.1(g) (collectively, the "Assigned Contracts").

**Section 1.2 Excluded Assets**. The Acquired Assets shall not include, and Sellers shall retain and shall not, and shall not be deemed to, sell, transfer, assign, convey, or deliver, all right, title, and interest to, in and under (y) any properties, rights, interests, and other assets that are not Acquired Assets and (z) the following properties, rights, interests, and other assets, which shall not be Acquired Assets ((y) and (z), collectively, the "Excluded Assets"):

(a) any properties, rights, interests, and other assets that are (i) expressly excluded by the terms of Section 1.1 or (ii) in the case of tangible assets, not located in the Territory;

(b) all Contracts, inventory, and other properties, rights, interests, and assets relating to the brokerage, sale, or distribution of non-alcoholic beverage products in the State of New Hampshire and, unless the Parties mutually agree in writing prior to the Closing to include the same as Acquired Assets, the Commonwealth of Pennsylvania;

(c) the business names "Republic National Distributing Company," "RNDC," "K&L," "Young's," "Young's Market," "Young's Market Company," and all variations thereof;

(d) all cash (including checks and deposits in transit, demand deposits, money markets, or similar accounts and any balances in any such accounts), certificates of deposit, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, bank deposits, government securities, marketable securities and any other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held, and all bank accounts, other than such bank accounts that the Parties may mutually agree to include as Acquired Assets;

(e) all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone, or otherwise);

(f) all advance payments, prepaid expenses, prepaid items, deferred charges and expenses (including all lease and rental payments), that have been prepaid by any Seller, all credits, prepaid items, deposits and rights to credits, refunds or rebates related to the Business for the period prior to Closing, any retainers or similar amounts paid to professional service providers, and any rights to credits, refunds or rebates of the Business;

(g) all accounts and notes receivable, advances or other amounts due from any Person, including all Supplier accounts receivable and notes receivable, advances or other amounts due from employees or related parties of Sellers;

(h) all rights or interests in and with respect to any employee benefit plan;

(i) all local, state and federal income Tax refunds, Tax attributes, and Tax assets;

(j) all Contracts other than Assigned Contracts;

(k) all of Sellers' rights and claims under this Agreement and the other Transaction Documents;

(l) except for Acquired IT, all intellectual property, including all of Sellers' logos, websites, social media accounts, domain names, email addresses and similar assets;

(m) all Documents (including information stored on the computer systems, data networks, or servers) (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities, (ii) that are financial accounting Documents, minute books, Organizational Documents, stock certificates or other equity interest instruments, stock registers and such other books and records pertaining to the ownership, organization, or existence of Sellers, Tax Returns and records (and any related work papers), corporate seals, checkbooks, and canceled checks, (iii) that any Seller is required by Law to retain, or (iv) that are governed under applicable data privacy Laws that prohibit the transfer or sale of personal information; provided that Purchaser shall have the right to make copies of any reasonably relevant portions of such Documents (other than Tax Returns) to the extent not prohibited by applicable Law;

(n) all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement, or the other Transaction Documents or the Transactions, including (i) all records and reports prepared or received by any Seller or its Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the businesses of any Seller or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any Seller's or its Affiliates' businesses or assets, (iii) all privileged materials, documents, and records of any Seller or any of its Affiliates, (iv) copies of the documents, materials, and data related to the Acquired Assets or Assumed Liabilities prior to the Closing Date, (v) confidentiality agreements with prospective purchasers of any Seller's or its Affiliates' businesses or assets, and (vi) any other files or records to the extent relating to any Excluded Assets or Excluded Liabilities;

(o) all current and prior insurance policies, including all director and officer insurance policies, and all rights and benefits of any nature of any Seller or its Affiliates with respect to such insurance policies, including all insurance recoveries under such insurance policies and rights to assert claims with respect to any such insurance recoveries;

(p) any equity interests of any form or nature of any Seller or any other Person;

(q) (i) all causes of action, claims, demands, rights and privileges against third parties to the extent related to any of the Excluded Liabilities or other Excluded Assets and (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller or its Affiliates, in each case, arising out of or relating to events occurring on or prior to the Closing Date;

(r) all preference, fraudulent transfer, and other avoidance claims, Actions, and causes of action arising under chapter 5 of the Bankruptcy Code or applicable Law, and any proceeds thereof;

(s) all demands, credits, statements, allowances, rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, causes of action, rights of set-off, rights of recovery, or rights of recoupment relating to or arising against Suppliers, vendors, merchants, manufacturers, and counterparties to any Contract, arising out of or relating to events occurring on or prior to the Closing Date;

(t) all liabilities or other amounts owing from any Affiliate of any Seller;

(u) all assets utilized primarily by any Seller in connection with a business other than the Business;

(v) all licenses, permits, authorizations and Orders, other than the Transferred Permits; and

(w) all assets listed on Schedule 1.2, which the Parties may amend by mutual consent at any time prior to or at the Closing.

**Section 1.3** **Assumed Liabilities**. Effective as of the Closing, Purchaser shall irrevocably assume from Sellers and pay, perform, discharge, or otherwise satisfy in accordance with their respective terms, and Sellers shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following liabilities (collectively, the "Assumed Liabilities" and each an "Assumed Liability"):

(a) all liabilities under the Assigned Contracts that arise or become due from and after the Closing;

(b) all liabilities arising out of the conduct of the Business or the ownership or operation of the Acquired Assets or the Business, in each case, by Purchaser from and after the Closing, including all liabilities arising out of or relating to any environmental, health or safety matter (including those relating to or arising under Environmental Law or relating to Hazardous Substances), in all cases, only to the extent arising out of or in connection with the ownership or operation of Acquired Assets or the Business by Purchaser on or after the Closing Date;

(c) all liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under the express terms of this Agreement and all Transfer Taxes; and

(d) all liabilities for Taxes with respect to the Acquired Assets, the Assumed Liabilities, or the Business, in each case, for any taxable period (or portion thereof) beginning after the Closing Date, but specifically excluding any liabilities for Taxes of the Sellers (other than Transfer Taxes governed by Section 6.6(a)).

**Section 1.4** **Excluded Liabilities**. Subject to the provisions of Section 1.3 but notwithstanding any other provision in this Agreement to the contrary, Purchaser shall not assume and shall not be responsible to pay, perform or discharge any liabilities of Sellers or any of their Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

(a) all liabilities arising from Seller's relationships with the Suppliers prior to the Closing;

(b) any accounts payable or other liabilities related to Saleable VOR Inventory arising prior to the Closing;

(c) all liabilities of NWS Michigan, LLC, RNDC-NWS, LLC and L&L Wine and Liquor, LLC to or arising under any financing or leasing arrangements with Wells Fargo Capital Finance, LLC, Wells Fargo Bank, National Association, or Banc of America Leasing & Capital, LLC; and

(d) all Cure Costs.

**Section 1.5** **Purchase Price; Payment**.

(a) Purchase Price. The purchase price (the "Purchase Price") for the Acquired Assets shall be equal to the sum of the following:

(i) an amount equal to $14,500,000;

(ii) *plus* estimated Laid-in-Cost of all Saleable VOR Inventory as of the Closing Date (the "Inventory Price") which estimate shall be agreed to by the Parties at least three (3) Business Days prior to the Closing (the result of (i) and (ii), the "Cash Payment"); and

(iii) the assumption of the Assumed Liabilities.

(b) Payment at Closing. At the Closing, Purchaser shall pay the Cash Payment (*minus* the Deposit) to Sellers by wire transfer of immediately available funds to such account(s) as Sellers shall designate.

(c) True-up of Inventory Price. At the Closing, the Parties shall instruct the Escrow Agent pursuant to the Escrow Agreement to retain in the Escrow Account an amount in cash equal to twenty-five percent (25%) of the estimated Inventory Price (the "VOR Adjustment Escrow Amount"). Within thirty (30) days after the Closing, the Parties shall reasonably cooperate to close the books on the Saleable VOR Inventory and negotiate in good faith to agree to the

difference between the actual and the estimated Inventory Price. If the Parties are unable to agree within thirty (30) days following the Closing, then any Party may petition the Chosen Courts to resolve such difference. Following such agreement or resolution, (i) if the actual Inventory Price is less than the estimated Inventory Price, (A) the Parties shall instruct the Escrow Agent to release to Purchaser an amount equal to such difference (up to the VOR Adjustment Escrow Amount), (B) the Parties shall instruct the Escrow Agent to release any remaining portion of the VOR Adjustment Escrow Amount to Sellers, and (C) if such difference exceeds the VOR Adjustment Escrow Amount, Sellers shall pay to Purchaser in cash an amount equal to such excess, and (ii) if the actual Inventory Price is higher than the estimated Inventory Price, (A) the Parties shall instruct the Escrow Agent to release to Sellers an amount equal to such difference (up to the VOR Adjustment Escrow Amount), (B) the Parties shall instruct the Escrow Agent to release any remaining portion of the VOR Adjustment Escrow Amount to Purchaser, and (C) if such difference exceeds the VOR Adjustment Escrow Amount, Purchaser shall pay to Sellers in cash an amount equal to such excess.

**Section 1.6 Deposit.**

(a) Purchaser has, on or prior to the Effective Date, made an earnest money deposit with SRS Acquiom (in its capacity as escrow agent, the "Escrow Agent") in an amount equal to ten percent (10%) of the Cash Payment (the "Deposit"), by wire transfer of immediately available funds for deposit into an account with the Escrow Agent (the "Escrow Account"), to be governed by the Escrow Agreement among the Seller Representative, Purchaser, and the Escrow Agent, dated as of the Effective Date (the "Escrow Agreement"). The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser.

(b) If, prior to the Closing, this Agreement is terminated by Sellers pursuant to Section 8.1(c) (or by Purchaser pursuant to Section 8.1(b), in circumstances where Sellers would be entitled to terminate this Agreement pursuant to Section 8.1(c)), then Sellers shall retain the Deposit, together with all investment income received thereon, if any (and Purchaser and the Seller Representative shall issue the necessary instructions to the Escrow Agent within five (5) Business Days of such termination to release the Deposit to a bank account designated by the Seller Representative).

(c) If, prior to the Closing, this Agreement is terminated by any Party other than as contemplated by Section 1.6(b), then the Deposit, together with all investment income received thereon, if any, shall be returned to Purchaser within five (5) Business Days after such termination (and Purchaser and the Seller Representative shall issue the necessary instructions to the Escrow Agent within five (5) Business Days of such termination to release the Deposit to a bank account designated by Purchaser).

(d) Sellers' right to retain the Deposit, as set forth in Section 1.6(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

(e) If the Closing occurs, at the Closing the applicable Parties shall deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds one hundred percent (100%) of the Deposit (together with any and all investment interest thereon, if any) *minus* the VOR Adjustment Escrow Amount to such account(s) as may be designated by Sellers, to be credited against the Cash Payment.

**Section 1.7 Withholding**. Purchaser (and any other withholding agent) shall be entitled to deduct and withhold any Taxes from any amounts payable pursuant to this Agreement that are required by applicable Law, and any amount so withheld and timely remitted to the appropriate Governmental Authority will be treated for all purposes hereof as having been paid to the Person in respect of which such withholding was made. Except for any Taxes required to be withheld from the amounts payable to any Seller under Section 1445 of the Code if such Seller does not provide to Purchaser an IRS Form W-9 executed by such Seller or such Seller's regarded owner for U.S. federal income Tax purposes, Purchaser will notify such Seller at least five (5) days prior to deducting or withholding from any consideration otherwise payable to such Seller pursuant to this Agreement, in writing of such intent to deduct and withhold (including the basis for such deduction or withholding) and will provide such Seller with a reasonable opportunity to provide forms or other evidence that would reduce or eliminate such deduction or withholding and shall cooperate in good faith with such Seller to obtain any available reduction of, or relief from, such deduction or withholding. The Parties agree that no Tax withholding shall be required under current Law if Seller provides Purchaser an IRS Form W-9.

**Section 1.8 Other Tax Matters**. The Parties intend for U.S. federal and applicable state and local income Tax purposes that any payments made pursuant to Section 1.5 or Section 1.6 be treated as an adjustment to the Purchase Price, and shall act for all Tax purposes consistently therewith (including filing Tax Returns), and not take any Tax position inconsistent therewith, unless otherwise required by applicable Law.

**Section 1.9 Allocation of Purchase Price**. Purchaser and Sellers will allocate the Purchase Price (as determined for federal income Tax purposes including any Assumed Liabilities) among the Acquired Assets for all applicable Tax purposes in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code") and the Treasury regulations promulgated under the Code (and any such similar applicable provision of state or local Tax Law, as appropriate), and the methodology set forth on Schedule 1.9 (the "Allocation Methodology"). As soon as commercially practicable, but no later than seventy-five (75) days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Sellers setting forth the allocation of the Purchase Price among the Acquired Assets in accordance with the Allocation Methodology (the "Allocation") for Sellers' review and comment. If Sellers do not deliver a written objection within thirty (30) days after receipt of the draft Allocation proposed by Purchaser, then the Allocation shall be final and binding on the Parties. If Sellers deliver a written objection within thirty (30) days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Sellers shall negotiate in good faith to resolve any such objection, and, if Sellers and Purchaser cannot resolve such dispute within thirty (30) days of Purchaser's receipt of Sellers' objection, then such dispute shall be submitted for resolution to a nationally recognized accounting firm mutually acceptable to Purchaser and Sellers, and the cost of such resolution shall be borne fifty percent (50%) by Purchaser and fifty percent (50%) by Sellers, and the resolution of such dispute shall be final and binding on the Parties. The Parties and their respective Affiliates shall

file all Tax Returns in accordance with such agreed Allocation (as finally determined under this Section 1.9) and not take any Tax-related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code. The Allocation will be adjusted to reflect any adjustments and other changes to the Purchase Price pursuant to this Agreement.

## ARTICLE II
## CLOSING

**Section 2.1** **Closing**. "Closing" means, in accordance with the terms and conditions of this Agreement, the sale, assignment, conveyance, transfer and delivery of all of Sellers' right, title, and interest in and to the Acquired Assets to Purchaser in consideration for the payment by Purchaser of the Cash Payment and the assumption of the Assumed Liabilities. The Closing shall be deemed to be effective as of the Calculation Time. Subject to Section 8.1, the Closing shall take place by telephone conference and electronic exchange of documents on the third (3rd) Business Day following the date upon which all of the conditions precedent set forth in Section 7.1 and Section 7.2 (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions) are satisfied or waived by the Party entitled to the benefit of such condition, or at such other place and time or on such other date, in each case as is mutually agreed in writing by Sellers and Purchaser, the date on which the Closing occurs in accordance with this Section 2.1 (the "Closing Date").

**Section 2.2** **Assumption/Rejection of Certain Contracts; Non-Assignable Items**.

(a) If: (i) any Seller's rights under any agreement, contract, commitment, lease, permit or other Acquired Asset may not be assigned without the consent of another Person, (ii) no Order of the Bankruptcy Court, including the Sale Order, is then in effect that has the legal effect of nullifying such requirement with respect to the transfer of the applicable Debtor's right, title and interest in and to such asset pursuant to the Transactions, and (iii) such consent has not been obtained prior to Closing, and the Closing occurs, this Agreement does not constitute an agreement to assign such rights if an assignment or attempted assignment of such rights would constitute a breach of such Acquired Asset or be unlawful.

(b) If any such consent shall not be obtained, until the earliest of (i) such time as such consent is obtained, (ii) six (6) months following the Closing, and (iii) the dissolution of the applicable Seller, Sellers and Purchaser shall (A) use reasonable best efforts to secure such consent as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement, including subcontracting, agency, licensing, or sublicensing to Purchaser any or all of such Seller's rights and obligations with respect to any such asset, under which (x) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on such Seller or its Affiliates or any direct costs associated with the retention and maintenance of such asset incurred by such Seller or its Affiliates) with respect to such asset and (y) Purchaser shall assume and timely discharge any related burden and obligation with respect to such asset. Upon satisfying any such consent requirement after the Closing, such Seller shall transfer to Purchaser and Purchaser shall accept such Seller's right, title, and interest in and to such Acquired Asset in accordance with the terms of this Agreement.

(c) Cure/Assumption Objection Resolution. In the event that any counterparty to an Assigned Contract objects to the proposed assumption and assignment of such Assigned Contract, including any objection to the Cure Costs, the adequacy of Purchaser's assurance of future performance, or any other aspect of the proposed assumption and assignment (each, a "Cure/Assumption Objection"): (i) the Parties shall use their best efforts to resolve any Cure/Assumption Objection, (ii) Sellers may not settle or compromise any Cure/Assumption Objection with respect to Purchaser's adequate assurance of future performance without Purchaser's express prior written consent; (iii) Purchaser shall reasonably cooperate with Sellers in connection with any Cure/Assumption Objection that is based solely on Purchaser's adequate assurance of future performance; (iv) Sellers shall be solely responsible for resolving all Cure Cost objections and all other objections that are not based on Purchaser's adequate assurance of future performance and shall be entitled to settle, compromise, or otherwise agree to resolve any such objections without Purchaser's consent; and (v) if any Cure/Assumption Objection cannot be resolved by agreement, Sellers shall promptly seek to have such objection heard and determined by the Bankruptcy Court on an expedited basis.

(d) Nothing in this Section 2.2 shall be deemed a waiver by Purchaser of its right to have received at the Closing an effective assignment of all of Sellers' right, title, and interest in and to the Acquired Assets in accordance with this Agreement nor shall this Section 2.2 be deemed to constitute an agreement to exclude from the Acquired Assets any assets described under Section 1.1. Sellers will not be obligated to pay any consideration to any third party from whom any consent is requested or to initiate any litigation to obtain any such consent.

(e) Contract Designation and De-Designation Right. Notwithstanding anything to the contrary in this Agreement, no later than one (1) Business Day prior to the Closing Date (the "Designation Deadline"), Purchaser may, by written notice to Sellers, (i) designate any Available Contract that is an Excluded Asset as an Assigned Contract or (ii) remove any Contract from Schedule 1.1(g) so that it becomes an Excluded Asset, in each case without any adjustment to the Purchase Price. Schedule 1.1(g) and the list of Assigned Contracts shall be deemed automatically amended to reflect any such designation or removal by Purchaser pursuant to this Section 2.2(e).

(f) Disputed Contracts. Notwithstanding anything to the contrary in this Agreement, if there is a Cure/Assumption Objection with respect to any Available Contract that is available for assumption and assignment under this Agreement (each, a "Disputed Contract") that has not been resolved prior to the Designation Deadline, then the Designation Deadline with respect to such Disputed Contract shall automatically be extended (including past the Closing) until the earlier of (i) the date on which such Disputed Contract is deemed rejected under section 365 of the Bankruptcy Code or is otherwise rejected with the express prior written consent of the Purchaser (which consent may be withheld in Purchaser's sole discretion), (ii) the date that is ten (10) Business Days following the date, if any, on which such dispute is finally determined by the Bankruptcy Court, or (iii) the date that is ten (10) Business Days following the date, if any, on which such dispute is mutually resolved (the "Extended Contract Period"). For the avoidance of doubt, Sellers may not seek to reject, or consent to the deemed rejection of, any Disputed Contract without Purchaser's express prior written consent. If Purchaser does not deliver a written notice designating such Disputed Contract for assumption and assignment within the Extended Contract Period, such Disputed Contract shall be deemed an Excluded Asset for all purposes under this Agreement.

(g) Assumption and Assignment of Executory Contracts. With respect to any Acquired Asset that is an executory Contract or unexpired Lease to which any Debtor is a party, Debtors shall provide written notice to the counterparty thereto identifying such Contract or Lease as one that may be assumed by the applicable Debtor and assigned to Purchaser, together with Debtors' good faith estimate of the amount, if any, required to cure any monetary defaults thereunder (the "Cure Costs"). Subject to entry of the Sale Order, at the Closing, the applicable Debtor shall assume and assign to Purchaser, and Purchaser shall accept and assume, each such Contract or Lease pursuant to Sections 363 and 365 of the Bankruptcy Code; provided that all Cure Costs with respect to the Assigned Contracts shall be paid by Sellers in accordance with Section 5.2, and Cure Costs shall not be Assumed Liabilities.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Schedules delivered by Sellers concurrently with this Agreement and subject to Section 10.5, each Seller, individually and not jointly and severally, represents and warrants to Purchaser as of the Effective Date as follows, solely as to itself, its Acquired Assets, and its Business and not as to any other Seller, any other Acquired Assets or any other Business (and where a representation and warranty is made with respect to a specific Seller (including a specifically identified Seller), such representation is made by and with respect to only such Seller, its Acquired Assets, and its Business and not by or with respect to any other Seller, any other Acquired Assets or any other Business):

**Section 3.1 Organization; Good Standing**. Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of its formation and has the power and authority to carry on its business as now being conducted and to own and operate the properties and assets now owned and being operated by it.

**Section 3.2 Qualifications**. Neither the operation of the Business nor the character of the properties owned, leased or operated by Seller in connection with the Business requires Seller to be licensed or qualified to do business as a foreign limited liability company in any jurisdiction other than the Territory, except as would not reasonably be expected to be material to the Business, taken as a whole.

**Section 3.3 Authority, Enforceability**.

(a) Seller has the power and authority to enter into this Agreement and to carry out its obligations under this Agreement, subject to requisite Bankruptcy Court approvals being granted. The execution, delivery and performance of this Agreement and the other agreements and documents to be executed and delivered pursuant to the provisions of this Agreement (the "Transaction Documents") to which Seller is a party, and the consummation by Seller of the Transactions, subject to requisite Bankruptcy Court approvals being granted, have been duly authorized by all necessary limited liability company action on the part of Seller.

(b) Subject to requisite Bankruptcy Court approvals being granted, this Agreement and each of the Transaction Documents to which Seller is a party have been (or, in the case of Transaction Documents to be delivered at the Closing, will be) duly executed and delivered

on behalf of Seller and each is (or at the Closing will be) a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or other laws or equitable principles relating to or affecting the enforcement of creditors' rights (the "Enforceability Exceptions").

(c) Seller is not transferring any of the Acquired Assets with any intent to hinder, delay, or defraud any of its creditors.

**Section 3.4 No Conflict or Violation**. Assuming that the Sale Order and all other requisite Bankruptcy Court approvals are obtained, and except as set forth on Schedule 3.4 and except for Supplier approvals, the execution, delivery and performance by Seller of this Agreement and the Transaction Documents (as applicable) and the consummation of any of the Transactions will not (a) violate or conflict with the Organizational Documents of Seller, (b) result in a breach of or default by Seller, require the consent or notification of any third party, or give rise to any right of modification, acceleration, payment, cancellation or termination, or in any manner release any party thereto from any obligation, in each case, under any provision of any of the Assigned Contracts, (c) be prohibited by, or require Seller to obtain or make any consent, authorization, approval, registration or filing under, any statute, Law, ordinance, regulation, rule, judgment, decree or Order of any court or governmental agency, board, bureau, body, department or authority, except such filings and notices as may be required under the Federal Worker Adjustment and Retraining Notification Act of 1988, as amended, set forth at 29 United States Code Section 2101 et seq. and any similar laws (the "WARN Act"), or (d) result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) upon or give to any other Person (other than Purchaser) any interest or right (including any right of termination or cancellation) in or with respect to, any of the Acquired Assets, except, in the case of clauses (b) and (c), as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.

**Section 3.5 Certain Financial Information**. Attached to Schedule 3.5 is Sellers' internal report of profit and loss with respect to the Business for the twelve-month period ended December 31, 2025, which report is not adjusted for any shared or "allocated" costs, such as for shared corporate overhead, and is not adjusted for management fees charged by the Sellers that are not Debtors (the "Financial Information"). The Financial Information (a) was prepared in good faith and derived from the books and records of Sellers and their Affiliates, (b) fairly presents in all material respects the revenues and expenses of the Business for the periods indicated therein, subject to the qualifications described above, and (c) was prepared in a manner consistent with the historical accounting practices of Sellers and their Affiliates. Purchaser acknowledges that the Financial Information does not constitute audited or reviewed financial statements prepared in accordance with GAAP and may not include all information that would be required for financial statements prepared in accordance with GAAP and is subject to the qualifications described above.

**Section 3.6 Absence of Certain Changes**. Except as set forth on Schedule 3.6 and except for (t) preparation, negotiation, commencement, and pendency of the Bankruptcy Cases and the debtor-in-possession financing and related matters, (u) processes of Sellers and their Affiliates to sell or potentially sell assets or lines of business, including the Transactions and including the sale of business of Sellers and their Affiliates in ten (10) or more states, and including the activities related to such processes (such as solicitations of interest, providing diligence

materials, engaging in negotiations and evaluations, and the commencement of transition services), (v) recent operational and liquidity challenges of Sellers and their Affiliates, (w) the engagement of legal, restructuring, and banking advisors with respect thereto, (x) reductions in force of employees of Sellers and their Affiliates, (y) negotiating with their creditors with respect to such matters, and (z) amendments to the credit facilities of Sellers and their Affiliates, since December 31, 2025, Seller has conducted the Business only in the Ordinary Course in all material respects and has not, in connection with or relating to the Business or the Acquired Assets:

(a) suffered any Material Adverse Effect;

(b) sold, transferred, distributed, leased to others or otherwise disposed of any material portion of its assets, except in the Ordinary Course, or canceled or compromised any debt or claim, or waived or released any right of substantial value;

(c) delayed or deferred material maintenance or repairs on any of the material Acquired Assets, including owned and leased transportation equipment;

(d) transferred or granted any rights under, or entered into any settlement regarding the breach or infringement of, any Supplier relationships, or modified any existing rights with respect thereto, except in each case in the Ordinary Course or as would not reasonably be expected to be material to the Business;

(e) been the subject of any labor union organizing activity, or had any employee strikes, work stoppages, concerted slowdowns or lockouts by or with respect to Business Employees;

(f) granted any material increase in the compensation (including bonus payments) of any officer or employee receiving base compensation in excess of $150,000 per annum other than in the Ordinary Course;

(g) made any change in any material method of Tax accounting; and

(h) authorized any of the foregoing or entered into an agreement to do any of the foregoing.

**Section 3.7 Acquired Assets.**

(a) Except as set forth on Schedule 3.7(a), Seller has good and valid title to all of its Acquired Assets free and clear of all Encumbrances, other than Permitted Encumbrances. Assuming that the Sale Order and all other requisite Bankruptcy Court approvals are obtained, Seller has the right to convey, and at the Closing Seller will have conveyed, or shall have caused to be conveyed, to Purchaser good and valid title to its Acquired Assets, free and clear of all Encumbrances, other than Permitted Encumbrances. Except as set forth on Schedule 3.7(a), there are no existing agreements, options, commitments or rights granted by or on behalf of Seller to or in any third party to acquire any of its Acquired Assets or any interest therein.

(b) Except (i) as set forth on Schedule 3.7(b), (ii) the Excluded Assets, (iii) employees that do not become employees of Purchaser, (iv) the corporate overhead type (e.g.,

accounting, financial, human resources, legal, purchasing, IT support, executive) systems and services and enterprise-wide systems and services and benefits (e.g., information technology, payroll systems) provided by RNDC and certain of its Affiliates to the Business and similarly to other businesses of Sellers and Sellers' Affiliates, (v) Contracts with Suppliers that relate to states in addition to the Territories and/or business of Sellers and their Affiliates other than the Business, and (vi) the assets, properties, and services provided under the Transition Services Agreement, (A) the Acquired Assets include the assets owned by Seller in connection with the Business, (B) the Acquired Assets are sufficient to enable Purchaser to conduct the Business immediately after the Closing in all material respects in the manner in which the Business is currently conducted by Seller, and (C) there are no material assets or properties used by Seller in the operation of the Business as currently conducted that are owned by any Person other than Seller that will not be leased or licensed to Purchaser under valid, current leases or license arrangements.

**Section 3.8 Real Property**.

(a) Schedule 3.8(a) sets forth the address of each parcel of real property held for use in connection with the Business of Seller and leased by Seller (the "Leased Real Property") and the lease documents (collectively, the "Leases") pursuant to which each Leased Real Property is leased by Seller. Seller has delivered to Purchaser a true and complete copy of each such Lease. Subject to requisite Bankruptcy Court approvals, entry of the Sale Order and assumption by the applicable Debtor of the applicable Lease in accordance with applicable Law (including satisfaction of any applicable Cure Costs), except as set forth in Schedule 3.8(a), and disregarding any breach or default arising as a result of the commencement of the Bankruptcy Cases or the failure to pay any amount that constitutes a Cure Cost, with respect to each of the Leases: (i) such Lease is legal, valid, binding, enforceable and in full force and effect (subject to the Enforceability Exceptions); (ii) Seller's possession and quiet enjoyment of such Leased Real Property under such Lease has not been disturbed, and to Seller's Knowledge, there are no disputes with respect to such Lease; (iii) neither Seller nor, to Seller's Knowledge, any other party to such Lease is in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Lease, in each case, that would reasonably be expected to be material to the Business; (iv) the other party to such Lease is not an Affiliate of Seller; (v) Seller has not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; and (vi) Seller has not collaterally assigned or granted any other security interest in such Lease or any interest therein.

(b) All buildings, structures, improvements, fixtures, building systems, and equipment, and all components thereof, included in the Leased Real Property (the "Improvements") are in good condition and repair and sufficient for the operation of the Business. There are no structural deficiencies or latent defects affecting any of the Improvements and, to Seller's Knowledge, there are no facts or conditions affecting any of the Improvements which would, individually or in the aggregate, interfere in any material respect with the use or occupancy of the Improvements or any portion thereof in the operation of the Business.

**Section 3.9 Tax Matters**. The term "Taxes" means all unclaimed property, escheatable property, net income, capital gains, gross income, gross receipts, sales, use, transfer, ad valorem, franchise, profits, license, capital, withholding, payroll, employment, excise, goods and services,

severance, stamp, occupation, premium, real estate, property, assessments or other governmental charges of any kind whatsoever in the nature of a tax, together with any interest, fines and any penalties, additions to tax or additional amounts incurred or accrued under applicable federal, state, local or non-U.S. Tax Law. Except as set forth on Schedule 3.9 or as would not reasonably be expected to result in liability to Purchaser:

(a) Seller has (i) duly and timely filed with respect to the Business and the Acquired Assets true, correct and complete Tax Returns, reports and estimates that it was required to file and (ii) prepared all such Tax Returns in accordance with applicable Tax Laws, for all years and periods (and portions thereof) and for all jurisdictions (whether federal, state, local or non-U.S.) in which any such Tax Returns, reports and estimates were due;

(b) all Taxes due and payable by Seller have been paid, and there is no current liability for any Taxes due and payable by Seller, except (i) where Seller is contesting any such Taxes in good faith or (ii) for Taxes the nonpayment of which is permitted or required by the Bankruptcy Code;

(c) there are no existing liens for Taxes (except for Taxes (i) not yet due and payable or (ii) the nonpayment of which is permitted or required by the Bankruptcy Code) upon or, to Seller's Knowledge, threatened in writing against the Business or any of the Acquired Assets;

(d) no portion of any Tax Return that relates to the Acquired Assets or the Business is currently the subject of any audit, action, suit, proceeding, claim or examination by any Governmental Authority, and to Seller's Knowledge no such audit, action, suit, proceeding, claim, or examination is pending or threatened in writing;

(e) the Acquired Assets do not include any stock or other ownership interests in any foreign or domestic corporations, partnerships, joint ventures, limited liability companies, business trusts, or other entities;

(f) no written claim, which has not been fully resolved, has been made by a Governmental Authority against Seller in a jurisdiction where Seller does not pay a specific Tax with respect to the Acquired Assets or the Business or file a specific Tax Return with respect to the Acquired Assets or the Business that Seller is or may be subject to pay such Tax or file such Tax Return by that jurisdiction;

(g) Seller is not currently the beneficiary of any extension of time within which to file any Tax Return with respect to the Acquired Assets or the Business (other than an automatic extension in the Ordinary Course of Business) which extension could have effect after the Closing Date, and Seller has not waived any statute of limitation with respect to any Tax with respect to the Acquired Assets or the Business which waiver remains in effect or agreed to any extension of time with respect to a Tax assessment or deficiency with respect to the Acquired Assets of the Business which extension of time remains in effect;

(h) Seller has withheld and paid all Taxes with respect to the Acquired Assets and the Business required to have been withheld and paid in connection with amounts paid or owing to any employee, stockholder, independent contractor, creditor, or other third party; and

(i) Seller does not have any material liability for the Taxes of any Person (other than Seller) under Treasury Regulation Section 1.1502-6 (or any corresponding provision of state, local or non-U.S. Tax Law), as a transferee or successor, by contract, or otherwise.

Section 3.6(g) and this Section 3.9 set forth the exclusive representations and warranties made with respect to Taxes.

**Section 3.10 Material Contracts.**

(a) Subject to requisite Bankruptcy Court approvals, entry of the Sale Order and assumption by the applicable Debtor of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs), except as set forth on Schedule 3.10 (the "Material Contracts"), as of the Effective Date, Seller is not party to any Contracts (other than purchase orders or similar instruments and any employee benefit plan):

(i) that relate primarily to the Business and involve the expenditure or receipt by Seller of more than $250,000 in any calendar year for any individual Contract, other than employee benefit plans and Contracts with Suppliers;

(ii) under which Seller leases, holds or operates any tools, furniture, machinery, equipment, vehicles or other personal property owned by any other Person, in each case, involving $250,000 or more in annual payments and relating primarily to the Business;

(iii) that relate to the Business that (A) require Seller to pay any severance to officers or employees of Seller, (B) involve labor provided by an unaffiliated third party, or (C) are with Business Employees with a base salary of more than $150,000 per year, other than any offer letter or similar document that sets forth the terms of an at-will employment arrangement;

(iv) with any Governmental Authority;

(v) with an Affiliate of RNDC or any other holder of equity interests in Seller, other than the Organizational Documents of Seller;

(vi) that (A) contains provisions or covenants purporting to restrict or restricting Seller from competing or engaging in any activity or line of business or within the Territory with any Person in any material respect or (B) grants any exclusive rights to any third party that would be material to the Business;

(vii) with Suppliers; or

(viii) is otherwise material to the Business, taken as a whole.

(b) Except as set forth on Schedule 3.10, and disregarding any breach or default arising as a result of the commencement of the Bankruptcy Cases or the failure to pay any amount that constitutes a Cure Cost: (i) each Material Contract is in full force and effect and is valid and enforceable by Seller in accordance with its terms, subject to the Enforceability Exceptions; (ii)

Seller is not in material default in the observance or the performance of any material term or obligation to be performed by it under any Material Contract to which it is a party; (iii) to Seller's Knowledge, no other Person is in material default in the observance or the performance of any material term or obligation to be performed by it under any Material Contract to which such Person is a party; and (iv) Seller has not received written notice that any counterparty to any Material Contract intends to cancel, terminate, not renew, or exercise an option under such Material Contract, in each case of (ii), (iii), and (iv), that would be detrimental and material to the Business, whether in connection with the Transactions or otherwise. Seller has made available to Purchaser true and complete copies of all Material Contracts.

**Section 3.11 Litigation or Proceedings.**

(a) Except as set forth on Schedule 3.11, other than the Bankruptcy Cases and actions within the Bankruptcy Cases or as would not reasonably be expected to result in material liability, (i) there are no actions, suits, proceedings, investigations, claims or orders, either at law or in equity, or before any commission or other Governmental Authority in any United States or foreign jurisdiction ("Action"), of any kind now pending or, to Seller's Knowledge, threatened in writing in any manner against Seller with respect to or affecting the Business or the Acquired Assets, and (ii) there has not been any such Action against Seller during the three (3)-year period prior to the Effective Date. There are presently no outstanding judgments, decrees or Orders of any Governmental Authority against or affecting such Seller or its Acquired Assets, other than Orders entered in the Bankruptcy Cases. No court of competent jurisdiction has issued, enacted, entered, promulgated, or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining, or otherwise prohibiting the Closing that is in effect, and, to Seller's Knowledge, no Governmental Authority has enacted or promulgated any Law that has the effect of making the Transactions illegal.

(b) There are no Actions now pending or, to Seller's Knowledge, threatened in writing involving Seller or any of the properties or assets of the Business that (i) questions the validity of this Agreement or any Transaction Document, (ii) seeks to delay, prohibit or restrict in any manner any of the Transactions or (iii) would reasonably be expected to adversely affect Seller's performance of its obligations under this Agreement or the consummation of the Transactions.

**Section 3.12 Compliance with Laws**. Except as set forth on Schedule 3.12, (a) Seller is presently conducting the Business in compliance in all material respects with, and has complied at all times since December 31, 2024 in all material respects with, all federal, state, local and foreign statutes, laws, ordinances, regulations, rules, permits, judgments, Orders or decrees of any Governmental Authority having jurisdiction over the Business ("Law"), including all Laws relating to the extension of credit and the delivery of products to customers, and (b) since December 31, 2024, has not been fined, disciplined, or investigated by any Governmental Authority that regulates the distribution of beverages in connection with the operation of the Business.

**Section 3.13 Health, Safety and Environmental Matters.**

Except as set forth on Schedule 3.13:

(a) Seller, with respect to its Acquired Assets and its Business, has complied in all material respects and is presently complying in all material respects with all Environmental Laws and Safety Requirements. Seller has obtained all material permits, licenses, approvals, consents, authorizations, registrations and certificates required under Environmental Laws (collectively, the "Environmental Permits") for the operation of its Business as currently conducted and all such Environmental Permits are set forth on Schedule 3.13(a). Seller is in compliance in all material respects with all terms and conditions of such Environmental Permits.

(b) There has been and currently is no Release of any Hazardous Substance at or into the environment at the Leased Real Property related to the Business, including Releases from underground storage tanks, in each case, in a manner that would reasonably be expected to give rise to a material liability of Seller, with respect to its Acquired Assets and its Business, under Environmental Law. Seller, with respect to its Acquired Assets and its Business, is not subject to any pending or, to Seller's Knowledge, written threat of an Environmental Claim.

(c) No Hazardous Substance has been used, generated, stored, manufactured, treated, processed, transported or disposed by Seller on, to or from its Leased Real Property or otherwise related to its Business, except in compliance in all material respects with Environmental Laws.

(d) Seller has provided to Purchaser copies of all material written environmental reports (including environmental site assessment reports), assessments, and analytical results concerning Environmental Laws or Hazardous Substances related to its Leased Real Property and its Business, in each case in its possession.

(e) "Environmental Claim" means any claim, notice of violation, demand, summons, suit, action, injunction, proceeding, penalty, fine, judgment, decree or Order from, by or with any Governmental Authority or private party concerning any Environmental Laws or any Release of any Hazardous Substance into the environment.

(f) "Environmental Laws" means any applicable Law in force and effect on or prior to the Effective Date, pertaining to (i) the protection of the environment or natural resources, (ii) subject to investigation, monitoring, reporting or remediation by a Governmental Authority, (iii) the management, use, generation, transportation, shipment, treatment, storage, disposal, Release, abatement, removal, remediation or handling of, or exposure to, Hazardous Substances or (iv) pollution.

(g) "Hazardous Substance" means any substance, chemical, compound, solid, gas, liquid, radiation, waste, pollutant, contaminant, or material that is (i) regulated, defined or designated as a hazardous substance, hazardous waste, extremely hazardous, carcinogenic, toxic, caustic, a pollutant or a contaminant pursuant to Environmental Laws, (ii) asbestos (in any form or condition), polychlorinated biphenyls, urea formaldehyde, petroleum and petroleum products (including crude oil or any fraction thereof), radioactive materials and lead-based paint, or (iii) natural gas, radon gas, synthetic gas and any mixtures thereof.

(h) "Release" means any spilling, leaking, depositing, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the

environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Substance) in violation of any Environmental Laws or Environmental Permits.

(i) "Safety Requirements" means all applicable Laws relating to public health and safety, and worker health and safety, all as amended and in effect on or prior to the Effective Date, and, in each case, to the extent related to exposure to Hazardous Substances.

**Section 3.14 Governmental Authorizations and Regulations**. Seller has all material licenses, franchises, permits and other governmental authorizations required by applicable Law for the conduct of the Business as currently conducted, which are set forth on Schedule 3.14. Seller is in material compliance with all such licenses, franchises, permits and other governmental authorizations. Such licenses, franchises, permits and other governmental authorizations are valid, and Seller has not received any written notice that any Governmental Authority intends to cancel, terminate or not renew or commence an Action with respect to any such license, franchise, permit or other governmental authorization.

**Section 3.15 No Illegal Payments; Etc.**. Neither Seller nor any of Seller's directors, officers, Affiliates, or, to Seller's Knowledge, employees or agents, has (a) directly or indirectly given or agreed to give any illegal gift, contribution, payment or similar benefit to any Supplier, customer, governmental official or employee or other Person who was, is or may be in a position to help or hinder Seller (or assist in connection with any actual or proposed transaction) or (b) made or agreed to make any illegal contribution, or reimbursed any illegal political gift or contribution made by any other Person, to any candidate for federal, state, local or foreign public office.

**Section 3.16 Brokers**. Except as set forth on Schedule 3.16, Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Transactions, and Seller shall be solely responsible for any such liabilities or obligations set forth on Schedule 3.16.

**Section 3.17 Certain Matters of Non-Debtor Sellers**. RNDC-NWS, LLC, NWS Michigan, LLC, National Wine & Spirits, LLC, and L&L Wine and Liquor, LLC (collectively, the "Michigan Non-Debtor Sellers") are the only entities operating and owning the Business in the State of Michigan. RNDC General, LLC is the only entity operating and owning the Business in the State of Ohio. However, certain Contracts with Suppliers and related to the Business in Ohio or Michigan may have been entered into by RNDC, and certain services, systems, and assets necessary for the operation of the Business by the Michigan Non-Debtor Sellers in Michigan and by RNDC General, LLC in Ohio are made available to such Sellers by RNDC. Each of the Michigan Non-Debtor Sellers and RNDC General, LLC is not a debtor in any bankruptcy proceeding. RNDC General, LLC is now and after the consummation of the Transactions will be solvent and able to pay or otherwise satisfy all of its outstanding obligations. Each Seller that is not a Debtor is receiving a portion of the Purchase Price that constitutes a fair value for the portion of the Business such Seller is selling under this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows:

**Section 4.1** **Organization**. Each of Martignetti Companies Control State, LLC, Martignetti Companies of New Hampshire, LLC and Martignetti Companies of Utah, LLC is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Massachusetts, the State of New Hampshire and the State of Utah, respectively, and has the power and authority to carry on its business as now being conducted and to own and operate the properties and assets now owned and being operated by it.

**Section 4.2** **Authorization of Agreement**. Purchaser has the requisite legal power and authority to enter into this Agreement and to carry out its obligations under this Agreement. The execution, delivery and performance of this Agreement and the other Transaction Documents to be executed and delivered by Purchaser pursuant to the provisions of this Agreement have been duly authorized by all necessary action on the part of Purchaser. This Agreement has been duly executed and delivered on behalf of Purchaser and is a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or other laws or equitable principles relating to or affecting the enforcement of creditors' rights.

**Section 4.3** **No Conflict or Violation**. Neither the execution, delivery or performance of this Agreement by Purchaser nor the consummation of any of the Transactions will (a) violate or conflict with any provision of the Organizational Documents of Purchaser, (b) result (with or without notice or lapse of time, or both) in any breach of or default by Purchaser under any provision of any contract or agreement of any kind to which Purchaser is a party or by which Purchaser is bound or to which the properties or assets of Purchaser are subject, or (c) except as set forth on Schedule 4.3, violate, or require Purchaser to obtain or make any consent, authorization, approval, registration or filing under, any statute, Law, ordinance, regulation, rule, judgment, decree or Order of any court or governmental agency, board, bureau, body, department or authority.

**Section 4.4** **Litigation**. There are no Actions of any kind now pending or, to the best of Purchaser's knowledge, threatened or proposed in any manner, or any circumstances which would reasonably be expected to form the basis of any such Action, involving Purchaser or any of its properties or assets that (a) questions the validity of this Agreement, (b) seeks to delay, prohibit or restrict in any manner any action taken or contemplated to be taken by Purchaser under this Agreement, or (c) would reasonably be expected to adversely affect Purchaser's performance of its obligations under this Agreement or the consummation of the Transactions. No court of competent jurisdiction has issued, enacted, entered, promulgated, or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining, or otherwise prohibiting the Closing that is in effect.

**Section 4.5** **Financing**. Purchaser has, and will have at the Closing, sufficient cash funds in an aggregate amount necessary to pay all amounts payable under this Agreement, including the Purchase Price and Cash Payment, and to consummate all of the other Transactions,

and does not know of any circumstance or condition that could reasonably be expected to prevent or substantially delay the availability of such funds or otherwise impair such capability at the Closing and such other dates that such obligations and transactions are required to be satisfied pursuant to the terms of this Agreement. Purchaser is and shall be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

**Section 4.6** **Solvency**. Purchaser is, and immediately after giving effect to the Transactions shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Purchaser. In connection with the Transactions, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

**Section 4.7** **WARN Act and Mass Layoffs**. Purchaser does not currently plan or contemplate any plant closings, reductions in force, terminations of employees, or similar personnel actions impacting Business Employees that, if aggregated with any such conduct on the part of any Seller prior to the Closing Date, would trigger obligations under the WARN Act.

**Section 4.8** **Brokers**. Purchaser has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Transactions.

## ARTICLE V
## BANKRUPTCY COURT MATTERS

**Section 5.1** **Bankruptcy Actions**.

(a) Within one (1) Business Day following the Effective Date, Debtors shall file with the Bankruptcy Court a motion seeking entry of the Sale Order, including a motion attaching and seeking approval of the execution, delivery, and performance of this Agreement, which shall be acceptable to the Purchaser. Debtors shall use commercially reasonable efforts to obtain a hearing on such motion as promptly as practicable. Purchaser will promptly take such actions as are reasonably requested by any Debtor in obtaining Bankruptcy Court approval of the Sale Order.

(b) From the Effective Date until the Closing Date, the Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order and any other Orders reasonably necessary to consummate the Transactions. In the event the entry of the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

(c) Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the

Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(d) Each Debtor and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request, promptly furnishing the other with copies of notices or other communications received from the Bankruptcy Court or any third party or Governmental Authority with respect to the Transactions.

(e) Purchaser shall provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been a sufficient demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, nonconfidential financial information, and other documents or information for filing with the Bankruptcy Court.

**Section 5.2** **Cure Costs**. Subject to entry of the Sale Order, at Closing, Sellers shall pay Cure Costs to the applicable counterparties to the Assigned Contracts. With respect to any Disputed Contract, following final resolution of such dispute in accordance with Section 2.2(f), Sellers shall pay such Cure Costs to the applicable counterparties. Sellers shall provide Purchaser with reasonable evidence of payment of all Cure Costs to the applicable counterparties.

**Section 5.3** **Approval**. Sellers' obligations under this Agreement and in connection with the Transactions are subject to entry of, and, to the extent entered, the terms of, any Orders of the Bankruptcy Court, including entry of the Sale Order. Nothing in this Agreement shall require Sellers or their respective Affiliates to give testimony to, or submit a motion to, the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

**Section 5.4** **Fiduciary Obligations**. Nothing in this Agreement, or any document related to the Transactions, will require any Seller or any of their respective managers, officers, directors, partners, or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law.

## ARTICLE VI
## COVENANTS

**Section 6.1** **Access, Information and Documents**.

(a) Prior to the Closing, each Seller will give to Purchaser and its Advisors reasonable access, and upon reasonable advance notice and during regular business hours (and in accordance with the reasonable procedures established by such Seller), to the books and records of such Seller, as is reasonably necessary in order to prepare for and consummate the Transactions,

including access to documents and materials referred to in this Agreement or the Schedules; provided that (i) such access does not unreasonably interfere with the normal operations of the Business, (ii) such access will occur in such a manner as such Seller reasonably determines to be appropriate to protect the confidentiality of the Transactions and such books and records, (iii) all requests for access will be directed to Sellers' Advisors or such other Person(s) as Seller (via such Advisors) may designate in writing from time to time, (iv) Seller is not obligated to disclose, and may redact or remove, any information that is not related to the Business, and (v) nothing in this Agreement will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to Seller if the Transactions are not consummated, (B) would require Seller to disclose any information regarding the Affiliates of Seller, (C) would reasonably be expected to adversely affect any legal privilege, (D) would be in violation of applicable Laws or the provisions of any agreement to which Seller is bound, or (E) would violate any fiduciary duty. Nothing in this Agreement will permit Purchaser or its Advisors to conduct any sampling, monitoring, or testing or other surface, subsurface, or intrusive investigation, assessment, or analysis of soil, groundwater, building materials, air, or other environmental media at any property or facility, including the Leased Real Property, including of the type commonly known as a Phase II environmental site assessment.

(b) The information provided pursuant to this Section 6.1 will be used solely for the purpose of consummating the Transactions and will be governed by the terms and conditions of the Confidentiality Agreement, which shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary contained in this Agreement or in the Confidentiality Agreement. No Seller makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.1, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c) Purchaser will not, and will not permit any of its Advisors, representatives or Affiliates to, contact any officer, manager, director, employee (other than Identified Employees as permitted by Section 6.7(a)), customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder, or other material business relation of Sellers prior to the Closing with respect to Sellers, the Business, or the Transactions, without the prior written consent of Sellers (such consent not to be unreasonably withheld, conditioned, or delayed); provided, however, that from and after the Effective Date, Purchaser and its Affiliates may contact and communicate directly with the Suppliers and, subject to Section 6.7(a), all of Sellers' Business Employees without Sellers' prior consent. The Parties will reasonably cooperate in terms of efficiently facilitating such contact with each Seller and its employees, customers and Suppliers in preparation for Closing.

**Section 6.2 Conduct of Business Pending Closing**. From the Effective Date until the Closing, except as consented to by Purchaser in writing (such consent not to be unreasonably withheld, conditioned, or delayed), each Seller will (solely with respect to the Business):

(a) except (v) as required by applicable Law or a Governmental Authority, (w) due to any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (x) as expressly contemplated, required or permitted by this Agreement, (y) to the extent related to an Excluded Asset or an Excluded Liability, or (z) as set forth on Schedule 6.2, during the period

from the Effective Date until the Closing, unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned, or delayed), such Seller shall (i) maintain such Seller at all times as a limited liability company duly organized, validly existing and in good standing under the Laws of the State of its formation and authorized to conduct business in the respective Territory, (ii) maintain the existing insurance of the Business or renewals or replacements of such insurance on substantially similar terms, and (iii) use its commercially reasonable efforts to carry on the Business in the Ordinary Course, including using such efforts to (A) preserve the organization of the Business and (B) preserve such Seller's relationships with Suppliers, licensees, distributors, vendors, sales agents and customers and others having business relationships with such Seller in connection with the Business.

However, no action by any Seller with respect to matters specifically addressed by Section 6.2(b) shall be deemed to be a breach of this Section 6.2(a) unless such action would constitute a breach of Section 6.2(b);

(b) except (v) as required by applicable Law or a Governmental Authority, (w) due to any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (x) as expressly contemplated, required or permitted by this Agreement, (y) to the extent related to an Excluded Asset or an Excluded Liability, or (z) as set forth on Schedule 6.2 during the period from the Effective Date until the Closing, unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned, or delayed), such Seller shall not:

(i) renegotiate, modify or alter in any material way the terms of any Material Contract (or terminate or elect not to renew any such Material Contract, if the terms of such Material Contract permit renewal) or exercise any material option that is detrimental to such Seller under any Material Contract other than in the Ordinary Course;

(ii) enter into any new leases, licenses, or other occupancy agreements or rights to occupancy for all or any portion of the Leased Real Property;

(iii) (A) sell, transfer, distribute, lease to others or otherwise dispose of any of its Acquired Assets, except in the Ordinary Course and dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the Business, or (B) cancel or compromise any material claim against any third party or waive or release any right of substantial value;

(iv) transfer or grant any rights under, or enter into any settlement regarding the breach or infringement of, any Supplier relationships in the Territory, or adversely modify any existing rights with respect to any Supplier relationships; and

(v) commit or agree to take any of the actions prohibited by this Section 6.2.

**Section 6.3 Other Consents and Approvals.**

(a) Other Consents and Approvals. Purchaser shall use reasonable best efforts (and each Seller shall reasonably cooperate with Purchaser upon request) to obtain prior to the

Closing all consents, authorizations and approvals and timely submit any notices or filings under all statutes, Laws, ordinances, regulations, rules, judgments, decrees and Orders of any court or governmental agency, board, bureau, body, department or authority or of any other person required to be obtained by Purchaser in connection with the execution, delivery and performance of this Agreement and the consummation of the Transactions as set forth on Schedule 6.3(a). Without limiting the foregoing, each Seller and Purchaser shall furnish the other Party with such necessary information and reasonable assistance as such other Party may reasonably request in connection with their preparation of necessary filings, registrations, or submissions of information to any Governmental Authority in connection with this Agreement and the Transactions. Each Seller shall reasonably cooperate with Purchaser as reasonably requested by Purchaser in order to assist Purchaser in seeking the federal, state, municipal and other licenses and permits necessary for Purchaser to operate the Business immediately following the Closing.

(b) Clear Skies. Purchaser will not, and will not permit any of its Affiliates to, engage in any action or enter into any transaction or permit any action to be taken or transaction to be entered into that would reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any clearances, consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions, or other authorizations from any Governmental Authority necessary to consummate the Transactions, (ii) increase the risk of any Governmental Authority entering an Order preventing, delaying, or prohibiting the consummation of the Transactions, or (iii) delay the consummation of the Transactions; provided that nothing in this Section 6.3(b) shall restrict Purchaser or its Affiliates from conferring or communicating with Suppliers or Business Employees in connection with the Transactions.

(c) Licenses and Permits. With respect to Purchaser obtaining all necessary federal and state licenses and permits pertaining to the sale and distribution of alcoholic beverages: (i) each Seller shall not cancel such Seller's existing federal basic permits as a wholesaler and importer until Purchaser has obtained its federal basic permits; and (ii) each Seller shall not cancel such Seller's existing state or county licenses as a wholesaler and importer until Purchaser has obtained its state and/or county licenses.

**Section 6.4 Restrictive Covenants Provisions.**

(a) Non-Competition. Each Seller covenants and agrees that for a period of five (5) years from the Closing Date (the "Restricted Period"), it shall not (and shall cause its controlled Affiliates not to) directly or indirectly (x) own an interest in, operate, join, control, or participate (including as a joint venturer, agent, representative, consultant or creditor) in any Person providing, soliciting orders for, selling, warehousing, distributing, or marketing beverage products in the Territory which directly or indirectly compete with the products of the Business, or (y) interfere with any arrangements or agreements entered into by Purchaser with any Supplier; provided that the foregoing shall not restrict any Seller or any of its Affiliates from providing, soliciting orders for, selling, warehousing, distributing, or marketing non-alcoholic beverage products in the State of New Hampshire or, unless the Parties mutually agree in writing prior to the Closing to include the same as Acquired Assets, the Commonwealth of Pennsylvania.

(b) Non-Disparagement. Each Seller, on the one hand, shall not, and shall cause its respective controlled Affiliates not to, and Purchaser, on the other hand, shall not, and shall

cause its respective Affiliates not to, make any negative, defamatory, or derogatory statements concerning the Business (including the Business's products, equipment, services, customers, suppliers, employees or agents), Purchaser or its Affiliates, any Seller and its Affiliates, as applicable. Nothing in this Section 6.4(b) will limit the ability of either Party or its respective Affiliates to make true and accurate statements or communications in connection with any disclosure such Person reasonably believes is required in response to incorrect, disparaging, or derogatory public statements to the extent reasonably necessary to correct or refute such public statements, or in connection with any Action.

(c) Confidential Information. Following the Closing, during the Restricted Period, each Seller shall, and shall cause its controlled Affiliates and its officers, employees, agents, and representatives to, keep confidential and not, directly or indirectly, divulge to anyone any confidential information or confidential documents of or relating to the Business, including the following to the extent relating to the Business: confidential records; client and customer lists; information about customer requirements; terms of license agreements; terms of contracts with clients and customers; pricing information, marketing information or sales techniques; and planning and financial information of the Business (the "Confidential Information"); provided that nothing in this Section 6.4(c) shall restrict (i) Purchaser or its Affiliates from conferring or communicating with Suppliers, Business Employees, or licensing authorities in connection with the Transactions or the operation of the Business, or (ii) any Seller from disclosing Confidential Information to Purchaser or at Purchaser's request in connection with any such communications. However, "Confidential Information" does not include information that (i) is or becomes generally available to the public other than as a result of disclosure, directly or indirectly, by such Seller or its representatives in violation of this Section 6.4(c), (ii) is independently developed by such Seller, its controlled Affiliates or their officers, employees, agents, and representatives without use of or reference to the Confidential Information, or (iii) becomes available after the Closing to any Seller, its controlled Affiliates or their officers, employees, agents, and representatives from a source other than Purchaser, so long as such source is not known by such Seller or such other Person, as applicable, to be bound by a confidentiality agreement with or other obligation of secrecy to Purchaser. In the event that any Seller, its controlled Affiliates or any of their officers, employees, agents, and representatives are requested or required (by oral question or request for information or documents in any legal proceeding, Action, investigation, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any information regarding the Business, such Seller will, if legally permitted and reasonably practicable under the circumstances, notify Purchaser of the request or requirement promptly following such Seller becoming aware of such request or requirement so that Purchaser may, at Purchaser's cost, seek an appropriate protective Order or waive compliance with the provisions of this Section 6.4(c). If the applicable Party believes in good faith, after consulting with counsel, that it is required to disclose any such information, the applicable Party may disclose such information to the tribunal; provided, however, that the applicable Party shall use commercially reasonable efforts to obtain, at the request of Purchaser and at the cost of Purchaser, assurance that confidential treatment will be accorded to such portion of such information required to be disclosed. Further, Confidential Information may be disclosed, and no notice as referenced above is required to be provided, (y) pursuant to requests for information in connection with routine regulatory examinations or inquiries that are not targeted at the Business specifically or the Transaction (or Purchaser) by regulatory authorities with jurisdiction over any Seller, its controlled Affiliates, or their officers, employees, agents, and representatives or (z) as is necessary to wind up and dissolve any Seller

and take actions in connection therewith (*e.g.*, completing Tax Returns). Each Seller hereby acknowledges and agrees that the prohibitions against disclosure of Confidential Information recited in this Section 6.4 are in addition to, and not in lieu of, any rights or remedies that Purchaser may have available pursuant to the Laws of any jurisdiction or at common law to prevent the disclosure of trade secrets or proprietary information, and the enforcement by Purchaser of its rights and remedies pursuant to this Agreement shall not be construed as a waiver of any other rights or available remedies that it may possess in law or equity absent this Agreement. Nothing in this Section 6.4 shall prevent any Seller from disclosing Confidential Information to the extent necessary or desirable to enforce its rights and remedies pursuant to any Transaction Document.

(d) Remedies. Each Seller and Purchaser acknowledge that should they violate any of the covenants contained in this Section 6.4, it will be difficult to determine the resulting damages to the applicable Person and, in addition to any other remedies it may have, such damaged Person shall be entitled to injunctive relief without the necessity of proving actual damage. The breaching Person regarding the foregoing shall be liable to pay all costs, including reasonable attorneys' fees which the seeking Person (if successful) may incur in any Action in enforcing, to any extent, the provisions of this Section 6.4, including litigation of any appeal taken or defended by the seeking Person (if successful). The damaged Person may elect to seek one or more of these remedies at its sole discretion on a case-by-case basis. Failure to seek any or all remedies in one case does not restrict the applicable Person from seeking any remedies in another situation. Such action by any such Person shall not constitute a waiver of any of its rights.

(e) Tolling. In the event of the breach by the applicable Person of any restrictive covenant contained in this Section 6.4, the running of the Restricted Period, if applicable, as to such breaching Person shall be automatically tolled and suspended for the amount of time that the breach continues, and shall automatically recommence when the breach is remedied so that the damaged Person shall receive the benefit of the breaching Person's compliance with the restrictive covenants contained in this Section 6.4 for the full term of the Restricted Period.

(f) No Other Defenses. The Parties agree that the restrictive covenants contained in this Section 6.4 shall be enforced independently of any other obligations between the Parties, and that the existence of any other claim or defense shall not affect the enforceability of this Agreement or the remedies under this Agreement.

**Section 6.5 Further Assurances**. In case at any time after the Closing any further action is necessary to evidence and effectuate the Transactions in accordance with the terms of this Agreement, each Seller and Purchaser will take such further action (including the execution and delivery of such further instruments and documents) as any other Party may reasonably request, at the sole cost and expense of the requesting Party. Without limiting the foregoing, from and after the Effective Date and continuing until the earlier of the resolution of all claims in the Bankruptcy Cases and the liquidation or dissolution of such Seller, each Seller shall cooperate with Purchaser and take all actions reasonably requested by Purchaser in connection with (i) the assignment of the Leases, (ii) relinquishing all distribution and/or brokerage arrangements with Suppliers related to the Business in the Territory, and (iii) the transfer or allowance of licensing arrangements in the Territory (if legally permissible), including providing any information, executing any documents, and taking any other actions necessary to effectuate such assignments, relinquishments, and transfers. At the Closing and solely in the Territory, each Seller shall discontinue and terminate its

relationships with the Suppliers related to the Business (and, if applicable, reject or terminate any Contracts that relate solely to the Debtors or the Affiliates of Sellers and that relate solely to the Territory) with respect to all applicable Brands. No such requested action shall, or shall require or permit any Party to, enlarge or extend (or diminish or eliminate) any existing right, liability or obligation of any Party or impose on any Party any new or additional liability or obligation.

**Section 6.6 Taxes.**

(a) All sales, use, documentary, recording, registration, conveyance, excise, license, stamp, or transfer (including real estate transfer) Tax arising from the sale of the Acquired Assets or assumption of the Assumed Liabilities as contemplated by this Agreement ("Transfer Taxes") shall be borne and paid by Purchaser; provided, however, for the avoidance of doubt, Transfer Taxes shall not include any income Taxes, including any franchise Taxes imposed in lieu of an income Tax, of the Sellers. Each Seller and Purchaser shall file all necessary documentation and Tax Returns with respect to Transfer Taxes required by law to be filed and reasonably cooperate with one another in connection therewith.

(b) Purchaser and each Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of any Tax return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto ("Tax Return") and any action, audit, litigation, or other proceeding with respect to Taxes; provided that in providing such information, assistance and access, each Party shall be entitled to redact information that is not related to the Business, and no Seller shall be obligated to provide or disclose any Tax Returns (or any portion of any Tax Return) and other books and records related to (i) Taxes that are not primarily related to any Acquired Asset or the Business or (ii) any income Tax Returns of such Seller or any of its Affiliates.

(c) At or prior to the Closing, each Seller shall deliver (or cause to be delivered) to Purchaser an IRS Form W-9 duly executed by such Seller (or such Seller's regarded owner for U.S. federal income Tax purposes).

**Section 6.7 Employee Matters; WARN Act.**

(a) From and after the Effective Date, at Sellers request, if not already provided, within five (5) Business Days of Sellers request, Purchaser shall deliver to Sellers a written list of current employees of Sellers whose responsibilities relate primarily to the Business and a list identifying new potential employment opportunities at Purchaser for such employees (the "Identified Employees"). Purchaser will set initial terms and conditions of employment for all employees to be hired by Purchaser. Until the Closing, (i) Sellers shall provide commercially reasonable assistance to Purchaser in facilitating discussions with the Identified Employees regarding post-Closing employment with Purchaser and (ii) Sellers shall allow Purchaser's representatives access to Seller's facility at mutually agreeable times during regular business hours for the purpose of conferring with the Identified Employees about such employment opportunities with Purchaser. Notwithstanding any other provision of this Agreement, the Parties will promptly and jointly coordinate a plan with respect to employees, offers, transition and related communication, immediately following which Purchaser and its Affiliates may initiate discussions

and otherwise communicate directly with the Identified Employees regarding post-Closing employment opportunities.

(b) Seller shall be solely responsible for any compensation or other amounts due and payable to any current or former employee, officer, director, independent contractor or consultant of Seller, including hourly pay, commission, bonus or other cash incentive, salary, accrued but unused vacation and paid time off, fringe, pension or profit sharing benefits or severance pay, in each case, for any period relating to service with Seller or any of its Affiliates at any time on or prior to the Closing Date, including the employer portion of any Taxes arising from any of the foregoing.

(c) On the Closing Date, Sellers will cease operating the Business in the Territory. Sellers shall be responsible for all severance payments, retention bonuses or other amounts, if any, that become payable to employees of Sellers as a result of the consummation of the Transactions. Sellers remain responsible for all applicable employer notice obligations in connection with the Transactions or the ceasing of the Business, including under the WARN Act and the National Labor Relations Act.

(d) Any Identified Employees actually hired by Purchaser or any of its Affiliates in connection with the Closing will be subject to Purchaser's work rules, policies, and all other initial terms and conditions of employment. However, Sellers shall have no obligation or liability with respect to any such rules, policies, or terms and conditions or with respect to any compliance or satisfaction or non-compliance or non-satisfaction by any Identified Employees of any such rules, policies, or terms and conditions.

(e) Should any Seller provide a notice to the Business Employees and to applicable governmental officials, agencies, and departments in the form required by the WARN Act (the "WARN Notice") after the execution of this Agreement, Purchaser agrees that such Seller's providing the WARN Notice shall not constitute a breach of such Seller's covenant under Section 6.2. Each Seller shall be responsible for any liability arising from or associated with the WARN Act or any WARN Notice, in each case, arising in connection with the Business up to and including the Closing.

(f) Purchaser shall reasonably cooperate with Sellers upon request from Sellers from time to time to advise Sellers with respect to whether any offer to any Identified Employee has been accepted or rejected. Nothing in this Agreement shall be construed as a representation or guarantee by any Seller that any or all employees will accept an offer of employment from Purchaser, or that any employee will continue in employment with Purchaser following the Closing for any period of time.

(g) This Section 6.7 shall be binding upon and inure solely to the benefit of each of the Parties to this Agreement, and nothing in this Section 6.7, express or implied, shall confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Section 6.7. The terms set forth in this Section 6.7 shall not create any right in any employee or any other Person to any continued employment with any Seller, Purchaser or any of their respective Affiliates or compensation or benefits of any nature or kind whatsoever. Nothing contained in this Section 6.7 (whether express or implied) shall be considered or deemed to

establish, amend or modify any benefit or compensation plan, program, policy, agreement, arrangement or contract or prohibit or limit the ability of any Seller, Purchaser or any of their respective Affiliates to amend, modify or terminate any benefit or compensation plan, program, policy, agreement, arrangement or contract.

(h) Notwithstanding any other provision of this Agreement or the Transition Services Agreement, from and after the Closing, Purchaser shall have the right to offer employment to, and hire, any employees of Sellers or their Affiliates who are providing services to Purchaser or the Business, whether pursuant to the Transition Services Agreement or otherwise, and no provision of this Agreement or the Transition Services Agreement shall restrict or prohibit Purchaser from making such offers or hiring such employees. However, no such offer or hiring of any such employee shall provide for employment that commences prior to the completion of services that involve such employee under the Transition Services Agreement or any other transition services agreement to which Sellers or any of their Affiliates are party.

**Section 6.8** **Seller Support Obligations**.

(a) Each Seller and its Affiliates may have entered into various arrangements (i) in which guarantees, letters of credit, sureties, bonds, or similar arrangements were issued by such Seller or its Affiliates and (ii) in which such Seller or its Affiliates are the primary obligors on other Contracts, in any such case to support or facilitate the Business. The arrangements entered into by any Seller and its Affiliates referred to in the foregoing clauses (i) and (ii) that are set forth in Schedule 6.8 are referred to as the "Seller Support Obligations". The Seller Support Obligations are not intended to continue after the Closing and Sellers shall be responsible to terminate and satisfy all such arrangements and all obligations and liabilities related thereto.

**Section 6.9** **Insurance Matters**. Upon Closing, all insurance coverage provided in relation to any Seller or the Acquired Assets or the Business that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with any Seller or its Affiliates) shall cease to provide any coverage with respect to the Business, the Acquired Assets, and the Assumed Liabilities, and no further coverage shall be available to Purchaser with respect to the Business, the Acquired Assets, or the Assumed Liabilities under any such policies. From and after the Closing, Purchaser shall have the right to make claims and to receive proceeds from such claims with respect to any matter to the extent related to the Acquired Assets or Assumed Liabilities for periods prior to the Closing, and, upon Purchaser's request, the applicable Seller shall use commercially reasonable efforts to seek recovery or allow Purchaser to seek recovery, under the applicable occurrence-based insurance policies, and such Seller shall cooperate with Purchaser's reasonable requests if it seeks recovery, with respect to such matters and shall remit (or, at Purchaser's request, direct any such insurer to pay directly to Purchaser) any insurance proceeds actually obtained with respect to such claims (net of Sellers' reasonable and documented out-of-pocket costs and expenses of seeking recovery, to the extent not otherwise paid or reimbursed by Purchaser) to Purchaser or its designee.

**Section 6.10** **Accounts**. In the event any Seller receives money (whether in the form of cash, check, electronic wire transfer or other form) relating to an account debtor of Purchaser from sales made from and after the Closing Date, such Seller shall promptly notify Purchaser and promptly forward such funds to Purchaser. In the event Purchaser receives money (whether in the

form of cash, check, electronic wire transfer or other form) relating to an account debtor of any Seller from sales made prior to the Closing Date, which money is an Excluded Asset, Purchaser shall promptly notify such Seller and promptly forward such funds to such Seller.

**Section 6.11 Access to Records**.

(a) By Sellers. After the Closing, Purchaser shall afford each Seller and its representatives reasonable access during regular business hours upon reasonable prior notice to Purchaser, to such books and records of such Seller acquired by Purchaser or located at any premises acquired by Purchaser, and reasonable access, during normal business hours, and upon reasonable advance notice, to Identified Employees, officers, Advisors, accountants, offices, and properties of Purchaser (including for the purpose of better understanding the books and records) as may be necessary in connection with such Seller's wind-down and related activities, including for such Seller to prepare Tax reports and returns required to be filed by it or to respond to inquiries by Governmental Authorities, and to review, identify and retrieve or remove any books and records. For a period of two (2) years after the Closing Date, Purchaser shall not dispose of any such books or records until Purchaser has given reasonable notice to each Seller of its intention to do so and given each Seller a reasonable opportunity to take possession of such books and records to be disposed of. From and after the Closing, Purchaser will, and will cause its employees to, provide each Seller with reasonable assistance, support, and cooperation with such Seller's wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns, reconciliation of claims or liabilities, and processing of insurance/benefit claims).

(b) By Purchaser. After the Closing, each Seller shall afford Purchaser, its counsel, accountants and other representatives reasonable access during regular business hours upon reasonable prior notice to such Seller, to any retained records and retained accounting general ledgers of such Seller that relate to the Business, as may be necessary in order for Purchaser to prepare Tax reports and returns required to be filed by it or to respond to inquiries by Governmental Authorities. For a period of two (2) years after the Closing Date (or, if earlier, the dissolution of such Seller), such Seller shall not dispose of any such retained records and retained accounting general ledgers until it has given reasonable notice to Purchaser of its intention to do so and given Purchaser a reasonable opportunity to take possession of such books and records to be disposed of.

**Section 6.12 Publicity**. Neither Purchaser nor any Seller shall issue or cause the publication of any press release or other public announcement with respect to, or otherwise make any public statement concerning, the Transactions without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed; provided that the foregoing requirements shall not apply to any publication or announcement required by applicable Law (based on the advice of counsel, the general substance of which is shared with the other Party), court process, or the rules or regulations of any national securities exchange, in which case the Party required to make the publication or announcement shall use its reasonable best efforts to allow the other such Party reasonable time to comment on such publication or announcement in advance of the issuance thereof. Following any such compliant public announcement by one Party, the other Party will have the right to issue press releases or make any other public announcements containing the same or substantially similar contents as such public announcement.

**Section 6.13 Acknowledgement by Purchaser**.

(a) Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that, in making its determination to execute this Agreement and proceed with the Transactions, Purchaser and the Purchaser Group have relied, are relying, and will rely solely on the Express Representations and have not relied on, are not relying on, and will not rely on any information, statements, disclosures, documents, Projections, forecasts or other material (including the completeness or accuracy of any of the foregoing) made available or provided by any Person (including in any presentations or other materials prepared by any Advisor or in that certain "Project Arrow MA" datasite administered by Datasite (the "Dataroom") or elsewhere) to Purchaser or any of its Affiliates or Advisors, or the Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, in all cases, except for the representations and warranties expressly contained in Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement, including the representation and warranty with respect to the Financial Information in Section 3.5) or the certificate delivered pursuant to Section 7.2(g) (the "Express Representations") (it being understood that Purchaser and the Purchaser Group have relied only on such Express Representations).

(b) Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of any Seller or other Seller Parties, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Dataroom, management meetings, etc.) (collectively, "Projections"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of the Business, the Acquired Assets and the Assumed Liabilities, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) subject to claims for Fraud, Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c) Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.13.

(d) Notwithstanding anything to the contrary in this Agreement, other than as limited by this Section 6.13, nothing in this Agreement shall limit or impair Purchaser's ability to pursue any claims for Fraud.

**Section 6.14 Supplier Relationships**. At the Closing, each Seller shall discontinue and terminate its relationships (and if applicable, reject any Contracts that relate solely to the Debtors and cover only the Territory) with the Suppliers with respect to all applicable Brands. From and

after the Effective Date, each Seller shall not assign, convey, transfer, or otherwise dispose of any distribution rights or brokerage rights with any Supplier in the Territory to any Person (other than Purchaser).

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1 Conditions to Obligations of Sellers**. The obligation of Sellers to consummate the Closing is subject to the satisfaction, on or prior to the Closing, of each of the following conditions, the failure of any one of which shall excuse Sellers from consummating the Closing unless, to the extent permitted by Law, any such conditions are waived in writing by each Seller in its sole discretion:

(a) Purchaser's Performance. The representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date. Purchaser shall have duly performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(b) Litigation. No court of competent jurisdiction shall have issued, enacted, entered, promulgated, or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining, or otherwise prohibiting the Closing that is still in effect and no Action seeking any such Order shall be pending.

(c) Officer's Certificate. Sellers shall have received a certificate from Purchaser representing and warranting that the conditions precedent set forth in Section 7.1(a) have been satisfied.

(d) Assumption Agreement. Purchaser shall have executed and delivered to Sellers an Assumption Agreement in the form attached hereto as Exhibit 7.1(d).

(e) Assigned Leases and MI License. Purchaser shall have delivered to Sellers (i) assignments of the Assigned Leases executed by Purchaser and, where applicable, by landlords to such leases, substantially in the form attached hereto as Exhibit 7.2(j)(i); and (ii) executed by Purchaser, as licensee, the license for 90 days for the premises located at 13000 Eckles Road, Livonia, MI 48150 in the form attached hereto as Exhibit 7.2(j)(ii).

(f) Sale Order. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed, vacated, or modified without Sellers' consent.

**Section 7.2 Conditions to Obligations of Purchaser**. The obligation of Purchaser to consummate the Closing is subject to the satisfaction, on or prior to the Closing, of each of the following conditions, the failure of any one of which shall excuse Purchaser from consummating the Closing unless, to the extent permitted by Law, any such conditions are waived in writing by Purchaser in its sole discretion:

(a) Bring-Down. (i) The representations and warranties made by Sellers in Article III (other than the Fundamental Representations) of this Agreement shall be true and correct in all respects as though made on and as of the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect, and (ii) the representations and warranties set forth in Section 3.1, Section 3.3, Section 3.7(a), and Section 3.15 (collectively, the "Fundamental Representations") shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all respects (in the case of any representation or warranty containing any materiality qualification) or in all material respects (in the case of any representation or warranty without any materiality qualification) only as of such date. Sellers shall have duly performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by them prior to or on the Closing Date.

(b) No Material Adverse Effect. Between the Effective Date and the Closing Date, there shall have been no Material Adverse Effect.

(c) Regulatory. Between the Effective Date and the Closing Date, no Governmental Authority shall have enacted or promulgated any Law that would have the effect of making illegal the Transactions.

(d) Litigation. No court of competent jurisdiction shall have issued, enacted, entered, promulgated, or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining, or otherwise prohibiting the Closing that is still in effect and no Action seeking any such Order shall be pending.

(e) Alcohol Regulatory Approvals. Purchaser shall have obtained by Closing all the federal and state licenses and permits pertaining to the sale and distribution of alcoholic beverages in the Territory listed on Schedule 6.3(c).

(f) Certain Consents. The Purchaser shall have received duly authorized and executed consents from the Persons or with respect to the matters set forth on Schedule 6.3(a).

(g) Officer's Certificate. Purchaser shall have received from Sellers a certificate representing and warranting that the conditions precedent set forth in Section 7.2(a) and Section 7.2(b) have been satisfied.

(h) Transition Services Agreement. The applicable Seller(s) shall have executed and delivered to Purchaser or its designee a Transition Services Agreement in the form attached hereto as Exhibit 7.2(h) (the "Transition Services Agreement").

(i) Bills of Sale. Sellers shall have executed and delivered to Purchaser or its designee Bills of Sale for the Acquired Assets in the form attached hereto as Exhibit 7.2(i).

(j) Assigned Leases and MI License. Sellers shall have delivered to Purchaser, or its designee, (i) assignments of the Assigned Leases executed by the applicable Seller and,

where applicable, by landlords to such leases, substantially in the form attached hereto as Exhibit 7.2(j)(i); and (ii) executed by the applicable Seller, as licensor, the license for 90 days for the premises located at 13000 Eckles Road, Livonia, MI 48150 in the form attached hereto as Exhibit 7.2(j)(ii).

(k) Sale Order. The Bankruptcy Court shall have entered the Sale Order, which Order shall be a Final Order, and the Sale Order shall not have been stayed, vacated, reversed or modified without Purchaser's consent.

(l) Supplier Threshold. Neither Purchaser nor Sellers shall have received written notice (including via electronic means, such as email) from any Supplier listed on Schedule 7.2(l) that such Supplier does not intend to do business with Purchaser in the Territory from and after the Closing or that such Supplier will be transferring to do business with a competitor of Purchaser in lieu of Purchaser from and after the Closing, in either case where the affected Suppliers represent, in the aggregate, more than ten percent (10%) of the commission revenue plus VOR gross profit of the Business (as for the twelve-month period ending December 31, 2025, as set forth on Schedule 7.2(l)).

(m) Release of Encumbrances. NWS Michigan, LLC, RNDC-NWS, LLC and L&L Wine and Liquor, LLC shall have delivered to Purchaser evidence, in form and substance reasonably satisfactory to Purchaser, of the release of the Encumbrances set forth on Schedule 7.2(m) (including UCC-3 termination statements and any other releases or terminations required to release such Encumbrances of record), to the extent not covered by the Sale Order (it being understood that the Sale Order does not address any Encumbrances applicable to Sellers that are not Debtors).

**Section 7.3 Waiver of Conditions**. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or any Seller may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

## ARTICLE VIII
## TERMINATION

**Section 8.1 Termination**. This Agreement may be terminated only as follows:

(a) Termination by Mutual Consent or Notice. This Agreement may be terminated at any time prior to the Closing by mutual written consent of Purchaser and Sellers or:

(i) by written notice of either Purchaser or any Seller, upon the issuance of an Order restraining, enjoining, or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, and such Order having become final, binding, and non-appealable; provided that no Party may terminate this Agreement under this Section 8.1(a)(i) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement; or

(ii) by written notice of either Purchaser or any Seller, if the Closing shall not have occurred on or before September 22, 2026 (the "Outside Date"); provided that Purchaser shall have the right, in its sole discretion, to extend the Outside Date up to an additional sixty (60) calendar days by notice to Sellers; provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(a)(ii) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement.

(b) Termination by Purchaser. Purchaser may terminate this Agreement by notice to Sellers at any time prior to or at the Closing upon a breach of any covenant or agreement on the part of any Seller, or if any representation or warranty of any Seller will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) would not be satisfied; provided that (i) if such breach is curable by such Seller then Purchaser may not terminate this Agreement under this Section 8.1(b) unless such breach has not been cured by the date that is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) fifteen (15) Business Days after Purchaser notifies Sellers of such breach, and (ii) the right to terminate this Agreement pursuant to this Section 8.1(b) will not be available to Purchaser at any time that Purchaser is in material breach of any covenant, representation, or warranty in this Agreement.

(c) Termination by Sellers. Any Seller may terminate this Agreement by notice to Purchaser at any time prior to the Closing upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.1(a) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser (other than a breach of Purchaser's obligation to consummate the Closing, which is not curable), then Sellers may not terminate this Agreement under this Section 8.1(c) unless such breach has not been cured by the date that is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) fifteen (15) Business Days after any Seller notifies Purchaser of such breach, and (ii) the right to terminate this Agreement pursuant to this Section 8.1(c) will not be available to any Seller at any time that such Seller is in material breach of any covenant, representation, or warranty in this Agreement.

(d) Fiduciary Obligations. Any Debtor may terminate this Agreement by notice to Purchaser at any time prior to the Closing if any Debtor or the board of directors, board of managers, or similar governing body of any Debtor determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties.

**Section 8.2 Effect of Termination**. Termination of this Agreement pursuant to this Article VIII shall terminate all obligations of the Parties, and this Agreement shall become null and void and no Party or any of its partners, officers, directors, managers or equity holders will have any liability under this Agreement; provided that termination pursuant to Section 8.1 shall not relieve the defaulting or breaching Party from any liability to the other Parties resulting from any Willful Breach of this Agreement prior to the date of such termination. Notwithstanding the foregoing, if this Agreement is terminated pursuant to the provisions of this Article VIII the provisions set forth in this Section 8.2, Article VIII and Article X shall survive such termination and subject to Section 10.11, nothing in this Section 8.2 will be deemed to impair the right of any

Party to specific performance or other equitable remedies to enforce specifically the surviving terms and provisions of this Agreement.

## ARTICLE IX
## INDEMNIFICATION

**Section 9.1** **By JV Sellers**. Subject to the limitations set forth in this Article IX, and notwithstanding Section 10.20, from and after the Closing until the first (1st) anniversary of the Closing Date, each of RNDC General, LLC, NWS Michigan, LLC, a Michigan limited liability company, and L&L Wine and Liquor, LLC, a Michigan limited liability company (collectively, the "JV Sellers" and each a "JV Seller"), individually and severally (and not jointly and severally), shall defend, indemnify and hold harmless Purchaser and each of its Affiliates, directors, officers, members, managers, employees, successors and assigns (each a "Purchaser Indemnified Party"), from and against, and pay or reimburse promptly such Purchaser Indemnified Party for, any and all liabilities, obligations, losses, fines, costs, royalties, deficiencies or damages (in each case, whether or not resulting from Third Party Claims), including out-of-pocket expenses and reasonable attorneys' and accountants' fees (excluding any amounts payable to employees, officers, or directors of Purchaser or any of its Affiliates or to any Affiliates of Purchaser) incurred (x) in the investigation or defense of any of the same, (y) in investigation or defense of any Actions or other claims by any Person asserting, demanding, or otherwise seeking any of the same (whether absolute, accrued, conditional, or otherwise), or (z) in enforcing any of their rights under this Article IX (collectively, "Losses") actually paid by, incurred against, resulting to, imposed upon, or incurred or suffered by any Purchaser Indemnified Party, resulting from or arising out of any of the following:

(a) any breach of any representation or warranty made by such JV Seller pursuant to Article III (other than the Fundamental Representations);

(b) any breach of any of the Fundamental Representations made by such JV Seller;

(c) the Excluded Liabilities of such JV Seller; and

(d) nonfulfillment of any covenant, agreement or other obligation of such JV Seller set forth in this Agreement that such JV Seller is required to comply with after the Closing.

**Section 9.2** **By Purchaser**. Subject to the limitations set forth in this Article IX, from and after the Closing until the first (1st) anniversary of the Closing Date, Purchaser shall defend, indemnify and hold harmless each JV Seller and each of its directors, officers, members, managers, employees, successors and assigns (each, a "JV Seller Indemnified Party"), from and against, and pay or reimburse promptly such JV Seller Indemnified Party for, any and all Losses actually paid by, incurred against, resulting to, imposed upon, or incurred or suffered by any JV Seller Indemnified Party, resulting from or arising out of any of the following:

(a) any breach of any representation or warranty made by Purchaser pursuant to Article IV (other than the Purchaser Fundamental Representations);

(b) any breach of any representation or warranty made by Purchaser pursuant to Section 4.1, Section 4.2 and Section 4.8 (the "Purchaser Fundamental Representations"); and

(c) nonfulfillment of any covenant, agreement or other obligation of Purchaser set forth in this Agreement that Purchaser is required to comply with after the Closing.

**Section 9.3 Indemnification Procedures.**

(a) Third-Party Claims. In the case of any claim asserted by a third party against a Person entitled to indemnification under this Agreement (the "Indemnified Party") (a "Third Party Claim"), the Indemnified Party shall provide to the Party from which indemnification is being sought pursuant to this Article IX (the "Indemnifying Party") promptly in writing, and in reasonable detail, including a good faith estimate of the amount of Losses incurred or expected to be incurred, the nature and basis of such claim, and copies of all documents (including court papers) received by the Indemnified Party with respect to such Third Party Claim, in any event within ten (10) Business Days after such Indemnified Party has knowledge of any claim as to which indemnity may be sought, and the Indemnified Party shall permit the Indemnifying Party (at the expense of such Indemnifying Party) to assume the defense of any claim or any litigation resulting therefrom; provided that (i) the Indemnifying Party acknowledges in writing its obligation under the terms and conditions of this Agreement to indemnify the Indemnified Party, (ii) the counsel for the Indemnifying Party who shall conduct the defense of such claim or litigation shall be reasonably satisfactory to the Indemnified Party, (iii) the Indemnified Party may participate in such defense at such Indemnified Party's expense (provided that if such Indemnified Party shall in good faith determine that the Indemnified Party may have available to it one or more defenses or counterclaims that represent a conflict of interest with one or more of those that may be available to the Indemnifying Party in respect of such claim or any litigation relating thereto, then such Indemnified Party shall be entitled to indemnification for the fees and expenses of such Indemnified Party's separate counsel's participation in such defense), and (iv) the omission by any Indemnified Party to give notice as provided in this Section 9.3(a) shall not relieve the Indemnifying Party of its indemnification obligation under this Agreement except to the extent that the Indemnifying Party is materially prejudiced as a result of such failure to give notice or as otherwise set forth in this Agreement. Except with the prior written consent of the Indemnified Party, no Indemnifying Party, in the defense of any such claim or litigation, shall consent to entry of any judgment or enter into any settlement that provides for injunctive or other nonmonetary relief affecting the Indemnified Party or that does not include as an unconditional term thereof the giving by each claimant or plaintiff to such Indemnified Party of a release from all liability (including as to Taxes) with respect to such claim or litigation. In the event that the Indemnified Party shall in good faith determine that the conduct of the defense of any Third Party Claim by the Indemnifying Party would reasonably be expected to affect adversely the Indemnified Party's relationships with customers, suppliers or other parties with whom Purchaser conducts business in connection with the operation of the Business following the Closing, the Indemnified Party shall have the right at all times to take over and assume control over the defense, settlement, negotiations or litigation relating to any such claim at the sole cost of the Indemnifying Party (to the extent such costs are indemnifiable under this Agreement). In the event that the Indemnifying Party does not accept the defense of any matter as above provided, the Indemnified Party shall have the full right to defend, at the Indemnifying Party's cost (to the extent such costs are indemnifiable under this Agreement), against any such claim or demand. Whether or not the Indemnifying Party has

assumed the defense, appeal or settlement proceedings with respect to a Third Party Claim, such Indemnifying Party will not be obligated to indemnify the Indemnified Party for any settlement entered into or any judgment that was consented to without the Indemnifying Party's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed). In any event, the Indemnifying Party and the Indemnified Party shall cooperate in the defense of any claim or litigation subject to this Section 9.3. If the Indemnified Party assumes or retains control of the defense of any Third Party Claim, the Indemnified Party shall keep the Indemnifying Party apprised of all material developments with respect to such Third Party Claim, including any settlement offers, and shall promptly provide the Indemnifying Party with copies of all material correspondence, pleadings, other documents relating thereto and any other documents or information the Indemnifying Party may reasonably request.

(b) Direct Claims. Any claim by an Indemnified Party that does not result from a Third Party Claim (a "Direct Claim") shall be asserted by the Indemnified Party by giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt written notice shall not relieve the Indemnifying Party of its indemnification obligations under this Agreement except to the extent that such Indemnifying Party is materially prejudiced by such delay or as otherwise set forth in this Agreement. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, including (i) the facts and circumstances related to Losses incurred or expected to be incurred in connection with such Direct Claim, (ii) the nature of the misrepresentation, breach of warranty or claim to which such Loss is related, and (iii) a good faith estimate of the amount of Losses incurred or expected to be incurred. The Indemnifying Party shall have ten (10) Business Days after its receipt of such notice to respond in writing to such Direct Claim. If the Indemnifying Party rejects any Direct Claim, either by written notice or failure to respond to the Indemnified Party's notice of a Direct Claim within such ten (10) Business Day period, the Indemnified Party shall be free to pursue any and all remedies as may be available to the Indemnified Party. If the Indemnifying Party delivers a response to such notice disputing its liability to the Indemnified Party within such ten (10) Business Day period, the Indemnifying Party and the Indemnified Party shall negotiate in good faith to resolve such dispute and, if not resolved, such dispute shall be resolved by litigation in the Chosen Courts.

**Section 9.4 Limitations on Recovery**. Notwithstanding any provision to the contrary contained in this Agreement, the following shall apply:

(a) Exclusive Remedy. Except with respect to Fraud, claims for specific enforcement pursuant to Section 10.8 in respect of a breach of any post-Closing covenants under this Agreement, the Parties agree that, from and after the Closing Date, the sole and exclusive remedies of the Parties to this Agreement and the Purchaser Indemnified Parties and JV Seller Indemnified Parties, respectively, for any claims or Losses (including any Losses from claims for breach of contract, warranty, tortious conduct (including negligence) or otherwise and whether predicated on common law, statute, strict liability, or otherwise) arising out of, relating to or based upon the matters set forth in this Agreement are the indemnification and/or reimbursement obligations of the Parties set forth in this Article IX.

(b) Basket. The Indemnifying Party shall not be liable to the Indemnified Party for indemnification under Section 9.1(a) or Section 9.2(a), as the case may be, unless and until the

aggregate amount of all Losses subject to indemnification for which a claim for indemnification may be validly brought under Section 9.1(a) or Section 9.2(a) (but for the application of this Section 9.4) exceeds $225,000 (the "Basket"), in which event the Indemnified Party shall be entitled to be indemnified from and against such Losses for which a claim for indemnification may be validly brought under Section 9.1(a) or Section 9.2(a) in excess of the Basket. The Indemnifying Party shall not be liable to any Indemnified Party for indemnification under Section 9.1(a) or Section 9.2(a) as the case may be, in respect of any individual Loss or series of related Losses that does not exceed $25,000 (the "Per-Claim Threshold"), which Losses shall not be taken into account for purposes of determining the satisfaction of the Basket or the thresholds in this Section 9.4. For the avoidance of doubt, neither the Basket nor the Per-Claim Threshold shall apply to any Losses arising from or related to any of the following: (A) Losses arising from the breach of any of the Fundamental Representations, (B) Losses arising from the breach of any of the Purchaser Fundamental Representations, or (C) Fraud.

(c) Cap. The maximum aggregate, cumulative liability of any JV Seller under Section 9.1 of this Agreement shall be limited to an amount equal to 50% of the aggregate cash proceeds actually received by such JV Seller pursuant to this Agreement; provided that the limitations in this Section 9.4(c) shall not apply with respect to any claim for Fraud.

(d) The maximum aggregate, cumulative liability of Purchaser under Section 9.2 of this Agreement shall be limited to an amount equal to the Purchase Price; provided that the limitations in this Section 9.4(d) shall not apply with respect to any claim for Fraud.

(e) Mitigation of Losses. Each Indemnified Party shall take, and cause each Purchaser Indemnified Party or JV Seller Indemnified Party, as applicable, to take, good faith, commercially reasonable steps (determined without regard to any indemnification of such Person under this Agreement (*i.e.*, as if such Person had no such rights under this Agreement)) to mitigate any Losses after becoming aware of any event which could reasonably be expected to give rise to any Losses.

(f) The amount of any and all indemnification payments in respect of Losses under this Article IX shall be determined net of (A) any Tax benefit realized by the applicable Indemnified Party as a result of any Loss or (B) any amounts actually recovered by the applicable Indemnified Party under insurance policies or other reimbursement arrangements with respect to such Losses, less any costs of collecting.

(g) In no event shall any Purchaser Indemnified Party be entitled to recover or make a claim for any amounts in respect of consequential, incidental or indirect damages, lost profits, diminution in value or punitive (except for punitive damages to the extent paid to an unrelated third party as a result of a final non-appealable judgment), special or exemplary damages and, in particular, no "multiple of profits" or "multiple of cash flow" or similar valuation methodology shall be used in calculating the amount of any Losses.

(h) Any indemnity payment under this Agreement shall be treated as an adjustment to the Purchase Price for Tax purposes.

(i) No Purchaser Indemnified Party shall assert any claim pursuant to Section 9.1 with respect to any Loss, cause of action or other claim unless the Purchaser Indemnified Party reasonably believes such Loss, cause of action or claim is reasonably likely to result in an actual Loss.

(j) Any Loss for which any Purchaser Indemnified Party is entitled to indemnification under Section 9.1 shall be determined without duplication of recovery by reason of the state of facts giving rise to such Loss constituting a breach of more than one representation, warranty, covenant or agreement and/or other matter addressed by Section 9.1.

(k) For the avoidance of doubt, and without limiting the other terms and provisions of this Agreement, no JV Seller shall be liable in any way for a breach of any representation, warranty, covenant or agreement or Excluded Liability of any other Seller under this Agreement.

## ARTICLE X
## MISCELLANEOUS

**Section 10.1 Expenses**. Except as otherwise provided in this Agreement, all fees, costs, and expenses, including fees, costs and expenses of any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person (each, an "Advisor") incurred in connection with the negotiation of this Agreement and the other Transaction Documents, the performance of this Agreement and the other Transaction Documents, and the consummation of the Transactions will be paid by the Party incurring such fees, costs, and expenses, whether or not the Transactions, including the Closing, are consummated. However, all fees and expenses in connection with any filing or Transfer Taxes will be allocated pursuant to Section 6.6.

**Section 10.2 Severability**. It is the Parties' intent that each section of this Agreement shall be read and interpreted with every reasonable inference given to its enforceability. However, it is also the Parties' intent that if any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction, and the remainder of the provisions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

**Section 10.3 Notices**.

(a) All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been given (i) when delivered in person, (ii) when transmitted by email to the address set out below for such recipient (with receipt indicating such email has been read or a non-automatic acknowledgement of receipt), if delivered by 5:00 P.M. local time of the recipient (based on the physical address of such recipient below) on a Business Day and otherwise on the following Business Day, (iii) upon receipt or first attempted delivery on a Business Day following the day on which the same has been delivered prepaid to a reputable national overnight courier service (charges prepaid) or (iv) upon receipt or first

attempted delivery on a Business Day after being mailed by first class mail (postage prepaid), return receipt requested. Notices, requests, demands and communications to Purchaser and any Seller shall, unless another address is specified in accordance with Section 10.3(b), be sent to the addresses indicated below:

If to any Seller, to both:

c/o Republic National Distributing Company, LLC
4300 Wildwood Way, Suite 200
Atlanta, GA 30339
Attn.: Dennis Bashuk
Email: dennis.bashuk@rndc-usa.com

and

c/o Republic National Distributing Company, LLC
One National Drive
Atlanta, GA 30336
Attn.: H. Alan Rosenberg, Esq.
Email: alan.rosenberg@rndc-usa.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Attn.: Steve Toth
Email: steve.toth@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn.: Christopher Marcus, P.C.
Email: christopher.marcus@kirkland.com

If to Purchaser, to:

Martignetti Beverage Company, LLC
500 John Hancock Rd.
Taunton, MA 02780
Attn.: Dean Crandall
Email: dcrandall@martignetti.com

with a copy to:

Lawson & Weitzen, LLP
88 Black Falcon Ave, Suite 345
Boston, MA 02210
Attn.: J. Mark Dickison
Glenn Frank
Email: mdickison@lawson-weitzen.com
gfrank@lawson-weitzen.com

with a copy to (which shall not constitute notice):

Ropes & Gray LLP
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
Attn.: Walter R. McCabe
Stephanie Lapidus
Email: walter.mccabe@ropesgray.com
stephanie.lapidus@ropesgray.com

and

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Attn.: Andrew Mordkoff
Email: andrew.mordkoff@ropesgray.com

(b) Any Party may from time to time change its address for the purpose of notices to that Party by a similar notice specifying a new address.

**Section 10.4** **Construction**. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party. The headings of the sections and paragraphs contained in this Agreement are for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

**Section 10.5** **Schedules**. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement. However, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement. Matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement, or other item set forth on

any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item, and such terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, the Schedules, and the Exhibits is disclosed solely for purposes of this Agreement, and no information contained in this Agreement, the Schedules, or the Exhibits will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of contract.

**Section 10.6 <u>Entire Agreement</u>**. This Agreement (including the Exhibits and Schedules hereto), when executed and delivered, constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the Parties, their Affiliates, or any of their related Persons, Advisors or other representatives with respect to the subject matter of this Agreement, and supersedes any prior documentation, including any letters of intent or other correspondence. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the other Transaction Documents will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions of this Agreement or the intent of the Parties, and will be deemed joint work product of the Parties.

**Section 10.7 <u>Counterparts</u>**. This Agreement and any other Transaction Documents, and any amendments to any Transaction Documents, may be executed in several counterparts any one of which need not contain the signature of more than one party to such Transaction Document, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF, Docusign, or other electronic transmission, will be treated in all manner and respects as an original contract and will be considered to have the same binding legal effects as if it were the original signed version of such contract delivered in person. Minor variations in the form of the signature page to this Agreement or any Transaction Document, including footers from earlier versions of any such other document, will be disregarded in determining the effectiveness of such signature. At the request of either Party to any Transaction Document, each other party to such Transaction Document will re-execute original forms of such Transaction Document and deliver them to all other Parties. No party to any such Transaction Document will raise the use of a .PDF, Docusign, or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of PDF, Docusign, or other electronic transmission as a defense to the formation of a contract and each such Party forever waives any such defense.

**Section 10.8 <u>Specific Performance</u>**. Irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it under this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance, or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the courts described in <u>Section 10.11</u> without proof of damages or otherwise, this being in addition to any other remedy to which the Parties are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither any Seller nor

Purchaser would have entered into this Agreement. Any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.8 will not be required to provide any bond or other security in connection with any such Order. The remedies available to any Party pursuant to this Section 10.8 will be in addition to any other remedy to which such Party was entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit either Party from seeking to collect or collecting damages. In no event will this Section 10.8 be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller.

**Section 10.9 Governing Law**. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware, applicable to agreements executed and performed entirely within such State without regard to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

**Section 10.10 Waiver of Jury Trial**. ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. ANY AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10.

**Section 10.11 Jurisdiction and Exclusive Venue**. Any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement, the negotiation, execution, or performance of this Agreement, or the Transactions and any questions concerning the construction, interpretation, validity, and enforceability of this Agreement (each, an "Agreement Dispute") brought by any Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "Chosen Courts"). Each of the Parties irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. No Party will commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent

jurisdiction to enforce any Order rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non conveniens*. Venue would be proper in any of the Chosen Courts, and each Party hereby irrevocably waives any objection that any Chosen Court is an improper or inconvenient forum for any Agreement Dispute. Each of the Parties irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3(a). Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

**Section 10.12 Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, successors and permitted assigns.

**Section 10.13 Assignment**. This Agreement shall not be assignable or otherwise transferable by any Party hereto without the prior written consent of the other Parties, which consent may be granted or withheld in such other Party's sole and absolute discretion and any attempted assignment or delegation without such prior written consent shall be null and void; provided that (a) Sellers may transfer or assign such rights and obligations under this Agreement to a wind-down trustee, liquidation trust or similar vehicle under a confirmed chapter 11 plan of liquidation in the Bankruptcy Cases and such wind-down trustee, liquidation trust or similar vehicle may transfer, assign and sell its right to receive proceeds of the Purchase Price under this Agreement and (b) Purchaser may assign this Agreement or any part thereof to a subsidiary or Affiliate of Purchaser or to any lender to Purchaser or any subsidiary or Affiliate thereof as security for obligations to such lender; provided further that any such assignment shall not release Purchaser from its obligations under this Agreement.

**Section 10.14 No Third Party Beneficiaries**. Except as expressly provided in this Agreement, nothing in this Agreement shall confer any legal or equitable rights, remedies or claims upon any Person other than the Parties and their successors and permitted assigns.

**Section 10.15 No Right of Set-Off**. Purchaser, on its own behalf and on behalf of its respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser and any of its respective successors and permitted assigns have or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

**Section 10.16 Non-Recourse**. This Agreement may be enforced against, and any Agreement Dispute may be brought against, only the Persons that are expressly named as Parties and not against any other Persons. Except to the extent named as a Party, and then only to the extent of the specific obligations of such Parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party (each, a "Non-Recourse Person") will (a) have any liability (whether in contract, tort, equity, or otherwise) for any of the representations, warranties, covenants, agreements, or other obligations or liabilities of any of the Parties or for any Agreement Dispute and (b) in no event shall any Person have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions or omissions (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of

such claims) of any other Person, and each of such Persons and the Non-Recourse Persons are intended third party beneficiaries of this Section 10.16 and shall be entitled to enforce this Section 10.16 as if a party directly hereto.

**Section 10.17 Amendment; Waivers**. No amendment or modification of this Agreement, and no waiver under this Agreement, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification or waiver is sought. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time. Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege under this Agreement, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges under this Agreement. The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights or remedies that either Party may otherwise have at law or in equity.

**Section 10.18 Bulk Sales Laws**. Purchaser and Sellers hereby waive compliance by each of Purchaser and Sellers with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions, it being the intention of the Parties that, pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances (including any Encumbrances arising out of any "bulk sales," "bulk transfers," or similar Laws), other than Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 10.19 Seller Representative**. RNDC ("Seller Representative") shall have the power and authority to unilaterally act on behalf of each Seller. Such power will include the power to make all decisions, actions, consents, and determinations on behalf of each such Seller including to make any waiver of any condition or agree to any amendment to this Agreement and to deliver any notices, requests, demands and other communications under this Agreement. No Party shall have any right to object, dissent, protest, or otherwise contest the same. Purchaser shall, and shall be entitled to, rely on any action or omission taken by the Seller Representative on behalf of each such Seller.

**Section 10.20 Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers**. Except as set forth in Article IX, each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) set forth in this Agreement or in any other Transaction Document will terminate effective immediately as of the Closing such that no claim for breach of, and no claim for detrimental reliance or other right or remedy (whether in contract, in tort, at law, or in equity) with respect to, any such representation, warranty, covenant, or agreement may be brought after the Closing. Each covenant and agreement in this Agreement or in any other Transaction Document that explicitly contemplates performance after the Closing will, only to the extent such covenant or agreement contemplates performance after the Closing, expressly survive the Closing in accordance with its terms, and if no term is specified, then for twelve (12) months following the Closing Date. Purchaser and Sellers acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller

Parties, as the case may be, that the agreements contained in this Section 10.20 (a) require performance after the Closing to the maximum extent permitted by applicable Law and (b) are an integral part of the Transactions and that, without the agreements set forth in this Section 10.20, none of the Parties would enter into this Agreement. Nothing in this Section 10.20 shall limit any claim or right arising as a result of Fraud, any right or obligation under Article IX, or any right or obligation under Section 1.9.

## ARTICLE XI
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

**Section 11.1 Certain Definitions**.

(a) "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs, and policies of such Person, whether through ownership of voting securities, by Contract, or otherwise.

(b) "Available Contracts" means any Contract or Lease, in either case, that satisfies all of the following: (i) a Debtor is party to such Contract or Lease, (ii) no Affiliate of a Debtor that is not also a Debtor itself is party to such Contract or Lease, (iii) such Contract or Lease relates primarily to the Business, and (iv) such Contract or Lease does not relate to any other business of Sellers and their Affiliates or to any services or function that is provided to and material to any other operations of Sellers and their Affiliates.

(c) "Business Day" means any day other than a Saturday, Sunday, or other day on which banks in New York City, New York are authorized or required by any Law to be closed.

(d) "Business Employees" means the active employees of Sellers whose duties primarily or wholly relate to the Business.

(e) "Calculation Time" means 11:59 PM Central Time on the Closing Date, and any matter calculated as of the Calculation Time shall be calculated without giving effect to the consummation of the Transactions.

(f) "Confidentiality Agreement" means that certain Confidentiality Agreement dated December 15, 2025, by and among RNDC and Martignetti Companies of New England, LLC, a Massachusetts limited liability company.

(g) "Contract" means any written contract, indenture, note, bond, lease, sublease, mortgage, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than an invoice, purchase order, service order, or sales order.

(h) "Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, Tax Returns, ledgers, journals, customer lists, regulatory filings, plans, research materials, technical documentation (design

specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(i) "Final Order" means an Order or judgment of the Bankruptcy Court entered by the clerk of the Bankruptcy Court or such other court on the docket in the Bankruptcy Cases or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such Order or judgment of the applicable Bankruptcy Court, or other court of competent jurisdiction shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such Order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure or a similar rule of such other court of competent jurisdiction; provided that with respect to the Bankruptcy Court, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure (28 U.S.C. App.), or any analogous rule under the Bankruptcy Rules (Fed. R. Bankr. P.), may be filed relating to such Order, shall not cause such Order not to be a Final Order.

(j) "Fraud" means an act committed by a Seller, in the making to Purchaser the representations and warranties of such Seller in Article III or in the certificate delivered pursuant to Section 7.2(g) with intent to deceive Purchaser, and to induce Purchaser to enter into this Agreement and requires (i) a false representation of fact made in such representation; (ii) with knowledge that such representation is false; (iii) with an intention to induce Purchaser to act or refrain from acting in reliance upon it; (iv) causing Purchaser, in justifiable reliance upon such false representation, to take or refrain from taking action; and (v) causing Purchaser to suffer damage by reason of such reliance, which together constitutes common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, unjust enrichment, negligent misrepresentation, recklessness or a similar theory).

(k) "GAAP" means United States generally accepted accounting principles, applied in a manner consistent with the preparation of the financial statements of Sellers and their Affiliates.

(l) "Governmental Authority" means any government, quasi-governmental entity, or other governmental or regulatory body, of any nature, whether foreign, federal, state, or local, or any agency, branch, department, official, entity, instrumentality, political subdivision, or authority of any of the foregoing, or any court of competent jurisdiction.

(m) "Material Adverse Effect" means a material adverse effect on the Business, Acquired Assets, and Assumed Liabilities, taken as a whole; provided that none of the following (or consequences of the following), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: any matter,

event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from, or relating to (i) general business or economic conditions; (ii) national or international political or social conditions, including tariffs, trade wars, sanctions or trade policies, riots, protests, the engagement in hostilities or the escalation of any hostilities, or the occurrence or the escalation of any military, cyber, or terrorist (whether or not state-sponsored) attack; (iii) any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Authority), viral outbreak or the worsening of any outbreak, or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) the change in price of any equipment or supplies necessary to or used in the Business; (v) to financial, banking, or securities markets (including (A) any disruption of any of such markets, (B) any decline or rise in the price of any security, commodity, contract, or index, and (C) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (vi) changes in GAAP or interpretation of GAAP; (vii) changes in Laws or other binding directives of any Governmental Authority and any change in the enforcement of any of the foregoing; (viii)(A) the taking of any action required by this Agreement or at the request in writing of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.2, or (D) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Business, Acquired Assets, Assumed Liabilities, and Business Employees including the impact on the relationships, contractual or otherwise, of the Business with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (ix) any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Purchaser has knowledge as of the Effective Date; (x) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or advisors) (however, the underlying cause of any such failure may be taken into account, if not otherwise excluded from this definition); (xi) any action taken by Purchaser or its Affiliates with respect to the Transactions or the financing of the Transactions or any breach by Purchaser of this Agreement; or (xii) the matters set forth on the Schedules. However, any adverse Effect in clauses (i) through (v) may be taken into account in determining whether there has been a Material Adverse Effect to the extent that such Effect has had a materially disproportionate adverse effect on Sellers relative to similarly situated participants in the industries and geographic areas in which Sellers operate.

(n) "Order" means any order, injunction, judgment, decree, ruling, writ, or award of a Governmental Authority.

(o) "Ordinary Course" means the ordinary and usual course of operations of the Business, taken as a whole, taking into account the operational and liquidity challenges facing Sellers and their Affiliates and the commencement, pending and protection of the Bankruptcy Cases.

(p) "Organizational Documents" means, with respect to any Person other than a natural person, the constituent documents or agreements by which such Person was organized (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or

articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or that relate to the internal governance of such Person (such as bylaws, a partnership agreement or an operating, limited liability or members' agreement).

(q) "Permitted Encumbrances" means: (i) real estate Taxes, assessments and other governmental levies, fees or charges imposed with respect to real property which are not due and payable, or which are being contested in good faith by appropriate proceedings, or the nonpayment of which is permitted or required by the Bankruptcy Code; (ii) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property that are incurred in the Ordinary Course and are not yet due and payable; (iii) zoning ordinances, building codes and other land use Laws regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property and which are not violated by the current use or occupancy of such real property or the operation of the Business thereon; (iv) easements, covenants, conditions, restrictions and other similar matters of record affecting title to any real property which do not or would not materially impair the use or occupancy of such real property in the operation of the Business conducted thereon; (v) the interests of the lessors (and sublessors, if any) under the Leases; and (vi) solely prior to the Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

(r) "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Authority, or other entity or group.

(s) "Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors, or permitted assigns.

(t) "Sale Order" means the Order of the Bankruptcy Court (i) approving this Agreement and the terms and conditions of this Agreement, including pursuant to Sections 363 and 365 of the Bankruptcy Code, and (ii) approving and authorizing Sellers to consummate the Transactions, in a form attached as Exhibit 11.1(t) hereto, subject to (a) immaterial modifications or clarifications, or (b) such other changes that Purchaser, in its sole discretion, consents to in writing.

(u) "Seller Parties" means any Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equity holders, controlling or controlled Persons, managers, agents, Advisors, successors, or permitted assigns.

(v) "Seller's Knowledge" or "Knowledge of Seller" or similar terms mean the actual knowledge of any of Dennis Bashuk, Tammy Curtis, and Alan Rosenberg, in each case, as of the Effective Date, after reasonable inquiry of such individual's direct reports in the applicable subject matter (and not any constructive, imputed or similar concepts of knowledge).

(w) "Territory" means with respect to:

(i) RNDC, the States of Maine, Vermont, Alabama, Iowa, Mississippi, North Carolina, Pennsylvania, Utah, West Virginia, Wyoming, Montana, and Virginia (for the avoidance of doubt, "control state" brokerage business only);

(ii) RNDC New Hampshire, LLC, the State of New Hampshire;

(iii) RNDC General, LLC, the State of Ohio;

(iv) K&L Beverage Company, LLC, the State of Idaho;

(v) Young's Market Company of Oregon, LLC, the State of Oregon (for the avoidance of doubt, "control state" brokerage business only); and

(vi) RNDC-NWS, LLC, a Michigan limited liability company, NWS Michigan, LLC, a Michigan limited liability company, National Wine & Spirits, LLC, a Michigan limited liability company, and L&L Wine and Liquor, LLC, a Michigan limited liability company, the State of Michigan (for the avoidance of doubt, "control state" brokerage business only).

(x) "Transactions" means the transactions contemplated by this Agreement and each of the other Transaction Documents.

(y) "Willful Breach" means an action or failure to act by one of the Parties hereto that constitutes a material breach of this Agreement, and such action was taken or such failure occurred with such Party's knowledge or intention that such action or failure to act would reasonably be expected to constitute a material breach of this Agreement. Any failure by Purchaser to consummate the Closing if and when it is obligated to do so under the terms of this Agreement shall be deemed to be a Willful Breach by Purchaser.

**Section 11.2 Index of Other Defined Terms.**


Acquired Assets ....................5
Acquired IT ....................5
Action ....................21
Advisor ....................45
Agreement ....................4
Agreement Dispute ....................49
Allocation ....................12
Allocation Methodology ....................12
Assigned Contract ....................7
Assigned Leases ....................5
Assumed Liability ....................9
Bankruptcy Cases ....................4
Bankruptcy Code ....................4
Bankruptcy Court ....................4
Basket ....................44
Brands ....................4
Business ....................4
Cash Payment ....................10
Chosen Courts ....................49
Closing ....................13
Closing Date ....................13
Code ....................12
Confidential Information ....................30
Cure Costs ....................15
Cure/Assumption Objection ....................14
Dataroom ....................36
Debtor ....................4
Debtors ....................4
Deposit ....................11
Designation Deadline ....................14
Direct Claim ....................43
Disputed Contract ....................14

Effect....54
Effective Date....4
Encumbrances....5
Enforceability Exceptions....16
Environmental Claim....22
Environmental Laws....22
Environmental Permits....22
Escrow Account....11
Escrow Agent....11
Escrow Agreement....11
Excluded Assets....7
Excluded Liabilities....10
Express Representations....36
Extended Contract Period....14
Financial Information....16
Fundamental Representations....38
Hazardous Substance....22
Identified Employees....32
Improvements....18
Indemnified Party....42
Indemnifying Party....42
Inventory Price....10
JV Seller Indemnified Party....41
JV Sellers....41
K&L....4
Laid-in-Cost....5
Law....21
Leased Real Property....18
Leases....18
Losses....41
Material Contracts....20
Michigan Non-Debtor Sellers....23
Non-Recourse Person....50
Other Intangible Property....6
Outside Date....40
Parties....4
Party....4
Per-Claim Threshold....44
Projections....36
Purchase Price....10
Purchaser....4
Purchaser Fundamental Representations....42
Purchaser Indemnified Party....41
Release....22
Restricted Period....29
RNDC....4
RNDC New Hampshire....4
Safety Requirements....23
Saleable VOR Inventory....5
Seller Representative....51
Seller Support Obligations....34
Sellers....4
Suppliers....4
Tangible Property....6
Tax Return....32
Taxes....18
Third Party Claim....42
Transaction Documents....15
Transfer Taxes....32
Transferred Permits....6
Transition Services Agreement....38
VOR Adjustment Escrow Amount....10
WARN Act....16
WARN Notice....33
Young's Market....4

**Section 11.3 Rules of Interpretation.**

Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any Transaction Document.

(a) The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule, and Exhibit references in this Agreement are references to Sections, clauses, Schedules and Exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed to this Agreement or referred to in this Agreement are incorporated in and made a part of this Agreement as if set forth in full in this Agreement. Any capitalized terms used but not defined in any Schedule or Exhibit shall be defined as set forth in this Agreement.

(b) Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation," whether or not such words are actually included. Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c) The words "to the extent" shall mean "the degree by which" and not simply "if."

(d) When calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, such period will end on the next succeeding Business Day. Whenever any action must be taken on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(e) Words denoting any gender will include all genders, including the neutral gender. Where a word is defined in this Agreement in the singular, such word shall have a comparable meaning when used in the plural and *vice versa*.

(f) The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory. "May" is permissive.

(g) References to "$" and Dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(h) References to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(i) Any document or item will be deemed "delivered," "provided" or "made available" by any Seller, within the meaning of this Agreement if such document or item is (i) included in the Dataroom, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors, or (iii) made available upon request, including at Sellers' offices.

(j) Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(k) Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth in this Agreement, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or noncompliance or alleged violation or non-compliance.

(l) A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(m) A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

* * * * * *

[Signature Pages Follow]

# Exhibit 2

## Cure Schedule

**Republic National Distributing Company, LLC, et al**

| ID # | Contract Counterparty | Debtor/Assignee | Description of Agreement | Building Type | Address | Expiration Date | Cure Amount |
|---|---|---|---|---|---|---|---|
| 1 | New Sunset Realty LLC, Gerald P. McCarthy | RNDC New Hampshire, LLC | Real Property Lease | Office/Warehouse | 44 Chenell Drive Concord, NH 03301 | 10/31/2027 | $25,725.00 |
| 2 | Oxmoor3/Snow, LLC and JMBD Investments, LLC, and CPG Oxmoor III, LLC,, Oxmoor Center Homewood , LLC and Oxmoor Center Investment, LLC | Republic National Distributing Company, LLC | Real Property Lease | Office/Warehouse | 131 West Oxmoor Road Homewood, AL 35209 | 5/31/2028 | $2,832.50 |
| 3 | Sherman Rental | Republic National Distributing Company, LLC | Real Property Lease | Office/Warehouse | 104 &106 Lone Wolf Drive Madison, MS 39110 | 9/30/2027 | $8,416.33 |
| 4 | HJB Holdings, LLC | Republic National Distributing Company, LLC | Real Property Lease | Office/Warehouse | 17830 Englewood Drive Middleburg Heights, OH 44130 | 5/31/2027 | $0.00 |
| 5 | Danny Clements Bullder, Inc, FMS Properties, LLC. | Republic National Distributing Company, LLC | Real Property Lease | Office/Warehouse | 836 Lagoon Commercial Blvd Montgomery, AL 36117 | 10/31/2026 | $5,410.00 |
| 6 | ARLO One LLC | Republic National Distributing Company, LLC | Real Property Lease | Office | 514A Hartman Run Road Morgantown, WV 26505 | 12/31/2027 | $0.00 |
| 7 | Sparrow Holdings, LLC | Republic National Distributing Company, LLC | Real Property Lease | Office/Warehouse | 7221 Becky Circle Raleigh, NC 27615 | 12/30/2026 | $9,517.36 |