**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC, *et al.*,[1] | ) | Case No. 26-90737 (CML) |
| Debtors. | ) | (Jointly Administered) |

# DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS' (A) CONSENT TO THE SALE OF CERTAIN ASSETS OF NON-DEBTOR RNDC-NWS, LLC AND ITS SUBSIDIARIES AND THE TAKING OF CERTAIN CORPORATE AND LIMITED LIABILITY COMPANY ACTION IN CONNECTION THEREWITH, AND (B) ENTRY INTO AND PERFORMANCE OF THEIR LIMITED OBLIGATIONS UNDER THE APA, AND (II) GRANTING RELATED RELIEF

**Emergency relief has been requested. Relief is requested not later than 9:00 a.m. (prevailing Central Time) on October 22, 2026.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on October 22, 2026, at 9:00 a.m. (prevailing Central Time) in Courtroom 402, 4th floor, 515 Rusk Street, Houston, Texas 77002. You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's homepage. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's homepage. Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/RNDC. The Debtors' service address in these Chapter 11 Cases is P.O. Box 669246, Marietta, GA 30066.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion"):[2]

**Preliminary Statement**

1. For more than six months, the Debtors, with the assistance of their advisors, have diligently marketed and pursued sales of substantially all of their assets nationwide, including those of their non-Debtor joint venture affiliate in Michigan, RNDC-NWS, LLC ("RNDC Michigan").[3] As a result of this extensive marketing process, RNDC Michigan and its wholly-owned subsidiaries (collectively, the "Michigan JV") are prepared to consummate a value-maximizing sale of the Michigan wine business to Great Lakes Wine & Spirits, LLC ("GLWAS"), Imperial Beverage Company ("Imperial"), and Vintage Wine ("Vintage," and collectively with GLWAS and Imperial, the "Wine Purchasers," and each, a "Wine Purchaser") and 100% of the equity interests of NWS Michigan, LLC (the "ADA Entity") to GLWAS (together with the Wine Purchasers, the "Purchasers"), pursuant to that certain *Asset Purchase Agreement*, dated as of October 7, 2026, substantially in the form attached as Exhibit 1 to the Order (as amended, modified, or supplemented from time to time in accordance with the terms thereof, the "APA," and together with the Transition Services Agreement (the "TSA"), all schedules, exhibits, and ancillary documents related thereto, the "Sale Documents," and the transactions contemplated or required to be taken in connection with the implementation and consummation thereof,

---

2 A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of John R. Castellano, Chief Restructuring Officer of Republic National Distributing Company, LLC and its Debtor Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 18] (the "First Day Declaration"). Capitalized terms used but not immediately defined in this Motion shall have the meanings ascribed to such terms in the First Day Declaration, the APA, or later in this Motion, as applicable.

3 RNDC Michigan is jointly owned by Debtor Republic National Distributing Company Michigan Holdings, LLC ("RNDC Michigan Holdings") and National Wine & Spirits, Inc. ("NWS").

collectively, the "Sale Transaction") by and between RNDC Michigan, the ADA Entity, National Wine & Spirits, LLC ("NW&S"), and L&L Wine and Liquor, LLC ("L&L," and together with RNDC Michigan, the ADA Entity, and NW&S, the "Sellers"), as sellers, GLWAS, Imperial, and Vintage, as the Wine Purchasers, and, solely for purposes of section 1.6(c), section 5.4, section 5.16, section 7.1(d), and article IX thereof, RNDC Michigan Holdings, and, solely for purposes of section 1.6(c), section 5.4, section 5.16, and article IX thereof, NWS. Pursuant to the Sale Transaction, the Michigan JV is prepared to sell substantially all of the assets of their wine distribution business (the "Michigan Wine Business"), operated primarily through L&L, and the equity of the ADA Entity, which operates its authorized distribution agent brokerage business in the state of Michigan (the "ADA Business," and together with the Wine Business, the "Michigan Wine and ADA Business"). The Michigan JV previously sold its "control" business to Martignetti in connection with the Debtors' control states sale.[4]

2. None of the assets to be sold in connection with the Sale Transaction are property of the Debtors' estates. The Debtors therefore submit that approval of the Sale Transaction is not required for the Michigan JV to sell its assets and the Debtors do not seek such relief through this Motion. However, because Debtor RNDC Michigan Holdings is not only required to approve the Sale Transaction in its capacity as member and/or manager of RNDC Michigan, the ADA Entity, and L&L, as applicable, but is also required to execute the APA in a limited capacity and undertake certain obligations on behalf of itself and the other Debtors in connection therewith, including compliance with the Restrictive Covenants and agreeing to enter into and perform under the TSA,

4 *See Order (I) Authorizing Entry Into and Performance Under the Asset Purchase Agreement, (II) Approving the Private Sale of Certain of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances, Rights, and Interests, (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (IV) Granting Related Relief* [Docket No. 437].

the Debtors submit this Motion seeking authority to perform the Debtors' obligations in connection with the Sale Transaction.

3. Absent such relief, the Michigan JV will be unable to move forward with the proposed Sale Transaction, which would materially impair the Michigan JV's ability to maximize the value of its business, and by extension the Debtors' ability to maximize the value of their estates, and could also threaten the Michigan JV's ability to continue operating as a going concern independent of the Debtors to the detriment of the Michigan JV's suppliers, customers, retailers, and other stakeholders. The Debtors estimate that they will realize approximately $20 million of net proceeds at or around closing of the Sale Transaction on account of Debtor RNDC Michigan Holdings' interest in non-Debtor RNDC Michigan.[5] Accordingly, the Debtors believe that the Sale Transaction is in the best interests of the Debtors and their estates and that the Debtors' support and narrow performance in connection therewith represents a sound exercise of the Debtors' business judgment and should be approved.

## Relief Requested

4. The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"): (a) authorizing and approving Debtor RNDC Michigan Holdings' consent to and approval of the Sale Transaction and the taking of corporate and limited liability company action in connection therewith; (b) authorizing Debtor RNDC Michigan Holdings' entry into the APA solely for purposes of sections 1.6(c), 5.4, 5.16, 7.1(d), and article IX thereof; (c) authorizing the Debtors' performance of their limited obligations under the APA and other Sale Documents,

---

5 As described herein, the Debtors may receive an additional approximately $10 million of net proceeds from the Sale Transaction depending on the Company's ability to address the Indiana JV's secured debt obligations to which RNDC Michigan, the ADA Entity, NW&S, and L&L are obligors.

including, without limitation, the Debtors' compliance with the Restrictive Covenants and entry into and performance under the TSA; and (d) granting related relief.

## Jurisdiction and Venue

5. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The bases for the relief requested herein are section 105(a), 362, 363, 365, 1107, and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 4001, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

## Background

8. Republic National Distributing Company, LLC (together with its Debtor and non-Debtor affiliates, the "Company") was, at its height, the nation's second largest alcoholic beverage distributor, operating across 40 states and specializing in wine and spirits distribution. Built on the strong foundation of four family-owned businesses, the Company historically enjoyed deep-seated relationships with over 2,000 suppliers and 170,000 customers across its expansive

nationwide distribution network. With headquarters in Atlanta, Georgia, the Debtors operated across 21 states and employed a workforce of approximately 1,460 employees as of the Petition Date.

9. On July 26, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10. On July 27, 2026, the Court entered an order [Docket No. 22] authorizing the procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1. On August 6, 2026, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 137] (the "Committee"). No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

**The Marketing Process**

11. Prior to the Petition Date, the Company, with the assistance of its advisors, ran a comprehensive marketing and sale process for the Company's operations nationwide, including in Michigan. This process included reaching out to over 50 potential purchasers, including a mix of financial and strategic counterparties. Over the course of this comprehensive marketing process, 14 parties, including GLWAS, expressed an interest in acquiring some or all of the Michigan Wine and ADA Business, with 13 parties executing confidentiality agreements with the Debtors and receiving access to diligence materials. Ultimately five parties, including GLWAS, submitted indications of interest under various deal structures.

12. Following the Petition Date, the Company re-engaged the parties who had previously expressed interest, as well as other potential purchasers. Of the five parties that

originally submitted indications of interest, three reaffirmed their interest in acquiring some or all of the Michigan Wine and ADA Business. Because two of the proposals were materially better than the third proposal, the Company continued negotiations with the two leading parties, including GLWAS, and exchanged multiple draft purchase agreements with each. Each of the two remaining parties materially improved their proposals over the course of July and August 2026, as the Company and its advisors continued to engage with both parties. However, in late September 2026, the other potential purchaser communicated to the Company that it was no longer interested in acquiring the Michigan Wine Business and that it would only be willing to acquire the ADA Business. The price such party's revised proposal ascribed to the ADA Business was materially lower than the corresponding value in GLWAS's proposal. Further, a transaction that would not include the Michigan Wine Business would require the Michigan JV to either pursue a piecemeal sale of the Michigan Wine Business or incur the substantial cost and administrative burden of winding down the Michigan Wine Business. As a result, the Company, in consultation with its advisors and NWS, determined that GLWAS's proposal to acquire 100% of the equity of the ADA Business and certain assets of the Michigan Wine Business, together with Imperial and Vintage, represented the only viable and most value-maximizing path forward for the Michigan JV. Accordingly, following extensive, good-faith, and arm's-length negotiations, the Parties executed the APA on October 7, 2026. Subject to the Court's approval, the Parties are prepared to close the Sale Transaction as soon as the end of October 2026.

13. The Sellers, GLWAS, and the Debtors all have an interest in closing the Sale Transaction on an expedited basis. Based on the Debtors' projected liquidity and the current timeline of the Chapter 11 Cases, the Debtors will not have the liquidity necessary to sustain operations, provide services under the TSA (the "TSA Services"), as may be required by the

Purchasers, or pay down the DIP Facility by its current maturity date, if the Sale Transaction does not close by the end of the month. Additionally, any delay to closing the Sale Transaction risks eroding the value of the Michigan JV, including through the loss of additional suppliers, many of which do not have long-term agreements in place with the Michigan JV.

**<u>The Sale Transaction</u>**

14. The terms of the Sale Transaction, as reflected in the APA and the other Sale Documents, are the product of extensive, arm's-length negotiations between the Company, GLWAS, Imperial, and Vintage. Pursuant to the APA, (a) the Wine Purchasers will (i) acquire certain of the Sellers' assets, including, without limitation, the exclusive distribution rights for the consenting Wine Business Suppliers, inventory, equipment, and other tangible personal property (as further described in the APA, collectively, the "<u>Wine Business Acquired Assets</u>") and (ii) assume the Wine Business Assumed Liabilities and (b) GLWAS will acquire (i) 100% of the issued and outstanding interests in the ADA Entity and (ii) 50% of the issued and outstanding equity interests in a newly formed wholly-owned subsidiary of RNDC Michigan (the "<u>RE Newco Interest</u>") that at closing will hold all of the Michigan JV's rights, title, and interest in the owned real property located in Livonia, Michigan (including, without limitation all buildings, improvements, and fixtures located at such property) ((b)(i) and (b)(ii), together with the Wine Business Acquired Assets, collectively, the "<u>Acquired Assets</u>"). None of the Acquired Assets are property of any of the Debtors or their estates.

15. In exchange for the Acquired Assets, the Purchasers shall pay the Sellers (a) a cash purchase price equal to (i) $31,000,000 for the Distribution Rights, *plus* (ii) the sum of, (A) with respect to all Inventory other than Dunnage, the aggregate, determined separately for each item of Inventory and, in the case of Wine Inventory, separately for each Brand, stock-keeping unit, and applicable Inventory Factor tranche of (1) the quantity included in such item or tranche, *multiplied*

by (2) the Laid-in Cost per unit of such item, *multiplied* by (3) the applicable Inventory Factor, *plus* (B) the amount of reimbursable deposits held by Wine Business Suppliers of the Brands for Dunnage, *plus* (iii) for the ADA Interest, $30,000,000 *plus* the amount of Closing Cash, *plus* (iv) for the RE Newco Interest, $23,000,000, *minus* (v) the amount of Closing Indebtedness, *minus* (vi) the amount of Closing Current Liabilities, *minus* (vii) the amount of Transaction Expenses, and (b) the assumption of the Wine Business Assumed Liabilities (the "Purchase Price"). The Purchase Price is subject to a customary post-closing true-up process, whereby the Parties will determine the final amount of each Purchase Price component as compared to the amount of such components that are estimated prior to Closing.

16. The Debtors expect to realize approximately $20 million net proceeds at or around closing of the Sale Transaction on account of Debtor RNDC Michigan Holdings' 50% interest in RNDC Michigan, after accounting for the Michigan JV's funded debt obligations, transaction-related expenses, amounts reserved to wind down the Michigan Wine Business, with additional proceeds potentially distributable to RNDC Michigan Holdings depending on the Company's ability to maximize the value of Republic National Distributing Company of Indiana, LLC (the "Indiana JV") and minimize its outstanding funded debt obligations to which the Michigan JV is a co-obligor. The Debtors estimate that Debtor RNDC Michigan Holdings may receive an additional $10 million of net proceeds from the Sale Transaction depending on the Company's ability to address the Indiana JV's funded debt obligations to which the Michigan JV is an obligor.

17. Debtor RNDC Michigan Holdings and NWS are parties to the APA solely with respect to section 1.6(c) (Livonia Real Estate Transaction Distribution of Remaining Interests and Proceeds), section 5.4 (Restrictive Covenants Provisions), section 5.16 (Member Support),

section 7.1(d) (Fiduciary Obligations), and article IX (Miscellaneous) of the APA, as applicable. Specifically, under section 5.4 of the APA, Debtor RNDC Michigan Holdings and NWS agree to comply, and cause their controlled Affiliates to comply, with certain customary covenants, including (a) not competing with the Business in the Territory, (b) not hiring former employees of RNDC Michigan or its subsidiaries that are hired by the Wine Purchasers, (c) not disparaging the Wine Purchasers, and (d) protecting the Confidential Information of the business ((a)-(d), and as more fully set forth in the APA, collectively, the "Restrictive Covenants"). As the Debtors are seeking to sell all remaining assets and wind down remaining operations, these Restrictive Covenants will not materially burden the Debtors' estates under the current circumstances.

18. In connection with the Sale Transaction, Debtor RNDC Michigan Holdings and NWS also agreed to (a) exercise their voting and governance rights in favor of the authorization, execution, delivery, and performance of the APA and consummation of the Sale Transaction, (b) not prevent, delay, or impair consummation of the Sale Transaction, and (c) reasonably cooperate with the Sellers and the Purchasers in obtaining the consents and approvals contemplated by the APA.

19. Debtor RNDC Michigan Holdings' support and approval of the Sale Transaction, including in its capacity as member and manager of RNDC Michigan and manager of the ADA Entity and L&L, and commitment to execute the TSA and provide the TSA Services (to the extent required under the APA) are integral components of the Sale Transaction, absent which the Michigan JV would be unable—and the Purchasers would be unwilling—to consummate the Sale Transaction. As a member and/or manager of RNDC Michigan, the ADA Entity, and L&L, as applicable, Debtor RNDC Michigan Holdings' consent is required for the sale of the Michigan JV. Further, in the ordinary course of operating its business, the Michigan JV depends on the Debtors

for, among other things, IT infrastructure, support, and back-office services. As a result, the Purchasers have required that, as a condition to close the Sale Transaction on or before November 13, 2026, the Sellers agree to provide the Purchasers with certain TSA Services for a limited period of time post-closing to facilitate a smooth transition of the Sellers' business to the Purchasers. The Debtors' ability to provide the TSA Services and support the TSA is therefore integral to the Sale Transaction. Moreover, the expected net proceeds to the Debtors from the Sale Transaction are expected to far exceed any costs incurred by the Debtors in providing the TSA Services. While the terms and scope of the TSA are still being negotiated, the Debtors and the Purchasers agree that, to the extent the TSA is required, the TSA Services will terminate no later than November 30, 2026.

20. The Debtors, in their capacity as members and/or managers of RNDC Michigan, the ADA Entity, and L&L, as applicable, believe that the proposed Sale Transaction for the Wine Business Acquired Assets, the ADA Interest, and the RE Newco Interest represents the highest and best option available and will serve to maximize the value of the Michigan JV for the benefit of the Michigan JV, its creditors, members (including the Debtors), and other stakeholders, including the Michigan JV's employees. Further, the Debtors' DIP Lenders support the Sale Transaction and the Debtors' approval and performance of their limited obligations in connection therewith. Accordingly, the Debtors, in consultation with their advisors, believe that Debtor RNDC Michigan Holdings' support and approval of the Sale Transaction, and the Debtors' performance of their obligations in connection therewith, including compliance with the Restrictive Covenants and entry into and performance under the TSA (to the extent required under the APA), is in the best interest of the Debtors, their estates, creditors, and all other stakeholders, including the Company's suppliers, customers, and employees. Further, while the Debtors do not

believe that the Sale Transaction itself requires Court approval, the Debtors seek relief from the Court as needed for the Michigan JV, GLWAS, Imperial, and Vintage to consummate the Sale Transaction, including by authorizing the Debtors, in their business judgment, to take any actions necessary or appropriate to effectuate the Sale Transaction.

## Summary of Key Transaction Terms

21. The following chart summarizes the key terms and conditions of the APA:

| Summary Description of the APA[6] | |
|---|---|
| **Sellers** | RNDC-NWS, LLC, NWS Michigan, LLC, National Wine & Spirits, LLC, and L&L Wine and Liquor, LLC |
| **Purchasers and Wine Purchasers** | Great Lakes Wines and Spirits, LLC, as Purchaser and a Wine Purchaser, Imperial Beverage Company, as a Wine Purchaser, and Vintage Wine Company, as a Wine Purchaser |
| **Wine Business Acquired Assets** | All of the Seller's right, title, and interest, as of the Closing in and to all of the exclusive distribution rights and related Assigned Contracts of the Wine Business for the Brands from the Wine Business Suppliers with respect to the Territory for which Supplier Approval is obtained, Inventory related to the Wine Business, Equipment used in the Wine Business located in the Territory, other tangible personal property used primarily in the operation of the Wine Business and located in the Territory, certain contracts, and all goodwill and going concern value of the Wine Business.<br><br>APA § 1.1 |
| **Excluded Assets** | Certain assets of the Sellers (other than the ADA Entity) shall not be included as part of the Wine Purchasers' acquisition of the Acquired Assets, including cash and cash equivalents of such Sellers, certain contracts, inventory, assets, and documents, all Intellectual Property, any equity interests, and all assets utilized by such Sellers in connection with a business other than the Business, and corporate organizational and other records that such Sellers are required by Law to retain.<br><br>APA § 1.2 |
| **Purchase Price** | The purchase price for the Acquired Assets shall be equal to the sum of the following: (a) a cash purchase price equal to (i) $31,000,000 for the Distribution Rights, *plus* (ii) the sum of, (A) with respect to all Inventory other than Dunnage, |

6 Any description of the terms of the APA contained herein is a summary provided for convenience purposes only. In the event of any inconsistency between the summary set forth herein and the APA, the APA shall control. Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the APA or this Motion, as applicable.

| Summary Description of the APA[6] | |
|---|---|
| | the aggregate, determined separately for each item of Inventory and, in the case of Wine Inventory, separately for each Brand, stock-keeping unit, and applicable Inventory Factor tranche of (1) the quantity included in such item or tranche, *multiplied* by (2) the Laid-in Cost per unit of such item, *multiplied* by (3) the applicable Inventory Factor, *plus* (B) the amount of reimbursable deposits held by Wine Business Suppliers of the Brands for Dunnage, *plus* (iii) for the ADA Interest, $30,000,000 *plus* the amount of Closing Cash, *plus* (iv) $23,000,000 for the RE Newco Interest, *minus* (v) the amount of Closing Indebtedness, *minus* (vi) the amount of Closing Current Liabilities, *minus* (vii) the amount of Transaction Expenses, and (b) the assumption of the Wine Business Assumed Liabilities. The Purchase Price is subject to a customary post-closing true-up process, whereby the Parties will determine the final amount of each Purchase Price component as compared to the amount of such components that are estimated prior to Closing.<br><br>APA § 1.8 |
| **Wine Business Assumed Liabilities and Excluded Liabilities** | Each Wine Purchaser shall irrevocably assume from Sellers and pay, perform, discharge, or otherwise satisfy in accordance with their respective terms, and Sellers shall irrevocably transfer, assign, convey, and deliver to the applicable Wine Purchaser, only the Wine Business Assumed Liabilities allocated to such Wine Purchaser in the Designation Notice. With respect to Wine Business Acquired Assets allocated to a Wine Purchaser in the Designation Notice, Wine Business Assumed Liabilities means: (a) all liabilities for reimbursable deposits from retail customers for Dunnage in the amounts set forth on Schedule 1.3 of the APA, together with the other liabilities as expressly set forth on Schedule 1.3 of the APA; (b) all liabilities for on order or in-transit Inventory that is to be received on or after the Closing Date, including the purchase orders for any such Inventory; (c) all liabilities and obligations under the Wine Business Assigned Contracts that (i) first arise from and after the Closing, (ii) do not arise from or relate to any breach by any Seller of any provision of such Wine Business Assigned Contracts, (iii) do not arise from or relate to any event, circumstance or condition occurring or existing prior to the Closing that, with notice or lapse of time, would constitute or result in a breach of such Wine Business Assigned Contracts, and (iv) do not arise from the failure to obtain any required consent from any third party in connection with the assignment and transfer of such Wine Business Assigned Contracts to the applicable Wine Purchaser pursuant to the APA; (d) all liabilities arising out of the ownership or operation of the Wine Business Acquired Assets by the applicable Wine Purchaser from and after the Closing, including all liabilities arising out of or relating to any environmental, health or safety matter (including those relating to or arising under Environmental Law or relating to Hazardous Substances), in all cases, only to the extent arising out of or in connection with the ownership or operation of the Wine Business Acquired Assets by the applicable Wine Purchaser on or after the Closing, and not caused by any act or omission by any of the Sellers before the Closing; (e) all liabilities for amounts required to be paid, or actions required to be taken or not to be taken, by the applicable Wine Purchaser under the express terms of the APA with respect to the Wine Business Acquired Assets; (f) all liabilities for Taxes with respect to the Wine Business Acquired Assets, the Wine Business Assumed Liabilities or the |

| Summary Description of the APA[6] | |
|---|---|
| | Wine Business, in each case, with respect to any taxable period (or portion thereof) beginning after the Closing Date.<br><br>Each Wine Purchaser shall not assume and shall not be responsible to pay, perform, or discharge any liabilities of Sellers or any other Wine Purchaser or any of their Affiliates of any kind or nature whatsoever other than its Wine Business Assumed Liabilities; *provided* that no liability or obligations of the ADA Entity that remains a liability or obligation of the ADA Entity from and after the Closing shall constitute an Excluded Liability.<br><br>APA § 1.3, § 1.4 |
| **ADA Transaction** | Prior to or simultaneously with Closing, the ADA Entity shall distribute, transfer, assign, convey and deliver to the JV all of the ADA Entity's right, title and interest in and to the Equity Securities of NW&S, such that, immediately prior to the sale described in Section 1.5(c) of the APA, none of the Equity Securities of NW&S or L&L is owned, directly or indirectly, by the ADA Entity.<br><br>Prior to or simultaneously with Closing, the JV shall contribute, transfer, assign, convey and deliver to the ADA Entity all of the JV's right, title and interest in and to (i) the Owned Real Property in Escanaba, Michigan (the "<u>Escanaba Owned Real Property</u>"), together with all buildings, Improvements and fixtures located thereon, all rights, privileges and easements appurtenant thereto, all strips and gores adjoining such Escanaba Owned Real Property, and any other easements, rights-of-way or appurtenances owned or used in connection with the beneficial use and enjoyment thereof, and (ii) to the leasehold or subleasehold estates and other rights to use or occupy the Leased Real Property, in each case free and clear of all Encumbrances other than Permitted Encumbrances.<br><br>At the Closing, the JV shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase from the JV, one hundred percent (100%) of the issued and outstanding Equity Securities of the ADA Entity, free and clear of all Encumbrances other than restrictions on transfer arising under applicable securities Laws.<br><br>APA § 1.5 |
| **Livonia Real Estate Transaction** | Prior to the Closing, the JV shall form 13000 Investments LLC, a new Michigan limited liability company (the "<u>Real Estate Entity</u>") as a wholly-owned subsidiary of the JV. Prior to or simultaneously with the Closing, the JV shall contribute, transfer, assign, convey and deliver to the Real Estate Entity all of the JV's right, title and interest in and to the Owned Real Property located in Livonia, Michigan (the "<u>Livonia Owned Real Property</u>"), together with all buildings, Improvements and fixtures located thereon, all rights, privileges and easements appurtenant thereto, all strips and gores adjoining such Livonia Owned Real Property, and any other easements, rights-of-way or appurtenances owned or used in connection with the beneficial use and enjoyment thereof, in each case free and clear of all |

| Summary Description of the APA[6] | |
|---|---|
| | Encumbrances other than Permitted Encumbrances.<br><br>At the Closing, the JV shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase from the JV, fifty percent (50%) of the issued and outstanding Equity Securities of the Real Estate Entity, free and clear of all Encumbrances other than restrictions on transfer arising under applicable securities Laws.<br><br>Simultaneously with, and conditioned upon, the sale described in Section 1.5(c) of the APA and the payment by Wine Purchasers of the Cash Payment, the JV shall (i) distribute the remaining fifty percent (50%) of the issued and outstanding Equity Securities of the Real Estate Entity to the NWS Member and (ii) distribute an amount equal to the Livonia Real Estate Price to the RNDC Member, in each case in accordance with the JV Operating Agreement and applicable Law.<br><br>APA § 1.6 |
| **Conditions Precedent to Obligations of Sellers** | The obligation of Sellers to consummate the Closing is subject to the satisfaction, on or prior to the Closing, of each of the following conditions, the failure of any one of which shall excuse Sellers from consummating the Closing unless, to the extent permitted by Law, any such conditions are waived in writing by each Seller in its sole discretion:<br><br>a) Wine Purchasers' Performance. The representations and warranties made by each Wine Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date. Each Wine Purchaser shall have duly performed and complied in all material respects with all covenants required by the APA to be performed or complied with by it prior to or on the Closing Date.<br><br>b) Litigation. No court of competent jurisdiction shall have issued, enacted, entered, promulgated, or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining, or otherwise prohibiting the Closing that is still in effect and no Action seeking any such Order shall be pending.<br><br>c) Officer's Certificate. Sellers shall have received a certificate from each Wine Purchaser representing and warranting that the conditions precedent set forth in Section 6.1(a) of the APA with respect to such Wine Purchaser have been satisfied.<br><br>d) Assumption Agreement. Each Wine Purchaser shall have executed and delivered to Sellers an Assumption Agreement with respect to the Wine Business Assumed Liabilities assumed by such Wine Purchaser in the form attached to the APA as Exhibit 6.1(d). |

| Summary Description of the APA[6] | |
|---|---|
| | e) Escrow Agreement. Wine Purchaser Representative and the Escrow Agent shall have executed and delivered to Sellers the Escrow Agreement.<br><br>f) Approval Order. The Bankruptcy Court shall have entered an order approving the estate-related aspects of the Transactions, including (i) the RNDC Member's exercise of its voting, consent, governance and approval rights with respect to the JV and the Transactions, (ii) the RNDC Member's participation in and support of the Transactions, (iii) the release of any liens or claims (including any liens granted under any debtor-in-possession financing order) affecting the RNDC Member's equity interests in, or rights to proceeds from, the JV, and (iv) the RNDC Member's execution, delivery and performance of the Transaction Documents to which it is a party (the "Approval Order"), and the Approval Order shall not have been stayed, vacated, or modified without Sellers' consent. In the event the Approval Order contains or requires any material adjustment to the terms of the APA, the APA may be (i) modified to reflect such adjustment if agreed to in writing by the Parties, or (ii) terminated in the sole discretion of the RNDC Member.<br><br>g) Designation Notice. Wine Purchasers shall have delivered to Sellers the Designation Notice.<br><br>h) Schedules. Sellers and Wine Purchasers shall have agreed in writing as to the form and substance of all Schedules.<br><br>APA § 6.1 |
| **Conditions Precedent to Obligations of the Purchaser** | The obligation of each of the Wine Purchasers to consummate the Closing is subject to the satisfaction, on or prior to the Closing, of each of the following conditions, the failure of any one of which shall excuse such Wine Purchaser from consummating the Closing unless, to the extent permitted by Law, any such conditions are waived in writing by such Wine Purchaser in its sole discretion:<br><br>a) Bring-Down. (i) The representations and warranties made by Sellers in Article III (other than the Fundamental Representations) of the APA shall be true and correct in all respects as though made on and as of the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect, and (ii) the representations and warranties set forth in Section 3.1, Section 3.3, Section 3.8(a), Section 3.9(b), Section 3.10, and Section 3.22 of the APA (collectively, the "Fundamental Representations") shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all respects (in the case of any representation or warranty containing any materiality qualification) or in all material respects (in the case of any representation or warranty without any materiality qualification) only as of such date. Sellers shall have duly performed and complied in all material respects with all covenants required by the APA to be |

| | Summary Description of the APA[6] |
|---|---|
| | performed or complied with by them prior to or on the Closing Date.<br>b) No Material Adverse Effect. Between the Effective Date and the Closing Date, there shall have been no Material Adverse Effect.<br>c) Regulatory. Between the Effective Date and the Closing Date, no Governmental Authority shall have enacted or promulgated any Law that would have the effect of making illegal the Transactions.<br>d) Litigation. No court of competent jurisdiction shall have issued, enacted, entered, promulgated, or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining, or otherwise prohibiting the Closing that is still in effect and no Action seeking any such Order shall be pending.<br>e) Escrow Agreement. Seller Representative and the Escrow Agent shall have executed and delivered to each Wine Purchaser the Escrow Agreement.<br>f) Officer's and Secretary's Certificates. Wine Purchasers shall have received from Sellers (i) a certificate representing and warranting that the conditions precedent set forth in Section 6.2(a) and Section 6.2(b) of the APA have been satisfied, and (ii) a certificate of the secretary or other authorized officer of each Seller, the ADA Entity, and the Real Estate Entity, dated as of the Closing Date, certifying and attaching (A) its Organizational Documents, (B) resolutions or written consents authorizing the execution, delivery and performance of the APA and the other Transaction Documents to which it is a party and the consummation of the Transactions, and (C) evidence of the incumbency and signatures of the officers or other authorized persons executing such documents on its behalf, together with a certificate of good standing or comparable certificate issued by its jurisdiction of organization dated not more than ten (10) Business Days before the Closing Date.<br>g) Transition Services Agreement. The applicable Seller(s) shall have executed and delivered to Purchaser a Transition Services Agreement in a form (together with schedules to such Transition Services Agreement) acceptable to the Parties; provided, however, that (A) Section 6.2(g) of the APA shall be a condition to the obligation of the Wine Purchasers to consummate the Closing only if the Closing Date would otherwise occur on or prior to November 13, 2026, and (B) if the Closing Date has not occurred on or prior to November 13, 2026, the Wine Purchasers shall be obligated to consummate the Closing without the Transition Services Agreement having been executed and delivered, and Section 6.2(g) of the APA shall be deemed satisfied in full.<br>h) Wine Business Bills of Sale. Sellers shall have executed and delivered to Wine Purchaser Bills of Sale for the Wine Business Acquired Assets to be acquired by such Wine Purchaser in the form attached to the APA as Exhibit 6.2(h), dated as of the Closing Date.<br>i) ADA Reorganization Documents. Sellers shall have delivered to Purchaser evidence reasonably satisfactory to Purchaser of the completion of the distributions described in Section 1.5 and Section 1.6 of the APA, together with duly executed Special Warranty Deeds (or limited warranty deeds if customary in the applicable jurisdiction) conveying the Escanaba Owned Real |

| Summary Description of the APA[6] | |
|---|---|
| | Property to the ADA Entity in accordance with Section 1.5(b) of the APA and the Livonia Owned Real Property to the Real Estate Entity in accordance with Section 1.6(a) of the APA, subject only to the Permitted Encumbrances.<br>j) Assumption Agreement. Sellers shall have executed and delivered to each Wine Purchaser an Assumption Agreement with respect to the Wine Business Assumed Liabilities assumed by such Wine Purchaser in the form attached to the APA as Exhibit 6.1(d).<br>k) ADA Interest Assignment. The JV shall have executed and delivered to Purchaser an assignment of the ADA Interest, free and clear of all Encumbrances other than Permitted Encumbrances.<br>l) RE Newco Interest Assignment. The JV shall have executed and delivered to Purchaser an assignment of the RE Newco Interest, free and clear of all Encumbrances other than Permitted Encumbrances.<br>m) Payoff Letters and Releases of Encumbrances. Sellers shall have delivered (i) payoff letters in customary form, including customary release and payment instructions and lien releases (including UCC-3 termination statements and any other releases or terminations required to release such Encumbrances of record), with respect to the Indebtedness set forth on Schedule 1.8(a)(iii) of the APA (the "Payoff Letters"), which Payoff Letters will provide that upon receipt by the applicable lenders of the amounts set forth in each such Payoff Letter, the ADA Entity and the Real Estate Entity will have no further obligations with respect to the applicable Closing Indebtedness and that all Encumbrances securing such Indebtedness with respect to the Wine Business Acquired Assets, the ADA Interest, the RE Newco Interest, and the Owned Real Property are released, and (ii) releases (including UCC-3 termination statements and any other releases or terminations required to release such Encumbrances of record) of any other Encumbrances set forth on Schedule 6.2(m) of the APA in customary form.<br>n) Approval Order. The Bankruptcy Court shall have entered the Approval Order in a form consistent with the terms of the APA and otherwise reasonably acceptable to each of the Wine Purchasers, and the Approval Order shall not have been stayed, vacated, or modified without any Wine Purchaser's consent. In the event the Approval Order contains or requires any material adjustment to the terms of the APA, the APA may be (i) modified to reflect such adjustment if agreed to in writing by the Parties, or (ii) terminated in the sole discretion of the Wine Purchaser Representative.<br>o) Supplier Approvals. Wine Purchasers shall have received Supplier Approvals from Wine Business Suppliers representing at least ninety percent (90%) of the sales volume in dollars for the year ended December 31, 2025, and Purchaser shall have received Supplier Approvals from ADA Business Suppliers representing at least seventy percent (70%) of the ADA Business' revenue for the twelve-month period ending July 31, 2026.<br>p) Side Letter. Sellers shall have delivered to Purchaser a side letter regarding certain obligations of the ADA Entity, substantially in the form attached to the APA as Exhibit 6.2(p), duly executed by all parties to such side letter. |

| Summary Description of the APA[6] | |
|---|---|
| | q) Schedules. Sellers and Wine Purchasers shall have agreed in writing (which may be by email, including by email between counsel for such Parties, expressly referencing the APA and Section 6.2(q) of the APA) as to the form and substance of all Schedules.<br><br>APA § 6.2 |
| **Deadline for the Closing of the Sale** | December 31, 2026 (the "Outside Date"); *provided* that a Party shall not be permitted to terminate the APA if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under the APA.<br><br>APA § 7.1 |
| **Escrow** | At the Closing, a portion of the purchase price equal to $10 million plus an amount equal to twenty percent of the estimated Inventory price will be placed in a third-party escrow pursuant to the Escrow Agreement, to support Seller's obligations with respect to the post-closing purchase price true-up and indemnification. The escrow is to be released to Seller fifteen months following the Closing, subject to any claims properly made against the escrow prior to such time.<br><br>APA § 1.8 |
| **Other Materials Terms** | Prior to Closing, the applicable Seller(s) shall have executed and delivered to Purchaser a Transition Services Agreement by which the applicable Seller(s) and RNDC Michigan Holdings agree to provide certain services and support to Purchaser for a specified period following Closing.<br><br>APA § 6.2(g)<br><br>Sellers (other than the ADA Entity) are agreeing to provide indemnification with respect to the representations and warranties made by any Seller, certain covenants of any Seller, and the Excluded Liabilities of any Seller.<br><br>APA § 1.7, § 8.2<br><br>Sellers (excluding the ADA Entity), RNDC Michigan Holdings, and NWS agree not to compete with the Business in the Territory for 3 years following closing, to not recruit, hire, or solicit Transferred Employees, and to not disparage the Purchaser.<br><br>APA § 5.4 |

## **Basis for Relief**

**I. The Debtors' Consent to the Sale Transaction and Entry Into and Performance of Their Limited Obligations Under the APA is a Sound Exercise of the Debtors' Business Judgment and Should Be Approved.**

22. The Debtors submit that consenting to their non-Debtor affiliates' entry into a strategic, value-maximizing transaction, in their capacity as members and/or managers of such affiliates, as applicable, is a sound exercise of the Debtors' business judgment and within the Debtors' authority to continue operating their businesses and managing their properties as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. *See* 11 U.S.C. § 1108 ("Unless the court, on request of a party in interest and after notice and a hearing, orders otherwise, the trustee may operate the debtor's business."). "It is well-settled that unless a trustee has been appointed, the Bankruptcy Code does not affect the applicability of the corporation law of [the] debtor's state of incorporation as it relates to management of the corporation." *In re FSC Corp.*, 38 B.R. 346 (Bankr. W.D. Pa. 1983); *see also* 11 U.S.C. § 363(c)(1) ("If the business of the debtor is authorized to be operated under section [1108] of this title and unless the court orders otherwise, the trustee may enter into transactions . . . in the ordinary course of business, without notice or a hearing.").

23. The Debtors submit that Court approval is not required for Debtor RNDC Michigan Holdings, in its capacity as member and/or manager of RNDC Michigan, the ADA Entity and L&L, as applicable, to approve the Sale Transaction for the sale of the Acquired Assets to the Purchasers pursuant to the APA because such assets do not constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. Accordingly, the Debtors seek only approval of Debtor RNDC Michigan Holdings' (and the other Debtors, as applicable): (a) consent to and support of the Sale Transaction (in its capacity as member and/or manager of the applicable Sellers) and (b) entry into and performance of their limited obligations under the

APA, including agreeing to execute and perform under the TSA (if required) and complying with the Restrictive Covenants. While the Debtors believe that they have authority to consent to and support the Sale Transaction in their capacity as members and/or managers of the applicable Sellers in the ordinary course of business without further Court approval, the Debtors submit that the Court may grant such relief pursuant to section 105(a) of the Bankruptcy Code. Further, the Debtors believe that the Debtors' support of the Sale Transaction and entry into and performance under the APA and the other Sale Documents, as applicable, represents a sound exercise of the Debtors' business judgment and satisfies the requirements of section 363(b) of the Bankruptcy Code.

24. Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *In re Tekoil & Gas Corp.*, No. 08-80270, 2008 WL 3297854 at * 2 (Bankr. S.D. Tex. Aug. 1, 2008) ("With respect to the transfer of property other than in the ordinary course of business, the debtor must articulate a sound business justification."); *ASARCO, Inc. v. Elliot Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593 (5th Cir. 2011) ("Section 363 of the Bankruptcy Code addresses the debtor's use of property of the estate and incorporates a business judgment standard."); *Institutional Creditors Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession . . . there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.").

25. Section 363(b) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code provides that "[t]he Court may issue

any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." Courts recognize that the authority to use estate property is within the grant of equitable power to carry out provisions of the Bankruptcy Code codified in section 105(a). *See Volvo White Truck Corp. v. Chambersburg Beverage, Inc.*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (noting the court's power to conduct sales of estate property falls within the court's equitable powers under section 105(a)).

26. After an extensive prepetition marketing process, and after considering all available alternatives for the Michigan JV, the Debtors, in consultation with their advisors, determined that the Sale Transaction represents the most value-maximizing option for the Michigan JV and is in the best interests of RNDC Michigan, its members, creditors, and other stakeholders, including hundreds of the Michigan JV's employees. The Debtors expect to realize approximately $20 million in net proceeds at or around closing of the Sale Transaction on account of the Debtors' 50% stake in RNDC Michigan.

27. The Debtors' consent to and support for the Sale Transaction, including the Debtors' compliance with the Restrictive Covenants and entry into and support of the TSA (if required by the Purchasers), are integral to the Sale Transaction and represent a sound exercise of the Debtors' business judgment. ***First***, the Debtors' limited obligations under the APA, including compliance with the Restrictive Covenants, were a condition to the Purchasers' willingness to enter into the Sale Transaction on the terms contemplated by the APA, including their willingness to pay the Purchase Price for the Acquired Assets. The Restrictive Covenants are customary for transactions of this type and necessary to ensure that the Purchasers are able to realize the benefits of their bargain with the Michigan JV without fear of potential interference from the Debtors or NWS following closing of the Sale Transaction. The Debtors' obligations under the APA will not

materially burden the Debtors' estates. Given the Debtors commenced these Chapter 11 Cases to pursue value-maximizing sales of their remaining markets and to pursue an orderly wind down, the Debtors do not expect that the Debtors' compliance with the Restrictive Covenants will have any impact on the Debtors' operations or their ability to successfully conclude and emerge from chapter 11. Further, the Debtors believe, in their business judgment, that the economic benefit the Debtors will receive from the net proceeds distributable to Debtor RNDC Michigan Holdings from the Sale Transaction will vastly exceed any expenses incurred to provide the TSA Services.

28. ***Second***, the Sellers' willingness to enter into and perform under the TSA is an integral component of the Sale Transaction. The Purchasers may require limited transition services from the Sellers (and by extension the Debtors) to close the Sale Transaction on or before November 13, 2026, and are unwilling to proceed with the Sale Transaction on the timeline required by the Debtors' Chapter 11 Cases without the Debtors' commitment to provide a TSA. The Debtors submit that their ability to promptly close the Sale Transaction, as required by the DIP Lenders and the current maturity of the DIP Facility, is factored into the DIP Budget, and is critical to maximizing the value of the Debtors' estates. The expected net proceeds of the Sale Transaction far exceed the costs that may be incurred by the Debtors in providing any TSA Services that would be required to facilitate a smooth transition of the business on the timeline required by the Chapter 11 Cases (*i.e.*, closing as soon as the end of October 2026). The Debtors therefore submit that entering into and/or performing under the TSA, as may be required by the Purchasers, represents a sound exercise of the Debtors' business judgment under section 363(b) of the Bankruptcy Code and should be approved.

29. ***Third***, the net proceeds of the Sale Transaction are necessary to have sufficient liquidity to pay down the DIP Facility prior to maturity and fund the continued administration of

these Chapter 11 Cases. The Debtors' DIP Facility currently matures on October 29, 2026, unless otherwise extended by the DIP Lenders. Moreover, based on the Debtors' forecasted liquidity, the Sale Transaction must close by the week ending October 30, 2026, to maintain minimum liquidity to sustain operations. Without the liquidity that the Sale Transaction provides, the Debtors will likely not be able to pay off the DIP New Money Loans (as defined in the DIP Motion) or maintain the liquidity necessary to fund the administration of the Chapter 11 Cases. Therefore, promptly closing the Sale Transaction is critical to the success of these Chapter 11 Cases and is necessary to avoid a value-destructive and disorderly liquidation or a potential default under the DIP Facility.

30. Accordingly, (a) Debtor RNDC Michigan Holdings' consent to and approval of the Sale Transaction (in its capacity as member and/or manager of RNDC Michigan, the ADA Entity, and L&L, as applicable) and (b) Debtor RNDC Michigan Holdings' entry into and performance of its limited obligations under the APA, including the Debtors' compliance with the Restrictive Covenants and entry into and performance under the TSA (to the extent required by the Purchasers), as applicable, represent a sound exercise of the Debtors' business judgment and should be approved.

## II. The Assumption and Assignment of Designatable Contracts as Designated by the Purchasers Is Appropriate and Should Be Approved.

31. To support the Debtors' performance under the TSA (as may be required under the APA), including following the Plan Effective Date, and to facilitate an orderly and cost-effective wind down of the Debtors' remaining operations, the Debtors seek authority to assume and assign to the applicable Purchasers any executory Contracts necessary to provide the TSA Services (each, a "Designatable Contract") that are subsequently designated as Post-Closing Assigned Contracts by the Purchasers, subject to the reasonable consent of the Debtors, and subject to the notice, cure, and objection procedures described below. If a Designatable Contract is (a) not designated as a

contract to be assumed prior to the end of the Designation Rights Period (*i.e.*, the earlier of (i) 5:00 p.m. (prevailing Central Time) on the date that is 90 days after the closing of the Sale Transaction or (ii) the termination of the applicable TSA Services) or (b) is designated by the Purchasers as a Post-Closing Excluded Contract, then the Debtors shall be authorized, in their sole discretion, to reject any such contract pursuant to section 365 of the Bankruptcy Code and the Order. The designation and assignment procedures set forth in the Order are designed to ensure that the Debtors can minimize the administrative burden of the Debtors' estates in servicing the TSAs while ensuring a smooth transition of the Michigan business to the Purchasers.

32. Section 365 of the Bankruptcy Code authorizes a debtor to assume or assume and assign its executory contracts and unexpired leases, subject to the approval of the court, provided that defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See generally* 11 U.S.C. § 365. "A bankruptcy court reviews a debtor's decision to assume or reject an executory contract under the deferential 'business judgment' standard." *In re J. C. Penney Direct Mktg. Servs., L.L.C.*, 50 F.4th 532, 534 (5th Cir. 2022) (citation omitted). Indeed, "a bankruptcy court should only withhold approval [of a debtor's assumption request] when 'the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.'" *Id.* (quoting *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985)); *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) (noting that the business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage").

33. The ability to designate, assume, and assign the Designatable Contracts to the Purchasers is critical to minimizing the cost to the Debtors' estates in providing any TSA Services, while also minimizing the period which the Purchasers may require TSA Services. Absent the

ability to assume and assign the Designatable Contracts to the applicable Purchaser during the Designation Rights Period, the Debtors may be unable to effectively service the TSA after the Plan Effective Date if the Debtors are forced to either reject the applicable contracts, find alternative vendor arrangements, or otherwise pay significant cure costs. By allowing the Debtors to assign the Designatable Contracts to the Purchasers, the Debtors will be able to facilitate a mutually beneficial transition of such contracts to the Purchasers, thereby allowing the Debtors to service the TSA without the Debtors' incurring significant cure costs to do so. Moreover, pursuant to the procedures in the Order, counterparties to any proposed Post-Closing Assigned Contracts will have sufficient notice and opportunity to raise any issues, including with respect to cure costs and adequate assurance of performance with the proposed assignee. The Debtors request that any party that fails to object to the proposed assumption and assignment of any Post-Closing Assigned Contract be deemed to consent to the assumption and assignment of the applicable Post-Closing Assigned Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Order. *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to the sale motion, the creditor was deemed to consent).

34. Accordingly, the Court should authorize the Debtors to assume and assign any Designatable Contract subsequently designated as Post-Closing Assigned Contract during the Designation Rights Period as a sound exercise of the Debtors' business judgment.

**a. Defaults Under the Post-Closing Assigned Contracts Will Be Cured.**

35. Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract or unexpired lease is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code. Specifically, before assumption will be permitted, a debtor must (a) cure existing defaults

or provide adequate assurance that cure will promptly occur, (b) compensate any party to the agreement that has suffered actual pecuniary loss as a result of a default or provide adequate assurance of prompt compensation to the injured party, and (c) provide adequate assurance of future performance under the agreement. *In re Carlisle Homes, Inc.,* 103 B.R. 524, 538 (Bankr. D.N.J. 1988); *see also Cinicola v. Scharffenberger,* 248 F.3d 110, 120 (3d Cir. 2001) ("Before an executory contract may be assigned, the trustee first must assume the contract and 'adequate assurance of future performance' of the contract must be provided."). This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *Id.* (*quoting In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)).

36. If any executory contracts of the Debtors are designated as Post-Closing Assigned Contracts pursuant to the procedures set forth in the Order, the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will promptly be satisfied because the applicable Purchaser will cure (or cause to be cured) all defaults associated with, or required for the Debtors to properly assume and assign, the Post-Closing Assigned Contract in accordance with the Order. The Debtors believe that if any defaults exist that must be cured, such cure will be achieved fairly, efficiently, properly, and consistently with the Bankruptcy Code.

37. If the Purchasers designate, subject to the reasonable consent of the Debtors, any Designatable Contract as a Post-Closing Assigned Contract, the Debtors will serve each non-Debtor counterparty to such executory contract and file with the Court a cure notice notifying such counterparty (a) that the relevant contract may be assumed and assigned to the applicable Purchaser, (b) of the proposed cure cost associated with the relevant contract, and (c) the deadline

for, and procedures governing, any objection to the proposed assumption and assignment or to the cure costs (the "Cure Notice"). Objections to the proposed assumption and assignment of any Designatable Contract designated as a Post-Closing Assigned Contract (including with respect to the proposed cure cost) must (i) be in writing, (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, (iii) state, with specificity, the legal and factual bases thereof, including the cure cost that the counterparty believes is required to cure defaults under the relevant contract if different from the cure cost set forth in the notice, and (iv) be filed with the Court (contemporaneously with a proof of service) by no later than 14 days after service of the Cure Notice to such counterparty, or such later date as may be agreed to by the Debtors (an "Assignment Objection").

38. If a counterparty to a Designatable Contract subsequently designated as a Post-Closing Assigned Contract fails to properly and timely file and serve an Assignment Objection in accordance with paragraph 37 of this Motion, the Debtors request that the counterparty be forever barred from asserting any objection with regard to the assumption or assignment of its Post-Closing Assigned Contract, and notwithstanding anything to the contrary in the Post-Closing Assigned Contract or any other document, the cure costs set forth in the cure schedule shall be the only amount necessary to cure outstanding defaults under the applicable Post-Closing Assigned Contract under section 365 of the Bankruptcy Code.

39. In the event of a dispute regarding any such Post-Closing Assigned Contract, the cure cost shall be paid only as consensually agreed by such Purchaser and the applicable counterparty or after the Court has entered an order fixing such cure costs; *provided* that the applicable Purchaser shall be authorized to remove any Post-Closing Assigned Contract and designate such contract as a Post-Closing Excluded Contract prior to the assignment effective date

provided for in the Cure Notice or if the finally determined cure costs exceed the amount listed on the cure schedule. The applicable Purchaser shall be responsible for all cure costs with respect to any Post-Closing Assigned Contract. In the event that a Designatable Contract is designated as a Post-Closing Excluded Contract, the Debtors, in their business judgment, may reject such contract under section 365 of the Bankruptcy Code.

**b. Non-Debtor Parties Will Be Adequately Assured of Future Performance.**

40. The third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied. "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).

41. Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (noting that adequate assurance of future performance is present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding). The Designatable Contracts may be required by the Purchasers after the termination of the TSA for the continued support of the Purchasers' operation of the Acquired Assets. The Purchasers are leading alcoholic beverage distributors in Michigan with long histories of distributing wine, beer, and spirits in the state and significant resources and infrastructure to operate the applicable Acquired Assets. Accordingly, if any of the Designatable Contracts are

designated as Post-Closing Assigned Contracts, the applicable counterparties will be adequately assured that the applicable Purchaser will perform under the Post-Closing Assigned Contracts.

42. Accordingly, the Debtors submit the applicable Purchaser's assumption and assignment of any Designatable Contracts subsequently designated as Post-Closing Assigned Contracts should be authorized pursuant to section 365(b) of the Bankruptcy Code.

**c. The Rejection of the Post-Closing Excluded Contracts Reflects the Debtors' Reasonable Business Judgment and Should Be Approved.**

43. In addition, section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may . . . reject any executory contract or unexpired lease of the debtor." Section 365 of the Bankruptcy Code "allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (citing *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62 (5th Cir. 1994)). Rejection of an executory contract or an unexpired lease is appropriate where such rejection would benefit the estate. *See In re Pisces Energy, LLC*, No. 09-36591-H5-11, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) ("Courts apply the 'business judgment test,' which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment.").

44. The Debtors' ability to reject the Designatable Contracts that are (a) not (i) designated as Post-Closing Assigned Contracts nor (ii) assumed by the Debtors pursuant to section 365 of the Bankruptcy during the Designation Rights Period or (b) are otherwise designated as Post-Closing Excluded Contracts (collectively, the "Rejected Contracts") is within the Debtors' business judgment and is in the best interest of the Debtors and their estates. Designatable Contracts that are not assigned to the Purchasers will likely provide no value to the Debtors' estates (or the Purchasers) after the termination of the applicable TSA Services. The ability to reject the

Rejected Contracts following the termination of the applicable TSA Services to the extent not assigned to the Purchasers (or otherwise assumed by the Debtors in accordance with the Plan) is necessary to minimize the administrative burden of maintaining such contracts to the Debtors' estates. Accordingly, the Debtors submit that authorizing the Debtors to reject the Rejected Contracts, in their sole discretion, is in the best interest of the Debtors' estates and should be approved.

## Emergency Consideration

45. The Debtors request emergency consideration of this Motion in accordance with Bankruptcy Local Rule 9013-1 and section G of the Complex Case Procedures. For the reasons discussed herein, consummating the Sale Transaction on an expedited basis is critical to the success of the Chapter 11 Cases and necessary to fund the orderly wind down of the Debtors' estates. Under the terms of the DIP Credit Agreement, the Plan Effective Date or closing sale transactions for substantially all of the Debtors' assets must occur on or before October 29, 2026, except as otherwise agreed to by the DIP Lenders. Further, the DIP Lenders have required that sale orders for substantially all of the Company's going-concern sales be entered by the Court by the Confirmation Date (as defined in the Plan). Moreover, the proceeds from the Sale Transaction will provide much needed liquidity to allow the Debtors to continue the administration of the Chapter 11 Cases, pay off obligations under the DIP Facility, and allow the Debtors to consummate a value-maximizing chapter 11 plan. It is critical that the Debtors receive available net proceeds from the Sale Transaction as soon as possible. Accordingly, emergency relief is needed to avoid immediate and irreparable harm, and is necessary for the Debtors to preserve and maximize the value of their estates for the benefit of all stakeholders, and bring these Chapter 11 Cases to a successful resolution. The Debtors therefore request that the Court approve the relief requested in this Motion on an emergency basis.

**Waiver of Bankruptcy Rules 4001(a)(4), 6004(a), 6004(h), and 6006(d)**

46. The Debtors request that the Order include a finding that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exempt such relief from the 14-day stay under Bankruptcy Rule and 6004(h). The Debtors also request waiver of the customary fourteen-day stay period under Bankruptcy Rule 4001(a)(4). Further, to the extent any Designatable Contracts are subsequently designated as Post-Closing Assigned Contracts and authorized to be assumed and assigned pursuant to the Order, the Debtors likewise request that the 14-day stay imposed by Bankruptcy Rule 6006(d) be waived so that such assumption and assignment may become effective without unnecessary delay.

**Reservation of Rights**

47. Nothing contained in this Motion or any order granting the relief requested in this Motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission, concession, or waiver of rights of the Debtors or any party in interest as to the amount of, basis for, validity, priority, enforceability, or perfection of any claim against, lien on (contractual, common law, statutory, or otherwise), security interest in, or other encumbrance on property of the Debtors' estates; (b) a promise or requirement to pay any particular claim; (c) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (d) a request, approval, assumption, adoption, rejection, or termination of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (e) a waiver or limitation of the Debtors or any other party in interest's (i) right to dispute any claim on any grounds or (ii) claims, causes of action,

or other rights, under the Bankruptcy Code or any other applicable law; or (f) a waiver of the obligation of any party in interest to file a proof of claim.

**Notice**

48. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee; (b) the Committee; (c) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (d) the Bank Lenders; (e) the Bank Agent; (f) the Second Lien Lender; (g) the Equipment Loan Lenders; (h) holders of the Owner Notes; (i) the office of the attorney general for each of the states in which the Debtors operate; (j) the Internal Revenue Service; (k) any other governmental agencies having a regulatory or statutory interest in these Chapter 11 Cases; (l) GLWAS; (m) Imperial; (n) Vintage; (o) NWS; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Debtors request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
Dated: October 16, 2026

*/s/ John F. Higgins*
**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Joanna D. Caytas (TX Bar No. 24127230)

1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 228-1331
Email: jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jcaytas@porterhedges.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Maddison Levine (admitted *pro hac vice*)

601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
christopher.marcus@kirkland.com
maddison.levine@kirkland.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

**Certificate of Accuracy**

In accordance with Bankruptcy Local Rule 9013-1(i), I certify that the foregoing statements are true and accurate to the best of my knowledge.

*/s/ John R. Castellano*
John R. Castellano

**Certificate of Service**

I certify that on October 16, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas. Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' claims and noticing agent.

*/s/ John F. Higgins*
John F. Higgins