United States Bankruptcy Court
Southern District of Texas
ENTERED
October 22, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC, *et al.*,[1] | ) | Case No. 26-90737 (CML) |
| Debtors. | ) | (Jointly Administered) |

**ORDER (I) AUTHORIZING THE DEBTORS' (A) CONSENT TO THE SALE OF CERTAIN ASSETS OF NON-DEBTOR RNDC-NWS, LLC AND ITS SUBSIDIARIES AND THE TAKING OF CERTAIN CORPORATE AND LIMITED LIABILITY COMPANY ACTION IN CONNECTION THEREWITH, AND (B) ENTRY INTO AND PERFORMANCE OF THEIR LIMITED OBLIGATIONS UNDER THE APA, AND (II) GRANTING RELATED RELIEF**

[Relates to Docket No. 618]

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"): (a) authorizing and approving Debtor RNDC Michigan Holdings' consent to and approval of the Sale Transaction and the taking of corporate and limited liability company actions in connection therewith; (b) authorizing Debtor RNDC Michigan Holdings' entry into that certain *Asset Purchase Agreement*, dated as of October 7, 2026, by and among RNDC-NWS, LLC, a Michigan limited liability company ("RNDC Michigan"), NWS Michigan, LLC, a Michigan limited liability company and a wholly owned subsidiary of RNDC Michigan (the "ADA Entity"), National Wine & Spirits, LLC, a Michigan limited liability company and a wholly owned subsidiary of the ADA Entity ("NW&S"),

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/RNDC. The location of Debtor Republic National Distributing Company, LLC's service address in these chapter 11 cases is P.O. Box 669246, Marietta, GA 30066.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the APA, or the Final DIP Order (each as defined herein), as applicable.

L&L Wine and Liquor, LLC, a Michigan limited liability company and an indirect wholly owned subsidiary of RNDC Michigan ("L&L," and collectively with RNDC Michigan, the ADA Entity, and NW&S, the "Sellers," and each, a "Seller"), Great Lakes Wine and Spirits, LLC, a Michigan limited liability company ("GLWAS"), Imperial Beverage Company, a Michigan corporation ("Imperial"), Vintage Wine Company, a Michigan corporation ("Vintage"), Debtor Republic National Distributing Company Michigan Holdings, LLC, a Michigan limited liability company and a member of RNDC Michigan ("RNDC Michigan Holdings"), solely for purposes of section 1.6(c), section 5.4, section 5.16, section 7.1(d), and article IX thereof, and National Wine & Spirits, Inc., an Indiana corporation and a member of RNDC Michigan ("NWS"), solely for purposes of section 1.6(c), section 5.4, section 5.16, and article IX thereof (as amended, modified, or supplemented from time to time in accordance with the terms thereof, the "APA"), substantially in the form attached hereto as **Exhibit 1**, solely for purposes of sections 1.6(c), 5.4, 5.16, 7.1(d), and article IX thereof; (c) authorizing the Debtors' performance of their limited obligations under the APA and the other Sale Documents, including, without limitation, the Debtors' compliance with the Restrictive Covenants and entry into and performance under the TSA; and (d) granting related relief, all as more fully set forth in the Motion; and upon consideration of the *Declaration of Ryan Murphy in Support of Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors' (A) Consent to the Sale of Certain Assets of Non-Debtor RNDC-NWS, LLC and Its Subsidiaries and the Taking of Certain Corporate and Limited Liability Company Action in Connection Therewith, and (B) Entry Into and Performance of Their Limited Obligations Under the APA, and (II) Granting Related Relief* [Docket No. 688] (the "Murphy Declaration") and the *Declaration of John R. Castellano in Support of Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors' (A) Consent to the Sale of Certain Assets of Non-Debtor RNDC-NWS,*

*LLC and Its Subsidiaries and the Taking of Certain Corporate and Limited Liability Company Action in Connection Therewith, and (B) Entry Into and Performance of Their Limited Obligations Under the APA, and (II) Granting Related Relief* [Docket No. 690] (the "Castellano Declaration"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that it may enter this Order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having conducted a hearing on the Motion and having heard the statements in support of the relief requested therein, at a hearing before this Court (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion, all relief related thereto, any objections thereto, and statements of counsel and the evidence presented at the Sale Hearing in support of the relief requested by the Debtors in the Motion; and after due deliberation thereon; and upon the full evidentiary record; and this Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing, if any, establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

A. **Jurisdiction and Venue**. This Court has jurisdiction to consider the Motion and approve the relief requested therein pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges from the United States District Court for the Southern District of Texas*, entered May 24, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for these Chapter 11 Cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This Court may enter a final order consistent with Article III of the United States Constitution.

B. **Statutory Predicates**. The statutory predicates for the relief sought in the Motion are sections 105(a), 362, 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Bankruptcy Local Rules 1075-1 and 9013-1.

C. **Final Order**. This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 4001(a)(4), 6004(h), and 6006(d), any other applicable Bankruptcy Rules, or Bankruptcy Local Rules, and to any extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, waives any stay, and expressly directs entry of judgment as set forth herein.

D. **Findings of Fact; Conclusions of Law**. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E. **Notice**. As evidenced by the affidavits of service filed with the Court [Docket Nos. 681 and 683], due, proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise be heard regarding, the Motion and entry of this Order under sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, 6006, 9007, and 9008 was given. No other or further notice of, other opportunity to object to, or other opportunity to be heard regarding the Motion or the entry of this Order needs to be given to any entity. The disclosures made by the Debtors concerning the Motion and the Sale Hearing were good, complete, and adequate and sufficient under the circumstances. The applicable requirements of the Bankruptcy Rules and the Bankruptcy Local Rules are satisfied by such notice and disclosures.

F. **Corporate and Limited Liability Company Authority**. The Debtors have full corporate and limited liability company power and authority to execute, authorize, and approve the applicable Sale Documents and do not require any consents or approvals that have not been obtained, other than this Court's entry of this Order and those expressly provided for in the APA. No other consents or approvals are required for the Debtors to consent to, approve, or perform under the Sale Documents, including the TSA.

G. The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.

H. The Debtors hold no liens in the Acquired Assets of the Sellers to be sold and transferred to the Purchasers in accordance with the Sale Documents. For the avoidance of doubt, the DIP Liens shall not affect or attach to (a) the Acquired Assets, including the Wine Business Acquired Assets, the ADA Interest, and the RE Newco Interest (including, without limitation, any

assets transferred to the ADA Entity or the Real Estate Entity in connection with the Sale Transaction), which are not property of the Debtors' estates, or (b) the Debtors' equity interests in or rights to proceeds from the Sellers.

I. **Sale Transaction in Best Interests of the Debtors' Estates**. Good and sufficient reasons for approval of the Debtors' execution of, and entry into, the applicable Sale Documents and the Debtors' performance thereunder have been articulated by the Debtors, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for (a) Debtor RNDC Michigan Holdings consenting to and approving the APA and Sale Documents in its capacity as a manager and member of RNDC Michigan, (b) Debtor RNDC Michigan Holdings executing the APA (solely with respect to section 1.6(c), section 5.4, section 5.16, section 7.1(d), and article IX thereof), and (c) the Debtors' performance of their limited obligations under the APA and the other Sale Documents, including, without limitation, complying with the Restrictive Covenants and entering into and performing under the TSA and providing the TSA Services. The Debtors' decision to enter into the APA (solely with respect to section 1.6(c), section 5.4, section 5.16, section 7.1(d), and article IX thereof) and consummate and approve the Sale Transaction (including in the Debtors' capacity as member and/or manager of the Sellers, as applicable) constitutes a proper exercise of the fiduciary duties of the Debtors and their respective directors, managers, and officers. Given all of the circumstances of these Chapter 11 Cases and the expected value of the Sale Transaction to the Michigan JV and the expected net proceeds of the Sale Transaction to be realized by the Debtors and their estates in connection therewith, the Debtors' consent to and performance in connection

with the Sale Transaction constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

J. The consummation of the Sale Transaction with respect to the Debtors and the Debtors' performance of their obligations thereunder, including providing the TSA Services, is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

K. The Debtors' determinations regarding the Designatable Contracts, including to assume and assign to any Purchaser or reject any such contracts in accordance with this Order, are based on and within the sound business judgment of the Debtors, and in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

L. **Good Faith of the Debtors, the Sellers, and the Purchasers**. The Sale Documents were negotiated, proposed, and entered into by the Debtors, the Sellers, and the Purchasers without collusion, in good faith, from arm's-length bargaining positions, and are substantively and procedurally fair to all parties in interest. No Purchaser is an "insider" or "affiliate" of any of the Debtors or the Sellers, as those terms are defined in sections 101(2) and 101(31) of the Bankruptcy Code, and no common identity of incorporators, directors, members, or controlling stockholders exists between any Purchaser and the Debtors or the Sellers.

M. **No Merger**. None of the Purchasers or any of their affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and the Sale Transaction does not amount to a consolidation, merger, or de facto merger of any Purchaser or any of its affiliates with or into the Debtors.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1. The Motion is **GRANTED** and approved to the extent indicated herein.

2. All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing (the full record of which is incorporated herein by reference) or otherwise, and all reservations of rights included in such objections, except as otherwise expressly preserved in this Order, are hereby denied and overruled on the merits with prejudice.

3. Nothing in this Order shall impair, modify, or otherwise affect any rights, claims, or remedies of any Supplier against any Seller, including any right of setoff or recoupment.

4. Notice of the Motion and Sale Hearing was adequate, appropriate, fair, and equitable under the circumstances and complied in all respects with Bankruptcy Rules 2002, 4001, 6004, and 6006.

5. The Debtors are authorized and empowered to enter into and execute the APA (solely for purposes of section 1.6(c), section 5.4, section 5.16, section 7.1(d), and article IX thereof), to consent to and approve the Sellers' consummation of the Sale Transaction (in their capacity as members and/or managers of the Sellers, as applicable), and to enter into and perform under the TSA, including any actions necessary or appropriate to perform, consummate, implement, or comply with their obligations under any of the foregoing. For the avoidance of doubt, the Debtors are authorized and empowered to comply with the Restrictive Covenants.

6. The Debtors are authorized and empowered to provide the TSA Services to the Purchasers, and to honor all obligations related thereto in compliance with the terms and subject to the conditions of the TSA.

7. The Debtors are authorized to take all such corporate and limited liability company actions as are desirable or necessary to cause the Sellers to monetize substantially all of their assets (including, without limitation, through the sale of 100% of the equity interests in the ADA Entity) pursuant to the APA, including, without limitation, approving, effectuating, and consummating the Sale Transaction. Subject only to the restrictions set forth in this Order and the Sale Documents, the Debtors are hereby authorized to take any and all actions as may be necessary or desirable to implement the Sale Transaction, and any actions taken by the Debtors prior to the date of this Order in connection with the Sale Transaction, are hereby approved and ratified. For the avoidance of doubt, the Debtors are authorized to take any acts, in their sole discretion, contemplated by this Order or the Sale Documents, to facilitate, to consummate, or in support of the Sale Transaction.

8. The APA and the TSA shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their equity holders, or any trustees, examiners, or receivers. Any trustee appointed in these cases (including a chapter 7 trustee, if applicable) shall be and hereby is authorized to operate the businesses of the Debtors to the fullest extent necessary to permit compliance with the terms of this Order. This Order, the APA, and the TSA (to the extent executed by the Debtors, as may be required in connection with the Sale Transaction) shall be binding upon and inure to the benefit of the Debtors, their estates and creditors, the Sellers, the Purchasers, and the respective successors and assigns of each of the foregoing (including, if applicable, any chapter 7 or chapter 11 trustee appointed with respect to any of the Debtors).

9. The Debtors are authorized to release any liens or claims (including any liens granted under the DIP Facility) affecting the Acquired Assets, including the Wine Business Acquired Assets, the ADA Interest, and the RE Newco Interest, or RNDC Michigan Holdings'

equity interests in, or rights to proceeds from the Sale Transaction, in its capacity as member of RNDC Michigan. The Purchasers shall have no liability, responsibility, or obligation for any claims, liabilities, or other obligations of the Debtors or their estates as a result of acquiring the Acquired Assets.

10. To the extent required by the APA, and to the extent applicable, the Debtors and the DIP Agent are authorized to prepare, file, execute, and deliver any applicable UCC termination statement or other release documentation pursuant to this Order.

11. Notwithstanding anything to the contrary set forth herein, in accordance with the DIP Orders and the DIP Loan Documents, and subject in all respects to the Carve Out and paragraph 16 of the Final DIP Order,[3] the Debtors shall transfer, or cause to be transferred, the net proceeds received by or on behalf of the Debtors in connection with the Sale Transaction for application to the DIP New Money Loans and the DIP Obligations related thereto, in each case solely to the extent and at the times required by and in accordance with paragraph 5 of the Final DIP Order and the DIP Loan Documents; *provided* that nothing herein shall restrict the Debtors from reborrowing any amounts so repaid in accordance with the DIP Loan Documents and the DIP Budget. For the avoidance of doubt, nothing in this paragraph shall require the Debtors to deliver or apply any proceeds that the Final DIP Order permits the Debtors to retain, including the proceeds from the sale of any Unencumbered Property. For purposes of this paragraph, net proceeds from the sale of the Acquired Assets by the non-Debtor Seller shall only include distributions made to the Debtors on account of their interests in the Seller.

12. The APA, and any related agreements, documents, or other instruments may be

---

[3] "Final DIP Order" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 275].

modified, amended, supplemented, or restated by the parties thereto in a writing signed by such parties and in accordance with the terms thereof, without further order of this Court; *provided* that all such modifications, amendments, supplements, or restatements shall be promptly provided to the Committee; *provided*, *further* that any such modification, amendment, supplement, or restatement that has a material or adverse effect on the Debtors' estates shall require notice to this Court and the Committee, and such material or adverse modification, amendment, supplement, or restatement shall be subject to further Court order prior to the effective date of any confirmed chapter 11 plan in these Chapter 11 Cases; *provided, however*, that no modifications, amendments, supplements, or restatements of the TSA shall require further approval of this Court.

13. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, without further order of this Court, to allow the Purchasers and the Sellers, to take any and all actions necessary to implement or consummate the Sale Transaction and perform their obligations thereunder, including delivering any notice provided for in the APA, the TSA, and the other Sale Documents and taking any and all actions permitted or required under the APA, the TSA, or the other Sale Documents, each in accordance with the terms and conditions thereof.

14. From the Closing Date until the earlier of (a) 5:00 p.m. (prevailing Central Time) on the date that is 90 days after the Closing Date or (b) the termination of the applicable TSA Services in connection therewith (the "Designation Rights Period"), each Purchaser has the right, in their sole discretion, subject to the reasonable consent of the Debtors, to designate by written notice to the Debtors (each, a "Designation Notice") any executory contract of RNDC that is necessary to provide the TSA Services (each, a "Designatable Contract," and collectively, the "Designatable Contracts") as a "Post-Closing Assigned Contract."

15. Within three business days after receiving a Designation Notice that designates a Designatable Contract as a Post-Closing Assigned Contract, the Debtors will file with the Court and serve on the applicable non-Debtor counterparty to such executory contract a cure notice that states the proposed cure costs and an objection deadline of 14 days after such service (or such later date as may be agreed to by the Debtors) (the "Cure Notice"). The Cure Notice shall include notifying such counterparty (a) that the relevant contract may be assumed and assigned to the applicable Purchaser, (b) of the proposed cure costs associated with the relevant contract, and (c) the deadline for, and procedures governing, any objection to the proposed assumption and assignment of the relevant contract or to the proposed cure costs. Objections to the proposed assumption and assignment of any Designatable Contract designated as a Post-Closing Assigned Contract (including with respect to the proposed cure cost) must (i) be in writing, (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, (iii) state, with specificity, the legal and factual bases thereof, including the cure cost that the counterparty believes is required to cure defaults under the relevant contract if different from the cure cost set forth in the notice, and (iv) be filed with this Court (contemporaneously with a proof of service) by no later than 14 days after service of the Cure Notice to such counterparty, or such later date as may be agreed to by the Debtors (an "Assignment Objection"). If no Assignment Objection is timely filed to the Cure Notice, or once any Assignment Objection is resolved by the parties or determined by this Court, such Post-Closing Assigned Contract shall be assigned to the applicable Purchaser under sections 363 and 365 of the Bankruptcy Code and this Order, effective on the applicable effective date included in such Cure Notice. The applicable Purchaser shall be responsible for all cure costs with respect to any assigned Post-Closing Assigned Contract.

16. Notwithstanding anything herein to the contrary, to the extent the applicable

Purchaser is not complying with its payment obligations under the TSA, the Debtors may terminate the Designation Rights Period in their sole discretion. At any time during the Designation Rights Period, each of the Purchasers may, by written notice, (a) remove a Designatable Contract from the cure schedule (a "Post-Closing Excluded Contract"), so long as the assignment effective date provided for in the Cure Notice for such Designatable Contract, if applicable, has not occurred, or (b) designate a Designatable Contract as a Post-Closing Excluded Contract. This includes removing a proposed Post-Closing Assigned Contract whose cure costs, as finally determined by this Court, exceed the amount listed on the cure schedule.

17. If a Designatable Contract has (a) not been (i) designated as a Post-Closing Assigned Contract nor (ii) assumed by the Debtors pursuant to section 365 of the Bankruptcy Code by the end of the Designation Rights Period or (b) been designated a Post-Closing Excluded Contract, the Debtors shall be authorized, in their sole discretion, to reject any such contracts pursuant to section 365 of the Bankruptcy Code (the "Rejected Contracts"), which rejection shall be effective as of the end of the Designation Rights Period; *provided* that, for any Post-Closing Excluded Contract that relates to services the applicable Purchaser is still receiving under the TSA, the Debtors shall provide the applicable Purchaser at least five business days' prior written notice (email being sufficient) before rejecting such Post-Closing Excluded Contract. The Debtors have exercised reasonable business judgment in determining that any such assumption and assignment or rejection of any Designatable Contract is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

18. The provisions of this Order and the terms and provisions of the APA shall survive the entry of any order that may be entered confirming or consummating any chapter 11 plan of the Debtors, dismissing these Chapter 11 Cases, or converting these Chapter 11 Cases to cases under

chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in any chapter 11 plan confirmed in these Chapter 11 Cases or any subsequent order of this Court, including, without limitation, any order confirming any such chapter 11 plan, and any order approving the wind-down or dismissal of any Debtor's chapter 11 case or any subsequent chapter 7 case, nothing in such plan or order shall change, supersede, abrogate, nullify, restrict, or conflict with the provisions of this Order, or in any way prevent or interfere with the Debtors' performance under the APA and other Sale Documents, as applicable. Notwithstanding the foregoing, nothing in this Order shall modify, supersede, or impair the Final DIP Order, including any rights under paragraph 16 of the Final DIP Order; *provided* that, nothing herein is intended to or shall be construed to affect the rights of the Purchasers under this Order, the APA, or the other Sale Documents, as applicable.

19. This Order shall bind the Parties, their estates and any successors or assigns, including without limitation, any Plan Administrator, Litigation Trustee, Wind-Down Debtors, (each as defined in the *First Amended Joint Chapter 11 Plan of Republic National Distributing Company, LLC and Its Debtor Subsidiaries* [Docket No. 369]), or any other estate representative, or any chapter 7 or chapter 11 trustee appointed for any of the Debtors. Nothing contained in any chapter 11 plan confirmed, or confirmation order entered, in these Chapter 11 Cases shall prejudice, impair, alter, or modify the terms of this Order, the APA, or the other Sale Documents.

20. This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding the applicability of Bankruptcy Rules 4001(a)(4), 6004(h), and 6006(d) or any other Bankruptcy Rules or Bankruptcy Local Rules stating the contrary, the terms and provisions of this Order shall be immediately effective and enforceable upon its entry, and any applicable stay of the effectiveness and enforceability of this Order is hereby waived. Any party objecting to this

Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the consummation of the Sale Transaction or risk its appeal being foreclosed as moot.

21. Except as expressly provided in this Order or the Sale Documents, nothing in this Order is intended to or should be construed or deemed to be: (a) an admission, concession, or waiver of rights of the Debtors or any party in interest as to the amount of, basis for, validity, priority, enforceability, or perfection of any claim against, lien on (contractual, common law, statutory, or otherwise), security interest in, or other encumbrance on property of the Debtors' estates; (b) a promise or requirement to pay any particular claim; (c) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in the Motion or any order granting the relief requested by the Motion; (d) a request, approval, assumption, adoption, rejection, or termination of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (e) a waiver or limitation of the Debtors or any other party in interest's (i) right to dispute any claim on any grounds or (ii) claims, causes of action, or other rights, under the Bankruptcy Code or any other applicable law; or (f) a waiver of the obligation of any party in interest to file a proof of claim.

22. For the avoidance of doubt, nothing in this Order authorizes the Debtors to sell or transfer any alleged accounts receivable or other amounts allegedly owed by Proximo Spirits, Inc. to the Debtors.

23. This Order shall govern any inconsistency between this Order and the Sale Documents (as it relates to the Debtors' rights and obligations thereunder).

24. The Debtors are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order.

25. The headings in this Order are for purposes of reference and shall not limit or otherwise affect the meaning of this Order.

26. The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce this Order and the Sale Documents (as it relates to the Debtors' rights and obligations thereunder), and to adjudicate, if necessary, any and all disputes concerning or relating to any of the foregoing.

Signed: October 22, 2026

Christopher Lopez
United States Bankruptcy Judge

# <u>Exhibit 1</u>

**APA**

***Execution Version***

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF OCTOBER 7, 2026**

**BY AND AMONG**

**GREAT LAKES WINE AND SPIRITS, LLC,**

**IMPERIAL BEVERAGE COMPANY,**

**AND VINTAGE WINE COMPANY,**

**AS THE WINE PURCHASERS,**

**AND**

**THE SELLERS NAMED HEREIN**

---

**TABLE OF CONTENTS**


**Page**

**ARTICLE I PURCHASE OF WINE BUSINESS ACQUIRED ASSETS AND ADA TRANSACTION ........ 2**

Section 1.1 Wine Business Acquired Assets ........ 2
Section 1.2 Excluded Assets ........ 4
Section 1.3 Assumption of Wine Business Assumed Liabilities ........ 6
Section 1.4 Excluded Liabilities ........ 7
Section 1.5 ADA Transaction ........ 8
Section 1.6 Livonia Real Estate Transaction ........ 9
Section 1.7 ADA Entity and Real Estate Entity Status ........ 9
Section 1.8 Purchase Price; Payment ........ 10
Section 1.9 Purchase Price Adjustment ........ 12
Section 1.10 Escrow Release ........ 16
Section 1.11 Receivables Collection ........ 17
Section 1.12 Withholding ........ 17
Section 1.13 Other Tax Matters ........ 18
Section 1.14 Allocation of Purchase Price ........ 18
Section 1.15 Tax Treatment ........ 18

**ARTICLE II CLOSING ........ 19**

Section 2.1 Closing ........ 19
Section 2.2 Non-Assignable Items ........ 19

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS ........ 20**

Section 3.1 Organization; Good Standing ........ 20
Section 3.2 Qualifications ........ 21
Section 3.3 Authority, Enforceability ........ 21
Section 3.4 No Conflict or Violation ........ 22
Section 3.5 Financial Statements ........ 22
Section 3.6 Undisclosed Liabilities ........ 23
Section 3.7 Absence of Certain Changes ........ 23
Section 3.8 Wine Business Acquired Assets; ADA Business Assets ........ 24
Section 3.9 Equity Interests ........ 25
Section 3.10 Real Estate Entity ........ 26
Section 3.11 Real Property ........ 26
Section 3.12 Tax Matters ........ 28
Section 3.13 Material Contracts ........ 29
Section 3.14 Litigation or Proceedings ........ 31
Section 3.15 Compliance with Laws ........ 31
Section 3.16 Health, Safety and Environmental Matters ........ 32
Section 3.17 Governmental Authorizations and Regulations ........ 33
Section 3.18 Certain Transactions ........ 33
Section 3.19 No Illegal Payments; Etc. ........ 34
Section 3.20 Employment Matters ........ 34
Section 3.21 Employee Benefits ........ 35
Section 3.22 Brokers ........ 37

**TABLE OF CONTENTS**

**Page**


**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF EACH WINE PURCHASER....37**

Section 4.1 Organization....37
Section 4.2 Authorization of Agreement....38
Section 4.3 No Conflict or Violation....38
Section 4.4 Litigation....38
Section 4.5 Financing....38
Section 4.6 Solvency....38
Section 4.7 Brokers....39

**ARTICLE V COVENANTS....39**

Section 5.1 Access, Information and Documents....39
Section 5.2 Conduct of Business Pending Closing....40
Section 5.3 Consents and Approvals....43
Section 5.4 Restrictive Covenants Provisions....44
Section 5.5 Further Assurances....47
Section 5.6 Taxes....47
Section 5.7 WARN Act; Employee Matters....49
Section 5.8 Benefit Plan Matters....51
Section 5.9 Seller Support Obligations....53
Section 5.10 Insurance Matters....53
Section 5.11 Accounts....54
Section 5.12 Receipt of Misdirected Assets....54
Section 5.13 Access to Records and Excluded Assets....54
Section 5.14 Publicity....55
Section 5.15 Vehicle Bills of Sale....56
Section 5.16 Member Support....56
Section 5.17 Notice of Certain Events....56
Section 5.18 Organization and Conduct of Real Estate Entity....57
Section 5.19 Schedule Updates....57

**ARTICLE VI CONDITIONS TO CLOSING....58**

Section 6.1 Conditions to Obligations of Sellers....58
Section 6.2 Conditions to Obligations of Wine Purchasers....59
Section 6.3 Waiver of Conditions....61

**ARTICLE VII TERMINATION....62**

Section 7.1 Termination....62
Section 7.2 Effect of Termination....63

**ARTICLE VIII SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION....63**

Section 8.1 Survival of Representations and Warranties....63
Section 8.2 Indemnification....64
Section 8.3 Acknowledgement by Wine Purchasers....70

## TABLE OF CONTENTS

**Page**

**ARTICLE IX MISCELLANEOUS .......... 71**
Section 9.1 Expenses .......... 71
Section 9.2 Severability .......... 72
Section 9.3 Notices .......... 72
Section 9.4 Construction .......... 75
Section 9.5 Schedules .......... 75
Section 9.6 Entire Agreement .......... 76
Section 9.7 Counterparts .......... 76
Section 9.8 Specific Performance .......... 76
Section 9.9 Governing Law .......... 77
Section 9.10 Waiver of Jury Trial .......... 77
Section 9.11 Jurisdiction and Exclusive Venue .......... 77
Section 9.12 Binding Effect .......... 78
Section 9.13 Assignment .......... 78
Section 9.14 No Third Party Beneficiaries .......... 78
Section 9.15 No Right of Set-Off .......... 78
Section 9.16 Non-Recourse .......... 78
Section 9.17 Amendment; Waivers .......... 79
Section 9.18 Bulk Sales Laws .......... 79
Section 9.19 Seller Representative .......... 79
Section 9.20 Wine Purchaser Representative .......... 79

**ARTICLE X ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS .......... 80**
Section 10.1 Certain Definitions .......... 80
Section 10.2 Index of Other Defined Terms. .......... 86
Section 10.3 Rules of Interpretation .......... 89

**EXHIBITS**

Exhibit 1.8(d)(i) Form of Escrow Agreement
Exhibit 6.1(d) Form of Assumption Agreement
Exhibit 6.2(h) Form of Bills of Sale
Exhibit 6.2(p) Form of Side Letter

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") dated as of October 7, 2026 (the "Effective Date"), is made and entered into by and among:

1. RNDC-NWS, LLC, a Michigan limited liability company (the "JV");

2. NWS Michigan, LLC, a Michigan limited liability company and a wholly owned subsidiary of the JV (the "ADA Entity");

3. National Wine & Spirits, LLC, a Michigan limited liability company and a wholly owned subsidiary of the ADA Entity ("NW&S");

4. L&L Wine and Liquor, LLC, a Michigan limited liability company and an indirect wholly owned subsidiary of the JV ("L&L" and collectively with the JV, the ADA Entity and NW&S, "Sellers" and each a "Seller");

5. Great Lakes Wine and Spirits, LLC, a Michigan limited liability company (the "Purchaser");

6. Imperial Beverage Company, a Michigan corporation ("Imperial");

7. Vintage Wine Company, a Michigan corporation ("Vintage," and collectively with Purchaser and Imperial, the "Wine Purchasers" and each a "Wine Purchaser");

8. Republic National Distributing Company Michigan Holdings, LLC, a Michigan limited liability company and a member of the JV (the "RNDC Member"), solely for purposes of Section 1.6(c), Section 5.4, Section 5.16, Section 7.1(d) and Article IX; and

9. National Wine & Spirits, Inc., an Indiana corporation and a member of the JV (the "NWS Member"), solely for purposes of Section 1.6(c), Section 5.4, Section 5.16, and Article IX (the RNDC Member and the NWS Member, together with Sellers and the Wine Purchasers, the "Parties" and each individually a "Party").

Capitalized terms are defined or indexed, as applicable, in Article X.

**WHEREAS**, the "Wine Business" is Sellers' business of distributing wine, low-proof alcoholic beverages, non-alcoholic beverages, and Sellers' related products in the State of Michigan, conducted primarily through L&L;

**WHEREAS,** the "ADA Business" is the business of warehousing, transporting, delivering, promoting, marketing, and brokering spirits as an authorized distribution agent in the State of Michigan, conducted primarily through the ADA Entity, together with the Owned Real Property and Leased Real Property used in connection therewith; and the Wine Business and the ADA Business are collectively referred to as the "Businesses" and each a "Business";

**WHEREAS**, the Wine Purchasers desire to purchase the Wine Business Acquired Assets (defined below) and, through the ADA Transaction, Purchaser desires to acquire one hundred percent (100%) of the equity interests of the ADA Entity, and Sellers desire to effect such transactions, upon the terms and subject to the conditions of this Agreement and the Transaction Documents;

**WHEREAS**, the RNDC Member owns fifty percent (50%) of the equity interests in the JV, is a debtor in the Bankruptcy Cases, and is entering into this Agreement solely for the purposes set forth in Section 1.6(c), Section 5.4, Section 5.16, Section 7.1(d) and Article IX and not as a Seller;

**WHEREAS**, the NWS Member owns fifty percent (50%) of the equity interests in the JV, and is entering into this Agreement solely for the purposes set forth in Section 1.6(c), Section 5.4, Section 5.16, and Article IX and not as a Seller; and

**NOW, THEREFORE,** in consideration of the mutual representations, warranties, covenants and agreements contained in this Agreement, the receipt and sufficiency of which is acknowledged by the Parties' signatures below, the Sellers and Wine Purchasers agree as follows:

## ARTICLE I
## PURCHASE OF WINE BUSINESS ACQUIRED ASSETS AND ADA TRANSACTION

**Section 1.1 Wine Business Acquired Assets**. Subject to the terms and conditions set forth in this Agreement, at the Closing, each Seller shall sell, transfer, assign, convey and deliver to the Wine Purchasers, and the Wine Purchasers shall purchase from such Seller, all of such Seller's right, title and interest, as of the Closing in and to the Wine Business Acquired Assets, free and clear of all liens, mortgages, security interests, claims or other encumbrances of any nature whatsoever (collectively, "Encumbrances"), except Permitted Encumbrances. The "Wine Business Acquired Assets" (and each a "Wine Business Acquired Asset") means all of each Seller's right, title and interest, as of the Closing, in and to the following, but excluding in all cases the Excluded Assets:

(a) Distribution Rights. The exclusive distribution rights and related Assigned Contracts of the Wine Business for the brands listed on Schedule 1.1(a) (the "Brands") from the Suppliers listed on Schedule 1.1(a) (the "Wine Business Suppliers") with respect to the Territory (the "Distribution Rights") for which Supplier Approval is obtained.

(b) Inventory. "Inventory" shall mean:

(i) all inventory of physical containers (*e.g.*, bottles, barrels, cans, etc.) of liquid labelled under the Brands for which Supplier Approval is obtained ("Approved Brands"), related to the Wine Business, including (A) Wine Inventory, (B) Aging Inventory and (C) Unsalable Inventory; and

(ii) all functional and undamaged dunnage, pallets, slip boards and kegs related to the Approved Brands and used primarily in the Wine Business ("Dunnage"), together with all reimbursable deposits held by such Wine Business Suppliers for Dunnage.

(c) Distribution Fleet, Rolling Stock and Warehouse Equipment. The warehouse and delivery equipment, including forklifts, floor cleaners, motor vehicles, trailers (including special events trailers), any other certified vehicles, automated warehouse systems, office equipment, computer equipment, and furniture used in the Wine Business and located in the Territory (collectively, the "Equipment"). If any Equipment is leased to a Seller (other than the ADA Entity), the applicable Wine Purchaser shall not acquire any right, title or interest in or to such Equipment unless the Contract governing such Equipment is a Wine Business Assigned Contract.

(d) Other Tangible Property. The following other tangible personal property used primarily in the operation of the Wine Business and located in the Territory (the "Other Tangible Property"):

(i) all packaging materials, draft tapping equipment, supplies, files, apparatus, appliances, implements, spare parts, fuel in tanks or in vehicles, oil and other supplies;

(ii) all point-of-sale (POS) materials, including advertising, sales literature, promotional literature, promotional displays, catalogs, tap handles/markers and similar materials of Sellers relating to the Approved Brands; and

(iii) copies of all books, records and information, including if and to the extent that any of the following exist: all customer lists, customer account records, sales records, route records, prospective customer and contact information, demographic data (including market statistics, studies and resulting marketing strategies), vendor lists, financial records relating to the Wine Business, warehouse expansion plans, cost analyses, process sheets, and environmental health and safety compliance and regulatory information, and product development records and reports, in each case relating primarily to the Wine Business.

If any Other Tangible Property is leased to a Seller, the applicable Wine Purchaser shall not acquire any right, title or interest in or to such Other Tangible Property unless the Contract governing such Other Tangible Property is a Wine Business Assigned Contract (defined below).

(e) Contracts. The Contracts set forth on Schedule 1.1(e) (collectively, the "Wine Business Assigned Contracts" and each, a "Wine Business Assigned Contract"). However, with respect to any Contract set forth on Schedule 1.1(e) that relates to any territory in addition to the Territory, such Contract shall constitute a Wine Business Assigned Contract only to the extent related to the Territory.

(f) Goodwill. All goodwill and the going concern value of the Wine Business.

The particular Wine Business Acquired Assets being sold, transferred, assigned, conveyed and delivered to each Wine Purchaser shall be designated, by written notice from Wine Purchaser Representative to Seller Representative no later than five (5) Business Days prior to the Closing Date (the "Designation Notice"), including the resulting portion of the Wine Price therefor and each Wine Purchaser shall (i) purchase the portion of the Wine Business Acquired Assets allocated to such Wine Purchaser in the Designation Notice and pay the corresponding portion of the Purchase Price, (ii) assume the Wine Business Assumed Liabilities associated with the Wine Business Acquired Assets allocated to such Wine Purchaser in the Designation Notice, and (iii) take title directly to any Wine Business Acquired Asset allocated to such Wine Purchaser in the Designation Notice; provided that, for the avoidance of doubt, the Designation Notice shall allocate all Wine Business Acquired Assets and Wine Business Assumed Liabilities among the Wine Purchasers; provided further that, among the Wine Purchasers, Purchaser shall have first right to any Wine Business Acquired Assets for the Wine Business other than Brands and Inventory relating to those Brands, which shall be allocated as agreed among the Wine Purchasers, as each Wine Purchaser shall acquire the Inventory associated with the Brands such Wine Purchaser is acquiring. However, notwithstanding anything to the contrary in this Agreement, unless and until the Designation Notice is duly and timely delivered, Purchaser shall acquire all the Wine Business Acquired Assets, assume all the Wine Business Assumed Liabilities, and be responsible for payment of the entire Wine Price. Sellers will have no responsibility for any information set forth in the Designation Notice and shall be entitled to rely on such information for all purposes under this Agreement without any Liability whatsoever to any Wine Purchaser.

**Section 1.2 Excluded Assets**. The Wine Business Acquired Assets shall not include, and Sellers shall retain and shall not, and shall not be deemed to, sell, transfer, assign, convey, or deliver, all right, title, and interest to, in and under (y) any properties, rights, interests, and other assets that are not Wine Business Acquired Assets and (z) the following properties, rights, interests, and other assets, which shall not be Wine Business Acquired Assets ((y) and (z), collectively, the "Excluded Assets"):

(a) any properties, rights, interests, and other assets that are (A) expressly excluded by the terms of Section 1.1 or (B) in the case of tangible assets, not located in the Territory;

(b) the business names "Republic National Distributing Company", "RNDC", and all variations thereof;

(c) all cash (including checks and deposits in transit, demand deposits, money markets, or similar accounts and any balances in any such accounts), certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, bank deposits, government securities, marketable securities and any other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held, and all bank accounts, other than such accounts that the Parties may mutually agree to include as Wine Business Acquired Assets;

(d) all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone, or otherwise) other than reimbursable deposits held by Wine Business Suppliers for Dunnage;

(e) all advance payments, prepaid or deferred charges and expenses (including all lease and rental payments), that have been prepaid by any Seller, any retainers or similar amounts paid to professional service providers, and any rights to credits, refunds or rebates of the Business;

(f) all accounts receivable and notes receivable due from any Person;

(g) all inventory that is not Inventory;

(h) all rights or interests in and with respect to any Seller Benefit Plan;

(i) all local, state and federal income Tax refunds, Tax attributes, and Tax assets of Sellers or any of their Affiliates;

(j) all Contracts of JV, NW&S, and L&L other than the Wine Business Assigned Contracts;

(k) all of Sellers' rights and claims under this Agreement and the other Transaction Documents;

(l) all intellectual property, including all of Sellers' logos, websites, social media accounts, domain names, email addresses and similar assets and information technology assets;

(m) all Documents (including information stored on the computer systems, data networks, or servers) (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities, (ii) that are minute books, Organizational Documents, stock certificates or other equity interest instruments, stock registers and such other books and records pertaining to the ownership, organization, or existence of Sellers, Tax returns and records (and any related work papers), corporate seals, checkbooks, and canceled checks, (iii) that any Seller is required by Law to retain, or (iv) that are governed under applicable data privacy Laws that prohibit the transfer or sale of personal information; provided that the Wine Purchasers shall have the right to make copies of any reasonably relevant portions of such Documents (other than Tax returns) to the extent not prohibited by applicable Law;

(n) all Documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Wine Business Acquired Assets, this Agreement, or the other Transaction Documents or the Transactions, including (i) all records and reports prepared or received by any Seller or its Affiliates or Advisors in connection with the sale of the Wine Business Acquired Assets and the Transactions, including all analyses relating to the businesses of any Seller or its Affiliates so prepared or received, (ii) all bids and expressions of

interest received from third parties with respect to the acquisition of any Seller's or its Affiliates' businesses or assets, (iii) all privileged materials, documents, and records of any Seller or any of its Affiliates, (iv) confidentiality agreements with prospective purchasers of any Seller's or its Affiliates' businesses or assets, and (v) any other files or records to the extent relating to any Excluded Assets or Excluded Liabilities;

(o) subject to Section 5.10, all current and prior insurance policies, including all director and officer insurance policies, and all rights and benefits of any nature of any Seller or its Affiliates with respect to such insurance policies, including all insurance recoveries under such insurance policies and rights to assert claims with respect to any such insurance recoveries;

(p) any equity interests of any form or nature of any Seller or any other Person; provided that the ADA Interest shall not be an Excluded Asset and shall be sold in accordance with Section 1.5(c); provided further that the RE Newco Interest shall not be an Excluded Asset and shall be sold in accordance with Section 1.6(b);

(q) all causes of action, claims, demands, rights and privileges against third parties to the extent related to any of the Excluded Liabilities or other Excluded Assets;

(r) all demands, credits, statements, allowances, rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, causes of action, rights of set off, rights of recovery, or rights of recoupment relating to or arising against Wine Business Suppliers, vendors, merchants, manufacturers, and counterparties to any Contract that is not a Wine Business Assigned Contract, arising out of or relating to events occurring on or prior to the Closing Date;

(s) all liabilities or other amounts owing from any Affiliate of any Seller;

(t) all assets utilized by any Seller primarily in connection with a business other than the Wine Business or the ADA Business;

(u) every asset of any Seller that would otherwise constitute a Wine Business Acquired Asset (if held immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the Effective Date until the Closing Date in the Ordinary Course of Business as permitted or not otherwise prohibited by the terms of this Agreement;

(v) all licenses, permits, authorizations and orders, other than the Transferred Permits; and

(w) all assets listed on Schedule 1.2, which the Parties may amend at any time prior to the Closing upon mutual written consent.

**Section 1.3 Assumption of Wine Business Assumed Liabilities**. Effective as of the Closing, each of the Wine Purchasers shall irrevocably assume from Sellers and pay, perform, discharge, or otherwise satisfy in accordance with their respective terms, and Sellers shall

irrevocably transfer, assign, convey, and deliver to the applicable Wine Purchaser, only the Wine Business Assumed Liabilities allocated to such Wine Purchaser in the Designation Notice. With respect to Wine Business Acquired Assets allocated to a Wine Purchaser in the Designation Notice, "Wine Business Assumed Liabilities" (and each a "Wine Business Assumed Liability") means:

(a) all liabilities for reimbursable deposits from retail customers for Dunnage in the amounts set forth on Schedule 1.3, together with the other liabilities as expressly set forth on Schedule 1.3;

(b) all liabilities for on order or in-transit Inventory that is to be received on or after the Closing Date, including the purchase orders for any such Inventory;

(c) all liabilities and obligations under the Wine Business Assigned Contracts that (i) first arise from and after the Closing, (ii) do not arise from or relate to any breach by any Seller of any provision of such Wine Business Assigned Contracts, (iii) do not arise from or relate to any event, circumstance or condition occurring or existing prior to the Closing that, with notice or lapse of time, would constitute or result in a breach of such Wine Business Assigned Contracts, and (iv) do not arise from the failure to obtain any required consent from any third party in connection with the assignment and transfer of such Wine Business Assigned Contracts to the applicable Wine Purchaser pursuant to this Agreement;

(d) all liabilities arising out of the ownership or operation of the Wine Business Acquired Assets by the applicable Wine Purchaser from and after the Closing, including all liabilities arising out of or relating to any environmental, health or safety matter (including those relating to or arising under Environmental Law or relating to Hazardous Substances), in all cases, only to the extent arising out of or in connection with the ownership or operation of the Wine Business Acquired Assets by the applicable Wine Purchaser on or after the Closing, and not caused by any act or omission by any of the Sellers before the Closing;

(e) all liabilities for amounts required to be paid, or actions required to be taken or not to be taken, by the applicable Wine Purchaser under the express terms of this Agreement with respect to the Wine Business Acquired Assets;

(f) all liabilities for Taxes with respect to the Wine Business Acquired Assets, the Wine Business Assumed Liabilities or the Wine Business, in each case, with respect to any taxable period (or portion thereof) beginning after the Closing Date.

**Section 1.4 Excluded Liabilities**. Subject to the provisions of Section 1.3 but notwithstanding any other provision in this Agreement to the contrary, each Wine Purchaser shall not assume and shall not be responsible to pay, perform or discharge any liabilities of Sellers or any other Wine Purchaser or any of their Affiliates of any kind or nature whatsoever other than its Wine Business Assumed Liabilities (the "Excluded Liabilities"); provided that no liability or obligation of the ADA Entity that remains a liability or obligation of the ADA Entity from and after the Closing shall constitute an Excluded Liability. Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

(a) any liabilities or obligations arising out of or relating to Sellers' ownership or operation of the Business and the Wine Business Acquired Assets prior to the Closing Date, including the Supplier Payables and any other accounts payable, and all liabilities arising out of or relating to any environmental, health or safety matter (including those relating to or arising under Environmental Law or relating to Hazardous Substances);

(b) any liabilities or obligations relating to or arising out of the Excluded Assets;

(c) any liabilities or obligations for (i) Taxes relating to the Business, the Wine Business Acquired Assets or the Wine Business Assumed Liabilities for any taxable period ending on or prior to the Closing Date and (ii) any other Taxes of Sellers for any taxable period (other than, for the avoidance of doubt, Taxes of the ADA Entity or the Real Estate Entity);

(d) except as otherwise specifically provided in this Agreement, any liabilities or obligations of Sellers relating to or arising out of (i) the employment, or termination of employment, of any employee through the Closing Date (including under any CBA), (ii) workers' compensation claims of any employee which relate to events occurring on or prior to the Closing Date, and (iii) any Seller Benefit Plan; and

(e) any liabilities or obligations of Sellers arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents and the Transactions, including, fees and expenses of counsel, accountants, consultants, advisers and others.

In the event of a conflict between the terms of Section 1.3 on the one hand, and this Section 1.4, on the other hand, the terms of Section 1.3 will prevail.

**Section 1.5 ADA Transaction**.

(a) Distribution of NW&S. Prior to or simultaneously with the Closing, the ADA Entity shall distribute, transfer, assign, convey and deliver to the JV all of the ADA Entity's right, title and interest in and to the Equity Securities of NW&S, such that, immediately prior to the sale described in Section 1.5(c), none of the Equity Securities of NW&S or L&L is owned, directly or indirectly, by the ADA Entity.

(b) Contribution of Escanaba Owned Real Property and Leased Real Property. Prior to or simultaneously with the Closing, the JV shall contribute, transfer, assign, convey and deliver to the ADA Entity all of the JV's right, title and interest in and to (i) the Owned Real Property in Escanaba, Michigan (the "Escanaba Owned Real Property"), together with all buildings, Improvements and fixtures located thereon, all rights, privileges and easements appurtenant thereto, all strips and gores adjoining such Escanaba Owned Real Property, and any other easements, rights-of-way or appurtenances owned or used in connection with the beneficial use and enjoyment thereof, and (ii) to the leasehold or subleasehold estates and other rights to use

or occupy the Leased Real Property, in each case free and clear of all Encumbrances other than Permitted Encumbrances.

(c) Sale of ADA Interest. At the Closing, the JV shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase from the JV, one hundred percent (100%) of the issued and outstanding Equity Securities of the ADA Entity (the "ADA Interest"), free and clear of all Encumbrances other than restrictions on transfer arising under applicable securities Laws. The transactions described in this Section 1.5 are collectively the "ADA Transaction".

**Section 1.6 Livonia Real Estate Transaction**.

(a) Contribution of Livonia Owned Real Property. Prior to the Closing, the JV shall form 13000 Investments LLC, a new Michigan limited liability company (the "Real Estate Entity") as a wholly-owned subsidiary of the JV. Prior to or simultaneously with the Closing, the JV shall contribute, transfer, assign, convey and deliver to the Real Estate Entity all of the JV's right, title and interest in and to the Owned Real Property located in Livonia, Michigan (the "Livonia Owned Real Property"), together with all buildings, Improvements and fixtures located thereon, all rights, privileges and easements appurtenant thereto, all strips and gores adjoining such Livonia Owned Real Property, and any other easements, rights-of-way or appurtenances owned or used in connection with the beneficial use and enjoyment thereof, in each case free and clear of all Encumbrances other than Permitted Encumbrances.

(b) Sale of RE Newco Interest. At the Closing, the JV shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase from the JV, fifty percent (50%) of the issued and outstanding Equity Securities of the Real Estate Entity (the "RE Newco Interest"), free and clear of all Encumbrances other than restrictions on transfer arising under applicable securities Laws.

(c) Distribution of Remaining Interests and Proceeds. Simultaneously with, and conditioned upon, the sale described in Section 1.5(c) and the payment by Wine Purchasers of the Cash Payment, the JV shall (i) distribute the remaining fifty percent (50%) of the issued and outstanding Equity Securities of the Real Estate Entity to the NWS Member and (ii) distribute an amount equal to the Livonia Real Estate Price (defined below) to the RNDC Member, in each case in accordance with the JV Operating Agreement and applicable Law.

**Section 1.7 ADA Entity and Real Estate Entity Status**. The ADA Entity is a Seller solely with respect to the sale of its Wine Business Acquired Assets and the assumption by the Wine Purchasers of its Wine Business Assumed Liabilities. The Real Estate Entity will not be a Seller. From and after the Closing, the ADA Entity shall automatically cease to be a "Seller" for all purposes of this Agreement, and from and after the Closing the ADA Entity shall have no rights, and shall have no obligations or liabilities, under this Agreement in its capacity as a Seller (including under Article VIII). Without limiting the foregoing, the ADA Entity shall not be bound by the covenants set forth in Section 5.4, and neither the ownership or operation of the ADA Business by the ADA Entity or the Livonia Owned Real Property by the Real Estate Entity from

and after the Closing nor any action taken by the ADA Entity or the Real Estate Entity in connection therewith shall constitute a breach of Section 5.4 by any Seller. For the avoidance of doubt, nothing in this Section 1.7 relieves any other Seller (being JV, NW&S, and L&L) of any of its obligations or liabilities under this Agreement, including the obligations of the Sellers with respect to the representations and warranties made as to the ADA Entity, the ADA Business, the Real Estate Entity, and the Owned Real Property under Article III.

**Section 1.8 Purchase Price; Payment.**

(a) Purchase Price. The purchase price (the "Purchase Price") for the Wine Business Acquired Assets, the ADA Interest, and the RE Newco Interest shall be equal to the sum of the following:

(i) for the Distribution Rights, an amount equal to $31,000,000 (the "Distribution Rights Price");

(ii) *plus* the sum of (A) with respect to all Inventory other than Dunnage, the aggregate, determined separately for each item of Inventory and, in the case of Wine Inventory, separately for each Brand, stock-keeping unit, and applicable Inventory Factor tranche of (1) the quantity included in such item or tranche (but, for the avoidance of doubt, different units of the same Brand and/or SKU may be included in different tranches), multiplied by (2) the Laid-in Cost per unit of such item, multiplied by (3) the applicable Inventory Factor, *plus* (B) the amount of reimbursable deposits held by Wine Business Suppliers of the Brands for Dunnage (the "Inventory Price" and, together with the Distribution Rights Price, the "Wine Price");

(iii) *plus* for the ADA Interest, the sum of (A) $30,000,000 (which includes the value of the Escanaba Owned Real Property), *plus* (B) the amount of Closing Cash (the "ADA Price");

(iv) *plus* for the RE Newco Interest, an amount equal to $23,000,000 (the "Livonia Real Estate Price");

(v) *minus* the amount of Closing Indebtedness;

(vi) *minus* the amount of Closing Current Liabilities;

(vii) *minus* the amount of Transaction Expenses (the result of Section 1.8(a)(i) through (vii), the "Cash Payment"); and

(viii) the assumption of the Wine Business Assumed Liabilities.

(b) For purposes of this Agreement: (A) the Inventory Price, Closing Cash, Closing Indebtedness, Transaction Expenses and Closing Current Liabilities are collectively the "Price Components"; (B) "Closing Cash" means the aggregate amount of cash and cash

equivalents of the ADA Entity as of the Calculation Time, determined in accordance with the Transaction Accounting Principles; (C) "Closing Indebtedness" means the aggregate amount, as of the Calculation Time of Indebtedness of the ADA Entity and the Real Estate Entity; (D) "Closing Current Liabilities" means the aggregate amount, as of the Calculation Time, of Current Liabilities of (1) the ADA Entity and the Real Estate Entity and (2) the other Sellers to the extent such Liabilities are associated with such Sellers' Transferred Employees and are Wine Business Assumed Liabilities or ADA Business Employees, in each case to the extent unpaid as of the Calculation Time; and (E) "Transaction Expenses" means the aggregate amount of all fees, costs and expenses incurred by the ADA Entity and the Real Estate Entity, in connection with the negotiation, preparation and performance of this Agreement and the other Transaction Documents and the consummation of the Transactions, in each case to the extent unpaid as of the Calculation Time.

(c) Pre-Closing Deliveries.

(i) At least five (5) calendar days prior to the Closing Date, Sellers shall prepare and deliver to the Wine Purchasers a statement ("Estimated Closing Statement") setting forth Sellers' reasonable, good faith estimates of the following in accordance with the Transaction Accounting Principles: (i) each Price Component, (ii) the resulting Wine Price and ADA Price, and (iii) the resulting Cash Payment (the "Estimated Cash Payment"). The Parties shall reasonably cooperate to reconcile the Designation Notice with the Estimated Closing Statement to include allocations of the Price Components and resulting Purchase Price and Cash Payment among each of the Wine Purchasers. The Estimated Closing Statement shall be accompanied by reasonable documentation to support the amounts and calculations in the Estimated Closing Statement and a certificate of Sellers confirming that the Estimated Closing Statement was prepared in good faith and in accordance with this Agreement and the Transaction Accounting Principles. Sellers shall reasonably communicate with the Wine Purchasers in connection with Sellers' preparation and the Wine Purchasers' review of the Estimated Closing Statement. Sellers shall provide the Wine Purchasers with a reasonable opportunity to review the Estimated Closing Statement and shall make available to the Wine Purchasers all information reasonably requested by the Wine Purchasers to assist in their review of the Estimated Closing Statement.

(d) Estimated Cash Payment. The Estimated Cash Payment shall be paid by the Wine Purchasers (subject to the last paragraph of Section 1.1, with Vintage and Imperial each paying only the portion of the Estimated Cash Payment relating to the Wine Price allocated to each of them in the Designation Notice and Purchaser paying the balance) at the Closing as follows:

(i) an amount in cash equal to the sum of (A) $10,000,000, plus (B) twenty percent (20%) of Sellers' good faith estimate of the Inventory Price as set forth on the Estimated Closing Statement (such estimate, the "Estimated Inventory Price," the amount in clause (B), the "Inventory Escrow Portion," and the sum of clauses (A) and (B), the "Escrow Amount," and any interest accrued on the Escrow Amount or additional funds

deposited with the Escrow Agent pursuant to this Agreement, together with the Escrow Amount, the "Escrow Fund") to an account (the "Escrow Account") with SRS Acquiom (the "Escrow Agent") pursuant to the Escrow Agreement among the Seller Representative, Wine Purchaser Representative, and the Escrow Agent, in substantially the form attached hereto as Exhibit 1.8(d)(i) (the "Escrow Agreement");

(ii) to the applicable lenders, as set forth in the Payoff Letters, the amounts necessary to pay off the Closing Indebtedness on behalf of the ADA Entity and the Real Estate Entity and any indebtedness secured by the Wine Business Acquired Assets and the Owned Real Property, by wire transfer of immediately available funds to the accounts designated by such lenders in the Payoff Letters;

(iii) to the applicable recipients thereof, the amounts necessary to pay off the Transaction Expenses on behalf of the Businesses, by wire transfer of immediately available funds to the accounts designated by such recipients in their respective final invoices; and

(iv) to Sellers (or to such other Persons as Sellers may direct in writing) by wire transfer of immediately available funds to such account(s) as Sellers shall designate in writing prior to the Closing, cash in an aggregate amount equal to (A) the Estimated Cash Payment, *minus* (B) the Escrow Amount.

**Section 1.9** **Purchase Price Adjustment**. This Section 1.9 sets forth the process by which such amounts set forth in the Estimated Closing Statement shall be adjusted following the Closing. The Purchase Price shall also be subject to adjustment as set forth in Section 2.2(c).

(a) The amount of each Price Component as of the Calculation Time and the Cash Payment shall be finally determined (i) based on facts and circumstances as they exist at the Calculation Time and exclude the effects of any transactions or events (including the passage of time) after the Calculation Time, (ii) in accordance with the terms and conditions (including definitions) set forth in this Agreement, and (iii) except with respect to any Price Component whose raw data is necessary for its determination, applying solely GAAP, applied in accordance with the accounting methods, policies, principles, practices, procedures, classifications, judgments and estimation methodologies consistently applied by Sellers in the preparation of the Financial Statements (the "Transaction Accounting Principles"). The purpose of preparing the Adjustment Statement and determining the Final Cash Payment is solely to accurately measure differences (if any) in the amounts of the Price Components from the respective amounts set forth in the Estimated Closing Statement, and such processes are not intended to permit the introduction of principles, policies, practices, procedures, methodologies, classifications, methods, conventions, assumptions, judgments or estimations techniques that are different from the Transaction Accounting Principles.

(b) The items of Inventory included in the Wine Business Acquired Assets, and the Inventory Price included in the Adjustment Statement shall be determined in accordance with the terms of this Agreement by an itemized physical inventory count (the "Inventory Count") to

be conducted jointly by the Wine Purchasers and Sellers at the facilities of the Wine Business commencing after the close of business on the Closing Date or at such other time mutually agreed upon by the Wine Purchasers and Sellers. The Inventory Count shall exclude the ADA Inventory, and no ADA Inventory shall be included in the determination of the Inventory Price. The Inventory Count shall be conducted using agreed-upon procedures customarily used to take inventories of similar kind for the types of items being inventoried. The Wine Purchasers and Sellers shall have the right to have present for the Inventory Count such officers, employees, representatives and agents as each one shall deem reasonably necessary to monitor such process. The Wine Purchasers and Sellers shall each bear their respective costs with respect to the Inventory Count. Based upon the Inventory Count, Sellers and the Wine Purchasers shall jointly prepare a detailed list, as of the Calculation Time, of each item in the Inventory and the Laid-in Cost of each item in the Inventory. Such detailed list shall identify separately, for each Brand and stock-keeping unit included in the Wine Inventory, (i) the quantity on hand as of the Calculation Time, (ii) the number of saleable units sold during the period of twelve (12) completed calendar months immediately preceding the Closing Date, (iii) the applicable Monthly Run Rate, (iv) the quantities allocated to each applicable Inventory Factor tranche and (v) the resulting value. No unit of Wine Inventory may be included in more than one tranche, but different units of the same Brand and/or SKU may be included in different tranches. Sellers shall provide reasonable supporting documentation from their books and records for such sales history and calculations. The Parties agree to work in good faith to attempt to reach agreement on the Inventory Price on or prior to the date that is five (5) Business Days following the Closing Date. Without limiting the generality of the foregoing, to the extent the reimbursable deposits for Dunnage collected by Sellers from retail customers after Closing are less than the reimbursable deposits made by Sellers for Dunnage held by Wine Business Suppliers for Approved Brands, then the Wine Purchasers shall receive a credit for such difference, and to the extent the reimbursable deposits made by Sellers for Dunnage held by Wine Business Suppliers for Approved Brands are less than the reimbursable deposits for Dunnage collected by Sellers from retail customers after Closing, then Sellers shall receive a credit for such difference.

(c) As soon as reasonably practicable after the Closing Date, but not later than thirty (30) days after the Closing Date, Wine Purchaser Representative, after consultation with each Wine Purchaser, and acting on behalf of all of the Wine Purchasers, shall prepare and deliver to Sellers a reasonably detailed statement (the "Adjustment Statement") consolidating the Wine Purchasers' good faith calculations of (i) each Price Component and (ii) the resulting Cash Payment (each of (i) and (ii), a "Closing Item"), and (iii) the difference, if any, between each Closing Item and the amount of the corresponding item set forth in the Estimated Closing Statement, in each case, based on books and records of the Business. For the avoidance of doubt, the Adjustment Statement will include also any Dunnage reimbursable deposits true-up calculations in accordance with the definition of "Inventory Price" and Section 1.9(b). The Adjustment Statement shall be accompanied by reasonable documentation to support the amounts and calculations in the Adjustment Statement and a certificate of each Wine Purchaser confirming that such Wine Purchaser's portions of the Adjustment Statement were prepared in good faith and in accordance with this Agreement. The Adjustment Statement and the amounts set forth in the Adjustment Statement shall be prepared by the Wine Purchasers in accordance with Section 1.9(a) and Section 1.9(b) and the terms and conditions (including definitions) in this Agreement. The

Wine Purchasers may not amend, supplement or modify the Adjustment Statement following its delivery to Sellers.

(d) Sellers shall have thirty (30) calendar days after their receipt of the Adjustment Statement ("Review Period") to review the Wine Purchasers' calculation of the Closing Items. If Sellers dispute any of the Closing Items, Sellers shall notify the Wine Purchasers in writing of such disputed Closing Items within the Review Period, together with the basis therefor and dollar amount thereof ("Dispute Notice"). Except for any Closing Items disputed by Sellers in a Dispute Notice delivered during the Review Period, the Closing Items, as set forth in the Adjustment Statement, shall be final, conclusive and binding on the Parties. If Sellers deliver a Dispute Notice during the Review Period, then the Wine Purchasers and Sellers shall, during the thirty (30) calendar days following the Wine Purchasers' receipt of such Dispute Notice (or such longer period as may be agreed by the Parties, the "Resolution Period"), attempt in good faith to resolve in writing their differences with respect to the matters set forth in the Dispute Notice and any such written resolution shall be final, conclusive and binding on the Parties. All discussions related thereto will be governed by Rule 408 of the Federal Rules of Evidence (as in effect as of the Effective Date) and any applicable similar state rule, unless otherwise agreed in writing by Sellers and Purchaser.

(e) Accounting Firm Resolution.

(i) "Independent Accounting Firm" means an independent accounting firm of regional or national reputation, which shall initially be Kroll, LLC (or, if Kroll, LLC is unwilling or unable to serve as the Independent Accounting Firm, another regionally or nationally recognized accounting or valuation firm mutually acceptable to Purchaser and Sellers); provided that the Independent Accounting Firm shall only be engaged if, at the time of such engagement, it had not had a material relationship with any Seller, Wine Purchaser, or any of their respective Affiliates within the two (2) year period prior to such engagement; provided further that if Kroll, LLC had such a relationship or the Independent Accounting Firm resigns or expressly states its refusal for any reason to resolve any matters set forth in the Dispute Notice in accordance with Section 1.9, the Parties shall submit the matter to another independent accounting firm of regional or national reputation reasonably acceptable to the Parties to resolve the remaining matters in dispute, and such firm shall be the Independent Accounting Firm for all purposes of this Agreement.

(ii) If, at the end of the Resolution Period, any Closing Items remain in dispute, then each of the Wine Purchasers and Sellers shall submit all items remaining in dispute to, and Sellers and the Wine Purchasers shall execute a customary engagement letter with, the Independent Accounting Firm for resolution. The Wine Purchasers and Sellers shall cooperate fully with the Independent Accounting Firm so as to enable the Independent Accounting Firm to make its determination as quickly and as accurately as practicable.

(iii) The Independent Accounting Firm will be instructed to consider only those items and amounts (as set forth on the Adjustment Statement or Dispute Notice, respectively) that are identified as being items and amounts to which the Wine Purchasers and Sellers have been unable to agree and send to the Wine Purchasers and Sellers, within thirty (30) days of the date on which such dispute is referred to such Independent Accounting Firm, its written determination on each specific matter in dispute as set forth in the Dispute Notice (and the basis for its determination), which determination shall be final, binding and non-appealable on all Parties and will not be subject to appeal or further review. Any failure by the Independent Accounting Firm to comply with any deadline or time period contained in this Section 1.9(e) shall not render the determination of the Independent Accounting Firm invalid. With respect to each amount in dispute, the Independent Accounting Firm's determination, if not in accordance with the position of either Sellers or the Wine Purchasers, shall not be in excess of the higher, nor less than the lower, of the amounts advocated by Sellers in the Dispute Notice or by the Wine Purchasers in the Adjustment Statement with respect to such disputed amount. The Independent Accounting Firm shall make its determination of any matters in dispute based solely on the information submitted by Sellers and the Wine Purchasers in accordance with this Agreement, as well as the terms and conditions of this Agreement, and acting only as an expert and not as an arbitrator. Neither the Wine Purchasers nor Sellers shall, and shall cause their Affiliates and Advisors not to, have any *ex parte* contact with the Independent Accounting Firm with respect to this Agreement. However, upon request from the Independent Accounting Firm, or as mutually agreed by the Parties in writing, the Parties may meet with the Independent Accounting Firm so long as representatives of both Parties are present (including by telephone or videoconference) at such meeting (and have the opportunity to speak) and the Independent Accounting Firm may consider any oral submissions made at such meeting in making its determination.

(iv) The fees and expenses of the Independent Accounting Firm pursuant to this Section 1.9(e) shall be allocated by the Independent Accounting Firm between the Wine Purchasers and Sellers based on the portion of the contested amount with respect to which each Party did not prevail relative to the aggregate contested amount (*i.e.*, for illustrative purposes only, if Sellers prevailed with respect to 40% of the aggregate contested amount, then Sellers would be responsible for 60% of such fees and expenses).

(v) The Independent Accounting Firm will have exclusive jurisdiction over, and resort to the process involving the Independent Accounting Firm as provided in this Section 1.9(e) will be the only recourse and remedy of the Parties against one another with respect to, any disputes arising out of or relating to the adjustments pursuant to this Section 1.9.

(vi) The substance of the Independent Accounting Firm's determination shall not be subject to review or appeal; provided that the foregoing shall not prohibit a Party from instituting litigation to enforce any final determination of any Closing Items by

the Independent Accounting Firm pursuant to this Section 1.9(e) in any court of competent jurisdiction in accordance with this Agreement.

(f) The "Final Cash Payment" shall be equal to the Cash Payment resulting from the Closing Items as finally determined pursuant to this Section 1.9. Within three (3) Business Days after the determination of the Final Cash Payment:

(i) if the Final Cash Payment is less than the Estimated Cash Payment, then an amount equal to the absolute value of such difference shall be disbursed from the Escrow Fund to the applicable Wine Purchasers; provided, however, that, if the Escrow Fund is insufficient to pay the amount of such difference, Sellers shall pay to the applicable Wine Purchasers the amount of such difference *minus* the amount of the Escrow Fund within three (3) Business Days in immediately available funds to an account designated in writing by each Wine Purchaser as to the amount owed to that Wine Purchaser; or

(ii) if the Final Cash Payment is greater than the Estimated Cash Payment, the Wine Purchasers shall pay to Sellers an aggregate amount equal to such difference, with each Wine Purchaser paying the difference between such Wine Purchaser's portion of the Estimated Cash Payment and such Wine Purchaser's portion of the Final Cash Payment.

**Section 1.10 Escrow Release.**

(a) On the Business Day following the date that is fifteen (15) months following the Closing Date (the "Final Release Date"), the Seller Representative and Wine Purchaser Representative will, pursuant to the Escrow Agreement, instruct the Escrow Agent to distribute from the Escrow Account an amount (which may not be less than zero) equal to (i) all of the Escrow Fund then remaining *minus* (ii) the sum of (A) if any of the Wine Purchasers has, by the Final Release Date, duly, timely and validly delivered in good faith in accordance with Section 8.2 one or more notices of a claim or claims for indemnification pursuant to Section 8.2 and such claims remain unresolved as of such date, the aggregate amount of the good faith estimate of the amount of Losses incurred or expected to be incurred by the applicable Purchaser Indemnified Part(ies) as set forth in such notices, *plus* (B) if, by the Final Release Date, the Seller Representative and Wine Purchaser Representative have duly and validly delivered to the Escrow Agent pursuant to the Escrow Agreement, one or more instructions to distribute funds from the Escrow Account and such funds have not been distributed by the Final Release Date, the aggregate amount of funds so instructed and not distributed.

(b) Within three (3) Business Days after the determination of the Final Cash Payment pursuant to Section 1.9, if the absolute value of the difference between the Final Cash Payment and the Estimated Cash Payment is less than the Inventory Escrow Portion, the Seller Representative and Wine Purchaser Representative shall instruct the Escrow Agent to release to Sellers the excess of the Inventory Escrow Portion over such difference; provided, however, that, for the avoidance of doubt, (i) the Wine Purchasers' right to recover amounts from the Escrow Fund in connection with the purchase price true-up under Section 1.9(f) shall not be limited to the

Inventory Escrow Portion, and (ii) if the amounts owed to the Wine Purchasers in connection with the purchase price true-up under Section 1.9(f) exceed the Inventory Escrow Portion, the Wine Purchasers may elect, in their sole discretion, to (A) require Sellers to pay such excess amount directly to the Wine Purchasers or (B) recover such excess amount from the remaining portion of the Escrow Fund.

(c) If any amount withheld pursuant to clause (ii)(A) of Section 1.10(a) is resolved following the Final Release Date, the Seller Representative and Wine Purchaser Representative will, within two (2) Business Days following such resolution, jointly instruct the Escrow Agent to distribute such amounts to the Party in whose favor the resolution was made.

**Section 1.11 Receivables Collection.**

(a) Each Wine Purchaser agrees that, for a period of 35 days from and after the Closing, such Wine Purchaser shall, at Sellers' request offer reasonable assistance to Sellers with respect to Sellers' collection of the accounts receivable of the Wine Business existing as of the Closing, it being understood that the collection of such accounts receivable shall be the responsibility of Sellers.

(b) With respect to payments received relating to accounts receivable of the Wine Business, (i) for any amounts received as a result of any electronic funds transfer (EFT) from a customer initiated by a Wine Purchaser shall be applied solely to such Wine Purchaser's accounts receivable from such customer, and (ii) for any amounts received by any Wine Purchaser, as applicable, or Seller from payments initiated by a Supplier itself, unless such payment clearly identifies which invoice(s) it applies to or the amount of the payment unequivocally aligns with a specific invoice (in which case such payment shall be applied to such invoice(s)), such collections shall be applied first to the oldest invoice of the applicable customer that is then outstanding.

(c) Within five (5) Business Days following the 35th day following the Closing Date, each Wine Purchaser shall pay to Sellers any proceeds collected by such Wine Purchaser pursuant to Section 1.11(a) through such 35th day. Any further proceeds of Sellers' accounts receivable received by any Wine Purchaser after such 35th day will be promptly paid over to Sellers.

(d) For the avoidance of doubt, each Wine Purchaser's obligations under this Section 1.11 shall only apply with respect to collections of accounts receivable from Suppliers whose Contracts are Wine Business Acquired Assets of such Wine Purchaser.

**Section 1.12 Withholding.** The Wine Purchasers shall be entitled to deduct and withhold any Taxes from any amounts otherwise payable by such Wine Purchaser pursuant to this Agreement to the extent required by applicable Tax Law, and, to the extent any such Taxes are withheld, such Taxes shall be paid over by such Wine Purchaser to the applicable taxing authority and shall be treated as amounts paid under this Agreement. However, each Wine Purchaser acknowledges and agrees that no such withholding will occur with respect to any Seller if such Seller provides to such Wine Purchaser an IRS Form W-9 executed by such Seller or such Seller's

regarded owner for U.S. federal income Tax purposes. Prior to making any such deduction or withholding, each Wine Purchaser shall use commercially reasonable efforts to (i) give notice to the Seller in respect of which such deduction or withholding is proposed of such proposed deduction or withholding, and (ii) cooperate with any reasonable request by such Seller to reduce or eliminate such withholding or deduction.

**Section 1.13 Other Tax Matters**. The Parties intend for U.S. federal and applicable state and local income Tax purposes that any payments made pursuant to Section 1.9(f), Section 1.10 and Section 1.11(c) be treated as an adjustment to the Purchase Price, and shall act for all Tax purposes consistently therewith (including filing Tax returns), and shall not take any Tax position inconsistent therewith, unless otherwise required by applicable Law.

**Section 1.14 Allocation of Purchase Price**. The Wine Purchasers and Sellers will allocate the Purchase Price among the Wine Business Acquired Assets, the assets of the ADA Entity, and the assets of the Real Estate Entity for all applicable Tax purposes in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code") and the Treasury regulations promulgated under the Code (and any such similar applicable provision of state or local Tax Law, as appropriate), and the methodology set forth on Schedule 1.14 (the "Allocation Methodology"). As soon as commercially practicable, but no later than seventy-five (75) days following the determination of the final Purchase Price, the Wine Purchaser Representative, after consultation with each Wine Purchaser, and acting on behalf of all of the Wine Purchasers, shall provide a proposed allocation to Sellers setting forth the allocation of the Purchase Price among the Wine Business Acquired Assets, the assets of the ADA Entity, and the assets of the Real Estate Entity, including schedules setting forth the portion of such allocation attributable to each Wine Purchaser's applicable acquired assets, in accordance with the Allocation Methodology (the "Allocation") for Sellers' review, comment and consent (such consent not to be unreasonably withheld, conditioned or delayed). If Seller Representative delivers a written objection within thirty (30) days after receipt of the draft Allocation, then Seller Representative and the Wine Purchaser Representative, in consultation with the applicable Wine Purchaser or Wine Purchasers to which such objection relates, shall negotiate in good faith to resolve any such objection. If Seller Representative and the Wine Purchaser Representative cannot resolve such dispute within thirty (30) days of such Wine Purchaser Representative's receipt of Sellers' objection, then such dispute shall be submitted for resolution pursuant to the dispute resolution provisions provided for in Section 1.9 applied *mutatis mutandis*, and the resolution of such dispute shall be final and binding on the Parties, as applicable. The Parties and their respective Affiliates shall file all Tax returns in accordance with such agreed Allocation (as finally determined under this Section 1.14) and shall not take any Tax-related action inconsistent with the Allocation, in each case, unless otherwise required by applicable Tax Law. The Allocation will be adjusted to reflect any adjustments and other changes to the Purchase Price pursuant to this Agreement.

**Section 1.15 Tax Treatment**. The Sellers and the Purchaser intend that, for U.S. federal and applicable state and local income Tax purposes, (i) each of (A) the distribution of the Equity Securities of NW&S pursuant to Section 1.5(a), (B) the contribution of the Escanaba Owned Real Property and Leased Real Property pursuant to Section 1.5(b), and (C) the contribution of the

Livonia Owned Real Property pursuant to Section 1.6(a), be disregarded, (ii) the Purchaser's acquisition of the ADA Interest pursuant to Section 1.5(c) be treated as a taxable purchase of the ADA Entity's assets by Purchaser from the JV under Section 1001 of the Code, (iii) the sale of the RE Newco Interest pursuant to Section 1.6(b) be treated as a transaction described under Internal Revenue Service Revenue Ruling 99-5, 1999-6 I.R.B., *Situation 1*, and (iv) each distribution described in Section 1.6(c) be treated as a distribution governed by Section 731 of the Code. No Party shall take any Tax position inconsistent with such treatment unless otherwise required by applicable Tax Law.

## ARTICLE II
## CLOSING

**Section 2.1** **Closing**. The closing of the Transactions (the "Closing") shall take place at a single closing, and at the Closing the following steps shall occur in the following order: (i) the distribution by the ADA Entity of the Equity Securities of NW&S to the JV and the contribution by the JV of the Escanaba Owned Real Property and assignment of the Leases for the Leased Real Property to the ADA Entity, in each case in accordance with Section 1.5; (ii) the contribution by the JV of the Livonia Owned Real Property to the Real Estate Entity in accordance with Section 1.6; (iii) the sale, assignment, conveyance, transfer and delivery of all of Sellers' right, title, and interest in and to the applicable Wine Business Acquired Assets to the applicable Wine Purchasers and the assumption by the applicable Wine Purchaser of the applicable Wine Business Assumed Liabilities; (iv) the surrender and termination of all wholesaler, importer, warehouse, and/or other licenses under the Michigan Liquor Control Code held by Sellers; (v) the sale, assignment, conveyance and delivery of the ADA Interest to Purchaser; (vi) the sale, assignment, conveyance and delivery of the RE Newco Interest to Purchaser; (vii) the payment by the Wine Purchasers of the Estimated Cash Payment; and (viii) the distribution by the JV of the remaining Equity Securities of the Real Estate Entity to the NWS Member and of an amount equal to the Livonia Real Estate Price to the RNDC Member. The Closing shall be deemed to be effective as of the Calculation Time. The Closing shall take place by telephone conference and electronic exchange of documents on the third (3rd) Business Day following the date upon which all of the conditions precedent set forth in Section 6.1 and Section 6.2 (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions) are satisfied or waived by the Party entitled to the benefit of such condition, or at such other place and time or on such other date, in each case as is mutually agreed in writing by Seller Representative and Wine Purchaser Representative (after consultation with the Wine Purchasers) (the date on which the Closing occurs in accordance with this Section 2.1 the "Closing Date").

**Section 2.2** **Non-Assignable Items**.

(a) To the extent that any Seller's rights under any agreement, Contract, commitment, lease, permit or other Wine Business Acquired Asset may not be assigned without the consent of another Person, such consent has not been obtained prior to Closing, and the Closing occurs, this Agreement does not constitute an agreement to assign such rights if an assignment or

attempted assignment of such rights would constitute a breach of such Wine Business Acquired Asset or be unlawful.

(b) Except with respect to the Distribution Rights and related Inventory, if any such consent shall not be obtained, until the earliest of (i) such time as such consent is obtained, (ii) six (6) months following the Closing, and (iii) the dissolution of the applicable Seller, Sellers and Wine Purchasers shall (A) use reasonable best efforts to secure such consent as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement, including subcontracting, agency, licensing, or sublicensing to the applicable Wine Purchaser any or all of such Seller's rights and obligations with respect to any such asset, under which (x) such Wine Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on such Seller or its Affiliates or any direct costs associated with the retention and maintenance of such asset incurred by such Seller or its Affiliates) with respect to such asset and (y) such Wine Purchaser shall assume and timely discharge any related burden and obligation with respect to such asset. Upon satisfying any such consent requirement after the Closing, such Seller shall transfer to such Wine Purchaser and such Wine Purchaser shall accept such Seller's right, title, and interest in and to such Wine Business Acquired Asset in accordance with the terms of this Agreement.

(c) The Parties agree that receipt of the Supplier Approvals in accordance with Section 6.2(o) is a condition precedent to Closing. In the event any Supplier Approval is not obtained from any Supplier prior to the Closing Date (in each case, a "Withholding Supplier"), either by an affirmative rejection by such Supplier or by such Supplier's failure to provide such Supplier's consent on or prior to the Closing, then (i) Sellers shall continue to cooperate with each Wine Purchaser and use their best efforts after the Closing to assist the Wine Purchasers in obtaining all remaining Supplier Approvals, and (ii) subject to Section 6.2(o), the Closing shall proceed on the Closing Date. If any Supplier Approval is not obtained within a reasonable period of time after the Closing, the Parties will cooperate in the alternative sale or disposition of those remaining Distribution Rights and related Inventory and the proceeds from the sale thereof shall be paid to the applicable Wine Purchasers as an adjustment to the Purchase Price.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Schedules delivered by Sellers concurrently with this Agreement and subject to Section 9.5, the Sellers, jointly and severally, represent and warrant to Purchaser as of the Effective Date and as of the Closing (as though made then and as though the Closing Date was substituted for the date of this Agreement throughout this Article III) as follows:

**Section 3.1** **Organization; Good Standing**. Each of JV, ADA Entity, NW&S, and L&L is a Michigan limited liability company duly organized, validly existing and in good standing under the Laws of the State of Michigan and has the power and authority to carry on its business as now being conducted and to own and operate the properties and assets now owned and being

operated by it. No Seller is a debtor in the Bankruptcy Cases or in any other proceeding under the Bankruptcy Code. The RNDC Member has full power and authority, subject only to entry of the Approval Order, to consummate the Transactions, and no Bankruptcy Case, debtor-in-possession financing Order, lien, claim, stay, objection or other bankruptcy-related restriction will impair the transfer of the ADA Interest, the transfer of the RE Newco Interest, the release or distribution of proceeds, the conveyance of the Owned Real Property to the ADA Entity or the Real Estate Entity, as applicable, or the consummation of the Transactions following entry of the Approval Order.

**Section 3.2 Qualifications**. Neither the operation of the Businesses nor the character of the properties owned, leased or operated by Sellers in connection with the Businesses requires Sellers to be licensed or qualified to do business as a foreign limited liability company in any jurisdiction other than the Territory, except as would not reasonably be expected to be material to the Businesses.

**Section 3.3 Authority, Enforceability**.

(a) Subject to entry of the Approval Order with respect to the RNDC Member in its capacity as a member of the JV (and without the need for any other approval or consent of the Bankruptcy Court, or any other creditor, equityholder or other party in interest), Sellers have full power and authority to enter into this Agreement and to carry out their obligations under this Agreement, and to consummate the Transactions. The execution, delivery and performance of this Agreement and the other agreements and documents to be executed and delivered pursuant to the provisions of this Agreement (the "Transaction Documents") to which such Seller is party have been duly authorized by all necessary corporate or limited liability company action, as applicable, on the part of such Sellers. The Approval Order, when entered, will be sufficient to authorize the RNDC Member's execution, delivery and performance of the Transaction Documents to which it is a party and its exercise of all voting, consent, governance and approval rights necessary to consummate the Transactions.

(b) Subject to entry of the Approval Order with respect to the RNDC Member in its capacity as a member of the JV (and without the need for any other approval or consent of the Bankruptcy Court, or any other creditor, equityholder or other party in interest), this Agreement and each of the Transaction Documents to which either RNDC Member or any of the Sellers are a party have been (or, in the case of Transaction Documents to be delivered at the Closing, will be) duly executed and delivered on behalf of the RNDC Member or the applicable Seller (as the case may be) and are (or at the Closing will be) legal, valid and binding obligations of the RNDC Member or the applicable Seller (as the case may be), enforceable against the RNDC Member or the applicable Seller (as the case may be) in accordance with their terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or other laws or equitable principles relating to or affecting the enforcement of creditors' rights (the "Enforceability Exceptions").

(c) Sellers are not transferring any of the Wine Business Acquired Assets with any intent to hinder, delay, or defraud any of their creditors. RNDC Member is not transferring its

direct or indirect equity interest in the Sellers with any intent to hinder, delay, or defraud any of its (or its Affiliates') creditors.

**Section 3.4** **No Conflict or Violation**. Subject to entry of the Approval Order with respect to the RNDC Member in its capacity as a member of the JV, except with respect to Distribution Rights, and except as set forth on Schedule 3.4, the execution, delivery and performance by the RNDC Member, the NWS Member, and the Sellers of this Agreement and the Transaction Documents (as applicable) and the consummation of any of the Transactions will not (a) result in a violation or breach of, or default under, or conflict with the Organizational Documents of the RNDC Member, the NWS Member, or any Seller, (b) conflict with, result in a breach of or default by RNDC Member, the NWS Member, or any Seller (with or without notice or lapse of time, or both), require the consent or notification of any third party (including any Supplier), or give rise to any right of modification, acceleration, payment, cancellation or termination, or in any manner release any party thereto from any obligation, in each case, under any Material Contract, Wine Business Assigned Contract (including any Contract that is deemed not assigned pursuant to Section 2.2), (c) conflict with, result in a breach or default by a Seller (with or without notice or lapse of time, or both) under any other Contract to which the Seller is a party, in each case, in a manner that would result in the right to modify, cancel, or terminate any Transaction, (d) be prohibited by, or require a Seller to obtain or make any consent, authorization, approval, registration or filing under, any statute, Law, ordinance, regulation, rule, judgment, decree or Order of any court or governmental agency, board, bureau, body, department or authority, except such filings and notices as may be required under the Federal Worker Adjustment and Retraining Notification Act of 1988, as amended, set forth at 29 United States Code Section 2101 et seq. and any similar Laws (the "WARN Act"), or (e) result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) upon or give to any other Person (other than Wine Purchasers) any interest or right (including any right of termination or cancellation) in or with respect to, any of the Wine Business Acquired Assets except, in the case of clauses (b) through (d), as would not, individually or in the aggregate, reasonably be expected to be material to the Business taken as a whole.

**Section 3.5** **Financial Statements**.

(a) Attached to Schedule 3.5(a) are copies of the unaudited consolidated balance sheet and statement of income of Sellers as of and for (i) the calendar year ended December 31, 2025, and (ii) the seven (7)-month period ended July 31, 2026 (collectively, the "Financial Statements"). The Financial Statements were prepared from the books and records of Sellers, in accordance with the Transaction Accounting Principles, consistently applied, and fairly present in all material respects the financial condition and results of operations of Sellers as of the dates and for the periods indicated, subject only to normal year-end adjustments and the absence of footnotes.

(b) Set forth in or attached to Schedule 3.5(b) are, for the twelve (12) month period ended on December 31, 2025 and the seven (7)-month period ended July 31, 2026, (i) with respect to the Wine Business, (A) sales volume in dollars by Brand and Supplier in the Territory,

(B) the Gross Profit by Brand in the Territory, (C) brokerage commissions received by each Seller from Suppliers in the Territory, and (D) service based revenue (*e.g.*, split case fees, delivery fees, or retailer penalties) in the Territory, and (ii) with respect to the ADA Business, the revenues, fees and brokerage commissions received by each Seller in connection with the operation of the ADA Business in the Territory. All such information (X) is true, correct, and complete in all material respects and (Y) was prepared in good faith from Sellers' books and records using methodologies consistent with past practice.

**Section 3.6** **Undisclosed Liabilities**. Except as set forth on Schedule 3.6, the ADA Entity does not have any liability or obligation of the type required to be accrued on or reserved against in a consolidated balance sheet prepared in accordance with GAAP, except for: (a) liabilities and obligations reflected on, accrued on or reserved against in the Financial Statements or disclosed in the notes to the Financial Statements, (b) liabilities and obligations incurred after the date of the most recent balance sheet included in the Financial Statements in the Ordinary Course, (c) liabilities arising after the Effective Date in connection with the Transactions, (d) liabilities to be included in the computation of Closing Indebtedness or Transaction Expenses, (e) liabilities to be included in the computation of Closing Current Liabilities, (f) liabilities disclosed in another section of the Schedules, and (g) other liabilities that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. This representation will not be deemed breached as a result of a change in applicable Law, the Code or GAAP after the Effective Date.

**Section 3.7** **Absence of Certain Changes**. Except as set forth on Schedule 3.7, since the date of the most recent balance sheet included in the Financial Statements through the Effective Date, Sellers (y) have conducted the Business only in the Ordinary Course in all material respects, except for processes of Sellers and their Affiliates to potentially sell assets or lines of business, including the Transactions, and including the activities related to such processes (such as solicitations of interest, providing diligence materials, engaging in negotiations and evaluations), the engagement of legal, restructuring, and banking Advisors with respect to recent operational and liquidity challenges of Sellers and their Affiliates, negotiating with their creditors with respect to such matters, and amendments to the credit facilities of Sellers and their Affiliates, and (z) have not, in connection with or relating to the Business or the Wine Business Acquired Assets:

(a) suffered any event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b) materially changed any method of accounting or accounting practice for the Business, except as required by GAAP or as disclosed in the notes to the Financial Statements;

(c) commenced, settled or compromised any litigation, arbitration, governmental investigation or other Action involving the Business;

(d) sold, transferred, assigned, distributed, leased to others or otherwise disposed of any material portion of the Wine Business Acquired Assets or any assets of the ADA Business, except for inventory sold in the Ordinary Course, or canceled or compromised any debt

or claim, or waived or released any right of substantial value, in each case, that is included in the Wine Business Acquired Assets or ADA Business;

(e) delayed or deferred material maintenance or repairs on any of the Wine Business Acquired Assets or any assets of the ADA Business, including owned and leased transportation equipment that is included in the Wine Business Acquired Assets or that is an asset of the ADA Business;

(f) transferred or granted any rights under, or entered into any settlement regarding the breach or infringement of, any Distribution Rights, or modified any existing rights with respect to any Distribution Rights;

(g) suffered any damage, destruction or loss, in each case, to any tangible Wine Business Acquired Assets or any assets of the ADA Business, whether or not covered by insurance, that would reasonably be expected to be material to the Business;

(h) been the subject of any labor union organizing activity, or had any employee strikes, work stoppages, concerted slowdowns or lockouts by or with respect to Business Employees;

(i) (i) granted any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of any current or former employees, officers, directors, independent contractors or consultants of the Business, other than in the Ordinary Course, (ii) changed the terms of employment for any employee of the Business or any termination of any employees for which the aggregate costs and expenses exceed $10,000, (iii) accelerated the vesting or payment of any compensation or benefit for any current or former employee, officer, director, consultant or independent contractor of the Business, (iv) entered into, amended or terminated any employment, severance, retention, change-in-control, consulting or similar agreement with any Business Employee or service provider; or (v) adopted, materially amended or terminated any ADA Benefit Plan;

(j) acquired any business (whether by asset sale, merger or otherwise), equity interests or other investments outside the Ordinary Course; or

(k) authorized any of the foregoing or entered into an agreement to do any of the foregoing.

**Section 3.8 Wine Business Acquired Assets; ADA Business Assets.**

(a) Except as set forth on Schedule 3.8(a), Sellers have good and valid title to all of the Wine Business Acquired Assets free and clear of all Encumbrances, other than Permitted Encumbrances. Sellers have the right to convey, and at the Closing Sellers will have conveyed, or shall have caused to be conveyed, to Wine Purchasers good and valid title to their Wine Business Acquired Assets, free and clear of all Encumbrances, other than Permitted Encumbrances. Except as set forth on Schedule 3.8(a), there are no existing agreements, options, commitments or rights

granted by or on behalf of Sellers to or in any third party to acquire any of their Wine Business Acquired Assets or any interest therein.

(b) Except (i) as set forth on Schedule 3.8(b), (ii) the Excluded Assets (including cash and cash equivalents, deposits, accounts receivable, prepaid expenses, Permits that are not transferable, Contracts that are not Wine Business Assigned Contracts, intellectual property and insurance policies), (iii) employees that do not become Transferred Employees and Benefit Plans, (iv) the assets, properties and rights and corporate-level services and enterprise-wide services and benefits provided to the Businesses by Sellers' Affiliates, (v) the assets, properties, and services provided under the Transition Services Agreement, and (vi) any Equipment, Leases or Leased Real Property that are not Wine Business Acquired Assets, (A) the Wine Business Acquired Assets include the assets owned by Sellers in connection with the Wine Business, (B) the Wine Business Acquired Assets, together with the assets, properties and rights held by the ADA Entity and the Real Estate Entity as of the Closing, are sufficient to enable Wine Purchasers, the ADA Entity, and the Real Estate Entity, collectively, to conduct the Businesses immediately after the Closing in all material respects in the manner in which the Businesses are currently conducted, and (C) there are no material assets or properties used in the operation of the Businesses as currently conducted that are owned by any Person other than Sellers, the ADA Entity, and the Real Estate Entity that will not be leased or licensed to Wine Purchasers, the ADA Entity, or the Real Estate Entity under valid, current leases or license arrangements.

(c) All of the material tangible property included in Sellers' Wine Business Acquired Assets is in operating condition and repair in all material respects to be usable in the Ordinary Course, subject to ordinary wear and tear, has been maintained in all material respects in accordance with customary industry practice and suitable in all material respects for the purposes for which it presently is used.

(d) All of the material tangible property of the ADA Entity is in adequate operating condition and repair in all material respects to be usable in the Ordinary Course, subject to ordinary wear and tear and suitable in all material respects for the purposes for which it presently is used.

**Section 3.9 Equity Interests**.

(a) Schedule 3.9(a) sets forth all of the issued and outstanding Equity Securities of the ADA Entity and the record and beneficial owner thereof, in each case as of immediately prior to the sale described in Section 1.5(c) and Section 1.6(b). All such Equity Securities have been duly authorized and validly issued and were not issued in violation of any preemptive or similar rights. Except as set forth on Schedule 3.9(a), there are no Equity Securities of the ADA Entity issued or outstanding.

(b) The JV owns the ADA Interest of record and beneficially, free and clear of all Encumbrances other than Permitted Encumbrances and restrictions on transfer arising under applicable securities Laws, and has full power and authority to sell, transfer, assign, convey and deliver the ADA Interest to Purchaser in accordance with this Agreement. The ADA Interest

constitutes one hundred percent (100%) of the issued and outstanding Equity Securities of the ADA Entity.

(c) There are no outstanding options, warrants, convertible or exchangeable securities, purchase rights, subscription rights, calls, puts or commitments obligating either the ADA Entity to issue, deliver, sell, repurchase or redeem any Equity Securities of the ADA Entity.

(d) Except as set forth on Schedule 3.9(a), the ADA Entity does not own, directly or indirectly, any Equity Securities of any other Person, and, immediately prior to the sale described in Section 1.5(c), after giving effect to the distribution described in Section 1.5(a), the ADA Entity will not own, directly or indirectly, any Equity Securities of NW&S, L&L or any other Person.

**Section 3.10 Real Estate Entity**. As of the Closing:

(a) All of the issued and outstanding Equity Securities of the Real Estate Entity will be owned, of record and beneficially, by the JV, free and clear of all Encumbrances other than restrictions on transfer arising under applicable securities Laws, and there will be no other Equity Securities of the Real Estate Entity issued or outstanding. All such Equity Securities will have been duly authorized and validly issued and will not have been issued in violation of any preemptive or similar rights.

(b) The RE Newco Interest will constitute fifty percent (50%) of the issued and outstanding Equity Securities of the Real Estate Entity.

(c) There will be no outstanding options, warrants, convertible or exchangeable securities, purchase rights, subscription rights, calls, puts or commitments obligating the Real Estate Entity to issue, deliver, sell, repurchase or redeem any Equity Securities of the Real Estate Entity.

(d) The Real Estate Entity will not own, directly or indirectly, any Equity Securities of any Person.

(e) The Real Estate Entity will have no liabilities other than (i) liabilities incurred under applicable Law in connection with the formation of the Real Estate Entity under such Law, (ii) liabilities arising in connection with the Transactions, and (iii) liabilities, if any, related to the Livonia Owned Real Property; provided that, notwithstanding the foregoing, the Real Estate Entity will have no Indebtedness as of the Closing.

**Section 3.11 Real Property**.

(a) Schedule 3.11(a) sets forth the street address of each parcel of real property held for use primarily in connection with the Business and owned by Sellers and the current owner of each such parcel (the "Owned Real Property"). With respect to each parcel of Owned Real Property: (i) such Seller has good and marketable indefeasible fee simple title to such Owned Real

Property, free and clear of all Encumbrances, except Permitted Encumbrances; (ii) except as set forth in Schedule 3.11(a), such Seller has not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; (iii) such Seller is not in breach or default and such Seller has not caused a breach or default under any material restrictive or other covenant encumbering such Owned Real Property; and (iv) other than the right of Purchaser pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein.

(b) Schedule 3.11(b) sets forth the address of each parcel of real property held for use in connection with the Business of Sellers and leased by Sellers (the "Leased Real Property") and the lease documents (collectively, the "Leases") pursuant to which each Leased Real Property is leased by Sellers. Sellers have delivered to Purchaser a true and complete copy of each such Lease. Except as set forth in Schedule 3.11(b), with respect to each of the Leases: (i) such Lease is legal, valid, binding, enforceable and in full force and effect (subject to the Enforceability Exceptions); (ii) Sellers' possession and quiet enjoyment of such Leased Real Property under such Lease has not been disturbed, and to Sellers' Knowledge, there are no disputes with respect to such Lease; (iii) neither Sellers nor, to Sellers' Knowledge, any other party to such Lease is in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Lease, in each case, that would reasonably be expected to be material to the Business; (iv) the other party to such Lease is not an Affiliate of any Seller; (v) Sellers have not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; and (vi) Sellers have not collaterally assigned or granted any other security interest in such Lease or any interest therein.

(c) The Owned Real Property constitutes all real property owned by Sellers and the Real Estate Entity, as applicable, and, together with the Leased Real Property, constitutes all the real property used primarily in the Businesses. All buildings, structures, improvements, fixtures, building systems, and equipment, and all components thereof, included in the Owned Real Property and the Leased Real Property (the "Improvements") are in good condition and repair and sufficient for the operation of the Business. There are no structural deficiencies or latent defects affecting any of the Improvements and there are no facts or conditions affecting any of the Improvements which would, individually or in the aggregate, reasonably be expected to interfere in any material respect with the use or occupancy of the Improvements or any portion thereof in the operation of the Business.

(d) There are no pending, or to Sellers' Knowledge, threatened condemnation proceedings, lawsuits or administrative actions relating to the Owned Real Property that would reasonably be expected to be material to the current use, occupancy, or value thereof.

(e) To Sellers' Knowledge, there are no improvements to be done to or on or about the Owned Real Property that would reasonably be expected to create any obligation against the Owned Real Property after Closing.

(f) To Sellers' Knowledge, all water, gas, electrical, steam, compressed air, telecommunications, sanitary and storm sewage lines and systems and other similar systems necessary for the use of the Owned Real Property are installed and operating in a manner sufficient in all material respects to enable the Owned Real Property to be used and operated in the manner being used and operated as of the Effective Date.

(g) To Sellers' Knowledge, the JV has or will have at Closing the unconditional right to obtain and will convey, transfer and assign to (a) the ADA Entity, good, marketable, indefeasible and insurable fee simple title to the Escanaba Owned Real Property, and (b) the Real Estate Entity, good, marketable, indefeasible and insurable fee simple title to the Livonia Owned Real Property, in each case free and clear of any deeds of trust, mortgages, liens, encumbrances, leases, tenancies, licenses, chattel mortgages, conditional sales agreements, security interests, covenants, conditions, restrictions, judgments, rights-of-way, easements, encroachments, claims and any other matters affecting title or use of the Owned Real Property, except for the Permitted Encumbrances.

**Section 3.12** **Tax Matters**. Except as set forth on Schedule 3.12 or as would not reasonably be expected to result in liability to any Wine Purchaser:

(a) Sellers have duly and timely filed all Tax Returns required to be filed by Sellers with respect to either Business, the Wine Business Acquired Assets, or the assets, operations, or activities of the ADA Entity and the Real Estate Entity. Each such Tax Return is true, correct and complete in all material respects, and was prepared in compliance with all applicable Tax Laws. All Taxes due and payable by any of the Sellers with respect to either Business, the Wine Business Acquired Assets, or the assets, operations, or activities of the ADA Entity and the Real Estate Entity, whether or not shown as due on any Tax Return, have been timely and fully paid, except (i) where Sellers are contesting any such Taxes in good faith or (ii) Taxes the nonpayment of which is permitted or required by the Bankruptcy Code. None of the Sellers, the ADA Entity, or the Real Estate Entity is, with respect to either Business, the Wine Business Acquired Assets, or the assets, operations, or activities of the ADA Entity and the Real Estate Entity, currently the beneficiary of any extension of time within which to file any material Tax Return, other than automatic extensions obtained in the Ordinary Course.

(b) There are no Encumbrances for Taxes upon any of the Wine Business Acquired Assets (or any assets of the Business) nor, to Seller's Knowledge, is any taxing or Governmental Authority in the process of imposing any Encumbrances for Taxes on any of the Wine Business Acquired Assets, the ADA Interest, the RE Newco Interest, or any assets of either the ADA Entity or the Real Estate Entity, other than statutory Encumbrances for current Taxes not yet due and payable or for Taxes the nonpayment of which is permitted or required by the Bankruptcy Code.

(c) No taxing or Governmental Authority in a jurisdiction where Sellers do not file Tax Returns with respect to either Business, the Wine Business Acquired Assets, or the assets, operations, or activities of the ADA Entity and the Real Estate Entity has in the last three years

made a written claim, assertion or threat that a Seller is or may be subject to taxation in such jurisdiction in connection with the Business, any Wine Business Acquired Asset, the ADA Entity, the Real Estate Entity, or the Owned Real Property which has not been fully resolved. No audit, examination, investigation, claim, or other Action relating to Taxes is currently being conducted with respect to (i) the ADA Entity or the Real Estate Entity, (ii) any other Seller with respect to a Michigan state or local Governmental Authority, (iii) either Business, or (iv) any Wine Business Acquired Asset and neither any Seller, the ADA Entity nor the Real Estate Entity has received written notice from any taxing or Governmental Authority threatening or proposing any such audit, examination, investigation, claim, or Action.

(d) Each of the Sellers, the ADA Entity, and the Real Estate Entity has complied in all material respects with all applicable Laws relating to Tax withholding with respect to either Business, the Wine Business Acquired Assets, or the assets, operations, or activities of the ADA Entity and the Real Estate Entity.

(e) No Seller is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2, nor is any Seller subject to income Tax in any jurisdiction outside the United States by reason of the operation of the Businesses.

(f) Sellers are not, and have not been, a party to, or a promoter of, a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b), other than a "loss transaction" under Treasury Regulations Section 1.6011-4(b)(5).

(g) Schedule 3.12(g) accurately and completely sets forth the federal, state and local income Tax classification of each Seller, the ADA Entity, and the Real Estate Entity.

This Section 3.12 (and Section 3.21 to the extent related to Taxes) sets forth the exclusive representations and warranties made with respect to Taxes.

**Section 3.13 Material Contracts**.

(a) Schedule 3.13(a) lists each of the following Contracts (x) by which any of the Wine Business Acquired Assets are bound or affected or (y) to which a Seller is a party or by which a Seller is bound in connection with the Businesses or the Wine Business Acquired Assets (the "Material Contracts"), as of the Effective Date, other than (1) purchase orders or similar instruments that are on the standard form (and consistent with the terms of such form) of the Business (a copy of which is attached to Schedule 3.13(a)) and (2) any Benefit Plan:

(i) that relate primarily to the Business and involve the expenditure or receipt by Sellers of more than $100,000 in any calendar year for any individual Contract, other than Benefit Plans and Contracts with Suppliers;

(ii) under which Sellers lease, hold or operate any tools, furniture, machinery, equipment, vehicles or other personal property owned by any other Person, in

each case, involving $100,000 or more in annual payments and relating primarily to the Business;

(iii) that relate to the Business that (A) require Sellers to pay any severance to officers or employees of Sellers, (B) involve labor provided by an unaffiliated third party, or (C) are with Business Employees or independent contractors or consultants (or similar arrangements) with a base salary of more than $100,000 per year, other than any offer letter or similar document that sets forth the terms of an at will employment arrangement;

(iv) that are Leases;

(v) all Equipment leases that require at least $20,000 per year in annual payments;

(vi) all leases of warehouse and delivery equipment, including forklifts, floor cleaners, motor vehicles, trailers (including special events trailers), any other certified vehicles or automated warehouse systems, in each case, that are used in the ADA Business and require at least $20,000 per year in annual payments;

(vii) with any Governmental Authority;

(viii) all collective bargaining agreements or Contracts with any union (each a "CBA");

(ix) with (A) an Affiliate of a Seller or any other holder of equity interests in a Seller, other than the Organizational Documents of such Seller, or (B) a Seller, on the one hand, and any member, manager, shareholder, officer, director or employee of such Seller or any Affiliate;

(x) any Contract for the employment or other engagement of any individual on a full-time, part-time, consulting, or other basis providing annual compensation in excess of $100,000.00 or providing retention or severance benefits;

(xi) that (A) contains provisions or covenants purporting to restrict or restricting Sellers from competing or engaging in any activity or line of business or within the Territory with any Person in any material respect or (B) grants any exclusive rights to any third party that would be material to the Business or the Wine Business Acquired Assets;

(xii) with Suppliers;

(xiii) service agreements, maintenance agreements, roof warranties and similar agreements, in each case, related to the Owned Real Property;

(xiv) is otherwise material to the Business and the Wine Business Acquired Assets, taken as a whole, and not previously disclosed pursuant to this Schedule 3.13(a).

(b) Except as set forth on Schedule 3.13(b): (i) each Material Contract is in full force and effect and is valid and enforceable by Sellers in accordance with its terms, subject to the Enforceability Exceptions; (ii) Sellers are not in default under or in breach of (or are alleged to be in breach of or default under) any Material Contract; (iii) to Sellers' Knowledge, no other Person is in default under any Material Contract to which such Person is a party; and (iv) Sellers have not received written (or, to Sellers' Knowledge, other) notice that any counterparty to any Material Contract intends to cancel, terminate, not renew, or re-negotiate such Material Contract, in each case of (ii), (iii), and (iv), that would be material to the Business, whether in connection with the Transactions or otherwise. Sellers have delivered to Wine Purchasers true and complete copies of all Material Contracts (including all modifications, amendments and supplements thereto and waivers thereunder). There are no material oral Contracts to which a Seller is a party or by which a Seller is bound that would reasonably be expected to be material to the Businesses.

**Section 3.14 Litigation or Proceedings**.

(a) Except as set forth on Schedule 3.14, (i) there are no actions, suits, proceedings, investigations, claims or orders, either at law or in equity, by or before any commission or other Governmental Authority in any United States or foreign jurisdiction ("Action"), of any kind now pending or, to Sellers' Knowledge, threatened against Sellers with respect to or affecting the Business or the Wine Business Acquired Assets, and (ii) there has not been any such Action against Sellers during the three (3) year period prior to the Effective Date. There are presently no outstanding judgments, decrees or Orders of any Governmental Authority against or affecting Sellers or their Wine Business Acquired Assets.

(b) There are no Actions now pending or, to Sellers' Knowledge, threatened in writing involving Sellers or any of the properties or assets of the Business that (i) question the validity of this Agreement or any Transaction Document, (ii) seek to delay, prohibit or restrict in any manner any of the Transactions or (iii) would reasonably be expected to adversely affect Sellers' performance of their obligations under this Agreement or the consummation of the Transactions.

**Section 3.15 Compliance with Laws**. Except as set forth on Schedule 3.15, (i) Sellers are presently conducting the Businesses in compliance in all material respects with, and have complied at all times since December 31, 2024 in all material respects with, all federal, state, local and foreign statutes, laws, ordinances, regulations, rules, permits, judgments, Orders or decrees of any Governmental Authority ("Law"), including all Laws relating to alcoholic beverage distribution, trade practices, franchise and distribution rights, extension of credit, delivery of products to customers, permits, employment, wage and hour, occupational safety, transportation, data privacy, anti-bribery, sanctions and anti-money laundering, and (ii) since such date, Sellers

have not been fined, disciplined, investigated, audited, cited or notified of any deficiency by any Governmental Authorities that regulates the Businesses.

**Section 3.16 Health, Safety and Environmental Matters**. Except as set forth on Schedule 3.16:

(a) Sellers, with respect to their Wine Business Acquired Assets and their Business, have for the past three (3) years complied in all material respects and are presently complying in all material respects with all Environmental Laws and Safety Requirements. Sellers have obtained all permits, licenses, approvals, consents, authorizations, registrations and certificates required under Environmental Laws (collectively, the "Environmental Permits") for the operation of their Business as currently conducted and all such Environmental Permits are set forth on Schedule 3.16(a). Sellers are in compliance in all material respects with all terms and conditions of such Environmental Permits.

(b) There has not been and currently is no Release of any Hazardous Substance at or into the environment at the Owned Real Property or Leased Real Property related to the Business, including Releases from underground storage tanks, in each case, in a manner that would reasonably be expected to give rise to a liability of Sellers, with respect to the Businesses, or the Wine Business Acquired Assets under Environmental Law. Sellers, with respect to their Wine Business Acquired Assets and their Business, are not subject to any pending or written threatened Environmental Claim.

(c) To Sellers' Knowledge, no Hazardous Substance has been used, generated, stored, manufactured, treated, processed, transported or disposed by Sellers on, to or from their Owned Real Property or Leased Real Property or otherwise related to their Business, except in compliance in all material respects with Environmental Laws.

(d) Sellers have provided to Wine Purchasers copies of all written environmental reports (including environmental site assessment reports), assessments, and analytical results concerning Environmental Laws or Hazardous Substances related to their Owned Real Property and the Leased Real Property and their Business, in each case in their reasonable control or possession.

(e) "Environmental Claim" means any claim, notice of violation, demand, summons, suit, action, injunction, proceeding, penalty, fine, judgment, decree or Order from, by or with any Governmental Authority or private party concerning any Environmental Laws or any Release of any Hazardous Substance into the environment.

(f) "Environmental Laws" means any applicable Law in force and effect on or prior to the Effective Date, pertaining to (i) the protection of the environment or natural resources, (ii) subject to investigation, monitoring, reporting or remediation by a Governmental Authority, (iii) the management, use, generation, transportation, shipment, treatment, storage, disposal, Release, abatement, removal, remediation or handling of, or exposure to, Hazardous Substances or (iv) pollution.

(g) "Hazardous Substance" means any substance, chemical, compound, solid, gas, liquid, radiation, waste, pollutant, contaminant, or material that is (i) regulated, defined or designated as a hazardous substance, hazardous waste, extremely hazardous, carcinogenic, toxic, caustic, a pollutant or a contaminant pursuant to Environmental Laws, (ii) asbestos (in any form or condition), polychlorinated biphenyls, urea formaldehyde, petroleum and petroleum products (including crude oil or any fraction thereof), radioactive materials and lead based paint, or (iii) natural gas, radon gas, synthetic gas and any mixtures thereof.

(h) "Release" means any spilling, leaking, depositing, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Substance) in violation of any Environmental Laws or Environmental Permits.

(i) "Safety Requirements" means all applicable Laws relating to public health and safety, and worker health and safety all as amended and in effect on or prior to the Effective Date, and, in each case, to the extent related to exposure to Hazardous Substances, including the Occupational Safety and Health Act, and other workplace, employee and public safety Laws applicable to the Business (each to the extent related to exposure to Hazardous Substances).

**Section 3.17 Governmental Authorizations and Regulations**. Sellers have all licenses, franchises, permits and other governmental authorizations required by applicable Law for the conduct of the Business as currently conducted. Sellers are in material compliance with all such licenses, franchises, permits and other governmental authorizations. Such licenses, franchises, permits and other governmental authorizations are valid and in full force and effect, and Sellers have not received any written notice that any Governmental Authority intends to cancel, terminate, suspend, revoke, audit, or not renew or commence an Action with respect to any such license, franchise, permit or other governmental authorization. Schedule 3.17 sets forth a list of all material authorizations, approvals, franchises, registrations, certificates of need or authority, consents, Orders, permits and licenses of all Governmental Authorities (the "Permits") held by Sellers relating to the Business or the Wine Business Acquired Assets, including all necessary state, county, and city licenses and other Permits, in each case, as are necessary for the conduct of the Business as currently conducted or ownership of the Wine Business Acquired Assets. Sellers hold all Permits necessary for the lawful conduct of the Business as presently conducted and ownership of the Wine Business Acquired Assets and are in compliance in all material respects with the terms of the Permits.

**Section 3.18 Certain Transactions**. Except (a) as set forth on Schedule 3.18, (b) for employment arrangements with Sellers and Benefit Plans, and (c) for director and officer indemnification and insurance, (d) the assets, properties and rights and corporate-level services and enterprise-wide services and benefits provided to the Business by Sellers' Affiliates, and (e) the assets, properties, and services provided under the Transition Services Agreement, no officer, director, member, manager, employee, shareholder or, to Sellers' Knowledge, Affiliate of Sellers

transacts any business with the Business nor owns or has any interest, in whole or in part, in any Wine Business Acquired Asset.

**Section 3.19 No Illegal Payments; Etc.**. Neither Sellers nor any of Sellers' directors, officers, Affiliates, or, to Sellers' Knowledge, employees or agents, have (a) directly or indirectly given or agreed to give any illegal gift, contribution, payment or similar benefit to any Supplier, customer, governmental official or employee or other Person who was, is or may be in a position to help or hinder Sellers (or assist in connection with any actual or proposed transaction) or (b) made or agreed to make any illegal contribution, or reimbursed any illegal political gift or contribution made by any other person, to any candidate for federal, state, local or foreign public office. Sellers and the Businesses are, and for the past five (5) years have been, in compliance with all applicable anti-bribery, anti-corruption, anti-money laundering, sanctions, trade compliance and alcoholic beverage trade practice Laws, and no Seller, owner, officer, director, employee or agent of a Seller is a sanctioned person or has made any unlawful payment, rebate, inducement, thing of value or other benefit to any Supplier, customer, retailer, governmental official or other Person.

**Section 3.20 Employment Matters**.

(a) Schedule 3.20(a) contains a list, as of the Effective Date, of all employees of the Business (including employees on approved leave of absence or sick leave, or who are absent from active employment by reason of disability or workers' compensation) (collectively, the "Business Employees"), setting forth their name, title, status as exempt or non-exempt, the visa status (if applicable), and annual salary or rate of compensation or contract fee, commission, bonus or other incentive-based compensation, work location, full-time or part-time status, union/CBA status, seniority date, leave status, accrued vacation and other paid time off accruals, whether such individual is assigned to the Wine Business, the ADA Business or both, all of which as of the Effective Date. As of the Effective Date, all compensation, including wages, commissions, bonuses, fees and other compensation, that was required to be paid prior to the Effective Date to all employees, independent contractors or consultants of the Business for services performed on or prior to the date hereof has been paid in full.

(b) Schedule 3.20(b) lists the following information for every individual independent contractor or consultant of the Business ("Independent Contractors") as of the Effective Date: name, responsibilities, date of engagement, and compensation.

(c) Except as would not result in material liability, (i) all Independent Contractors are properly treated as independent contractors under all applicable Laws; (ii) all Business Employees classified as exempt under the Fair Labor Standards Act and state and local wage and hour Laws are properly classified; and (iii) with respect to the Business, Sellers are in compliance with and have complied with all immigration Laws, including Form I-9 requirements and any applicable mandatory E-Verify obligations.

(d) With respect to the Business Employees, except as set forth on Schedule 3.20(d): (i) no trade union, council of trade unions, employee association, employee

bargaining agency or affiliated bargaining agent holds bargaining rights with respect to any of the Business Employees by way of certification, interim certification, voluntary recognition, designation or successor rights; (ii) to Sellers' Knowledge, no trade union, council of trade unions, employee association, employee bargaining agency or affiliated bargaining agent has applied to be certified as the bargaining agent of any of the Business Employees; (iii) there are no current union organizing activities ongoing among the Business Employees; (iv) there is no material unfair labor practice charge or complaint pending or, to Sellers' Knowledge, threatened against any Seller; (v) there is no labor strike, concerted slowdown, concerted work stoppage, or lockout in effect or, to Sellers' Knowledge, threatened against any Seller; and (vi) no Action brought by or on behalf of any Business Employees, former Business Employee, or labor organization representing Business Employees is pending or, to Sellers' Knowledge, threatened. Schedule 3.20(d) lists all collective bargaining agreements, memorandum of understanding, side letters, material arbitrations, or material unfair labor practice charges relating to the Business Employees.

(e) Except with respect to any Business Employee who is not hired by, or is not offered employment with, any Wine Purchaser, or as set forth on Schedule 3.20(e), which may be updated by Sellers on the day preceding the Closing Date, no Business Employees shall have had their employment terminated, been laid off or had their hours reduced by more than fifty percent (50%) by any Seller. Schedule 3.20(e) also identifies all Business Employees who have had their employment terminated, been laid off or had their hours reduced by more than fifty percent (50%) by any Seller since June 1, 2026.

**Section 3.21 Employee Benefits.**

(a) List of Plans. Schedule 3.21(a) lists all material ADA Benefit Plans and material Seller Benefit Plans. For purposes of this Agreement, (i) "Benefit Plan" means each employee benefit plan (as defined in Section 3(3) of ERISA) and each other compensation or benefit plan, policy, program or contract, whether or not subject to ERISA, whether funded or unfunded, whether written or unwritten, whether insured or self-insured, including each pension, retirement, savings, disability, medical, dental, health, life, death benefit, profit sharing, executive compensation, deferred compensation, equity option, equity appreciation, phantom equity, restricted equity, bonus, incentive, vacation, paid time off, sick time, cafeteria plan, flexible spending account, supplemental unemployment, tuition, severance, retention, individual consulting, and change of control plan, but in each case excluding any "multiemployer plan" as defined in Section 3(37) of ERISA and any plan or arrangement maintained or to which contributions are required by a Governmental Authority or applicable Laws; (ii) "ADA Benefit Plan" means each Benefit Plan sponsored or contributed to by the ADA Entity; and (iii) "Seller Benefit Plan" means, other than an ADA Benefit Plan, each Benefit Plan that any Seller or any ERISA Affiliate have any obligation or liability to contribute to or that are maintained, contributed to, or sponsored by any Seller or any ERISA Affiliate, in each case, for the benefit of any current or former members, shareholders, managers, directors, officers, employees, individual service providers, or individual independent contractors of the Businesses, including the family members,

dependents and beneficiaries of such active or former members, shareholders, managers, directors, officers, employees, individual service providers, or individual independent contractors.

(b) Plan Qualification. With respect to any ADA Benefit Plan and Seller Benefit Plan intended to qualify under Section 401 of the Code, such Benefit Plan has been determined by the Internal Revenue Service ("IRS") to be so qualified in form by receipt of an IRS determination letter to the plan sponsor, or by the issuance of an IRS opinion or advisory letter to the prototype plan's sponsor, and no event has occurred and no condition exists with respect to the form or operation of such Benefit Plan that would cause the loss of such qualification. No ADA Benefit Plan or, except as would not result in material liability of the Wine Purchasers, Seller Benefit Plan is currently under examination by the IRS, the Employee Benefit Security Administration, or any Governmental Authority. There have been no non-exempt prohibited transactions as defined in Section 4975 of the Code or Section 406 of ERISA with respect to any Benefit Plan which reasonably would be likely to subject any Wine Purchaser or any of its Affiliates or any ADA Benefit Plans to a material tax or material penalty under Section 4975 of the Code or Section 406 of ERISA.

(c) Material Compliance. All ADA Benefit Plans and, except as would not result in material liability of the Wine Purchasers, all Seller Benefit Plans, are in compliance in all material respects with and have been administered in all material respects in accordance with their terms and in compliance with all requirements of Laws, including the Code and ERISA. The ADA Entity has complied in all material respects with all applicable reporting requirements under Sections 6055 and 6056 of the Code.

(d) Multiemployer and Multiple Employer Plans. Except as set forth on Schedule 3.21(d), the ADA Entity does not sponsor, contribute to or have an obligation to contribute to or have any liability (including on account of any ERISA Affiliate) regarding: (i) a plan that is or has been subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code; (ii) a "multiemployer plan" as defined in Section 3(37) of ERISA; (iii) a plan sponsored by two or more contributing sponsors at least two of whom are not under common control (within the meaning of Section 4063 of ERISA); (iv) a "multiple employer plan" as defined in Section 413(c) of the Code; (v) a multiple employer welfare arrangement as defined in Section 3(40) of ERISA; (vi) a plan maintained in connection with a trust described in Sections 501(c)(9) or 501(c)(17) of the Code; (vii) a plan that provides for or promises retiree medical or life insurance benefits (whether or not insured) to any current or former employee, officer, director, service provider, owner, or their respective survivors, dependents, or beneficiaries, as applicable, of a Seller or any ERISA Affiliate, except to the extent required by Laws for which the covered individual pays the full cost of such coverage. The Sellers (other than the ADA Entity) do not contribute to or have any liability with respect to any plan subject to Title IV of ERISA or Section 412 of the Code with respect to any Wine Business Employee.

(e) Foreign Plans. To Sellers' Knowledge, no ADA Benefit Plan is subject to any Laws outside of the United States and its political subdivisions.

(f) Self-Insured and Self-Funded Benefit Plans. The ADA Entity does not currently maintain, sponsor, participate in, or contribute to any self-insured or self-funded employee welfare benefit plan within the meaning of Section 3(1) of ERISA or workers compensation plan.

(g) Section 280G and Excise Taxes. There is no Contract, plan or arrangement covering any employee or former employee or independent contractor or former independent contractor of the ADA Entity that, individually or collectively, would reasonably be expected to give rise to a (or already has resulted in a) payment by a Seller (or the provision of any other benefit such as accelerated vesting) that would not be deductible by reason of Section 280G of the Code or subject to an excise Tax under Section 4999 of the Code. The ADA Entity does not have any indemnity obligation for any excise Taxes imposed under Section 4999 of the Code.

(h) Section 409A. Schedule 3.21(h) lists each Contract or Benefit Plan of the ADA Entity that is a "nonqualified deferred compensation plan" subject to Section 409A of the Code. Each such Benefit Plan or Contract that is or forms part of a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code complies in form and operation in all respects with the requirements of Section 409A of the Code. Neither any Seller's nor any ERISA Affiliate's federal or state Tax Return is under examination by the IRS with respect to any nonqualified deferred compensation plan. The Sellers and ERISA Affiliates do not have any indemnity obligation for any Taxes imposed under Section 409A of the Code.

(i) Severance and Acceleration. Except as set forth in Schedule 3.21(i), the consummation of the Transactions, either alone or in combination with any other event, will not: (i) entitle any director, officer, service provider, or employee to any severance pay or any other payment or benefit; or (ii) accelerate the time of payment, funding, or vesting or increase the amount of compensation or benefits due to any such individual under any ADA Benefit Plan.

**Section 3.22 Brokers**. Except as set forth on Schedule 3.22, Sellers have no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Transactions, and Sellers shall be solely responsible for any such liabilities or obligations set forth on Schedule 3.22.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF EACH WINE PURCHASER

Each Wine Purchaser, individually and not jointly and severally, represents and warrants to Sellers as of the Effective Date and as of the Closing (as though made then and as though the Closing Date was substituted for the date of this Agreement throughout this Article IV) as follows, solely as to itself, and not as to any other Wine Purchaser:

**Section 4.1 Organization**. Such Wine Purchaser is either a corporation or a limited liability company, as indicated in the preamble to this Agreement, that is duly organized, validly existing and in good standing under the Laws of the State of Michigan and has the power and

authority to carry on its business as now being conducted and to own and operate the properties and assets now owned and being operated by it.

**Section 4.2** **Authorization of Agreement**. Such Wine Purchaser has the requisite legal power and authority to enter into this Agreement and to carry out its obligations under this Agreement. The execution, delivery and performance of this Agreement and the other Transaction Documents to be executed and delivered by such Wine Purchaser pursuant to the provisions of this Agreement have been duly authorized by all necessary action on the part of such Wine Purchaser. This Agreement has been duly executed and delivered on behalf of such Wine Purchaser and is a legal, valid and binding obligation of such Wine Purchaser enforceable against such Wine Purchaser in accordance with its terms, subject to the Enforceability Exceptions.

**Section 4.3** **No Conflict or Violation**. Neither the execution, delivery or performance of this Agreement by such Wine Purchaser nor the consummation of any of the Transactions will (a) violate or conflict with any provision of the Organizational Documents of such Wine Purchaser, (b) result (with or without notice or lapse of time, or both) in any breach of or default by such Wine Purchaser under any provision of any Contract or agreement of any kind to which such Wine Purchaser is a party or by which such Wine Purchaser is bound or to which the properties or assets of such Wine Purchaser are subject, or (c) except as set forth on Schedule 4.3, violate, or require such Wine Purchaser to obtain or make any consent, authorization, approval, registration or filing under, any statute, Law, ordinance, regulation, rule, judgment, decree or Order of any court or governmental agency, board, bureau, body, department or authority.

**Section 4.4** **Litigation**. There are no Actions of any kind now pending or, to such Wine Purchaser's knowledge, threatened in writing, involving such Wine Purchaser or any of its properties or assets that (a) question the validity of this Agreement, (b) seek to delay, prohibit or restrict in any manner any action taken or contemplated to be taken by such Wine Purchaser under this Agreement, or (c) would reasonably be expected to adversely affect such Wine Purchaser's performance of its obligations under this Agreement or the consummation of the Transactions.

**Section 4.5** **Financing**. Such Wine Purchaser will have at the Closing, sufficient cash funds in an aggregate amount necessary to pay all amounts payable by such Wine Purchaser under this Agreement, including such Wine Purchaser's portions of the Purchase Price and Cash Payment, and to consummate all of the other Transactions, and does not know of any circumstance or condition that could reasonably be expected to prevent or substantially delay the availability of such funds or otherwise impair such capability at the Closing and such other dates that such obligations and Transactions are required to be satisfied pursuant to the terms of this Agreement.

**Section 4.6** **Solvency.** Such Wine Purchaser is, and immediately after giving effect to the Transactions shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation

is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of such Wine Purchaser.

**Section 4.7** **Brokers.** Such Wine Purchaser has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Transactions.

## ARTICLE V
## COVENANTS

**Section 5.1** **Access, Information and Documents**.

(a) Prior to the Closing, each Seller will give to the Wine Purchasers and their respective Advisors reasonable access, and upon reasonable advance notice and during regular business hours (and in accordance with the reasonable procedures established by such Seller), to the books and records of such Seller and the properties (including for purposes of making inspections of the Owned Real Property), assets, and facilities of the Business, as is reasonably necessary in order to prepare for and consummate the Transactions; provided that (i) such access does not unreasonably interfere with the normal operations of the Business, (ii) such access will occur in such a manner as such Seller reasonably determines to be appropriate to protect the confidentiality of the Transactions and such books and records, (iii) all requests for access will be directed to Sellers' Advisors or such other Person(s) as Sellers (via such Advisors) may designate in writing from time to time, (iv) Sellers are not obligated to disclose, and may redact or remove, any information that is not related to the Business, and (v) nothing in this Agreement will require Sellers to provide access to, or to disclose any information to, any Wine Purchaser if such access or disclosure (A) would cause significant competitive harm to Sellers if the Transactions are not consummated, (B) would require Sellers to disclose any information regarding the Affiliates of Sellers that is not related primarily to the Business, (C) would reasonably be expected to adversely affect any legal privilege, (D) would be in violation of applicable Laws or the provisions of any agreement to which Sellers are bound, or (E) would violate any fiduciary duty. Nothing in this Agreement will permit any Wine Purchaser or its Advisors to conduct any sampling, monitoring, or testing or other surface, subsurface, or intrusive investigation, assessment, or analysis of soil, groundwater, building materials, air, or other environmental media at any property or facility, including the Owned Real Property and Leased Real Property, including of the type commonly known as a Phase II environmental site assessment, provided that Purchaser may, with the prior written consent of Sellers (such consent not to be unreasonably withheld, conditioned, or delayed), conduct sampling to the extent reasonably necessary to investigate a recognized environmental condition expressly identified in a Phase I environmental site assessment prepared by or for Purchaser; provided, however, that Purchaser shall first submit to Seller a detailed written sampling plan (including scope, methods, locations, duration, qualified personnel and restoration measures) and other reasonably requested documents and information.

(b) The information provided pursuant to this Section 5.1 will be used solely for the purpose of consummating the Transactions and will be governed by the terms and conditions of the Confidentiality Agreement, which shall not terminate upon the execution of this

Agreement notwithstanding anything to the contrary contained in this Agreement or in the Confidentiality Agreement. No Seller makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 5.1, and no Wine Purchaser may rely on the accuracy of any such information, in each case, other than the Express Representations.

(c) Each Wine Purchaser will not, and will not permit any of its Advisors, representatives or Affiliates to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder, or other material business relation of Sellers prior to the Closing with respect to Sellers, the Business, or the Transactions, without the prior written consent of Sellers (such consent not to be unreasonably withheld, conditioned, or delayed). The Parties will reasonably cooperate in terms of efficiently facilitating such contact with each Seller and its employees, customers and Suppliers in preparation for Closing.

**Section 5.2 Conduct of Business Pending Closing**. From the Effective Date until the Closing, except as consented to by the applicable Wine Purchaser(s) in writing (such consent not to be unreasonably withheld, conditioned, or delayed), each Seller will (solely with respect to the Business):

(a) except (v) as required by applicable Law or a Governmental Authority, (w) as expressly contemplated, required or permitted by this Agreement, (x) to the extent related to an Excluded Asset or an Excluded Liability, or (y) as set forth on Schedule 5.2, during the period from the Effective Date until the Closing, unless the Wine Purchasers otherwise consent in writing (such consent not to be unreasonably withheld, conditioned, or delayed), such Seller shall (i) maintain such Seller at all times as a limited liability company duly organized, validly existing and in good standing under the Laws of the State of its formation and authorized to conduct business in the respective Territory, (ii) maintain the existing insurance of the Wine Business or renewals or replacements of such insurance on substantially similar terms, and (iii) use its commercially reasonable efforts to carry on the Wine Business in the Ordinary Course, including using such efforts to (A) preserve the organization of the Wine Business, and (B) not establish, adopt, enter into, amend or terminate any Wine Business Benefit Plan or any other employee benefit plan, program, policy, agreement, arrangement or Contract for the benefit of any Wine Business Employee (other than as required by applicable Law), (C) preserve such Seller's relationships with Suppliers, licensees, distributors, vendors, sales agents and customers and others having business relationships with such Seller in connection with the Wine Business.

(b) except (v) as required by applicable Law or a Governmental Authority, (w) as expressly contemplated, required or permitted by this Agreement, (x) to the extent related to an Excluded Asset or an Excluded Liability, or (y) as set forth on Schedule 5.2, during the period from the Effective Date until the Closing, unless the Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned, or delayed), such Seller shall (i) maintain such Seller at all times as a limited liability company duly organized, validly existing and in good standing under the Laws of the State of its formation and authorized to conduct business in the respective Territory, (ii) maintain the existing insurance of the ADA Business or renewals or

replacements of such insurance on substantially similar terms, and (iii) use its commercially reasonable efforts to carry on the ADA Business in the Ordinary Course, including using such efforts to (A) preserve the organization of the ADA Business, (B) preserve such Seller's relationships with Suppliers, licensees, distributors, vendors, sales agents and customers and others having business relationships with such Seller in connection with the ADA Business, and (C) maintain the Owned Real Property in its current condition and repair, reasonable wear and tear excepted.

However, no action by any Seller with respect to matters specifically addressed by Section 5.2(c) or Section 5.2(d), as applicable, shall be deemed to be a breach of either Section 5.2(a) or Section 5.2(b) unless such action would constitute a breach of Section 5.2(c) or Section 5.2(d), as applicable;

(c) except (v) as required by applicable Law or a Governmental Authority, (w) as expressly contemplated, required or permitted by this Agreement, (x) to the extent related to an Excluded Asset or an Excluded Liability, or (y) as set forth on Schedule 5.2, during the period from the Effective Date until the Closing, unless the Wine Purchasers otherwise consent in writing (such consent not to be unreasonably withheld, conditioned, or delayed), such Seller shall not:

(i) amend or exercise any material option under any Material Contract of the Wine Business;

(ii) except as required by the terms of any existing Benefit Plan, (A) make any material change in employment terms for any Seller's officers or employees having an annual base compensation in excess of $100,000, (B) grant or increase any severance, retention, change-in-control, transaction bonus, or termination pay to any Wine Business Employee, or (C) take any action to accelerate the vesting, funding or payment of any compensation or benefits payable to any Wine Business Employee; provided that the foregoing shall not restrict Sellers from (Y) entering into or making available, to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, in each case, in the Ordinary Course, plans, agreements, benefits, and compensation arrangements in a manner consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions or (Z) taking any action that is not targeted at Wine Business Employees or that will not result in a Wine Business Assumed Liability;

(iii) (A) sell, transfer, distribute, lease to others or otherwise dispose of any of its Wine Business Acquired Assets, except for inventory sold in the Ordinary Course and dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the Wine Business, or (B) cancel or compromise any material claim against any third party or waive or release any right of substantial value;

(iv) transfer or grant any rights under, or enter into any settlement regarding the breach or infringement of, any of its Distribution Rights, or adversely modify any existing rights with respect to any Distribution Rights;

(v) create or suffer to exist any Encumbrance (other than Permitted Encumbrances) on any of the Wine Business Acquired Assets;

(vi) enter into any agreement containing any provision or covenant limiting the ability of the Wine Business to (A) sell any products or services of or to any other Person, (B) engage in any line of business, (C) hire or solicit the services of any Person, or (D) compete; and

(vii) commit or agree to take any of the actions prohibited by this Section 5.2(c).

(d) except (v) as required by applicable Law or a Governmental Authority, (w) as expressly contemplated, required or permitted by this Agreement, (x) to the extent related to an Excluded Asset or an Excluded Liability, or (y) as set forth on Schedule 5.2, during the period from the Effective Date until the Closing, unless the Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned, or delayed), such Seller shall not:

(i) amend or modify the Organizational Documents of the ADA Entity;

(ii) issue, sell, grant, pledge, distribute or otherwise dispose of, or create or suffer to exist any Encumbrance on, any Equity Securities of the ADA Entity, or any options, warrants, convertible or exchangeable securities, subscriptions, rights, stock appreciation rights, calls or commitments with respect to the Equity Securities of the ADA Entity of any kind, or grant phantom equity or other similar rights with respect to the Equity Securities of the ADA Entity; provided that the foregoing shall not restrict the distributions and contributions described in Section 1.5;

(iii) amend the terms of any Material Contract of the ADA Business or exercise any material option under any Material Contract of the ADA Business;

(iv) enter into any new leases, licenses, or other occupancy agreements or rights to occupancy for all or any portion of the Leased Real Property;

(v) enter into any new agreements, easements, covenants or restrictions relating to all or any portion of the Owned Real Property, other than that certain License Agreement, to be dated on or about September 30, 2026, by and between the JV and Martignetti Companies Control State, LLC, a Massachusetts limited liability company;

(vi) except as required the terms of any existing Benefit Plan, (A) make any material change in employment terms for any Seller's officers or employees having an annual base compensation in excess of $100,000, (B) establish, adopt, enter into, materially amend or terminate any ADA Benefit Plan for the benefit of any ADA Business Employee, (C) grant or increase any severance, retention, change-in-control, transaction bonus, or termination pay to any ADA Business Employee, (D) take any action to accelerate the vesting, funding or payment of any compensation or benefits payable to any ADA Business

Employee; provided that the foregoing shall not restrict Sellers from (Y) entering into or making available, to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, in each case, in the Ordinary Course, plans, agreements, benefits, and compensation arrangements in a manner consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions or (Z) taking any action that is not targeted at ADA Business Employees or that will not result in a Wine Business Assumed Liability;

(vii) (A) sell, transfer, distribute, lease to others or otherwise dispose of any of the material assets used or useful in the conduct of the ADA Business, except for inventory sold in the Ordinary Course and dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the ADA Business, or (B) cancel or compromise any material claim against any third party or waive or release any right of substantial value;

(viii) create or suffer to exist any Encumbrance (other than Permitted Encumbrances) on any of the ADA Business' assets;

(ix) enter into any agreement containing any provision or covenant limiting the ability of the ADA Business to (A) sell any products or services of or to any other Person, (B) engage in any line of business, (C) hire or solicit the services of any Person, or (D) compete; and

(x) commit or agree to take any of the actions prohibited by this Section 5.2(d).

**Section 5.3 Consents and Approvals.**

(a) Other Consents and Approvals. Each Seller shall cooperate with each Wine Purchaser as reasonably requested by such Wine Purchaser in order to assist such Wine Purchaser in obtaining prior to the Closing all consents, authorizations and approvals required to transfer the Sellers' interests in and to the Wine Business Acquired Assets, the ADA Interest, and the RE Newco Interest, and in timely submitting any notices or filings under all statutes, Laws, ordinances, regulations, rules, judgments, decrees and Orders of any court or governmental agency, board, bureau, body, department or authority or of any other person required to be obtained by such Wine Purchaser in connection with the execution, delivery and performance of this Agreement and the consummation of the Transactions, in each case of the foregoing, as set forth on Schedule 5.3(a). Without limiting the foregoing, each Seller and each Wine Purchaser shall furnish the other Party with such necessary information and reasonable assistance as such other Party may reasonably request in connection with their preparation of necessary filings, registrations, or submissions of information to any Governmental Authority in connection with this Agreement and the Transactions. Each Seller shall reasonably cooperate with each Wine Purchaser as reasonably requested by such Wine Purchaser in order to assist such Wine Purchaser in seeking (i) the federal, state, municipal and other licenses and permits necessary for such Wine Purchaser to operate the portion(s) of the Business acquired by such Wine Purchaser immediately following the Closing

and (ii) Supplier Approval from all Suppliers. Each Wine Purchaser shall cooperate with Sellers as reasonably requested by any Seller in order to assist such Seller in obtaining Supplier Approval from all Suppliers.

(b) Clear Skies. Each Wine Purchaser will not, and will not permit any of its Affiliates to, engage in any action or enter into any transaction or permit any action to be taken or transaction to be entered into that would reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any clearances, consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions, or other authorizations from any Governmental Authority necessary to consummate the Transactions, (ii) increase the risk of any Governmental Authority entering an Order preventing, delaying, or prohibiting the consummation of the Transactions, or (iii) delay the consummation of the Transactions.

(c) Each Seller and each Wine Purchaser shall and shall cause its Affiliates to use reasonable best efforts in cooperation with the other Party to obtain the Supplier Approvals.

(d) No arrangement entered into by a Wine Purchaser with any Supplier in connection with obtaining Supplier Approval shall, without Sellers' prior written consent, include any Seller as a party, impose any liability on any Seller, increase, accelerate or otherwise adversely modify any liability of any Seller, constitute an acknowledgment, admission, waiver or settlement by or on behalf of any Seller with respect to any liability, claim, defense or right of such Seller, or reallocate to any Seller any liability that would otherwise constitute a Wine Business Assumed Liability under this Agreement. Each Wine Purchaser may obtain Supplier Approval through a new distribution agreement, novation, replacement or other arrangement with the applicable Supplier in lieu of assuming an existing distribution agreement included among the Wine Business Assigned Contracts, in which case such existing distribution agreement shall cease to constitute a Wine Business Assigned Contract.

**Section 5.4 Restrictive Covenants Provisions**.

(a) Non-Competition. Each Seller covenants and agrees that for a period of three (3) years from the Closing Date (the "Restricted Period"), it shall not (and shall cause its controlled Affiliates not to) directly or indirectly own an interest in, operate, join, control, or participate (including as a joint venturer, agent, representative, consultant, creditor or in any other capacity) in any Person providing, managing, supervising, soliciting orders for, selling, warehousing, distributing, or marketing beverage products in the Territory which directly or indirectly compete with the products of the Business.

(b) Non-Recruitment. Each Seller agrees that during the Restricted Period, neither it nor its controlled Affiliates shall directly or indirectly, hire, recruit, entice or solicit or seek to induce or influence any of the Transferred Employees or ADA Business Employees to leave employment with any Wine Purchaser or employ or retain or enter into any business relationship with any Transferred Employees or ADA Business Employees; provided, however, that the foregoing provision shall not prevent any Seller or its Affiliates from (i) engaging in general advertising or solicitation not specifically targeted at any one or more employees of any

Wine Purchaser, or from hiring employees of any Wine Purchaser who first respond to Sellers with respect to such general and non-targeted advertising or solicitations or (ii) soliciting and hiring any individual whose employment with any Wine Purchaser terminated at least six (6) months prior to such soliciting and hiring.

(c) Non-Disparagement. Each Seller, on the one hand, shall not, and shall cause its respective controlled Affiliates not to, and each Wine Purchaser, on the other hand, shall not, and shall cause its respective Affiliates not to, make any negative, defamatory, or derogatory statements concerning the Business (including the Business' products, equipment, services, customers, suppliers, employees or agents), any Wine Purchaser or its Affiliates, any Seller and its Affiliates, as applicable. Nothing in this Section 5.4(c) will limit the ability of either Party or its respective Affiliates to make true and accurate statements or communications in connection with any disclosure such Person reasonably believes is required in response to incorrect, disparaging, or derogatory public statements to the extent reasonably necessary to correct or refute such public statements, or in connection with any Action.

(d) Confidential Information. Following the Closing, during the Restricted Period, each Seller shall, and shall cause its controlled Affiliates and its officers, employees, agents, and representatives to, keep confidential and not, directly or indirectly, divulge to anyone any confidential information or confidential documents of or relating to the Business, including the following to the extent relating to the Business: confidential records; client and customer lists; information about customer requirements; terms of license agreements; terms of Contracts with clients and customers; pricing information, marketing information or sales techniques; and planning and financial information of the Business (the "Confidential Information"). However, "Confidential Information" does not include information that (i) is or becomes generally available to the public other than as a result of disclosure, directly or indirectly, by such Seller or its representatives in violation of this Section 5.4(d), (ii) is independently developed by such Seller, its controlled Affiliates or their officers, employees, agents, and representatives without use of or reference to the Confidential Information, or (iii) becomes available after the Closing to any Seller, its controlled Affiliates or their officers, employees, agents, and representatives from a source other than a Wine Purchaser, so long as such source is not known by such Seller or such other Person, as applicable, to be bound by a confidentiality agreement with or other obligation of secrecy to such Wine Purchaser. In the event that any Seller, its controlled Affiliates or any of their officers, employees, agents, and representatives are requested or required (by oral question or request for information or documents in any legal proceeding, Action, investigation, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any information regarding the Business, such Seller will, if legally permitted and reasonably practicable under the circumstances, notify such Wine Purchaser of the request or requirement promptly following such Seller becoming aware of such request or requirement so that such Wine Purchaser may, at such Wine Purchaser's cost, seek an appropriate protective Order or waive compliance with the provisions of this Section 5.4(d). If the applicable Party believes in good faith, after consulting with counsel, that it is required to disclose any such information, the applicable Party may disclose such information to the tribunal; provided, however, that the applicable Party shall use commercially reasonable efforts to obtain, at the request of the applicable Wine Purchaser and at the cost of such

Wine Purchaser, assurance that confidential treatment will be accorded to such portion of such information required to be disclosed. Further, Confidential Information may be disclosed, and no notice as referenced above is required to be provided, (y) pursuant to requests for information in connection with routine regulatory examinations or inquiries that are not targeted at the Business specifically or the Transaction (or Wine Purchaser) by regulatory authorities with jurisdiction over any Seller, its controlled Affiliates, or their officers, employees, agents, and representatives or (z) as is necessary to wind up and dissolve any Seller and take actions in connection therewith (*e.g.*, completing Tax returns). Each Seller hereby acknowledges and agrees that the prohibitions against disclosure of Confidential Information recited in this Section 5.4 are in addition to, and not in lieu of, any rights or remedies that each Wine Purchaser may have available pursuant to the Laws of any jurisdiction or at common law to prevent the disclosure of trade secrets or proprietary information, and the enforcement by such Wine Purchaser of its rights and remedies pursuant to this Agreement shall not be construed as a waiver of any other rights or available remedies that it may possess in law or equity absent this Agreement. Nothing in this Section 5.4 shall prevent any Seller from disclosing Confidential Information to the extent necessary or desirable to enforce its rights and remedies pursuant to any Transaction Document.

(e) Remedies. Each Seller and each Wine Purchaser acknowledge that should they violate any of the covenants contained in this Section 5.4, it will be difficult to determine the resulting damages to the applicable Person and, in addition to any other remedies it may have, such damaged Person shall be entitled to injunctive relief without the necessity of proving actual damage. The breaching Person regarding the foregoing shall be liable to pay all costs, including reasonable attorneys' fees which the seeking Person (if successful) may incur in any Action in enforcing, to any extent, the provisions of this Section 5.4, including litigation of any appeal taken or defended by the seeking Person (if successful). The damaged Person may elect to seek one or more of these remedies at its sole discretion on a case-by-case basis. Failure to seek any or all remedies in one case does not restrict the applicable Person from seeking any remedies in another situation. Such action by any such Person shall not constitute a waiver of any of its rights.

(f) Tolling. In the event of the breach by the applicable Person of any restrictive covenant contained in this Section 5.4, the running of the Restricted Period, if applicable, as to such breaching Person shall be automatically tolled and suspended for the amount of time that the breach continues, and shall automatically recommence when the breach is remedied so that the damaged Person shall receive the benefit of the breaching Person's compliance with the restrictive covenants contained in this Section 5.4 for the full term of the Restricted Period.

(g) No Other Defenses. The Parties agree that the restrictive covenants contained in this Section 5.4 shall be enforced independently of any other obligations between the Parties, and that the existence of any other claim or defense shall not affect the enforceability of this Agreement or the remedies under this Agreement.

(h) NWS Member. The NWS Member agrees to be bound by, and to comply with, this Section 5.4 to the same extent as a Seller, as if the NWS Member were a Seller for all purposes of this Section 5.4 and shall cause its controlled Affiliates to do the same. The NWS

Member is not a Seller and, other than Section 1.6(c), this Section 5.4, Section 5.16, and Article IX, has no obligations or liabilities under this Agreement.

(i) RNDC Member. The RNDC Member agrees to be bound by, and to comply with, this Section 5.4 to the same extent as a Seller, as if the RNDC Member were a Seller for all purposes of this Section 5.4 and shall cause its controlled Affiliates to do the same. The RNDC Member is not a Seller and, other than Section 1.6(c), Section 5.4, Section 5.16, Section 7.1(d) and Article IX, has no obligations or liabilities under this Agreement.

**Section 5.5 Further Assurances**. In case at any time after the Closing any further action is necessary to evidence and effectuate the Transactions in accordance with the terms of this Agreement, each Seller and each Wine Purchaser will take such further action (including the execution and delivery of such further instruments and documents) as any other Party may reasonably request, at the sole cost and expense of the requesting Party. No such requested action shall, or shall require or permit any Party to, enlarge or extend (or diminish or eliminate) any existing right, liability or obligation of any Party or impose on any Party any new or additional liability or obligation.

**Section 5.6 Taxes**.

(a) All sales, use, documentary, recording, registration, conveyance, excise, license, stamp, or transfer (excluding real estate transfer) Tax arising from the sale of the Wine Business Acquired Assets or the assumption of the Wine Business Assumed Liabilities as contemplated by this Agreement ("Wine Business Transfer Taxes") shall be borne and paid fifty percent (50%) by Sellers and fifty percent (50%) by Wine Purchasers. Sellers and Wine Purchasers shall file all necessary documentation and returns required by Law to be filed with respect to Wine Business Transfer Taxes, and reasonably cooperate with one another in connection therewith, and shall use commercially reasonable efforts to obtain any available exemption from or reduction of any Wine Business Transfer Taxes.

(b) All sales, use, documentary, recording, registration, conveyance, excise, license, stamp, or transfer (including real estate transfer) Tax arising from the distribution of the Equity Securities of NW&S, the contribution of the Escanaba Owned Real Property to the ADA Entity, the contribution of the Livonia Owned Real Property to the Real Estate Entity, the sale of the ADA Interest, or the sale of the RE Newco Interest as contemplated by this Agreement ("ADA Transfer Taxes" and, together with the Wine Business Transfer Taxes, the "Transfer Taxes") shall be borne and paid fifty percent (50%) by Sellers and fifty percent (50%) by Purchaser. Sellers and Purchaser shall file all necessary documentation and returns required by Law to be filed with respect to ADA Transfer Taxes, and reasonably cooperate with one another in connection therewith, and shall use commercially reasonable efforts to obtain any available exemption from or reduction of any ADA Transfer Taxes.

(c) No Wine Purchaser nor any Seller shall request or file any state or local Tax clearance certificate with respect to the Transactions.

(d) At or prior to the Closing, each Seller shall deliver (or cause to be delivered) to each Wine Purchaser an IRS Form W-9 duly executed by such Seller (or such Seller's regarded owner for U.S. federal income Tax purposes).

(e) Each Wine Purchaser and each Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party (and at the expense of the requesting Party, to the extent out of pocket third party costs or expenses are incurred in the non-requesting Party responding to such request), in connection with the filing of any return, declaration, report, claim for refund, or information return or statement relating to Taxes of the Business, the Wine Business Acquired Assets, or the Wine Business Assumed Liabilities for any taxable period (or portion thereof) ending on or before the Closing Date, including any schedule or attachment, and any action, audit, litigation, or other proceeding with respect to such Taxes; provided that in providing such information, assistance and access, each Party shall be entitled to redact information that is not related to the Business, and no Seller shall be obligated to provide or disclose any Tax Returns (or any portion of any Tax Return) and other books and records related to (i) Taxes that are not primarily related to any Wine Business Acquired Asset or the Business or (ii) any income Tax Returns of such Seller or any of its Affiliates.

(f) Without the prior written consent of JV (not to be unreasonably withheld, conditioned, or delayed), Purchaser will not, and will cause each of the ADA Entity and the Real Estate Entity not to, (i) make (other than consistent with past practice or consistent with Section 5.6(h)) or change any Tax election of or with respect to either the ADA Entity or the Real Estate Entity that could have retroactive effect to any Pre-Closing Tax Period, (ii) file (other than consistent with Section 5.6(h)), amend or re-file any Tax Return of or with respect to either the ADA Entity or the Real Estate Entity for a Pre-Closing Tax Period, (iii) agree to extend or waive the statute of limitations relating to Taxes or Tax Returns of or with respect to either the ADA Entity or the Real Estate Entity for any Pre-Closing Tax Period, or (iv) take any other action with respect to a Pre-Closing Tax Period, in each case, to the extent that such action would reasonably be expected to increase the Tax liability or liability under this Agreement of any Seller (or beneficial owner thereof) (including, for the avoidance of doubt, an indemnification obligation under Section 8.2(a)).

(g) For purposes of determining the Tax liability of the ADA Entity and the Real Estate Entity for a Straddle Period, (i) all personal property and similar ad valorem obligations or other Taxes not described in clause (ii) shall be apportioned between the applicable Seller and Purchaser based on the number of days of such taxable period ending on the Closing Date and the number of days of such taxable period beginning on the day after the Closing Date and (ii) any Taxes based upon or related to income, receipts or payroll (including withholding) shall be determined by assuming that each of the ADA Entity and the Real Estate Entity had a taxable year or period which ended on the Closing Date using the interim closing of the books method of accounting.

(h) Purchaser shall prepare or cause to be prepared and timely file or cause to be timely filed all Tax Returns of the ADA Entity and the Real Estate Entity for any Pre-Closing

Tax Period and for any Straddle Period, in each case, the due date of which (taking into account extensions of time to file) is after the Closing Date (the "Purchaser Returns"). All such Tax Returns shall be prepared consistently with the past practices of the ADA Entity and, with respect to the Livonia Owned Real Property, Sellers (including reporting positions, elections and accounting methods), if such practices are supported at a "more likely than not" (or higher) level of confidence of the ADA Entity and the Real Estate Entity, as applicable. Purchaser shall submit each such Purchaser Return to Seller Representative at least fifteen (15) days prior to the due date (taking into account any extensions) for Seller Representative's review, comment and approval, which approval shall not be unreasonably withheld, conditioned or delayed.

(i) Purchaser shall promptly (and in any event within ten (10) days) forward to Seller Representative a copy of all written notifications and other material communications received by it, the ADA Entity or the Real Estate Entity from any Governmental Authority relating to any action or other audit, examination or notice of deficiency or other adjustment, assessment or redetermination with respect to Taxes or Tax Returns of the ADA Entity or the Real Estate Entity if any of the Sellers (or any Seller's direct or indirect owners) would be liable as a matter of Law for such Taxes for a Pre-Closing Tax Period or any Straddle Period or have an indemnification obligation for such Taxes pursuant to Section 8.2(a)(v) (each a "Tax Contest"). Seller Representative shall have the right, at its election, to control (including any disposition thereof) any Tax Contest that relates solely to a Pre-Closing Tax Period or could give rise to an indemnification obligation for such Taxes pursuant to Section 8.2(a)(v) (such a Tax Contest, a "Seller-Option Tax Contest", and a Seller-Option Tax Contest which Seller Representative elects to control, a "Seller Tax Contest"). In the case of a Seller Tax Contest: (i) Purchaser shall have the right (at its expense) to participate fully in such Seller Tax Contest, including to review in advance and reasonably comment upon submissions made in the course of such Seller Tax Contest and to attend any in-person or telephonic meetings, and (ii) Seller Representative shall not settle, compromise, or otherwise resolve any such Seller Tax Contest without the prior written consent of Purchaser (not to be unreasonably withheld, conditioned, or delayed). In the case of a Tax Contest which is not a Seller Tax Contest, Purchaser shall control such Tax Contest (including the disposition thereof), provided that: (i) Sellers shall have the right (at their expense) to participate fully in such Tax Contest, including to review in advance and reasonably comment upon submissions made in the course of such Tax Contest and to attend any in-person or telephonic meetings, and (ii) Purchaser shall not settle, compromise, or otherwise resolve any such Tax Contest without the prior written consent of Sellers (not to be unreasonably withheld, conditioned, or delayed) if any such action could reasonably be expected to affect the Tax liability or Tax positions of any Seller (or any direct or indirect owner thereof) or give rise to an indemnification obligation for such Taxes pursuant to Section 8.2(a)(v).

**Section 5.7 WARN Act; Employee Matters.**

(a) WARN Act. Sellers have delivered to the Business Employees and the applicable governmental officials, agencies and departments all notices required by the WARN Act in connection with the Transactions (the "WARN Notice"), and, after the execution of this Agreement and up until the Closing, shall timely deliver any additional WARN Notice required

by the WARN Act so that no Wine Purchaser will incur liability under the WARN Act solely as a result of electing not to employ any Wine Business Employee or causing the termination of any ADA Business Employee at or in connection with the Closing; provided that no Seller's delivery of any WARN Notice shall constitute a breach of such Seller's covenant under Section 5.2. Each Seller shall be responsible for any liability arising from or associated with the WARN Act or any WARN Notice, in each case, arising in connection with the Business up until the Closing; provided, however, that each Wine Purchaser shall be responsible for any liability incurred or suffered by Seller pursuant to the WARN Act to the extent that after the Closing such Wine Purchaser implements any employee layoffs, furloughs, reductions in force, plant closings, reductions in compensation or other similar actions that result in an "employment loss" (as defined in the WARN Act) for any Transferred Employee or ADA Business Employee within the ninety (90) day period following the Closing.

(b) Business Employees.

(i) From and after the Effective Date, subject to Section 5.7(b)(iv) each Wine Purchaser shall have the opportunity to meet with all Business Employees whose duties and responsibilities relate primarily to the Wine Business (the "Wine Business Employees") whom each Wine Purchaser determines may be of assistance with respect to the Brands included in such Wine Purchaser's Wine Business Acquired Assets to discuss potential employment opportunities with Purchaser, and each Wine Purchaser shall be free to negotiate with and hire any such Wine Business Employees; provided that no Wine Purchaser shall have any obligation to hire any Wine Business Employees; provided further that no Wine Purchaser shall employ any Business Employee prior to the Closing.

(ii) From and after the Effective Date, Purchaser shall have the opportunity to meet with all Business Employees of the ADA Business (the "ADA Business Employees") to discuss employment opportunities with Purchaser and to determine which ADA Business Employees Purchaser believes may be necessary to carry out the ADA Business. At the written request of Purchaser, Sellers shall terminate any Business Employee of the ADA Business to be effective no later than immediately prior to the Closing. Sellers shall be responsible for any severance or other obligations (including, without limitation, WARN Act obligations) associated with such termination.

(iii) At least ten (10) Business Days prior to the Closing, each Wine Purchaser may, or may cause an Affiliate to, extend a written offer of employment (conditioned on, and to commence immediately following, the Closing) to each Wine Business Employee that such Wine Purchaser may determine should receive a written offer of employment (each, a "Transfer Offer"). Subject to the applicable Wine Purchaser's ordinary course requirements for new hires, including, *e.g.*, background checks, drug screen tests, immigration status verification, all Wine Business Employees who accept a Transfer Offer will become employees of the applicable Wine Purchaser (or its applicable Affiliates) effective as of the date stated in the Transfer Offer (but not earlier than the day immediately following the Closing Date) and shall be collectively referred to as

"Transferred Employees". Each Wine Purchaser shall notify Sellers in a reasonable timeframe (but in any event within three (3) Business Days of receiving a response from the applicable Wine Business Employee and no later than the Business Day immediately preceding the Closing Date) with respect to whether each of their Transfer Offers has been accepted or rejected. Nothing in this Agreement shall be construed as a representation or guarantee by Sellers that any or all Wine Business Employees will accept a Transfer Offer, or that any Transferred Employee will continue in employment with any Wine Purchaser following the Closing for any period of time.

(iv) No Wine Purchaser shall be obligated to employ any employees of any Seller following the Closing and all such employees shall remain the responsibility of Sellers unless employed by a Wine Purchaser. The Parties shall reasonably coordinate regarding planning for and making communications to Business Employees. Each Seller will use commercially reasonable efforts to assist each Wine Purchaser in interviewing Wine Business Employees, including making Wine Business Employees available to meet with such Wine Purchaser. The Wine Business Employees remain free at all times to accept or decline a Wine Purchaser's Transfer Offer and shall remain employees of Sellers if they are not provided with a Transfer Offer by a Wine Purchaser or decide to decline a Transfer Offer; provided that nothing in this Agreement shall create any obligation on the part of any Seller to continue the employment of such Business Employees.

**Section 5.8 Benefit Plan Matters.**

(a) Retirement Plans. As of the Closing Date, each Wine Purchaser shall, or shall cause one of its Affiliates to, have in effect one or more defined contribution plans intended to be qualified under Section 401(a) of the Code that include a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (the "Wine Purchaser 401(k) Plan") to cover the applicable Transferred Employees and ADA Business Employees of such Wine Purchaser or one of its Affiliates (including, following the Closing, the ADA Entity) as of immediately following the Closing ("ADA Continuing Employees") who were participants in a 401(k) Seller Benefit Plan as of immediately prior to the Closing (the "Seller 401(k) Plans"). All Transferred Employees and ADA Continuing Employees who were participating in the Seller 401(k) Plans on the Closing Date shall become fully vested in their respective Seller 401(k) Plans account balances as of such date. Each Wine Purchaser shall cause the applicable Wine Purchaser 401(k) Plan to accept direct rollover contributions of the account balances of the applicable Transferred Employees and ADA Continuing Employees (including promissory notes for any outstanding loans from the Seller 401(k) Plans).

(b) COBRA. For so long as the "selling group" (within the meaning of COBRA) continues to maintain a group health plan following the Closing, each Seller (other than the ADA Entity) agrees that such group health plan of the "selling group" (within the meaning of COBRA) shall be solely responsible for all liabilities and obligations with respect to the continuation notification and coverage required under Section 4980B of the Code and Part 6 of Title I of ERISA and in each case including the rules and regulations promulgated with respect

thereto (collectively, "COBRA"), for every "M&A qualified beneficiary" (within the meaning of COBRA) associated with the Wine Business whose qualifying event occurs on or prior to the Closing Date. Each Wine Purchaser shall be solely responsible for all liabilities and obligations with respect to the continuation notification and coverage required under COBRA for every "M&A qualified beneficiary" (within the meaning of COBRA) associated with the Wine Business whose qualifying event occurs after the Closing Date. Notwithstanding the foregoing, in the event the selling group (within the meaning of COBRA) ceases to maintain any group health plan in connection with the Transactions: (i) Sellers (other than the ADA Entity) shall provide each Wine Purchaser written notice of such anticipated cessation at such time as Sellers (other than the ADA Entity) provide notice of the same to M&A qualified beneficiaries (within the meaning of COBRA) associated with the Wine Business; and (ii) Sellers (other than the ADA Entity) shall provide each Wine Purchaser with a complete list of all M&A qualified beneficiaries (within the meaning of COBRA) associated with the Wine Business whose qualifying events occurred prior to or in connection with the Closing, together with all information reasonably requested by each Wine Purchaser to administer COBRA continuation coverage for such individuals; and (iii) Sellers (other than the ADA Entity) shall indemnify and hold harmless each Wine Purchaser and the ADA Entity for all liabilities, costs, and expenses (including excise taxes under Code §4980B and penalties under ERISA §502(c)) associated with providing COBRA continuation coverage to any M&A qualified beneficiary of the Business whose qualifying event occurred on or prior to the Closing Date, to the extent such liabilities arise from or are attributable to the selling group's cessation of its group health plan.

(c) Vacation and PTO. Each Wine Purchaser shall be solely responsible for liabilities, if any, for any earned and unused vacation and other paid time off of such Wine Purchaser's Transferred Employees and ADA Business Employees that were included in Closing Indebtedness or Current Liabilities. Sellers shall be solely responsible for liabilities, if any, for any earned and unused vacation and other paid time off of any Business Employees that were not included in Closing Indebtedness or Current Liabilities or who were terminated by Sellers on or prior to the Closing Date, which shall be paid to such Business Employees if and when required by applicable Law.

(d) Cooperation of Parties. Each of the Sellers, on the one hand, and each Wine Purchaser, on the other hand, will reasonably cooperate with each other in order to accomplish the actions described in this Section 5.8.

(e) ADA Benefit Plans. Notwithstanding anything in this Agreement to the contrary, Purchaser shall, and shall cause the ADA Entity to, assume or retain the sponsorship of, and be solely responsible for all liabilities and obligations at any time arising under, pursuant to or in connection with the ADA Benefit Plans, including all liabilities and obligations arising under and for compliance with the requirements of COBRA for every "M&A qualified beneficiary" (within the meaning of COBRA) associated with the ADA Business.

(f) Nothing contained in Section 5.7(a) or this Section 5.8 (whether express or implied) shall (i) be considered or deemed to establish, amend or modify any benefit or

compensation plan, program, policy, agreement, arrangement or Contract, (ii) prohibit or limit the ability of any Seller, any Wine Purchaser or any of their respective Affiliates to amend, modify or terminate any benefit or compensation plan, program, policy, agreement, arrangement or Contract or (iii) confer any rights or benefits (including any third party beneficiary rights) on any Person other than the Parties.

**Section 5.9** **Seller Support Obligations**.

(a) Each Seller and its Affiliates may have entered into various arrangements (i) in which guarantees, letters of credit, sureties, bonds, or similar arrangements were issued by such Seller or its Affiliates and (ii) in which such Seller or its Affiliates are the primary obligors on other Contracts, in any such case to support or facilitate the Business. The arrangements entered into by any Seller and its Affiliates referred to in the foregoing clauses (i) and (ii) that are set forth in Schedule 5.9 are referred to as the "Seller Support Obligations". The Seller Support Obligations are not intended to continue after the Closing.

(b) Purchaser shall use its reasonable efforts to obtain replacements for the Seller Support Obligations (which shall include the full and unconditional release of the applicable Seller and its Affiliates) that will be in effect at the Closing or, in the case of Seller Support Obligations described in Section 5.9(a) clause (ii), will use its commercially reasonable efforts to arrange for itself to be substituted as the primary obligor as of the Closing through an assumption, accession, acknowledgement, or similar agreement (which shall include the full and unconditional release of the applicable Seller and its Affiliates) with the beneficiary of the applicable Seller Support Obligation.

(c) Whether or not the Purchaser is able to satisfy the terms of Section 5.9(b), (i) the obligations of Purchaser in Section 5.9(b) shall continue following the Closing until such terms have been satisfied and (ii) Purchaser shall indemnify each Seller and its Affiliates and each of their respective officers, directors, employees, agents and representatives from and against any and all liabilities incurred by any of them attributable to matters following the Closing and relating to the Seller Support Obligations. With respect to any Seller Support Obligation, Purchaser's reasonable best efforts shall include, if requested, the execution and delivery by Purchaser, or by an Affiliate of Purchaser acceptable to the beneficiary of such Seller Support Obligation, of a replacement guarantee or similar arrangement that includes the full and unconditional release of the applicable Seller and its Affiliates. All costs and expenses incurred in connection with Purchaser's obligations arising under Section 5.9(b) shall be borne by Purchaser.

**Section 5.10** **Insurance Matters**. Upon Closing, all insurance coverage provided in relation to any Seller or the Wine Business Acquired Assets or the Business that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with any Seller or its Affiliates) shall cease to provide any coverage with respect to the Business, the Wine Business Acquired Assets, and the Wine Business Assumed Liabilities, and no further coverage shall be available to a Wine Purchaser with respect to the Business, the Wine Business Acquired Assets, or the Wine Business Assumed Liabilities under any such policies. From and

after the Closing, each Wine Purchaser shall have the right to make claims and to receive proceeds from such claims with respect to any matter to the extent related to the Wine Business Acquired Assets or Wine Business Assumed Liabilities for periods prior to the Closing, and, upon such Wine Purchaser's request, the applicable Seller shall use commercially reasonable efforts to seek recovery or allow such Wine Purchaser to seek recovery, under, and subject to the terms and conditions (including deductibles or retention) of, the applicable occurrence-based insurance policies, and such Seller shall cooperate with such Wine Purchaser's reasonable requests if it seeks recovery, with respect to such matters and shall remit (or, at such Wine Purchaser's request, direct any such insurer to pay directly to such Wine Purchaser) any insurance proceeds actually obtained with respect to such claims (net of Sellers' reasonable and documented out-of-pocket costs and expenses of seeking recovery, to the extent not otherwise paid or reimbursed by such Wine Purchaser) to such Wine Purchaser or its designee.

**Section 5.11 Accounts**. In the event any Seller receives money (whether in the form of cash, check, electronic wire transfer or other form) relating to an account debtor of the ADA Entity or a Wine Purchaser (with respect to a Wine Purchaser, from sales made from and after the Closing Date), such Seller shall promptly notify the ADA Entity or applicable Wine Purchaser and promptly forward such funds to the applicable Party. In the event a Wine Purchaser receives money (whether in the form of cash, check, electronic wire transfer or other form) relating to an account debtor of any Seller from sales made prior to the Closing Date, which money is an Excluded Asset, such Wine Purchaser shall promptly notify such Seller and promptly forward such funds to such Seller.

**Section 5.12 Receipt of Misdirected Assets**. From and after the Closing, if (a) any Seller or any of its Affiliates receives any right, property or asset that is a Wine Business Acquired Asset, such Seller shall promptly transfer, or cause to be transferred, such right, property or asset to the applicable Wine Purchaser; or (b) if any Wine Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, such Wine Purchaser shall promptly transfer, or cause to be transferred, such right, property or asset to Sellers. In each case, such right, property or asset (including any such asset received in the form of cash, checks or other documents, which shall be promptly endorsed and delivered) shall be deemed the property of the Person entitled to it under this Agreement and shall be held in trust by the receiving Person until so transferred, and no additional consideration shall be payable in respect of any such transfer.

**Section 5.13 Access to Records and Excluded Assets**.

(a) By Sellers. After the Closing, each Wine Purchaser shall afford each Seller and its representatives reasonable access during regular business hours upon reasonable prior notice to such Wine Purchaser, to such books and records of such Seller acquired by such Wine Purchaser or located at any premises acquired by such Wine Purchaser, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices, and properties of such Wine Purchaser (including for the purpose of better understanding the books and records) as may be necessary in connection with such Seller's wind-down and related activities, including for such Seller to prepare Tax reports and

returns required to be filed by it, to respond to inquiries by Governmental Authorities, and to retrieve or remove any books and records. From and after receipt of the Adjustment Statement, Sellers and their Advisors shall be afforded reasonable access, during regular business hours and upon reasonable prior notice, to the books and records, personnel and Advisors of each Wine Purchaser to the extent reasonably relating to the preparation of, or relevant to such Seller's review of, the Adjustment Statement; provided that nothing in this Section 5.13(a) shall require such Wine Purchaser or any of its Affiliates to disclose any information to the extent that such disclosure would result in the loss of any attorney-client privilege. For a period of seven (7) years after the Closing Date, no Wine Purchaser shall dispose of any such books or records until such Wine Purchaser has given reasonable notice to each Seller of its intention to do so and given each Seller a reasonable opportunity to take possession of such books and records to be disposed of. From and after the Closing, each Wine Purchaser will, and will cause its employees to, provide each Seller with reasonable assistance, support, and cooperation with such Seller's wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns, reconciliation of claims or liabilities, and processing of insurance/benefit claims).

(b) By Wine Purchasers. After the Closing, each Seller shall afford each Wine Purchaser, its Advisors, accountants and other representatives reasonable access during regular business hours upon reasonable prior notice to such Seller, to any retained records and retained accounting general ledgers of such Seller that relate to the Business, as may be necessary in order for such Wine Purchaser to prepare Tax reports and returns required to be filed by it or to respond to inquiries by Governmental Authorities. For a period of seven (7) years after the Closing Date (or, if earlier, the dissolution of such Seller), such Seller shall not dispose of any such retained records and retained accounting general ledgers until it has given reasonable notice to each Wine Purchaser of its intention to do so and given such Wine Purchaser a reasonable opportunity to take possession of such books and records to be disposed of.

(c) Excluded Inventory. After the Closing, each Wine Purchaser shall afford each Seller, with respect to Suppliers from which Supplier Approval was not obtained and their representatives, reasonable access during regular business hours upon reasonable prior notice to such Wine Purchaser to the facilities of the Business and provide reasonable assistance, support, and cooperation with the retrieval and delivery of items of inventory for such Suppliers and the transfer of such inventory to such Suppliers' new distributors.

**Section 5.14 Publicity**. Neither any Wine Purchaser nor any Seller shall issue or cause the publication of any press release or other public announcement with respect to, or otherwise make any public statement concerning, the Transactions without the prior written consent of the other Parties, which consent shall not be unreasonably withheld, conditioned or delayed; provided that the foregoing requirements shall not apply to any publication or announcement required by applicable Law (based on the advice of counsel, the general substance of which is shared with the other Parties), court process, or the rules or regulations of any national securities exchange, in which case the Party required to make the publication or announcement shall use its reasonable best efforts to allow such other Parties reasonable time to comment on such publication or announcement in advance of the issuance thereof. Following any such compliant public

announcement by one Party, the other Parties will have the right to issue press releases or make any other public announcements containing the same or substantially similar contents as such public announcement.

**Section 5.15 Vehicle Bills of Sale**. No later than thirty (30) days following the Closing, each Wine Purchaser shall prepare and provide to Sellers draft notices of sale for motor vehicles that are Wine Business Acquired Assets, in the form provided by applicable Law. No later than thirty (30) days following receipt of such drafts, Sellers shall deliver to the applicable Wine Purchaser duly executed copies of such notices.

**Section 5.16 Member Support**. Each of the RNDC Member (subject to entry of the Approval Order by the Bankruptcy Court) and the NWS Member (until the earliest of (i) the Closing, (ii) the valid termination of this Agreement in accordance with its terms, or (iii) any amendment to any Transaction Document that adversely affects the NWS Member in a manner that is disproportionate to the RNDC Member based on their relative ownership of the Equity Interests of the JV) shall (a) vote or cause to be voted all Equity Securities of the JV held by it, and execute and deliver such written consents as may be requested, in favor of the authorization, execution, delivery and performance of this Agreement and the consummation of the Transactions, including any written consent of the members of the JV required under Section 5.1 of the JV Operating Agreement, (b) not take any action, or omit to take any action, that would reasonably be expected to prevent, delay or impair the satisfaction of any condition set forth in Article VI or the consummation of the Transactions, and (c) reasonably cooperate with Sellers and Purchaser in obtaining the consents and approvals contemplated by this Agreement. For clarification, NWS Member reserves the right to review/approve the proposed form of Approval Order, and this advance consent shall not be deemed to apply to Sellers' proposed allocation or use of sale proceeds.

**Section 5.17 Notice of Certain Events**. From the Effective Date through the Closing, each Party shall promptly notify the other Parties in writing of:

(a) such Party becoming aware of any fact, circumstance, event or action the existence, occurrence or taking of which has resulted in, or would reasonably be expected to result in, the failure of any of the conditions set forth in Article VI to be satisfied;

(b) such Party having received any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions, but only if such consent is material to the Businesses, taken as a whole; and

(c) any written notice or other written communication from any Governmental Authority directly related to the Transactions.

No notice delivered pursuant to this Section 5.17 shall be deemed to cure any breach of any representation, warranty, covenant or agreement, amend or supplement any Schedule, or affect any right or remedy of any Party or any condition to Closing.

**Section 5.18** **<u>Organization and Conduct of Real Estate Entity</u>**. Prior to the Closing, the JV shall cause the Real Estate Entity to be duly formed as a Michigan limited liability company and shall cause the Real Estate Entity to remain duly organized, validly existing and in good standing under the Laws of the State of Michigan through the Closing. From the date of its formation until the Closing, except as expressly contemplated by this Agreement or with Purchaser's prior written consent, the JV shall cause the Real Estate Entity to:

(a) issue all of its Equity Securities solely to the JV and not issue, sell, grant, pledge, transfer or otherwise dispose of any additional Equity Securities or any option, warrant, convertible security or other right to acquire any Equity Securities;

(b) conduct no business or activity other than activities necessary or incidental to its formation, the acquisition, ownership and maintenance of the Livonia Owned Real Property, and the consummation of the Transactions;

(c) not incur, assume or guarantee any Indebtedness or other liability, except liabilities arising by operation of Law in connection with its formation, liabilities arising in connection with the Transactions and ordinary-course liabilities relating solely to the Livonia Owned Real Property;

(d) not acquire or hold any asset other than the Livonia Owned Real Property, rights appurtenant thereto, and other assets expressly contemplated by this Agreement;

(e) not enter into, amend, terminate or waive any material right under any Contract, other than organizational documents and documents expressly contemplated by this Agreement;

(f) not create or permit any Encumbrance on its Equity Securities or assets, other than Permitted Encumbrances; and

(g) not amend its organizational documents, effect any merger, consolidation, conversion, dissolution or liquidation, or agree or commit to take any of the foregoing actions.

**Section 5.19** **<u>Schedule Updates</u>**.

(a) The Parties acknowledge that this Agreement is being executed before all Schedules have been finalized. From the date on which Sellers and Wine Purchasers agree to the final form of all Schedules until the Closing, Sellers may complete, supplement or update any Schedule to reflect any matter arising on or after such date, or that existed as of such date but of which Sellers did not have Knowledge until after such date; provided that no such update shall be taken into account for purposes of Section 6.2(a) or Section 8.2(a).

# ARTICLE VI
# CONDITIONS TO CLOSING

**Section 6.1** **Conditions to Obligations of Sellers**. The obligation of Sellers to consummate the Closing is subject to the satisfaction, on or prior to the Closing, of each of the following conditions, the failure of any one of which shall excuse Sellers from consummating the Closing unless, to the extent permitted by Law, any such conditions are waived in writing by each Seller in its sole discretion:

(a) Wine Purchasers' Performance. The representations and warranties made by each Wine Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date. Each Wine Purchaser shall have duly performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(b) Litigation. No court of competent jurisdiction shall have issued, enacted, entered, promulgated, or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining, or otherwise prohibiting the Closing that is still in effect and no Action seeking any such Order shall be pending.

(c) Officer's Certificate. Sellers shall have received a certificate from each Wine Purchaser representing and warranting that the conditions precedent set forth in Section 6.1(a) with respect to such Wine Purchaser have been satisfied.

(d) Assumption Agreement. Each Wine Purchaser shall have executed and delivered to Sellers an Assumption Agreement with respect to the Wine Business Assumed Liabilities assumed by such Wine Purchaser in the form attached hereto as Exhibit 6.1(d).

(e) Escrow Agreement. Wine Purchaser Representative and the Escrow Agent shall have executed and delivered to Sellers the Escrow Agreement.

(f) Approval Order. The Bankruptcy Court shall have entered an order approving the estate-related aspects of the Transactions, including (i) the RNDC Member's exercise of its voting, consent, governance and approval rights with respect to the JV and the Transactions, (ii) the RNDC Member's participation in and support of the Transactions, (iii) the release of any liens or claims (including any liens granted under any debtor-in-possession financing order) affecting the RNDC Member's equity interests in, or rights to proceeds from, the JV, and (iv) the RNDC Member's execution, delivery and performance of the Transaction Documents to which it is a party (the "Approval Order"), and the Approval Order shall not have been stayed, vacated, or modified without Sellers' consent. In the event the Approval Order contains or requires any material adjustment to the terms of this Agreement, this Agreement may be (i) modified to reflect such adjustment if agreed to in writing by the Parties, or (ii) terminated in the sole discretion of the RNDC Member.

(g) Designation Notice. Wine Purchasers shall have delivered to Sellers the Designation Notice.

(h) Schedules. Sellers and Wine Purchasers shall have agreed in writing (which may be by email, including by email between counsel for such Parties, expressly referencing this Agreement and this Section) as to the form and substance of all Schedules.

**Section 6.2 Conditions to Obligations of Wine Purchasers**. The obligation of each of the Wine Purchasers to consummate the Closing is subject to the satisfaction, on or prior to the Closing, of each of the following conditions, the failure of any one of which shall excuse such Wine Purchaser from consummating the Closing unless, to the extent permitted by Law, any such conditions are waived in writing by such Wine Purchaser in its sole discretion:

(a) Bring-Down. (i) The representations and warranties made by Sellers in Article III (other than the Fundamental Representations) of this Agreement shall be true and correct in all respects as though made on and as of the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect, and (ii) the representations and warranties set forth in Section 3.1, Section 3.3, Section 3.8(a), Section 3.9(b), Section 3.10, and Section 3.22 (collectively, the "Fundamental Representations") shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all respects (in the case of any representation or warranty containing any materiality qualification) or in all material respects (in the case of any representation or warranty without any materiality qualification) only as of such date. Sellers shall have duly performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by them prior to or on the Closing Date.

(b) No Material Adverse Effect. Between the Effective Date and the Closing Date, there shall have been no Material Adverse Effect.

(c) Regulatory. Between the Effective Date and the Closing Date, no Governmental Authority shall have enacted or promulgated any Law that would have the effect of making illegal the Transactions.

(d) Litigation. No court of competent jurisdiction shall have issued, enacted, entered, promulgated, or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining, or otherwise prohibiting the Closing that is still in effect and no Action seeking any such Order shall be pending.

(e) Escrow Agreement. Seller Representative and the Escrow Agent shall have executed and delivered to each Wine Purchaser the Escrow Agreement.

(f) Officer's and Secretary's Certificates. Wine Purchasers shall have received from Sellers (i) a certificate representing and warranting that the conditions precedent set forth in Section 6.2(a) and Section 6.2(b) have been satisfied, and (ii) a certificate of the secretary or other authorized officer of each Seller, the ADA Entity, and the Real Estate Entity, dated as of the Closing Date, certifying and attaching (A) its Organizational Documents, (B) resolutions or written consents authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party and the consummation of the Transactions, and (C) evidence of the incumbency and signatures of the officers or other authorized persons executing such documents on its behalf, together with a certificate of good standing or comparable certificate issued by its jurisdiction of organization dated not more than ten (10) Business Days before the Closing Date.

(g) Transition Services Agreement. The applicable Seller(s) shall have executed and delivered to Purchaser a Transition Services Agreement in a form (together with schedules to such Transition Services Agreement) acceptable to the Parties (the "Transition Services Agreement"); provided, however, that (A) this Section 6.2(g) shall be a condition to the obligation of the Wine Purchasers to consummate the Closing only if the Closing Date would otherwise occur on or prior to November 13, 2026, and (B) if the Closing Date has not occurred on or prior to November 13, 2026, the Wine Purchasers shall be obligated to consummate the Closing without the Transition Services Agreement having been executed and delivered, and this Section 6.2(g) shall be deemed satisfied in full.

(h) Wine Business Bills of Sale. Sellers shall have executed and delivered to Wine Purchaser Bills of Sale for the Wine Business Acquired Assets to be acquired by such Wine Purchaser in the form attached hereto as Exhibit 6.2(h), dated as of the Closing Date.

(i) ADA Reorganization Documents. Sellers shall have delivered to Purchaser evidence reasonably satisfactory to Purchaser of the completion of the distributions described in Section 1.5 and Section 1.6, together with duly executed Special Warranty Deeds (or limited warranty deeds if customary in the applicable jurisdiction) conveying the Escanaba Owned Real Property to the ADA Entity in accordance with Section 1.5(b) and the Livonia Owned Real Property to the Real Estate Entity in accordance with Section 1.6(a), subject only to the Permitted Encumbrances.

(j) Assumption Agreement. Sellers shall have executed and delivered to each Wine Purchaser an Assumption Agreement with respect to the Wine Business Assumed Liabilities assumed by such Wine Purchaser in the form attached hereto as Exhibit 6.1(d).

(k) ADA Interest Assignment. The JV shall have executed and delivered to Purchaser an assignment of the ADA Interest, free and clear of all Encumbrances other than Permitted Encumbrances.

(l) RE Newco Interest Assignment. The JV shall have executed and delivered to Purchaser an assignment of the RE Newco Interest, free and clear of all Encumbrances other than Permitted Encumbrances.

(m) Payoff Letters and Releases of Encumbrances. Sellers shall have delivered (i) payoff letters in customary form, including customary release and payment instructions and lien releases (including UCC-3 termination statements and any other releases or terminations required to release such Encumbrances of record), with respect to the Indebtedness set forth on Schedule 1.8(a)(iii) (the "Payoff Letters"), which Payoff Letters will provide that upon receipt by the applicable lenders of the amounts set forth in each such Payoff Letter, the ADA Entity and the Real Estate Entity will have no further obligations with respect to the applicable Closing Indebtedness and that all Encumbrances securing such Indebtedness with respect to the Wine Business Acquired Assets, the ADA Interest, the RE Newco Interest, and the Owned Real Property are released, and (ii) releases (including UCC-3 termination statements and any other releases or terminations required to release such Encumbrances of record) of any other Encumbrances set forth on Schedule 6.2(m) in customary form.

(n) Approval Order. The Bankruptcy Court shall have entered the Approval Order in a form consistent with the terms of this Agreement and otherwise reasonably acceptable to each of the Wine Purchasers, and the Approval Order shall not have been stayed, vacated, or modified without any Wine Purchaser's consent. In the event the Approval Order contains or requires any material adjustment to the terms of this Agreement, this Agreement may be (i) modified to reflect such adjustment if agreed to in writing by the Parties, or (ii) terminated in the sole discretion of the Wine Purchaser Representative.

(o) Supplier Approvals. Wine Purchasers shall have received Supplier Approvals from Wine Business Suppliers representing at least ninety percent (90%) of the sales volume in dollars for the year ended December 31, 2025, and Purchaser shall have received Supplier Approvals from ADA Business Suppliers representing at least seventy percent (70%) of the ADA Business' revenue for the twelve-month period ending July 31, 2026.

(p) Side Letter. Sellers shall have delivered to Purchaser a side letter regarding certain obligations of the ADA Entity, substantially in the form attached hereto as Exhibit 6.2(p), duly executed by all parties to such side letter.

(q) Schedules. Sellers and Wine Purchasers shall have agreed in writing (which may be by email, including by email between counsel for such Parties, expressly referencing this Agreement and this Section) as to the form and substance of all Schedules.

**Section 6.3 Waiver of Conditions**. Upon the occurrence of the Closing, any condition set forth in this Article VI that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of any Wine Purchaser or any Seller may rely on the failure of any condition set forth in this Article VI, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

## ARTICLE VII
## TERMINATION

**Section 7.1 Termination**. This Agreement may be terminated only as follows:

(a) Termination by Mutual Consent or Notice. This Agreement may be terminated at any time prior to the Closing by:

(i) mutual written consent of all Wine Purchasers and all Sellers;

(ii) by written notice of the Wine Purchaser Representative or any Seller, upon the issuance of an Order restraining, enjoining, or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, and such Order having become final, binding, and non-appealable; provided that no Party may terminate this Agreement under this Section 7.1(a)(ii) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement; or

(iii) by written notice of the Wine Purchaser Representative or any Seller, if the Closing shall not have occurred on or before December 31, 2026 (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 7.1(a)(iii) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement.

(b) Termination by Wine Purchasers. Wine Purchasers may terminate this Agreement by notice to Sellers at any time prior to the Closing (i) upon a breach of any covenant or agreement on the part of any Seller, or if any representation or warranty of any Seller will have become untrue, in each case, such that the conditions set forth in Section 6.2(a) would not be satisfied; provided that (A) if such breach is curable by such Seller then Wine Purchasers may not terminate this Agreement under this Section 7.1(b) unless such breach has not been cured by the date that is the earlier of (1) two (2) Business Days prior to the Outside Date and (2) thirty (30) days after Purchaser notifies Sellers of such breach, and (B) the right to terminate this Agreement pursuant to this Section 7.1(b) will not be available to a Wine Purchaser at any time that such Wine Purchaser is in material breach of any covenant, representation, or warranty in this Agreement and (ii) if there has been a Material Adverse Effect.

(c) Termination by Sellers. Any Seller may terminate this Agreement by notice to Wine Purchasers at any time prior to the Closing upon a breach of any covenant or agreement on the part of any Wine Purchaser, or if any representation or warranty of any Wine Purchaser will have become untrue, in each case, such that the conditions set forth in Section 6.1(a) would not be satisfied, including a breach of any Wine Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by a Wine Purchaser (other than a breach of such Wine Purchaser's obligation to consummate the Closing, which is not curable), then Sellers may not terminate this Agreement under this Section 7.1(c) unless such breach has not been cured by the date that is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after any Seller notifies such Wine Purchaser of such breach, and (ii) the right to terminate

this Agreement pursuant to this Section 7.1(c) will not be available to any Seller at any time that such Seller is in material breach of any covenant, representation, or warranty in this Agreement.

(d) Fiduciary Obligations. The RNDC Member may terminate this Agreement by notice to Wine Purchasers at any time prior to the Closing if the board of directors or other applicable governing body of the RNDC Member determines in good faith, after consultation with its financial advisors and outside bankruptcy counsel, that failure to terminate this Agreement would be inconsistent with its fiduciary duties under applicable Law.

**Section 7.2 Effect of Termination**. Termination of this Agreement pursuant to this Article VII shall terminate all obligations of the Parties and this Agreement shall become null and void and no Party or any of its partners, officers, directors, managers or equityholders will have any liability under this Agreement; provided that termination pursuant to Section 7.1 shall not relieve the defaulting or breaching Party from any liability to the other Parties resulting from any Willful Breach of this Agreement prior to the date of such termination. Notwithstanding the foregoing, if this Agreement is terminated pursuant to the provisions of this Article VII, the provisions set forth in this Section 7.2, Article VIII and Article IX shall survive such termination and subject to Section 9.11, nothing in this Section 7.2 will be deemed to impair the right of any Party to specific performance or other equitable remedies to enforce specifically the surviving terms and provisions of this Agreement.

## ARTICLE VIII
## SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

**Section 8.1 Survival of Representations and Warranties**. The Fundamental Representations shall survive the Closing and shall terminate on the sixth (6th) anniversary of the Closing Date. All other representations and warranties made by Sellers or Wine Purchasers shall survive the Closing and shall terminate on the Final Release Date. The covenants and agreements contained in this Agreement that are to be performed prior to the Closing shall terminate at, and shall not survive, the Closing, and all other covenants and agreements contained in this Agreement that are to be performed at or after the Closing shall survive for the period expressly contemplated thereby or, if no period is specified, fifteen (15) months following the Closing Date. Upon the expiration of the applicable survival period set forth in this Section 8.1 (each such period, a "Survival Period") in respect of the representations and warranties and covenants and other agreements, such matters shall terminate and be of no further force or effect and no claim may be made in respect thereof and thereafter none of the Parties hereto or any of their Affiliates shall have any liability whatsoever with respect thereto. Any claims asserted in good faith in accordance with this Article VIII, in a writing received by the other Party prior to expiration of the applicable Survival Period, shall not be barred by the expiration of such applicable Survival Period. However, for the avoidance of doubt, the Parties intend that the expiration of the applicable Survival Period shall be a strict deadline, that the certainty and finality of such deadline is an integral part of the Transactions and that, without the strict deadline of the applicable Survival Period, the Parties would not enter into this Agreement. Therefore, in no event shall any Indemnified Party be entitled

to any claim or recovery whatsoever pursuant to Section 8.2 unless notice of such claim is provided in strict accordance with this Article VIII and the other provisions of this Agreement (including Section 9.3(a)) prior to the expiration of the applicable Survival Period. Satisfying the preceding sentence shall be a condition precedent to any potential claim pursuant to this Article VIII, and any claim sought after the expiration of the applicable Survival Period shall be null and void.

**Section 8.2 Indemnification.**

(a) By Sellers. Subject to the limitations set forth in this Article VIII, following the Closing, the Sellers shall, jointly and severally, defend, indemnify and hold harmless each Wine Purchaser and each of its Affiliates, directors, officers, members, managers, employees, successors and assigns (each a "Purchaser Indemnified Party"), from and against, and pay or reimburse promptly such Purchaser Indemnified Party for, any and all liabilities, obligations, losses, Actions, fines, costs or expenses, royalties, deficiencies or damages (in each case, whether or not resulting from Third Party Claims), including out-of-pocket expenses and reasonable attorneys' and accountants' fees (excluding any employment or similar compensation amounts payable to employees, officers, or directors of such Wine Purchaser or any of its Affiliates or amounts payable by any Purchaser Indemnified Party to any Affiliates of any Wine Purchaser, it being understood that this parenthetical shall not prevent any such Affiliate itself from being a Purchaser Indemnified Party), incurred (x) in the investigation or defense of any of the same, (y) in investigation or defense of any Actions or other claims by any Person asserting, demanding, or otherwise seeking any of the same (whether absolute, accrued, conditional, or otherwise), or (z) in enforcing any of their rights under this Section 8.2 (collectively, "Losses") actually paid by, incurred against, resulting to, imposed upon, or incurred or suffered by any Purchaser Indemnified Party, resulting from or arising out of any of the following (collectively, "Purchaser Indemnifiable Claims"):

(i) any breach of any representation or warranty made by any Seller pursuant to Article III (other than a Fundamental Representation);

(ii) any breach of any Fundamental Representation made by any Seller;

(iii) the Excluded Liabilities of any Seller;

(iv) nonfulfillment of any covenant, agreement or other obligation of any Seller set forth in this Agreement that such Seller is required to comply with after the Closing;

(v) any Taxes of or imposed on Sellers, the ADA Entity or the Real Estate Entity, or arising from or attributable to either Business, the Wine Business Acquired Assets, or the assets, operations or activities of the ADA Entity or the Real Estate Entity, in each case, for any Pre-Closing Tax Period; and any Transfer Taxes for which Sellers are liable pursuant to Section 5.6; in each case, excluding any Taxes to the extent such Taxes are attributable to a breach of Section 5.6(f), (h), or (i); and

(vi) the matters set forth on Schedule 8.2.

(b) By Each Wine Purchaser. Subject to the limitations set forth in this Article VIII, from and after the Closing, each Wine Purchaser, severally and not jointly, shall defend, indemnify and hold harmless each Seller and each of its Affiliates, directors, officers, members, managers, employees, successors and assigns (each, a "Seller Indemnified Party"), from and against, and pay or reimburse promptly such Seller Indemnified Party for, any and all Losses actually paid by, incurred against, resulting to, imposed upon, or incurred or suffered by any Seller Indemnified Party, resulting from or arising out of any of the following (collectively, "Seller Indemnifiable Claims"):

(i) any breach of any representation or warranty made by such Wine Purchaser pursuant to Article IV (other than such Wine Purchaser's Purchaser Fundamental Representations);

(ii) any breach of any representation or warranty made by such Wine Purchaser pursuant to Section 4.1, Section 4.2 and Section 4.7 (the "Purchaser Fundamental Representations");

(iii) nonfulfillment of any covenant, agreement or other obligation of such Wine Purchaser set forth in this Agreement that such Wine Purchaser is required to comply with after the Closing; and

(iv) any unlawful actions taken by Wine Purchasers in connection with selecting, making offers to, or hiring, or declining to continue, any Wine Business Employees, including any analysis and determinations by Wine Purchasers in connection with such actions and the consequences of any of the foregoing under applicable Law.

(c) Certain Limitations. For purposes of this Article VIII, the existence of any breach of any representation or warranty made by any Seller pursuant to Article III or the officer's certificate delivered pursuant to Section 6.2(f) and the amount of any Losses with respect to any such breach, will be determined without regard to any materiality, Material Adverse Effect or other similar qualification contained in or otherwise applicable to such representation or warranty, except (i) the definition of Material Adverse Effect, (ii) Section 3.7(a) and Section 3.13(a)(xiv), (iii) the word "Material" in the term "Material Contract" or "Material Adverse Effect", and (iv) "materially" in Section 10.1(z). For the avoidance of doubt, this Section 8.2(c) shall not apply for purposes of determining whether any act or omission constitutes Fraud or Willful Breach. For the avoidance of doubt, any breach of a representation or warranty in the certificate delivered pursuant to Section 6.1(c) or Section 6.2(f), as applicable, shall be deemed a breach of the corresponding representation or warranty under Article III or Article IV.

(d) Indemnification Procedures.

(i) Third-Party Claims. In the case of any claim asserted by a third party against a Person entitled to indemnification under this Agreement (the "Indemnified

Party") (a "Third Party Claim"), the Indemnified Party shall provide to the Party from which indemnification is being sought pursuant to Section 8.2 (the "Indemnifying Party") reasonably prompt written notice of such Third Party Claim, but in any event within fifteen (15) Business Days after such Indemnified Party has knowledge of such Third Party Claim. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail, based on the facts and circumstances then known to, or reasonably available to, the Indemnified Party, including, to the extent then known or reasonably estimable, (i) the facts and circumstances then known related to Losses incurred or reasonably expected to be incurred in connection with, and the nature and basis of, such Third Party Claim, (ii) the nature of the misrepresentation, breach of warranty or claim to which such Loss is related, (iii) a good faith estimate (based on such facts and circumstances) of the amount of Losses incurred or reasonably expected to be incurred, which estimate shall be updated as additional information becomes available, and (iv) copies of all material documents (including court papers) received by the Indemnified Party with respect to such Third Party Claim; provided that no such notice shall be deemed deficient solely because it omits information not then known or reasonably available to the Indemnified Party or because the amount of Losses is later revised. The Indemnified Party shall permit the Indemnifying Party (at the expense of such Indemnifying Party) to assume the defense of any claim or any litigation resulting therefrom; provided that (i) the Indemnifying Party acknowledges in writing its obligation under the terms and conditions of this Agreement to indemnify the Indemnified Party, (ii) the counsel for the Indemnifying Party who shall conduct the defense of such claim or litigation shall be reasonably satisfactory to the Indemnified Party, (iii) the Indemnified Party may participate in such defense at such Indemnified Party's expense (provided that if such Indemnified Party shall in good faith determine that the Indemnified Party may have available to it one or more defenses or counterclaims that represent a conflict of interest with one or more of those that may be available to the Indemnifying Party in respect of such claim or any litigation relating thereto, then such Indemnified Party shall be entitled to indemnification for the fees and expenses of such Indemnified Party's separate counsel's participation in such defense), and (iv) the omission by any Indemnified Party to give notice as provided in this Section 8.2(d)(i) shall not relieve the Indemnifying Party of its indemnification obligation under this Agreement except to the extent that the Indemnifying Party is materially prejudiced as a result of such failure to give notice or as otherwise set forth in this Agreement. Except with the prior written consent of the Indemnified Party, no Indemnifying Party, in the defense of any such claim or litigation, shall consent to entry of any judgment or enter into any settlement that provides for injunctive or other nonmonetary relief affecting the Indemnified Party or that does not include as an unconditional term thereof the giving by each claimant or plaintiff to such Indemnified Party of a release from all liability (including as to Taxes) with respect to such claim or litigation. In the event that the Indemnified Party shall in good faith determine that the conduct of the defense of any Third Party Claim by the Indemnifying Party would reasonably be expected to affect adversely the Indemnified Party's relationships with customers, suppliers or other parties with whom a Wine Purchaser conducts business in connection with the operation of the Business following the Closing,

the Indemnified Party shall have the right at all times to take over and assume control over the defense, settlement, negotiations or litigation relating to any such claim at the sole cost of the Indemnifying Party (to the extent such costs are indemnifiable under this Agreement). In the event that the Indemnifying Party does not accept the defense of any matter as above provided, the Indemnified Party shall have the full right, but not the obligation, to defend, at the Indemnifying Party's cost (to the extent such costs are indemnifiable under this Agreement), against any such claim or demand. Whether or not the Indemnifying Party has assumed the defense, appeal or settlement proceedings with respect to a Third-Party Claim, such Indemnifying Party will not be obligated to indemnify the Indemnified Party for any settlement entered into or any judgment that was consented to without the Indemnifying Party's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed). In any event, the Indemnifying Party and the Indemnified Party shall cooperate in the defense of any claim or litigation subject to this Section 8.2. If the Indemnified Party assumes or retains control of the defense of any Third Party Claim, the Indemnified Party shall keep the Indemnifying Party apprised of all material developments with respect to such Third Party Claim, including any settlement offers, and shall promptly provide the Indemnifying Party with copies of all material correspondence, pleadings, other documents relating thereto and any other documents or information the Indemnifying Party may reasonably request.

(ii) Direct Claims. Any claim by an Indemnified Party that does not result from a Third Party Claim (a "Direct Claim") shall be asserted by the Indemnified Party by giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt written notice shall not relieve the Indemnifying Party of its indemnification obligations under this Agreement except to the extent that such Indemnifying Party is materially prejudiced by such delay or as otherwise set forth in this Agreement. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, based on the facts and circumstances then known to, or reasonably available to, the Indemnified Party, including, to the extent then known or reasonably estimable, (i) the facts and circumstances related to Losses incurred or reasonably expected to be incurred in connection with such Direct Claim, (ii) the nature of the misrepresentation, breach of warranty or claim to which such Loss is related, and (iii) a good faith estimate (based on such facts and circumstances) of the amount of Losses incurred or reasonably expected to be incurred, which estimate may be updated as additional information becomes available; provided that no such notice shall be deemed deficient solely because it omits information not then known or reasonably available to the Indemnified Party or because the amount of Losses is later revised. The Indemnifying Party shall have ten (10) Business Days after its receipt of such notice to respond in writing to such Direct Claim. If the Indemnifying Party rejects any Direct Claim, either by written notice or failure to respond to the Indemnified Party's notice of a Direct Claim within such ten (10) Business Day period, the Indemnified Party shall be free to pursue any and all remedies as may be available to the Indemnified Party. If the Indemnifying Party delivers a response to such notice disputing its liability to the Indemnified Party within such ten

(10) Business Day period, the Indemnifying Party and the Indemnified Party shall negotiate in good faith to resolve such dispute and, if not resolved, such dispute shall be resolved by litigation in the Chosen Courts.

(e) Right to Set-Off. In pursuing the collection of any indemnification owed by any Seller under Section 8.2, each Wine Purchaser shall first seek to set off the amount of such obligations against the Escrow Fund; provided that the Escrow Fund shall not be the sole source of recovery for claims for indemnification made by or for the Purchaser Indemnified Parties under Section 8.2 and to the extent the Escrow Fund is insufficient for any indemnification obligation, the Purchaser Indemnified Parties shall have the right to seek recovery directly from the applicable Sellers (subject to the other limitations of this Article VIII).

(f) Limitations on Recovery. Notwithstanding any provision to the contrary contained in this Agreement, the following shall apply:

(i) Exclusive Remedy. Except with respect to Fraud or claims for specific enforcement pursuant to Section 9.8 in respect of a breach of any post-Closing covenants under this Agreement, the Parties agree that, from and after the Closing Date, the sole and exclusive remedies of the Parties to this Agreement and the Purchaser Indemnified Parties and Seller Indemnified Parties, respectively, for any claims or Losses (including any Losses from claims for breach of contract, warranty, tortious conduct (including negligence) or otherwise and whether predicated on common law, statute, strict liability, or otherwise) arising out of, relating to or based upon the matters set forth in this Agreement are the indemnification and/or reimbursement obligations of the Parties set forth in this Article VIII.

(ii) Deductible. The Indemnifying Party shall not be liable to the Indemnified Party for indemnification under Section 8.2(a)(i) or Section 8.2(b)(i), as the case may be, unless and until the aggregate amount of all Losses subject to indemnification for which a claim for indemnification may be validly brought under Section 8.2(a)(i) or Section 8.2(b)(i) (but for the application of this Section 8.2) exceeds $500,000 (the "Deductible"), in which event the Indemnified Party shall be entitled to be indemnified from and against such Losses for which a claim for indemnification may be validly brought under Section 8.2(a)(i) or Section 8.2(b)(i) only in excess of the Deductible. The Indemnifying Party shall not be liable to any Indemnified Party for indemnification under Section 8.2(a)(i) or Section 8.2(b)(i) as the case may be, in respect of any individual Loss or series of related Losses that does not exceed $25,000 (the "Per-Claim Threshold"), which Losses shall not be taken into account for purposes of determining the satisfaction of whether the Deductible or the thresholds in this Section 8.2(f) have been satisfied, all Losses of the Wine Purchasers and the other Purchaser Indemnified Parties shall be aggregated and treated as Losses of a single Indemnified Party, regardless of which Wine Purchaser or other Purchaser Indemnified Party incurred, suffered or asserted such Losses. For the avoidance of doubt, neither the Deductible nor the Per-Claim Threshold shall apply to any Losses arising from or related to any of the following: (A) the breach of any

Fundamental Representation, (B) the breach of a Purchaser Fundamental Representation, (C) Losses arising from the Excluded Liabilities (in case of Purchaser Indemnifiable Claims) or the Wine Business Assumed Liabilities (in the case of Seller Indemnifiable Claims), (D) Section 8.2(a)(iv) or Section 8.2(b)(iii), or (E) Fraud.

(iii) Cap. The maximum aggregate, cumulative liability of Sellers, jointly and severally, under Section 8.2(a)(i) shall be limited to an amount equal to $50,000,000 (the "General Cap"); provided that (A) the General Cap shall not apply with respect to any Losses arising from the breach of any Fundamental Representation, the Excluded Liabilities, the nonfulfillment of any covenant, agreement or other obligation of any Seller, or Fraud, and (B) the maximum aggregate, cumulative liability of Sellers, jointly and severally, for all claims under Section 8.2(a) shall not exceed one hundred percent (100%) of the aggregate Cash Payment received by Sellers pursuant to this Agreement. For the avoidance of doubt, the Cap shall not apply to any Losses arising from or related to any of the following: (A) Losses arising from the Excluded Liabilities (in case of Purchaser Indemnifiable Claims) or the Wine Business Assumed Liabilities (in the case of Seller Indemnifiable Claims), or (B) Fraud.

(iv) Mitigation of Losses. Each Indemnified Party shall take, and cause each Purchaser Indemnified Party or Seller Indemnified Party, as applicable, to take, good faith, commercially reasonable steps (determined without regard to any indemnification of such Person under this Agreement (*i.e.*, as if such Person had no such rights under this Agreement)) to mitigate any Losses after becoming aware of any event which could reasonably be expected to give rise to any Losses.

(v) The amount of any and all indemnification payments in respect of Losses under this Section 8.2 shall be determined net of any amounts actually recovered in cash by the applicable Indemnified Party under insurance policies or other third-party reimbursement arrangements with respect to such Losses, less any reasonable and documented out-of-pocket costs of collection, including any deductibles, retentions, increased premiums, retroactive premium adjustments, and costs of pursuing recovery; provided that no Indemnified Party shall be required to pursue or exhaust any insurance or other third-party recovery before seeking indemnification under this Agreement, and no indemnification payment shall be delayed, reduced or conditioned based on any potential, disputed, contingent or unavailable insurance or other third-party recovery. If an Indemnified Party receives any such recovery after receiving an indemnification payment with respect to the same Losses, such Indemnified Party shall promptly remit to the Indemnifying Party the amount of such recovery, net of the foregoing costs and only to the extent necessary to avoid duplicate recovery.

(vi) In no event shall any Indemnified Party be entitled to recover or make a claim for any amounts in respect of punitive, special or exemplary damages, except for such damages to the extent paid to an unrelated third party as a result of a final non-

appealable judgment. For the avoidance of doubt, this limitation shall not apply to any Losses arising from or related to Fraud.

(vii) Any indemnity payment under this Agreement shall be treated as an adjustment to the Purchase Price for Tax purposes.

(viii) No Purchaser Indemnified Party shall have the right to assert any claim pursuant to Section 8.2 with respect to any Loss, cause of action or other claim to the extent it is a possible or potential Loss, Action, cause of action or claim that the Purchaser Indemnified Party believes may be asserted rather than an actual or asserted Loss, cause of action or claim that has, in fact, been filed or asserted against any Purchaser Indemnified Party or paid or incurred by any Purchaser Indemnified Party; provided that a Purchaser Indemnified Party may provide notice of a claim that is otherwise in accordance with the requirements of this Article VIII and based on a reasonable good faith estimate of Losses that are reasonably expected to be incurred with respect to such matter, and such notice shall not be deemed invalid as a result of including such estimate, or be deemed premature or deficient solely because the amount of Losses is contingent, unliquidated, not yet paid or incurred, or later revised. For the avoidance of doubt, the foregoing shall not require that any Loss be finally determined or liquidated, as a condition to providing notice of or asserting a claim hereunder.

(ix) No Purchaser Indemnified Party shall have the right to recover under Section 8.2 with respect to any Loss or alleged Loss (A) to the extent the matter forming the basis for such Loss or alleged Loss shall have been taken into account in the determination of the Purchase Price or any component thereof pursuant to Section 1.8 or Section 1.9 or (B) to the extent included in the Closing Indebtedness or Closing Current Liabilities.

(x) Any Loss for which any Purchaser Indemnified Party is entitled to indemnification under Section 8.2 shall be determined without duplication of recovery by reason of the state of facts giving rise to such Loss constituting a breach of more than one representation, warranty, covenant or agreement and/or other matter addressed by Section 8.2.

**Section 8.3 Acknowledgement by Wine Purchasers.**

(a) Each Wine Purchaser acknowledges and agrees, on its own behalf and on behalf of its Purchaser Group, that, in making its determination to execute this Agreement and proceed with the Transactions, such Wine Purchaser and its Purchaser Group have relied, are relying, and will rely solely on the Express Representations and have not relied on, are not relying on, and will not rely on any information, statements, disclosures, documents, Projections, forecasts or other material (including the completeness or accuracy of any of the foregoing) made available or provided by any Person (including in any presentations or other materials prepared by any Advisor or in that certain "Project Arrow MA" datasite administered by Datasite (the "Dataroom") or elsewhere) to such Wine Purchaser or any of its Affiliates or Advisors, or the Projections or any

other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, in all cases, except for the representations and warranties expressly contained in Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or the certificate delivered pursuant to Section 6.2(f) (the "Express Representations") (it being understood that such Wine Purchaser and its Purchaser Group have relied only on such Express Representations).

(b) Without limiting the generality of the foregoing, in connection with the investigation by its Purchaser Group, each Wine Purchaser and the members of such Wine Purchaser's Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of any Seller or other Seller Parties, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Dataroom, management meetings, etc.) (collectively, "Projections"). Each Wine Purchaser acknowledges and agrees, on its own behalf and on behalf of its Purchaser Group, that (i) such Projections are being provided solely for the convenience of such Wine Purchaser to facilitate its own independent investigation, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) such Wine Purchaser is familiar with such uncertainties, and (iv) subject to claims for Fraud, such Wine Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c) Each Wine Purchaser acknowledges and agrees, on its own behalf and on behalf of the members of its Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of such Wine Purchaser's Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 8.3.

(d) Notwithstanding anything to the contrary in this Agreement, other than as limited by this Section 8.3, nothing in this Agreement shall limit or impair any Wine Purchaser's ability to pursue any claims for Fraud.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1 Expenses**. Except as otherwise provided in this Agreement, all fees, costs, and expenses, including fees, costs and expenses of any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person (each, an "Advisor") incurred in connection with the negotiation of this Agreement and the other Transaction Documents, the performance of this Agreement and the other Transaction Documents, and the consummation of the Transactions will be paid by the Party incurring such fees, costs, and expenses, whether or not the Transactions, including the Closing,

are consummated. However, all fees and expenses in connection with any filing or Transfer Taxes will be allocated pursuant to Section 5.6.

**Section 9.2 Severability**. It is the Parties' intent that each section of this Agreement shall be read and interpreted with every reasonable inference given to its enforceability. However, it is also the Parties' intent that if any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction, and the remainder of the provisions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Finally, it is also the Parties' intent that if a court should determine any restrictive covenant contained in this Agreement to be unenforceable because of over breadth, then the court may modify said covenant so as to make it reasonable and enforceable under the prevailing circumstances and applicable Law.

**Section 9.3 Notices**.

(a) All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been given (i) when delivered in person, (ii) when transmitted by email to the address set out below for such recipient (so long as such transmission does not generate an error message or notice of non-delivery), if delivered by 5:00 P.M. local time of the recipient (based on the physical address of such recipient below) on a Business Day and otherwise on the following Business Day, (iii) upon receipt or first attempted delivery on a Business Day following the day on which the same has been delivered prepaid to a reputable national overnight courier service (charges prepaid) or (iv) upon receipt or first attempted delivery on a Business Day after being mailed by first class mail (postage prepaid), return receipt requested. Notices, requests, demands and communications to Purchaser and any Seller shall, unless another address is specified in accordance with this Section 9.3, be sent to the addresses indicated below:

If to any Seller or the RNDC Member, to both:

c/o Republic National Distributing Company, LLC
4300 Wildwood Way
Suite 200
Atlanta, GA 30339
Attn.: Dennis Bashuk
Email: dennis.bashuk@rndc-usa.com

and

c/o Republic National Distributing Company, LLC
One National Drive
Atlanta, GA 30336
Attn.: H. Alan Rosenberg, Esq.
Email: alan.rosenberg@rndc-usa.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Attn.: Steve Toth
Email: steve.toth@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn.: Christopher Marcus, P.C.
Email: christopher.marcus@kirkland.com

If to NWS Member, to both:

National Wine & Spirits, Inc.
c/o Bose McKinney & Evans LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
Attn.: Michael J. Schneider and Robert K. Prather
Email: jbaker@nwscorp.com

with a copy to (which shall not constitute notice):

Bose McKinney & Evans LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
Attn.: Michael J. Schneider
Email: mschneider@boselaw.com

and

Bose McKinney & Evans LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
Attn.: Robert K. Prather
Email: rprather@boselaw.com

If to Purchaser, to:

Great Lakes Wine and Spirits, LLC
373 Victor Street
Highland Park, MI 48203
Attn.: J. Lewis Cooper III
Email: LC3@GLWAS.com

with a copy to (which shall not constitute notice):

Wilson Rode, PLLC
2250 Butterfield Dr., Suite 220
Troy, MI 48084
Attn.: Jim Wilson
Email: ljwilson@wilsonrode.com

and

Bodman PLC
201 W. Big Beaver, Suite 500
Troy, MI 48084
Attn.: Anthony P. Cracchiolo
Email: acracchiolo@bodmanlaw.com

If to Imperial, to:

Imperial Beverage Company
3825 Emerald Dr.
Kalamazoo, MI 49001
Attn.: Joe Cekola
Email: jcekola@imperialbeverage.com

with a copy to (which shall not constitute notice):

Kreis Enderle
P.O. Box 4010
Kalamazoo, MI 49003-4010
Attn.: Daniel P. McGlinn
Email: DMcGlinn@KreisEnderle.com

If to Vintage, to:

Vintage Wine Company
15420 E 12 Mile Rd.
Roseville, MI 48066
Attn.: Michelle Giorgio
Email: mmgiorgio@vwmi.com

with a copy to (which shall not constitute notice):

Bodman PLC
201 W. Big Beaver, Suite 500
Troy, MI 48084
Attn.: Joseph P. Michniacki
Email: jmichniacki@bodmanlaw.com

(b) Any Party may from time to time change its address for the purpose of notices to that Party by a similar notice specifying a new address.

**Section 9.4** **Construction**. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party. The headings of the sections and paragraphs contained in this Agreement are for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

**Section 9.5** **Schedules**. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement. Information disclosed in any numbered or lettered part of the Schedules will be deemed to relate to and to qualify the particular provision set forth in the corresponding numbered or lettered section of this Agreement. However, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement, in each case, so long as the applicability of such disclosure to such other sections of the Schedules is readily apparent on its face. Matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement, or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item, and such terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, the Schedules, and the Exhibits is disclosed solely for purposes of this Agreement, and no information contained in this Agreement, the Schedules, or the Exhibits will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of contract. No document merely made available in the data room shall constitute

disclosure against any representation or warranty unless expressly set forth in the applicable Schedule.

**Section 9.6** **Entire Agreement**. This Agreement (including the Exhibits and Schedules hereto), when executed and delivered, constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the Parties, their Affiliates, or any of their related Persons, Advisors or other representatives with respect to the subject matter of this Agreement, and supersedes any prior documentation, including any letters of intent or other correspondence. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the other Transaction Documents will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions of this Agreement or the intent of the Parties, and will be deemed joint work product of the Parties.

**Section 9.7** **Counterparts**. This Agreement and any other Transaction Documents, and any amendments to any Transaction Documents, may be executed in several counterparts any one of which need not contain the signature of more than one party to such Transaction Document, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF, DocuSign, or other electronic transmission, will be treated in all manner and respects as an original contract and will be considered to have the same binding legal effects as if it were the original signed version of such contract delivered in person. Minor variations in the form of the signature page to this Agreement or any Transaction Document, including footers from earlier versions of any such other document, will be disregarded in determining the effectiveness of such signature. At the request of either Party to any Transaction Document, each other party to such Transaction Document will re-execute original forms of such Transaction Document and deliver them to all other Parties. No party to any such Transaction Document will raise the use of a .PDF, DocuSign, or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of PDF, DocuSign, or other electronic transmission as a defense to the formation of a contract and each such Party forever waives any such defense.

**Section 9.8** **Specific Performance**. Irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it under this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance, or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the courts described in Section 9.11 without proof of damages or otherwise, this being in addition to any other remedy to which the Parties are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither any Seller nor Purchaser would have entered into this Agreement. Any Party pursuing an injunction or

injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 9.8 will not be required to provide any bond or other security in connection with any such Order. The remedies available to any Party pursuant to this Section 9.8 will be in addition to any other remedy to which such Party was entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit either Party from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any Action in accordance with Section 9.8 to enforce specifically the performance of the terms and provisions of this Agreement by any other Party, the Outside Date will automatically be extended (i) for the period during which such Action is pending, plus ten (10) Business Days or (ii) by such other time period established by the court presiding over such Action, as the case may be. In no event will this Section 9.8 be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller.

**Section 9.9 Governing Law**. This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware, applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply; provided, however, that to the extent this Agreement is subject to the provisions of the Michigan Liquor Control Code, the Agreement will be governed by the Laws of the State of Michigan.

**Section 9.10 Waiver of Jury Trial**. ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. ANY AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

**Section 9.11 Jurisdiction and Exclusive Venue**. Any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement, the negotiation, execution, or performance of this Agreement, or the Transactions and any questions concerning the construction, interpretation, validity, and enforceability of this Agreement (each, an "Agreement Dispute")

brought by any other Party or its successors or assigns will be brought and determined only in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "Chosen Courts"). Each of the Parties irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. No Party will commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non conveniens*. Venue would be proper in any of the Chosen Courts, and each Party hereby irrevocably waives any objection that any Chosen Court is an improper or inconvenient forum for any Agreement Dispute. Each of the Parties irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 9.3(a). Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

**Section 9.12 Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, successors and permitted assigns.

**Section 9.13 Assignment**. This Agreement shall not be assignable or otherwise transferable by any Party hereto without the prior written consent of the other Parties, which consent may be granted or withheld in such other Party's sole and absolute discretion and any attempted assignment or delegation without such prior written consent shall be null and void; provided that Purchaser may assign this Agreement or any part thereof to a subsidiary or Affiliate of Purchaser or to any lender to Purchaser or any subsidiary or Affiliate thereof as security for obligations to such lender; provided further that any such assignment shall not release Purchaser from its obligations under this Agreement.

**Section 9.14 No Third Party Beneficiaries**. Except as expressly provided in this Agreement, nothing in this Agreement shall confer any legal or equitable rights, remedies or claims upon any Person other than the Parties and their successors and permitted assigns.

**Section 9.15 No Right of Set-Off**. Purchaser, on its own behalf and on behalf of its respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser and any of its respective successors and permitted assigns have or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith; provided that the foregoing waiver shall not limit Purchaser's right to set off indemnification obligations in accordance with Section 8.2(e).

**Section 9.16 Non-Recourse**. This Agreement may be enforced against, and any Agreement Dispute may be brought against, only the Persons that are expressly named as Parties and not against any other Persons. Except to the extent named as a Party, and then only to the extent of the specific obligations of such Parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or

Advisor of any Party (each, a "Non-Recourse Person") will have any liability (whether in contract, tort, equity, or otherwise) for any of the representations, warranties, covenants, agreements, or other obligations or liabilities of any of the Parties or for any Agreement Dispute and in no event shall any Person have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions or omissions (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person, and each of such Persons and the Non-Recourse Persons are intended third party beneficiaries of this Section 9.16 and shall be entitled to enforce this Section 9.16 as if a party directly hereto.

**Section 9.17 Amendment; Waivers**. No amendment or modification of this Agreement, and no waiver under this Agreement, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification or waiver is sought. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time. Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege under this Agreement, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges under this Agreement. The rights and remedies in this Agreement provided are cumulative and are not exclusive of any rights or remedies that either Party may otherwise have at law or in equity.

**Section 9.18 Bulk Sales Laws**. Purchaser and Sellers hereby waive compliance by each of Purchaser and Sellers with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

**Section 9.19 Seller Representative**. Subject to Section 1.7 and Section 5.16, RNDC-NWS, LLC ("Seller Representative") shall have the power and authority to unilaterally act on behalf of each Seller. Such power will include the power to make all decisions, actions, consents, and determinations on behalf of each such Seller including to make any waiver of any condition or agree to any amendment to this Agreement and to deliver any notices, requests, demands and other communications under this Agreement. No Party shall have any right to object, dissent, protest, or otherwise contest the same. Wine Purchaser and Wine Purchaser Representative shall, and shall be entitled to, rely on any action or omission taken by the Seller Representative on behalf of each such Seller.

**Section 9.20 Wine Purchaser Representative**. Purchaser ("Wine Purchaser Representative") shall have the power and authority to unilaterally act on behalf of each Wine Purchaser in writing. Such power will include the power to make all decisions, actions, consents, and determinations on behalf of each such Wine Purchaser including to make any waiver of any condition or agree to any amendment to this Agreement and to deliver any notices, requests, demands and other communications under this Agreement. No Party shall have any right to object, dissent, protest, or otherwise contest the same. Sellers shall, and shall be entitled to, rely on any

action or omission taken by the Wine Purchaser Representative on behalf of each such Wine Purchaser.

## ARTICLE X
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

**Section 10.1 Certain Definitions.**

(a) "ADA Business Suppliers" means the suppliers whose product is distributed by the Sellers in connection with the ADA Business listed on Schedule 10.1(a).

(b) "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs, and policies of such Person, whether through ownership of voting securities, by Contract, or otherwise.

(c) "Aging Inventory" means any Inventory that is not Unsalable Inventory and that (i) is beer, a low-proof alcoholic beverage, a non-alcoholic product, a boxed wine, and any product that has an expiration date or "best before" date within sixty (60) days following the Closing Date or (ii) is not wine and was received by or on behalf of any Seller more than 365 days prior to the Closing Date, except, in either case of (i) and (ii), for the items set forth on Schedule 10.1(c).

(d) "Bankruptcy Cases" means the voluntary cases commenced on July 26, 2026 by Republic National Distributing Company, LLC and certain of its Affiliates under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

(e) "Business Day" means any day other than a Saturday, Sunday, or other day on which banks in New York City, New York are authorized or required by any Law to be closed.

(f) "Calculation Time" means 11:59 PM Eastern Time on the Closing Date, and any matter calculated as of the Calculation Time shall be calculated without giving effect to the consummation of the Transactions.

(g) "Confidentiality Agreement" means that certain Confidentiality Agreement, dated April 13, 2026, by and between Republic National Distributing Company, LLC and Great Lakes Wine and Spirits, LLC.

(h) "Contract" means any written or oral contract, indenture, note, bond, lease, sublease, mortgage, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than an invoice, purchase order, service order, or sales order.

(i) "Current Liabilities" of a particular Person means all of the current liabilities of such Person, including accounts payable, payroll and associated payroll taxes, real and personal property lease obligations, any earned and unused vacation and other paid time off of Transferred Employees and ADA Business Employees, and liabilities for damage to Supplier inventories; provided that Current Liabilities will not include any Indebtedness.

(j) "Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, Tax returns, ledgers, journals, customer lists, regulatory filings, plans, research materials, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(k) "Equity Securities" means, with respect to any Person, (i) any capital stock, membership interests, partnership interests or other equity interests of such Person, (ii) any securities convertible into or exchangeable for any of the foregoing, and (iii) any options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, calls, puts, rights of first refusal or other Contracts that could require such Person to issue, sell, repurchase or redeem any of the foregoing.

(l) "ERISA Affiliate" means any entity that, together with any Seller, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

(m) "Fraud" means an act committed by a Seller, in the making to Purchaser the representations and warranties of such Seller in Article III or in the certificate delivered pursuant to Section 6.2(f) with intent to deceive Purchaser, and to induce Purchaser to enter into this Agreement or consummate the Transactions and requires (i) a false representation of fact made in such representation; (ii) with knowledge that such representation is false; (iii) with an intention to induce Purchaser to act or refrain from acting in reliance upon it; (iv) causing Purchaser, in justifiable reliance upon such false representation, to take or refrain from taking action; and (v) causing Purchaser to suffer damage by reason of such reliance, which together constitutes common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, unjust enrichment, negligent misrepresentation, recklessness or a similar theory).

(n) "GAAP" means United States generally accepted accounting principles, applied in a manner consistent with the preparation of the financial statements of Sellers and their Affiliates.

(o) "Governmental Authority" means any government, quasi-governmental entity, or other governmental or regulatory body, of any nature, whether foreign, federal, state, or local, or any agency, branch, department, official, entity, instrumentality, political subdivision, or authority of any of the foregoing, or any court of competent jurisdiction.

(p) "Gross Profit" means, with respect to each Seller and any Brand in the Territory for such Seller, for any specified period, (i) the gross sales dollars for sales by such Seller of such Brand, including, *e.g.*, split case fees, delivery fees, penalties and other service based revenue, plus any brokerage commissions received by such Seller from any Supplier in connection with such Brand, plus rebates received by such Seller from such Supplier for such Brand, *less* (ii) Supplier investments as historically reflected on such Seller's internal P&L, *less* (iii) the Laid-in Cost for the products of such Brand, *less* (iv) the state, county and city excise Taxes for the products of such Brand, to the extent not previously considered in Laid-in Cost.

(q) "Indebtedness" of a particular Person means all liabilities of such Person: (a) with respect to borrowed money, whether secured or unsecured; (b) with respect to the deferred purchase price of property or services (other than trade liabilities, accounts payable or accrued expenses); (c) represented by a note, bond, indenture or similar instrument; (d) with respect to any conditional sale or other title retention agreement; (e) secured by any Encumbrance on any property (other than Permitted Encumbrances); (f) with respect to leases of any property (real, personal or mixed) which have been or should be, in accordance with GAAP, recorded as capital leases, together with all renewals of such leases; (g) of a type referred to in clauses (a) through (f) above which are directly or indirectly guaranteed by such Person or which such Person has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a creditor against loss; (h) with respect to nonqualified deferred compensation, severance, bonus, incentive, or similar payments, including all Taxes that are payable by such Persons in connection with or as a result of the payment of such liability; (i) with respect to any change of control, severance, bonus or similar payments and other accelerations or increases in rights or benefits which obligation, in each case (whether payable or occurring prior to, on or after the Closing Date), either (i) arises at or prior to the Closing, or (ii) is payable or becomes due in whole or in part as a result of the consummation of the Transactions, in each case including all Taxes that are payable by such Persons in connection with or as a result of the payment of such liability; and (j) for interest, termination fees, prepayment penalties, "breakage" costs or any other payments, fees or expenses owed with respect to the items identified in items (a) through (i) above; provided that Indebtedness will not include any Current Liabilities.

(r) "Inventory Factor" means:

(i) with respect to any items of Aging Inventory, eighty five hundredths (0.85);

(ii) with respect to Inventory set forth on Schedule 10.1(r), determined separately for each Brand and stock-keeping unit, (A) for the quantity (other than Aging Inventory) up to but not to exceed nine (9) times the applicable Monthly Run Rate, one (1.0); and (B) for the quantity (if any) exceeding nine (9) times the applicable Monthly Run Rate, eighty five hundredths (0.85);

(iii) with respect to Unsalable Inventory, zero (0); and

(iv) for all other Inventory, one (1.0).

(s) "JV Operating Agreement" means the Operating Agreement of RNDC-NWS, LLC, dated as of February 14, 2014, by and among National Wine & Spirits, Inc., the Lacrosse Family 1998 Business Trust and Republic National Distributing Company Michigan Holdings, LLC, as amended, restated or otherwise modified from time to time.

(t) "Laid-in Cost" means the actual invoiced cost paid or owing to Suppliers for the Inventory, plus actual freight costs, excise Taxes and any delivery costs actually incurred by Sellers to receive physical possession, less all discounts, rebates and special purchase allowances, if any, whether or not reflected on Sellers' actual invoices, as such costs are reflected in Sellers' actual invoices, books and records, using the Transaction Accounting Principles; provided that the Laid-in Cost for Dunnage shall be the amount of reimbursable deposits held by Suppliers of the Brands for such Dunnage.

(u) "Material Adverse Effect" means a material adverse effect on Sellers, the Business, the ADA Entity, the Owned Real Property, the Leases, Wine Business Acquired Assets, and Wine Business Assumed Liabilities, taken as a whole; provided that none of the following (or consequences of the following), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from, or relating to (i) general business or economic conditions; (ii) national or international political or social conditions, including tariffs, trade wars, sanctions or trade policies, riots, protests, the engagement in hostilities or the escalation of any hostilities, or the occurrence or the escalation of any military, cyber, or terrorist (whether or not state-sponsored) attack; (iii) any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Authority), viral outbreak or the worsening of any outbreak, or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) the change in price of any Equipment or supplies necessary to or used in the Business; (v) financial, banking, or securities markets (including (A) any disruption of any of such markets, (B) any decline or rise in the price of any security, commodity, Contract, or index, and (C) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (vi) changes in GAAP or interpretation of GAAP; (vii) changes in Laws or other binding directives of any Governmental Authority and any change in the enforcement of any of the foregoing; (viii)(A) the taking of any action required by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 5.2, or (D) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Business, Wine Business Acquired Assets, Wine Business Assumed Liabilities, and Business Employees including the impact on the relationships, contractual or otherwise, of the Business with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (ix) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business

(however, the underlying cause of any such failure may be taken into account, if not otherwise excluded from this definition); (x) any action taken by Purchaser or its Affiliates with respect to the Transactions or the financing of the Transactions or any breach by Purchaser of this Agreement; (xi) the preparation, negotiation, commencement, or pendency of the Bankruptcy Cases, any debtor-in-possession financing and related matters, and any objection, challenge, or other pleading filed in the Bankruptcy Cases with respect to this Agreement, the Transactions, or the Approval Order; or (xii) the matters set forth on the Schedules as of the Effective Date. However, any adverse Effect resulting or arising from any matter described in clauses (i) through (vii) may be taken into account in determining whether there has been a Material Adverse Effect to the extent that such Effect has had a materially disproportionate adverse effect on Sellers relative to similarly situated participants in the industries and geographic areas in which Sellers operate.

(v) "Monthly Run Rate" means, with respect to each Brand and stock-keeping unit included in the Wine Inventory, the total number of saleable units of such Brand and stock-keeping unit sold by Sellers during the twelve (12) complete calendar months immediately preceding the Closing Date, divided by twelve (12). If no units of a Brand and stock-keeping unit were sold during such twelve (12)-month period, the Monthly Run Rate for such Brand and stock-keeping unit shall be zero.

(w) "Order" means any order, injunction, judgment, decree, ruling, writ, or award of a Governmental Authority.

(x) "Ordinary Course" means the ordinary and usual course of operations of the Businesses, taken as a whole, consistent with past customs and practices, including taking into account the operational and liquidity challenges facing Sellers and their Affiliates.

(y) "Organizational Documents" means, with respect to any Person other than a natural person, the constituent documents or agreements by which such Person was organized (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or that relate to the internal governance of such Person (such as bylaws, a partnership agreement or an operating, limited liability or members agreement).

(z) "Permitted Encumbrances" means: (i) real estate Taxes, assessments and other governmental levies, fees or charges imposed with respect to real property which are not due and payable, or which are being contested in good faith by appropriate proceedings, (ii) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property that are incurred in the Ordinary Course and are not yet due and payable; (iii) zoning ordinances, building codes and other land use Laws regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property and which are not violated by the current use or occupancy of such real property or the operation of the Business thereon; (iv) easements, covenants, conditions, restrictions and other similar matters of record affecting title to any real property which do not or would not materially impair the use or occupancy of such real property in the operation of the

Business conducted thereon; (v) the interests of the lessors (and sublessors, if any) under the Leases; and (vi) solely prior to the Closing, Encumbrances of secured lenders to Sellers and their Affiliates, which, for the avoidance of doubt, will not be Permitted Encumbrances as of the Closing.

(aa) "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Authority, or other entity or group.

(bb) "Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period through the end of the Closing Date.

(cc) "Purchaser Group" means, as applicable, each Wine Purchaser, any Affiliate of such Wine Purchaser, and each of such Wine Purchaser's and its Affiliates' respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors, or permitted assigns.

(dd) "Seller Parties" means any Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors, or permitted assigns.

(ee) "Sellers' Knowledge" or "Knowledge of Seller(s) " or similar terms mean the actual knowledge of any of Dennis Bashuk, Tammy Curtis or Alan Rosenberg, in each case, as of the Effective Date, after reasonable inquiry of such individual's direct reports in the applicable subject matter (and not any constructive, imputed or similar concepts of knowledge).

(ff) "Supplier Approval" means (i) with respect to an ADA Business Supplier, an acknowledgement in writing by the applicable Supplier of the ADA Transaction and such Supplier's waiver of any rights it may have under any Contract it has with the ADA Entity with respect to such transaction, (ii) with respect to a Wine Business Supplier: (A) such Supplier issues a written exclusive appointment of the applicable Wine Purchaser for the Territory without a distribution agreement and such appointment is executed by both the applicable Supplier and applicable Wine Purchaser; or (B) the applicable Wine Purchaser and the applicable Supplier enter into a mutually agreed upon distribution agreement that grants such Wine Purchaser exclusive distribution rights for the Territory with respect to such Supplier's Brands or (C) such Supplier executes a written consent in favor of the applicable Wine Purchaser consenting to assignment of the distribution agreement for such Supplier to such Wine Purchaser with respect to the Territory.

(gg) "Supplier Payables" means all outstanding accounts payable, debt and other outstanding liabilities with respect to each Supplier from which Supplier Approval is obtained.

(hh) "Suppliers" means the ADA Business Suppliers and the Wine Business Suppliers, collectively.

(ii) "Straddle Period" means any taxable period beginning on or before and ending after the Closing Date.

(jj) "Taxes" means all unclaimed property, escheatable property, net income, capital gains, gross income, gross receipts, sales, use, transfer, ad valorem, franchise, profits, license, capital, withholding, payroll, employment, excise, goods and services, severance, stamp, occupation, premium, property, assessments or other governmental charges of any kind whatsoever in the nature of a tax, together with any interest, fines and any penalties, additions to tax or additional amounts incurred or accrued under applicable federal, state, local or foreign tax law.

(kk) "Tax Return" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(ll) "Territory" means the State of Michigan.

(mm) "Transactions" means the transactions contemplated by this Agreement and each of the other Transaction Documents.

(nn) "Unsalable Inventory" means any Inventory that Purchaser elects not to acquire as Inventory that (i) is out of compliance with the applicable standards of the Supplier from which such Inventory was purchased, including any applicable distributor-level code date or vintage standard, (ii) is not packaged and labeled in material conformity with all applicable Laws, (iii) contains materially defective labels, packaging or tops, in each case of clauses (ii) and (iii), in a manner that would reasonably be expected to render such Inventory not saleable or merchantable to customers according to recognized industry standards in the Ordinary Course, (iv) is damaged, spoiled, expired, discontinued, recalled, obsolete or otherwise not saleable and merchantable to customers or, (v) has been returned by customers according to recognized industry standards in the Ordinary Course.

(oo) "Willful Breach" means an action or failure to act by one of the Parties hereto that constitutes a material breach of this Agreement, and such action was taken or such failure occurred with such Party's knowledge or intention that such action or failure to act would reasonably be expected to constitute a material breach of this Agreement.

(pp) "Wine Inventory" means all saleable wine Inventory owned by Sellers and on hand as of the Calculation Time.

**Section 10.2 Index of Other Defined Terms.**


| | | | |
|---|---|---|---|
| ADA Benefit Plan | 36 | ADA Continuing Employees | 52 |
| ADA Business | 1 | ADA Entity | 1 |
| ADA Business Employees | 51 | ADA Interest | 9 |
| ADA Business Suppliers | 80 | ADA Price | 10 |

| | |
|---|---|
| ADA Transaction | 9 |
| ADA Transfer Taxes | 48 |
| Adjustment Statement | 14 |
| Advisor | 72 |
| Affiliate | 80 |
| Aging Inventory | 80 |
| Agreement | 1 |
| Agreement Dispute | 78 |
| Allocation | 18 |
| Allocation Methodology | 18 |
| Approval Order | 59 |
| Approved Brands | 3 |
| Bankruptcy Cases | 80 |
| Bankruptcy Code | 80 |
| Bankruptcy Court | 80 |
| Brands | 2 |
| Business | 1 |
| Business Day | 81 |
| Business Employees | 34 |
| Businesses | 1 |
| Calculation Time | 81 |
| Cash Payment | 11 |
| CBA | 31 |
| Chosen Courts | 78 |
| Closing | 19 |
| Closing Cash | 11 |
| Closing Current Liabilities | 11 |
| Closing Date | 20 |
| Closing Indebtedness | 11 |
| Closing Item | 14 |
| COBRA | 52 |
| Code | 18 |
| Confidential Information | 46 |
| Confidentiality Agreement | 81 |
| Contract | 81 |
| Current Liabilities | 81 |
| Dataroom | 71 |
| Deductible | 69 |
| Designation Notice | 4 |
| Direct Claim | 68 |
| Dispute Notice | 14 |
| Distribution Rights | 2 |
| Distribution Rights Price | 10 |
| Documents | 81 |
| Dunnage | 3 |
| Effect | 83 |
| Effective Date | 1 |
| Encumbrances | 2 |
| Enforceability Exceptions | 22 |
| Environmental Claim | 33 |
| Environmental Laws | 33 |
| Environmental Permits | 32 |
| Equipment | 3 |
| Equity Securities | 81 |
| ERISA Affiliate | 81 |
| Escanaba Owned Real Property | 9 |
| Escrow Account | 12 |
| Escrow Agent | 12 |
| Escrow Agreement | 12 |
| Escrow Amount | 12 |
| Escrow Fund | 12 |
| Estimated Cash Payment | 11 |
| Estimated Closing Statement | 11 |
| Estimated Inventory Price | 12 |
| Excluded Assets | 4 |
| Excluded Liabilities | 8 |
| Express Representations | 71 |
| Final Cash Payment | 16 |
| Final Release Date | 16 |
| Financial Statements | 23 |
| Fraud | 81 |
| Fundamental Representations | 60 |
| GAAP | 82 |
| General Cap | 69 |
| Governmental Authority | 82 |
| Gross Profit | 82 |
| Hazardous Substance | 33 |
| Imperial | 1 |
| Improvements | 28 |
| Indebtedness | 82 |
| Indemnified Party | 66 |
| Indemnifying Party | 66 |
| Independent Accounting Firm | 14 |
| Independent Contractors | 35 |
| Inventory | 3 |
| Inventory Count | 13 |

| | |
|---|---|
| Inventory Escrow Portion | 12 |
| Inventory Factor | 83 |
| Inventory Price | 10 |
| IRS | 36 |
| JV | 1 |
| JV Operating Agreement | 83 |
| Knowledge of Seller(s) | 85 |
| L&L | 1 |
| Laid-in Cost | 83 |
| Law | 32 |
| Leased Real Property | 27 |
| Leases | 27 |
| Livonia Owned Real Property | 9 |
| Livonia Real Estate Price | 11 |
| Losses | 65 |
| Material Adverse Effect | 83 |
| Material Contracts | 30 |
| Monthly Run Rate | 84 |
| Non-Recourse Person | 79 |
| NW&S | 1 |
| NWS Member | 1 |
| Order | 84 |
| Ordinary Course | 84 |
| Organizational Documents | 85 |
| Other Tangible Property | 3 |
| Outside Date | 63 |
| Owned Real Property | 27 |
| Parties | 1 |
| Party | 1 |
| Payoff Letters | 61 |
| Per-Claim Threshold | 69 |
| Permits | 34 |
| Permitted Encumbrances | 85 |
| Person | 85 |
| Pre-Closing Tax Period | 85 |
| Price Components | 11 |
| Projections | 72 |
| Purchase Price | 10 |
| Purchaser | 1 |
| Purchaser Fundamental Representations | 66 |
| Purchaser Group | 85 |
| Purchaser Indemnifiable Claims | 65 |
| Purchaser Indemnified Party | 64 |
| Purchaser Returns | 49 |
| RE Newco Interest | 9 |
| Real Estate Entity | 9 |
| Release | 33 |
| Republic National Distributing Company | 5 |
| Resolution Period | 14 |
| Restricted Period | 45 |
| Review Period | 14 |
| RNDC | 5 |
| RNDC Member | 1 |
| Safety Requirements | 33 |
| Seller | 1 |
| Seller 401(k) Plans | 52 |
| Seller Benefit Plan | 36 |
| Seller Indemnifiable Claims | 65 |
| Seller Indemnified Party | 65 |
| Seller Parties | 85 |
| Seller Representative | 80 |
| Seller Support Obligations | 54 |
| Seller-Option Tax Contest | 50 |
| Sellers | 1 |
| Sellers’ Knowledge | 85 |
| Straddle Period | 86 |
| Supplier Approval | 86 |
| Supplier Payables | 86 |
| Suppliers | 86 |
| Survival Period | 64 |
| Tax Contest | 50 |
| Tax Return | 86 |
| Taxes | 86 |
| Territory | 86 |
| Third Party Claim | 66 |
| Transaction Accounting Principles | 13 |
| Transaction Documents | 21 |
| Transaction Expenses | 11 |
| Transactions | 86 |
| Transfer Offer | 51 |
| Transfer Taxes | 48 |
| Transferred Employees | 51 |
| Transition Services Agreement | 61 |
| Unsalable Inventory | 86 |
| Vintage | 1 |
| WARN Act | 22 |

| | |
|---|---|
| WARN Notice | 50 |
| Willful Breach | 87 |
| Wine Business | 1 |
| Wine Business Acquired Asset | 2 |
| Wine Business Acquired Assets | 2 |
| Wine Business Assigned Contract | 4 |
| Wine Business Assigned Contracts | 4 |
| Wine Business Assumed Liabilities | 7 |
| Wine Business Assumed Liability | 7 |
| Wine Business Employees | 51 |
| Wine Business Suppliers | 2 |
| Wine Business Transfer Taxes | 48 |
| Wine Inventory | 87 |
| Wine Price | 10 |
| Wine Purchaser | 1 |
| Wine Purchaser 401(k) Plan | 52 |
| Wine Purchaser Representative | 80 |
| Wine Purchasers | 1 |
| Withholding Supplier | 20 |


**Section 10.3** **Rules of Interpretation**. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any Transaction Document.

(a) The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule, and Exhibit references in this Agreement are references to Sections, clauses, Schedules and Exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed to this Agreement or referred to in this Agreement are incorporated in and made a part of this Agreement as if set forth in full in this Agreement. Any capitalized terms used but not defined in any Schedule or Exhibit shall be defined as set forth in this Agreement.

(b) Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation," whether or not such words are actually included. Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c) The words "to the extent" shall mean "the degree by which" and not simply "if."

(d) When calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, such period will end on the next succeeding Business Day. Whenever any action must be taken on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(e) Words denoting any gender will include all genders, including the neutral gender. Where a word is defined in this Agreement in the singular, such word shall have a comparable meaning when used in the plural and *vice versa*.

(f) The word "will" will be construed to have the same meaning and effect as the word "shall." The words "shall," "will," or "agree(s)" are mandatory. "May" is permissive.

(g) References to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(h) References to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(i) Any document or item will be deemed "delivered," "provided" or "made available" by any Seller, within the meaning of this Agreement if such document or item is (i) included in the Dataroom, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors, or (iii) made available upon request, including at Sellers' offices.

(j) Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(k) Any reference to any particular Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth in this Agreement, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Tax Code section or Law, the reference to such Tax Code section or Law means such Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(l) A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(m) A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

* * * * * *

[Signature pages on file with the Debtors]