**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC, *et al.*,[1] | ) | Case No. 26-90737 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING ENTRY INTO AND PERFORMANCE UNDER THE PURCHASE AND SALE AGREEMENT, (II) APPROVING THE PRIVATE SALE OF CERTAIN OF THE DEBTORS' REAL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, RIGHTS, AND INTERESTS, AND (III) GRANTING RELATED RELIEF**

**Emergency relief has been requested. Relief is requested not later than November 23, 2026, at 5:00 p.m. (prevailing Central Time).**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion"):[2]

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/RNDC. The Debtors' service address in these Chapter 11 Cases is P.O. Box 669246, Marietta, GA 30066.

[2] A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of John R. Castellano, Chief Restructuring Officer of Republic National Distributing Company, LLC and its Debtor Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 18] (the "First Day Declaration"). Capitalized terms used but not immediately defined in this Motion shall have the meanings ascribed to such terms in the Sale Order, the PSA (as defined herein), the First Day Declaration, the *Second Amended Joint Chapter 11 Plan of Republic National Distributing Company, LLC and its Debtor Subsidiaries* [Docket No. 712] (the "Plan"), or later in this Motion, as applicable.

## Preliminary Statement

1. The Debtors submit this Motion seeking to approve the private sale of certain real property located at 14402 Franklin Street in the City of Tustin, County of Orange, State of California, together with all related rights, privileges, easements, appurtenances, and improvements (collectively, the "Property"), by Debtor Republic National Distributing Company, LLC (the "Seller" or "RNDC") to PSIP 14402 Franklin LLC (the "Purchaser," and together with the Seller, the "Parties") free and clear of all liens, claims, encumbrances, and interests pursuant to that certain Purchase and Sale Agreement, dated as of November 5, 2026, by and between the Parties, and attached as Exhibit 1 to the Sale Order (as amended, modified, or supplemented from time to time in accordance with the terms thereof, the "PSA," and together with all schedules, exhibits, and ancillary documents related thereto, the "Sale Documents," and the transactions contemplated or required to be taken in connection with the implementation and consummation thereof, collectively, the "Sale Transaction").

2. The Sale Transaction is the product of a comprehensive marketing process and good-faith, arm's-length negotiations between the Parties. In January 2025, the Debtors engaged Cushman & Wakefield of California, Inc. ("Cushman") as the Seller's broker to market the Property. Cushman provided preliminary information on the Property to more than 17,000 parties. 65 of the contacted parties executed confidentiality agreements and obtained access to confidential information regarding the Property, generating seven initial indications of interest. Over the next 18 months, Cushman continued marketing the Property, including in the months leading up to the Petition Date and in parallel with the Debtors' broader marketing efforts for the sale of their businesses and operations nationwide. Following the Petition Date, Cushman reengaged interested parties, seeking "best and final" offers in September 2026. This process culminated in four of the seven interested parties, including EBS Realty Partners, LLC ("EBS Partners"), the joint-venture

partner of the Purchaser, submitting "best and final" offers. EBS Partners' best and final offer reflected a $10.25 million gross purchase price (including a $1 million non-refundable deposit), a 30-day due diligence period with no financing contingencies, and closing within five business days of entry of the Sale Order. While the gross purchase price submitted by EBS Partners was not the highest—one of the other parties submitted a proposal for $16 million and another submitted a proposal for $10.25 million—the Debtors, in consultation with their advisors, Cushman, and the DIP Lenders, decided to move forward with the Purchaser because of, among other things, the speed and certainty to closing. EBS Partners is an experienced industrial real estate developer and one of the largest developers in the Tustin, California area. In particular, the party that submitted an offer for $16 million required, among other things, a 120-day due diligence period, financing, a co-tenant, and a conditional use permit as a condition to closing (which the Debtors understand would take at least six months to obtain). Accordingly, after receiving the EBS Partners' revised offer in September 2026, the Debtors moved forward with EBS Partners' proposal and began negotiating definitive documentation.

3. On October 1, 2026, RNDC and EBS Partners entered into that certain Access and Inspection Agreement dated as of October 1, 2026, by and between RNDC and EBS Partners (the "Access Agreement") to provide the Purchaser with access to the property to conduct due diligence. Under the terms of the Access Agreement, RNDC and EBS Partners agreed to a 30-day diligence period during which time the Purchaser could inspect the property. During this period, the Parties also engaged in hard-fought and arm's-length negotiations regarding the PSA, which the Parties executed on November 5, 2026.

4. The Sale Transaction provides for, among other things: (a) a cash purchase price of $10.15 million[3] payable at Closing, subject to credits, adjustments, and prorations as set forth in the PSA (the "Purchase Price"); (b) a non-refundable deposit of $1 million (to be credited against the Purchase Price at Closing), subject to the conditions set forth in the PSA; and (c) the Property's conveyance in "as is," "where is" condition. Importantly, the PSA also provides the Seller with a "fiduciary out," reserving the Seller's right to terminate the PSA at any time prior to the entry of the Sale Order, including if the Seller determines that proceeding with the Sale Transaction or failing to terminate the PSA would be inconsistent with its fiduciary duties, in which case the Seller may pivot to a superior alternative to maximize the value of the estates for the benefit of all stakeholders.

5. The Debtors believe, in their business judgment, that the Sale Transaction represents the most value-maximizing—and only actionable—proposal to acquire the Property on the timeline required by the Debtors' Chapter 11 Cases and is supported by the Debtors' key stakeholders, including the DIP Lenders. The Debtors will use the proceeds from the Sale Transaction to pay down the outstanding DIP New Money Loans (as defined in the Final DIP Order) and to fund the administration of the Chapter 11 Cases prior to consummation of the Plan. Accordingly, the Debtors believe that entering into the PSA and consummating the Sale Transaction is fair and reasonable, represents a sound exercise of the Debtors' business judgment, and is the best available option to maximize value for the benefit of the Debtors, their estates, and all other stakeholders.

---

[3] Following the Purchaser completing its due diligence, the Purchaser and Debtors agreed to a purchase price reduction of $100,000 for a gross purchase price of $10.15 million.

## Relief Requested

6. The Debtors seek entry of an order, substantially in the form attached hereto (the "Sale Order"): (a) authorizing and approving the Seller's entry into and performance under the PSA, whereby the Seller has agreed to sell, and the Purchaser has agreed to purchase, the Property; (b) authorizing and approving the consummation of the Sale Transaction, including the sale of the Property free and clear of all liens, claims, encumbrances, rights, and interests; and (c) granting related relief.

## Jurisdiction and Venue

7. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9. The bases for the relief requested herein are sections 105, 363, 1107, and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 1075-1, 4002-1(e), and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

## Background

10. RNDC (together with its Debtor and non-Debtor affiliates, the "Company") was the nation's second largest alcoholic beverage distributor, operating across 40 states. The Company maintained deep-seated relationships with over 2,000 suppliers and 170,000 customers across its expansive nationwide distribution network. With headquarters in Atlanta, Georgia, the Debtors operated across 21 states and employed a workforce of approximately 1,460 employees as of the Petition Date.

11. On July 26, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12. On July 27, 2026, the Court entered an order [Docket No. 22] authorizing the procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1. On August 6, 2026, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 137] (the "Committee"). No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

## The Marketing Process

13. In January 2025, the Seller engaged Cushman to market the Property, an approximately 73,892 square foot office building on approximately 3.28 acres of land that the Seller acquired as part of its expansion into California. Cushman sent preliminary information about the Property to more than 17,000 active regional users, developers, and high net worth and family office investors. Of the parties contacted, 65 parties executed confidentiality agreements, and 10 parties toured the Property. This process ultimately led to seven parties submitting initial

nonbinding offers. Cushman continued marketing the Property over the next 18 months leading up to the Petition Date and in parallel with the Debtors' broader marketing efforts for the sale of their businesses and operations nationwide. Following the Petition Date, the Debtors, in consultation with their advisors, reengaged potential purchasers on their interest in acquiring the Property. During the week ending September 4, 2026, Cushman requested that the four remaining parties submit "best and final" offers by September 8, 2026. Two of the four parties improved their offers, one confirmed its prior offer, and one indicated it may withdraw its initial offer. The best and final offers ranged from $6,250,000 to $16,000,000 in gross purchase price and varied in deposit amount, diligence and closing timelines, financing requirements, and closing conditions, including the ability to obtain permits. However, the Debtors did not believe the proposal for $16 million was actionable under the circumstances due to financing uncertainty, required permitting, and an extended diligence period. Accordingly, after evaluating the offers received and consulting with the Debtors' advisors and Cushman, the Debtors determined, in their business judgment, that the proposal from EBS Partners represented the best offer under the circumstances due to, among other things, a competitive cash offer, buyer sophistication, and speed and certainty to closing. Following the expiration of the diligence period, the Parties executed the PSA on November 5, 2026, which provides for a gross purchase price of $10.15 million. Importantly, both the Seller and the Purchaser have an interest in closing the Sale Transaction on an expedited basis, and the Parties expect to promptly close the Sale Transaction after entry of the Sale Order. The Purchaser has already paid a non-refundable deposit of $1 million upon execution of the PSA.

14. The Debtors believe that a private sale process is appropriate under the circumstances. The Debtors, with the assistance of Cushman, ran a comprehensive marketing process for the Property over the last 22 months. To date, no other party has submitted an

alternative actionable proposal for the Property on the timeline required by the Debtors' Chapter 11 Cases. The Debtors do not believe an extended sale process or public auction is appropriate under the circumstances. The Debtors have already confirmed the Plan and expect to consummate the Plan on or around November 30, 2026. The DIP Lenders are unwilling to extend the Debtors' chapter 11 case timeline or the Maturity Date (as defined in the Final DIP Order) of the DIP Facility to accommodate an extended sale process or auction. Moreover, neither the Debtors nor their advisors believe that an extended sale process or auction would lead to a higher or otherwise better offer for the Property. Additionally, under the PSA, the Purchaser has a termination right if the Sale Order is not entered by December 21, 2026, and the Debtors understand that the Purchaser would be unwilling to pay the Purchase Price for the Property without a Sale Order being entered prior to the conclusion of the Chapter 11 Cases. Accordingly, the Debtors do not believe that reopening the marketing process for the Property is likely to generate a higher or otherwise better actionable proposal for the Property under the circumstances and believe that a private sale of the Property to the Purchaser is therefore appropriate and in the best interests of the Debtors and their estates.

## **The Sale Transaction**

15. The terms of the Sale Transaction as reflected in the PSA are the product of arm's-length negotiations between the Debtors and the Purchaser. Pursuant to the PSA, the Purchaser will pay $10.15 million at Closing, subject to credits, adjustments, and prorations, in exchange for the Property. The Seller intends to use the net proceeds of the Sale Transaction to pay down outstanding DIP New Money Loans (as defined in the Final DIP Order) and fund the administration of the Chapter 11 Cases prior to consummating the Plan.

16. Consummating the Sale Transaction on the terms set forth in the PSA is a sound exercise of the Debtors' business judgment. ***First***, the Sale Transaction represents the most

value-maximizing and only actionable proposal for the sale of the Property on the timeline required by the Debtors' Chapter 11 Cases. The Sale Transaction is expected to provide the Debtors with approximately $9 million of net proceeds and eliminate the ongoing carrying costs of the Property, including taxes, utilities, and other related operating expenses, and enjoys the support of the Debtors' DIP Lenders. Absent the Sale Transaction, the Debtors will likely be forced to resume marketing the Property after the Plan Effective Date, which would come at significant expense to the Debtors' estates.

17. ***Second***, the Debtors believe that the Purchase Price represents the highest or otherwise best offer available for the Property. Although one party submitted an offer with a higher gross purchase price ($16 million), that offer was subject to, among other conditions, obtaining a conditional use permit, which the Debtors and their advisors understand would have taken at least six months to obtain, thereby delaying any sale closing to, at the earliest, April 2027. Additionally, while the Debtors received one additional offer for $10.25 million, this prospective purchaser indicated that it may not be willing to move forward with the sale at the contemplated purchase price based on their intended use of the Property. Therefore, the Debtors believe the Purchase Price reflects the highest and otherwise best proposal for the Property under the circumstances.

18. ***Third***, the Debtors expect to close the Sale Transaction with the Purchaser promptly upon entry of the Sale Order, whereas a sale to any other purchaser would almost certainly lead to substantial delay at significant cost and expense to the Debtors' estates. The Purchaser has no financing contingencies, has already completed its due diligence, and has paid a non-refundable deposit for the Property. The Purchaser has limited "outs" and is acquiring the Property "as is" and "where is," and with all faults. The Parties expect to close the Sale Transaction promptly after

the Sale Order is entered. Accordingly, the Debtors believe that the Sale Transaction with the Purchaser represents the only option for the Debtors to close a value-maximizing sale of the Property prior to the Plan Effective Date.

19. ***Finally***, pursuant to the terms of the PSA, the Debtors maintain a "fiduciary out" prior to entry of the Sale Order. In the event a higher or more value-maximizing offer materializes prior to the Sale Hearing, the Debtors are permitted, consistent with their fiduciary duties, to pivot to an alternative proposal. To date, no other party has submitted an alternative actionable proposal for the Property on the timeline required by the Debtors' Chapter 11 Cases. Accordingly, the Debtors believe, in their business judgment, that the Sale Transaction represents the best possible terms and that any delay, including as would be necessary to conduct a public auction process, risks the likelihood of a successful closing, thereby impairing the Debtors' ability to maximize the value of their estates.

## Summary of Key Transaction Terms

20. The following chart summarizes the key terms and conditions of the PSA:

| **Summary Description of the PSA**[4] | |
|---|---|
| **Seller** | Republic National Distributing Company, LLC, a Delaware limited liability company |
| **Purchaser** | PSIP 14402 Franklin LLC, a Delaware limited liability company |
| **Property** | All of the following (collectively, the "Property"): (a) the real property located in the City of Tustin, Orange County, California, legally described as Lot 23 of Tract Number 8590, as shown on a map recorded in Book 346, Pages 19 to 24 inclusive of Miscellaneous Maps, records of Orange County, California (excepting therefrom all oil, oil rights, minerals, mineral rights, natural gas rights, and other hydrocarbons, as reserved of record) (the "Land"); (b) all of the Seller's interest in all rights, privileges, easements, and appurtenances benefiting the Land and/or the Improvements; (c) the parking, fixtures, site-related improvements, landscaped |

[4] Any description of the terms of the PSA contained herein is a summary provided for convenience purposes only. In the event of any inconsistency between the summary set forth herein and the PSA, the PSA shall control. Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the PSA or this Motion, as applicable.

| Summary Description of the PSA[4] | |
|---|---|
| | areas, utility equipment and lines, driveways, loading zones, parking lots and structures, and all above and below-ground improvements and structures located on the Land (the "Improvements"); (d) all personal property owned by the Seller located on or in the Land and/or the Improvements and used in connection with the operation and maintenance thereof (the "Personal Property"); and (e) all intangible property owned by the Seller and used in connection with the Land, the Improvements, and/or the Personal Property, including licenses, entitlements, permits, plans, and transferable guarantees and warranties (the "Intangible Property").<br><br>PSA § 1. |
| **Purchase Price** | The purchase price for the Property is $10,150,000 in cash to be paid at Closing, subject to credits, adjustments, and prorations provided for in the PSA (including prorations of Operating Expenses and real estate taxes as of 12:01 a.m. on the Closing Date).<br><br>PSA §§ 2, 13. |
| **Earnest Money Deposit** | Within two business days after the Effective Date, the Purchaser shall deposit $500,000 (the "Initial Earnest Money") and, provided the PSA has not been terminated in accordance with Section 6(c) of the PSA, within one business day after expiration of the Inspection Period, an additional $500,000 (the "Additional Earnest Money," and together, the "Earnest Money"), to be held by Fidelity National Title Insurance Company as escrow agent (the "Escrow Agent") in an interest-bearing, FDIC-insured account. Following the expiration of the Inspection Period, the Earnest Money and any interest earned thereon shall be non-refundable but credited to and considered as payment of part of the total Purchase Price at the time of Closing. If the Purchaser terminates during the Inspection Period, the Earnest Money less $100 will be returned to the Purchaser. If the sale fails to close due to the Purchaser's uncured material default following the expiration of the Inspection Period, the Seller will retain the Earnest Money as liquidated damages. The Earnest Money will be returned to the Purchaser if, among other things, (a) the Seller terminates pursuant to its reservation of rights, (b) the Purchaser terminates because the Sale Order has not been entered within 45 days after the expiration of the Inspection Period, or (c) the Purchaser terminates because a closing condition has not been satisfied.<br><br>PSA §§ 3, 6(c), 7(c), 8, 16, 18. |
| **Closing Costs and Broker Fees** | Seller Costs. The Seller shall pay its counsel, charges to clear title, the transfer tax due on recording of the deed, the base premium for the owner's title policy, and one-half of the escrow fee.<br><br>Purchaser Costs. The Purchaser shall pay its counsel, recording fees, extended coverage and endorsements, the Survey, any loan policy, and one-half of the escrow fee. All other costs shall be paid according to the custom of the locality where the Property is located.<br><br>Broker Fees. At Closing, the Seller shall pay a brokerage commission to Cushman & Wakefield of California, Inc., pursuant to a separate written agreement. The |

| Summary Description of the PSA[4] | |
|---|---|
| | Seller and the Purchaser each represent that no other broker was employed in connection with the PSA.<br><br>PSA §§ 12, 17. |
| **Closing Date** | Closing shall occur through escrow with the Title Insurer on the date that is five business days after the later of (a) the conclusion of the Inspection Period and (b) the date the Sale Order becomes effective (including the expiration of any bankruptcy stay), unless otherwise agreed in writing (the "Closing Date"), time being of the essence with respect to each party's obligation to close. The Purchaser's obligation to close is subject to (i) the Seller's performance of its obligations and the accuracy of its representations and warranties as of Closing, (ii) the Title Insurer's commitment to issue an ALTA extended coverage owner's policy subject only to the Permitted Exceptions, and (iii) entry of the Sale Order on terms reasonably satisfactory to the Purchaser prior to the occurrence of the Plan Effective Date.<br><br>PSA §§ 11, 18. |
| **Seller Reservation of Rights; Fiduciary Out** | The Seller reserves all rights to terminate the PSA at any time prior to the entry of the Sale Order by written notice, including if the Seller or its board of directors (or similar governing body) determines that proceeding with the Sale Transaction or failing to terminate would be inconsistent with its fiduciary duties, in which case the Earnest Money will be returned to the Purchaser. Nothing in the PSA requires the Seller or its managers, officers, directors, partners, or members to act inconsistently with their fiduciary obligations or applicable law.<br><br>PSA § 8. |
| **Sale Free and Clear** | The Sale Order shall provide that title to the Property shall be transferred to the Purchaser free and clear of all liens, claims, encumbrances, and interests pursuant to section 363(f) of the Bankruptcy Code, with all such liens, claims, encumbrances, and interests to attach to the proceeds of the sale in the same order, priority, and validity that presently exist; *provided* that the Property shall be transferred subject to the Permitted Exceptions.<br><br>PSA § 7(b). |
| **"As Is" Sale; Purchaser Release** | Except as expressly provided in the PSA, the Property is sold "as is," "where is," and with all faults, without representations or warranties of any kind. As of Closing, the Purchaser and its related parties release the Seller and its related parties from all claims relating to the Property, including its physical condition, construction defects, compliance with law, Hazardous Substances, and Environmental Laws, and waive California Civil Code Section 1542, excluding claims for breach of the Seller's representations and warranties, surviving express obligations, and the Seller's willful misconduct or fraud. The PSA also includes a natural hazard disclosure (California Civil Code Section 1103 *et seq.*) acknowledgment and waiver.<br><br>PSA §§ 20, 22. |

| Summary Description of the PSA[4] | |
|---|---|
| **Remedies** | The Seller's sole remedy for the Purchaser's uncured material default is retention of the Earnest Money as liquidated damages (plus indemnity claims). The Purchaser's sole remedy for the Seller's material default is specific performance (if commenced within 45 days of the Seller's default) or termination and a refund of the Earnest Money.<br>PSA § 16. |

## <u>Basis for Relief</u>

### I. The Sale Transaction is a Sound Exercise of the Debtors' Business Judgment, is Appropriate Pursuant to Bankruptcy Rule 6004(f), and Should Be Approved Pursuant to Section 363(b) of the Bankruptcy Code.

21. Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." A debtor may sell estate property outside the ordinary course of business under this provision if there is a good business reason for doing so. *See, e.g.*, *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011). "Great judicial deference is given to the [debtor in possession's] exercise of business judgment" regarding the sale of estate property. *GBL Holding Co. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005). Once a debtor articulates a valid business justification, then the burden of rebutting the "strong presumption . . . that the agreement at issue was negotiated in good faith and in the best interests of the estate" falls to parties opposing the transaction. *In re Filene's Basement*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). Thus, if a debtor satisfies the business judgment rule, the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

22. Bankruptcy Rule 6004(f)(1) authorizes a debtor to sell estate property outside of the ordinary course of its business by private sale or public auction. Private sales are appropriate

where the debtor demonstrates that the proposed sale is permissible pursuant to section 363 of the Bankruptcy Code. *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 436 (Bankr. S.D. Tex. 2009) ("[T]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction." (quoting *In re Woodscape Ltd. P'ship*, 134 B.R. 165, 174 (Bankr. D. Md. 1991))); *In re Dura Auto. Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *88 (Bankr. D. Del. Aug. 15, 2007) ("[S]ales of property rights outside the ordinary course of business may be by private sale or public auction."). Additionally, a debtor has broad discretion to determine the manner in which its assets are sold. *See Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) (finding that section 363 of the Bankruptcy Code "clearly indicates that the manner of sale is within the discretion of the trustee"); *see also In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has ample authority to conduct a sale of estate property through a private or public sale).

23. Selling the Property on the terms set forth in the PSA is a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' estates, and should be approved. After engaging in good-faith, arm's-length negotiations, the Debtors and the Purchaser agreed on the Purchase Price of $10.15 million. The Debtors, in consultation with their advisors, believe that the Purchase Price is the highest and otherwise best offer available for the Property under the circumstances and that the Sale Transaction on the terms set forth in the PSA is value-maximizing and in the best interests of the Debtors and their estates. The Sale Transaction to the Purchaser is the only actionable proposal to sell the Property prior to the Plan Effective Date, which will provide the Debtors with approximately $9 million in net sale proceeds to pay down the DIP New Money Loans and fund the administration of the Chapter 11 Cases. Any alternative proposal would deprive the Debtors' estates of considerable sale proceeds and require the Wind-Down Debtors or

Plan Administrator to incur the significant time and expense of selling the Property after the Plan Effective Date and without a "free and clear" order.

24. For similar reasons, the Debtors believe that selling the Property through a private sale is in the best interests of the Debtors' estates and should be approved. The Debtors, with the assistance of Cushman, solicited interest from more than 17,000 potential purchasers, 65 of which executed confidentiality agreements. The Purchaser was one of the final four parties that submitted a best and final offer by September 8, 2026. Of those four parties, the Purchaser's offer provided the highest speed and certainty to closing. The DIP Lenders will not consent to extending the Debtors' case timeline to run an extended sale or auction process for the Property. It is critical that the Debtors close the Sale Transaction as quickly as possible to minimize the administrative burden to the Debtors' estates and use the transaction proceeds to fund the administration of the Chapter 11 Cases.

25. Courts in this jurisdiction have authorized private sales pursuant to section 363 of the Bankruptcy Code. *See, e.g.*, *In re Republic National Distributing Company, LLC*, No. 26-90737 (CML) (Bankr. S.D. Tex. Sept. 18, 2026) (authorizing the Debtors' private sale of their "control states" business); *In re Alea Holdings US Company*, No. 26-90714 (CML) (Bankr. S.D. Tex. Aug. 14, 2026) (authorizing a private sale of certain of the debtors' assets without bidding procedures or an auction); *In re Desktop Metal, Inc.*, No. 25-90268 (CML) (Bankr. S.D. Tex. July 31, 2025) (same); *In re Sunnova Energy Int'l Inc.*, No. 25-90160 (ARP) (Bankr. S.D. Tex. June 11, 2025) (same); *In re Kal Freight Inc.*, No. 24-90614 (CML) (Bankr. S.D. Tex. Mar. 31, 2025) (same).

26. Accordingly, the Debtors' entry into the Sale Transaction is a sound exercise of the Debtors' business judgment and should be approved under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004(f).

## II. The Sale of the Property Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.

27. Section 363(f) of the Bankruptcy Code permits a debtor in possession to sell estate property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.

28. Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of *any* of the requirements enumerated therein will suffice to warrant the sale of the applicable property free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed under the applicable agreement. *See In re C-Power Prods., Inc.*, 230 B.R. 800, 803 (Bankr. N.D. Tex. 1998); *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 Bankr. LEXIS 4333, at *7 (Bankr. E.D. Tex. 2007) ("The language of [section] 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in [section] 363(f) are satisfied").

29. The PSA contemplates that the Property shall be transferred to the Purchaser free and clear of all liens, claims, encumbrances, and interests (collectively, the "Encumbrances"). To the extent the Property is subject to any Encumbrances, the holders of such Encumbrances have either consented to or are anticipated to consent to the Sale Transaction, because the Sale Transaction will

provide the most efficient and value-maximizing path to realizing proceeds for, among other things, the repayment of amounts due to such parties. Any and all Encumbrances in the Property will attach to the net proceeds of the Sale Transaction with the same force, effect, and priority as such Encumbrances currently have on these assets, subject to the rights and defenses, if any, of the Seller and of any party in interest to object thereto. Additionally, prior to the filing of this Motion, the Debtors consulted with Wells Fargo Bank, National Association, as agent under the Prepetition Credit Agreement and DIP Credit Agreement, regarding the Sale Transaction and the relief sought herein, and obtained its consent to enter into the Sale Transaction notwithstanding the liens the DIP Lenders hold on substantially all of the Debtors' assets, including the Property. The Debtors are not aware of any holders of Encumbrances that oppose the Sale Transaction, and any entity that does not object to the Sale Transaction should be deemed to have consented.

30. The Debtors therefore submit that the treatment of all Encumbrances in the Property satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code. Accordingly, the Court should approve the Sale Transaction of the Property free and clear of all liens, claims, rights, mortgages, interests, charges, and other encumbrances, other than as set forth in the PSA.

## III. The Purchaser is a Good Faith Purchaser and is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code.

31. Because the Purchaser is acting in good faith, it is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale Transaction. Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith[.]" Although "[t]he Bankruptcy Code does not explicitly define 'good faith,'" the Fifth Circuit has stated that a good faith purchaser is one who

(a) "purchases the assets for value, in good faith, and without notice of adverse claims" and (b) "one who does not engage in 'misconduct' including," among other things, "fraud, collusion between the purchaser and other bidders, or an attempt to take grossly unfair advantage of other bidders." *In re Palm Springs II, L.L.C.*, 65 F.4th 752, 759 (5th Cir. 2023) (quoting *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014)). "Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pa.*, 788 F.2d 143, 147 (3d Cir. 1986).

32. ***First***, as set forth in more detail above, the Purchase Price to be received by the Debtors is fair and reasonable under the circumstances. ***Second***, the Parties entered into the PSA and the other Sale Documents in good faith after extensive, arm's-length negotiations, during which all parties were represented by competent counsel. ***Third***, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code. ***Fourth***, the Purchaser is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in sections 101(2) and 101(31) of the Bankruptcy Code, and no common identity of incorporators, directors, members, or controlling stockholders exists between the Purchaser and the Debtors. ***Fifth***, the Purchaser in no way induced or caused the commencement of these Chapter 11 Cases. ***Sixth***, the Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Property during the prepetition and postpetition marketing processes, and did not act in a collusive manner with any person. ***Seventh***, the Purchase Price was not controlled by any agreement among third parties. Accordingly, the Purchaser is a "good faith purchaser" of the

Property and is entitled to the full protection of section 363(m) of the Bankruptcy Code in connection with the Sale Transaction.

**IV. Consummation of the Sale Transaction is Appropriate Under Bankruptcy Rule 6004(f).**

33. Bankruptcy Rule 6004(f) authorizes a debtor in possession to sell estate property outside of the ordinary course of business by private sale or public auction. Courts generally afford debtors in possession broad discretion to determine the manner in which estate property is sold. *See, e.g.*, *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998); *In re Alisa P'ship*, 15 B.R. 802, 802 (Bankr. D. Del. 1981). Sales outside of an auction are appropriate where the debtor demonstrates that the proposed sale is permissible under section 363(b) of the Bankruptcy Code (*i.e.*, where the debtor articulates a good business reason for the sale). *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 436 (Bankr. S.D. Tex. 2009). Additionally, courts have held that a debtor has broad discretion to determine the manner in which its assets are sold. *See In re Alisa P'ship*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) (finding that section 363 "clearly indicates that the manner of sale is within the discretion of the trustee"); *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has ample authority to conduct a sale of estate property through a private or public sale).

34. Here, there are sound business reasons for the Sale Transaction, and the Sale Transaction is the best available option to maximize the value of the Property under the circumstances. The Sale Transaction represents the highest or otherwise best offer for the Property following the comprehensive prepetition and postpetition marketing process conducted by the Debtors. To date, the Debtors have not received an actionable alternative proposal for the sale of the Property that is higher or better than the Sale Transaction, which can close on the timeline required by the Debtors' Chapter 11 Cases (*i.e.*, prior to November 30, 2026). For these reasons,

selling the Property via private sale without an auction is appropriate under Bankruptcy Rule 6004(f) and should be approved.

**V. Relief Under Bankruptcy Rule 6004(h) is Appropriate.**

35. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately upon its entry by providing that the 14-day stay under Bankruptcy Rule 6004(h) is waived.

36. Although Bankruptcy Rule 6004(h) and the *Advisory Committee Notes* to the Bankruptcy Rules are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, the leading treatise on bankruptcy suggests that the 14-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 Collier on Bankruptcy ¶ 6004.11, ¶ 6004.04 (16th rev. ed. 2014).

37. Time is of the essence in closing the Sale Transaction. As a condition to the closing of the Sale Transaction on the terms set forth in the PSA, the Purchaser requires that the Sale Order be entered prior to the Plan Effective Date, which the Debtors expect to occur on or around November 30, 2026. The Debtors intend to promptly close the Sale Transaction upon entry of the Sale Order, which will provide the Debtors' estates with net sale proceeds of approximately $9 million, which will be used to fund the pay down of outstanding DIP New Money Loans (as defined in the Final DIP Order) and to fund the administration of the Chapter 11 Cases prior to consummation of the Plan. The Debtors therefore submit that waiving Bankruptcy Rule 6004(h) will allow the Sale Transaction to close as soon as possible (and on the best possible terms) and prevent any unnecessary cost or delay to the Chapter 11 Cases. Accordingly, the Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rule 6004(h).

**Emergency Consideration**

38. The Debtors request emergency consideration of this Motion in accordance with Bankruptcy Local Rule 9013-1 and section G of the Complex Case Procedures. The Debtors expect to consummate the Plan on or around November 30, 2026. As a condition to closing the Sale Transaction, the Purchaser requires that the Sale Order be entered prior to the Plan Effective Date. Accordingly, absent emergency relief, the Debtors will be unable to consummate the Sale Transaction on the terms set forth in the PSA. Further, prompt closing of the Sale Transaction will provide the Debtors' estates with approximately $9 million of net sale proceeds, which funds will be used to pay down outstanding DIP New Money Loans (as defined in the Final DIP Order) and the continued administration of the Chapter 11 Cases prior to the Plan Effective Date. Accordingly, the Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

39. The Debtors request that the Sale Order include a finding that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exempt such relief from the 14-day stay under Bankruptcy Rule 6004(h).

**Reservation of Rights**

40. Nothing contained in this Motion or any order granting the relief requested in this Motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission, concession, or waiver of rights of the Debtors or any party in interest as to the amount of, basis for, validity, priority, enforceability, or perfection of any claim against, lien on (contractual, common law, statutory, or otherwise), security interest in, or other

encumbrance on property of the Debtors' estates; (b) a promise or requirement to pay any particular claim; (c) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (d) a request, approval, assumption, adoption, rejection, or termination of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (e) a waiver or limitation of the Debtors or any other party in interest's (i) right to dispute any claim on any grounds or (ii) claims, causes of action, or other rights, under the Bankruptcy Code or any other applicable law; or (f) a waiver of the obligation of any party in interest to file a proof of claim. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

41. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee; (b) the Creditors' Committee; (c) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (d) the Bank Lenders; (e) the Bank Agent; (f) the Second Lien Lender; (g) the Equipment Loan Lenders; (h) holders of the Owner Notes; (i) the office of the attorney general for each of the states in which the Debtors operate; (j) the Internal Revenue Service; (k) any other governmental agencies having a regulatory or statutory interest in these Chapter 11 Cases; (l) counsel to the Purchaser; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors request that the Court enter the Sale Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
Dated: November 13, 2026

*/s/ John F. Higgins*
**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Joanna D. Caytas (TX Bar No. 24127230)
John ("Jack") Eiband (TX Bar No. 24135185)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 228-1331
Email: jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jcaytas@porterhedges.com
jeiband@porterhedges.com

*Co-Counsel for the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Maddison Levine (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
christopher.marcus@kirkland.com
maddison.levine@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

**Certificate of Accuracy**

In accordance with Bankruptcy Local Rule 9013-1(i), I certify that the foregoing statements are true and accurate to the best of my knowledge.

*/s/ John R. Castellano*
John R. Castellano

**Certificate of Service**

I certify that on November 13, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas. Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' claims and noticing agent.

*/s/ John F. Higgins*
John F. Higgins